UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>FEDERAL ELECTION COMMISSION<br><br>　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs SpeechNow.org, David Keating, Fred Young, Ed Crane, Brad Russo, and Scott Burkhardt, by their attorneys, respectfully move this Court, pursuant to Fed. R. Civ. P. 65(a) and Local Rule 65.1 for a preliminary injunction enjoining Defendant Federal Election Commission (hereinafter, "FEC") from enforcing the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(c) and 441a(a)(3), as well as any applicable rules and regulations regarding those provisions, against SpeechNow.org and its supporters, including the individual Plaintiffs. Filed with this Motion are the Declarations of David Keating, Fred Young, Ed Crane, Brad Russo, Scott Burkhardt, Ed Traz, and Steven M. Simpson, and a Memorandum of Points and Authorities in support of this Motion and the proposed injunction.

In support of this Motion, and as more fully set forth in Plaintiffs' memorandum of law, Plaintiffs state the following:

1.      Plaintiff SpeechNow.org is an independent speech group comprised of individuals who wish to pool their resources in order to promote greater protections for rights to free speech and association in America. Its mission is to promote and protect First Amendment rights by advocating the election of candidates who support those rights and the defeat of candidates who do not. SpeechNow.org is independent of candidates, parties, and political committees. SpeechNow.org raises money from individual donations only in order to make independent expenditures on advertisements that advocate the election or defeat of candidates based on their position on First Amendment rights. The organization's by-laws prevent if from making contributions to candidates or political party committees or coordinating in any way with candidates or political parties.

2.      The individual Plaintiffs wish to amplify their voices by associating with SpeechNow.org and its supporters. Plaintiffs Keating, Crane, and Young are ready, willing, and able to make donations to SpeechNow.org in excess of $5000 but are prohibited from doing so because of the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(c) and 441a(a)(3). Plaintiffs Russo and Burkhardt are ready, willing and able to make donations of $100 to SpeechNow.org but are unable to do so because SpeechNow.org cannot accept any donations until it has sufficient funds to operate.

3.      Plaintiffs are likely to succeed on the merits of their claims against the FEC. SpeechNow.org and its supporters wish to exercise their fundamental rights to speech and association. SpeechNow.org does not present any threat of corruption or its appearance that would justify imposing contribution limits on it or its supporters. Thus, the FEC cannot

demonstrate that applying the contribution limits to SpeechNow.org are narrowly tailored to serve a compelling interest.

4.    Plaintiffs will suffer irreparable harm without the issuance of an injunction. As a direct result of the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(c) and 441a(a)(3), SpeechNow.org cannot raise and thus cannot spend the funds necessary to produce and broadcast advertisements calling for the election or defeat of candidates based on their support for First Amendment rights. Furthermore, individual Plaintiffs cannot pool their funds together and associate with SpeechNow.org, each other, or like-minded individuals in order to amplify their speech about free speech and restrictions on it.

5.    An injunction will not substantially injure others, because the FEC's interest in enforcing campaign laws simply cannot trump the First Amendment rights of Plaintiffs. An injunction is in the public interest because it will permit SpeechNow.org and its supporters to exercise their fundamental rights to free speech and association.

6.    Pursuant to Local Rule 7(m), counsel for Plaintiffs has conferred with counsel for the FEC concerning this motion. The FEC opposes this motion.

7.    Plaintiffs request that the Court hold a hearing within 20 days of the filing of this motion pursuant to Local Rule 65.1(d). As more fully set forth in Plaintiffs' memorandum of law, to exercise their rights to speech and association effectively, SpeechNow.org must be permitted to broadcast its ads during the election season. SpeechNow.org would like to broadcast ads in primary elections, several of which will be held within months. Accordingly, SpeechNow.org can demonstrate facts which make expedition essential.

8.    Plaintiffs also request that the Court waive the bond requirement under Fed. R. Civ. Pr. 65(c) because a preliminary injunction presents no monetary risk to the FEC.

Dated: February 14, 2008

Respectfully submitted,

Steven M. Simpson (DC Bar No. 462553)

William H. Mellor (DC Bar No. 462072)
Robert Gall (DC Bar No. 482476)
Paul M. Sherman (DC Bar No.978663)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: wmellor@ij.org, ssimpson@ij.org,
bgall@ij.org, psherman@ij.org

Steven M. Hoersting*
Bradley A. Smith*
CENTER FOR COMPETITIVE POLITICS
124 W. Street South, Suite 201
Alexandria, VA 22314
Tel: (703) 894-6800
Email: smhoer@aol.com, BSmith@law.capital.edu

*Attorneys for Plaintiffs*

*Motion for *Pro Hac Vice* to be filed

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of February, 2008, a copy of the

foregoing **Motion for Preliminary Injunction** and attachments were filed with the Clerk of

the United States District Court for the District of Columbia, and notice of this filing was

served on the following:

Thomasaenia P. Duncan
General Counsel
Federal Election Commission
999 E. Street, NW
Washington, DC 20463

Michael B. Mukasey
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Jeffrey A. Taylor
United States Attorney for the District of Columbia
U.S. Attorney's Office
555 4th Street, NW
Washington, DC 20530

Steven M. Simpson (DC Bar No. 462553)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL ELECTION COMMISSION<br><br>        Defendant. | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

William H. Mellor (DC Bar No. 462072)
Steven M. Simpson (DC Bar No. 462553)
Robert Gall (DC Bar No. 482476)
Paul M. Sherman (DC Bar No.978663)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Email: wmellor@ij.org, ssimpson@ij.org,
bgall@ij.org, psherman@ij.org

Steven M. Hoersting*
Bradley A. Smith*
CENTER FOR COMPETITIVE POLITICS
124 W. Street South, Suite 201
Alexandria, VA 22314
Tel: (703) 894-6800
Email: smhoer@aol.com, BSmith@law.capital.edu
*Attorneys for Plaintiffs*
 *Motions for *Pro Hac Vice* to be filed

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION.............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 2

    A. Structure and Operations of SpeechNow.org................................................. 3

    B. SpeechNow.org's Planned Political Advertisements ................................... 4

    C. The Application of the Federal Election Campaign Act to
       SpeechNow.org ............................................................................................. 6

    D. SpeechNow.org's Advisory Opinion Request............................................... 8

ARGUMENT..................................................................................................................... 10

    I.      Plaintiffs are Substantially Likely to Succeed on the Merits ........................... 11

         A.    As Applied to SpeechNow and It's Supporters,
               the Contribution Limits are Subject to Strict Scrutiny............................... 12

         B.    The FEC Cannot Demonstrate a Compelling State
               Interest in Limiting Contributions to SpeechNow.org ................................. 18

         C.    As Applied to SpeechNow.org and It's Supporters,
               the Contribution Limits Are Not Narrowly Tailored ................................... 22

         D.    Plaintiffs are Substantially Likely to Prevail Even if
               Strict Scrutiny Does Not Apply ................................................................... 23

    II.     Plaintiffs Will Suffer Irreparable Harm Without an Injunction ..................... 24

    III.    An Injunction Will Not Substantially Injure Others......................................... 26

    IV.   An Injunction Will Further the Public Interest ................................................ 27

    V.     The Court Should Waive the Bond Requirement
          Under F.R.C.P. 65(c)...................................................................................... 28

CONCLUSION ................................................................................................................. 29

## TABLE OF AUTHORITIES

__Cases__                                                                                          __Page(s)__

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ............................................................... 11

*Austin v. Mich. Chamber of Commerce*, 494 U.S. 652 (1990) ................................. 18

*Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999)..................... 15

*\*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................... 12,13,14,17,22,23,24

*\*California Medical Association v. FEC*, 453 U.S. 182 (1981) ................................ 19,20,21,23

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).............. 10,24

*\*Citizens Against Rent Control v. City of Berkeley*,
454 U.S. 290 (1981)......................................................................... 12,13,14,15,16,18,22,27

*Cobell v. Norton*, 225 F.R.D. 41 (D.D.C. 2004) ...................................................... 28

*Comm. on Jobs Candidate Advocacy Fund v. Herrera*, 07-03199,
2007 U.S. Dist. LEXIS 73736 (N.D.Cal. September 20, 2007) ..................................... 17,22,26

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................... 24

*FEC v. Mass. Citizens for Life*, 479 U.S. 238 (1986) ..................................... 10,14,22

*\*FEC v. Nat'l Conservative Political Action Comm.*,
470 U.S. 480 (1985)............................................................................. 12,14,16,17,18,19,23,24

*\*FEC v. Wisc. Right to Life, Inc.*, 127 S. Ct. 2652 (2007)................................... 11,12,23,26,27

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)...................................... 13

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ............................................................. 28

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) .............. 11

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
515 U.S. 557 (1995)....................................................................................... 23

*Marks v. United States*, 430 U.S. 188 (1977) ........................................................ 21

*McConnell v. FEC*, 540 U.S. 93 (2003)................................................................. 18

*McIntyre v. Ohio Elections Bd.*, 514 U.S. 334 (1995) ................................................ 15

*Mills v. Alabama*, 384 U.S. 214 (1966) ....................................................................... 28

*NAACP v. Alabama*, 357 U.S. 449 (1958) ................................................................... 13

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................................ 28

*North Carolina Right to Life, Inc. v. Leake*, 482 F.Supp.2d 686
(W.D.N.C. 2007) ................................................................................................ 18,22,26

*OAKPAC v. The City of Oakland*, 06-6366, 2006 U.S. Dist.
LEXIS 96900 (N.D.Cal. Oct. 19, 2006) ............................................................. 18,22,26

*Ogden v. Marendt*, 264 F. Supp. 2d 785 (S.D. Ind. 2003) ......................................... 29

*Randall v. Sorrell*, 126 S.Ct. 2479 (2006) ............................................................. 18,23

*Smith v. Bd. of Election Comm'rs*, 591 F. Supp. 70 (N.D. Ill. 1984) ......................... 29

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) ................................................. 28

## Codes, Rules and Statutes

2 U.S.C. § 431(4) ....................................................................................................... 7,8,9
    § 431(8) ................................................................................................................ 7,8,9
    § 431(9) ................................................................................................................... 7,9
    § 431(17) ................................................................................................................ 6,14
    § 432 ...................................................................................................................... 8,9
    § 433 ...................................................................................................................... 8,9
    § 434 ...................................................................................................................... 8,9
    § 434(c) ..................................................................................................................... 6
    § 437f ......................................................................................................................... 8
    § 441a(a)(1)(C) ............................................................ 5,7,8,9,15,17,20,22,24,29
    § 441a(a)(3) ...................................................................... 5,8,9,15,17,22,24,29
    § 441a(a)(7)(B) ........................................................................................................ 4
    § 441a(a)(7)(C) ........................................................................................................ 4
    § 441d(a) .................................................................................................................. 6
    § 441d(d)(2) ............................................................................................................. 6

11 C.F.R. §109 ............................................................................................................... 4
    §110.1(d) ................................................................................................................. 29
    §110.5(b) ................................................................................................................. 29
    §112.4(a) ................................................................................................................... 8

F.R.C.P. 65(c) ......................................................................................................... 28,29

iv

D.C. Code § 29-971.01 *et seq.* ..................................................................................... 3

I.R.C. §527 ...................................................................................................................... 3

District of Columbia Uniform Unincorporated Nonprofit Associations Act .............................. 3

## INTRODUCTION

This case is a constitutional challenge to campaign finance laws that prevent individuals from joining together to exercise their First Amendment rights to speech and association. Plaintiff SpeechNow.org is an independent group of citizens whose mission is to engage in express advocacy in favor of candidates who support the First Amendment and against those who do not. Toward that end, SpeechNow.org plans to run television advertisements during the 2008 election cycle in the states and districts of political candidates whose records demonstrate that they do not support full protections for First Amendment rights. SpeechNow.org has prepared scripts for four such ads and is prepared to produce the ads, purchase the air time, and begin broadcasting those ads immediately. Plaintiffs David Keating, Edward Crane, Fred Young and others are prepared to donate the money to SpeechNow.org that is necessary to fund the production and broadcasting of the ads.

However, under the campaign finance laws, if SpeechNow.org accepted any of these donations or the individual Plaintiffs actual made the donations, both would be subject to civil and criminal fines and even jail time. The reason is that the donations are "contributions" under the campaign finance laws, and if SpeechNow.org accepted any of them it would immediately become a "political committee." Under the campaign finance laws, political committees may not accept contributions of more than $5000 from any one donor in any calendar year. However, the donations that SpeechNow.org must accept in order to pay for the ads it wants to broadcast, and the donations that Plaintiffs Keating, Crane, and Young want to make, are necessarily greater than $5000 each.

In short, the campaign finance laws treat SpeechNow.org—which will only make independent expenditures under those laws—as though it were a full-fledged political action

committee, or PAC, that will make contributions to political candidates. But SpeechNow.org does not want to make contributions to candidates, and, under its by-laws, it is prevented from making any such contributions either directly or indirectly or from coordinating with candidates or political parties in any way. SpeechNow.org exists to allow individuals to pool their funds in order to speak. It is not a conduit for contributions to candidates; it is a group of citizens who want to spend their own money on their own speech. SpeechNow.org thus raises no concerns about corruption or its appearance that would justify limiting the funds it can raise or requiring it to register as a political committee. SpeechNow.org will comply with the existing disclosure and disclaimer requirements for those who make independent expenditures under the campaign finance laws, which will address any interests the government has in disclosure. Accordingly, there is no constitutionally adequate justification for requiring SpeechNow.org to become a full-fledged PAC and limiting the contributions it may accept.

Because the campaign finance laws prevent SpeechNow.org from accepting the individual Plaintiffs' donations and thus prevent it and its supporters from exercising their rights to speech and association, Plaintiffs are entitled to a preliminary injunction preventing the FEC from enforcing those laws against SpeechNow.org and its supporters while the issues in this case are fully litigated.

## STATEMENT OF FACTS

Plaintiff David Keating created SpeechNow.org because he believes that the issue of free speech and the threats posed to it by campaign finance laws are vital to the future of the nation. Declaration of David Keating at ¶ 3. He wanted individuals who share this concern to be able pool their funds so they could speak out as loudly and effectively in favor of First Amendment rights as possible. *Id.* Because federal elections provide a rare opportunity both to impact public

2

policy—by affecting the political futures of the candidates who make it—and to influence public

debate, David believes that running advertisements calling for the election or defeat of

candidates based on their support for free speech and association is the most effective way for

private citizens to protect those rights. *Id.* In David's view, if an individual is permitted to

spend unlimited amounts of money advocating the election or defeat of candidates for office,

there is absolutely no reason why groups of individuals should be prevented from doing so. He

created SpeechNow.org to give ordinary Americans the ability to band together to achieve these

purposes.

## A. Structure and Operations of SpeechNow.org

SpeechNow.org is an unincorporated non-profit association organized under the District

of Columbia Uniform Unincorporated Nonprofit Associations Act, D.C. Code section 29-971.01

*et seq.*, and registered as a "political organization" under section 527 of the Internal Revenue

Code. See Keating Decl., Ex. D. SpeechNow.org was founded by individuals and will operate

solely on private donations from individuals. *Id.*, Ex. E, art. II. It cannot accept, directly or

indirectly, any donations or anything of value from business corporations, labor organizations,

national banks, federal government contractors, foreign nationals, or political committees. *Id.*,

art. X, § 1. Nor can it engage in business activities or offer to any donors or members any

benefit that is a disincentive for them to disassociate themselves with SpeechNow.org on the

basis of the organization's position on a political issue. *Id.*, art. VI, §§ 6, 8.

SpeechNow.org is independent of any political candidates, committees, and parties, and

its by-laws require it to operate wholly independently of any of these entities. *Id.*, art. X, §§ 2-

10. SpeechNow.org cannot make contributions or donations of any kind directly or indirectly to

any FEC-regulated candidate or political committee, and it cannot coordinate its activities, as

3

defined in 2 U.S.C. §§ 441a(a)(7)(B) & C and 11 C.F.R. Part 109, with any candidates, national, state, district or local political party committees, or their agents. *Id.*, art. VI § 10; art. X §§ 2-10.

SpeechNow.org will solicit donations from individuals for funds to cover operating expenses and to buy public, political advertising to promote the election or defeat of candidates based on their positions on free speech and associational rights. Keating Decl. at ¶ 10. SpeechNow.org's solicitations will inform potential donors that their donations may be used for political advertising that will advocate the election or defeat of candidates to federal office based on their support for First Amendment rights. *Id.* SpeechNow.org will also advise its donors that their donations are not tax deductible. *Id.* at ¶ 12. Some of SpeechNow.org's solicitations will refer to particular candidates for federal office by name. *Id.* at ¶ 10.

**B.     SpeechNow.org's Planned Political Advertisements**

SpeechNow.org plans to run advertisements on television and in other media during the 2008 election cycle and other future election cycles. *Id.* at ¶ 13. SpeechNow.org has prepared television scripts for four such advertisements. *Id.*, Ex. F. Two of the advertisements call for the defeat of Dan Burton, a Republican Congressman currently running for reelection in the fifth district of Indiana. Both ads criticize Representative Burton for voting for a bill that would restrict the speech of many public interest groups. The first urges voters to "Say no to Burton for Congress." The second states that "Dan Burton voted to restrict our rights. Don't let him do it again." *Id.*, Ex. F. SpeechNow.org intends to broadcast these advertisements in the fifth district of Indiana, where Representative Burton is running for office. *Id.* at ¶ 17.

The other two advertisements call for the defeat of Mary Landrieu, a Democratic Senator currently running for reelection in Louisiana. Both ads criticize Landrieu for voting for a law to restrict the speech of public interest groups. The first urges voters to "Say no to Landrieu for

Senate." The second concludes by saying that "Our founding fathers made free speech the First

Amendment to the Constitution. Mary Landrieu is taking that right away. Don't let her do it

again." *Id.*, Ex. F. SpeechNow.org intends to broadcast these advertisements in Louisiana,

where Senator Landrieu is running for office. *Id.* at ¶ 17.

The production costs for these advertisements would be approximately $12,000. The cost

to air the advertisements depends on the number of times they are run and the size of the

audience SpeechNow.org wants to reach. Id. at ¶¶ 18-19; Ex. G; Declaration of Ed Traz at ¶¶ 3-

5. Ideally, David Keating would like to be able to run the ads enough times so that the target

audience could view the ads at least ten times, but that would cost roughly $400,000. A less

expensive option is simply to run the ads fewer times. Keating Decl. at ¶¶ 18-19.

SpeechNow.org knows of at least four individuals who are willing, ready, and able to donate

funds that would allow it to produce and broadcast the ads enough times to have an impact on the

audience in the relevant markets. *Id.* David Keating is willing to donate $5500. *Id.* at ¶ 25.

Edward Crane is willing to donate $6,000. Declaration of Edward Crane at ¶ 6. Richard Marder

is willing to donate $5,500. Keating Decl. at ¶ 25. Fred M. Young is willing to donate

$110,000. Declaration of Fred Young at ¶ 5.

However, under the federal campaign finance laws, these individuals may not make their

donations and SpeechNow.org may not accept them because they are all over the limits

contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3). SpeechNow.org also knows of two

individuals who are willing to donate amounts under the contribution limits. Plaintiffs Brad

Russo and Scott Burkhardt are each willing to donate $100 to SpeechNow.org. Declaration of

Brad Russo at ¶ 5; Declaration of Scott Burkhardt at ¶ 5. Even though Plaintiffs Russo and

Burkhardt could not themselves finance the production and broadcast of SpeechNow.org's ads,

they wish to associate with SpeechNow.org's other supporters in order to amplify their voices and reach an audience far greater than they would be able to achieve without SpeechNow.org. Russo Decl. at ¶ 3; Burkhardt Decl. at ¶ 3. However, because SpeechNow.org is unable to accept donations above $5000, it cannot operate at all and thus cannot accept donations even below the contribution limits. Keating Decl. at ¶ 33.

**C.     The Application of the Federal Election Campaign Act to SpeechNow.org**

Under the Federal Election Campaign Act (FECA), SpeechNow.org's expenditures for advertisements would be "independent expenditures." Independent expenditures are expenditures by a person "expressly advocating the election or defeat of a clearly identified candidate" that are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 2 U.S.C. § 431 (17). As a result, SpeechNow.org will comply with all disclaimer and reporting obligations for those who make independent expenditures under the campaign finance laws. For instance, under 2 U.S.C. § 441d(a), SpeechNow.org's advertisements and other communications will include its name, address and telephone number or World Wide Web address, along with a statement indicating that the communication was paid for by SpeechNow.org and was not authorized by any candidate or candidate's committee. Under 2 U.S.C. § 441d(d)(2), SpeechNow.org's advertisements will include a statement indicating that SpeechNow.org is responsible for the content of the advertisement. And, pursuant to 2 U.S.C. § 434(c), SpeechNow.org will file statements with the FEC reporting its donations and its donors' identities as well as its expenditures. *See* Keating Decl., Ex. ¶¶ 22-24.

At the same time, however, if SpeechNow.org accepts any of the donations that Plaintiffs Keating, Crane, or Young are prepared to make or produces and broadcasts the advertisements

for which it has scripts, SpeechNow.org will immediately become a "political committee"—or

PAC—and be subject to all regulations that apply to PACs, including limits on contributions.

A "political committee" is "any committee, club, association, or other group of persons

which receives contributions aggregating in excess of $1,000 during a calendar year or which

makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4).

A "contribution" includes "any gift, subscription, loan, advance, or deposit of money or anything

of value made by any person for the purpose of influencing any election for Federal Office." *Id*.

§ 431(8). "Expenditure" includes "any purchase, payment, distribution, loan, advance, deposit,

gift of money or anything of value, made by any person for the purpose of influencing any

election for Federal office." 2 U.S.C. § 431(9).

Under these provisions, SpeechNow.org would become a political committee if it

accepted any of the donations from Plaintiffs Keating, Crane, or Young because they would be

made "for the purpose of influencing" a federal election. *See* Keating Decl. at ¶ 25; Crane Decl.

at ¶ 3; Young Decl. at ¶ 2. Likewise, if SpeechNow.org spent the money necessary to produce

and broadcast the ads for which it has scripts, it would also become a political committee

because those expenditures would be made "for the purpose of influencing" a federal election.

*See* Keating Decl. at ¶ 31.

Political committees are subject to limits on the contributions they may accept. Two

limits in particular would apply to SpeechNow.org and its donors. Under 2 U.S.C.

§ 441a(a)(1)(C), SpeechNow.org and its donors would be subject to annual contribution limits

$5000 from any one person; and under 2 U.S.C. § 441a(a)(1)(C), supporters of SpeechNow.org

would be subject to biennial aggregate limits of $42,700 for contributions to political committees

and parties and $108,200 for all contributions to candidates, political committees and party

committees.  Under these provisions, Plaintiffs Keating, Crane and Young cannot make the

donations to SpeechNow.org that they are ready, willing, and able to make and SpeechNow.org

cannot accept those donations.

In addition to being subject to contribution limits, political committees are subject to

burdensome organizational, administrative, and reporting requirements.  These include, among

other things, the obligation to file a statement of organization, appoint a treasurer, maintain

records of all contributions and expenditures for three years, and file regular reports disclosing

detailed information concerning the amounts of all contributions and expenditures, the identities

of all contributors, persons who make loans or give rebates or refunds to the committee, persons

who provide any dividend or interest to the committee, the identities of those to whom

expenditures are made, and the committees' operating expenses, among other information.  *See* 2

U.S.C. §§ 432, 433, and 434.

**D.    SpeechNow.org's Advisory Opinion Request**

On November 19, 2007, SpeechNow.org filed a request for an advisory opinion (AOR)

with the FEC pursuant to 2 U.S.C. § 437f.  The request presented, in essence, three questions: (1)

Must SpeechNow.org register as a political committee as defined in 2 U.S.C. § 431(4), and, if so,

when?  (2) Are donations to SpeechNow.org "contributions" (as defined in 2 U.S.C. § 431(8))

subject to the limits described in 2 U.S.C. § 441a(a)(1)(C)?  (3) Must an individual donor to

SpeechNow.org count his donations to SpeechNow.org among the contributions applicable to his

biennial aggregate contribution limit described in 2 U.S.C. § 441a(a)(3)?  *See* Declaration of

Steven M. Simpson, Ex. 1.

Under FEC rules, the Commission is required to issue a written advisory opinion within

sixty days of accepting a request.  11 C.F.R. § 112.4(a).  If it is unable to render an advisory

opinion within that time, the rules state that the FEC "shall issue a written response stating that the Commission was unable to approve" the request by a required vote of four commissioners. *Id*. The FEC issued its response to SpeechNow.org's AOR on January 28, 2008. Because the FEC is currently without a full complement of commissioners, it lacks a quorum and thus could not issue an advisory opinion in response to SpeechNow.org's request. Accordingly, under FEC rules, SpeechNow.org's request was not approved. *See* Simpson Decl., Ex. 2.

However, the general counsel's office of the FEC issued a draft advisory opinion in response to SpeechNow.org's AOR. *Id*., Ex. 3. Consistent with the analysis, above, the draft advisory opinion concluded that, among other things, the donations Plaintiffs Keating, Crane, and Young wish to make to SpeechNow.org would be "contributions" under 2 U.S.C. § 431(8); expenditures by SpeechNow.org on advertisements calling for the election or defeat of candidates for federal office would be "expenditures" under 2 U.S.C. § 431(9); SpeechNow.org has a "major purpose" of campaign activity; accepting the contributions noted above to fund its advertisements would make SpeechNow.org a "political committee" under § 431(4); as a political committee, SpeechNow.org would be subject to the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) and the registration, administrative and reporting requirements for political committees contained in 2 U.S.C. §§ 432, 433, and 434. *See* Simpson Decl., Ex. 3. In short, the draft advisory opinion concluded that the campaign finance laws prohibit SpeechNow.org from accepting donations that exceed the contribution limits in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) to fund its advertisements.

The draft advisory opinion was consistent with the FEC's position on other groups that make independent expenditures. The FEC has consistently required such groups both to register as political committees and to abide by contribution limits. *See* Simpson Decl., Exs. 4-9.

The application of the PAC requirements and contribution limits to SpeechNow.org places the organization and its supporters in an impossible position. If SpeechNow.org accepts the donations that Plaintiffs Crane, Young and Keating want to make, it immediately becomes a "political committee," making those donations illegal and subjecting both SpeechNow.org and those who make the donations to civil and criminal liability. If it does not accept those donations, SpeechNow.org cannot produce and broadcast its advertisements and fulfill its mission. *See* Keating Decl. at ¶ 26. Moreover, if it does not accept donations above the contribution limits, SpeechNow.org will not only be unable to produce the ads it currently wants to run, it will be prevented from obtaining the start-up funding necessary to begin operations and to allow it to raise additional funds to produce and broadcast additional advertisements. *See id.* at ¶ 27.

## ARGUMENT

"Freedom of speech plays a fundamental role in a democracy; as [the Supreme] Court has said, freedom of thought and speech is the matrix, the indispensable condition of nearly every other form of freedom." *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 264 (1986) (internal citation and quotation marks omitted) [hereinafter *MCFL*]. Plaintiffs seek to preliminarily enjoin contribution limits that, if applied to SpeechNow.org and its supporters, will prevent them from exercising their rights to speech and association during the only time in which those rights, for them, are effective—the election season.

To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel*

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). As demonstrated below, each of these factors weighs in Plaintiffs' favor.

I.    **Plaintiffs Are Substantially Likely to Succeed on the Merits.**

The burden of proof at the preliminary injunction stage tracks the burden of proof at trial. Therefore, where First Amendment rights are at stake, the FEC must demonstrate the likelihood that the law will be upheld. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). In this context, that means that the FEC must demonstrate that the contribution limits meet strict scrutiny as applied to SpeechNow.org and its supporters. *See FEC v. Wisc. Right to Life, Inc.*, 127 S.Ct. 2652, 2664 (2007) (stating that the government bears the burden of demonstrating that a statute that burdens speech passes strict scrutiny as applied to a particular speaker) [hereinafter *WRTL II*].

The FEC cannot meet its burden here for the primary reason that SpeechNow.org does not present any threat of corruption or its appearance that would be necessary to justify limiting the contributions SpeechNow.org may accept or requiring it to become a fully-regulated PAC. SpeechNow.org is, in essence, an independent expenditure committee. Under its by-laws it is prohibited from making contributions directly or indirectly to candidates, political parties or political committees or coordinating in any way with candidates or parties. Plaintiff David Keating created SpeechNow.org to allow like-minded individuals to pool their resources so they can purchase advertisements calling for the election or defeat of candidates depending on those candidates' support for free speech. *See* Keating Decl. at ¶ 3. SpeechNow.org's members and donors wish to contribute to the organization because they agree with both its message and its means and they wish to add their voices to SpeechNow.org's so that, collectively, they may speak more effectively and reach a wider audience than any of them would be able to do on their

own. *See id.* at ¶ 35; Crane Decl. at ¶¶ 3-4; Young Decl. at ¶¶ 2-3; Russo Decl. at ¶¶ 2-3; Burkhardt Decl. at ¶¶ 2-3.  In short, SpeechNow.org is a group of individuals who simply want to spend their own money on their own speech.

The Supreme Court has held that independent expenditures, whether by individuals or committees, cannot constitutionally be limited, because they are, by definition, unconnected to candidates and thus cannot raise any concerns about corruption. *See FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985) [hereinafter *NCPAC*]; *Buckley v. Valeo*, 424 U.S. 1, 47 (1976).  The Court has also held that limits on contributions to groups that make independent expenditures are necessarily restrictions on their expenditures. *See Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299-300 (1981).  Combined, these principles make clear that the contribution limits that apply to fully-regulated PACs cannot constitutionally be applied to SpeechNow.org, which is independent of political candidates, committees and parties and raises money only to spend it directly on speech.  Moreover, SpeechNow.org will report all contributions and expenditures under the reporting requirements that apply to those who make independent expenditures.  These provisions satisfy the government's interest in disclosure and in ensuring that SpeechNow.org does not coordinate with candidates or political parties or circumvent the limitations that apply to those entities.

**A.    As Applied to SpeechNow.org and Its Supporters, the Contribution Limits are Subject to Strict Scrutiny.**

Strict scrutiny applies where a law burdens the exercise of fundamental First Amendment rights. *WRTL II*, 127 S.Ct. at 2664.  SpeechNow.org's activities are at the very core of the First Amendment's protections, and the Supreme Court has held that the speech-related activities of groups very similar to the SpeechNow.org are entitled to the full protections of the First Amendment.  Because the contribution limits that apply to SpeechNow.org impose extreme

burdens on its and its members and supporters rights under the First Amendment, strict scrutiny applies.

As the Supreme Court has repeatedly stated, a fundamental purpose of the First Amendment was to protect the discussion of governmental affairs, and, in particular, of candidates, in order to "ensure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley*, 424 U.S. at 14. Thus, the First Amendment protects vigorous advocacy intended to influence the outcome of elections no less than the discussion of ideas. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978). It also protects the right of individuals to associate with one another because "effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). By associating with others, "individuals can make their views known, when, individually, their voices would be faint or lost." *Citizens Against Rent Control*, 454 U.S. at 294. *See also Buckley*, 424 U.S. at 22 (stating that the purpose of the right of association is to allow individuals to amplify their voices by associating with others).

SpeechNow.org's activities are at the heart of the First Amendment's protections. SpeechNow.org and its members and supporters wish to band together to advocate political and social change—greater protections for First Amendment rights. SpeechNow.org will accomplish this by broadcasting advertisements calling for the election or defeat of candidates. In short, SpeechNow.org will seek to influence the outcome of elections in order to influence the decisions and the political futures of the politicians who make the laws that affect First Amendment rights. *See* Keating Decl. at ¶ 2. By associating with SpeechNow.org, its members and supporters will be able to amplify their voices beyond what any of them would be able to

achieve on their own, because they either lack the financial means or the time and the experience to speak out effectively on their own. *See id.* at ¶ 35; Crane Decl. at ¶ 4; Young Decl. at ¶ 3; Russo Decl. at ¶ 3; Burkhardt Decl. at ¶ 3.

SpeechNow.org will only make independent expenditures—that is, expenditures on express advocacy that are not coordinated with candidates or political parties. *See* 2 U.S.C. § 431(17). The Supreme Court has held that "[i]ndependent expenditures constitute expression 'at the core of our electoral process and of the First Amendment freedoms.'" *MCFL*, 479 U.S. at 254 (quoting *Buckley*, 424 U.S. at 39). *See also NCPAC*, 470 U.S. at 493 (stating that independent expenditures "produce speech at the core of the First Amendment"). As a result, limits on what independent expenditure committees can spend are subject to strict scrutiny. *See id. See also id.* at 496. As the Court stated in *NCPAC*, "[a] restriction on the amount of money a person or group can spend on political communications during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Id.* at 493-94 (quoting *Buckley*, 424 U.S. at 19).

While the limit at issue in *NCPAC* operated directly on expenditures by the group, rather than contributions to it, limits on contributions to independent expenditure committees such as SpeechNow.org automatically operate to limit the group's expenditures. This conclusion necessarily follows from the Supreme Court's decision in *Citizens Against Rent Control*. That case involved a $250 limit on contributions to support or oppose a ballot measure. 454 U.S. at 292. Concluding that the limit prevented individuals from pooling their funds in order to finance

their collective advocacy, the Court applied strict scrutiny[1] and struck it down. *See id.* at 294-95,
300. In arriving at that conclusion, the Court recognized that the limit on contributions
necessarily limited the funds that the group could spend on its own speech. *See id.* at 299. As
the Court explained, while an individual may make unlimited expenditures under the law, she
may not "contribute beyond the $250 limit when joining with others to advocate common views.
The contribution limit thus automatically affects expenditures, and limits on expenditures operate
as a direct restraint on freedom of expression . . . ." *Id. See also id.* ("Placing limits on
contributions which in turn limit expenditures plainly impairs freedom of expression.").

    The same is true here. To produce and broadcast just the initial ads for which
SpeechNow.org now has scripts will cost upwards of $110,000. *See* Keating Decl. at ¶¶ 18-19.
Without the contributions from Plaintiffs Keating, Crane, and Young, as well as Richard
Marder—all of which exceed $5000—SpeechNow.org would be unable to produce and
broadcast those ads at all. *See id.* at ¶ 26. Even assuming SpeechNow.org could raise sufficient
funds in increments of $5000 or less to pay for these ads, the contribution limits would still
significantly limit the number of times it could run those ads, and would limit its ability to run
additional ads concerning other federal candidates in other races. *See id.* at ¶ 29. In short, it is
undeniable that the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3)
directly restrain SpeechNow.org's expenditures and reduce the quantity of its expression by
restricting the number of political candidates it can discuss, the number of times it can run its
ads, and the size of the audience it can reach.

    Thus, as in *NCPAC* and *Citizens Against Rent Control*, the contribution limits that apply
to SpeechNow.org restrict its and its members and supporters rights to pool their funds in order

---

[1] While the Court in *Citizens Against Rent Control* referred to the scrutiny it applied as "exacting," it has elsewhere
made clear that "exacting scrutiny" is the same as "strict scrutiny." *See Buckley v. Am. Constitutional Law Found.*,
525 U.S. 182, 192 n.12, 204 (1999); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

to amplify their voices beyond what any of them would be able to achieve on their own. *See NCPAC*, 470 U.S. at 495; *Citizens Against Rent Control*, 454 U.S. at 296. The contribution limits thus restrict the rights to free speech and association of both SpeechNow.org and its supporters. *See Citizens Against Rent Control*, 454 U.S. at 299-300 (stating that the rights of speech and association "blend and overlap" and are both implicated by contribution limits imposed on groups that support or oppose ballot issues). In other words, the contribution limits restrict not only SpeechNow.org's right to free speech by limiting the funds it has available to spend on its advertisements. The limits also directly restrict its supporters' rights to free speech by preventing them from pooling their funds and speaking collectively through SpeechNow.org. *See NCPAC*, 470 U.S. at 495. SpeechNow.org's supporters like and agree with both its means and its message, and they wish to add their voices to that message. *See* Keating Decl. at ¶ 35; Crane Decl. at ¶ 3; Young Decl. at ¶ 2; Russo Decl. at ¶ 2; Burkhardt Decl. at ¶ 2. By associating with one another through SpeechNow.org, the group's members and supporters are just as much exercising their rights to free speech and association as were the individuals who associated through the groups at issue in *NCPAC* and *Citizens Against Rent Control*.

SpeechNow.org and its members and supporters thus join the long practice in American politics of "persons sharing common views banding together to achieve a common end" to which the Supreme Court has often referred in cases involving restrictions on the right to associate. *See Citizens Against Rent Control*, 454 U.S. at 294. As the Supreme Court stated in *NCPAC*, "[t]o say that their collective action in pooling their resources to amplify their voices is not entitled to full First Amendment protection would subordinate the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources." 470 U.S. at 495. *See also* Russo Decl. at ¶ 3; Burkhardt Decl. at ¶ 3 (stating that

16

while they lack the financial means to donate more than a few hundred dollars, their ability to associate with SpeechNow.org and its wealthier donors allows them to speak out effectively where they would otherwise be unable to do so).

Thus, as applied to SpeechNow.org, the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) operate very differently from the contribution limits in the circumstances in which the Supreme Court upheld them in *Buckley*. There, the Court addressed limits that applied to contributions made directly to candidates or to their committees. 424 U.S. at 23-38. Finding that contributions to candidates served only as a "general expression of support for the candidate and his views but does not communicate the underlying basis for the support" and that the contributors' expression "rests solely on the undifferentiated symbolic act of giving," the Court concluded that the speech element in contributions to candidates was minimal. *See id.* at 21. By contrast, SpeechNow.org makes only independent expenditures that directly fund speech, not contributions to candidates. Support for SpeechNow.org thus conveys much more than the "undifferentiated, symbolic act if giving." It conveys agreement with SpeechNow.org's message—the importance of First Amendment rights—and its means— express advocacy for and against candidates based on their support for those rights. As the Court stated in rejecting the "speech by proxy" argument in *NCPAC*, "the contributors obviously like the message they are hearing from these organizations and want to add their voices to that message; otherwise, they would not part with their money." 470 U.S. at 495.

As a result, contributions to SpeechNow.org enjoy the full protections of the First Amendment, and the contribution limits that apply to it and its supporters are subject to strict scrutiny. *See, e.g., Comm. on Jobs Candidate Advocacy Fund v. Herrera*, No. 07-03199, 2007 U.S. Dist. LEXIS 73736, at *8-*10 (N.D. Cal. Sept. 20, 2007) (holding that "[l]imits on

contributions to independent expenditure committees are subject to strict scrutiny" and granting motion for preliminary injunction); *OAKPAC v. The City of Oakland*, No. 06-6366, 2006 U.S. Dist. LEXIS 96900, at *3 (N.D. Cal. Oct. 19, 2006) (holding that by "limiting the source of funds available for political committees to conduct independent expenditures" contribution limits were subject to strict scrutiny and granting preliminary injunction). Under strict scrutiny, the FEC must demonstrate applying the contribution limits to SpeechNow.org narrowly serves a compelling state interest.

**B.    The FEC Cannot Demonstrate a Compelling State Interest in Limiting Contributions to SpeechNow.org.**

The Supreme Court has only identified one interest sufficiently compelling to limit contributions to political organizations: the interest in preventing corruption of candidates.[2] As the Court has stated, "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *NCPAC*, 470 U.S. at 496-97. *See also Randall v. Sorrell*, 126 S.Ct. 2479, 2491-92 (2006) (recognizing corruption as the only interest that can support contribution limits and striking down limits as broader than necessary to achieve that interest); *Citizens Against Rent Control*, 434 U.S. at 437-38 ("*Buckley* identified only a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate*.") (emphasis in original).

---

[2] The Court has recognized another type of corruption that has no application here. So-called "corporate form corruption" relates to "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 660 (1990) (emphasis added). This form of corruption applies only to corporations by virtue of "the *unique state-conferred corporate structure* that facilitates the amassing of large treasuries." *Id.* (emphasis added). This same concern for corporate-form corruption was used to justify the electioneering-communications provisions of the Bipartisan Campaign Reform Act of 2002. *See McConnell v. FEC*, 540 U.S. 93, 205 (2003). Because SpeechNow.org is not a corporation, conducts no business activities, and accepts no contributions from corporations, unions, or national banks, corporate form corruption has no bearing on this case. *See* Keating Decl. at ¶ 8. *See also NCPAC*, 470 U.S. at 495-96 (distinguishing cases dealing with limits on corporate solicitations and expenditures on the grounds that the statute at issue applied to any "committee, association, or organization" and thus was not limited to corporations).

Contributions to SpeechNow.org cannot raise any concerns about corruption, however,

because SpeechNow.org cannot make contributions to or coordinate its activities with political

candidates, parties or committees. SpeechNow.org exists to make independent expenditures—it

wishes only to spend its supporters' money directly on speech that gives voice to its supporters'

desire to expressly advocate for and against candidates based on their support for First

Amendment rights. SpeechNow.org's independent expenditures, by definition, cannot raise any

concerns about corruption. As the Supreme Court explained in *NCPAC*,

> Corruption is a subversion of the political process. Elected officials are
> influenced to act contrary to their obligations of office by the prospect of financial
> gain to themselves or infusions of money into their campaigns. The hallmark of
> corruption is the financial *quid pro quo*: dollars for political favors. But here the
> conduct proscribed is not contributions to the candidate, but independent
> expenditures in support of the candidate.

470 U.S. at 497. Likewise, here the conduct proscribed is not contributions to a candidate, but

contributions to SpeechNow.org, a group of individuals who want to pool their funds in order to

make independent expenditures. As the Court concluded in *NCPAC*, "there [is] a fundamental

difference between money spent to advertise one's views independently of the candidate's

campaign and money contributed to the candidate to be spent on his campaign." *Id.* Only the

latter can raise any concerns over corruption or its appearance. SpeechNow.org's supporters

make contributions only to advertise their views independently of any candidate. Their

contributions cannot possibly raise concerns about corruption.

While the Supreme Court has never directly addressed whether the government has a

compelling interest in limiting contributions to groups like SpeechNow.org, its decision in

*California Medical Association v. FEC*, 453 U.S. 182 (1981) [hereinafter *CalMed*], provides

guidance on the proper analysis of the issue in this case. *CalMed* involved a challenge by a

multicandidate committee—a political committee that makes contributions to five or more

19

candidates for office—to the $5000 annual contribution limit under 2 U.S.C. § 441a(a)(1)(C). *Id.* at 194. Concluding that contributions to the multicandidate committee amounted merely to "speech by proxy" of the PAC's contributors—which was entitled to lesser protections under the First Amendment—a plurality of the Court upheld the limit on the ground that it served the government's interest in preventing circumvention of the limits on contributions made directly to candidates. *Id.* at 196-98. The multicandidate committee made contributions directly to candidates. Thus, according to the plurality, contributors seeking to avoid the $1000 annual contribution limits could make larger contributions to multicandidate committees, which could then be funneled to candidates. *Id.* at 197-98.

Justice Blackmun separately concurred, however, and concluded that the plurality's circumvention rationale applied only because the committee at issue was a multicandidate committee that made direct contributions to candidates. *Id.* at 203. Justice Blackmun rejected the plurality's conclusion that contributions to the multicandidate committee were not entitled to full First Amendment protection. *Id.* at 201-02. He joined the plurality's judgment, however, because he recognized that, as applied to multicandidate committees, the annual contribution limit was a narrow means of preventing circumvention of the limits that applied to direct contributions to candidates. *Id.* at 203.

Justice Blackmun made clear, however, that the same analysis would not apply to limits on contributions to committees "established for the purpose of making independent expenditures." *Id.* In sharp contrast to multicandidate committees—which are "conduits for contributions to candidates" and thus raise concerns about corruption—"contributions to a committee that makes only independent expenditures pose no such threat." *Id.* As Justice Blackmun explained,

> [t]he Court repeatedly has recognized that effective advocacy of both public and
> private points of view, particularly controversial ones, is undeniably enhanced by
> group association. . . . By pooling their resources, adherents of an association
> amplify their own voices . . .; the association is but the medium through which its
> individual members seek to make more effective the expression of their own
> views.

*Id.* (internal quotation marks and citations omitted).  Because Justice Blackmun's decision is the

narrower one, his is the controlling decision in the case. *See Marks v. United States*, 430 U.S.

188, 193 (1977) (stating that when the Court issues a fragmented decision, the position of the

narrowest concurrence controls).

Two principles emerge from *CalMed*.  First and foremost, under Justice Blackmun's

controlling decision, the government may limit contributions to groups only where they

implicate the interest in preventing corruption or its appearance.  453 U.S. at 203.  While

contributions to multicandidate committees can raise such concerns, contributions to groups that

make only independent expenditures cannot. *Id.* at 203-04.  Second, even the plurality's

conclusions apply only to multicandidate committees that make contributions directly to

candidates.  This point is not only implicit in the plurality's analysis; it is also stated expressly in

the opinion.  In a footnote, the plurality noted that the ACLU in an amicus brief claimed that the

contribution limit at issue "would violate the First Amendment if construed to limit the amount

individuals could jointly expend to express their political views." *Id.* at 197 n.17.  This concern

was not at issue in the case, however, because it involved only a multicandidate committee that

made contributions directly to candidates. *Id.*  As the plurality explained, "[c]ontributions to

such committees are therefore distinguishable from expenditures made jointly by groups of

individuals in order to express common political views." *Id.*  In short, SpeechNow.org's case is

distinguishable from the plurality's decision in *CalMed* and falls squarely within the reasoning of

Justice Blackmun's controlling concurrence.

Accordingly because SpeechNow.org raises no concerns about corruption or its appearance and cannot be used to circumvent limits on contributions to candidates, the FEC cannot demonstrate any interest, much less a compelling interest, in applying the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) to SpeechNow.org or its supporters. *See, e.g., Herrera*, 2007 U.S. Dist. LEXIS 73736, at *12-*13 (holding that contribution limits applied to independent expenditure committees serve no compelling interest and granting motion for preliminary injunction); *OAKPAC*, 2006 U.S. Dist. LEXIS 96900, at *4-*5 (same). The individual supporters of SpeechNow.org—and, indeed, any individuals—are entitled to make unlimited independent expenditures advocating the election or defeat of candidates. Preventing those individuals from doing the same thing as a group violates their rights to free speech and association under the First Amendment. *See, e.g., Citizens Against Rent Control*, 454 U.S. at 296 ("To place a Spartan limit—or, indeed, any limit—on individuals wishing to band together to advance their views on a ballot measure, while placing none of individuals acting alone, is clearly a restraint on the right of association").

C.    **As Applied to SpeechNow.org and Its Supporters, the Contribution Limits Are Not Narrowly Tailored.**

"Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." *MCFL*, 479 U.S. at 265. The "problem at hand" for which Congress passed FECA's contribution limits was the appearance or reality of corruption of candidates. *See Buckley*, 424 U.S. at 23-38. Thus, regulating "only to the degree necessary" to address that problem would mean applying contribution limits only to those groups that raise concerns about corruption. As demonstrated above, SpeechNow.org cannot raise such concerns and cannot be used to circumvent the limits on contributions to candidates. As a result, applying

contributions limits to SpeechNow.org and its supporters is not narrowly tailored. *See, e.g.*,

*NCPAC*, 470 U.S. at 498; *CalMed*, 453 U.S. at 203-04 (Blackmun, J., concurring).

It is no answer to say that SpeechNow.org could speak through media that are cheaper

than broadcast advertisements or alter what it wants to say by not engaging in express advocacy.

As the Supreme Court made clear in *WRTL II*, cheaper alternatives to broadcast advertising are

not reasonable alternatives in terms of "impact and effectiveness." 127 S.Ct. at 26771 n.9. And

telling SpeechNow.org that it can speak as long as it does not expressly advocate the election or

defeat of candidates would "run afoul of 'the fundamental rule of protection under the First

Amendment, that a speaker has the autonomy to choose the content of his own message.'" *Id.*

(quoting *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573

(1995)). In short, SpeechNow.org and its supporters have the right to choose their media and

their message.

SpeechNow.org will satisfy any governmental interests in disclosure by complying with

the disclaimer and reporting obligations that apply to those who make independent expenditures.

*See* Keating Decl. at ¶ 22-24. Beyond disclosure, the government has no legitimate interest in

regulating SpeechNow.org or its supporters' First Amendment rights. Accordingly, applying

contribution limits to them is not narrowly tailored to achieve a compelling state interest.

**D.     Plaintiffs Are Substantially Likely to Prevail Even If Strict Scrutiny Does Not Apply.**

Even under the "less rigorous review" that applies to limits on contributions to

candidates, those limits are permissible only if they are "closely drawn," to serve a "sufficiently

important government interest." *Randall*, 126 S.Ct. at 2491 (quoting *Buckley*, 424 U.S. at 25).

This is not a cursory review, and, to date, the Supreme Court has identified only the interest in

combating corruption of candidates as important enough to justify contribution limits.[3]  *See, e.g.,*

*NCPAC*, 470 U.S. at 496-97; *Buckley*, 424 U.S. at 25; 28.  As discussed above, SpeechNow.org

cannot raise any concerns about corruption or its appearance and cannot be used to circumvent

the contribution limits that apply to candidates.  Thus, even if this court concludes that strict

scrutiny does not apply here, Plaintiffs have still demonstrated a substantial likelihood of success

on the merits to justify a preliminary injunction.  *See, e.g., N.C. Right to Life, Inc. v. Leake*, 482

F.Supp.2d 686, 698-99 (W.D.N.C. 2007) (holding contribution limit unconstitutional as applied

to independent expenditure committee even under the lesser scrutiny that applies to limits on

contributions to candidates).

## II.    Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable harm." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Under

the contribution limits applicable to PACs, SpeechNow.org cannot possibly produce and

broadcast the ads for which it currently has scripts.  Plaintiffs Keating, Crane, and Young, as

well as Richard Marder, are ready, willing, and able to donate the necessary funds, and

SpeechNow.org will produce and broadcast those ads if it is legally permitted to accept those

funds.  The only thing standing between SpeechNow.org and its ability to speak through its ads

are the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3).  *See* Keating

Decl. at ¶¶ 26, 35; Crane Decl. at ¶ 7; Young Decl. at ¶ 6.  Thus, SpeechNow.org's and its

supporters' First Amendment rights are in fact being impaired right now; there is nothing

speculative about their claims. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

---

[3] As stated above, the only exception to this statement is so-called "corporate form corruption," which has no
relevance to this case. *See supra* note 2.

290, 301 (D.C. Cir. 2006) (stating that "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed").

The contribution limits irreparably harm not only the rights of SpeechNow.org, itself, but its supporters as well. Plaintiffs Crane, Young, Russo, and Burkhardt have neither the time, experience, nor, in most cases, the funds to be able to produce and broadcast advertisements of the type SpeechNow.org intends to run. It is only by pooling their funds and associating with each other and with SpeechNow.org that they will be able to produce and broadcast the ads SpeechNow.org currently intends to run, as well as other ads it intends to run in the near future. *See* Crane Decl. at ¶ 3; Young Decl. at ¶ 4; Russo Decl. at ¶ 3; Burkhardt Decl. at ¶ 3.

Indeed, by making it impossible for SpeechNow.org to function and to afford to produce and broadcast any ads at all, the contribution limits harm SpeechNow.org's supporters regardless of whether they can afford to donate more than the $5000 limit on contributions. According to David Keating, without sufficient start-up or "seed" funding, SpeechNow.org cannot produce and broadcast any ads and is significantly impaired in its ability to raise additional funds for future ads. *See* Keating Decl. at ¶ 27. Thus, without the ability to accept large donations that could actually fund its initial ads, accepting small donations from individuals such as Plaintiffs Russo and Burkhardt would be both pointless—because it is virtually impossible for SpeechNow.org to raise sufficient funds to produce and broadcast its ads with only small donations—and possibly even counterproductive—because it would simply trigger the burdensome registration, administrative, and reporting provisions that apply to PACs. *Id.* at ¶ 31. Accepting small donations above $1000—the trigger for political committee status— would require David Keating to spend his time complying with burdensome regulations that apply to PACs, but would provide no assurance that SpeechNow.org would ever be able to do

what it was formed to do—produce and broadcast advertisements. Accordingly, the contribution limits irreparably harm SpeechNow.org and all of its supporters regardless of the amount they can donate to the organization. *See, e.g., Herrera*, 2007 U.S. Dist. LEXIS 73736, at *15-*16 (holding that contribution limits caused irreparable harm to independent expenditure committees and granting motion for preliminary injunction); *OAKPAC*, 2006 U.S. Dist. LEXIS 96900, at *5-*6 (same).

While Plaintiffs are irreparably harmed right now, that harm increases as time passes. SpeechNow.org's mission is not simply to speak out about candidates based on their support for First Amendment rights. Its mission is to call for the election or defeat of such candidates—that is, to attempt to protect First Amendment rights by influencing the political careers of the candidates who pass laws that affect those rights. SpeechNow.org's mission can be achieved only by producing and broadcasting ads during the election season in which the candidates it wishes to address are running for office. *See* Keating Decl. at ¶ 2. Several of the elections in which SpeechNow.org wishes to run ads are primaries, which are only a few months away. *Id.* at ¶ 28. Accordingly, Plaintiffs irreparable harm is ongoing and becomes more severe with the passage of time.

**III.    An Injunction Will Not Substantially Injure Others.**

In its most recent campaign finance decision, the Supreme Court made clear that in any conflict between First Amendment rights and regulation, courts "must give the benefit of any doubt to protecting rather than stifling speech." *WRTL II*, 127 S.Ct. at 2667. Thus, even though the Court had earlier upheld the electioneering communications ban on its face, it held that the burden was still squarely on the government to demonstrate that the provision was constitutional as-applied to speakers in any given case. *Id.* at 2664. In fashioning a test to determine whether

26

speech was the functional equivalent of express advocacy under the electioneering communications ban, the Court rejected one that focused on the intent and effects of the speech because that would lead to too much burdensome litigation by those who wanted simply to exercise their First Amendment rights. *Id.* at 2666-67. As a result, the Court concluded that speech would be considered to be within the ban only if it was susceptible of no other reasonable interpretation. *Id.* at 2667. In short, *WRTL II* stands for the proposition that "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *Id.* at 2669.

Thus, while the FEC can be said to have an interest in enforcing the campaign finance laws, under the Supreme Court's approach to First Amendment rights in *WRTL II*, the FEC's interest simply cannot trump the First Amendment rights of SpeechNow.org and its supporters. As demonstrated above, SpeechNow.org raises no concern about corruption or circumvention of limits on contributions to candidates, and it will comply with the reporting and disclaimer provisions that apply to independent expenditures. Keating Decl. at ¶ 24. In short, permitting SpeechNow.org and its supporters to exercise their rights to speech and association cannot possibly harm the FEC.

## IV.    An Injunction Will Further the Public Interest.

The Supreme Court "has long viewed the First Amendment as protecting a marketplace for the clash of different views and conflicting ideas. That concept has been stated and restated almost since the Constitution was drafted." *Citizens Against Rent Control*, 454 U.S. at 295. SpeechNow.org and its supporters wish to participate in that marketplace of ideas by attempting to convince citizens to protect the First Amendment with their votes.

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . includ[ing] discussion

of candidates." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Thus "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). SpeechNow.org and its supporters wish to participate in the process of self-government by urging voters to support candidates who protect rights to free speech and association and to oppose those who do not.

The First Amendment reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964). SpeechNow.org and its supporters wish to ensure that debate on all topics—including the First Amendment itself—remains uninhibited, robust, and wide-open by bringing to light abuses of First Amendment rights by particular politicians and urging Americans to vote against them.

In short, SpeechNow.org's activities are at the core of the First Amendment. Enjoining the contribution limits that apply to SpeechNow.org and its supporters and thus allowing SpeechNow.org and its supporters to exercise their rights to free speech and association is thus entirely consistent with the public interest.

## V.    The Court Should Waive the Bond Requirement Under F.R.C.P. 65(c).

Federal Rule of Civil Procedure 65(c) provides that no preliminary injunction shall issue without the giving of security by the applicant in an amount determined by the court. However, "[i]t is within the Court's discretion to waive Rule 65(c)'s security requirement where it finds such a waiver to be appropriate in the circumstances." *Cobell v. Norton*, 225 F.R.D. 41, 50 n.4 (D.D.C. 2004). In non-commercial cases, courts often waive the bond requirement where the likelihood of harm to the non-moving party is slight and the bond requirements would impose a significant burden on the moving party. *See, e.g., Temple Univ. v. White*, 941 F.2d 201, 219 (3d

Cir. 1991); *Herrera*, 2007 U.S. Dist. LEXIS 73736, at *17-*18. Cases raising constitutional

issues are particularly appropriate for a waiver of the bond requirement. *See Ogden v. Marendt*,

264 F. Supp. 2d 785, 795 (S.D. Ind. 2003); *Smith v. Bd. of Election Comm'rs*, 591 F. Supp. 70,

71 (N.D. Ill. 1984). Accordingly, Plaintiffs respectfully request that the court waive the bond

requirement in the event that it grants Plaintiffs' motion for preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for preliminary

injunction and enjoin the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and

441a(a)(3) and 11 C.F.R. §§ 110.1(d) and 110.5(b) as they apply to SpeechNow.org and its

supporters. The Court should also waive the bond requirement under Federal Rule of Civil

Procedure 65(c).

Dated:  February 14, 2008

Respectfully submitted,

Steven M. Simpson (DC Bar No. 462553)
William H. Mellor (DC Bar No. 462072)
Robert Gall (DC Bar No. 482476)
Paul M. Sherman (DC Bar No.978663)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Email: wmellor@ij.org, ssimpson@ij.org,
bgall@ij.org, psherman@ij.org

Steven M. Hoersting*
Bradley A. Smith*
CENTER FOR COMPETITIVE POLITICS
124 W. Street South, Suite 201
Alexandria, VA 22314
Tel: (703) 894-6800
Email: smhoer@aol.com, BSmith@law.capital.edu

29

*Attorneys for Plaintiffs*

* Motions for *Pro Hac Vice* to be filed

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SPEECHNOW.ORG,                          )
DAVID KEATING,                          )
FRED M. YOUNG, JR.,                     )
EDWARD H. CRANE, III,                   )
BRAD RUSSO, and                         )
SCOTT BURKHARDT                         )
                                        )
                    Plaintiffs,         )
                                        )     Case: 1:08-cv-00248
            v.                          )     Assigned To : Robertson, James
                                        )     Assign. Date : 2/14/2008
FEDERAL ELECTION COMMISSION             )     Description: Labor-ERISA
                                        )
                    Defendant.          )
                                        )

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction. The motion is GRANTED. The Court finds that the Plaintiffs' have demonstrated a substantial likelihood of success on the merits, that they will suffer irreparable harm from the application of the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(c) and 441a(a)(3) to SpeechNow.org and its supporters, that the FEC will suffer no harm from the granting of the motion, and that a preliminary injunction is in the public interest. Accordingly, Defendant FEC is preliminarily enjoined from enforcing the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(c) and 441a(a)(3) and any related rules and regulations against Plaintiffs and SpeechNow.org's supporters until a final hearing on the merits.

SO ORDERED this _____ day of _____, 2008.

_____

United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION<br><br>Defendant. | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

**DECLARATION OF BRAD RUSSO IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, BRAD RUSSO, declare under penalty of perjury that the following is true:

1.      I am a citizen of the United States, a resident of the District of Columbia and am over

the age of 18 years. I am eligible to vote in an election for the office of the President of the

United States.  I make this declaration in support of Plaintiffs' motion for preliminary injunction.

This declaration is based on my personal knowledge of the facts stated herein.

2.      I would like to donate money to SpeechNow.org, an independent speech group of

individuals dedicated to promoting and protecting Americans' First Amendment rights to speech,

association, and assembly.  I oppose restrictions on rights to free speech and association,

including those contained in the federal campaign finance laws.  Thus, I support

1

SpeechNow.org's mission, which is to advocate the election of political candidates who favor free speech and to advocate the defeat of candidates who favor speech restrictions in the name of campaign finance reform. I think that calling for the election or defeat of candidates based on their support of First Amendment rights is an ideal way both to affect policy—by affecting who serves in Congress, which makes significant policy regarding those rights—and to promote the importance of free speech. Because SpeechNow.org is going to undertake that kind of advocacy in support of my views, I want to donate to it.

3.      Furthermore, I believe that joining with other like-minded individuals who wish to support and operate SpeechNow.org will allow me to more effectively communicate my views on free speech and candidates than if I were to attempt to speak alone. In other words, giving money to SpeechNow.org allows me to amplify my voice and to reach a much broader audience than I could by myself. I do not consider myself to be a political activist, and I do not have the time, capability, or necessary resources to do things like produce television advertisements that can reach a wide segment of the population; the only way for me to do that is to associate with other like-minded individuals and an organization such as SpeechNow.org. This opportunity of association is particularly important to me because I only have a very small amount of discretionary income that I can use to speak out on free speech and candidates. Joining with others who have greater resources is a great benefit to my efforts to speak out against candidates who support restrictions on free speech.

4.      I have read, understood, and will abide by SpeechNow.org's Bylaws, in particular, sections 9 and 10 of Article X of those Bylaws. I understand that my donations will be used to fund speech, including advertisements that will advocate the election and/or defeat of candidates to federal office based upon their positions on freedom of speech and campaign finance laws. I

understand that SpeechNow.org is an independent group that will not make any contributions to candidates, political committees or political parties and will not coordinate its activities with candidates, candidate committees or political party committees.

5.    I would like to make an immediate donation of $100 to SpeechNow.org to fund its speech activities.  However, as I understand it, SpeechNow.org cannot currently accept any donations because doing so might make it a "political committee" under the campaign finance laws.  If it is determined that SpeechNow.org is not subject to these laws and it begins accepting donations, then I will immediately donate $100 to it.

6.    I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of February, 2008.

Brad Russo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SPEECHNOW.ORG,                          )
DAVID KEATING,                          )
FRED M. YOUNG, JR.,                     )
EDWARD H. CRANE, III,                   )
BRAD RUSSO, and                         )
SCOTT BURKHARDT                         )
                                        )
                Plaintiffs,             )
                                        )       Case: 1:08-cv-00248
                                        )       Assigned To : Robertson, James
        v.                              )   C:  Assign. Date : 2/14/2008
                                        )       Description: Labor-ERISA
FEDERAL ELECTION COMMISSION             )
                                        )
                Defendant.              )
                                        )

---

## DECLARATION OF DAVID KEATING IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

I, DAVID KEATING, declare under penalty of perjury that the following is true:

1.      I am a citizen of the United States, a resident of the State of Maryland, am over the

age of 18 years, and am eligible to vote in an election for the office of President of the United

States. I make this declaration in support of Plaintiffs' motion for preliminary injunction. This

declaration is based on my personal knowledge of the facts stated herein.

2.      I am President and Treasurer of SpeechNow.org, an independent speech group of

individuals dedicated to promoting and protecting Americans' First Amendment rights to free

speech, association, and assembly. SpeechNow.org's mission is to protect First Amendment

rights; an essential part of that mission is advocating the election of political candidates who

favor free speech and advocating the defeat of candidates who favor speech restrictions. SpeechNow.org intends to spend the majority of its funds on that express advocacy. SpeechNow.org seeks to influence the outcome of elections in order to influence the policy decisions and political futures of those who make the policies that affect First Amendment rights.

3.    I organized SpeechNow.org because I believe that the issue of free speech and the threats posed to it by campaign finance laws is vital to the future of this nation. I wanted individuals who share this concern to be able to pool their funds and thus amplify their voices beyond what any individual could achieve on his own. Because federal elections provide a rare opportunity both to impact public policy—by affecting the political futures of the candidates who seek to make public policy—and public debate on issues discussed in campaigns, SpeechNow.org desires to run advertisements calling for the election of candidates who support free speech and association and the defeat of candidates who do not support those rights.

4.    I created SpeechNow.org's website (www.SpeechNow.org), I participate in the creation of all ads that SpeechNow.org intends to publish and/or broadcast, and I also administer all of the organization's affairs. I create and maintain the content of the website, which has a sign-up page for people who are interested in supporting the organization's activities. Currently, SpeechNow.org does not have any employees.

5.    I do not want SpeechNow.org to become a political committee, or PAC, because that has the connotation of an organization that gives to and works with candidates and their political parties. I believe that the media, donors, and voters have a negative view of PACs because of the reputation of PACs as colluding with elected officials, political parties, and candidates. I do not want SpeechNow.org to have to register as a political committee or have to refer to it as a political committee, because I believe that will make it more difficult to raise funds for

SpeechNow.org. There are a number of reasons for that. For example, there are complex contribution limits that affect political committees and parties. There has been an annual calendar-year contribution limit of $5,000 to political committees for over thirty years, and therefore I believe many donors would be reluctant to contribute more than that amount even if a Court ruled additional donations to PACs are structured like SpeechNow.org are legal. Finally, many people are aware of the biennial contribution limits applicable to all PAC contributions, and would thus be reluctant to give SpeechNow.org an amount over this biennial limit or believe they may be forced to choose between giving to SpeechNow.org or other political committees.

6.    SpeechNow.org is an independent group of citizens whose purpose is communicative. We seek to expressly advocate the election or defeat of candidates, not to make contributions to them. Thus, when I organized SpeechNow.org, I did so with the purpose of avoiding any possibility that SpeechNow.org could pose a threat of corruption or its appearance. Furthermore, SpeechNow.org will abide by all of the disclosure requirements described in paragraphs 22-24 of this declaration. Accordingly, I do not believe it is appropriate for SpeechNow.org to be subject to contribution limits or to have to register as a "political committee" as defined by 2 U.S.C. § 431(4).

7.    SpeechNow.org is a District of Columbia unincorporated nonprofit association that is registered as a "political organization" under Internal Revenue Code section 527. Attached hereto as Exhibits A, B, C, and D are true and correct copies of the following organizational documents: SpeechNow.org's Articles of Organization (Ex. A); a Member Action by Written Consent in Lieu of an Organizational Meeting (Ex. B); a Statement of Appointment of Registered Agent for Service of Process (Ex. C), and SpeechNow.org's Internal Revenue Form 8871 (Ex. D). Attached hereto as Exhibit E is a true and correct copy of SpeechNow.org's

Bylaws (Ex. E) (hereinafter, "*Bylaws*"), which specify the organization's mission and the principles under which it will operate. I kept all of these documents, which record or relate to the organizational structure of SpeechNow.org, in the course of the regularly conducted business activity of managing the organization's start-up phase, and it is the regular practice of that business activity to prepare those documents.

8.    SpeechNow.org was founded by individuals and will operate solely on private donations from individuals. The organization's Bylaws, which I wrote and will abide by, prohibit it from directly or indirectly accepting donations or anything of value from business corporations, labor organizations, national banks, federal government contractors, foreign nationals, or political committees. *Bylaws*, Art. VI, § 9; Art X, § 1.

9.    SpeechNow.org is independent of any political candidates, committees, and political parties, and its Bylaws require it to operate wholly independently of any of these entities. Under its Bylaws, SpeechNow.org cannot make contributions or donations of any kind to any FEC-regulated candidate or political committee, and it cannot "coordinate" its activities, as defined in 2 U.S.C. § 441a(a)(7)(B)(C) and 11 C.F.R. Part 109, with any candidates, national, State, district or local political party committees, or their agents. *Bylaws*, Art. VI, §10; Art. X, §§2-10. SpeechNow.org will also not coordinate with political committees.

10.    SpeechNow.org will solicit donations from individuals for funds to buy public, political advertising, to promote free speech and associational rights, and for administrative purposes. Under its Bylaws, SpeechNow.org's solicitations will inform potential donors that their donations may be used for political purposes such as supporting or opposing candidates. *Bylaws*, Art. VI, § 11. Some of SpeechNow.org's solicitations will refer to particular candidates for federal office by name.

11.   Under its Bylaws, SpeechNow.org cannot engage in business activities including the provision of any goods or services that results in income to SpeechNow.org, or any advertising or promotional activity that results in income to SpeechNow.org, other than in the form of membership dues or donations. *Bylaws*, Art. VI, § 6.  Under its Bylaws, SpeechNow.org cannot offer to any donors or members any benefit that is a disincentive for them to disassociate themselves with SpeechNow.org on the basis of the organization's position on a political issue, and it cannot offer its donors or members credit cards, insurance policies or savings plans, training, education, business information, or any other benefits other than that which is necessary to enable recipients to engage in promotion of SpeechNow.org's political ideas. *Bylaws*, Art. VI, § 8.

12.   Under its Bylaws, SpeechNow.org must advise its donors that their donations are not tax deductible and will be used for political purposes such as supporting or opposing candidates. *Bylaws*, Art. VI, § 11.

13.   If it is determined that SpeechNow.org is not subject to contribution limits, SpeechNow.org plans to run political advertisements on television during the 2008 election cycle and other future election cycles.  The political advertisements about Dan Burton and Mary Landrieu, discussed below, along with other advertisements that the organization would like to run in the future, will expressly advocate the election of candidates for federal office who support rights to free speech and association and the defeat of candidates for federal office who do not support those rights.

14.   SpeechNow.org has prepared video and audio scripts for four such advertisements; true and correct copies of these scripts are attached hereto as Exhibit F.

15.  Two of the advertisements call for the defeat of Dan Burton, a Republican Congressman currently running for reelection in the fifth district of Indiana.  Both ads criticize Representative Burton for voting for a bill that would restrict the speech of some nonprofit groups.  The first urges voters to "Say no to Burton for Congress."  The second states that "Dan Burton voted to restrict our rights.  Don't let him do it again."  Ex. F.

16.  The other two advertisements call for the defeat of Mary Landrieu, a Democratic Senator currently running for reelection in Louisiana.  Both ads criticize Landrieu for voting for a law restricting the speech of public-interest groups.  The first urges voters to "Say no to Landrieu for Senate."  The second concludes by saying that "Our founding fathers made free speech the First Amendment to the Constitution.  Mary Landrieu is taking that right away.  Don't let her do it again."  Ex. F.

17.  SpeechNow.org intends to broadcast the advertisements calling for the defeat of Dan Burton in the fifth district of Indiana and the advertisements calling for the defeat of Mary Landrieu in Louisiana.

18.  Attached to this declaration as Exhibit G is a true and correct copy of a bid for the production and airing of the above-described political advertisements.  I received this bid from Mr. Ed Traz of the Traz Group.  As noted in the bid, the production costs for these advertisements will be approximately $12,000.  The cost to buy advertising to achieve the total number of gross ratings points described in the bid—for the markets of Indianapolis, New Orleans, and Baton Rouge—is over $150,000.  (A gross rating point is a measure of the number of times that an ad is viewed by a target audience.)

19.  Based on my experience, these prices are reasonable.  With the donations pledged to SpeechNow.org (about $127,00), the organization can afford to run ads in Indianapolis and either

New Orleans or Baton Rouge. The cost of running the ads in Indianapolis and New Orleans will be about $110,500 (plus $12,000 in production costs). The cost of running the ads in Indianapolis and Baton Rouge will be about $110,500 (plus $12,000 in production costs).

20.    Based on my previous experience, I believe that an ideal buy in a market would be one that would obtain 1,000 gross rating points or more (meaning that the target audience sees the ad about ten or more times), and that, as a general rule, advertisers in a similar situation are looking for a minimum number of gross ratings points of 500 (meaning that the target audience sees the ad about five or more times). The reason for this is that it is important for people to see an advertisement more than once in order for its message to sink in. Also, in a statewide race— such as Landrieu's Senate race – it is important to reach as many people in the state as possible.

21.    Thus, I would strongly prefer to air advertisements in both New Orleans and Baton Rouge and to buy more advertising time than is indicated by the bid. Bringing the Indianapolis, New Orleans, and Baton Rouge buys up to 1,000 gross ratings points would make the total airtime cost roughly $400,000—roughly $180,000 for Indianapolis, roughly $150,000 for New Orleans, and roughly $70,000 for Baton Rouge. (These numbers and those that follow would probably be a bit smaller because the Traz Group would probably reduce its commission with a higher buy.) Bringing the Indianapolis and New Orleans buys up to 500 gross ratings points would make the total airtime cost roughly $ 219,000—roughly $90,000 for Indianapolis and roughly $75,000 for New Orleans. (I'm assuming that the Baton Rouge buy stays the same.) Still, I believe that the purchase of advertisements that SpeechNow.org can afford with the donations pledged would at least allow SpeechNow.org to start making an impact; of course, SpeechNow.org plans to buy more advertising time—indeed, as much as it can afford in order to reach 1,000 gross ratings points in all three markets—if it can legally obtain the funds to do so.

7

Furthermore, based on my experience, I believe that it is important to be able to spend six figures on purchasing airtime because doing so generates additional media interest and free publicity, which can generate more attention to SpeechNow.org's message nationally and possibly more interest among potential donors.

22. Pursuant to 2 U.S.C. § 441d(a), all of SpeechNow.org's advertisements and other communications will include its name, address, and telephone number or World Wide Web address, along with a statement indicating that the communication was paid for by SpeechNow.org and was not authorized by any candidate or candidate's committee.

23. Pursuant to 2 U.S.C. § 441d(d)(2), SpeechNow.org's advertisements will include a statement indicating that SpeechNow.org is responsible for the content of the advertisement.

24. Pursuant to 2 U.S.C. § 434(c), SpeechNow.org will file statements with the FEC reporting the identities of its contributors and the amounts contributed along with the other information required by this provision.

25. I am ready, willing, and able to donate immediately $5,500 in order to fund the advertisements that SpeechNow.org wants to run calling for the defeat of candidates to federal office. Edward Crane is ready, willing, and able to donate immediately $6,000; Richard Marder is ready, willing, and able to donate immediately $5,500; and Fred M. Young, Jr. is ready, willing, and able to donate immediately $110,000. But SpeechNow.org is prohibited from accepting these donations or soliciting additional donations over $5,000 because they would exceed the limit described in 2 U.S.C. § 441a(a)(1)(C). Furthermore, Fred Young's donation would also exceed the limit set forth in 2 U.S.C. § 441a(a)(3). I also understand that SpeechNow.org faces a credible threat of prosecution if it accepts donations in excess of the limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) to fund its advertisements as

described herein. Accordingly, SpeechNow.org cannot currently raise the funds necessary to produce and broadcast the advertisements against Burton and Landrieu as well as other, similar advertisements during the 2008 and future election seasons.

26.    SpeechNow.org will immediately accept the donations from me, Edward Crane, Richard Marder, Fred Young and plans to run the advertisements against Burton and Landrieu if it is legally able to do so without violating the contribution limits described above. Without those contributions, SpeechNow.org cannot afford to run the proposed advertisements.

27.    Furthermore, because of the contribution limits contained in 2 U.S.C. §§ 441(a)(1)(C) and 441a(a)(3), SpeechNow.org cannot raise the initial start-up or "seed" funding necessary to finance its operations. I have been involved in or aware of the running of and raising money for nonprofits for 30 years. Based on my experience, I believe that it is crucial for new organizations to have seed-money that allows them to begin to advance their mission before a successful program of larger-scale fundraising can take place. This is particularly true when an organization is working on an issue for which there is not yet an overwhelming and sustained amount of outrage (usually generated by a string of high-profile events) throughout all quarters of the public and the media that generates a strong demand for the change favored by the organization. Right now, the issue of restrictions on free speech by candidates such as Burton and Landrieu is not such an issue. SpeechNow.org will need to spend substantial funds on advertisements in order to raise the profile of this issue and thus add more donors, both large and small, to the cause. However, without initial seed funding, SpeechNow.org lacks the funds necessary to convince donors that it is a going concern that has already produced advertisements consistent with its mission; I believe convincing donors of this is a prerequisite to a successful larger-scale fundraising effort. Another prerequisite is SpeechNow.org's ability to hire a full-

time employee who can devote most or all of her time to the organization's mission, including its fundraising efforts. I am a one-man volunteer staff right now, and the only time I could conceivably devote to personal fundraising is during the evenings, lunch breaks, or personal or vacation time, when I'm not working in my role as executive director of the Club for Growth. Of course, reaching potential donors in the limited hours available during those times is quite difficult, and often impossible.

28.    The longer SpeechNow.org has to go without seed-funding, the more it will be delayed in producing and running its political advertisements and then in undertaking larger-scale fundraising based on a reputation for taking actions that advance its mission in the real world. Indeed, every day that goes by under the current restrictions under federal election law is one less day that SpeechNow.org has to raise the issue of free speech and restrictions on it during this election season—the period when it is most effective for SpeechNow.org to speak. In particular, if SpeechNow.org is unable to produce and broadcast its ads soon, it will be unable to have any impact on Dan Burton's primary contest, which is set for May 6. Mr. Burton has a credible opponent, and his defeat would surprise many of his colleagues in Congress. We hope that the voters in his district respond to our message about his record opposing free speech by voting for his opponent. I believe that SpeechNow.org will need to start airing its advertisements in Indianapolis at least two weeks before that contest in order to have a reasonable chance to make an impact. Furthermore, SpeechNow.org would like to run advertisements for and against candidates in other House and Senate races besides the Burton and Landrieu races. For example, it would like to run an advertisement against Congresswoman Jean Schmidt in Ohio's primary of March 4, 2008. Of course, not being able to speak at all through advertising during the election season would utterly defeat SpeechNow.org's mission, at least for the current elections.

29.   Even making the dubious and wrong assumption that SpeechNow.org could somehow raise enough money in increments of $5,000 or less per donor to pay for its advertisements against Burton and Landrieu, the contribution limits applicable to political committees would, by making it harder to gather funds, still greatly limit the number of times it could run those ads. The limits would also restrict SpeechNow.org's ability to run additional advertisements concerning other federal candidates in other races.

30.   Following a determination that SpeechNow.org is not subject to contribution limits, which will allow it to run its advertisements about Burton and Landrieu, SpeechNow.org will immediately begin efforts to raise money on a larger scale.  It will use the funds it raises to run more ads against Burton and Landrieu and then to fund the production and airing of political advertisements in other House and Senate races.  Depending on our research on the political situation in various races, we will deploy our resources for or against candidates where we would have the best possibility of success.  It would probably take at least one month from when SpeechNow.org's first advertisements about Burton and Landrieu appear for the organization to be able to raise enough money to make another substantial purchase of advertisements.  Thus, in order to maximize the number of advertisements it can air during the election season, it is important for SpeechNow.org that its request for an injunction be granted as soon as possible.

31.   In addition to the contribution limits described above, having to register as a political committee presents its own set of problems.  Another reason that SpeechNow.org has not produced and run the above-described political advertisements is because, under the definition of political committee contained in 2 U.S.C. § 431(4) and according to what I believe is the FEC's position, spending or receiving more than $1,000 to pay for the advertisements would make SpeechNow.org a political committee subject to organizational, administrative, and reporting

obligations under FECA (described in the following paragraph). For the same reason, SpeechNow.org has not accepted any donations, other than the $76 in in-kind donations I made through the end of 2007, whether above or below the contribution limits for political committees, or solicited any donations or accepted any other funds for its operation. Doing so over the $1,000 threshold would cause SpeechNow.org to have to register as a political committee. I understand that SpeechNow.org faces a real threat of prosecution if it accepts donations in excess of $1,000 without registering as a political committee and complying with the organizational, administrative, and reporting obligations described in the next paragraph.

32.    My understanding is that having to register as a political committee would, among other things, require SpeechNow.org to file a statement of organization, appoint a treasurer for federal election law purposes, maintain a record of all contributions and expenditures for three years, and file regular reports disclosing detailed information concerning the amounts of all contributions and expenditures, the identities of contributors, persons who make loans or give rebates or refunds to the committee, persons who provide any dividend or interest to the committee, the identities of those to whom expenditures are made, and the committee's operating expenses, among other information. It is particularly burdensome to have these obligations before SpeechNow.org can spend money on political advertisements or other activities that advance its mission. In such a situation, I would be spending too much of my time with the organization complying with the above-mentioned obligations and could not spend this time advancing SpeechNow.org's mission.

33.    Because of the current state of the law, I have decided that SpeechNow.org cannot even accept donations under $1,000, even though I have been contacted, through the SpeechNow.org website and other means, by potential donors who want to make such donations.

(Indeed, about 26 people have signed up on the SpeechNow.org website to indicate their support for our policies and to receive updates about the organization.) Two donors who are ready willing and able to give SpeechNow.org $100 each are Brad Russo and Scott Burkhardt. These donations would inch SpeechNow.org closer to being a "political committee," but they would not give it nearly enough money to produce and run advertisements, which, as noted above, are a necessary precondition to a successful large-scale fundraising effort. Until SpeechNow.org is allowed to accept the contributions of over $5,000 that are already pledged, it cannot accept any donations. Accepting even small donations could expose SpeechNow.org to all of the burdensome requirements discussed above without providing the organization enough money to speak out through advertisements in support of its mission and become a going concern that can undertake broader fundraising efforts.

34.    If it is determined that SpeechNow.org is not subject to contribution limits, it will immediately accept, in addition to the donations from me, Ed Crane, Fred Young, and Richard Marder, the donations of Brad Russo and Scott Burkhardt. Furthermore, following that determination, which will allow SpeechNow.org to produce and run advertisements against Burton and Landrieu—which SpeechNow.org plans to do promptly following that determination—SpeechNow.org will solicit large and small donations (including from individuals who have signed up on SpeechNow.org's website).

35.    If it is determined that SpeechNow.org is not subject to contribution limits, I will immediately donate $5,500 to SpeechNow.org. I would also like to be able to donate additional funds this year to finance SpeechNow.org's advertisements, and I will make those donations if it is determined that SpeechNow.org is not subject to contribution limits of any kind. I obviously support and agree with SpeechNow.org's mission and message, and I believe that joining with

other like-minded individuals who wish to support and operate SpeechNow.org will allow me to more effectively communicate my views on free speech and candidates' positions on free speech than if I were to attempt to speak alone. In other words, giving money to SpeechNow.org allows me to amplify my speech about my views and to reach a much broader audience than I could by myself. Despite my desire to give money, I will not be able to donate $5,500 to SpeechNow.org if it is subject to the contribution limits imposed on PACs. I also understand that I face a real threat of prosecution if I give over $5,000 to SpeechNow.org this calendar year. I am also not willing to spend $5,500 on my own as an individual because I believe this amount, if spent on advertising, would have no measurable effect to promote the cause of free speech.

36.    I declare under penalty of perjury that the foregoing is true and correct. Executed this _13th_ day of February, 2008.

David Keating

# EXHIBIT A

## ARTICLES OF ORGANIZATION
## SPEECH NOW.ORG

The below-named organizers of Speech Now.org, an unincorporated non-profit association under D.C. Code § 29-971 et seq. (the District of Columbia Uniform Unincorporated Non-Profit Association Act of 2000), adopt the following Articles of Organization:

FIRST: The name of this unincorporated association shall be Speech Now.Org.

SECOND: The effective date of these articles shall be  *October 24 2007*

THIRD: The period of duration of this unincorporated association shall be perpetual.

FOURTH: The purpose for which this unincorporated association has been organized is to assemble an independent speech group of individuals who are dedicated to promoting and protecting our First Amendment rights to free speech and the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

FIFTH: The name and address of the unincorporated association's registered agent in the District of Columbia is Angela Angelovska-Wilson, 4913 43rd St. NW, Washington DC, 20016. This agent's consent to act as registered agent for the company is evidenced in the attached executed "Written Consent to Act as Registered Agent."

SIXTH: This unincorporated association's address is P.O. Box 18773, Washington DC 20036.

SEVENTH: The number of organizers of this unincorporated association is five. The name and address of the organizers are David Keating, P.O. Box 18773, Washington DC 20036; Edward H. Crane, III, P.O. Box 18773, Washington DC 20036; Richard Marder, P.O. Box 18773, Washington DC 20036; Jon Coupal, P.O. Box 18773, Washington DC 20036; and Daniel J. Shapiro, P.O. Box 18773, Washington DC 20036.

DATE:  *October 24 2007*

Speech Now.Org

_____
David Keating

_____
Richard Marder

_____
Jon Coupal

_____
Edward H. Crane, III

_____
Daniel J. Shapiro

## ARTICLES OF ORGANIZATION
## SPEECH NOW.ORG

The below-named organizers of Speech Now.org, an unincorporated non-profit association under D.C. Code § 29-971 et seq. (the District of Columbia Uniform Unincorporated Non-Profit Association Act of 2000), adopt the following Articles of Organization:

FIRST: The name of this unincorporated association shall be Speech Now.Org.

SECOND: The effective date of these articles shall be _October 24, 2007_

THIRD: The period of duration of this unincorporated association shall be perpetual.

FOURTH: The purpose for which this unincorporated association has been organized is to assemble an independent speech group of individuals who are dedicated to promoting and protecting our First Amendment rights to free speech and the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

FIFTH: The name and address of the unincorporated association's registered agent in the District of Columbia is Angela Angelovska--Wilson, 4913 43rd St. NW, Washington DC, 20016. This agent's consent to act as registered agent for the company is evidenced in the attached executed "Written Consent to Act as Registered Agent."

SIXTH: This unincorporated association's address is P.O. Box 18773, Washington DC 20036.

SEVENTH: The number of organizers of this unincorporated association is five. The name and address of the organizers are David Keating, P.O. Box 18773, Washington DC 20036; Edward H. Crane, III, P.O. Box 18773, Washington DC 20036; Richard Marder, P.O. Box 18773, Washington DC 20036; Jon Coupal, P.O. Box 18773, Washington DC 20036; and Daniel J. Shapiro, P.O. Box 18773, Washington DC 20036.

DATE: _October 14 2007_

Speech Now.Org

_____          _____
David Keating                      Jon Coupal


_____          _____
Richard Marder                     Edward H. Crane, III

_____
Daniel J. Shapiro

ARTICLES OF ORGANIZATION
SPEECH NOW.ORG

The below-named organizers of Speech Now.org, an unincorporated non-profit association under D.C. Code § 29-971 et seq. (the District of Columbia Uniform Unincorporated Non-Profit Association Act of 2000), adopt the following Articles of Organization:

FIRST: The name of this unincorporated association shall be Speech Now.Org.

SECOND: The effective date of these articles shall be _October 24 2007_

THIRD: The period of duration of this unincorporated association shall be perpetual.

FOURTH: The purpose for which this unincorporated association has been organized is to assemble an independent speech group of individuals who are dedicated to promoting and protecting our First Amendment rights to free speech and the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

FIFTH: The name and address of the unincorporated association's registered agent in the District of Columbia is Angela Angelovska-Wilson, 4913 43rd St. NW, Washington DC, 20016. This agent's consent to act as registered agent for the company is evidenced in the attached executed "Written Consent to Act as Registered Agent."

SIXTH: This unincorporated association's address is P.O. Box 18773, Washington DC 20036.

SEVENTH: The number of organizers of this unincorporated association is five. The name and address of the organizers are David Keating, P.O. Box 18773, Washington DC 20036; Edward H. Crane, III, P.O. Box 18773, Washington DC 20036; Richard Marder, P.O. Box 18773, Washington DC 20036; Jon Coupal, P.O. Box 18773, Washington DC 20036; and Daniel J. Shapiro, P.O. Box 18773, Washington DC 20036.

DATE: _10/24/07_

Speech Now.Org

_____         _____
David Keating                     Jon Coupal

_____         _____
Richard Marder                    Edward H. Crane, III

_____
Daniel J. Shapiro

# EXHIBIT B

MEMBER ACTION BY WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING OF
SPEECH NOW.ORG

The undersigned, being the Members of Speech Now.Org (the "Association"), hereby adopt the following resolutions in lieu of a meeting.

BE IT RESOLVED, that the attached Articles of Organization are hereby adopted the Articles of Organization; and

BE IT FURTHER RESOLVED, that the attached bylaws hereby are adopted as the Bylaws of the Association; and

BE IT FURTHER RESOLVED, that the following persons are elected as officers of the Association:

David Keating, President and Treasurer
Jon Coupal, Vice President and Secretary

BE IT FURTHER RESOLVED, that each officer is authorized to obtain a taxpayer identification number from the Internal Revenue Service and use of a post office box from the U.S. Postal Service or a private vendor; and

BE IT FURTHER RESOLVED, that the officers of the Association hereby are authorized, empowered, and directed to establish and maintain accounts with such banks and investment companies as they deem appropriate, and to pay into or deposit therein, subject to the rules of such firms, funds of the Association, consisting of monies, checks, negotiable paper, and other instruments for the payment of money acceptable to the firm or bank; that such funds paid into or deposited in said accounts shall, subject to the rules of such banks, be withdrawn from said account by means of checks, drafts, credit or debit card payments, notes, orders, and receipts issued in the name of the Association and signed as authorized in the Bylaws for the transaction of business in connection with said accounts; and

BE IT FURTHER RESOLVED, that the Secretary of the Association hereby is authorized, empowered, and directed to file a copy of this consent action with the Minutes of proceedings of the Members of the Association; and

This Consent may be executed in one or more counterparts, all of which, taken together, shall constitute a single executed original.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of this 24th day of October 2007.

MEMBERS:

_____
David Keating

_____
Jon Coupal

_____
Richard Harder

_____
Edward H. Crane, III

_____
Daniel J. Shapiro

MEMBER ACTION BY WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING OF
SPEECH NOW.ORG

The undersigned, being the Members of Speech Now.Org (the "Association"), hereby
adopt the following resolutions in lieu of a meeting.

BE IT RESOLVED, that the attached Articles of Organization are hereby adopted the
Articles of Organization; and

BE IT FURTHER RESOLVED, that the attached bylaws hereby are adopted as the
Bylaws of the Association; and

BE IT FURTHER RESOLVED, that the following persons are elected as officers of the
Association:

David Keating, President and Treasurer
Jon Coupal, Vice President and Secretary

BE IT FURTHER RESOLVED, that each officer is authorized to obtain a taxpayer
identification number from the Internal Revenue Service and use of a post office box
from the U.S. Postal Service or a private vendor; and

BE IT FURTHER RESOLVED, that the officers of the Association hereby are
authorized, empowered, and directed to establish and maintain accounts with such
banks and investment companies as they deem appropriate, and to pay into or
deposit therein, subject to the rules of such firms, funds of the Association,
consisting of monies, checks, negotiable paper, and other instruments for the
payment of money acceptable to the firm or bank; that such funds paid into or
deposited in said accounts shall, subject to the rules of such banks, be withdrawn
from said account by means of checks, drafts, credit or debit card payments, notes,
orders, and receipts issued in the name of the Association and signed as authorized
in the Bylaws for the transaction of business in connection with said accounts; and

BE IT FURTHER RESOLVED, that the Secretary of the Association hereby is
authorized, empowered, and directed to file a copy of this consent action with the
Minutes of proceedings of the Members of the Association; and

This Consent may be executed in one or more counterparts, all of which, taken
together, shall constitute a single executed original.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of
this _____ day of October 2007.

MEMBERS:


_____          _____
David Keating                          Jon Coupal


_____          _____
Richard Marder                         Edward H. Crane, III


_____
Daniel I. Shapiro

**MEMBER ACTION BY WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING OF
SPEECH NOW.ORG**

The undersigned, being the Members of Speech Now.Org (the "Association"), hereby adopt the following resolutions in lieu of a meeting.

BE IT RESOLVED, that the attached Articles of Organization are hereby adopted the Articles of Organization; and

BE IT FURTHER RESOLVED, that the attached bylaws hereby are adopted as the Bylaws of the Association; and

BE IT FURTHER RESOLVED, that the following persons are elected as officers of the Association:

David Keating, President and Treasurer
Jon Coupal, Vice President and Secretary

BE IT FURTHER RESOLVED, that each officer is authorized to obtain a taxpayer identification number from the Internal Revenue Service and use of a post office box from the U.S. Postal Service or a private vendor; and

BE IT FURTHER RESOLVED, that the officers of the Association hereby are authorized, empowered, and directed to establish and maintain accounts with such banks and investment companies as they deem appropriate, and to pay into or deposit therein, subject to the rules of such firms, funds of the Association, consisting of monies, checks, negotiable paper, and other instruments for the payment of money acceptable to the firm or bank; that such funds paid into or deposited in said accounts shall, subject to the rules of such banks, be withdrawn from said account by means of checks, drafts, credit or debit card payments, notes, orders, and receipts issued in the name of the Association and signed as authorized in the Bylaws for the transaction of business in connection with said accounts; and

BE IT FURTHER RESOLVED, that the Secretary of the Association hereby is authorized, empowered, and directed to file a copy of this consent action with the Minutes of proceedings of the Members of the Association; and

This Consent may be executed in one or more counterparts, all of which, taken together, shall constitute a single executed original.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of this __23rd__ day of October 2007.

MEMBERS:

_____          _____
David Keating                     Jon Coupal

_____          _____
Richard Marder                    Edward H. Crane, III

_____
Daniel J. Shapiro

# EXHIBIT C

STATEMENT OF APPOINTMENT

TO: The Mayor of the District of Columbia

Pursuant to D.C. Code Title 29, Chapter 971 .10, this statement is to inform the Mayor that Speech Now.Org, an unincorporated nonprofit association, has appointed Angela Angelovska-Wilson, a bona fide resident of the District of Columbia, as an agent authorized to receive service of process.

- Name and address of the nonprofit association:

  Speech Now.Org
  P.O. Box 18773
  Washington, DC 20036

- Federal tax identification number:  26-1288587

- D.C. business tax identification number:  Pending

- Name and address of registered agent for service of process:

  Angela Angelovska-Wilson
  4913 43rd St. NW
  Washington, DC 20016

- Statement of Appointment:

  I, David Keating, President of Speech Now.org, appoint Angela Angelovska-Wilson as an agent of Speech Now.org authorized to receive service of process in the District of Columbia. By signing this statement, Angela Angelovska-Wilson acknowledges and accepts this appointment.

SIGNATURE: _____    DATE: 11/2/07
David Keating,
President, Speech Now.org

SIGNATURE: _____    DATE: 10/30/07
Angela Angelovska-Wilson,
Registered Agent for Service of Process

# EXHIBIT D

Form **8871**
(Rev. July 2003)

Department of the Treasury
Internal Revenue Service

## Political Organization
## Notice of Section 527 Status

OMB No. 1545-1693

---

**Part I    General Information**

1  Name of organization
SPEECH NOW.ORG

Employer identification number
26 - 1288587

2  Mailing address (P.O. box or number, street, and room or suite number)
PO BOX 18773

City or town, state, and ZIP code
WASHINGTON, DC 20036

3  Check applicable box:        ✓ Initial notice     ___ Amended notice     ___ Final notice

4a Date established
10/24/2007

4b Date of material change

5  E-mail address of organization
no@email

6a Name of custodian of records
DAVID KEATING

6b Custodian's address
PO BOX 18773
WASHINGTON, DC 20036

7a Name of contact person
DAVID KEATING

7b Contact person's address
PO BOX 18773
WASHINGTON, DC 20036

8  Business address of organization (If different from mailing address shown above).  Number, street, and room or suite number
PO BOX 18773

City or town, state, and ZIP code
WASHINGTON, DC 20036

9a Election authority

NONE

9b Election authority identification number

---

**Part II    Notification of Claim of Exemption From Filing Certain Forms (see instructions)**

10a Is this organization claiming exemption from filing Form 8872, Political Organization Report of Contributions and Expenditures, as a qualified state or local political organization? Yes ___ No ✓

10b If 'Yes,' list the state where the organization files reports:

11  Is this organization claiming exemption from filing Form 990 (or 990-EZ), Return of Organization Exempt from Income Tax, as a caucus or associations of state or local officials? Yes ___ No ✓

---

**Part III    Purpose**

12  Describe the purpose of the organization

The Association is an independent speech group of individuals who have assembled in order to promote and protect our First Amendment rights to free speech and the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

**Part IV**  List of All Related Entities (see instructions)

13 Check if the organization has no related entities...............................................................  ✓

| 14a  Name of related entity | 14b  Relationship | 14c  Address |
|---|---|---|
| | | |

**Part V**  List of All Officers, Directors, and Highly Compensated Employees (see instructions)

| 15a  Name | 15b  Title | 15c  Address |
|---|---|---|
| DANIEL J SHAPIRO | MEMBER | PO BOX 18773<br>WASHINGTON, DC 20036 |
| EDWARD H CRANE III | MEMBER | PO BOX 18773<br>WASHINGTON, DC 20036 |
| RICHARD MARDER | MEMBER | PO BOX 18773<br>WASHINGTON, DC 20036 |
| JON COUPAL | VICE PRESIDENT AND SECRETARY | PO BOX 18773<br>WASHINGTON, DC 20036 |
| DAVID KEATING | PRESIDENT AND TREASURER | PO BOX 18773<br>WASHINGTON, DC 20036 |

Under penalties of perjury, I declare that the organization named in Part I is to be treated as a tax-exempt organization described in section 527 of the Internal Revenue Code, and that I have examined this notice, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that I am the official authorized to sign this report, and I am signing by entering my name below.

**Sign Here**

DAVID KEATING

Name of authorized official

10/24/2007

Date

# EXHIBIT E

The undersigned Members hereby adopt the following bylaws (the "Bylaws") for the creation and governance of the Speech Now.org as of October ___24___, 2007:

BYLAWS
OF
SPEECH NOW.ORG
(the "Association")

ARTICLE I

ORGANIZATION

Section 1. Formation. Each of the undersigned Members hereby acknowledge the formation of the Association as an unincorporated association in accordance with the District of Columbia Uniform Unincorporated Non-Profit Association Act of 2000, D.C. Code Ann. §29-971, et. seq. (the "Act"), and confirms and agrees to such Member's status as a Member of the Association. ("Member" shall have the meaning ascribed to "member" in the Act.)

Section 2. Name. The name of the Association is "Speech Now.org," and it is hereinafter referred to in these Bylaws as the "Association." The business of the Association shall be conducted under that name or such other name or names as the Members shall determine.

Section 3. Mailing Address. The mailing address of the Association shall be P.O. Box 18773, Washington DC 20036 or such other place within the District of Columbia as the Members shall determine. The Association may maintain an office or offices for the transaction of business at such other locations as the Members or the President may deem advisable.

Section 4. Registered Agent. The initial registered agent of the Association in the District of Columbia is Angela Angelovska-Wilson, and the address of the initial registered agent is 4913 43rd St. NW, Washington DC, 20016. The name and address of the registered agent may be filed with the Mayor of Washington, DC as provided in the Act and may be changed to such other agent or office as the Members designate from time to time in the manner provided under the Act.

Section 5. Organization. The Association shall be made up of Members elected to membership by the then-current Members of the Association as set forth in these Bylaws. No person may become a Member by virtue of providing financial or other support to the Association, by declaring themselves a Member of the Association, or by virtue of their membership, participation in or association with any other organization. No dues shall be required of Members, nor shall the payment of any sums to the Association be deemed grounds for Membership herein.

Section 6. Term and Termination. The term of the Association shall commence as of the date of these Bylaws and shall continue until the dissolution of the Association by vote of two-thirds of the then-current elected and serving Members (and not two-thirds of the Members representing a quorum at any meeting of the Members).

Section 7. Powers. In furtherance of its mission, subject to the provisions of these Bylaws and the Act, the Association shall have the power to take any action or incur any obligation as an Association.

Section 8. Limitation on Liability. In accordance with the Act, the debts, obligations

and liabilities of the Association, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Association, and none of the Members, officers or agents of the Association shall be obligated personally for any such debt, obligation or liability of the Association solely by reason of being a Member, officer or agent or otherwise participating in the management of the Association.

ARTICLE II

MISSION

The Association is an independent speech group of individuals who have assembled in order to promote and protect our First Amendment rights to free speech and the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

ARTICLE III

MEMBERS

Section 1. General Powers. The property, affairs, and business of the Association shall be managed and controlled by its Members as a body. The Members may by general resolution delegate to officers of the Association and to committees of the Association such powers as provided for in these Bylaws.

Section 2. Number and Qualification. The number of initial Members shall be five. The Association shall have a set number of Members, which may be changed by a majority vote of the Members. In order to be qualified for membership in the Association, and prior to becoming a Member, each Member shall execute an acknowledgement setting forth the Member's obligations under Section X of these Bylaws. Initial Members shall sign such acknowledgment concurrently with the execution of these Bylaws.

Section 3. Election. Other than the initial Members, all new and continuing Members shall be elected by then current Members by majority vote. Election of Members shall be held at least once a year. Election of Members can be held at any meeting called for such purpose by the President or a majority of the Members. Any person elected as a Member shall not become a Member until duly qualified as set forth in section 2 of Article III.

Section 4. Terms. Members shall serve terms of one year or less as determined by the Members when electing such Member; provided that no Member shall cease to be a Member until the earlier of such Member's death, resignation, removal or the election and qualification of a successor to such Member. Failure to hold one or more Member meetings or failure to elect and qualify Members in one or more years, or both, will not end the term of any Member, will not cause any vacancy of a Member, and will not affect the powers or the validity of any act of the Members on behalf of the Association. This paragraph does not prevent or restrict the filling of a vacancy of any Member, including a vacancy caused by an increase in the number of Members.

Section 5. Resignation. Any Member may resign at any time by giving written notice to the President or all other Members. If that resignation takes effect before the Member's term is complete, an election called by the President will be held to fill the remainder of such resigning Member's term.

Section 6. Removal. The vote of two-thirds of all of the elected and serving Members (and not two-thirds of the Members representing a quorum at any meeting of the Members) is required to remove a Member from office prior to the expiration of the term for which that Member has been elected. If a Member is removed, an election called by the President will be held to fill the remainder of such removed Member's term.

Section 7. Vacancies. Any vacancy among the Members, whether caused by resignation, death or removal, shall be filled by a majority vote of the remaining Members.

Section 8. Meetings. The annual, special or any other regular meetings of the Members may be called by the President, or a majority of the Members then in office may provide by resolution the time and place, who may fix any place, whether within or without the District of Columbia, as the place for holding any meeting. The Members shall meet at least once a year.

Section 9. Notice. Notice of any special meeting of the Members shall be given at least seven days previous thereto by written notice delivered personally, by phone, by e-mail, by mail or by fax to each Member at such Member's address as shown by the records of the Association, unless waived by each Member. The attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. If a special meeting of the Members is convened, the notice shall indicate the business to be transacted at, or the purpose of, the special meeting of the Members.

Section 10. Quorum. The presence in person of a majority of then elected and serving Members (not counting any vacancies of Members) shall constitute a quorum for the transaction of business at any meeting of the Members; but if less than a quorum are present at said meeting, a majority of the Members present may adjourn the meeting.

Section 11. Manner of Acting. The act of a majority of the Members present at a meeting at which a quorum is present shall be the act of the Members, unless the act of a supermajority vote is required by these Bylaws. Members may attend a meeting by telephonic or similar equipment by means of which all persons participating in the meeting can hear each other.

Section 12. Informal Action. Any action permissible or required by these Bylaws to be taken at a meeting of Members may be taken without a meeting if consent in writing, setting forth the action so taken, shall be given by all of the Members. Such consent in writing may be by signature of any such member or may be by electronic mail message sent from the electronic mail account for such Member on file with the Association. Any such consent may be executed in one or more counterparts and may be transmitted via facsimile, electronic mail or either, all of which, taken together, shall constitute a single executed original.

Section 13. Compensation. Members shall not receive any stated salaries for their services as such, but by resolution of the Members expenses of attendance may be allowed for attendance at each regular or special meeting of the Members; however, nothing herein contained shall be construed to preclude any Member from serving the Association in any other capacity and receiving reasonable compensation therefor.

Section 14. Access. A copy of these Bylaws and other official documents and records of the Association shall be made available upon request to any Member.

ARTICLE IV

COMMITTEES

Section 1. Committees. The Members may, by resolution, designate one or more committees of the Association. Each committee shall consist of at least two or more Members in addition to any other persons who serve on such committee. Such committees shall have such names as may be determined from time to time by resolution of the Members.

Section 2. Authority of Committees. Each committee of the Association shall have and may exercise all the powers of the Members in the management of the business and affairs of the Association delegated to it by resolution of the Members; provided that no such committee shall have the power or authority to elect Members or take any action that requires more than a simple majority vote of a quorum of the Members.

ARTICLE V

OFFICERS

Section 1. Officers. The officers of the Association shall be a President, a Vice President, a Secretary, a Treasurer, and such other officers as may be designated by the Members as set forth below. Any two offices may be held by the same person.

Section 2. Selection and Qualification. In order to be qualified to hold any office of the Association, and prior to becoming an officer, each designated officer shall execute an acknowledgement setting forth an officer's obligations under Section X of these Bylaws. The officers of the Association shall be designated annually by the Members at the annual meeting of the Members. If current officers shall not be designated at such meeting, they shall hold office until the next designation of officers by the Members, which designation shall be accomplished as soon thereafter as convenient. Failure to hold one or more Member meetings or failure to designate and qualify officers in one or more years, or both, will not end the term of any officer, will not cause any vacancy, and will not affect the existence or powers of or the validity of any act of such officer on behalf of the Association. New offices may be created and filled at any meeting of the Members.

Section 3. Removal. Any officer may be removed by a majority vote (except the President) of the Members, but such removal shall be without prejudice to the contract rights, if any, of the officer so removed. The President shall be removed only upon a two thirds vote of all the Members the elected and serving (and not two-thirds of the Members representing a quorum at any meeting of the Members).

Section 4. Resignation. Any officer may resign at any time by giving written notice to the President, but such resignation shall be without prejudice to the contract rights, if any, of the Association. If that resignation takes effect before the officer's successor is designated, a meeting called by the President will be held to fill such resigning officer's position.

Section 5. Vacancy. A vacancy in any office because of death, resignation, removal or otherwise, may be filled by the Members.

Section 6. President. The President shall be the principal executive officer of the Association and shall exercise general supervision over the affairs of the Association, its officers, and personnel, consistent with policies established by the Members. The President may sign any deeds, mortgages, bonds, contracts, or other instruments, except in cases where the signing and execution thereof shall be expressly delegated by the Members or by these Bylaws or by statute to some other officer or agent of the Association; and in general shall perform all duties incident to the office of the President and such other duties as may be prescribed by the Members. The President may authorize and approve expenditures and take such other steps he or she shall deem necessary to advance the purposes of the Association, provided such steps do not exceed the scope of authority granted the President by these Bylaws or the Members.

Section 7. Vice President. The Vice President shall perform such duties as may be assigned by the President or the Members.

Section 8. Treasurer. The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Association; receive and give receipts for monies due and payable to the Association from any source whatsoever and deposit all such monies in the name of the Association in such banks, trust companies, or other depositories as shall be selected in accordance with the provisions of Article VI of these Bylaws; and in general perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned by the President or by the Members. The Treasurer shall be responsible for the administration and oversight of the Association's financial records, initiation of an annual audit, compliance with statutory reporting requirements, tax returns, and tax payments.

Section 9. Secretary. The Secretary shall keep the minutes of the meetings of the Members and all committees of the Association and shall oversee the keeping, preparation, and filing of all other records required by law or by the policies of the Association; be custodian of the Association records; keep a register of the post office address of each Member and officer which shall be furnished to the Secretary by such Member or officer; and in general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned by the President or by the Members.

ARTICLE VI

OPERATIONS, CONTRACTS, CHECKS, DEPOSITS AND FUNDS

Section 1. Contracts. The Members may authorize any officer or officers, agent, or agents of the Association in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Association and such authority may be general or confined to specific instances.

Section 2. Checks. All checks, drafts, or orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Association, shall be signed by such officer or officers, agent, or agents of the Association and in such manner as shall from time to time be determined by resolution of the Members. In the absence of such determination by the Members, such instruments shall be signed or otherwise authorized by any officer of the Association.

Section 3. Deposits. Except as provided below, all funds of the Association shall be deposited from time to time to the credit of the Association in such banks, trust

companies, or other depositories as the Members may select. No funds of $1,000 or more in aggregate per calendar year shall be solicited, accepted or deposited until it is determined the Association may legally accept such amount of funds.

Section 4.  Funds. Except as provided below, the Members may accept on behalf of the Association any contribution, gift, bequest, or devise for the general purposes or for any special purpose of the Association.

Section 5.  Books and Records. The Association shall keep correct and complete books and records of accounts and shall also keep minutes of the proceedings of its Members and committees having any of the authority of the Members.

Section 6.  Business Activities Prohibited.  The Association shall not engage in business activities including: A) Any provision of goods or services that results in income to the corporation; and B) Advertising or promotional activity which results in income to the corporation, other than in the form of donations.

Section 7.  Claims Barred. The Association  shall have no persons, other than employees and creditors with fair market value contracts, affiliated in any way that could allow them to make a claim on the organization's assets or earnings.

Section 8.  Benefits of Support for the Association.  The Association shall not offer to any supporters or members any benefit that is a disincentive for them to disassociate themselves with the Association on the basis of the Association's position on a political issue. Such benefits include but are not limited to: A) Credit cards, insurance policies, consumer discounts or savings plans; and B) Training, education, or business information, other than that which is necessary to enable recipients to engage in the promotion of the Association's political ideas.

Section 9.  Certain Contributions Prohibited.  The Association shall not directly or indirectly accept donations of anything of value from corporations, labor organizations, national banks, federal government contractors, foreign nationals, candidates, political parties or political committees.  It shall keep records to demonstrate that it has not accepted such donations.

Section 10.  Certain Expenditures Prohibited.  The Association shall not make a contribution or directly or indirectly make a donation of anything of value to any candidate for elected public office, any political committee or political party.  Such limitations do not apply to independent expenditures.

Section 11.  Disclosures to Supporters. Donors to the Association shall be advised that their donations are not tax deductible and may be used for political purposes such as supporting or opposing candidates.  Donors to the Association shall also be advised that all donations to the Association will be spent according to the sole discretion of Association.

## ARTICLE VII

### FISCAL YEAR

The fiscal year of the Association shall begin on the first day of January and end on the last day of December.

## ARTICLE VIII

### INDEMNIFICATION

Any present or former Member or officer of the Association, or such other persons so designated in the discretion of the Members (each, an "Indemnified Person"), or the legal representative of such Indemnified Person, shall be indemnified by the Association against all reasonable costs, expenses, and counsel fees paid or incurred in connection with any action, suit, or proceeding to which any such person or his legal representative may be made a party by reason of his being or having been such a Member or officer serving or having served the Association, except in relation to matters as to which he shall be found guilty of gross negligence or misconduct in respect of the matters in which indemnity is sought and in relation to matters settled or otherwise terminated without a final determination on the merits where such settlement or termination is predicated on the existence of such gross negligence or misconduct.

## ARTICLE IX

### PROCEDURE

The rules contained in the most recent edition of Robert's Rules of Order shall provide the rules of procedure for the Association where they are not inconsistent with these Bylaws.

## ARTICLE X

### MEMBER AND ASSOCIATION RULES

Section 1.  Prohibited donations.  The Association shall not accept donations or other funds from corporations, labor organizations, national banks, federal government contractors, candidates, political parties, political committees, or foreign nationals.

Section 2.  Prohibited vendors.  The Association shall not use any media, polling, fundraising, public relations, advertising, or political vendor for services in producing or distributing an Association communication featuring a candidate for federal office or in advising the Association about a Congressional or Senate race involving the featured candidate if that vendor is also engaged, or was engaged in the same election cycle, by the candidate featured or mentioned in the Association communication, his or her opponent, or a political party committee.

Section 3.  Prohibited employees.  The Association shall not employ or otherwise use former employees or independent contractors, in the same election cycle, of any candidate featured or mentioned in an Association communication, his or her opponent, or a political party committee.

Section 4.  Ensure independence of speech.  Members, officers, employees, and agents of the Association shall ensure the independence of all speech by the Association on any candidate or political party. They shall do this in part by

understanding 11 Code of Federal Regulations 109.21 or successor regulations that define coordinated communications in order to avoid coordination with a candidate, an authorized committee of a candidate, a political party committee, or an agent of any of the foregoing.

Section 5. Prohibited speech. Members, officers, employees, and agents of the Association shall not inquire about the campaign plans, projects, activities, or needs of a candidate featured or mentioned in an Association communication, his or her opponent, or a political party committee.

Section 6. Use of nonpublic information. A Member, officer, employee, and agent of or donor to the Association who possesses nonpublic information about the campaign plans, projects, activities, or needs of a candidate featured or mentioned in an Association communication shall not relay such information to the Association, and a Member or donor shall recuse himself from all decisions about Association deliberations regarding potential communications about a featured candidate or his or her opponent. Such officer, employee or agent of the Association shall not participate in any work of the Association related to the advertisements featuring such a candidate.

Section 7. Other prohibited speech. Members, officers, employees, and agents of and donors to the Association shall not inform any candidate featured or mentioned in an Association communication, his or her opponent, a political party committee, or agents of any of the foregoing about the Association's plans, projects, activities, or needs—especially as it relates to advertising.

Section 8. Actions by candidates. No candidate featured or mentioned in an Association communication, his or her opponent, political party committee, or agent of any of the foregoing shall be involved in any way whatsoever in making decisions about the Association's activities or in the creation or distribution of Association advertisements.

Section 9. Requests by candidates. The Association and its Members, officers, agents, employees and donors shall not make any communications featuring or mentioning a candidate at the request of the featured candidate, his or her opponent, a political party, or an agent of any of the foregoing. The Association and its agents and donors shall not seek the assent, directly or indirectly, of any communication from any candidate featured or mentioned in the communication, his or her opponent, a political party committee, or a agent of any of the foregoing.

Section 10. Speech by donors. Any donor to the Association who has any connection with any candidate featured or mentioned in an Association communication shall not communicate in any way with the candidate, his or her opponent, a political party committee, or agents of any of the foregoing regarding any details of Association advertisements.

Section 11. Communication of Obligations. The Members and officers shall cause all employees and agents of and donors to the Association to be notified of their duties under this Article 10; and each employee and agent of the Association shall be required to sign an acknowledgment of such employee's or agent's duties under this Article 10 as a condition to such person's participation in Association activities.

ARTICLE XI

AMENDMENTS TO BYLAWS

These Bylaws may only be altered, amended, or repealed and new Bylaws may be adopted by a majority of the then elected and serving Members (and not a majority of the Members representing a quorum at any meeting of the Members) at any regular meeting or at any special meeting. If at least seven days written notice is given of intention to alter, amend, or repeal, or to adopt new Bylaws at such meeting.

[Signature Page Follows]

SIGNATURE PAGE TO THE
Bylaws of
Speech Now.org

IN WITNESS WHEREOF, the undersigned have duly executed these Bylaws as of date first written above.

MEMBERS:

_____          _____
David Keating                                   Jon Coupal

_____          _____
Richard Marder                                  Edward H. Crane, III

_____
Daniel J. Shapiro

These Bylaws may only be altered, amended, or repealed and new Bylaws may be adopted by a majority of the then elected and serving Members (and not a majority of the Members representing a quorum at any meeting of the Members) at any regular meeting or at any special meeting, if at least seven days written notice is given of intention to alter, amend, or repeal, or to adopt new Bylaws at such meeting.

[Signature Page Follows]

SIGNATURE PAGE TO THE
Bylaws of
Speech Now.org

IN WITNESS WHEREOF, the undersigned have duly executed these Bylaws as of date first written above.

MEMBERS:

_____          _____
David Keating                             Jon Coupal


_____          _____
Richard Marder                            Edward H. Crane, III


_____
Daniel J. Shapiro

These Bylaws may only be altered, amended, or repealed and new Bylaws may be adopted by a majority of the then elected and serving Members (and not a majority of the Members representing a quorum at any meeting of the Members) at any regular meeting or at any special meeting, if at least seven days written notice is given of intention to alter, amend, or repeal, or to adopt new Bylaws at such meeting.

[Signature Page Follows]

SIGNATURE PAGE TO THE
Bylaws of
Speech Now.org

IN WITNESS WHEREOF, the undersigned have duly executed these Bylaws as of date first written above.

MEMBERS:

_____          _____
David Keating                              John Coupal

_____          _____
Richard Marder                             Edward H. Crane, III

_____
Daniel J. Shapiro

10/30/2007  23:06    3016522185    SCHADLER&KEATING    PAGE 01

## Speech Now.org Affirmation

As an Officer of, Member of, consultant to and/or employee of Speech Now.org ("Association") and in accordance with Articles III, V, and X of the Association's Bylaws, I do hereby affirm that I will abide by my obligations under Section X of the Association's Bylaws as follows:

### MEMBER AND ASSOCIATION RULES

Section 1.  Prohibited donations.  The Association shall not accept donations or other funds from corporations, labor organizations, national banks, federal government contractors, candidates, political parties, political committees, or foreign nationals.

Section 2.  Prohibited vendors.  The Association shall not use any media, polling, fundraising, public relations, advertising, or political vendor for services in producing or distributing an Association communication featuring a candidate for federal office or in advising the Association about a Congressional or Senate race involving the featured candidate if that vendor is also engaged, or was engaged in the same election cycle, by the candidate featured or mentioned in the Association communication, his or her opponent, or a political party committee.

Section 3.  Prohibited employees.  The Association shall not employ or otherwise use former employees or independent contractors, in the same election cycle, of any candidate featured or mentioned in an Association communication, his or her opponent, or a political party committee.

Section 4.  Ensure independance of speech.  Members, officers, employees, and agents of the Association shall ensure the independence of all speech by the Association on any candidate or political party.  They shall do this in part by understanding 11 Code of Federal Regulations 109.21 or successor regulations that define coordinated communications in order to avoid coordination with a candidate, an authorized committee of a candidate, a political party committee, or an agent of any of the foregoing.

Section 5.  Prohibited speech.  Members, officers, employees, and agents of the Association shall not inquire about the campaign plans, projects, activities, or needs of a candidate featured or mentioned in an Association communication, his or her opponent, or a political party committee.

Section 6.  Use of nonpublic information.  A Member, officer, employee, and agent of or donor to the Association who possesses nonpublic information about the campaign plans, projects, activities, or needs of a candidate featured or mentioned in an Association communication shall not relay such information to the Association, and a Member or donor shall recuse himself from all decisions about Association deliberations regarding potential communications about a featured candidate or his or her opponent.  Such officer, employee or agent of the Association shall not participate in any work of the Association related to the advertisements featuring such a candidate.

Section 7.  Other prohibited speech.  Members, officers, employees, and agents of and donors to the Association shall not inform any candidate featured or mentioned in an Association communication, his or her opponent, a political party committee, or agents of any of the foregoing about the Association's plans, projects, activities, or needs—especially as it relates to advertising.

10/30/2007  23:06     3016522185     SCHADLER&KEATING     PAGE  82

Section 8.  Actions by candidates.  No candidate featured or mentioned in an Association communication, his or her opponent, political party committee, or agent of any of the foregoing shall be involved in any way whatsoever in making decisions about the Association's activities or in the creation or distribution of Association advertisements.

Section 9.  Requests by candidates.  The Association and its Members, officers, agents, employees and donors shall not make any communications featuring or mentioning a candidate at the request of the featured candidate, his or her opponent, a political party, or an agent of any of the foregoing.  The Association and its agents and donors shall not seek the assent, directly or indirectly, of any communication from any candidate featured or mentioned in the communication, his or her opponent, a political party committee, or a agent of any of the foregoing.

Section 10.  Speech by donors.  Any donor to the Association who has any connection with any candidate featured or mentioned in an Association communication shall not communicate in any way with the candidate, his or her opponent, a political party committee, or agents of any of the foregoing regarding any details of Association advertisements.

Section 11.  Communication of Obligations.  The Members and officers shall cause all employees and agents of and donors to the Association to be notified of their duties under this Article 10; and each employee and agent of the Association shall be required to sign an acknowledgment of such employee's or agent's duties under this Article 10 as a condition to such person's participation in Association activities.

Name (please print): _David Keating_

Signature _[signature]_

Date _10/30/07_

Section 8.  Actions by candidates.  No candidate featured or mentioned in an Association communication, his or her opponent, political party committee, or agent of any of the foregoing shall be involved in any way whatsoever in making decisions about the Association's activities or in the creation or distribution of Association advertisements.

Section 9.  Requests by candidates.  The Association and its Members, officers, agents, employees and donors shall not make any communications featuring or mentioning a candidate at the request of the featured candidate, his or her opponent, a political party, or an agent of any of the foregoing.  The Association and its agents and donors shall not seek the assent, directly or indirectly, of any communication from any candidate featured or mentioned in the communication, his or her opponent, a political party committee, or a agent of any of the foregoing.

Section 10.  Speech by donors.  Any donor to the Association who has any connection with any candidate featured or mentioned in an Association communication shall not communicate in any way with the candidate, his or her opponent, a political party committee, or agents of any of the foregoing regarding any details of Association advertisements.

Section 11.  Communication of Obligations.  The Members and officers shall cause all employees and agents of and donors to the Association to be notified of their duties under this Article 10; and each employee and agent of the Association shall be required to sign an acknowledgment of such employee's or agent's duties under this Article 10 as a condition to such person's participation in Association activities.

Name (please print):  EDWARD H. CRANE

Signature

Date  10-19-07

Section 8.  Actions by candidates.  No candidate featured or mentioned in an Association communication, his or her opponent, political party committee, or agent of any of the foregoing shall be involved in any way whatsoever in making decisions about the Association's activities or in the creation or distribution of Association advertisements.

Section 9.  Requests by candidates.  The Association and its Members, officers, agents, employees and donors shall not make any communications featuring or mentioning a candidate at the request of the featured candidate, his or her opponent, a political party, or an agent of any of the foregoing.  The Association and its agents and donors shall not seek the assent, directly or indirectly, of any communication from any candidate featured or mentioned in the communication, his or her opponent, a political party committee, or a agent of any of the foregoing.

Section 10.  Speech by donors.  Any donor to the Association who has any connection with any candidate featured or mentioned in an Association communication shall not communicate in any way with the candidate, his or her opponent, a political party committee, or agents of any of the foregoing regarding any details of Association advertisements.

Section 11.  Communication of Obligations.  The Members and officers shall cause all employees and agents of and donors to the Association to be notified of their duties under this Article 10; and each employee and agent of the Association shall be required to sign an acknowledgment of such employee's or agent's duties under this Article 10 as a condition to such person's participation in Association activities.


Name (please print):  _Jonathan Coupal_

_(signature)_

Signature


_10/23/07_

Date

10/25/2007  08:53    3015522185                SCHADLER&KEATING                        PAGE  05

10/14/2007  16:52    13045987922              OFFICE DEPOT                          PAGE  02/05

Section 8.  Actions by candidates.  No candidate featured or mentioned in an Association communication, his or her opponent, political party committee, or agent of any of the foregoing shall be involved in any way whatsoever in making decisions about the Association's activities or in the creation or distribution of Association advertisements.

Section 9.  Requests by candidates.  The Association and its Members, officers, agents, employees and donors shall not make any communications featuring or mentioning a candidate at the request of the featured candidate, his or her opponent, a political party, or an agent of any of the foregoing.  The Association and its agents and donors shall not seek the assent, directly or indirectly, of any communication from any candidate featured or mentioned in the communication, his or her opponent, a political party committee, or a agent of any of the foregoing.

Section 10.  Speech by donors.  Any donor to the Association who has any connection with any candidate featured or mentioned in an Association communication shall not communicate in any way with the candidate, his or her opponent, a political party committee, or agents of any of the foregoing regarding any details of Association advertisements.

Section 11.  Communication of Obligations.  The Members and officers shall cause all employees and agents of and donors to the Association to be notified of their duties under this Article 10; and each employee and agent of the Association shall be required to sign an acknowledgment of such employee's or agent's duties under this Article 10 as a condition to such person's participation in Association activities.

Name (please print): _____Daniel Shapiro_____

Signature _____Daniel Shapiro_____

Date _____10/14/07_____

Section 8.  Actions by candidates.  No candidate featured or mentioned in an Association communication, his or her opponent, political party committee, or agent of any of the foregoing shall be involved in any way whatsoever in making decisions about the Association's activities or in the creation or distribution of Association advertisements.

Section 9.  Requests by candidates.  The Association and its Members, officers, agents, employees and donors shall not make any communications featuring or mentioning a candidate at the request of the featured candidate, his or her opponent, a political party, or an agent of any of the foregoing.  The Association and its agents and donors shall not seek the assent, directly or indirectly, of any communication from any candidate featured or mentioned in the communication, his or her opponent, a political party committee, or a agent of any of the foregoing.

Section 10.  Speech by donors.  Any donor to the Association who has any connection with any candidate featured or mentioned in an Association communication shall not communicate in any way with the candidate, his or her opponent, a political party committee, or agents of any of the foregoing regarding any details of Association advertisements.

Section 11.  Communication of Obligations.  The Members and officers shall cause all employees and agents of and donors to the Association to be notified of their duties under this Article 10; and each employee and agent of the Association shall be required to sign an acknowledgment of such employee's or agent's duties under this Article 10 as a condition to such person's participation in Association activities.

Name (please print): RICHARD A MARDER

_____
Signature

10-16-07
Date

# EXHIBIT F

SPEECHNOW.ORG:    BURTON SCRIPT

AUDIO:

Free speech is so important,
it's the First Amendment to the
Constitution.

But politicians like Dan Burton
don't like free speech.

Burton voted for a bill to restrict the speech of
many public interest groups.

Under this bill you could go to jail
for criticizing politicians.

Hey Dan Burton.
This is America, not Russia .

But we still have the right to vote.

Say no to Burton for Congress.

Say no to censorship.

Speech Now.org is responsible for the content
of this advertising.

VIDEO:

Montage of media, TV, newspaper,
fold in video of Constitution
CHYRON: Freedom of Speech

Burton footage slow mo on TV screen
Burning/disappearing Constitution
CHYRON: ID Burton, Opposes Free Speech.

TV screen turns off.
CHYRON: Restricting Free Speech

Focus on handcuffs, being led to cell.
CHYRON: Protecting Politicians.

Cell door closes behind cuffed person.
Burton pic

Voting footage.
CHYRON to chase VO.

Burton pic.
Say no to Burton for Congress
Say no to censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising. Paid for by Speech
Now.org.  Not authorized by any candidate or
candidate's committee.www.Speech Now.org

<u>SPEECHNOW.ORG:</u>     <u>ALT: BURTON SCRIPT</u>

AUDIO:
We've all seen the fight for
free speech around the world.

Lately, free speech has come under
attack right here in America.

Thanks to politicians like
Dan Burton.

Burton voted for a bill to
restrict the speech of
many public interest groups.

Under this bill you could go to jail
for criticizing politicians.

Our founding fathers made free speech
the First Amendment to the Constitution.

Dan Burton voted to restrict our rights.

Don't let him do it again.

SpeechNow.org is responsible for
the content of this advertising.

VIDEO:
Footage of Tiananmen Square on TV screen
Footage of Berlin Wall coming down
hold still of each on screen

Chyron: Free Speech Under Attack in
America.

Dissolve to Burton photo.
ID Burton

TV shuts off. Chyron: Silencing Free
Speech

Cuffed hands, led to cell, cell door closes

Show Constitution.

Constitution burns/dissolves.  Burton photo, ID
him, CHYRON: Say NO to Burton for
Congress.

CHYRON: Say NO to Censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising.  Paid for by Speech
Now.org.  Not authorized by any candidate or
candidate's committee.www.Speech Now.org

SPEECHNOW.ORG:    LANDRIEU SCRIPT

AUDIO:

Free speech is so important,
it's the First Amendment to the
Constitution.

But politicians like Mary Landrieu
don't like free speech.

Landrieu voted for the law restricting
the speech of public interest groups.

People can now go to jail for violating
her law that protects politicians from
criticism.

Hey Mary Landrieu.
This is America, not Russia .

But we still have the right to vote.

Say no to Landrieu for Senate.

Say no to censorship.

Speech Now.org is responsible for the content
of this advertising.

VIDEO:

Montage of media, TV, newspaper,
fold in video of Constitution
CHYRON: Freedom of Speech

Landrieu footage slow mo on TV screen
Burning/disappearing Constitution
CHYRON: ID Landrieu, Opposes Free Speech.

TV screen turns off.
CHYRON: Restricting Free Speech

Focus on handcuffs, being led to cell.
CHYRON: Protecting Politicians.

Cell door closes behind cuffed person.
Landrieu pic

Voting footage.
CHYRON to chase VO.

Landrieu pic.
Say no to Landrieu for Senate
Say no to censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising.  Paid for by Speech
Now.org.  Not authorized by any candidate or
candidate's committee.www.Speech Now.org

SPEECHNOW.ORG:     ALT: LANDRIEU SCRIPT

AUDIO:
We've all seen the fight for
free speech around the world.

Lately, free speech has come under
attack right here in America.

Thanks to politicians like
Mary Landrieu.

Landrieu helped pass the law restricting
the speech of many public interest groups.

Under this law you could go to jail
for criticizing politicians.

Our founding fathers made free speech
the First Amendment to the Constitution.

Mary Landrieu is taking that right away.


Don't let her do it again.

SpeechNow.org is responsible for
the content of this advertising.

VIDEO:
Footage of Tiananmen Square on TV screen
Footage of Berlin Wall coming down
hold still of each on screen

Chyron: Free Speech Under Attack in
America.

Dissolve to Landrieu photo.
ID Landrieu

TV shuts off. Chyron: Silencing Free
Speech

Cuffed hands, led to cell, cell door closes


Show Constitution.


Constitution burns/dissolves.  Landrieu photo,
ID her, CHYRON: Say NO to Landrieu for
Senate.

CHYRON: Say NO to Censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising.  Paid for by Speech
Now.org.  Not authorized by any candidate or
candidate's committee.www.Speech Now.org

# EXHIBIT G

# thetrazgroup

26 South Maple Avenue * Suite 205
Marlton, New Jersey 08053
856.797.9970
edtraz@thetrazgroup.com

## MEMORANDUM

TO:        DAVID KEATING
FROM:      ED TRAZ
DATE:      NOVEMBER 15, 2007
RE:        MEDIA COSTS FOR INDIANA & LOUISIANA

The following are costs for planning schedules for Speech Now. We are basing production costs at $12,000 to produce 2 spots. I believe our actual costs will be closer to $10,000 or $11,000. Any savings can be rolled right into the buys.


## INDIANA C.D. #5:

- Indianapolis television serves more than 80% of the 5th Congressional District. Costs for indianapolis TV are:

- $180 CPP

- $56,500 will get a schedule of 313 GRPs on Indianapolis TV


## LOUISIANA:

- New Orleans (reaches approx. 30% of Louisiana):

-- $150 CPP

-- $54,000 will get a schedule of 376 GRPs on New Orleans TV


- Baton Rouge (reaches approx. 19% of Louisiana-NOTE-I would pour what resource we have into the NO market.):

-- $70 CPP

-- $54,000 will get a schedule of 807 GRPs on Baton Rouge TV.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>          Plaintiffs,<br><br>    v.<br><br>FEDERAL ELECTION COMMISSION<br><br>          Defendant. | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

---

**DECLARATION OF EDWARD H. CRANE, III IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

I, EDWARD H. CRANE, III, declare under penalty of perjury that the following is true:

1.   I am a citizen of the United States, a resident of the Commonwealth of Virginia and over the age of 18 years.  I am eligible to vote in an election for the office of the President of the United States.  I make this declaration in support of Plaintiffs' motion for preliminary injunction. This declaration is based on my personal knowledge of the facts stated therein.

2.   I am a member of SpeechNow.org, an independent speech group of individuals dedicated to promoting and protecting Americans' First Amendment rights to speech, association and assembly.

1

3.    In addition to being a member of SpeechNow.org, I would also like to donate money to the group. I oppose restrictions on rights to free speech and association, including those contained in the federal campaign finance laws. Thus, I support SpeechNow.org's mission, which is to advocate the election of political candidates who favor free speech and to advocate the defeat of candidates who favor speech restrictions in the name of campaign finance reform. I think that calling for the election or defeat of candidates based on their support for First Amendment rights is an ideal way both to affect policy—by affecting the political futures of those who make it—and to promote the importance of free speech. Because SpeechNow.org is going to undertake that kind of advocacy in support of my views, I want to donate to it.

4.    Furthermore, I believe that joining with other like-minded individuals who wish to support and operate SpeechNow.org will allow me to more effectively communicate my views on free speech and candidates than if I were to attempt to speak alone. In other words, giving money to SpeechNow.org allows me to amplify my voice and to reach a much broader audience than I could by myself. I do not have the time or individual resources to do things like produce television advertisements about free speech and candidates that can reach a wide segment of the population; the only way for me to do so is to associate with other like-minded individuals and a group like SpeechNow.org.

5.    I have read, understood, and will abide by SpeechNow.org's Bylaws, in particular, sections 9 and 10 of Article X of those Bylaws. I understand that my donations will be used to fund speech, including advertisements that will advocate the election and/or defeat of candidates to federal office based upon their positions on freedom of speech and campaign finance laws. I understand that SpeechNow.org is an independent group that will not make any contributions to

candidates, political committees or political parties and will not coordinate its activities with candidates, candidate committees or political party committees.

6.    I would like to make an immediate donation of $6,000 to SpeechNow.org to fund its speech activities, but, as I understand it, I am prohibited from doing so by the contribution limits contained in 2 U.S.C. § 441a(a)(1)(C). I also understand that I face a real threat of prosecution if I give over $5,000 to SpeechNow.org this calendar year. Thus, for both of these reasons, I cannot make my contribution of $6,000 despite my desire to do so.

7.    If it is determined that SpeechNow.org is not subject to contribution limits, I will donate $6,000 to the organization immediately.

8.    I have been involved in running and raising money for non-profits and other groups over the years, including the three decades I have been at the Cato Institute, which I founded in 1977 and where I serve as President. Based on my experience, I believe that it is necessary for new organizations to first gather seed-money that allows them to begin operations related to their mission before being able to begin fundraising on a larger scale. Successful large-scale fundraising is very difficult until an organization has taken public steps toward advancing its goals and can thus convince the public that it is a going concern that deserves contributions. Based on my experience, limiting SpeechNow.org's contributions from individuals to $5,000 per year will make it extremely difficult, if not impossible, for the organization to begin advancing its mission and to engage in fundraising on a larger scale.

9.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of February, 2008

Edward H. Crane, III

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>          Plaintiffs,<br><br>     v.<br><br>FEDERAL ELECTION COMMISSION<br><br>          Defendant. | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

## DECLARATION OF ED TRAZ IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, ED TRAZ, declare under penalty of perjury that the following is true:

1.    I am a citizen of the United States, a resident of the State of New Jersey, and am over the age of 18 years. I make this declaration in support of SpeechNow.org's motion for preliminary injunction. This declaration is based on my personal knowledge of the facts stated herein.

2.    I am President of the Traz Group. Among other services that it provides for its clients, the Traz Group produces political advertisements and purchases airtime for them on television.

1

3.      Attached to this declaration as Exhibit A is a true and correct copy of a bid, dated November 15, 2007, that I prepared on behalf of the Traz Group for David Keating of SpeechNow.org for the costs of producing and running television advertisements in Indianapolis, New Orleans, and Baton Rouge.  The bid is a memorandum/report/record/data compilation of conditions – in this case, pricing information for the production and airing of television advertisements – made at or near the time by me, a person with knowledge.  Furthermore, like all such bids, I kept this bid in the course of a regularly conducted business activity of the Traz Group, and it is the regular practice of that business activity to make the bid.

4.      Attached to this declaration as Exhibit B are true and correct copies of the scripts for the advertisements to be run in Indianapolis.  Attached to this declaration as Exhibit C are true and correct copies of the scripts for the advertisements to be run in New Orleans and Baton Rouge.

5.      On the bid, "CPP" is short for "cost per point", which refers to the dollar cost per "gross rating point."  Gross rating point, or "GRP", is a term used in the media business that measures the number of times an ad is viewed by a target audience.

6.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8 day of February, 2008

Ed Traz

2

# EXHIBIT A

# thetrazgroup

26 South Maple Avenue * Suite 205
Marlton, New Jersey 08053
856.797.9970
edtraz@thetrazgroup.com

**MEMORANDUM**
TO:          DAVID KEATING
FROM:     ED TRAZ
DATE:      NOVEMBER 15, 2007
RE:          MEDIA COSTS FOR INDIANA & LOUISIANA

The following are costs for planning schedules for Speech Now. We are basing production costs at $12,000 to produce 2 spots. I believe our actual costs will be closer to $10,000 or $11,000. Any savings can be rolled right into the buys.

**INDIANA C.D. #5:**

- Indianapolis television serves more than 80% of the 5th Congressional District. Costs for Indianapolis TV are:

- $180 CPP

- $56,500 will get a schedule of 313 GRPs on Indianapolis TV

**LOUISIANA:**

- New Orleans (reaches approx. 30% of Louisiana):

– $150 CPP

– $54,000 will get a schedule of 376 GRPs on New Orleans TV

- Baton Rouge (reaches approx. 19% of Louisiana–NOTE-I would pour what resource we have into the NO market.):

– $70 CPP

– $54,000 will get a schedule of 807 GRPs on Baton Rouge TV.

# EXHIBIT B

SPEECHNOW.ORG:     BURTON SCRIPT

AUDIO:

Free speech is so important,
it's the First Amendment to the
Constitution.

But politicians like Dan Burton
don't like free speech.

Burton voted for a bill to restrict the speech of
many public interest groups.

Under this bill you could go to jail
for criticizing politicians.

Hey Dan Burton.
This is America, not Russia .

But we still have the right to vote.

Say no to Burton for Congress.

Say no to censorship.

Speech Now.org is responsible for the content
of this advertising.

VIDEO:

Montage of media, TV, newspaper,
fold in video of Constitution
CHYRON: Freedom of Speech

Burton footage slow mo on TV screen
Burning/disappearing Constitution
CHYRON: ID Burton, Opposes Free Speech.

TV screen turns off.
CHYRON: Restricting Free Speech

Focus on handcuffs, being led to cell.
CHYRON: Protecting Politicians.

Cell door closes behind cuffed person.
Burton pic

Voting footage.
CHYRON to chase VO.

Burton pic.
Say no to Burton for Congress
Say no to censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising. Paid for by Speech
Now.org. Not authorized by any candidate or
candidate's committee.www.Speech Now.org

SPEECHNOW.ORG:      ALT: BURTON SCRIPT

AUDIO:
We've all seen the fight for
free speech around the world.

Lately, free speech has come under
attack right here in America.

Thanks to politicians like
Dan Burton.

Burton voted for a bill to
restrict the speech of
many public interest groups.

Under this bill you could go to jail
for criticizing politicians.

Our founding fathers made free speech
the First Amendment to the Constitution.

Dan Burton voted to restrict our rights.

Don't let him do it again.

SpeechNow.org is responsible for
the content of this advertising.

VIDEO:
Footage of Tiananmen Square on TV screen
Footage of Berlin Wall coming down
hold still of each on screen

Chyron: Free Speech Under Attack in
America.

Dissolve to Burton photo.
ID Burton

TV shuts off. Chyron: Silencing Free
Speech

Cuffed hands, led to cell, cell door closes

Show Constitution.

Constitution burns/dissolves.  Burton photo, ID
him, CHYRON: Say NO to Burton for
Congress.

CHYRON: Say NO to Censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising.  Paid for by Speech
Now.org.  Not authorized by any candidate or
candidate's committee.www.Speech Now.org

# EXHIBIT C

SPEECHNOW.ORG:    LANDRIEU SCRIPT

AUDIO:

Free speech is so important,
it's the First Amendment to the
Constitution.

But politicians like Mary Landrieu
don't like free speech.

Landrieu voted for the law restricting
the speech of public interest groups.

People can now go to jail for violating
her law that protects politicians from
criticism.

Hey Mary Landrieu,
This is America, not Russia.

But we still have the right to vote.

Say no to Landrieu for Senate.

Say no to censorship.

Speech Now.org is responsible for the content
of this advertising.

VIDEO:

Montage of media, TV, newspaper,
fold in video of Constitution
CHYRON: Freedom of Speech

Landrieu footage slow mo on TV screen
Burning/disappearing Constitution
CHYRON: ID Landrieu, Opposes Free Speech.

TV screen turns off.
CHYRON: Restricting Free Speech

Focus on handcuffs, being led to cell.
CHYRON: Protecting Politicians.

Cell door closes behind cuffed person.
Landrieu pic.

Voting footage.
CHYRON to chase VO.

Landrieu pic.
Say no to Landrieu for Senate
Say no to censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising.  Paid for by Speech
Now.org.  Not authorized by any candidate or
candidate's committee.www.Speech Now.org

SPEECHNOW.ORG:    ALT: LANDRIEU SCRIPT

AUDIO:
We've all seen the fight for
free speech around the world.

Lately, free speech has come under
attack right here in America.

Thanks to politicians like
Mary Landrieu.

Landrieu helped pass the law restricting
the speech of many public interest groups.

Under this law you could go to jail
for criticizing politicians.

Our founding fathers made free speech
the First Amendment to the Constitution.

Mary Landrieu is taking that right away.

Don't let her do it again.

SpeechNow.org is responsible for
the content of this advertising.

VIDEO:
Footage of Tiananmen Square on TV screen
Footage of Berlin Wall coming down
hold still of each on screen

Chyron: Free Speech Under Attack in
America.

Dissolve to Landrieu photo.
ID Landrieu

TV shuts off. Chyron: Silencing Free
Speech

Cuffed hands, led to cell, cell door closes

Show Constitution.

Constitution burns/dissolves. Landrieu photo,
ID her, CHYRON: Say NO to Landrieu for
Senate.

CHYRON: Say NO to Censorship

NOTE: chyron disclaimer as per regs.
Speech Now.org is responsible for the content
of this advertising. Paid for by Speech
Now.org. Not authorized by any candidate or
candidate's committee.www.Speech Now.org

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>      Plaintiffs,<br><br>  v.<br><br>FEDERAL ELECTION COMMISSION<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

**DECLARATION OF FRED M. YOUNG, JR. IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, FRED M. YOUNG, JR., declare under penalty of perjury that the following is true:

1.    I am a citizen of the United States, a resident of the state of Wisconsin and am over the age of 18 years. I am eligible to vote in an election for the office of the President of the United States. I make this declaration in support of Plaintiffs' motion for preliminary injunction. This declaration is based on my personal knowledge of the facts stated herein.

2.    I would like to donate money to SpeechNow.org, an independent speech group of individuals dedicated to promoting and protecting Americans' First Amendment rights to speech, association, and assembly. I oppose restrictions on rights to free speech and association, including those contained in the federal campaign finance laws. Thus, I support

1

SpeechNow.org's mission, which is to advocate the election of political candidates who favor free speech and to advocate the defeat of candidates who favor speech restrictions in the name of campaign finance reform. I think that calling for the election or defeat of candidates is an ideal way both to affect policy—by affecting the political futures of those who make it—and to promote the importance of free speech. Because SpeechNow.org is going to undertake that kind of advocacy in support of my views, I want to donate to it.

3.     Furthermore, I believe that joining with other like-minded individuals who wish to support and operate SpeechNow.org will allow me to more effectively communicate my views on free speech and candidates than if I were to attempt to speak alone. In other words, giving money to SpeechNow.org allows me to amplify my voice and to reach a much broader audience than I could by myself. I do not consider myself to be a political activist, and I do not have the time or necessary experience to do things like produce television advertisements that can reach a wide segment of the population; the only way for me to do that is to associate with other like-minded individuals and groups like SpeechNow.org.

4.     I have read, understood, and will abide by SpeechNow.org's Bylaws, in particular, sections 9 and 10 of Article X of those Bylaws. I understand that my donations will be used to fund speech, including advertisements that will advocate the election and/or defeat of candidates to federal office based upon their positions on freedom of speech and campaign finance laws. I understand that SpeechNow.org is an independent group that will not make any contributions to candidates, political committees or political parties and will not coordinate its activities with candidates, candidate committees or political party committees.

5.     I would like to make an immediate donation of $110,000 to SpeechNow.org to fund its speech activities, but, as I understand it, I am prohibited from doing so by the contribution

limits contained in 2 U.S.C. § 441a(a)(1)(C). I also understand that my donation would count against and exceed the individual biennial aggregate limit of 2 U.S.C. § 441a(a)(3). Finally, I understand that I face a real threat of prosecution if I give over $5,000 to SpeechNow.org this calendar year. For all of these reasons, I cannot make my contribution of $110,000 despite my desire to do so.

6.     If it is determined that SpeechNow.org is not subject to contribution limits, I will donate $110,000 to the organization immediately.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of February, 2008

Fred M. Young, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>                Plaintiffs,<br><br>      v.<br><br>FEDERAL ELECTION COMMISSION<br><br>           Defendant. | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

## DECLARATION OF SCOTT BURKHARDT IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, SCOTT BURKHARDT, declare under penalty of perjury that the following is true:

1.  I am a citizen of the United States, a resident of the state of North Carolina and am over the age of 18 years. I am eligible to vote in an election for the office of the President of the United States. I make this declaration in support of Plaintiffs' motion for preliminary injunction. This declaration is based on my personal knowledge of the facts stated herein.

2.  I would like to donate money to SpeechNow.org, an independent speech group of individuals dedicated to promoting and protecting Americans' First Amendment rights to speech, association, and assembly. I oppose restrictions on rights to free speech and association, including those contained in the federal campaign finance laws. Thus, I support

1

SpeechNow.org's mission, which is to advocate the election of political candidates who favor free speech and to advocate the defeat of candidates who favor speech restrictions in the name of campaign finance reform. I think that calling for the election or defeat of candidates based on their support for First Amendment rights is an ideal way both to affect policy—by affecting the political futures of those who make it—and to promote the importance of free speech. Because SpeechNow.org is going to undertake that kind of advocacy in support of my views, I want to donate to it.

3.     Furthermore, I believe that joining with other like-minded individuals who wish to support and operate SpeechNow.org will allow me to more effectively communicate my views on free speech and candidates than if I were to attempt to speak alone. In other words, giving money to SpeechNow.org allows me to amplify my speech about my views and to reach a much broader audience than I could by myself. I do not consider myself to be a political activist, and I do not have the time, capability, or necessary resources to do things like produce television advertisements that can reach a wide segment of the population; the only way for me to do that is to associate with other like-minded individuals and SpeechNow.org. This opportunity of association is particularly important to me because I only have a very small amount of discretionary income that I can use to speak out on free speech and candidates. Joining with others who have greater resources is a great benefit to my efforts to speak out against restrictions on free speech.

4.     I have read and understood SpeechNow.org's Bylaws, particularly sections 9 and 10 of Article X of those Bylaws. I understand that my donations will be used to fund speech, including advertisements that will advocate the election and/or defeat of candidates to federal office based upon their positions on freedom of speech and campaign finance laws. I understand

2

that SpeechNow.org is an independent group that will not make any contributions to candidates, political committees or political parties and will not coordinate its activities with candidates, candidate committees or political party committees.

5.    I would like to make an immediate donation of $100 to SpeechNow.org to fund its speech activities. However, as I understand it, SpeechNow.org cannot currently accept any donations because doing so might make it a "political committee" under the campaign finance laws. If it is determined that SpeechNow.org is not subject to these laws and it begins accepting donations, then I will immediately donate $100 to it.

6.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7 day of February, 2008

Scott Burkhardt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPEECHNOW.ORG,<br>DAVID KEATING,<br>FRED M. YOUNG, JR.,<br>EDWARD H. CRANE, III,<br>BRAD RUSSO, and<br>SCOTT BURKHARDT<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION<br><br>Defendant. | Case: 1:08-cv-00248<br>Assigned To : Robertson, James<br>Assign. Date : 2/14/2008<br>Description: Labor-ERISA |

---

## DECLARATION OF STEVEN M. SIMPSON IN SUPPORT
## OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

I, Steven M. Simpson, declare under penalty of perjury that the following is true:

1. I am an attorney representing the Plaintiffs in the above-captioned matter. I am a member in good standing of the Bar of the District of Columbia and have been admitted to the United States District Court for the District of Columbia. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2. Attached hereto are true and correct copies of the following documents:

    a. Plaintiffs' Exhibit 1: Advisory Opinion Request to the Federal Election Commission, dated November 14, 2007.

    b. Plaintiffs' Exhibit 2: Letter from the Federal Election Commission to Bradley A. Smith and Steven M. Hoersting from the Center for Competitive Politics and

1

William H. Mellor, Steven Simpson, and Paul Sherman from the Institute for

Justice, dated January 28, 2008, which was accompanied by draft Advisory

Opinion 2007-32.

c. Plaintiffs' Exhibit 3: Draft Advisory Opinion 2007-32 from the Federal Election

Commission, dated January 25, 2007.

d. Plaintiffs' Exhibit 4: Federal Election Commission Conciliation Agreement for

Progress for America Voter Fund.

e. Plaintiffs' Exhibit 5: Federal Election Commission Conciliation Agreement for

The Media Fund.

f. Plaintiffs' Exhibit 6: Federal Election Commission Conciliation Agreement for

Swift Boat Veterans and POWs for Truth.

g. Plaintiffs' Exhibit 7: Federal Election Commission Conciliation Agreement for

MoveOn.org Voter Fund.

h. Plaintiffs' Exhibit 8: Federal Election Commission Conciliation Agreement for

Empower Illinois Media Fund.

i. Plaintiffs' Exhibit 9: Federal Election Commission Conciliation Agreement for

League of Conservation Voters 527.

3. I certify and declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 13 day of February, 2008.

Steven M. Simpson

2

# EXHIBIT 1

# Center for Competitive Politics

RECEIVED
FEDERAL ELECTION COMMISSION
OFFICE OF GENERAL
COUNSEL

2007 NOV 19 A 9:49

STEPHEN M. HOERSTING

## Institute for Justice

STEVEN M. SIMPSON
SENIOR ATTORNEY

November 14, 2007

*AOR 2007-32*

2007 NOV 16 AM 10:15
RECEIVED
FEC MAIL CENTER

Ms. Thomasenia Duncan
General Counsel
FEDERAL ELECTION COMMISSION
999 E. Street, N.W.
Washington, DC 20463

Dear Ms. Duncan:

Pursuant to 2 U.S.C. § 437f of the Federal Election Campaign Act of 1971, as amended ("Act"), the undersigned counsel submit the following advisory opinion request on behalf of our client, SpeechNow.org.

## I.    Introduction

SpeechNow.org is an independent speech organization whose purpose is to expressly advocate the election or defeat of candidates to federal office in the 2008, 2010, and future election cycles. SpeechNow.org is an unincorporated association organized under section 527 of the Internal Revenue Code that will only make independent expenditures financed by individuals. SpeechNow.org needs to know whether it is required to register with the Commission as a political committee, and whether certain other provisions of the Federal Election Campaign Act apply to it and to its donors. SpeechNow.org has commitments from several individuals who wish to donate in excess of $5000 to the organization, but to date it has not accepted aggregate funds in excess of $1000 because it is concerned that doing so may trigger the political committee thresholds for "contributions" received and "expenditures" made, as set forth in 2 U.S.C. § 431(4).

SpeechNow.org believes the Act requires SpeechNow.org to place disclaimers on its solicitations and independent-expenditure communications, and to report its independent expenditures when and as it makes them, pursuant to 2 U.S.C. § 434(c). But SpeechNow.org requests the Commission's guidance as to whether it is required to register with the Commission as a political committee, whether it is subject to the contribution limits of 2 U.S.C. § 441a(a)(1)(C), and whether donors to SpeechNow.org

must count their donations to SpeechNow.org against individual biennial aggregate limits described in 2 U.S.C. § 441a(a)(3). SpeechNow.org believes that each of these questions should be answered by the Commission in the negative, for the reasons that follow.

## II.    Factual Statement

SpeechNow.org is an independent group of individuals dedicated to promoting and protecting Americans' First Amendment rights to free speech, association, and assembly. *See* Bylaws of SpeechNow.org ("Bylaws"), Article II, Mission, attached as Exhibit A. Its mission and major purpose is to advocate the election of candidates -- in the 2008, 2010, and future federal election cycles -- who favor returning America to a state of political freedom and advocating the defeat of candidates who favor speech restrictions in the name of campaign finance reform. *Id.* This includes advocating the election of candidates who favor repealing the electioneering communication provision of the so-called "McCain-Feingold" legislation of 2002. *Id.; see also*, 107 Pub. Law. 155 (Mar. 27, 2002).

SpeechNow.org is an unincorporated association under the laws of the District of Columbia, and is registered as a "political organization" under Internal Revenue Code section 527. *See* Articles of Organization, attached as Exhibit B; Statement of Appointment of Registered Agent for Service of Process, attached as Exhibit C; Internal Revenue Form 8871 of SpeechNow.org, attached as Exhibit D; and Notice of Business Tax Registration, attached as Exhibit N. Because SpeechNow.org is not incorporated and has the sole purpose of electing or defeating candidates to federal office, it believes that it is not an exempt organization under *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986), and regulations promulgated by the Commission. *See* 11 CFR 114.10.

SpeechNow.org is comprised of the following Members of its governing board: David Keating, President and Treasurer; Jon Coupal, Vice President and Secretary; Edward H. Crane III, Member; Richard A. Marder, Member; and Daniel J. Shapiro, Member. *See* Member Action by Written Consent in Lieu of an Organizational Meeting of SpeechNow.org (Oct. 24, 2007), attached as Exhibit E.

SpeechNow.org will solicit donors for funds to buy public political advertising and for administrative purposes. These donors will be informed that the public political advertising will advocate the election of candidates to federal office that are respectful of free speech and the defeat of candidates to federal office who favor campaign finance regulation and other speech restrictions. SpeechNow.org will run such advertisements -- independent expenditures as defined at 2 U.S.C. §431(17) and 11 C.F.R. 100.16 -- in the districts of voters able to elect or defeat those officeholders.

SpeechNow.org will operate wholly independently of candidates, political party committees, and any other political committees. *See* Exhibit A, Bylaws, Article X,

2

Member and Association Rules. SpeechNow.org will make no contributions (or donations) of any kind to any FEC-regulated political committee. *See* Exhibit A, Bylaws, Article VI, § 10, Certain Expenditures Prohibited. SpeechNow.org will not "coordinate" its activities, as defined in 2 U.S.C §§ 441a(a)(7)(B) & (C) and 11 CFR Part 109, with any candidates, national, State, district or local political party committees, other political committees, or their agents. *See* Exhibit A, Bylaws, Article X, Member and Association Rules, §§ 2-10.

SpeechNow.org was not established by any political committee or any other organization, nor will it be financed, maintained or controlled by any political committee or any other organization.

SpeechNow.org will not directly or indirectly accept donations or anything of value from business corporations, labor organizations, national banks, federal government contractors, foreign nationals, or political committees. *See* Exhibit A, Bylaws, Article VI, § 9, Certain Contributions Prohibited. Nor will it accept donations or contributions from other political organizations or political committees, but will only accept donations from individuals. *Id.* It will keep records to demonstrate that it has not accepted such donations. *Id.*

SpeechNow.org will not engage in business activities including any provision of goods or services that results in income to SpeechNow.org or advertising or promotional activity that results in income to SpeechNow.org, other than in the form of membership dues or donations. *See* Exhibit A, Bylaws, Article VI, § 6, Business Activities Prohibited. SpeechNow.org will not offer to any donors or members any benefit that is a disincentive for them to disassociate themselves with SpeechNow.org on the basis of SpeechNow.org's position on a political issue. *See* Bylaws, Article VI, § 8, Benefits of Support for the Association. SpeechNow.org will not offer its donors credit cards, insurance policies or savings plans, nor will it offer training, education, business information, or any other benefits other than that which is necessary to enable recipients to engage in promotion of SpeechNow.org's political ideas. *Id.*

Donors to SpeechNow.org will be advised that their donations are not tax deductible and will be used for political purposes such as supporting or opposing the election of candidates. *See* Exhibit A, Bylaws, Article VI, § 11, Disclosures to Supporters.

SpeechNow.org will run political advertisements over television in the 2008 and 2010 election cycles. It has prepared scripts for two ads to be run in 2008, "Burton" and "Landrieu," *see* Burton Script, attached as Exhibit F; Landrieu Script, attached as Exhibit G, and has retained The Traz Group to produce the ads and reserve airtime, *see* Bid of Mr. Ed Traz on behalf of The Traz Group, attached as Exhibit H. SpeechNow.org would already have produced these ads except that the production costs exceed the $1000 limit for expenditures counting toward political committee status under 2 U.S.C. § 431(4). *See* Bid of Mr. Ed Traz on behalf of The Traz Group, attached as Exhibit H.

The following individuals are willing and able to donate more than $5000 per calendar year to SpeechNow.org contingent only upon a favorable ruling from the Commission. David L. Keating will donate $5500. *See* declaration of David L. Keating, attached as Exhibit I. Edward H. Crane III will donate $6000. *See* declaration of Edward H. Crane III, attached as Exhibit J. Fred M. Young, Jr. will donate $110,000. *See* affidavit of Fred M. Young, Jr., attached as Exhibit K. Richard A. Marder will donate $5500. *See* declaration of Richard A. Marder, attached as Exhibit L. SpeechNow.org would already have accepted these donations, but each donation, if deemed a "contribution" by the Commission, exceeds the $1000 threshold for contributions counting toward political committee status under 2 U.S.C. § 431(4). Each donation would also exceed applicable contribution limits to SpeechNow.org ($5000), *see* 2 U.S.C. § 441a(a)(1)(C), should the Commission determine that SpeechNow.org must register with the Commission as a political committee, and would place both SpeechNow.org and these donors in legal jeopardy under Federal law.

SpeechNow.org is prepared to make independent expenditures, as defined at 2 U.S.C. § 431(17), paid for with funds raised solely from these and other individuals. It is prepared to place disclaimers on its written solicitations in compliance with 2 U.S.C § 441d(a), and to place disclaimers on its independent expenditures in compliance with 2 U.S.C. § 441d(d)(2). SpeechNow.org is prepared to report its independent expenditures according to the provisions for organizations "other than political committees" in 2 U.S.C. § 434(c). Before proceeding, SpeechNow.org must ask the Commission for guidance on several questions.

III.    **Questions**

SpeechNow.org asks the Commission the following questions:

1) Must SpeechNow.org register as a political committee as defined at 2 U.S.C. § 431(4)? Specifically:

        a) Must SpeechNow.org register as a political committee before accepting contributions, as the term is defined in the Act, in excess of $1000, or making expenditures, as that term is defined in the Act and in *Buckley v. Valeo*, 424 U.S. 1 (1976), in excess of $1000, because its major purpose is to influence the election or defeat of candidates for Federal office?

        b) Must SpeechNow.org register as a political committee after it has received donations in excess of $1000 from donors who are informed that the purpose of SpeechNow.org is to influence elections through advocacy for or against the election of clearly identified candidates, but before it has made expenditures in excess of $1000?

        c) Must SpeechNow.org register as a political committee after making expenditures in excess of $1000?

2)  Are donations to SpeechNow.org "contributions" (as defined at 2 U.S.C. §
    431(8)) subject to the limits described at 2 U.S.C. § 441a(a)(1)(C)?

3)  Must an individual donor to SpeechNow.org count his donations to
    SpeechNow.org among the "contributions" applicable to his individual biennial
    aggregate contribution limit described at 2 U.S.C. § 441a(a)(3)?

## IV.    Discussion

*Overview*

The Federal Election Campaign Act of 1971, as amended, operates "in an area of
the most fundamental First Amendment activities," *Buckley v. Valeo*, 424 U.S. 1, 14
(1976), and is constitutional only insofar as it furthers three purposes:

1)  To prevent the corruption that stems from "large contributions [that may]
    secure political *quid pro quo's* from current and potential office holders", or the
    "appearance of [such] corruption." *Buckley, supra*, at 27-28;

2)  To prevent the "corrosive and distorting effects of immense aggregations of
    wealth that are accumulated with the help of the corporate form and ... have little
    or no correlation to the public's support for the corporation's political ideas"
    *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); or

3)  To "provide the electorate with information ... to aid the voters in evaluating
    those who seek federal office"; "deter actual corruption and [its] appearance ... by
    exposing large contributions and expenditures to the light of publicity," and
    "gather[] the data necessary to detect violations of the contribution limitations."
    *Buckley* at 66-68.

Because SpeechNow.org would not make contributions to, nor coordinate its
activities or communications with, candidates, political committees, or their agents,
SpeechNow.org does not believe that registering as a political committee and subjecting
itself to contribution limits would further any interest in preventing *quid pro quo*
corruption or its appearance.

Because SpeechNow.org is not incorporated, does not accept anything of value
from corporations or labor unions, and is not established, financed, maintained, or
controlled by any corporation or labor organization, SpeechNow.org does not believe that
registering as a political committee would stem corruption arising from the "corrosive ...
effects of ... wealth that are accumulated with the help of the corporate form."

The informational interests recognized in *Buckley* are satisfied by SpeechNow.org
placing disclaimers on its written solicitations in compliance with 2 U.S.C § 441d(a), and
disclaimers on its independent expenditures in compliance with 2 U.S.C. § 441d(d)(2);
and by SpeechNow.org reporting its independent expenditures in excess of $250 and the

names of those individuals who help SpeechNow.org finance independent expenditures through donations in excess of $200. The reporting requirements of 2 U.S.C. § 434(c) are sufficient to further these interests without subjecting SpeechNow.org to the burdens associated with organizing, registering and administering a political committee.

For these reasons, SpeechNow.org asks whether it is required to organize as a political committee under 2 U.S.C. § 432, register with the Commission as a political committee pursuant to 2 U.S.C. § 433, or report as a political committee under 2 U.S.C. § 434(a). SpeechNow.org also asks whether the donations it receives from individuals are subject to the contribution limits of 2 U.S.C. § 441a(a)(1)(C), and whether the individuals who donate to SpeechNow.org must count those donations against their individual biennial aggregate contribution limit found at 2 U.S.C § 441a(a)(3).

*1.    Must SpeechNow.org register as a political committee as defined at 2 U.S.C. § 431(4)?*

A "political committee" means any committee, club, association, or other group of persons which receives *contributions* aggregating in excess of $1000, or makes *expenditures* aggregating in excess of $1000 during a calendar year. 2 U.S.C. § 431(4). But "[t]o fulfill the purposes of the Act [political committees] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Buckley v. Valeo*, 424 U.S. 1, 79-80 (1976). SpeechNow.org is not under the control of any candidate, but its major purpose is to expressly advocate the election of candidates who respect free speech, and the defeat of candidates who do not.

*a)    Must SpeechNow.org register as a political committee before accepting contributions, as the term is defined in the Act, in excess of $1000, or making expenditures, as that term is defined in the Act, in excess of $1000, because its major purpose is to influence the election or defeat of candidates for Federal office?*

If the Commission determines that SpeechNow.org must register as a political committee, when must it register? Must it register as a political committee, before making expenditures or receiving contributions, solely on the basis of its major purpose?

Longstanding precedent suggests that major purpose alone is insufficient to require SpeechNow.org to register as a political committee. The statute itself makes no reference to "major purpose" as triggering political committee status. The Federal District Court for the District of Columbia has held that "[t]he major purpose test treats an organization as a 'political committee' *if* it receives contributions and/or makes expenditures of $1000 or more *and* its 'major purpose' is the nomination or election of a particular candidate or candidates for federal office. *FEC v. GOPAC, Inc.*, 917 F. Supp.

851, 859 (D. D.C. 1996) (emphasis added). And "[c]ircuit precedent indicates ... that *even if* the organization's major purpose *is* the election of a federal candidate or candidates, the organization does not become a 'political committee' unless or until it makes expenditures in cash or in kind to support a 'person who has decided to become a candidate' for federal office." *Id.*, quoting *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 392 (D.C. Cir. 1981) (emphasis added).

Nevertheless, some doubt about this apparently clear provision of the law has been cast by certain commentators,[3] courts,[4] and even the Commission itself.[5] In particular, in *Shays v. FEC*, Civ. No. 04-1597, 2007, U.S. Dist. LEXIS 63688, at *14 (D. D.C. August, 30, 2007) (*Shays II*), the Federal District Court for the District of Columbia stated in *dicta* that that it is error, and a misreading of *Buckley, supra,* for the "FEC [to] believe[] that there is an 'express advocacy requirement for expenditures on communications made independently of a candidate,' which applies to all organizations regardless of whether they satisfy the 'major purpose' test." *Shays II, supra,* at 12. This *dicta* is directly contrary to the holdings in *GOPAC* and *Machinists,* which imposed an express-advocacy requirement -- a requirement that independent organizations engage in speech that expressly advocates the election or defeat of a clearly identified candidate or candidates to federal office -- to meet the Act's definition of "expenditure." This is why the *GOPAC* court held that "[a]s a matter of law, the Commission [at that time] failed to demonstrate that GOPAC became a 'political committee' within the meaning of the Act by spending or receiving $1000 or more and engaging in 'partisan politics' and 'electioneering' [rather than engage in express advocacy]." *GOPAC, supra,* at 861-62. As a result, it is not clear to SpeechNow.org what standard the Commission is using in determining when an organization becomes a political committee.

SpeechNow.org believes that a proper interpretation of the law requires an organization to make expenditures or receive contributions in excess of $1000 before it can be required to register as a political committee, regardless of the organization's major purpose. SpeechNow.org seeks clarification that, having not made $1000 in expenditures or received $1000 in contributions, it is not at this time required to register as a political committee. Therefore, we ask the Commission to conclude that SpeechNow.org, by virtue of its major purpose alone, is not at this time required to register with the Commission as a political committee.

---

[3] *See* Edward B. Foley and Donald Tobin, *The New Loophole: 527s, Political Committees, and McCain-Feingold,* BNA Money & Politics Report, Jan. 7, 2004.

[4] Shays *v. FEC,* Civ. No. 04-1597, 2007, U.S. Dist. LEXIS 63688 (D. D.C. August, 30, 2007) (*Shays II*).

[5] *See e.g.* MURs 5511 & 5525 (Swift Boat Veterans for Truth); MUR 5753 (League of Conservation Voters); MUR 5754 (MoveOn.org Voter Fund); and MUR 5487 (Progress for America Voter Fund). In each of these and other recently released MURs, SpeechNow.org submits that the released documents do not make clear whether the basis for the Commission's determination that the organizations involved should have registered as political committees.

7

> *b)      Must SpeechNow.org register as a political committee after*
> *it has received donations in excess of $1000 from donors who are*
> *informed that the purpose of SpeechNow.org is to influence elections*
> *through advocacy for or against the election of clearly identified*
> *candidates, but before it has made expenditures in excess of $1000?*

SpeechNow.org intends to solicit and receive donations aggregating in excess of $1000, and has submitted affidavits and declarations from individuals who intend to contribute such amounts. However, SpeechNow.org may hold and accumulate funds in excess of $1000 for some time, without making expenditures that would trigger political committee status. Thus, SpeechNow.org seeks guidance on whether the receipt of funds solicited for the eventual purpose of advocacy for or against candidates to Federal office triggers political committee status that would require SpeechNow.org to register before making any expenditure relative to a clearly identified candidate.

Under the Act, a "contribution" means a gift, subscription, loan, advance or anything of value made for the purpose of:

(A) influencing the nomination for election, or election, of any person to Federal office or for the purpose influencing the results of a primary held for the selection of delegates to a national nominating convention of a political party, or

(B) influencing the results of an election held for the expression of a preference for the nomination of persons for election to the office President of the United States.

2 U.S.C. § 431(8).

For many years the Commission determined that only if funds were spent as "expenditures" could they in turn be deemed to be "contributions" under the Act. In its 2004 rulemaking on political committee status, 69 FR 68056 (Nov. 23, 2004), the Commission adopted an additional definition of "contribution" at 11 CFR 100.57. According to the accompanying explanation and justification (E&J), the regulation "classifies all funds provided in response to a communication as contributions under FECA if the communication indicates that any portion of the funds will be used to support or oppose the election of a clearly identified candidate." *Id.* at 68057. The E&J claims as support for this interpretation *FEC v. Survival Education Fund*, 65 F.3d 285 (2d Cir. 1994) (*"SEF"*). The Second Circuit holding in *SEF,* however, applies only to prevent the corruption (or its appearance) of candidates and officeholders, and did not apply to organizations that operate independently of political party committees and candidates. Therefore, SpeechNow.org asks whether it must register as a political committee after it receives donations in excess of $1000 from donors who are informed that the purpose of SpeechNow.org is to influence elections by advocating either the election or defeat of clearly identified candidates, even though it has not made "expenditures" as defined in the Act.

8

The Survival Education Fund was an independent, not-for-profit corporation founded in 1978 to educate the public regarding nuclear and alternative sources of energy. *SEF* at 287. At the time of the 1984 Presidential election cycle, Survival Education Fund used its treasury funds to co-sponsor a fund-raising letter to the general public that opposed the reelection of then-President Ronald Reagan. The mailer sought "help", saying it was "urgent" that the public "respond to this message as soon as possible ... as a favor to [SEF] and for the future of the country." *SEF* at 288.

As party to the case in the early 1990s, the Commission alleged that Survival Education Fund violated 2 U.S.C. § 441d(a), which requires a disclaimer on any public mailing that expressly advocates the election or defeat of a clearly identified candidate or solicits a contribution. The disclaimer, if made, would have disclosed who paid for the mailing and whether it was authorized by, or made independently of, a candidate or candidate's committee. *Id.* The Second Circuit had to determine whether the mailer solicited a "contribution,"[6] and looked to *Buckley* in making its determination. In *Buckley*, the Supreme Court identified three types of contributions regulable under FECA: 1) "contributions made directly or indirectly to a candidate, political party, or campaign committee;" 2) "contributions made to other organizations or individuals but earmarked for political purposes;" and 3) "expenditures [coordinated] with a candidate, his agents, or an authorized committee of the candidate." *Buckley*, 424 U.S. at 78. It was the second type of contribution that intrigued the Second Circuit; funds "earmarked for political purposes."

The Second Circuit reasoned that "*Buckley's* definition of independent expenditures ... provides a limiting principle for the definition in 431(8)(A)(i), as applied to groups acting independently of any candidate or his agents and which are not political committees under FECA." *Id.* at 295. It then interpreted the phrase "earmarked for political purposes" to include those funds "that will be converted to expenditures subject to regulation under FECA". *SEF* at 295.

The Second Circuit then held that "[e]ven if a communication does not itself constitute express advocacy, it may still fall within the reach of § 441d(a) [FECA's disclaimer provisions] if it contains solicitations clearly indicating that the contributions will be targeted to the election or defeat of a clearly identified candidate for federal office." *Id.* The Second Circuit held nothing more than that "[t]he July 24, 1984 mailing was a solicitation of *contributions* within the meaning of §441d(a) as we construe that section." *SEF* at 295 (emphasis added). In short, the Second Circuit determined nothing more than that Survival Education Fund's solicitation must carry a disclaimer.

---

[6] The Second Circuit did not determine whether the mailer expressly advocated President Ronald Reagan's defeat. Instead, the Second Circuit held that Survival Education Fund had a right to finance the mailer using its treasury funds, whether or not it contained express advocacy, because Survival Education Fund was exempt from FECA's corporate source prohibition by operation of the Supreme Court's opinion in *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986). As noted, because SpeechNow.org not a corporation, it does not appear to qualify for the *MCFL* exemption.

The E&J's explanation of the new rule is inconsistent with *SEF* on which it relies. *See Supplemental Explanation and Justification, Political Committee Status*, 72 *FR* 5595 (Feb. 7, 2007). The E&J seems to suggest, contrary to *SEF*, that if funds given in response to a solicitation can be regulated constitutionally as a "contribution" for purposes of the disclaimer provisions of § 441 d(a)(3), then those same funds can be regulated constitutionally as a "contribution" for all parts of FECA. This would mean that funds provided in response to a solicitation that indicates that any portion of the funds will be used to support or oppose the election of a clearly identified candidate are "contributions" not just under the disclaimer provisions of § 441d(a) or the reporting provisions of § 434(c), but also under the contribution limits of § 441a(a)(1)(C), the individual biennial aggregate limit of § 441a(a)(3), and even the definition of political committee at 2 U.S.C. § 431(4). Further, the E&J suggests this reading whether or not regulation of the funds in each application would advance a constitutional governmental interest in FECA.

The Second Circuit did determine that "'[a] communication ... may still fall within the reach of § 441d(a)(3) if it contains solicitations clearly indicating that the contributions will be targeted to the election or defeat of a clearly identified candidate for federal office." *SEF* at 295. But the Second Circuit said that its reasoning applies only to those instances that address a corrupting nexus to candidates and officeholders:

> [Our] interpretation limits the application of §441d(a) to Congress's core purpose: [i]nforming the public whether ostensibly unaffiliated organizations taking positions in an election or beseeching contributions from the public are doing so *at the behest of candidates*."

> \*\*\*

> Potential contributors are entitled to know that they are supporting independent critics of a candidate and not a group that may be in league *with that candidate's opponent*."

> \*\*\*

> By requiring disclosure of who has paid for the solicitation and that it is not being made on behalf of a candidate, *the statute deters clandestine corruption of candidates*, an interest that the Supreme Court has repeatedly found compelling.

*SEF* at 295-297 (emphasis added).

Indeed, the Second Circuit was concerned about proceeding in the absence of a nexus to candidates or officeholders, and specified the limits of its holding by noting that "[s]ection 441d(a)(3) ... does not require direct disclosure of what an individual or group contributes or spends [the very essence, by the way, of political committee reporting] but

only disclosure of who paid for the particular communication at issue and that it was *not authorized by a candidate or his agents.*" *SEF, supra,* at 297. (Emphasis added).[7]

The Second Circuit's opinion in *SEF* teaches that funds solicited or received are "contributions" for purposes of the Act only where the application of the Act to the funds or solicitation of funds would further one of the three compelling governmental interests enunciated in *Buckley, supra,* and discussed above. Each of those interests is either inapplicable to SpeechNow.org or is addressed by other, less burdensome provisions within the Act and therefore they do not, individually or collectively, require SpeechNow.org to register as a political committee.[8]

---

[7] Further, because a group may make independent expenditures in unlimited amounts, and because 2 U.S.C. § 434 (c) provides a separate reporting mechanism for groups "other than political committees" that make such expenditures, it cannot be that a group soliciting funds necessary to make independent expenditures and operating other than as a political committee is somehow converted into a political committee. The statute clearly anticipates that a group can raise money for expressly advocating the defeat of candidates, through independent expenditures, without becoming a political committee. *See* footnotes 14-15 and accompanying text, *infra.*

[8] First, requiring SpeechNow.org to register as a political committee would further no governmental interest in preventing *quid pro quo* corruption because SpeechNow.org operates wholly independently of candidates and political committees. Second, requiring SpeechNow.org to register as a political committee would further no governmental interest in preventing corruption by aggregations of wealth amassed by benefit of the corporate form because SpeechNow.org is unincorporated, has no ties to corporations or labor organizations, and engages in no business activities. The third interest in requiring an organization to register as a political committee is comprised of three sub-interests. One sub-interest is to "provide the electorate with information ... to aid the voters in evaluating those who seek federal office." *Buckley,* at 66-68. Another sub-interest is to "deter actual corruption and [its] appearance ... by exposing large contributions and expenditures to the light of publicity." *Id.* These sub-interests are adequately addressed by the disclaimer and disclosure provisions of 2 U.S.C. §§ 441d(a), 441d(d)(2) and 434(c). The third sub-interest is to "gather[] the data necessary to detect violations of the contribution limitations." *Buckley* at 66-68. This last sub-interest in disclosure (and by extension, in political committee registration and reporting) is inapplicable to SpeechNow.org because SpeechNow.org makes no contributions and operates independently of candidates. Moreover, as discussed fully below, donations from individuals to SpeechNow.org cannot be subject to contribution limits without violating the rights of speech and association of the individual donors and SpeechNow.org. Public monitoring of SpeechNow.org's receipts and disbursements, *see* 2 U.S.C. § 434(a), therefore, will not detect violations of the contribution limits of 2 U.S.C. § 441a(a)(1)(C) or the contribution limits of 2 U.S.C. § 441a(a)(3). In short, no governmental interest is served by requiring SpeechNow.org to register as a political committee. Therefore, FECA's independent-expenditure-reporting provisions for organizations other than political committees (2 U.S.C. § 434(c)), and not its political-committee organization, registration, and reporting provisions (2 U.S.C. §§ 432, 433, and 434(a)), are both the method of disclosure contemplated by FECA and the method that is sufficiently tailored to the compelling interests Congress sought to advance.

Furthermore, the funds received from individuals responding to a solicitation from SpeechNow.org are more similar to a political expenditure than to a political contribution. Such gifts differ from the making of a contribution to a candidate; donations to SpeechNow.org foster speech, a particularized message with which the donor agrees and which he has decided to finance, and is more than just the undifferentiated symbolic act of giving. *Cf. Buckley, supra,* at 21 (contributions to candidates are a kind of speech by proxy; rest solely on the undifferentiated, symbolic act of giving). Paraphrasing the Supreme Court in *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 258 (1986), "[t]he resources available to *this* fund … in fact reflect popular support for the political positions of the committee." As the Court noted, donors to ideological organizations know precisely why they participate in and finance ideological organizations:

> Individuals who contribute to [the ideological organization] are fully aware of its political purposes, and in fact contribute precisely because they support those purposes. It is true that a contributor may not be aware of the exact use to which his or her money ultimately may be put, or the specific candidate that it may be used to support. However, individuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction. Any contribution therefore necessarily involves at least some degree of delegation of authority to use such funds in a manner that best serves the shared political purposes of the organization and contributor.

*Id.* at 261-62.

In accordance with *SEF,* SpeechNow.org believes that its solicitations of funds for independent expenditures are required by the Act to carry disclaimers in conformity with 2 U.S.C. § 441d(a), which applies both to political committees and organizations other than political committees, so the public may know that SpeechNow.org operates independently of candidates. However, because these funds are not contributions for purposes of 2 U.S.C. § 434(c), SpeechNow.org is not required to register as a political committee merely by virtue of accepting donations, even if those donations were made to SpeechNow.org in response to a written solicitation that indicated the funds would be used to run independent expenditures, that is, express advocacy to the general public.

> c)    *Must SpeechNow.org register as a political committee after making expenditures in excess of $1000?*

SpeechNow.org will also make "expenditures,"[10] specifically, "independent expenditures,"[11] and asks whether it must register as a political committee after making "expenditures" in excess of $1000.

An independent expenditure is a "communication by a person expressly advocating the election or defeat of a clearly identified candidate that is not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents."[12] 2 U.S.C. § 431(17).

SpeechNow.org concedes that its express advocacy communications and solicitations of funds for independent expenditures should carry disclaimers in conformity with 2 U.S.C. §§ 441d(a) and 441d(d)(2) so the public may know that SpeechNow.org operates independently of candidates.[13] Similarly, SpeechNow.org concedes that the amount spent on its independent-expenditure communications, as well as the names of "contributors", *see* 2 U.S.C. §434(c), and the amount of their "contributions" must be reported under 2 U.S.C. § 434(c) to "provide the electorate with

---

[10] "Expenditure" means a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of:

(A) influencing the nomination for election, or the election, of any person to Federal office, or to the office of presidential and vice-presidential elector; or
influencing the results of a primary election held for the selection of delegates to a national nominating convention of political party or for the expression of a preference for the nomination of persons for election to the office of President of the United States.

[11] Independent expenditures constitute expression "'at the core of our electoral process and of the First Amendment freedoms.'" *Buckley*, 424 U.S., at 39 (quoting *Williams v. Rhodes*, 393 U.S. 23, 32 (1968)). See also *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 493 (1985) (NCPAC) (independent expenditures "produce speech at the core of the First Amendment").

[12] The Commission notes in its latest political committee explanation and justification, *see Supplemental Explanation and Justification, Political Committee Status*, 72 FR 5595 (Feb. 7, 2007) that "[n]either BCRA [nor] *McConnell* has eliminated ... the Supreme Court's express advocacy requirement for expenditures on communications made independently of a candidate."

[13] The Act requires a disclaimer for any communication that expressly advocates the election or defeat of a candidate, or solicits a contribution:

[W]henever any person makes a disbursement for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any contribution through any ... general public political advertising ... such communication—

(3) if not authorized by a candidate ... or its agents, shall clearly state the name and permanent street address, telephone number or ... Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

2 U.S.C. § 441d(a)(3).

13

information ... to aid the voters in evaluating those who seek federal office" and to "deter actual corruption and [its] appearance ... by exposing large ... expenditures to the light of publicity." *Buckley* at 66-68. But the Act furthers those interests by requiring disclaimers and disclosure for independent organizations without requiring those organizations to register as political committees. *See* 2 U.S.C. §§ 434(c) (reporting of independent expenditures by "persons ... other than political committees"); 441d(a) (disclaimers on express advocacy communications or solicitations by "any person"), and 441d(d)(2) (disclaimers on communications by "other person[s]").

SpeechNow.org's wish to associate with fellow citizens to make expenditures independently of any candidate or political committee should not, under a proper interpretation of the Act, convert SpeechNow.org into a fully regulated political committee. Organizations have a right to engage in unlimited independent expenditures. *Buckley, supra,* at 51. FECA provides a method for the reporting of independent expenditures by persons "other than political committees", 2 U.S.C. § 434(c).[14] If the Commission were to require SpeechNow.org to register as a political committee on the basis of its expenditures in excess of $1000, the effect would be to render 2 U.S.C. § 434 (c), which provides for reporting by persons "other than political committees" that make independent expenditures in excess of $250, a virtual nullity. Surely Congress did not intend that 2 U.S.C. § 434(c) would only capture and provide reporting requirements for independent expenditure organizations that spend more than $250 but less than $1000 on independent expenditures.[15] In that instance, Congress could not have intended that political committee status automatically follows, thus thrusting the independent organization into the organizational, registration, and reporting requirements of 2 U.S.C §§ 432, 433, and 434(a). Such an interpretation would render § 434(c) an absurdity.

Moreover, there are constitutional problems in requiring independent speech organizations to comply with FECA's political committee provisions, and therefore suggest, under a proper statutory reading, that SpeechNow.org's activities do not require

---

[14] "Every person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250 in a calendar year shall file a statement containing ... information ... for all contributions received by such person." 2 U.S.C. § 434(c)(1).

The term "person" in 2 U.S.C. § 434(c) applies to organizations such as SpeechNow.org no less than to individuals. "The term 'person' includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal government." 2 U.S.C. § 431(11).

[15] Similarly, Congress could not have intended that every independent organization that solicits more than $1000 for independent expenditure communications (a necessary predicate to spending $1000) becomes a political committee merely because the solicitation indicates that the funds "will be used to support or oppose the election of a clearly identified candidate." *See* 11 CFR 100.57. *See* discussion supra, part III. 1. b). Note also that other organizations cannot engage in independent expenditures at all -- corporations and unions are prohibited from making such communications under 2 U.S.C. § 441b; other unincorporated organizations, operating under Internal Revenue Code § 501(c), are generally limited in such activities by their tax status. To suggest that 2 U.S.C. § 434 (c) exists for the benefit of partnerships and Indian Tribes seeking to make independent expenditures strains all credulity.

it to register as a political committee. As stated by the Supreme Court, "[t]he administrative costs of complying with [the] increased responsibilities [of organizing, registering, and reporting as a political committee] may create a disincentive for the organization itself to speak." *MCFL, supra,* 255, n.7.[16]

As stated by Justice O'Connor, the *Buckley* Court "was concerned not only with the chilling effect of reporting and disclosure requirements on an organization's contributors, 424 U.S., at 66-68, but also with the potential burden of disclosure requirements on a group's own speech. *Id.,* at 74-82." *MCFL* at 265, J. O'Connor, concurring). Justice O'Connor noted that the requirements of administering a political committee can deter organizations like SpeechNow.org from speaking, and must only be required where registering as a political committee would further some governmental interest.

> In my view, the significant burden on MCFL [if it were required to register with the Commission] in this case comes *not from the disclosure requirements that it must satisfy, but from the additional organizational restraints imposed upon it by the Act.* [E]ngaging in campaign speech requires MCFL to assume a more formalized organizational form.... These additional requirements do not further the Government's informational interest in campaign disclosure, and, for the reasons given by the Court, cannot be justified by any of the other interests identified by the Federal Election Commission. Although the organizational ... restrictions are not invariably an insurmountable burden on speech, *see, e. g., FEC v. National Right to Work Committee,* 459 U.S. 197 (1982), in this case the Government has failed to show that groups such as MCFL pose any danger that would justify infringement of its core political expression.

*MCFL,* at 266 (J. O'Connor, concurring).

---

[16] The Court in *MCFL* also stated that:

> Furthermore, should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee. *See Buckley,* 424 U.S. 1 at 79. As such, it would automatically be subject to the obligations and restrictions applicable to those groups whose primary objective is to influence political campaigns.

*MCFL,* at 262.

> First, the statement is *dicta* as the Court did not decide the question of whether there are constitutional problems in regulating an organization with no ties to candidates, and no ties to corporations or labor organizations, but whose major purpose is independent campaign activity. Second, the *MCFL* opinion is a corporate-form corruption case of the kind discussed in *Austin v. Michigan Chamber of Commerce.* Unlike, MCFL, SpeechNow.org is unincorporated, and implicates no corrupting basis recognized by the Courts -- no nexus to officeholders or candidates, and no ties to labor organizations or corporations, and no business activity -- that would require SpeechNow.org to register as a political committee and be subject to contribution limits.

Any and all interests the Commission could legitimately assert for requiring SpeechNow.org to register as a political committee are either inapplicable or addressed by other less burdensome provisions of the Act. Therefore, a proper reading of FECA would not require SpeechNow.org to organize as a political committee under 2 U.S.C. § 432, to register as a political committee under 2 U.S.C. § 433, or file as a political committee under 2 U.S.C. § 434(a).

   2. *Are donations to SpeechNow.org "contributions" (as defined at 2 U.S.C. § 431(8)) subject to the limits described at 2 U.S.C. § 441a(a)(1)(C)?*

Adhering to the contribution limits of 2 U.S.C. §§ 441a(a)(1)(C) is among the obligations of registered political committees. SpeechNow.org believes, however, that whether or not the Commission determines that SpeechNow.org is a political committee, donations to SpeechNow.org cannot be subject to contribution limits as described in 2 U.S.C. § 441a(a)(1)(C) without violating the Constitution because there is no governmental interest in limiting donations to wholly independent organizations; that is, organizations that operate independently of candidates, political party committees, other political committees, or their agents.

The distinction between governmental regulation of candidate-controlled speech and purely independent speech harkens back to *Buckley v. Valeo*, 424 U.S. 1 (1976). In *Buckley*, the Supreme Court held that both contribution and expenditure limits implicate First Amendment concerns. It subjected the expenditure limits to a higher degree of scrutiny, however, because they "impose significantly more severe restrictions on protected freedoms of political expression and association than [did] limitations on financial contributions" to candidates. *Id.* at 23. Expenditure limits "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19.

By contrast, contribution limits to candidates are thought to impose a less significant burden on free expression and are permissible "as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important government interest.'" *Randall v. Sorrell*, __ U.S. __, __, 126 S. Ct. 2479, 2491 (2006) (quoting *Buckley*, 424 U.S. at 25). This "less rigorous scrutiny" has also been invoked in the context of contribution limits to political party committees, which are comprised of candidates and inherently involved with candidates. *McConnell v. FEC*, 540 U.S. 93, 136 n.39 (2003).

However, the Court has only applied this "less rigorous scrutiny" in the context of contributions to candidates and groups that have direct contact with candidates, such as multicandidate PACs and party committees. The Court has been clear that strict scrutiny applies to contribution limits outside of those contexts. In *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley ("CARC")*, the Court considered whether a limitation on contributions to support or defeat a ballot measure could withstand constitutional scrutiny. 454 U.S. 290 (1981). The Court applied "exacting judicial scrutiny" to the regulation, *Id.* at 294, which it has elsewhere defined to mean

16

"strict scrutiny." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)
(defining "exacting scrutiny" to mean that a restriction can be upheld "only if it is
narrowly tailored to serve an overriding state interest.") In reaching this conclusion, the
Court noted that freedom of association "is diluted if it does not include the right to pool
money through contributions, for funds are often essential if 'advocacy' is to be truly or
optimally 'effective.'" *Id.* at 296. (citing *Buckley*, 424 U.S., at 65-66). Like the potential
regulation here, the regulation in *CARC* was triggered "only when contributions are made
in concert with one or more others in the exercise of the right of association." *Id.* The
Court was clear that "[t]o place a Spartan limit—or indeed any limit—on individuals
wishing to band together to advance their views on a ballot measure, while placing none
on individuals acting alone, is clearly a restraint on the right of association." *CARC*, 454
U.S. at 296. To interpret FECA as allowing sole individuals to make unlimited
independent expenditures without registering as committees, while requiring groups of
individuals to register, would be to interpret the statute in a manner directly contrary to
*CARC*.

    The distinction between *Buckley* and *CARC's* seemingly contradictory holdings is
not whether contributions to ballot measure campaigns convey a different type or degree
of speech from contributions to candidates or parties. That is the wrong distinction to
consider. *See* John C. Eastman, *Strictly Scrutinizing Campaign Finance Restrictions
(and the Courts that Judge Them)*, 50 Cath. U. L. Rev. 13, 35 (2000) (observing that,
"[w]hen dealing with independent expenditure committees, drawing the line between the
ballot-measure-election and the candidate election simply does not hold analytical
water."). Rather, the critical distinction is between independent expenditures (and the
contributions that make them possible), on the one hand, and contributions to candidates,
on the other. This distinction makes sense because contributions to candidates and
contributions to independent expenditure organizations have qualitatively different
expressive value. Contributions to independent expenditure organizations *do* convey "a
different type or degree of speech" than contributions to candidates or candidate-
controlled groups.

    As the *Buckley* Court observed, the expression conveyed by a candidate
contribution "rests solely on the undifferentiated, symbolic act of contributing," *Buckley*,
424 U.S. at 21. By contrast, an independent expenditure committee "is but the medium
through which its individual members seek to make more effective the expression of *their
own* views." *NAACP v. Alabama*, 357 U.S. at 459, 78 S. Ct. at 1170 (emphasis added).
This distinction, between contributions to independent expenditure organizations and
contributions to candidates (or groups associated with candidates), is the difference
between citizens banding together at the grassroots to directly fund the expression of their
own views, and merely facilitating a candidate's expression of the candidate's views.
*Compare California Medical Association v. FEC*, 453 U.S. 182, 196 (1981) (upholding
contribution limits to multicandidate PACs and suggesting that "'speech by proxy' . . . is
not the sort of political advocacy . . . entitled to full First Amendment protection"), *with
FEC v. Nat'l Conservative PAC (NCPAC)*, 470 U.S. 480, 495 (1985) ("[T]he 'proxy
speech' approach is not useful in this case [because] the contributors obviously like the

message they are hearing from these organizations and want to add *their voices* to that message; otherwise they would not part with their money") (emphasis added).

In the question posed, Commission regulation would limit contributions to SpeechNow.org, an independent committee that *only* engages in independent expenditures. Neither candidates nor candidate-associated groups are the recipients of these funds. Instead, regulating SpeechNow.org as a political committee subject to contribution limits would directly limit the ability of citizens to pool their resources and amplify their own voices, a right that is "entitled to full First Amendment protection."[17] *NCPAC*, 470 U.S. at 495. Thus, the question is subject to *CARC*'s "exacting," or "strict," scrutiny. *See also Righeimer v. City of Huntington Beach*, No. SACV94-676 (C.D. Cal. Oct. 13, 1994) (denying, on associational freedom grounds, a motion to dismiss in case involving an ordinance that limited a committee's ability to make independent expenditures if it accepted more than $300 from an individual in an election cycle); *San Franciscans for Sensible Gov't v. Renne*, No. 99-02456 (N.D. Cal. Sept. 8 1999) (granting preliminary injunction against ordinance placing contribution limits upon committee making independent expenditures).

Even under "less rigorous review," contribution limits are permissible only if those limits are "closely drawn," to match a "sufficiently important government interest." *Randall v. Sorrell*, ___ U.S. ___, ___, 126 S. Ct. 2479, 2491 (2006) (plurality opinion) (quoting *Buckley*, 424 U.S. at 25). This is not cursory review and, to date, the Supreme Court has identified one, and only one, government interest "sufficiently important" to justify contribution limits: combating corruption of officeholders or the appearance of such corruption. Moreover, since *Buckley*, the Court has repeatedly shown that it will only find corruption or its appearance in situations that involve contributions to candidates or to groups intimately associated with candidates.[18] The Supreme Court has found that these are the only financial contributions that create the likelihood that *quid pro quo* arrangements will take place or that create "the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley*, 424 U.S. at 25; *id.* at 28 (1976) ("The Act's $1,000 contribution limitation focuses precisely on the problem of large *campaign* contributions--*the narrow aspect of political association*

---

[17] The Eastern District of North Carolina recently considered the same issue: Can the State place a contribution limit on "NCRLC-FIPE ... an internal PAC established by NCRL whose sole purpose is to make independent expenditures[?]" *North Carolina Right to Life v. Leake*, No. 5:99-CV-798-BO(3) (ED NC Mar. 29, 2007). The district court determined that "NCRLC-FIPE makes no contributions of any kind to candidates," then held that "it is well established that limiting corruption or the appearance of corruption is a sufficiently important or compelling state interest," and that the State "failed to present any evidence that the independent expenditures made by [an independent expenditure political action committee] have a tendency to corrupt or create the appearance of corruption." *Id.*

[18] The one, narrow exception to this statement, so-called "corporate-form corruption," is not applicable to this case. *See, Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) (identifying the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas" as "a different type of corruption").

*where the actuality and potential for corruption have been identified*--while leaving persons free to engage in independent political expression. . . ." (emphasis added)).

This required candidate nexus was reaffirmed five years after *Buckley* in *California Medical Association v. Federal Election Commission*, 453 U.S. 182 (1981). In that case, the Supreme Court considered the constitutionality of a $5,000 limit on contributions to a multicandidate political action committee, an organization that, by definition, made candidate contributions. The Court upheld the limit after considering several challenges to the law, but with regard to the First Amendment question, it mustered only a four-member plurality. Justice Blackmun concurred with the result reached by the plurality and provided the fifth vote, but did so on narrower grounds, which control. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

Justice Blackmun accepted, as a matter of *stare decisis*, that the contribution limits in *Buckley v. Valeo* were constitutional. *Id.* at 201-02. He continued, however, that "it does not follow that I must concur in the plurality conclusion today that political contributions are not entitled to full First Amendment protection." Applying the "rigorous standard of review," Justice Blackmun concluded that "contributions to multicandidate political committees may be limited to $5,000 per year as a means of preventing evasion of the limitations on contributions," though it was a "close[] question." *Id.* at 202. However, he cautioned that "a different result would follow if [the statute] were applied to contributions to a political committee *established for the purpose of making independent expenditures*, rather than contributions to candidates" because "contributions to a committee that makes only independent expenditures pose no such threat [of corruption]." *Id* at 203; *accord*, *NCPAC*, 470 U.S. at 498 ("the absence of prearrangement and coordination [with a candidate] . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate").

This required nexus was reaffirmed again in *McConnell v. FEC*. In that case, the Supreme Court upheld contributions to *party* committees because such committees are composed of candidates, and are direct funnels to candidates. 540 U.S. at 156-157 n. 51 (2003) ("Thus . . . we rely not only on the fact that they regulate contributions used to fund activities influencing federal elections, but also that they regulate contributions to, or at the behest of, entities uniquely positioned to act as conduits for corruption). Indeed, the Court explicitly rejected the argument that the majority's holding would allow Congress to restrict the funding of independent activity that merely benefits a candidate. *See*, *Id.* ("Congress could not regulate financial contributions to political talk show hosts or newspaper editors on the sole basis that their activities conferred a *benefit* on the candidate.") (emphasis in original).[19]

---

[19] That the independent groups addressed were members of the institutional press is of no constitutional significance. "The purpose of the Constitution was not to erect the press into a privileged institution but to protect all persons in their right to print what they will as well as to utter it. '. . . the liberty of the press is no greater and no less . . .' than the liberty of every citizen of the Republic. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 802 (1978) (Burger, C.J., concurring) (citing *Pennekamp v. Florida*, 328 U.S. 331, 364 (1946).

Justice Kennedy's discussion in *McConnell* is also instructive on this point. There, he noted that, quite apart from whether a candidate benefits, a contribution limit could not "withstand constitutional challenge unless it was shown to advance the anticorruption interest." *McConnell v. FEC*, 540 U.S. at 291-292. As Justice Kennedy put it: "To ignore the fact that in *Buckley* the money at issue was given to candidates, creating an obvious *quid pro quo* danger. . . is to ignore the Court's comments in *Buckley* that show *quid pro quo* was of central importance to the analysis." *Id.* at 295-96

As one leading commenter put it, "the Supreme Court has never said that benefit to the candidate, with the inference that the candidate will be grateful for the benefit and will be tempted to provide favors accordingly, is enough to support regulation of campaign money. *McConnell* clearly held that *benefit (even benefit followed by gratitude and temptation) is not sufficient to justify a campaign restriction.*" Richard Briffault, *The 527 Problem...and the* Buckley *Problem*, 73 Geo. Wash. L. Rev. 1701, 1745 (2005) (emphasis added). Nor would it be sufficient to show that candidates respond to independent expenditures by changing their positions on issues, for "the fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political message . . . can hardly be called corruption." *NCPAC*, 470 U.S. at 498. Indeed, far from being corruption, "the presentation to the electorate of varying points of view" is "one of the essential features of democracy." *Id.*

3.    *Must an individual donor to SpeechNow.org count his donations to SpeechNow.org among the "contributions" applicable to his individual biennial aggregate contribution limit described at 2 U.S.C. § 441a(a)(3)?*

As discussed above, SpeechNow.org believes that whether or not the Commission determines that SpeechNow.org must register as a political committee, donations to SpeechNow.org cannot be subject to contribution limits, as described in 2 U.S.C. § 441a(a)(1)(C), without violating the Constitution. If a donation is not a "contribution" for purposes of the limits described in § 441a(a)(1)(C), then individuals who donate to SpeechNow.org need not count those donations among contributions subject to a biennial aggregate limit, as described in 2 U.S.C. § 441a(a)(3).

V.    **Conclusion**

SpeechNow.org will make independent expenditures, as defined at 2 U.S.C. § 431(17), paid for with funds raised solely from individuals. It will place disclaimers on its written solicitations in compliance with 2 U.S.C § 441d(a), and to place disclaimers on its independent expenditures in compliance with 2 U.S.C. § 441d(d)(2). SpeechNow.org will report its independent expenditures according to the provisions for non-political committees in 2 U.S.C. § 434(c).

SpeechNow.org seeks the Commission's guidance on whether and if so when it must organize as a political committee under 2 U.S.C. § 432, register as a political

20

committee under 2 U.S.C. § 433, or report as a political committee under 2 U.S.C. § 434(a).

Further, if the Commission determines that SpeechNow.org must register as a political committee, SpeechNow.org asks whether the donations it receives are subject to the contribution limits described in 2 U.S.C. § 441a(a)(I)(C), and whether individuals who donate to SpeechNow.org must count their donations to SpeechNow.org among the contributions subject to a biennial aggregate limit, as described in 2 U.S.C. § 441a(a)(3).

The undersigned await the Commission's guidance in this matter. Thank you for your consideration of this request. Please direct any further inquiries or requests for additional information to Steve Hoersting or Steve Simpson.

Respectfully submitted,

_____

Bradley A. Smith
Stephen M. Hoersting
CENTER for COMPETITIVE POLITICS
1800 Diagonal Road
Suite 600
Alexandria, VA. 22314
(703) 682-9359

_____

William H. "Chip" Mellor
Steven Simpson
Paul M. Sherman
INSTITUTE FOR JUSTICE
901 North Glebe Road
Suite 900
Arlington, VA. 22203
(703) 682-9320

# EXHIBIT 2

 FEDERAL ELECTION COMMISSION
Washington, DC  20463

January 28, 2008

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Bradley A. Smith
Stephen M. Hoersting
Center for Competitive Politics
1800 Diagonal Road
Suite 600
Alexandria, VA 22314

William H. "Chip" Mellor
Steven Simpson
Paul M. Sherman
Institute for Justice
901 North Glebe Road
Suite 900
Arlington, VA 22203

RE:  Advisory Opinion Request 2007-32

Dear Messrs. Smith, Hoersting, Mellor, Simpson, and Sherman:

This letter responds to your letters received on November 19, 27, and 29, 2007, requesting an advisory opinion on behalf of SpeechNow.org.

On January 22, 2008, the Commission released for public comment Agenda Document No. 08-04, which contains a draft advisory opinion responding to your request. Under the Federal Election Campaign Act of 1971, as amended ("the Act"), the affirmative vote of 4 members of the Commission is required in order for the Commission to render an advisory opinion. *See* 2 U.S.C. 437c(c) and 437d(a)(7); *see also* 11 CFR 112.4(a). As you know, the Commission currently has only two members. On January 24, 2008, the Commission discussed Agenda Document No. 08-04 and voted 1-1 on a motion to approve the draft. Thus, the Commission was unable to render an opinion in this matter.

A draft advisory opinion that is identical to Agenda Document No. 08-04, but contains technical amendments to citations, is enclosed for your convenience. Neither this document nor Agenda Document No. 08-04 should be considered an advisory opinion by the Commission or any of its employees because the Commission may issue such an opinion only in accordance with specific provisions of the Act. *See* 2 U.S.C. 437f(b). Also enclosed for your convenience is the Dissenting Opinion of Chairman David M. Mason in Advisory Opinion Request 2007-32.

Accordingly, you are hereby advised that the Commission has concluded its review of Advisory Opinion Request 2007-32. You are not precluded from resubmitting the same or a similar request for an advisory opinion at such time as the Commission is able to take action on advisory opinion requests.

Sincerely,

Rosemary C Smith

Rosemary C. Smith
Associate General Counsel

Enclosures

# EXHIBIT 3

1    ADVISORY OPINION 2007-32

2                                                                **DRAFT**

3

4    Bradley A. Smith
5    Stephen M. Hoersting
6    Center for Competitive Politics
7    1800 Diagonal Road
8    Suite 600
9    Alexandria, VA 22314

10

11    William H. "Chip" Mellor
12    Steven Simpson
13    Paul M. Sherman
14    Institute for Justice
15    901 North Glebe Road
16    Suite 900
17    Arlington, VA 22203

18

19    Dear Messrs. Smith, Hoersting, Mellor, Simpson, and Sherman:

20          We are responding to your advisory opinion request on behalf of SpeechNow.org

21    ("SpeechNow") concerning the application of the Federal Election Campaign Act of

22    1971, as amended (the "Act" or "FECA"), and Commission regulations to SpeechNow's

23    status as a political committee and funds received by SpeechNow.

24          The Commission concludes that once SpeechNow receives in excess of $1,000 in

25    contributions or makes in excess of $1,000 in expenditures in one calendar year, it would

26    satisfy the statutory definition of "political committee" and would have to register as a

27    political committee because its major purpose is Federal campaign activity. The

28    Commission also concludes that funds received by SpeechNow would constitute

29    contributions, as defined in the Act and Commission regulations, and would be subject to

30    the Act's amount limitations on individuals' contributions to political committees,

31    including the individual biennial aggregate contribution limit.

1    *Background*

2        The facts presented in this advisory opinion are based on your letters received on

3    November 19, 27, and 29, 2007, and information on SpeechNow's website.[1]

4        SpeechNow is organized under the laws of the District of Columbia as an

5    unincorporated non-profit association and under Section 527 of the Internal Revenue

6    Code. SpeechNow is dedicated to "promoting and protecting Americans' First

7    Amendment right of free speech, association, and assembly." Its "mission and major

8    purpose is to advocate the election of candidates – in the 2008, 2010, and future federal

9    election cycles – who favor returning America to the state of political freedom and

10   advocate the defeat of candidates who favor speech restrictions in the name of campaign

11   finance reform."

12       SpeechNow was founded by five individuals who are SpeechNow's only

13   participants. Other individuals may join the organization if elected to join by the current

14   participants. SpeechNow will operate and conduct its activities wholly independently of

15   candidates, political party committees, and other political committees. Provisions of its

16   bylaws ("Bylaws") prohibit SpeechNow and its participants from certain activities that

17   might compromise the independence of its activities, such as using a vendor that is also

18   used by a Federal candidate, hiring a former employee of a Federal candidate, or

19   communicating with candidates about their campaign needs or SpeechNow's activities.

20   *See* Bylaws Art. X. SpeechNow will not make any contribution to any candidate or

21   political committee. *See* Bylaws Art. VI, Sec. 10.

---

[1] www.SpeechNow.org (last viewed on Jan. 9, 2008).

AO 2007-32
Page 3

1    SpeechNow will rely solely on funds from individuals to pay for its activities and

2    administrative costs. Four individuals have already indicated they would like to give

3    amounts ranging from $5,500 to $110,000, and SpeechNow would like to accept these

4    funds. To date, however, SpeechNow has accepted less than $1,000 total. SpeechNow

5    will not accept any funds from candidates, and will not accept, directly or indirectly, any

6    funds or anything of value from political committees or from corporations, labor

7    organizations, national banks, Federal government contractors, or foreign nationals.

8    SpeechNow plans to solicit individuals using two proposed solicitations

9    ("Solicitation 1" and "Solicitation 2") that request that individuals give their "maximum"

10    amount to SpeechNow and that state that SpeechNow "operate[s] independently of any

11    candidate and expressly advocate[s] to other people to vote for federal candidates who

12    support these First Amendment rights and to vote against candidates who oppose such

13    rights." The two proposed solicitations are identical, except that Solicitation 2 also states

14    that SpeechNow plans to oppose the election of two specific Federal candidates,

15    Representative Dan Burton and Senator Mary Landrieu, in the 2008 election.

16    During the 2008 election, SpeechNow plans to pay for political advertisements

17    supporting and opposing four specific Federal candidates. It has prepared four political

18    advertisement scripts, and the company retained to produce the proposed advertisements

19    and reserve television airtime, The Traz Group, estimates production costs to be $12,000

20    and the cost of airing the advertisements to exceed $150,000.

21    SpeechNow plans to place "disclaimers" on its solicitations and political

22    advertisements in accordance with 2 U.S.C. 441d(d)(2), and to report its spending for its

AO 2007-32
Page 4

1  political advertisements as "independent expenditures" in accordance with 2 U.S.C.

2  434(c).

3  *Questions Presented*

4     1.  *Are funds received and amounts disbursed by SpeechNow "contributions" and*
5        *"expenditures" under 2 U.S.C. 431(8) and 431(9)?*
6

7     2.  *Must SpeechNow register as a political committee:*
8

9          a.  *Before accepting "contributions," or making "expenditures," in excess of*
10           *$1,000 because its major purpose is to influence the election or defeat of*
11           *candidates for Federal office?*
12

13          b.  *After it has received more than $1,000 from individuals who are informed*
14           *that the purpose of SpeechNow is to influence elections through advocacy*
15           *for or against the election of clearly identified candidates, but before it*
16           *has made "expenditures" in excess of $1,000?*
17

18          c.  *After making "expenditures" in excess of $1,000?*
19

20     3.  *What amount limitations apply to funds received by SpeechNow from individuals?*
21

22  *Legal Analysis and Conclusions*

23  *Question 1: Are funds received and amounts disbursed by SpeechNow "contributions"*
24  *and "expenditures" under 2 U.S.C. 431(8) and 431(9)?*
25

26       Yes, funds received by SpeechNow would be contributions and amounts

27  disbursed by SpeechNow would be expenditures under the Act and Commission

28  regulations.

29     *A. Contributions*

30       Under the Act and Commission regulations, a "contribution" is "any gift,

31  subscription, loan, advance, or deposit of money or anything of value made by any

32  person for the purpose of influencing any election for Federal office." *See* 2 U.S.C.

33  431(8)(A)(i); 11 CFR 100.52(a). The Act does not define the phrase "for the purpose of

34  influencing any election for Federal office."

AO 2007-32
Page 5

1    Commission regulations provide that funds received in response to solicitations

2    must be treated as contributions "if the communication indicates that any portion of the

3    funds received will be used to support or oppose the election of a clearly identified

4    Federal candidate."[2] 11 CFR 100.57(a); *see also Political Committee Status, Definition*

5    *of Contribution and Allocation for Separate Segregated Funds and Nonconnected*

6    *Committees; Final Rules*, 69 FR 68056, 68057 (Nov. 23, 2004) ("*Political Committee*

7    *Status Final Rules*").

8    SpeechNow proposes to solicit funds with two proposed communications,

9    Solicitation 1 and Solicitation 2, that contain identical language describing SpeechNow

10   and its purpose as follows:

11   SpeechNow.org is an independent speech group of individuals dedicated to
12   promoting and protecting our First Amendment rights to free speech and for the
13   freedom to assemble. We operate independently of any candidate and expressly
14   advocate to other people to vote for federal candidates who support these First
15   Amendment rights and to vote against candidates who oppose such rights.
16
17   Solicitation 1 and Solicitation 2 state that "the best way" to achieve SpeechNow's

18   purpose is:

19   to speak out when politicians and the voters are most likely to pay attention.
20   That's election time. We need to tell our fellow Americans who supports, and
21   who opposes, free speech and the First Amendment. We need to defeat some
22   candidates who are against free speech and elect the ones who support the First
23   Amendment. That will take money. A lot of it.
24
25   Solicitation 2 contains additional language stating that SpeechNow plans to run

26   advertisements to defeat two Federal candidates in 2008: Louisiana Senator Mary

27   Landrieu and Congressman Dan Burton from Indiana. Because Solicitation 2 indicates

---

[2] A Federal candidate is "clearly identified" if the candidate's name, nickname, photograph, or drawing appears in the communication, or if the identity of the candidate is otherwise apparent through an unambiguous reference to the person's status as a candidate, such as "the Democratic presidential nominee." *See* 11 CFR 100.17.

AO 2007-32
Page 6

1    that funds received will be used to oppose the election of two Federal candidates clearly

2    identified by name, money received in response would constitute contributions under 11

3    CFR 100.57(a).

4            Because Solicitation 1 does not include an indication that the funds received in

5    response will be used to support or oppose the election of a clearly identified Federal

6    candidate, money received in response to Solicitation 1 would not constitute

7    contributions under 11 CFR 100.57(a). The Commission has emphasized, however, that

8    11 CFR 100.57 provides "one example of communications that can generate

9    contributions; it is not an exhaustive list. The rule addresses communications that

10   indicate that the funds received in response will be used to support or oppose the election

11   of a clearly identified Federal candidate. Other communications that do not include such

12   an indication may also generate contributions under FECA." *Political Committee Status*

13   *Final Rules*, 69 FR at 68058. Solicitation 1 asks individuals to give money to

14   SpeechNow so that SpeechNow can work to elect and defeat Federal candidates. Money

15   given to work to elect and defeat Federal candidates would be "for the purpose of

16   influencing any election for Federal office," and thus would constitute a contribution

17   under 2 U.S.C. 431(8)(A)(i) and 11 CFR 100.52(a).

18           In addition, any funds received from the four individuals who have indicated they

19   would like to give amounts ranging from $5,500 to $110,000 would also constitute

20   contributions under the Act and Commission regulations. Each individual acknowledges

21   in a signed declaration that he understands that funds given to SpeechNow "will be used

22   to fund speech, including advertisements that will advocate the election or defeat of

23   candidates to federal office based on their position on freedom of speech and campaign

AO 2007-32
Page 7

1   finance laws." Accordingly, any such funds given to SpeechNow would be made "for the

2   purpose of influencing any election for Federal office." 2 U.S.C. 431(8)(A)(i); 11 CFR

3   100.52(a).

4       *B. Expenditures*

5       Under the Act and Commission regulations, an "expenditure," is a "purchase,

6   payment, distribution, loan, advance, deposit, or gift of money or anything of value, made

7   by any person for the purpose of influencing any election for Federal office." *See* 2

8   U.S.C. 431(9)(A)(i); 11 CFR 100.111(a). The Supreme Court has held that the term

9   "expenditure," when applied to communications made wholly independently of a

10  candidate or candidate's committee, includes only "expenditures for communications that

11  in express terms advocate the election or defeat of a clearly identified candidate for

12  federal office." *Buckley v. Valeo*, 424 U.S. 1, 44 (1976); *see also id.* at 80.

13      Under Commission regulations, a communication contains express advocacy

14  when it uses phrases such as "vote for the President," "re-elect your Congressman," or

15  "Smith for Congress," or uses campaign slogans or words that in context have no other

16  reasonable meaning than to urge the election or defeat of one or more clearly identified

17  candidates, such as posters, bumper stickers, or advertisements that say, "Nixon's the

18  One," "Carter '76," "Reagan/Bush," or "Mondale!" *See* 11 CFR 100.22(a); *see also FEC*

19  *v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 249 (1986) ("*MCFL*") ("[The

20  publication] provides in effect an explicit directive: vote for these (named) candidates.

21  The fact that this message is marginally less direct than 'Vote for Smith' does not change

22  its essential nature"). Courts have held that "express advocacy also includes verbs that

23  exhort one to campaign for, or contribute to, a clearly identified candidate." *FEC v.*

AO 2007-32
Page 8

1   *Christian Coalition*, 52 F. Supp. 2d 45, 62 (D.D.C. 1999) (explaining why *Buckley*, 424

2   U.S. at 44 n.52, included the word "support," in addition to "vote for" or "elect," in its

3   list of examples of express advocacy).

4       SpeechNow plans to fund the creation of four proposed political advertisements

5   (the "Burton Ad," the "Alternative Burton Ad," the "Landrieu Ad," and the "Alternative

6   Landrieu Ad") and pay to air them on television, independently of a candidate or a

7   candidate's committee. All four advertisements contain audio and video content. The

8   audio portions of the advertisements are as follows:

9   *Burton Ad*:
10  Free speech is so important, it's the First Amendment to the Constitution. But
11  politicians like Dan Burton don't like free speech. Burton voted for a bill to
12  restrict the speech of many public interest groups. Under this bill you could go to
13  jail for criticizing politicians. Hey Dan Burton. This is America, not Russia. But
14  we still have the right to vote. Say no to Burton for Congress. Say no to
15  censorship.
16
17  *Alternative Burton Ad*:
18  We've all seen the fight for free speech around the world. Lately, free speech has
19  come under attack right here in America. Thanks to politicians like Dan Burton.
20  Burton voted for a bill to restrict the speech of many public interest groups.
21  Under this bill you could go to jail for criticizing politicians. Our founding
22  fathers made free speech the First Amendment to the Constitution. Dan Burton
23  voted to restrict our rights. Don't let him do it again.
24
25  *Landrieu Ad*:
26  Free speech is so important, it's the First Amendment to the Constitution. But
27  politicians like Mary Landrieu don't like free speech. Landrieu voted for the law
28  restricting the speech of public interest groups. People can now go to jail for
29  violating her law that protects politicians from criticism. Hey Mary Landrieu.
30  This is America, not Russia. But we still have the right to vote. Say no to
31  Landrieu for Senate. Say no to censorship.
32
33  *Alternative Landrieu Ad*:
34  We've all seen the fight for free speech around the world. Lately, free speech has
35  come under attack right here in America. Thanks to politicians like Mary
36  Landrieu. Landrieu helped pass the law restricting the speech of many public
37  interest groups. Under this law you could go to jail for criticizing politicians.

AO 2007-32
Page 9

1         Our founding fathers made free speech the First Amendment to the Constitution.
2    Mary Landrieu is taking that right away.   Don't let her do it again.
3
4         The video portions of the Burton Ad and the Alterative Burton Ad both show a

5 picture of Congressman Burton and include text that states "Say no to Burton for

6 Congress." The video portions of the Landrieu Ad and the Alternative Landrieu Ad both

7 show a picture of Senator Landrieu and include text that states "Say no to Landrieu for

8 Senate."

9         The phrases "Say no to Burton for Congress" and "Say no to Landrieu for Senate"

10 constitute express advocacy under the Commission regulations because they have no

11 other reasonable meaning than to urge the defeat of the candidate clearly identified by

12 name and by picture. *See* 11 CFR 100.22(a). Accordingly, all four advertisements

13 contain express advocacy, and funds spent on these advertisements would constitute

14 expenditures under the Act and Commission regulations.

15 *Question 2: Must SpeechNow register as a political committee:*
16
17        a.   *Before accepting "contributions," or making "expenditures," in excess of*
18           *$1,000 because its major purpose is to influence the election or defeat of*
19           *candidates for Federal office?*
20
21        b.   *After it has received more than $1,000 from individuals who are informed*
22           *that the purpose of SpeechNow is to influence elections through advocacy*
23           *for or against the election of clearly identified candidates, but before it*
24           *has made "expenditures" in excess of $1,000?*
25
26        c.   *After making "expenditures" in excess of $1,000?*
27
28         SpeechNow would have to register as a political committee once it has either

29 received contributions in excess of $1,000 or made expenditures in excess of $1,000, in a

30 calendar year, because it would satisfy the statutory definition of "political committee"

31 and its major purpose is Federal campaign activity. SpeechNow need not, however,

AO 2007-32
Page 10

1    register as a political committee before receiving contributions or making expenditures

2    exceeding either of these thresholds solely because its major purpose is Federal campaign

3    activity.

4    *Definition of Political Committee*

5          The Act and Commission regulations, with certain exceptions, define a "political

6    committee" as "any committee, club, association, or other group of persons which

7    receives contributions aggregating in excess of $1,000 during a calendar year or which

8    makes expenditures aggregating in excess of $1,000 during a calendar year." *See* 2

9    U.S.C. 431(4)(A); 11 CFR 100.5(a). Under the Act and Commission regulations,

10   political committees are subject to certain registration and reporting requirements, as well

11   as limitations and prohibitions on contributions received and made. Once an organization

12   receives more than $1,000 in contributions or makes more than $1,000 in expenditures, in

13   a calendar year, it satisfies the statutory definition of "political committee."

14         The Supreme Court has held that "[t]o fulfill the purposes of the Act" and avoid

15   "reach[ing] groups engaged purely in issue discussion," only organizations whose major

16   purpose is Federal campaign activity can be considered political committees under the

17   Act. *See Buckley*, 424 U.S. at 79; *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S.

18   238, 262 (1986).

19         Accordingly, SpeechNow would have to register as a political committee if it

20   satisfies the statutory definition of "political committee" and its major purpose is Federal

21   campaign activity.

22         A.  *Statutory Definition of "Political Committee"*

23               1. *Receiving contributions in excess of $1,000 in a calendar year*

AO 2007-32
Page 11

1    As explained above in response to *Question 1*, funds received in response to

2    Solicitation 1 and Solicitation 2, and funds from the four individuals who would like to

3    give amounts ranging from $5,500 to $110,000, would constitute contributions under the

4    Act and Commission regulations. Thus, once SpeechNow receives more than $1,000 in a

5    calendar year in response to these solicitations, or from the four individuals, it would

6    meet the statutory definition of a "political committee."

7         2. *Making expenditures in excess of $1,000 in a calendar year*

8    As explained above in response to *Question 1*, SpeechNow's proposed political

9    advertisements contain express advocacy and funds spent on these advertisements would

10   be expenditures under the Act and Commission regulations. Thus, once SpeechNow

11   spends more than $1,000 in a calendar year on these advertisements, it would meet the

12   statutory definition of a "political committee."

13   *B. Major Purpose*

14   An organization's "major purpose" may be established through public statements

15   of purpose. *See, e.g., FEC v. Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004)

16   (finding that the organization evidenced its "major purpose" through its own materials

17   which stated the organization's goal of supporting the election of Republican Party

18   candidates for federal office and through efforts to get prospective donors to consider

19   supporting federal candidates); *FEC v. GOPAC, Inc.*, 917 F. Supp. 851, 859 (D.D.C.

20   1996) ("organization's [major] purpose may be evidenced by its public statements of its

21   purpose or by other means"); Advisory Opinion 2006-20 (Unity 08) (organization

22   evidenced its major purpose through organizational statements of purpose on Web site).

AO 2007-32
Page 12

1    SpeechNow's major purpose is Federal campaign activity. SpeechNow makes

2    clear in its advisory opinion request, and through its proposed solicitations and other

3    proposed communications, that its "mission and major purpose is to advocate the election

4    of candidates . . . and advocating the defeat of candidates." Advocating the election and

5    defeat of candidates constitutes campaign activity.[3] In its Internal Revenue Service Form

6    8871 (Political Organization Notice of Section 527 Status), its bylaws, and its articles of

7    organization, SpeechNow clearly states this purpose: "We operate independently of any

8    candidate and expressly advocate to other people to vote for federal candidates who

9    support these First Amendment rights and vote against candidates who oppose such

10    rights." In addition, SpeechNow plans to continue making similar statements of its

11    purpose in its proposed solicitations, discussed above, which confirms that its major

12    purpose is Federal campaign activity.

13        Therefore, because its major purpose is Federal campaign activity, SpeechNow

14    would have to register as a political committee once it either (1) receives more than

15    $1,000 in a calendar year in response to its proposed solicitations or from the four

16    individuals who pledged donations, or (2) spends more than $1,000 in a calendar year on

17    its proposed advertisements. SpeechNow would have to file a statement of organization

18    within 10 days of becoming a political committee, *see* 11 CFR 102.1(d) and 102.2, and it

19    would be subject to all provisions of the Act and Commission regulations applicable to

20    political committees.

21    *Question 3: What amount limitations apply to funds received by SpeechNow from*
22    *individuals?*

23

---

[3] *See Buckley v. Valeo*, 424 U.S. 1, 79 (the term "political committee" encompasses organizations "the major purpose of which is the nomination or election of a candidate").

AO 2007-32
Page 13

1    Because amounts given to SpeechNow would be contributions, as explained

2    above in response to *Question 1*, they would count towards the contribution limitations in

3    the Act and Commission regulations, including the individual biennial aggregate

4    contribution limit.

5        The Act and Commission regulations prohibit a person from making a

6    contribution in excess of $5,000 to a political committee that is not an authorized

7    committee, a political committee of a national political party, or a political committee of

8    a State political party. *See* 2 U.S.C. 441a(a)(1); 11 CFR 110.1(d). The Act and

9    Commission regulations also limit the total amount of contributions an individual may

10   make to candidates and political committees within a two-year period, known as the

11   individual aggregate biennial contribution limit. *See* 2 U.S.C. 441a(a)(3); 11 CFR

12   110.5(b)(1). Under the individual aggregate biennial contribution limit for the 2007-2008

13   election cycle, an individual may make no more than $108,200 in total contributions to

14   candidates and political committees, including up to $42,700 in contributions to political

15   committees that are not authorized committees and are not political committees of the

16   national political parties.[4] *See id.*; *Price Index Increases of Expenditure and*

17   *Contribution Limitations: Notice of Expenditure and Contribution Limitation Increases*,

18   72 FR 5294, 5295 (Feb. 2007).

19       Once SpeechNow becomes a political committee, it would not be an authorized

20   committee or a political committee of a national or State political party. *See* 2

21   U.S.C. 431(6) (definition of authorized committee); 11 CFR 100.5(e)(4) and (f)(1)

22   (definitions of authorized committee and party committee). Therefore, contributions to it

---

[4] These figures reflect the statutory figures adjusted to account for increases in the consumer price index. *See* 2 U.S.C. 441a(c)(1); 11 CFR 110.5(b)(3) and 110.17.

AO 2007-32
Page 14

1   would be subject to the $5,000 amount limitation in 2 U.S.C. 441a(a)(1)(C) and 11 CFR

2   110.1(d) and would count towards the $42,700 in total contributions that each individual

3   may make to political committees that are not authorized committees and are not political

4   committees of the national political parties and the $108,200 in total contributions to all

5   candidates and political committees. *See* 2 U.S.C. 441a(a)(3); 11 CFR 110.5(b)(1).

6        Commission regulations prohibit a political committee from knowingly accepting

7   any contribution in excess of the Act's amount limitations, including the individual

8   biennial aggregate contribution limit. *See* 11 CFR 110.9. Accordingly, SpeechNow may

9   not accept any contribution that would cause an individual to exceed $5,000 in total

10  contributions to SpeechNow, $42,700 in total contributions to political committees that

11  are not authorized committees and are not political committees of the national political

12  parties, or $108,200 in total contributions to all candidates and political committees.

13       This response constitutes an advisory opinion concerning the application of the

14  Act and Commission regulations to the specific transaction or activity set forth in your

15  request. *See* 2 U.S.C. 437f. The Commission emphasizes that, if there is a change in any

16  of the facts or assumptions presented and such facts or assumptions are material to a

17  conclusion presented in this advisory opinion, then the requester may not rely on that

18  conclusion as support for its proposed activity. The cited advisory opinion is available on

19  the Commission's website at http://saos.nictusa.com/saos/searchao.

20                                              Sincerely,
21
22
23                                              David M. Mason
24                                              Chairman



THE FEDERAL ELECTION COMMISSION
Washington, DC 20463

## DISSENTING OPINION OF CHAIRMAN DAVID M. MASON
## IN ADVISORY OPINION REQUEST 2007-32

Draft Advisory Opinion 2007-32 for SpeechNow.org ("SpeechNow") proposed to conclude that SpeechNow would satisfy the statutory definition of a "political committee" and would be required to register as such. I agree with the analysis of the Office of General Counsel as set forth in the draft advisory opinion as to SpeechNow's statutory status and its obligation to register and file reports with the Commission. The draft also recommended concluding that donations received by SpeechNow would constitute "contributions" and would be subject to the Act's amount limitations on individuals' contributions to political committees, including the individual biennial aggregate contribution limit. I do not believe the Commission may, consistent with the Constitution and with Supreme Court decisions on independent political spending, enforce the FECA's $5,000 limit on contributions to political committees which limit their activities exclusively to independent spending, nor may we apply the individual aggregate limit to such contributions. I write separately to express my views on the authority of the Commission to make constitutional determinations in such matters and on issue of contribution limits.

## I.  Constitutional Questions

Certain commentors have expressed the concern that advisory opinions are not for the purpose of declaring portions of the Federal Election Campaign Act (the "Act") unconstitutional. It is black letter law that "adjudication of the constitutionality of congressional enactments [is] beyond the jurisdiction of administrative agencies." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) (quoting *Johnson v. Robison*, 415 U.S. 361, 367-68 (1974)). However, an agency may be "influenced by constitutional considerations in the way it interprets or applies statutes." *Branch v. FCC*, 824 F.2d 37, 47 (C.A.D.C. 1987). Indeed, the Commission makes these considerations every day in carrying out its statutory obligations.[1]

---

[1] *See, e.g.,* Advisory Opinion (AO) 1998-20 (*Fulani*) (F.E.C. Nov. 4, 1998) (relying on *Buckley v. Valeo*, 424 U.S. 1 (1976), to make a constitutional distinction between a candidate's funds and contributions from others); AO 2003-02 (*Socialist Workers Party*) (F.E.C. April 4, 2003) (Commission applied disclosure exemption based on constitutional principles); AO 2003-33 (*Cantor*) (F.E.C. April 29, 2003) (citing Commission's earlier

In the past, the Commission has exempted certain organizations from disclosure requirements due to constitutional concerns. In *Buckley v. Valeo*, 424 U.S. 1, 71-72 (1976), the United States Supreme Court recognized that some disclosure requirements under the Act would be unconstitutional as applied to minor parties because of the possibility of threats, harassment, or reprisals. *See also Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982). Because of those constitutional concerns, the Commission undertook constitutional considerations and exempted minor parties from disclosure requirements. *See* AO 2003-02, *Socialist Workers Party* (F.E.C. April 4, 2003).[2] In a similar manner, and as discussed more thoroughly in Part II below, because of well-stated concerns about the unconstitutional burden made by limiting contributions to organizations engaged in speech wholly independent of candidates, the Commission is empowered to grant a similar exemption here.

SpeechNow seeks the Commission's advice on the application of the law to particular activities. It does not ask the Commission to declare a statute unconstitutional – an action beyond the jurisdiction of this Commission. It comes as no surprise that the Commission makes these types of constitutional applications as a matter of regular course. By engaging in rulemaking, providing answers to advisory opinion requests, and ruling on

---

rulemaking as basis for constitutional concern); AO 2006-32 (*Progress for America*) (F.E.C. Nov. 21, 2006) (dismissing matter, but noting the importance of the major purpose test as a constitutional consideration). *See also* Statement of Reasons (SOR) by Commissioners Darryl P. Wold, Lee Ann Elliott, and David M. Mason in Matter Under Review (MUR) 4250 (*Republican National Committee*) (F.E.C. Feb. 11, 2000) (directing the Commission to read the Act narrowly because it impinges on protected First Amendment liberties); SOR by Commissioner Sandstrom in MUR 4620 (*The Coalition*) (F.E.C. Sept. 6, 2001) ("the Commission must be mindful of constitutional constraints); Additional SOR by Commissioner Michael E. Toner in MUR 4735 (*Bordonaro for Congress*) (F.E.C. Dec. 1, 2003) (indicating the Commission has a duty to be sensitive to constitutional concerns when interpreting and enforcing the Act); SOR by Commissioner David M. Mason in MUR 4741 (*Mary Bono Committee*) (F.E.C. April 7, 1999) (expressing concern over the constitutionality of 2 U.S.C. § 441d(a)); Additional SOR by Commissioner David M. Mason in MUR 4766 (*Phillip Morris Companies, Inc.*) (F.E.C. May 5, 2000) (raising the issue of the speech or debate clause as a matter of constitutional immunity); SOR by Commissioner Bradley A. Smith in SOR 5275 (F.E.C. March 30, 2004) (advising the Commission to tread lightly on the matter of anonymous speech under the First Amendment); SOR of Commissioner Weintraub in MURs 5540, 5545, 5562, 5570 (*CBS Broadcasting, Inc.*) (F.E.C. July 12, 2005) ("merely investigating" allegations of fairness or accuracy "would intrude upon Constitutional guarantees of freedom of the press").

[2] Likewise, some commissioners have expressed doubt over the constitutionality of applying 2 U.S.C. § 441d(a) against citizens of modest means who act independently of a candidate. *See* SOR of Commissioner Darryl R. Wold in MUR 5156 (*Morton*, et al.) (F.E.C. March 22, 2002).

Dissenting Opinion in AOR 2007-32
Page 3 of 6

enforcement matters, the Commission makes constitutionally-governed decision making in its day-to-day operations. *See Electioneering Communications*, 72 Fed. Reg. 72899 (F.E.C., Dec. 26, 2007); Advisory Opinion 1990– 13, *Socialist Workers Party* (F.E.C., Aug. 21, 1990) MUR 5754; MoveOn.org Voter Fund (F.E.C., Dec. 13, 2006).

Moreover, commissioners take an oath to support and defend the Constitution. In doubtful cases of law, the Commission is instructed to "err on the side of protecting political speech rather than suppressing it." *FEC v. Wisconsin Right to Life, Inc. (WRTL II)*, 127 S. Ct. 2652, 2659 (2007). Indeed, in *Shays v. FEC*, the district court required that the Commission undertake a *more thorough* analysis of First Amendment concerns to survive review. 337 F. Supp. 2d 28, 79, 86-87 (D.D.C 2004). The Commission is mindful of these instructions when considering the application of the Act to matters before it.

Under the Act, the Congress established the Commission with specifically enumerated powers as an independent agency to perform just the type of constitutional determination that SpeechNow requests. *See* 2 U.S.C. §§ 437d, 437f, 437g, 438. It is not only within the discretion of the Commission to make such determinations; the Commission possesses an independent obligation to do so. As President Lincoln reminded citizens of this nation in his first inaugural address:

> I do not forget the position assumed by some that constitutional
> questions are to be decided by the Supreme Court, nor do I deny
> that such decisions must be binding in any case upon the parties to
> a suit as to the object of that suit, while they are also entitled to
> very high respect and consideration in all parallel cases by all other
> departments of the Government. And while it is obviously possible
> that such decision may be erroneous in any given case, still the evil
> effect following it, being limited to that particular case, with the
> chance that it may be overruled and never become a precedent for
> other cases, can better be borne than could the evils of a different
> practice. At the same time, the candid citizen must confess that if
> the policy of the Government upon vital questions affecting the
> whole people is to be irrevocably fixed by decisions of the
> Supreme Court, the instant they are made in ordinary litigation
> between parties in personal actions the people will have ceased to
> be their own rulers, having to that extent practically resigned their
> Government into the hands of that eminent tribunal.

Lincoln's First Inaugural Speech (Mar. 4, 1861), in Bartleby's Great Books Online, available at http://www.bartleby.com/124/pres31.html

The Commission is equally mindful that courts are not the sole mechanism through which constitutional determinations may be made. It is the duty of this

Commission, pursuant to its statutory grant of authority by Congress, to consider these very questions.

## II. Contribution Limits Applied to Grassroots Organizations Engaged Solely in Independent Speech are Inapplicable Under the First Amendment

The United States Supreme Court recognizes that speech like that made by SpeechNow – citizens banded together in grassroots organizations – is protected at the very core of the First Amendment. *FEC v. Massachusetts Citizens for Life (MCFL)*, 479 U.S. 238, 256 (1986) n.9 (independent spending is "core political speech protected under the First Amendment"). SpeechNow is but one manifestation of this phenomenon where "individual members seek to make more effective the expression of their own views." *NAACP v. Alabama*, 357 U.S. 449, 459 (1958). Here, money given to SpeechNow funds the expression of members' views; it does not facilitate candidates' views. *See California Medical Ass'n v. FEC (Cal-Med)*, 453 U.S. 182, 196 (1981). Placing limits on the money given to independent organizations serves only to limit speech – an unjustifiable result in a Republic with a profound commitment to the principle that debate should be "uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The distinction between candidate coordinated speech and independent speech is of constitutional significance. The Supreme Court has recognized government interests in limiting corruption, or its appearance, only when that spending is connected or coordinated with candidates for public office or, in a very limited manner, because of the corporate form. *See Buckley*, 424 U.S. 1; *MCFL*, 479 U.S. 238; *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990).

Limiting the contribution limits given to an organization like SpeechNow would impose an intolerable, and constitutionally unjustifiable, burden on the independent spending of this citizen organization. *See Buckley,* 424 U.S. at 47-48 (while the "independent expenditure ceiling thus fails to serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process, it heavily burdens core First Amendment expression"); *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 299 (1981) (restrictions on expenditures "plainly impair[] freedom of expression").

This organization operates autonomously without connection or coordination with candidates, political party committees, other political committees or their agents. It does not make any contributions to candidates. Limiting donations to organizations that are wholly independent of candidates and political party committees serves no recognizable government interest. *See Cal-Med*, 453 U.S. at 203 (Blackmun, J., concurring) ("contributions to a committee that makes only independent expenditures pose no such

threat [of actual or perceived corruption]").[3] Hindering contributions to SpeechNow furthers no interest in preventing real or apparent corruption – for the organization is autonomous and does not make political contributions. *See FEC v. NCPAC*, 470 U.S. 480, 498 (1985) ("the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate"). In addition, SpeechNow has not assumed the corporate form and cannot be said to have amassed wealth through that special status. *MCFL*, 479 U.S. at 257.

The reasoned basis of *California Medical Association* was to avoid circumvention of direct limits on contributions to candidates. *See Cal-Med*, 453 U.S. at 203, Blackmun, J., concurring ("contributions to multicandidate political committees may be limited to $5,000 per year as a means of preventing evasion of the limitations on contributions to a candidate or his authorized campaign committee upheld in *Buckley* "). Applying a rule intended to prevent circumvention of direct contributions to a group which does not make direct contributions is precisely the sort of "prophylaxis-upon-prophylaxis" rationale that *WRTL II* held unconstitutional. *WRTL II*, 127 S.Ct. at 2672. While mindful of the judiciary's expertise concerning such matters, the Commission is obligated to avoid the unconstitutional application of the Act.[4] *See* SOR for MUR 4305, *Forbes for President, et al.* (F.E.C. May 27, 1999) (recognizing the importance of construing the Act to avoid unconstitutional results).

As the Supreme Court indicated in *MCFL*, 479 U.S. at 262, organizations whose independent spending "bec[a]me so extensive that the organization's major purpose may be regarded as campaign activity," political committee registration and regulation would be required. That is the case here. However, nowhere in the holding or dicta of *MCFL* did the Court specifically explain that contribution limits would apply to such organizations.

In short, the contribution limits at hand would place a direct restraint on associational and expressive activity simply because citizens have decided to band together. Individual members of SpeechNow are free to spend as much, and make as many, independent expenditures as they like acting as individual citizens. It is only when they join together that the contribution limits at hand are applicable. Those contribution

---

[3] Justice Blackmun's concurrence in *Cal-Med* is the controlling holding of the Court. When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal citations omitted).
[4] The Commission does not undertake constitutional considerations lightly. *See* AO 1998-17 (*Daniels-Cablevision*) (F.E.C. Sept. 10, 1998) (refusing to undertake a constitutional analysis pursuant to clear statutory guidance "clearly drawn with the First Amendment in mind"; AO 2003-34 (*Showtime*) (F.E.C. Dec. 19, 2003) (declining to engage in constitutional considerations when a satisfactory statutory basis was available).

limits then place restrictions on the ability of citizens to associate and amplify their voices in direct contradiction of the First Amendment. *See Buckley*, 424 U.S. at 22 (recognizing that "amplifying the voice" of association members is "the original basis for the recognition of First Amendment protection of the freedom of association"); *see also NAACP*, 357 U.S. at 460 ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association"). Just as the Commission enjoys no basis upon which to restrain the expression of individuals, it may not do so just because they band together to speak more robustly.

In sum, "limitations on independent expenditures are less directly related to preventing corruption, since '[t]he absence of prearrangement and coordination of an expenditure with the candidate ... not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.'" *Colorado Repub. Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 615 (1996). SpeechNow plans to engage in one of the essential features of democracy: "the presentation to the electorate of varying points of view." *NCPAC* at 488. Placing limits on such speech quells vibrant discussion and does nothing to prevent corruption or its appearance. Thus, lacking a constitutionally permissible reason to apply the contribution limits at hand, the Commission must decline to do so.

Under this analysis, the $5,000 contribution amount limitation in 2 U.S.C. 441a(a)(1)(C) and 11 CFR 110.1(d) would not apply to SpeechNow. Likewise, these donations would not count towards the individual biennial aggregate contribution limits. *See* 2 U.S.C. 441a(a)(3); 11 CFR 110.5(b)(1).

January 25, 2008

David M. Mason
Chairman

# EXHIBIT 4



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

February 28, 2007

<u>VIA FACSIMILE & FIRST CLASS MAIL</u>

Benjamin L. Ginsberg
Mitchell R. Berger
Benjamin D. Wood
Patton Boggs
2550 M Street, NW
Washington, DC 20037

       RE:  MUR 5487
          Progress for America Voter Fund

Dear Counsel:

  On February 22, 2007, the Federal Election Commission accepted the signed conciliation agreement submitted on your client's behalf in settlement of violations of 2 U.S.C. §§ 433, 434, 441a(f), and 441b(a) provisions of the Federal Election Campaign Act of 1971, as amended ("the Act"). Accordingly, the file has been closed in this matter.

  Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003). Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission. *See* 2 U.S.C. § 437g(a)(4)(B).

  Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the civil penalty is due within 30 days of the conciliation agreement's effective date. If you have any questions, please contact me at (202) 694-1650.

         Sincerely,

         Ann Marie Terzaken
         Assistant General Counsel

Enclosure
 Conciliation Agreement

BEFORE THE FEDERAL ELECTION COMMISSION

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL

2001 FEB 15 A 11: 46

In the Matter of            )
                            )        MUR 5487
    Progress for America Voter Fund    )

### CONCILIATION AGREEMENT

This matter was generated by a complaint filed with the Federal Election Commission

("the Commission"). *See* 2 U.S.C. § 437g(a)(1). The Commission found reason to believe that

Progress for America Voter Fund (hereinafter, "PFA-VF") violated 2 U.S.C. §§ 433, 434,

441a(f), and 441b(a) of the Federal Election Campaign Act of 1971, as amended ("the Act") by

failing to register as a political committee with the Commission, by failing to report

contributions and expenditures, by knowingly accepting contributions in amounts exceeding

$5,000 from individuals, and by knowingly accepting corporate and/or union contributions, and

an investigation was conducted.

NOW, THEREFORE, the Commission and the Respondent, having participated in

informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree

as follows:

I.      The Commission has jurisdiction over the Respondent and the subject matter of

this proceeding.

II.     Respondent has had a reasonable opportunity to demonstrate that no action should

be taken in this matter.

III.    Respondent enters voluntarily into this agreement with the Commission.

IV.     The pertinent facts in this matter are as follows:

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

Applicable Law

1.    The Act defines a political committee as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A).

2.    The Act defines the term "contribution" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also, FEC v. Survival Education Fund, Inc.*, 65 F.3d 285, 295 (2d Cir. 1995) (where a statement in a solicitation "leaves no doubt that the funds contributed would be used to advocate [a candidate's election or] defeat at the polls, not simply to criticize his policies during the election year," proceeds from that solicitation are contributions).

3.    The Act defines the term "expenditure" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i).

4.    Under the Commission's regulations, a communication contains express advocacy when it uses phrases such as "vote for the President," "re-elect your Congressman," or "Smith for Congress," or uses campaign slogans or words that in context have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, or advertisements that say, "Nixon's the One," "Carter '76," "Reagan/Bush," or "Mondale!" *See* 11 C.F.R. § 100.22(a); *see also FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 249 (1986) ("[The publication] provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than "Vote for Smith" does not change its essential nature."). Courts have held that

-2-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

"express advocacy also include[s] verbs that exhort one to campaign for, or contribute to, a clearly identified candidate." *FEC v. Christian Coalition*, 52 F. Supp. 2d 45, 62 (D.D.C. 1999) (explaining why *Buckley v. Valeo*, 424 U.S. 1, 44, n.52 (1976), included the word "support," in addition to "vote for" or "elect," on its list of examples of express advocacy communication).

     5.     The Commission's regulations further define express advocacy as communication containing an "electoral portion" that is "unmistakable, unambiguous, and suggestive of only one meaning" and about which "reasonable minds could not differ as to whether it encourages actions to elect or defeat" a candidate when taken as a whole and with limited reference to external events, such as the proximity to the election. 11 C.F.R. § 100.22(b). "Communications discussing or commenting on a candidate's character, qualifications or accomplishments are considered express advocacy under section 100.22(b) if, in context, they have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question." *Explanation and Justification*, 60 Fed. Reg. 35291, 35295 (Jul. 6, 1995).

     6.     The Supreme Court has held that "[t]o fulfill the purposes of the Act" and avoid "reach[ing] groups engaged purely in issue discussion," only organizations whose major purpose is campaign activity can be considered political committees under the Act. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 79 (1975); *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 262 (1986) ("*MCFL*"). It is well-settled that an organization can satisfy *Buckley's* "major purpose" test through sufficient spending on campaign activity. *MCFL*, 479 U.S. at 262-264; *see also Richey v. Tyson*, 120 F. Supp. 2d 1298, 1310 n.11 (S.D. Ala. 2002). An organization's "major purpose" may also be established through public statements of purpose. *See, e.g., FEC v. Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004); *FEC v. GOPAC*, 917 F. Supp. 851, 859 (D.D.C. 1996).

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

7.    The Act requires all political committees to register with the Commission and file a statement of organization within ten days of becoming a political committee, including the name, address, and type of committee; the name, address, relationship, and type of any connected organization or affiliated committee; the name, address, and position of the custodian of books and accounts of the committee; the name and address of the treasurer of the committee; and a listing of all banks, safety deposit boxes, or other depositories used by the committee. *See* 2 U.S.C. § 433.

8.    Each treasurer of a political committee shall file periodic reports of the committee's receipts and disbursements with the Commission. *See* 2 U.S.C. § 434(a)(1). In the case of committees that are not authorized committees of a candidate for Federal office, these reports shall include, *inter alia*, the amount of cash on hand at the beginning of the reporting period, *see* 2 U.S.C. § 434(b)(1); the total amounts of the committee's receipts for the reporting period and for the calendar year to date, *see* 2 U.S.C. § 434(b)(2); and the total amounts of the committee's disbursements for the reporting period and the calendar year to date. *See* 2 U.S.C. § 434(b)(4).

9.    The Act states that no person shall make contributions to any political committee that, in the aggregate, exceed $5,000 in any calendar year, with an exception for political committees established and maintained by a state or national political party. *See* 2 U.S.C. § 441a(a)(1)(C). Further, the Act states that no political committee shall knowingly accept any contribution in violation of the limitations imposed under this section. *See* 2 U.S.C. § 441a(f).

10.    Pursuant to 2 U.S.C. § 441b(a), it is unlawful for any political committee to knowingly accept or receive, directly or indirectly, any contribution from a corporation.

-4-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

<u>Factual Background</u>

11.     PFA-VF was formed as an Internal Revenue Code Section 527

organization on May 27, 2004. In its own words, PFA-VF was formed to "[f]ocus primarily on

TV & radio in key battleground states serving as [sic] counter-balance to liberal 527

committees."

12.     PFA-VF has not registered as a political committee with the Federal

Election Commission.

13.     Between May 27, 2004 and the November 2, 2004 General Election,

PFA-VF raised $44.9 million in corporate and individual contributions, over 70% of which came

from just thirteen donors according to IRS reports, and spent $26.4 million on nine television

advertisements in Arkansas, Florida, Iowa, Minnesota, Missouri, Nevada, New Hampshire,

Massachusetts, New Mexico, Ohio, Pennsylvania, Wisconsin and on national cable networks.

14.     All of these advertisements praised George W. Bush's leadership as

President and/or criticized Senator Kerry's ability to provide similar leadership. Examples of

these television advertisements include:

**Finish It**

Audio: Announcer: These people want to kill us.

On screen: Images of Mohammed Atta, Osama bin Laden, Khalid Sheik
Mohammed, Nick Berg's killers and victims of terrorist attacks.

Audio: They killed hundreds of innocent children in Russia. Two hundred
innocent commuters in Spain. And 3,000 innocent Americans.

On screen: Pictures showing 9/11 attack on Twin Towers and terrorist
attacks in Russia and Spain.

Audio: John Kerry has a 30-year record of supporting cuts in defense and
intelligence and endlessly changed positions on Iraq.

On screen: Still Picture of Kerry; 30 years of cuts in defense and intelligence.

-5-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

Audio: Would you trust Kerry against these fanatic killers? President Bush didn't start this war, but he will finish it.

On screen: Would you trust Kerry? Pictures of President Bush addressing the US military.

Audio: Progress for America Voter Fund is responsible for the content of this message.

On screen: PFAvoterfund.com. Paid For By Progress For America Voter Fund & Not Authorized By Any Candidate Or Candidate's Committee; 877-792-3800; Progress for America Voter Fund Is Responsible For The Content Of This Ad.

## Ashley's Story

On screen: Lynn Faulkner; picture of Wendy Faulkner with her two daughters.

Audio: Lynn Faulkner: My wife, Wendy, was murdered by terrorists on Sept. 11.

On screen: Picture of Ashley reading a book; Bush at a campaign rally in Ohio.

Audio: The Faulkners' daughter Ashley closed up emotionally. But when President George W. Bush came to Lebanon, Ohio, she went to see him as she had with her mother four years before.

On screen: Linda Prince; Family Friend.

On screen: Ashley Faulkner.

On screen: President Bush embracing Ashley Faulkner.

Audio: Linda Prince: He walked toward me and I said, "Mr. President, this young lady lost her mother in the World Trade Center."

Audio: Ashley Faulkner: And he turned around and he came back and he said, "I know that's hard. Are you all right?"

Audio: LINDA PRINCE: Our president took Ashley in his arms and just embraced her. And it was at that moment that we saw Ashley's eyes fill up with tears.

ASHLEY FAULKNER: He's the most powerful man in the world and all he wants to do is make sure I'm safe, that I'm OK.

On screen: Lynn Faulkner; picture of President Bush with a firefighter.

-6-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

Audio: LYNN FAULKNER: What I saw was what I want to see in the heart and in the soul of the man who sits in the highest elected office in our country.

Footage of a newspaper with President Bush embracing a girl captioned "Bush Comforts Daughter Of 9/11 Victim."

Audio: Progress for America Voter Fund is responsible for the content of this message.

On screen: PFAvoterfund.com. Paid For By Progress For America Voter Fund & Not Authorized By Any Candidate Or Candidate's Committee; 877-792-3800; Progress for America Voter Fund Is Responsible For The Content Of This Ad.[1]

15.    In October 2004, PFA-VF also spent $500,000 on Spanish-language television advertisements praising George Bush and $900,000 on Spanish-language radio advertisements in Nevada, New Mexico, and Florida supporting the Republican Party and opposing the Democratic Party.

16.    Between October 14 and the General Election on November 2, 2004, PFA-VF also spent $1.5 million on direct mail pieces, over $600,000 on email communications, and more than $170,000 on Internet banner advertisements. All of these materials supported George Bush and/or attacked John Kerry.

17.    The Commission concludes that PFA-VF intended these communications to influence the 2004 presidential election. For example, to solicit funds for PFA-VF's advertisements in Pennsylvania, PFA-VF stated in a direct mailing, "So please, help us promote President Bush's agenda in Pennsylvania with the greatest possible strength *between now and November 1st*. Your generous support will help us raise the $2.5 million we need to dominate the Pennsylvania airwaves and have a crucial impact on public opinion." Further, in a memorandum

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

to PFA-VF personnel, PFA-VF media consultant Larry McCarthy opined as to the impact "What If?" would have on the election: "Based upon data and experience, I believe "What if' could produce a 5% net swing toward support for the President and his policies in polling data in the battleground states where the issues debate is being watched most intensely."

      18.    According to IRS reports, as of April 15, 2006, PFA-VF has raised $4,675,029 and spent $11,239,723 since the 2004 presidential election.

Contributions

      19.    The Commission concludes that the language used in fundraising solicitations sent by PFA-VF preceding the 2004 General Election clearly indicated that the funds received would be targeted to the election or defeat of a specific federal candidate.

      20.    Although PFA-VF made most solicitations by email communication, it also solicited funds in two direct mailings, on its website, and through private meetings and conversations. Virtually all of the email solicitations reference George Bush and John Kerry and state that "Liberal 527 Organizations" are outspending President Bush by a significant margin. The Commission concludes that they also make clear that the funds received will be used to counter "liberal 527 Organizations" by running advertisements supporting George Bush and/or criticizing John Kerry in specific states.

      21.    For example, an email solicitation sent to potential donors in July 2004 claimed that "Liberals [were] outspending President Bush 2 to 1 in key media markets" and that PFA-VF needed help to "raise $1 million per week for the rest of the year in order to help offset the Liberals' spending advantage." The solicitation also claimed that PFA-VF "already has the

---

[1] In post-election materials, PFA-VF praised "Ashley's Story" as the "most important and successful part of PFA-VF's efforts." In fact, of the $26.4 million spent on television advertisements, PFA-VF spent $16.5 million on media buys for "Ashley's Story" in eleven states and national cable television.

-8-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

Kerry campaign on the run .... **CONTRIBUTE NOW TO KEEP KERRY CHASING US!**"
*Id.* (emphasis in original).

      22.    Similarly, the two direct mail solicitations, which PFA-VF sent to
approximately 1,600 potential donors, reference George Bush and make clear that the funds will
be used for media buys in "key states" up to the day before the election. The first mailing
includes the line: "So please, help us promote President Bush's agenda in Pennsylvania with the
greatest possible strength between now and November 1st." The second mailing also includes
the line, "So please, help us promote President Bush's agenda with the greatest possible strength
between now and November 1st." The Commission concludes that these solicitations clearly
indicate that the funds received would be targeted to the election of George W. Bush in the 2004
General Election.

      23.    With regard to PFA-VF's website, during the 2004 election cycle, the
homepage stated that "PFA-VF is a conservative issue advocacy organization dedicated to
keeping the issue record straight on the campaign trail and serving as a 'Political Truth Squad.'"
Immediately next to this message was a solicitation for contributions to pay for television
advertisements, accompanied by a picture of President Bush on a television screen. This same
picture of Bush on a television screen appeared on the contribution webpage where PFA-VF
specifically stated that donors' contributions will "help launch TV ads." The Commission
concludes that, similar to the email solicitations and direct mailings, the solicitations on the
website made clear that the funds received would be used to fund "TV ads" supporting George
Bush on the "campaign trail."

      24.    The Commission concludes that at least some of the solicitations made by
PFA-VF in meetings and private conversations with large donors clearly indicated that the funds

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

received would be used to elect George W. Bush. For example, Alex Spanos, who gave
$5 million to PFA-VF and fundraised on its behalf, gave the last $4 million on August 19, 2004,
two days after attending a "briefing" by PFA-VF in California, the invitation to which stated,
"Your participation is critical to our success in November!," and two weeks after receiving a
written solicitation stating that George Soros said he would become poor to beat Bush and that
"We cannot let that happen!"

     25.    PFA-VF claims that it "cannot identify the total number of persons to
whom it provided the solicitation materials, the total amounts received in response to these
solicitations or even estimate the positive response rate as such data was not recorded."
Nevertheless, considering that PFA-VF raised $44.9 million in the five months before the 2004
General Election, there is no genuine doubt that the funds received in response to its email
solicitations and direct mailings far exceed $1,000. Further, PFA-VF received $475,895 in
contributions through its website and an additional $7.75 million, collectively, from three
donors.

     26.    Accordingly, the Commission concludes that contributions received in
response to these solicitations caused PFA-VF to surpass the $1,000 statutory threshold.
*See* 2 U.S.C. § 431(4)(A).

## Expenditures

     27.    The Commission concludes that certain television advertisements run by
PFA-VF before the 2004 General Election expressly advocated that recipients vote for,
campaign for, or contribute to a clearly identified candidate. For example, "Veterans" was run in
eight battleground states in September 2004, less than two months before the General Election,
at a total cost of $1.56 million.

-10-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

**"Veterans"**

Four veterans from the frontlines of Iraq and Afghanistan. President Bush will be the best man to lead us in the war against terror. President Bush sticks to his policies. I'd ask Senator Kerry why would you vote to go to war but vote not to support troops over there. I don't think that Senator Kerry has what it takes. He doesn't have the resolve. Progress for America Voter Fund is responsible for the content of this message.

28.    In addition, "Why do we fight?" was run in five battleground states in July 2004 at a total cost of $521,524.

**"Why do we fight?"**

Why do we fight? Years of defense and intelligence cuts left us vulnerable. We fight now because America is under attack. Positions are clear. A president, who fights to defeat terrorists before they can attack again. Or the nation's most liberal senator with a 30-year record of supporting defense and intelligence cuts. The war is against terror. And President Bush has the strength and courage to lead us to victory. Progress for America Voter Fund is responsible for the content of this ad.

<u>Progress for America Voter Fund's Major Purpose</u>

29.    The Commission concludes that PFA-VF's statements and activities demonstrate that its major purpose was to defeat John Kerry and elect George Bush. In the press release announcing the creation of PFA-VF, the President of PFA-VF, stated, "Although PFA (the 501(c)(4) organization) has worked since 2001 to advance the conservative issue agenda, the establishment of the PFA Voter Fund will give us the additional flexibility we need to affect the political process."

30.    In solicitation materials, PFA-VF described itself as "a conservative issue advocacy organization dedicated to keeping the issue record straight *on the campaign trail* and serving as a 'Political Truth Squad'" and stated that "With your support, PFA-VF will rebut the

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

liberal 527 committees and level the playing field on television *in the battleground states.*"

(emphasis added).

       31.    In solicitation materials and on its website, PFA-VF described the three

goals of its media campaign before the 2004 General Election as:

    1.       Level the playing field on ads — it may not be possible to out
           raise even George Soros alone, but the PFA Voter Fund must
           try to reduce the lopsided advertising advantage the Democratic
           527s have on the campaign trail today.

    2.       Reinforce the message of conservatives across the nation – we
           have messages we know will work and energize the base; we
           just need the resources to deliver these messages.

    3.       Become a major factor in the battleground states, and also
           advertise on targeted national cable networks. To effectively
           air one thirty second TV ad in every battleground state will cost
           $9.3 million per week.

    We believe we can play a critical role in the following eleven states
    (Arizona, Florida, Iowa, Minnesota, Missouri, Nevada, New Hampshire,
    New Mexico, Ohio, Pennsylvania, Wisconsin). To do this we must be on
    the air from Labor Day straight through to the election.[2]

       32.    Further, in email communications made to donors in October 2004,

PFA-VF stated that it "continues to win the 527 battle against liberal organizations like

MoveOn.org, The Media Fund, Americans Coming Together & others. PFA-VF is outspending

George Soros and dozens of liberal 527 groups on television for the month of October in key

states across the country. But we still have a long way to go to increase support for President

Bush's agenda & expose John Kerry's record as the most liberal member of the U.S. Senate!"

---

[2]  The first two goals are still provided on PFA-VF's website. *See* http://pfavoterfund.com/docs/aboutus (last
visited December 1, 2006). Just below the two stated goals on the website is the statement: "As a diverse coalition
of concerned citizens, nonprofit organizations, and other players in the political process, PFA-VF is dedicated to
educating the American people regarding the public policy positions of candidates for federal, state, and local office

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

33.    The Commission concludes that PFA-VF spent virtually all of its money on federal campaign activity.  PFA-VF spent $26.4 million out of the $44.9 million it raised before the 2004 General Election, or nearly 60%, on nine television advertisements run in swing states that praised George Bush and were critical of John Kerry.

34.    PFA-VF spent an additional $1.4 million on Spanish-language television and radio advertisements in Nevada, New Mexico, and Florida promoting George W. Bush or the Republican Party and $2.3 million on direct mailings, email communications, and Internet banner advertisements promoting George Bush in "Ashley's Story."

35.    PFA-VF also spent at least $20,000 on Internet banner advertisements that attacked John Kerry.

36.    During the entire 2004 election cycle, the only other disbursements made by PFA-VF were for fundraising, administrative costs, and consulting/professional fees. PFA-VF made no disbursements in connection with state or local elections during the 2004 election cycle.

37.    Respondent contends that it made its fundraising communications with the good faith belief that they did not constitute solicitations for contributions under 2 U.S.C. § 431(8)(A)(i), and further contends that the language used in its fundraising solicitations did not clearly indicate that the funds received would be targeted to the election or defeat of a specific federal candidate.  In addition, Respondent contends that it made the communications described herein for the purpose of influencing the issues debate that was heightened during the 2004 Presidential election and with the good faith belief that they did not contain express advocacy

and mobilizing conservative voters. These activities provide the American people with the information they need to see through the misleading public policies and campaign themes of liberal politicians." *Id.*

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

under either 11 C.F.R. §§ 100.22(a) or (b) and that disbursements spent thereon did not

constitute expenditures under 2 U.S.C. § 431 (9)(A)(i).

     V.    Solely for the purpose of settling this matter expeditiously and avoiding litigation,

without admission with respect to any other proceeding, and with no finding of probable cause

by the Commission, PFA-VF agrees not to contest the Commission's conclusions that

Respondent violated the Act in the following ways:

     A.  Respondent violated 2 U.S.C. §§ 433 and 434 by failing to register and report as a

political committee.

     B.  Respondent violated 2 U.S.C. § 441a(f) by knowingly accepting contributions in

amounts exceeding $5,000 from individuals and 2 U.S.C. § 441b(a) by accepting prohibited

corporate contributions.

     VI.    Respondent will cease and desist from violating 2 U.S.C. §§ 433 and 434 by

failing to register and report as a political committee.  Respondents will cease and desist from

violating 2 U.S.C. §§ 441a(f) and 441b(a) by accepting contributions in excess of the limits as

set forth in the Act or from prohibited sources.  Respondent agrees to register with and report to

the Commission as a political committee in the event that it should engage in activities that the

Commission has concluded would trigger federal political committee status in connection with

future elections, and will comply with any and all applicable provisions of the Act and

Commission regulations.

     VII.    Respondent will pay a civil penalty to the Federal Election Commission in the

amount of Seven Hundred Fifty Thousand Dollars ($750,000), pursuant to 2 U.S.C.

§ 437g(a)(5)(A).

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

VIII.    Respondent will file reports with the Commission containing all information required to be disclosed by federal political committees for its activities from May 27, 2004 until January 31, 2007. The Commission agrees that PFA-VF may fulfill this obligation by submitting copies of reports filed with the Internal Revenue Service for activities during this period, if supplemented with additional information required of federal political committees. Such supplementation would include, but not be limited to, the information contained on the summary pages of reports filed by political committees.

IX.    The Commission, on request of anyone filing a complaint under 2 U.S.C. § 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance with this agreement. If the Commission believes that this agreement or any requirement thereof has been violated, it may institute a civil action for relief in the United States District Court for the District of Columbia.

X.    This agreement shall become effective as of the date that all parties hereto have executed same and the Commission has approved the entire agreement.

XI.    Respondent shall have no more than 30 days from the date this agreement becomes effective to comply with and implement the requirements contained in this agreement and to so notify the Commission.

*Continued on the next page*

-15-

MUR 5487
Conciliation Agreement with Progress for America Voter Fund

XII.    This Conciliation Agreement constitutes the entire agreement between the parties

on the matters raised herein, and no other statement, promise, or agreement, either written or

oral, made by either party or by agents of either party, that is not contained in this written

agreement shall be enforceable.

FOR THE COMMISSION:

Lawrence H. Norton
General Counsel

BY: _____          _2/28/07_____
       Rhonda J. Vosdingh                    Date
       Associate General Counsel
       for Enforcement

FOR THE RESPONDENT:

_____          _Feb. 15, 2007_____
(NAME)                                      Date
(POSITION) Counsel

-16-

# EXHIBIT 5



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

November 19, 2007

**VIA FAX (202-293 3411) and FIRST CLASS MAIL**

Lyn Utrecht, Esq.
Ryan, Phillips, Utrecht & MacKinnon
1133 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036

RE:    MUR 5440
       The Media Fund

Dear Ms. Utrecht:

On November 7, 2007, the Federal Election Commission accepted the signed conciliation agreement and civil penalty submitted on your client's behalf in settlement of a violation of 2 U.S.C. §§ 433, 434, 441a(f) and 441b(a), provisions of the Federal Election Campaign Act of 1971, as amended ("the Act"). Accordingly, the Commission closed the file in this matter on November 16, 2007.

Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003). Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission. *See* 2 U.S.C. § 437g(a)(4)(B).

Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the civil penalty is due within 30 days of the conciliation agreement's effective date. If you have any questions, please contact me at (202) 694-1650.

Sincerely,

Peter G. Blumberg
Attorney

Enclosure
Conciliation Agreement

RECEIVED
FEC MAIL CENTER

BEFORE THE FEDERAL ELECTION COMMISSION

2007 OCT 29 PM 12: 38

In the Matter of          )
                          )          MUR 5440
The Media Fund            )

## CONCILIATION AGREEMENT

This matter was initiated by three signed, sworn, and notarized complaints.[1] The Federal

Election Commission ("Commission") found probable cause to believe that The Media Fund

("TMF" or "Respondent") violated 2 U.S.C. §§ 433, 434, 441a(f), and 441b(a), provisions of the

Federal Election Campaign Act of 1971, as amended ("the Act"), by failing to register as a

political committee with the Commission, by failing to report contributions and expenditures,

by knowingly accepting individual contributions in excess of $5,000, and by knowingly

accepting corporate and/or union contributions.

NOW, THEREFORE, the Commission and the Respondent, having duly entered into

conciliation pursuant to 2 U.S.C. § 437g(a)(4)(A)(i), do hereby agree as follows:

I.      The Commission has jurisdiction over the Respondent and the subject matter of

this proceeding.

II.     Respondent has had a reasonable opportunity to demonstrate that no action should

be taken in this matter.

III.    Respondent enters voluntarily into this agreement with the Commission.

IV.     The pertinent facts in this matter are as follows:

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL

2007 OCT 29 P 2: 51

---

[1] The Commission merged allegations as to The Media Fund from MURs 5403 and 5427 into MUR 5440.

MUR 5440 (The Media Fund)
Conciliation Agreement

## Applicable Law

1.    The Act defines a political committee as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A).

2.    The Act defines the term "contribution" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also FEC v. Survival Education Fund, Inc.*, 65 F.3d 285, 295 (2d Cir. 1995) (where a statement in a solicitation "leaves no doubt that the funds contributed would be used to advocate [a candidate's election or] defeat at the polls, not simply to criticize his policies during the election year," proceeds from that solicitation are contributions).

3.    The Act defines the term "expenditure" as including "anything of value ... made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i).

4.    Under the Commission's regulations, a communication contains express advocacy when it uses phrases such as "vote for the President," "re-elect your Congressman," or "Smith for Congress," or uses campaign slogans or words that in context have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, or advertisements that say, "Nixon's the One," "Carter '76," "Reagan/Bush," or "Mondale!" *See* 11 C.F.R. § 100.22(a); *see also FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 249 (1986) ("*MCFL*") ("[The publication] provides in effect an explicit directive: vote for these (named) candidates. The fact that this

2

MUR 5440 (The Media Fund)
Conciliation Agreement

message is marginally less direct than "Vote for Smith" does not change its essential nature.").

Courts have held that "express advocacy also includes verbs that exhort one to campaign for, or

contribute to, a clearly identified candidate." *FEC v. Christian Coalition*, 52 F.Supp. 2d 45, 62

(D.D.C. 1999) (explaining why *Buckley v. Valeo*, 424 U.S. 1, 44, n.52 (1976), included the word

"support," in addition to "vote for" or "elect," on its list of examples of express advocacy

communication).

     5.    The Commission's regulations further provide that express advocacy also

includes communications containing an "electoral portion" that is "unmistakable, unambiguous,

and suggestive of only one meaning" and about which "[r]easonable minds could not differ as to

whether it encourages actions to elect or defeat" a candidate when taken as a whole and with

limited reference to external events, such as the proximity to the election. 11 C.F.R. § 100.22(b).

"Communications discussing or commenting on a candidate's character, qualifications or

accomplishments are considered express advocacy under ... section 100.22(b) if, in context, they

have no other reasonable meaning than to encourage actions to elect or defeat the candidate in

question." *Express Advocacy; Independent Expenditures; Corporate and Labor Organization

Expenditures*, 60 Fed. Reg. 35,292, 35,295 (July 6, 1995).

     6.    The Supreme Court has held that "[t]o fulfill the purposes of the Act" and

avoid "reach[ing] groups engaged purely in issue discussion," only organizations whose major

purpose is campaign activity can be considered political committees under the Act. *See, e.g.,*

*Buckley*, 424 U.S. at 79; *MCFL*, 479 U.S. at 262. It is well-settled that an organization can

satisfy *Buckley's* "major purpose" test through sufficient spending on campaign activity. *MCFL*,

479 U.S. at 262-4; *see also Richey v. Tyson*, 120 F. Supp. 2d 1298, 1310 n.11 (S.D. Ala. 2002).

3

MUR 5440 (The Media Fund)
Conciliation Agreement

An organization's "major purpose" may also be established through public statements of

purpose. *See, e.g., FEC v. Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004), *rev'd in part*

*on other grounds, on reconsideration*, 2005 WL 588222 (D.D.C. Mar. 7, 2005); *FEC v. GOPAC*,

917 F. Supp. 851, 859 (D.D.C. 1996).

       7.    The Act requires all political committees to register with the Commission

and file a statement of organization within ten days of becoming a political committee, including

the name, address, and type of committee; the name, address, relationship, and type of any

connected organization or affiliated committee; the name, address, and position of the custodian

of books and accounts of the committee; the name and address of the treasurer of the committee;

and a listing of all banks, safety deposit boxes, or other depositories used by the committee. *See*

2 U.S.C. § 433.

       8.    Each treasurer of a political committee shall file periodic reports of the

committee's receipts and disbursements with the Commission. *See* 2 U.S.C. § 434(a)(1). In the

case of committees that are not authorized committees of a candidate for Federal office, these

reports shall include, *inter alia*, the amount of cash on hand at the beginning of the reporting

period, *see* 2 U.S.C. § 434(b)(1); the total amounts of the committee's receipts for the reporting

period and for the calendar year to date, *see* 2 U.S.C. § 434(b)(2); and the total amounts of the

committee's disbursements for the reporting period and the calendar year to date. *See* 2 U.S.C.

§ 434(b)(4).

       9.    The Act states that no person shall make contributions to any political

committee that, in the aggregate, exceed $5,000 in any calendar year, with an exception for

political committees established and maintained by a state or national political party. *See*

4

MUR 5440 (The Media Fund)
Conciliation Agreement

2 U.S.C. § 441a(a)(1)(C). Further, the Act states that no political committee shall knowingly

accept any contribution in violation of the limitations imposed under this section. *See* 2 U.S.C.

§ 441a(f).

      10.    Pursuant to 2 U.S.C. § 441b(a), it is unlawful for any political committee

knowingly to accept or receive, directly or indirectly, any contribution made in connection with a

federal election from a corporation or a labor organization.

Factual Background

      11.    TMF is an unincorporated entity organized under Section 527 of the

Internal Revenue Code. TMF filed its Notice of 527 Status with the Internal Revenue Service on

November 5, 2003.

      12.    TMF has not registered as a political committee with the Commission.

      13.    From its inception through 2004, TMF raised $59,414,183. While TMF

received substantial sums from small individual donors, approximately 93% of its receipts during

that time period– over $55 million – came from labor organizations (or corporations) and

individuals who gave in amounts that exceeded the $5,000 limit established under the Act for

contributions to political committees.

      14.    TMF received the majority of its funds ($44,475,000) through a joint

fundraising committee, Joint Victory Campaign 2004 ("JVC"), in which TMF and America

Coming Together participated. JVC received contributions from individuals in excess of $5,000

and it also received labor and corporate contributions. The Commission determined that

approximately 85% of the funds that JVC transferred to TMF were in excess of $5,000 and 6%

of those funds were from corporate and labor sources.

5

MUR 5440 (The Media Fund)
Conciliation Agreement

      15.    TMF disbursed $57,637,115 from its inception through 2004. TMF spent approximately $53,389,856 – or more than 92% of its reported disbursements during that time period – on 37 television advertisements, 24 radio advertisements, nine newspaper advertisements, and 20 mailers that reference President George Bush or Senator John Kerry in the context of the 2004 Presidential election. TMF broadcast or disseminated some of these communications in "battleground states," including Florida, Missouri, Nevada, New Hampshire, Ohio, Pennsylvania, Wisconsin, and West Virginia.

      16.    TMF contends that its 2004 activities consisted of issue advocacy relating to the 2004 election cycle. TMF's communications centered on pertinent social and public policy issues, such as the economy, unemployment, poverty, education, health care, prescription drugs, government special interests and fuel prices.

      17.    According to IRS reports and electioneering communications reported filed with the Commission, from January 1, 2005 through December 31, 2006, TMF raised $1,020,000 and spent $1,985,044.

<u>TMF's Contributions</u>

      18.    The Commission concludes that the language used in fundraising solicitations sent by TMF or its joint fundraising committee, JVC, preceding the 2004 election clearly indicated that the funds received would be targeted to the election or defeat of a specific federal candidate. TMF contends that its solicitations indicated that the funds would be utilized to further the national discussion of issues relevant to the 2004 election cycle.

      19.    Some TMF solicitations to potential donors made it clear that the funds received would be used to sponsor advertisements depicting George Bush in "battleground

MUR 5440 (The Media Fund)
Conciliation Agreement

states" that would decide the upcoming presidential election. TMF touted its ongoing advertising

campaigns as the basis for polls reflecting decreased public support for George Bush in these

"battleground states."

        20.    TMF's former president, Harold Ickes, made direct solicitations to donors,

most of which were made from joint fundraising solicitations with America Coming Together

(that had a federally registered political committee). Some solicitations included slides

containing messages such as "Bush can be beaten," "The Race for 270; The fight for the White

House is a state-by-state battle," "270 Electoral Votes (Evs) Needed to Win, and "17 Key States

Will Decide the 2004 Election." The presentation also outlined TMF's "17 state media plan"

which was "[t]imed to counter Bush onslaught . . ." and indicated that TMF intended to

"challenge Bush: trust, competence, economy, and other issues . . . ."

        21.    In addition to the general efforts of TMF to raise funds, TMF made

specific solicitations to certain individuals in which it highlighted the effectiveness of its ads, as

well as its overall advertising efforts, in depressing public support for Bush and increasing public

support for Kerry. For example, one solicitation noted that the polls "found Bush's job

performance among swing voters fall in the states where TMF was advertising" and stated that

during this "critical" time period, "TMF and [its] allies made a significant impact ensuring a

Democratic message was on the airwaves at competitive levels."

        22.    The Commission concludes that the fundraising efforts of JVC—premised

mainly on solicitations that only identified presidential candidates—also produced

"contributions" to TMF. JVC began raising funds in November 2003, and one of its solicitation

documents explained "to potential donors what The Media Fund was and the need for it and,

MUR 5440 (The Media Fund)
Conciliation Agreement

ultimately the groundwork for asking them to support it financially." This fundraising document,

entitled "The Media Fund; Victory Campaign 2004; A Strategic Plan for Winning," contains the

following messages: "Without the aggregated resources of The Media Fund, the Democrats

simply will not be competitive in this pre-convention period" and "17 states will decide who

takes the oath of office for President in January 2005 ."

   23. In response to specific solicitations from TMF's former president, Harold

Ickes, which, the Commission concludes, indicated that the funds received would be targeted to

the defeat of George Bush, certain donors gave funds to TMF through JVC as part of a

fundraising "challenge" where donors agreed to donate $20 million to TMF on the condition that

a collection of labor organizations gave the same amount. For example, in a letter forwarded to

potential donors, Mr. Ickes enclosed a polling report in that letter and noted that "the fact that

Kerry is dead even with Bush in these [17 battleground states] and now leads with Independents

by 7 points, after trailing Bush with them, speaks to the effectiveness of the combined paid media

programs of TMF and AFL-CIO."

   24. The Commission concludes that all funds received in response to these

solicitations constituted contributions under the Act and caused TMF to surpass the $1,000

statutory threshold by December 2003. *See* 2 U.S.C. § 431(4)(A). TMF subsequently accepted

more than $46 million in individual contributions in excess of the $5,000 limit and more than $9

million in labor or corporate contributions.

   25. TMF contends that it made all its fundraising communications with the

good faith belief that they did not constitute solicitations for contributions under 2 U.S.C.

MUR 5440 (The Media Fund)
Conciliation Agreement

§431(8)(A)(i), and that FEC regulations allow joint fundraising between federal political

committees and non-federal entities.

### TMF's Expenditures

26.    The Commission concludes that TMF expended more than $1,000 for

certain communications to the general public that expressly advocated the defeat of a clearly

identified federal candidate, George Bush. These advertisements attacked the character,

qualifications, and fitness for office of George Bush, or supported the character, qualifications,

and fitness for office of John Kerry. TMF contends that these communications sought to discuss

pertinent social and policy issues relevant to the 2004 election cycle. Examples of these

communications appear below.

27.    TMF spent more than $1,000 for the following mailers that depicted or

referred to George Bush or John Kerry in the context of the 2004 election:

- The "Education Mailer" addresses rising college tuition costs and states in
  boldtype: "John Kerry Wants Every Child To Be Able To Afford A College
  Education And Live The American Dream." The accompanying text addresses
  John Kerry's plan for the "American Dream," declaring: "We need a President
  who encourages pursuit of the American Dream instead of dashing these hopes.
  John Kerry will make college affordable for every American."

- The "Health Care Mailer" describes details of the Kerry-Edwards health care plan
  and announces in large-font text: "George W. Bush and Dick Cheney have NO
  PLAN to lower health care costs." The juxtaposition of the candidates' health
  care initiatives is followed with the tagline: "For Florida's Families. The Choice
  is Clear."

- The "Military Service Mailer" states, "These Men Could Have Served In
  Vietnam, But Didn't" (next to pictures of George Bush and Dick Cheney). The ad
  references Kerry's military service stating that it provides him a "unique
  perspective on decisions about sending our children into combat and caring for
  them when they return and when they retire." The mailer links Kerry's 30-year
  old military record to today's events by stating: "Vietnam was a long time ago.
  Some say it's not important now, while others must think it is...."

9

MUR 5440 (The Media Fund)
Conciliation Agreement

28.  TMF spent more than $1,000 on broadcast advertisements that depicted George Bush or John Kerry in the context of the 2004 election, an example of which includes the following text and imagery:

"Stand Up"

This 30-second television ad, features a screen image of Kerry accompanied by a voiceover stating,

Only a man who stands up to his government can truly lead.

John Kerry fought and bled in the Vietnam War. He fought side by side with brothers who could not get out of the draft because they didn't have a rich father like George W. Bush.

The ad concludes with the statement: "You better wake up before you get taken out."

29.  The Commission concludes that all of these communications comment on George Bush's character, qualifications, and fitness for office, explicitly link those charges to his status as a candidate for President, and have no other reasonable meaning than to encourage actions to defeat George Bush. Therefore, because the Commission concludes that the communications are "unmistakable, unambiguous, and suggestive of only one meaning" and because reasonable minds cannot differ that the communications urge Bush's defeat, they are express advocacy as defined at 11 C.F.R. § 100.22(b).

30.  Furthermore, the Commission concludes that one of these communications, the "Education Mailer" also contains express advocacy under 11 C.F.R. § 100.22(a) because it refers to the "need" for a particular kind of President, followed by identification of John Kerry as that type of candidate.

10

MUR 5440 (The Media Fund)
Conciliation Agreement

31.　As a result of these communications, the Commission concludes that TMF made expenditures in excess of the $1,000 statutory threshold for political committee status. *See* 2 U.S.C. § 431(4)(A).

32.　TMF contends that the communications described above centered upon important policy issues. TMF further contends that it made all of its communications with the good faith belief that the communications did not contain express advocacy or constitute expenditures under 2 U.S.C. §431(9)(A)(i), and that its expenditures were properly and in good faith publicly disclosed under I.R.C. §527. TMF contends that it predicated this belief on their understanding, informed by legal advice, of the legal definition and scope of "express advocacy" under Supreme Court and other appellate case law and the Commission's regulatory and enforcement policies and practices regarding "express advocacy."

33.　Furthermore, TMF contends that to the extent that its communications referred to a clearly identified federal candidate, it used only individual funds and filed electioneering reports with the Commission.

### TMF's Major Purpose

34.　The Commission concludes that TMF's statements and activities demonstrate that its major purpose was to elect John Kerry and defeat George Bush. From its inception, TMF presented itself to donors as a destination for "soft money" that the DNC no longer could accept, but which TMF could use to support the Democratic presidential nominee. TMF proclaimed that, "Under the new law, the DNC … will not be able to raise enough money to pay for sufficient media in 2004 to make an impact. Without the aggregated resources of The Media Fund, the Democrats simply will not be competitive in this pre-convention period."

11

MUR 5440 (The Media Fund)
Conciliation Agreement

35.    The Commission concludes that the focus of TMF was on running

advertisements in the "17 key states" considered to be battleground states in the 2004

Presidential election. TMF noted that these "17 states will decide who takes the oath of office

for President in January 2005." It argued that

> The key to winning enough of these 17 battleground states will be the turnout of
> Democratic base constituencies ... and, very importantly, the ability to identify the
> key swing votes who are open to persuasion to vote Democratic. Figuring out the
> effective issue messages that will move these swing votes [sic] and delivering
> those messages between March and late August, before the race is defined by the
> Bush campaign, is critical to the outcome of the 2004 race.

TMF's fundraising presentations explicitly cited the goal of reaching "270 electoral votes" for

the Democratic Presidential nominee.

36.    The Commission concludes that TMF's communications to the public

further establish its major purpose of federal campaign activity—specifically the defeat of

George Bush. The vast majority of TMF's advertisements—34 out of 36 television

advertisements, 20 out of 24 radio advertisements, and 26 out of 29 print advertisements—

mention either George Bush or John Kerry. Moreover, not one of TMF's advertisements

mentions any candidates other than the presidential and vice-presidential contenders in the 2004

general election. TMF's self-proclaimed goal in producing and running these advertisements

was to decrease public support for Bush and to increase public support for Kerry.

37.    TMF contends that it operated under a good faith belief that it had not

triggered political committee status. The Commission has never alleged that TMF acted in

knowing defiance of the law, or with the conscious recognition that its actions were prohibited by

law, made no findings or conclusions that there were knowing and willful violations of the law in

12

MUR 5440 (The Media Fund)
Conciliation Agreement

connection with this matter and, thus, does not challenge TMF's assertion of their good faith

reliance on their understanding of the law.

V.     Solely for the purpose of settling this matter and avoiding litigation costs, without

admitting or denying each specific basis for the Commission's findings above, Respondent

agrees not to contest the Commission's conclusion that Respondent violated the Act in the

following ways:

1.     TMF violated 2 U.S.C. §§ 433 and 434 by failing to register and report as

a political committee.

2.     TMF violated 2 U.S.C. § 441a(f) by knowingly accepting contributions in

excess of $5,000 and 2 U.S.C. § 441b(a) by knowingly accepting labor or corporate

contributions.

VI.     Respondent will cease and desist from violating 2 U.S.C. §§ 433 and 434 by

failing to register and report as a political committee.  Respondents will cease and desist from

violating 2 U.S.C. §§ 441a(f) and 441b(a) by accepting contributions in excess of the limits as set

forth in the Act or from prohibited sources.  Respondent will provide an executed copy of this

agreement to each of its current and former officers, principals, agents, representatives,

successors, and assigns, and certify in writing to the Commission that it has complied with this

requirement, including identifying each individual that Respondent has provided with an

executed copy of the Agreement.

MUR 5440 (The Media Fund)
Conciliation Agreement

VII.    Respondent will pay a civil penalty to the Federal Election Commission in the amount of Five Hundred and Eighty Thousand Dollars ($580,000), pursuant to 2 U.S.C. § 437g(a)(5)(A).

VIII.    Respondent will register with the Commission as a political committee. TMF will submit to the FEC copies of its Form 8872 reports previously filed with the Internal Revenue Service for activities from January 1, 2004 through the present, supplemented with the additional information that Federal political committees are required to include on page 2 of the Summary Page of Receipts and Disbursements of FEC Form 3X.

IX.    The Commission, on request of anyone filing a complaint under 2 U.S.C. § 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance with this agreement. If the Commission believes that this agreement or any requirement thereof has been violated, it may institute a civil action for relief in the United States District Court for the District of Columbia.

X.    This agreement resolves all matters that relate to the activities of The Media Fund arising from MUR 5440 and, except as provided in Section IX of the agreement, no further inquiry or action will be taken by the FEC regarding the matters described herein.

XI.    This agreement shall become effective as of the date that all parties hereto have executed same and the Commission has approved the entire agreement.

XII.    Respondent shall have no more than 30 days from the date this agreement becomes effective to comply with and implement the requirements contained in this agreement and to so notify the Commission.

MUR 5440 (The Media Fund)
Conciliation Agreement

  XIII. This Conciliation Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or by agents of either party, that is not contained in this written agreement shall be enforceable.

15

MUR 5440 (The Media Fund)
Conciliation Agreement

FOR THE COMMISSION:

Thomasenia P. Duncan
General Counsel

BY: _____          _11/15/07_____
      Ann Marie Terzaken                     Date
      ~~Acting~~ Associate General Counsel
      for Enforcement

FOR THE RESPONDENT:

_____          _10/29/07_____
Lyn Utrecht                         Date
Counsel

16

# EXHIBIT 6



FEDERAL ELECTION COMMISSION
WASHINGTON, D C 20463

December 13, 2006

Benjamin L. Ginsberg, Esq.
Glenn M. Willard, Esq.
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037-1350

Re:    MURs 5511 and 5525
       Swift Boat Veterans and POWs for Truth

Dear Messrs. Ginsberg and Willard:

On December 8, 2006, the Federal Election Commission accepted the signed conciliation agreement and civil penalty submitted on your client's behalf in settlement of violations of 2 U.S.C. §§ 433, 434, 441a(f) and 441b(a), provisions of the Federal Election Campaign Act of 1971, as amended, Accordingly, the file has been closed in this matter.

Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003). Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission. *See* 2 U.S.C. § 437g(a)(4)(B).

Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the civil penalty is due within 30 days of the conciliation agreement's effective date. If you have any questions, please contact us at (202) 694-1650.

Sincerely,

Peter G. Blumberg          Julie McConnell
Attorney                   Attorney

Enclosure
  Conciliation Agreement

BEFORE THE FEDERAL ELECTION COMMISSION

RECEIVED
FEC MAIL
REPORTING CENTER

2006 DEC -4 P 3: 46

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Swiftboat Veterans and POWs for Truth | ) | MURs 5511 and 5525 |
| | ) | |

## CONCILIATION AGREEMENT

These matters were initiated by signed, sworn, and notarized complaints. The Federal

Election Commission ("Commission") found reason to believe that Swiftboat Veterans and

POWs for Truth ("SwiftVets") violated 2 U.S.C. §§ 433, 434, 441a(f), and 441b(a) of the Federal

Election Campaign Act, as amended, ("the Act") by failing to register as a political committee

with the Commission, by failing to report contributions and expenditures as a political committee

to the Commission, by knowingly accepting individual contributions in excess of $5,000, and by

knowingly accepting corporate and/or union contributions. Following an investigation, the

Commission concluded that SwiftVets did not unlawfully coordinate its activities with, or make

excessive in-kind contributions to, any federal candidate or political party committee.

NOW, THEREFORE, the Commission and SwiftVets, having participated in informal

methods of conciliation, prior to a finding by the Commission of probable cause to believe, do

hereby agree as follows:

I.      The Commission has jurisdiction over the SwiftVets and the subject matter of this

proceeding.

II.      SwiftVets has had a reasonable opportunity to demonstrate that no action should

be taken in this matter.

III.      SwiftVets enters voluntarily into this agreement with the Commission.

IV.     The pertinent facts in these matters are as follows:

<u>Applicable Law</u>

1.     The Act defines a political committee as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A).

2.     The Act defines the term "contribution" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also FEC v. Survival Education Fund, Inc.*, 65 F.3d 285, 295 (2d Cir. 1995) (where a statement in a solicitation "leaves no doubt that the funds contributed would be used to advocate [a candidate's election or] defeat at the polls, not simply to criticize his policies during the election year," proceeds from that solicitation are contributions).

3.     The Act defines the term "expenditure" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i).

4.     Under the Commission's regulations, a communication contains express advocacy when it uses phrases such as "vote for the President," "re-elect your Congressman," or "Smith for Congress," or uses campaign slogans or words that in context have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidates, such as posters, bumper stickers, or advertisements that say, "Nixon's the One," "Carter '76," "Reagan/Bush," or "Mondale!" *See* 11 C.F.R. § 100.22(a); *see also FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 249 (1986) ("[The publication] provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally

less direct than "Vote for Smith" does not change its essential nature."). Courts have held that "express advocacy also include[s] verbs that exhort one to campaign for, or contribute to, a clearly identified candidate." *FEC v. Christian Coalition*, 52 F.Supp. 2d 45, 62 (D.D.C. 1999) (explaining why *Buckley v. Valeo*, 424 U.S. 1, 44, n.52 (1976), included the word "support," in addition to "vote for" or "elect," on its list of examples of express advocacy communication).

       5.    The Commission's regulations provide that express advocacy also includes communications containing an "electoral portion" that is "unmistakable, unambiguous, and suggestive of only one meaning" and about which "reasonable minds could not differ as to whether it encourages actions to elect or defeat" a candidate when taken as a whole and with limited reference to external events, such as the proximity to the election. 11 C.F.R. § 100.22(b). Communications discussing or commenting on a candidate's character, qualifications or accomplishments are considered express advocacy under section 100.22(b) if, in context, they have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question." *See Explanation and Justification*, 60 Fed. Reg. 35,291, 35,295 (Jul. 6, 1995).

       6.    The Supreme Court has held that "[t]o fulfill the purposes of the Act" and avoid "reach[ing] groups engaged purely in issue discussion," only organizations whose major purpose is campaign activity can be considered political committees under the Act. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 79 (1975); *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 262 (1986) ("*MCFL*"). It is well-settled that an organization can satisfy *Buckley's* "major purpose" test through sufficient spending on campaign activity. *MCFL*, 479 U.S. at 262-264; *see also Richey v. Tyson*, 120 F. Supp. 2d 1298, 1310 n.11 (S.D. Ala. 2000). An organization's "major purpose" may also be established through public statements of purpose. *See, e.g., FEC v.*

*Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004); *FEC v. GOPAC*, 917 F. Supp. 851, 859 (D.D.C. 1996).

       7.    The Act requires all political committees to register with the Commission and file a statement of organization within ten days of becoming a political committee, including the name, address, and type of committee; the name, address, relationship, and type of any connected organization or affiliated committee; the name, address, and position of the custodian of books and accounts of the committee; the name and address of the treasurer of the committee; and a listing of all banks, safety deposit boxes, or other depositories used by the committee. *See* 2 U.S.C. § 433.

       8.    Each treasurer of a political committee shall file periodic reports of the committee's receipts and disbursements with the Commission. *See* 2 U.S.C. § 434(a)(1). In the case of committees that are not authorized committees of a candidate for Federal office, these reports shall include, *inter alia*, the amount of cash on hand at the beginning of the reporting period, *see* 2 U.S.C. § 434(b)(1); the total amounts of the committee's receipts for the reporting period and for the calendar year to date, *see* 2 U.S.C. § 434(b)(2); and the total amounts of the committee's disbursements for the reporting period and the calendar year to date. *See* 2 U.S.C. § 434(b)(4).

       9.    The Act states that no person shall make contributions to any political committee that, in the aggregate, exceed $5,000 in any calendar year, with an exception for political committees established and maintained by a state or national political party. *See* 2 U.S.C. § 441a(a)(1)(C). Further, the Act states that no political committee shall knowingly accept any contribution in violation of the limitations imposed under this section. *See* 2 U.S.C. § 441a(f).

10.     Pursuant to 2 U.S.C. § 441b(a), it is unlawful for any political committee to knowingly accept or receive, directly or indirectly, any contribution made in connection with a federal election from a corporation.

11.     Under certain circumstances, organizations established under I.R.C. § 527 may not qualify as political committees. There is substantial overlap in the content of disclosures required of such Section 527 organizations and the disclosures required of political committees, although they differ in format, timing and level of detail. Unlike a political committee, which must register and file reports with the Commission, a Section 527 organization may avoid disclosing certain receipts to the IRS if it pays the highest corporate tax rate on such funds. SwiftVets, however, maintains that it did not avail itself of this provision and disclosed all of its receipts. In addition, an organization that does not trigger political committee status may accept contributions larger than $5,000 and accept (for limited purposes) funds from corporate or union sources.

### Factual Background

12.     SwiftVets is an unincorporated entity organized under Section 527 of the Internal Revenue Code, and it filed its Notice of 527 Status with the IRS on April 23, 2004. SwiftVets has not registered as a political committee with the Federal Election Commission, but filed public reports of its receipts and disbursements with the IRS, and also filed reports as to some of its receipts and disbursements with the Commission under the electioneering communications provisions of the Act.

13.     SwiftVets contends that its 2004 activities were intended to set the record straight with regard to the public discussion of John Kerry's conduct in, and statements about, the Vietnam War, particularly Mr. Kerry's statements about the conduct of those who fought in

Vietnam, and the declaration that he was "reporting for duty" in connection with his 2004 Presidential campaign. SwiftVets engaged in no activities prior to it becoming apparent that John Kerry would be the Democratic Party's nominee for President of the United States in Spring 2004, and also engaged in no political activities after John Kerry lost the Presidential election in November 2004, which it contends was because it had made its point on the issue of concern at the time it was the focus of public debate.

14.    During the 2004 election cycle, SwiftVets raised $25,080,796. As discussed below, most if not all of the solicitations for such funds made reference to Mr. Kerry's 2004 Presidential campaign. SwiftVets contends that a majority of its receipts came from 155,000 separate individual contributions from small grassroots donors, at an average of $124 each. The remaining SwiftVets receipts came from large individual donors or corporations. SwiftVets also maintains that its $715,050 in receipts from corporations constituted a relatively small percentage of its overall revenues, and that these were placed in a segregated account for administrative purposes and not used to make electioneering communications under the Act.

15.    During the 2004 cycle, SwiftVets spent $19,304,642 for 12 television advertisements that were broadcast in the Presidential election battleground states of Colorado, Florida, Minnesota, Nevada, New Mexico, Ohio, Pennsylvania, Tennessee, Wisconsin, and West Virginia, as well as in the District of Columbia and on national cable television stations, such as CNN and the History Channel. All of these advertisements attacked the character, qualifications, and fitness for office of Senator John Kerry, the Democratic Presidential nominee. Excerpts from several of these advertisements include:

### Any Questions?

John Kerry has not been honest.

And he lacks the capacity to lead.

When the chips are down, you could not count on John Kerry.

...

I served with John Kerry ... John Kerry cannot be trusted.

### Why?

How can you expect our sons and daughters to follow you, when you condemned this fathers and grandfathers?

Why is this relevant?

Because character and honor matter. Especially in a time of war.

John Kerry cannot be trusted.

### Never Forget (a/k/a Other Hand)

John Kerry gave aide [*sic*] and comfort to the enemy by advocating their negotiating points to our government.

Why is it relevant? Because John Kerry is asking us to trust him.

I will never forget John Kerry's testimony. If we couldn't trust John Kerry then, how could we possibly trust him now?

### Friends

Even before Jane Fonda went to Hanoi to meet with the enemy and mock America, John Kerry secretly met with enemy leaders in Paris.

...

Eventually, Jane Fonda apologized for her activities, but John Kerry refuses to.

In a time of war, can America trust a man who betrayed his country?

### Medals

Symbols. They represent the best things about America.

Freedom … Valor … Sacrifice.

Symbols, like the heroes they represent, are meant to be respected.

Some didn't share that respect … and turned their backs on their brothers.

…

How can the man who renounced his countries [*sic*] symbols now be trusted?

16.      SwiftVets also spent $1,120,881.09 for mailers sent to households in Presidential election battleground states. The first mailer accused Senator Kerry of "dishonoring" and "demoralizing" his fellow soldiers and of "aiding and abetting the enemy" by secretly meeting with North Vietnamese officials, and concluded,

> Why is John Kerry's Betrayal Relevant Today? Because character and trust are essential to leadership, especially in a time of war. A man who so grossly distorts his military record, who betrays his fellow soldiers, who endangers our soldiers and sailors held captive, who secretly conspires with the enemy, who so brazenly mocks the symbols of sacrifice of our servicemen … all for his own personal political goals … has neither the character nor the trust for such leadership.  JOHN KERRY CANNOT BE TRUSTED. If we couldn't trust John Kerry then, how could we possibly trust him now?

The second mailer listed "Four reasons why John Kerry is unfit for command," claiming Kerry (1) "lied to the American people about his service record in Vietnam," (2) "betrayed his fellow soldiers when he charged them with war crimes," (3) "lost the respect of the men he served with by throwing away his medals – America's symbols of valor and sacrifice," and (4) "betrayed America by assisting North Vietnamese Communists and extreme leftist radicals." This mailer

concluded by stating, "We're not debating Vietnam, it's about John Kerry's character, he betrayed us in the past, how do we know he won't do it again?"

      17.    SwiftVets spent $39,140.91 for a newspaper advertisement in the St. Louis Post Dispatch for a two-day period coinciding with the 2004 Presidential debate held in St. Louis, Missouri. This advertisement features photographs of Kerry and Jane Fonda, and, after raising questions about Kerry's postwar activities, the advertisement asks in bold type "WHY IS THIS RELEVANT? Because in a time of War – America needs a man that can be trusted to make the right decisions. JOHN KERRY CANNOT BE TRUSTED."

SwiftVets' Contributions

      18.    The Commission concludes that language used in various SwiftVets fundraising solicitations that made reference to Senator Kerry's 2004 Presidential campaign clearly indicated that the funds received would be targeted for the defeat of Senator Kerry. SwiftVets contends that its solicitations indicated that the funds would be utilized to discuss John Kerry's conduct in and statements about the Vietnam War and those who fought in it, and to respond to his statements about these issues in order to present an accurate record.

      19.    SwiftVets made a direct mail solicitation to potential donors in September and October 2004, which stated,

> [W]e plan to make sure every American is aware of how John Kerry is misrepresenting his record and ours in Vietnam... *...and to demonstrate why he is clearly unfit for command.... The truth is* that the man whose entire Presidential campaign is based on his experience in Vietnam, used highly suspicious personal injuries to cut his tour of duty to a mere four months.... All of this makes it clear to us that *Mr. Kerry is clearly unfit for command* of the armed forces of the United States!... [N]ow that a key creator of that poisonous image – *John Kerry* – is seeking to be Commander-in-Chief of the United States we have resolved to end our silence

and set the record straight. Your gift will help us do that by ensuring our message stays on TV.

SwiftVets received total income of $2,020,286.10 in response to three mailings of this solicitation, netting $1,489,683.89.

20.    SwiftVets also made e-mail and Internet fundraising solicitations. One such e-mail solicitation, dated September 8, 2004, stated,

> I would like to extend my sincere and personal gratitude for your generous contribution to Swift Boat Veterans for Truth. I am sure you have seen the impact your contribution has had on the public discussion surrounding Senator Kerry's fitness for duties as Commander-in-Chief... John Kerry's campaign – aided by a sympathetic media – has responded to our work by evading our criticisms and turning up the volume on their attacks... You have already done so much, but I'm here now to ask you to help once more. We are at a critical point in this effort and we must keep our ads – including some new ones which I think you'll really appreciate – on the airwaves in key battleground states. We are up against the big guns, and we now need to make sure they can't drown us out... You can lend us a hand, as well, by passing this information on to other friends you think might be interested in helping us tell the true story of John Kerry.

SwiftVets' Third Quarter 2004 Report to the IRS includes approximately 509 contributions to SwiftVets on September 8, 2004, and approximately 554 contributions to SwiftVets on September 9, 2004. These contributions totaled substantially more than $1,000.

21.    The Commission concludes that all funds received in response to various solicitations, including those set forth above, constituted contributions under the Act, that SwiftVets received more than $1,000 in contributions by no later than May 2004, and that SwiftVets accepted more than $12.5 million in individual contributions in excess of the $5,000 limit and $715,050 in prohibited corporate contributions. *See* 2 U.S.C. § 431(4)(A).

22.    SwiftVets contends that it made all of its fundraising communications with the good faith belief that they did not constitute solicitations for contributions under 2 U.S.C. § 431(8)(A)(i).

### SwiftVets' Expenditures

23.    The Commission concludes that SwiftVets made more than $1,000 in expenditures for fundraising communications and communications to the general public that expressly advocated the defeat of a clearly identified federal candidate, Senator John Kerry. SwiftVets contends that these communications sought to discuss John Kerry's conduct in and statements about the Vietnam War and those who fought in it.

24.    The Commission concludes that SwiftVets' fundraising letters unmistakably exhort the recipients to contribute funds to prevent Kerry from becoming President. In one fundraising appeal, SwiftVets stated,

> All of this makes it clear to us that Mr. Kerry is clearly unfit for command of the armed forces of the United States!... Which is why I have sent you this letter. And why I hope I can count on you to send back a special gift of $25, $35, $50, $75, $100 or more to Swift Boat Veterans for Truth.

The Commission concludes that SwiftVets fundraising communications, such as the example above, constitute express advocacy under 11 C.F.R. § 100.22(a) because it references an election and specific candidates, and it advocates action – in this case contributing funds – designed to lead to the candidate's defeat in the election. The Commission concludes that costs associated with the various fundraising appeals that contained express advocacy exceeded $1,000.

25.    SwiftVets spent $9,477,999 on five television advertisements, "Any Questions," "Why?" "Never Forget (a/k/a Other Hand)," "Friends," and "Medals," that the Commission concludes expressly advocated the defeat of Senator John Kerry. The television

advertisements were broadcast shortly before the 2004 Presidential Election, explicitly challenge Senator Kerry's "capacity to lead," assert that he cannot be "trusted," and ask why citizens should be willing to "follow" him as a leader. The Commission concludes that, speaking to voters in this context, the advertisements unambiguously refer to Senator Kerry as a Presidential candidate by discussing his character, fitness for office, and capacity to lead, and have no other reasonable meaning than to encourage actions to defeat him. *See* 11 C.F.R. § 100.22(b); *Explanation and Justification*, 60 Fed. Reg. at 35,295.

26. SwiftVets spent $1,120,881.09 for two mailers that the Commission concludes expressly advocated John Kerry's defeat in the 2004 election. Both mailers comment on Kerry's character, qualifications and accomplishments and the Commission concludes that, in context, they have no other reasonable meaning than to encourage actions to defeat Senator Kerry. Senator Kerry, the recipient is told, lacks an essential requirement to lead in a time of war – he "cannot be trusted" and is "unfit for command." Thus, the Commission concludes that the only manner in which the reader can act on the message that "Kerry cannot be trusted" is to vote against him in the upcoming election. *See* 11 C.F.R. § 100.22(b).

27. SwiftVets paid $39,140.91 to place a newspaper advertisement in the St. Louis Post Dispatch. The ad featured photos of John Kerry and Jane Fonda, raised questions about Kerry's "betrayal," and asked in bold type, "WHY IS THIS RELEVANT? Because in a time of War – America needs a man that can be trusted to make the right decisions. JOHN KERRY CANNOT BE TRUSTED." The Commission concludes that, here, the "man" that "America needs" "in a time of war" can only mean "the President," and the reader is to understand that Kerry cannot be trusted to make the right decisions as the country's president in a time of war. The Commission concludes that the only action a voter exposed to this

advertisement could take to ensure that America gets a "man that can be trusted to make the right decisions" is to vote against Kerry.

28.    The Commission concludes that all of these communications comment on Senator Kerry's character, qualifications, and fitness for office, explicitly link those charges to his status as a candidate for President, and have no other reasonable meaning than to encourage actions to defeat Senator Kerry. Therefore, because the Commission concludes that the communications are "unmistakable, unambiguous, and suggestive of only one meaning" and because reasonable minds cannot differ that the communications urge Kerry's defeat, the Commission concludes that they are express advocacy as defined at 11 C.F.R. § 100.22(b). Accordingly, the Commission concludes that SwiftVets made expenditures in excess of $1,000, surpassing the statutory threshold for political committee status. *See* 2 U.S.C. § 431(4)(A).

29.    The Commission states that in the thirty years since the enactment of the relevant provisions of the Act and the Supreme Court's decision in *Buckley, see supra* paras. IV.1-6, the definition of express advocacy and the prerequisites for political committee status have been addressed in Supreme Court and lower court opinions, Commission regulations, advisory opinions, and enforcement actions. This includes the "major purpose" test, which serves as a constitutional limit in determining whether an organization is a political committee. The Commission states that it has been applying these principles for many years, and it will continue to do so in the future. *See* Explanation and Justification, 69 Fed. Reg. 68,056, 68,065 (Nov. 23, 2004).

30.    Notwithstanding the foregoing paragraph 29, SwiftVets contends that their referenced communications were intended to respond to statements by John Kerry on the issue of his conduct in, and his statements about, the Vietnam War and those who fought in it. SwiftVets

further maintains that it made all of its communications with the good faith belief that the communications did not contain express advocacy or constitute expenditures under 2 U.S.C. § 431(9)(A)(i), and that its expenditures were properly and in good faith publicly disclosed under I.R.C. § 527. While the Commission disagrees with its reasoning, SwiftVets contends that it was uncertain as to the continued validity and application of the alternative express advocacy test set forth in 11 C.F.R. § 100.22(b) because of: (1) SwiftVets' understanding of the First and Fourth Circuit court decisions holding 11 C.F.R. § 100.22(b) unconstitutional; (2) SwiftVets' understanding of the Commission's history of not relying on 11 C.F.R. § 100.22(b) in recent enforcement matters; (3) SwiftVets' understanding of the division on the Commission in voting whether to initiate a rulemaking to revise or repeal 11 C.F.R. § 100.22(b); and (4) SwiftVets' understanding of the Commission's decision in 2004 not to issue specific regulation regarding the political committee status of 527 organizations whose major purpose was the nomination or election of Federal candidates (May 13, 2004), and its September 27, 2001 decision to hold in abeyance a rulemaking to revise the definition of "expenditure" and to promulgate a definition for the "major purpose" test.

### SwiftVets' Major Purpose

31.    The Commission concludes that SwiftVets' statements and activities demonstrate that its major purpose was to defeat John Kerry. *See* Paragraphs IV.12-IV.30. SwiftVets contends that its purpose was to discuss John Kerry's conduct in, and statements about their service in, the Vietnam War and what they believed to be a more accurate record of this issue.

32.    In a document distributed to a limited number of prospective donors by a SwiftVets fundraiser, SwiftVets stated,

> **GOAL**
> Prevent John Kerry from becoming Commander-in-Chief....

**STRATEGY**
Dramatize for key elements of the American public what Kerry did
and why he is unfit to be Commander-in-Chief....

**TACTICS**
Train, equip and deploy the Swift Boat Vets who can speak with
unique credibility.... *We Will Conduct Such An Aggressive,
Passionate Effort That The American People Will Reject John
Kerry As A Liar And A Fraud*....

**FUNDING**
Large gifts: the Swift Boat vets ability to reach the American
people depends on large gifts from individuals who understand the
potent message they carry and why John Kerry must be stopped
from being Commander-in-Chief....

 ·33. In addition, SwiftVets made other statements that the Commission

concludes establish that its major purpose was to defeat John Kerry. For example, during the

2004 election, its website showed a picture of Kerry and stated, "[O]f the 19 veterans pictured

with Kerry, only THREE actually support him for president. 12 now state that Kerry is 'UNFIT

to be Commander-in-Chief.'" Also, a letter signed by the Chairman of SwiftVets thanking a

large donor for a $100,000 contribution stated,

> We will do our utmost to assure this timely donation will be
> expended directly and prudently in our quest to derail Senator
> Kerry's well organized and funded campaign to become the
> Commander in Chief of the United States Armed Forces. We are
> adamantly opposed to the political self serving ambitions of this
> man who betrayed us in 1971.

Finally, On August 6, 2004, a Steering Committee member was asked on a news program

whether SwiftVets' advertisements were produced and made to influence the Presidential

election and responded, "Yes, of course."

 34. In its fundraising solicitations, SwiftVets referred repeatedly to efforts to

demonstrate that John Kerry is "unfit to be Commander-in-Chief of the United States" through

advertisements targeted to battleground states. Consistent with these statements, the funds

donated to SwiftVets paid for advertisements and direct mail pieces that were focused on states such as Ohio, Pennsylvania, Florida, Nevada, New Mexico, Colorado, Minnesota, West Virginia, Wisconsin and Tennessee. SwiftVets contends that it targeted these states because it believed people were paying the closest attention to John Kerry's conduct in, and statements about, the Vietnam War and those who fought in it.

35.    SwiftVets spent $20,464,664, or approximately 91 percent of its reported disbursements, on television and print advertisements and direct mail pieces attacking Senator John Kerry or expressly advocating his defeat.

36.    Since the 2004 election, SwiftVets has effectively ceased active operations. It has added no new content to its website, no longer solicits contributions, and has limited its disbursements primarily to legal and administrative costs, as well as charitable contributions to veteran-related charities.

37.    SwiftVets contends that it operated under the good faith belief that it had not triggered political committee status in 2004, and that it fulfilled the applicable regulatory requirements via public disclosure to the IRS of its overall receipts and disbursements under I.R.C. § 527, and contemporaneous disclosure to the Commission of its electioneering communications. Indeed, the Commission has never alleged that the SwiftVets acted in knowing defiance of the law, or with the conscious recognition that their actions were prohibited by law, made no findings or conclusions that there were any knowing and willful violations of the law in connection with this matter, and, thus, does not challenge SwiftVets' assertion of its good faith reliance on its understanding of the law.

V.    Solely for the purpose of settling this matter expeditiously and avoiding litigation, without admission with respect to any other proceeding, and with no finding of probable cause by

the Commission, SwiftVets agrees not to contest the Commission's conclusions, as stated herein, that it violated 2 U.S.C. §§ 433, 434, 441a(f), and 441b(a) of the Act by failing to register and report as a political committee with the Commission, by knowingly accepting individual contributions in excess of $5,000, and by knowingly accepting corporate contributions.

VI.     SwiftVets states that, upon completing its obligations under this Agreement, it intends to cease operations as an IRC Section 527 organization and to donate the remainder of its funds to a charity supporting the families of U.S. servicemen and servicewomen killed or wounded in the War in Iraq.  Pursuant to this Agreement, SwiftVets agrees to do the following:

1.     SwiftVets will pay a civil penalty to the Federal Election Commission in the amount of $299,500 pursuant to 2 U.S.C. § 437g(a)(5)(A).

2.     SwiftVets will cease and desist from violating 2 U.S.C. §§ 433 and 434 by failing to register and report as a political committee, and will cease and desist from violating 2 U.S.C. § 441(a)(f) by accepting individual contributions in excess of the limits set forth in the Act.  SwiftVets states that it has no present intention to accept contributions or to make expenditures as defined by the Act, and will register and report to the Commission if it should engage in activities that the Commission has concluded would trigger Federal political committee status in connection with future elections.

3.     SwiftVets will submit to the FEC copies of its Form 8872 reports previously filed with the Internal Revenue Service for activities from January 1, 2004 until December 31, 2004, supplemented with the additional information that Federal political committees are required to include on page 2 of the Summary Page of Receipts and Disbursements of FEC Form 3X.

VII.    The Commission, on request of anyone filing a complaint under 2 U.S.C. § 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance with this agreement. If the Commission believes that this agreement or any requirement thereof has been violated, it may institute a civil action for relief in the United States District Court for the District of Columbia.

VIII.    This agreement shall become effective as of the date that all parties hereto have executed same and the Commission has approved the entire agreement.

IX.    Respondent shall have no more than 30 days from the date this agreement becomes effective to comply with and implement the requirements contained in this agreement and to so notify the Commission.

X.    This Conciliation Agreement constitutes the entire agreement between the parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either party or by agents of either party, that is not contained in this written agreement shall be enforceable.

FOR THE COMMISSION:


Lawrence H. Norton
General Counsel


BY: _____          _____12/11/86_____
    Rhonda J. Vosdingh                Date
    Associate General Counsel
    for Enforcement




FOR THE RESPONDENT:

_____          _____December 3, 2006_____
Benjamin L. Ginsberg                Date

# EXHIBIT 7

BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of                                    )
                                                    )          MUR 5754
     MoveOn.org Voter Fund                          )

## CONCILIATION AGREEMENT

This matter was generated by a complaint filed with the Federal Election Commission ("the Commission"). *See* 2 U.S.C. § 437g(a)(1). The Commission found "reason to believe" in accordance with 2 U.S.C. § 437g(a)(2) that MoveOn.org Voter Fund (hereinafter, "MOVF") violated 2 U.S.C. §§ 433, 434, and 441a(f) of the Federal Election Campaign Act of 1971, as amended ("the Act"), by failing to register as a political committee with the Commission, by failing to disclose its contributions and expenditures, and by knowingly accepting contributions in amounts exceeding $5,000 from individuals, and an investigation was conducted.

NOW, THEREFORE, the Commission and MOVF, having participated in informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree as follows:

I.      The Commission has jurisdiction over MOVF and the subject matter of this proceeding

II      MOVF has had a reasonable opportunity to demonstrate that no action should be taken in this matter

III.    MOVF enters voluntarily into this agreement with the Commission

IV.     The pertinent facts in this matter are as follows:

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

<u>Applicable Law</u>

1.    The Act defines a political committee as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C § 431(4)(A).

2.    The Act defines the term "contribution" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also, FEC v. Survival Education Fund, Inc.,* 65 F.3d 285, 295 (2d Cir. 1995) (where a statement in a solicitation "leaves no doubt that the funds contributed would be used to advocate [a candidate's election or] defeat at the polls, not simply to criticize his policies during the election year," proceeds from that solicitation are contributions).

3    The Act requires all political committees to register with the Commission and file a statement of organization within ten days of becoming a political committee, including the name, address, and type of committee; the name, address, relationship, and type of any connected organization or affiliated committee; the name, address, and position of the custodian of books and accounts of the committee; the name and address of the treasurer of the committee, and a listing of all banks, safety deposit boxes, or other depositories used by the committee. *See* 2 U S.C. § 433.

4.    Each treasurer of a political committee shall file periodic reports of the committee's receipts and disbursements with the Commission. *See* 2 U.S.C. § 434(a)(1). In the case of committees that are not authorized committees of a candidate for Federal office, these reports shall include, *inter alia,* the amount of cash on hand at the beginning of the reporting

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

1    period, see 2 U.S.C. § 434(b)(1); the total amounts of the committee's receipts for the reporting

2    period and for the calendar year to date, see 2 U.S.C. § 434(b)(2); and the total amounts of the

3    committee's disbursements for the reporting period and the calendar year to date. See 2 U.S C.

4    § 434(b)(4).

5          5.    The Act states that no person shall make contributions to any political

6    committee that, in the aggregate, exceed $5,000 in any calendar year, with an exception for

7    political committees established and maintained by a state or national political party. See

8    2 U.S.C. § 441a(a)(1)(C). Further, the Act states that no political committee shall knowingly

9    accept any contribution in violation of the limitations imposed under this section  See 2 U.S.C.

10   § 441a(f).

11         6.    Under certain circumstances, organizations established under I.R.C. § 527

12   may not qualify as political committees. The disclosure reports generally required of such

13   Section 527 organizations are different from those required of political committees in format,

14   timing and level of detail  However, there is substantial overlap in the content of disclosures

15   required of such Section 527 organizations and the disclosures required of political committees,

16   though the Act has some additional disclosure requirements for political committees that are not

17   required under the Internal Revenue Code. Unlike a political committee, a Section 527 may

18   avoid disclosing certain receipts if it pays the highest corporate tax rate on such fund. In

19   addition, an organization which does not trigger political committee status may accept

20   contributions larger than $5,000 and accept (for limited purposes) funds from corporate or union

21   sources

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

<u>Factual Background</u>

1

2        7.    The MoveOn org family of organizations includes: (1) MoveOn.org, an

3    entity organized under Section 501(c)(4) of the Internal Revenue Code; (2) MoveOn PAC, a

4    political committee registered with the Commission; and (3) MOVF, an entity organized under

5    Section 527 of the Internal Revenue Code.

6        8.    MOVF filed a Notice of 527 Status with the Internal Revenue Service

7    ("IRS") on September 18, 2003 as a political organization under 26 U.S.C. § 527.

8        9.    MOVF has not registered as a political committee with the Federal

9    Election Commission.

10        10.    MOVF accepted contributions from individuals in amounts exceeding

11    $5,000. During the 2004 election cycle, MOVF accepted aggregate contributions as large as

12    $2,505,014 from a single individual. During the 2004 election cycle, MOVF accepted

13    approximately $9.8 million in contributions in amounts exceeding $5,000 per individual,

14    including $3,142,242 in 2003 and $6,662,888 in 2004.

15        11.    From November 5, 2003 to November 2, 2004, MOVF spent $14.6 million

16    for 25 television advertisements that were broadcast in the states of Pennsylvania, Florida,

17    Maine, West Virginia, Minnesota, Iowa, Ohio, Colorado, Oregon, Nevada, Michigan, Missouri,

18    Wisconsin, and on CNN. The advertisements opposed George W. Bush regarding his record on

19    campaign issues and criticized his leadership.

20        12    The ads raised such issues as spending on the war in Iraq, prescription

21    drugs, overtime pay, and job outsourcing -- each with the tag line, "George Bush  He's not on our

22    side." or "Face it  George Bush is not on our side." Another common theme in the MOVF ads

MUR 5754
Conciliation Agreement with MoveOn.org Voter Fund

1  was that George Bush was misleading the American people on issues from the Iraq war to

2  financial security and Medicare  In many of these ads, the word "Leader" was superimposed on

3  President Bush's picture and then the letters "M-I-S" appear to form the word "Misleader." In

4  other ads, the tag line was "We're not being led. We're being misled." In a newspaper

5  advertisement, bold headlines read "BIN LADIN DETERMINED TO STRIKE IN US." Beneath

6  the headline read "President Bush received this warning five weeks before September 11, 2001.

7  He did nothing  George Bush. A failure of leadership."

8        13.    MOVF dedicated more than $14 6 million of its $21,346,380 in total

9  disbursements reported to the IRS during the 2004 election cycle to the production costs and

10  media expenses related to the advertisements described in paragraphs 11 and 12 above.  During

11  the entire 2004 election cycle, the only other disbursements made by MOVF were for

12  fundraising, administrative expenses, and $724,000 in grants to other political organizations.

13  MOVF made no disbursements in connection with state or local elections during the 2004

14  election cycle.

15        14    MOVF's solicitations were sent almost exclusively by email

16  communication  Examples of fundraising messages in these solicitations include:

17      A  The three main themes on which MoveOn intended to
18         focus were: "1) President Bush's Actions Can't Be
19         Trusted;" "2) Bush's Actions Reflect a Lack of Concern
20         for Working Families;" and "3) Bush's Actions and
21         Record Show a Lack of Competence to Solve Our
22         Nation's Problems "  "If we pull this off, we won't just
23         change the shape of this election – we may well change
24         the way politics works."

25      B  "In their first ad for the 2004 election, [the GOP]
26         implicitly accuse Democratic presidential candidates of
27         'attacking the president for attacking terrorists '  The ad
28         doesn't question opponents' ideas, it questions their

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

1  commitment to America  But there is nothing more un-
2  American than attacking an adversary's patriotism for
3  political gain."

4  "We won't let the Bush campaign get away with these
5  kinds of attacks.  And in the end, we'll take our country
6  back."

7  "Can you help?    With the Soros/Lewis match, a
8  contribution of $50 will actually bring in $75.  Multiply
9  that by thousands of us, and we'll easily bring in enough
10  money to take the Republicans on."

11  C.  "Weeks of on-the-ground testing have shown that our '$87
12  Billion' TV ad successfully gets the truth out about
13  President Bush and his policies  Our tests showed that an
14  impressive 4% of viewers changed their positions to
15  disfavor Bush after seeing the ad.  Even experts who have
16  been in this field for years were blown away "

17
18  "So today, we're launching our first really big MoveOn.org
19  Voter Fund ad buy.  We're putting the '$87 Billion' ad to
20  work in several key swing states – putting up close to two
21  million dollars to make sure that every TV viewer in these
22  states sees the ad multiple times."

23  D  "On Tuesday, we sent out a survey asking you and other
24  MoveOn contributors if you would support a multi-million
25  dollar advertising campaign to expose the failure of
26  President Bush's policies in key "battleground" states.
27  The response was overwhelming  98% of the people who
28  responded urge us to take it up  Clearly, this is work that
29  needs to be done."

30  "Please do what you can  If we can pull this off together,
31  the political establishment may never be the same."

32  E.  "Over the next months, we're going to raise an
33  unprecedented $10 million for the production and
34  placement of ads that take the truth about the Bush
35  administration directly to the American people in key
36  battleground states."

37  "Every dollar that you donate today will be matched one-
38  for-one – it's great bang for your buck  The sooner this

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

1　money starts coming in, the sooner we can get those ads
2　running – if we raise $300,000 today, we can start running
3　the ads in less than two weeks. Please help however you
4　can – be it $25 or $2500."

5　F.  "Every cent of your ticket will go towards our $10 million
6　MoveOn org Voter Fund advertising campaign that's
7　getting out the word about President Bush's bad policies."

8
9　"The Voter Fund will create and run powerful political ads
10　in swing states to challenge President Bush's policies and
11　his administration."

12　G.  "The MisLeader campaign will be housed in, controlled
13　by and administered through the MoveOn.org Voter Fund,
14　a 527 organization. . . . A small group of progressive
15　political consultants, activists and fundraisers have joined
16　with the leadership of the MoveOn.org Voter Fund, a 527
17　organization, to carry out an early advertising campaign to
18　unseat President George Bush."

19　Finally, one solicitation contained the following descriptions of
20　MOVF's intentions.

21　H.  "Our objective is to challenge George Bush's policies and
22　record in order to reduce support for his re-election in
23　2004. We will concentrate our resources in several states
24　critical to his re-election  In those states, we will reduce
25　his support among swing voters through an empirically
26　driven advertising campaign "

27　In the same solicitation, under the heading of "Tactics":

28　I.  "We will create powerful television advertising to
29　implement this strategy. We will produce convincing
30　anti-Bush TV spots and get them on the air in targeted
31　states. We will buy enough airtime to effectively deliver
32　our message to swing voters in those states. We will
33　sustain our advertising presence continually throughout
34　the pre-primary and primary periods."

35　Similarly, in the same solicitation under "Targeting"

36　J  "We have selected five states in which to launch this
37　project  They are FL, OH, MO, WV, and NV  These are

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

1      five states Bush won by small margins in 2000. If results
2      in 2004 mirror those in 2000, we can defeat Bush by
3      turning only one of the three larger states (FL, OH, MO)
4      or both of the two smaller ones (WV, NV)."

5

6      15      The Commission concludes that contributions received in response to

7   MOVF's solicitations that clearly indicated the funds received would be used to defeat George

8   Bush in the 2004 general election caused MOVF to surpass the $1,000 statutory threshold. *See*

9   2 U S.C. § 431(4)(A)  MOVF received its first $1,000 in contributions in November 2003, at the

10  latest. MOVF received $846,040 in response to an e-mail solicitation sent to prospective donors

11  on November 21, 2003, the relevant text of which appears in Paragraph 14, subparagraphs G, H

12  and J.

13      16.     Since the 2004 election, MOVF has effectively ceased active operations

14  It has added no new content to its website, no longer accepts contributions, and has limited its

15  disbursements primarily to legal and administrative costs

16      17.     MOVF contends that it made all of its fundraising communications with

17  the good faith belief that they did not constitute solicitations for contributions under 2 U.S.C.

18  § 431(8)(A)(i) and that its disbursements did not constitute expenditures under 2 U.S.C.

19  § 431(9)  Furthermore, MOVF contends that it operated under the good faith belief that it had

20  not triggered political committee status in 2004, and that it fulfilled the applicable regulatory

21  requirements via disclosure to the Internal Revenue Service of its overall receipts and

22  disbursements, and timely disclosure to the Commission of its electioneering communications.

MUR 5754
Conciliation Agreement with MoveOn.org Voter Fund

1

2       V.      In order to settle this matter and avoid the cost and time of further proceedings,

3   and without admitting or denying each specific basis for the findings, for the purposes of

4   settlement, MOVF no longer contests that

5               1.   MOVF violated 2 U.S.C. §§ 433 and 434 by failing to register and report as a

6   political committee as of November 2003.

7               2.   MOVF violated 2 U.S.C. § 441a(f) by knowingly accepting contributions in

8   amounts exceeding $5,000 from individuals.

9       VI      MOVF, its officers, principals, agents, representatives, successors, and assigns,

10   will cease and desist from violating 2 U.S.C. §§ 433 and 434 by failing to register and report as a

11   political committee. MOVF, its officers, principals, agents, representatives, successors, and

12   assigns, will cease and desist from violating 2 U.S.C. § 441a(f) by accepting contributions in

13   excess of the limits set forth in the Act. MOVF will provide an executed copy of this Agreement

14   to each of its officers, principals, agents, representatives, successors, and assigns.

15       VII.    MOVF will pay a civil penalty to the Federal Election Commission in the amount

16   of One Hundred Fifty Thousand dollars ($150,000), pursuant to 2 U.S.C. § 437g(a)(5)(A)

17       VIII.   MOVF will file reports with the Commission containing all information required

18   to be disclosed by federal political committees for its activities from September 18, 2003 until

19   December 31, 2006. The Commission agrees that MOVF may fulfill this obligation by

20   submitting copies of reports filed with the Internal Revenue Service for activities during this

21   period, if supplemented with additional information required of federal political committees.

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

1    Such supplementation would include, but not be limited to, the information contained on the

2    summary pages of reports filed by political committees.

3        IX    MOVF agrees to register and report to the Commission as a political committee in

4    the event that it receives additional contributions and/or makes expenditures for the purpose of

5    influencing federal elections, and will comply with any and all applicable provisions of the Act

6    and Commission regulations.

7        X.    The Commission, on request of anyone filing a complaint under 2 U.S.C.

8    § 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance

9    with this agreement. If the Commission believes that this agreement or any requirement thereof

10   has been violated, it may institute a civil action for relief in the United States District Court for

11   the District of Columbia.

12       XI.    This agreement shall become effective as of the date that all parties hereto have

13   executed same and the Commission has approved the entire agreement.

14       XII.   MOVF shall have no more than 30 days from the date this agreement becomes

15   effective to comply with and implement the requirements contained in this agreement and to so

16   notify the Commission.

17       XIII   This Conciliation Agreement constitutes the entire agreement between the parties

18   on the matters raised herein, and no other statement, promise, or agreement, either written or

19   oral, made by either party or by agents of either party, that is not contained in this written

20   agreement shall be enforceable.

21

-10-

MUR 5754
Conciliation Agreement with MoveOn org Voter Fund

1   FOR THE COMMISSION:
2
3   Lawrence H Norton
4   General Counsel
5
6
7   BY: _Rhonda Woody_____        _12/11/06_____
8        Rhonda J. Vosdingh              Date
9        Associate General Counsel
10       for Enforcement
11
12
13  FOR MOVF:
14
15
16  _____            _11/17/06_____
17
18  (NAME)  Joseph E Sandler          Date
19  (POSITION) Counsel
20  MoveOn org Voter Fund

44152440

-11-

# EXHIBIT 8



FEDERAL ELECTION COMMISSION
WASHINGTON, D C 20463

Jeffrey D. Davis
President
Empower Illinois Media Fund                 AUG - 1 2007
Empower Illinois
118 N. Clinton Street
Suite 102
Chicago, IL 60661

                                RE:    MUR 5568
                                       Empower Illinois Media Fund
                                       Empower Illinois

Dear Mr. Davis:

        On July 12, 2007, the Federal Election Commission accepted the signed conciliation
agreement submitted by Empower Illinois Media Fund in settlement of a violation of 2 U.S.C.
§§ 441a(f), 433, and 434, provisions of the Federal Election Campaign Act of 1971, as amended
("the Act"). Accordingly, the file has been closed with respect to both Empower Illinois Media
Fund and Empower Illinois in this matter.

        Documents related to the case will be placed on the public record within 30 days. *See*
Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed.
Reg. 70,426 (Dec. 18, 2003). Information derived in connection with any conciliation attempt
will not become public without the written consent of the respondent and the Commission. See
2 U.S.C. § 437g(a)(4)(B).

        Enclosed you will find a copy of the fully executed conciliation agreement for your files.
Please note that the civil penalty is due within 30 days of receipt of the conciliation agreement. If
you have any questions, please contact me at (202) 694-1650.

                                       Sincerely,

                                       Jin Lee
                                       Attorney

Enclosure
  Conciliation Agreement

BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of                           )
                                           )        MUR 5568
Empower Illinois Media Fund                )

CONCILIATION AGREEMENT

This matter was generated by a complaint filed with the Federal Election Commission

("the Commission"). *See* 2 U.S.C. § 437g(a)(1). The Commission found "reason to believe" in

accordance with 2 U.S.C. § 437g(a)(2) that Empower Illinois Media Fund (hereinafter, "EIMF")

violated 2 U.S.C. §§ 433, 434, and 441a(f) of the Federal Election Campaign Act of 1971, as

amended ("the Act"), by failing to register as a political committee with the Commission, by

failing to disclose its contributions and expenditures, and by knowingly accepting contributions

in amounts exceeding $5,000 from individuals, and an investigation was conducted.

NOW, THEREFORE, the Commission and EIMF, having participated in informal

methods of conciliation, prior to a finding of probable cause to believe, do hereby agree as

follows:

    I.    The Commission has jurisdiction over EIMF and the subject matter of this

proceeding.

    II.    EIMF has had a reasonable opportunity to demonstrate that no action should be

taken in this matter.

    III.    EIMF enters voluntarily into this agreement with the Commission.

    IV.    The pertinent facts in this matter are as follows:

RECEIVED
FEDERAL ELECTION
COMMISSION
OFFICE OF GENERAL
COUNSEL

2001 MAY -3 A 10: 27

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

Applicable Law

1.    The Act defines a political committee as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A).

2.    The Act defines the term "contribution" as including "anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also, FEC v. Survival Education Fund, Inc.*, 65 F.3d 285, 295 (2d Cir. 1995) (where a statement in a solicitation "leaves no doubt that the funds contributed would be used to advocate [a candidate's election or] defeat at the polls, not simply to criticize his policies during the election year," proceeds from that solicitation are contributions).

3.    The Act requires all political committees to register with the Commission and file a statement of organization within ten days of becoming a political committee, including the name, address, and type of committee; the name, address, relationship, and type of any connected organization or affiliated committee; the name, address, and position of the custodian of books and accounts of the committee; the name and address of the treasurer of the committee; and a listing of all banks, safety deposit boxes, or other depositories used by the committee. *See* 2 U.S.C. § 433.

4.    Each treasurer of a political committee shall file periodic reports of the committee's receipts and disbursements with the Commission. *See* 2 U.S.C. § 434(a)(1). In the case of committees that are not authorized committees of a candidate for Federal office, these reports shall include, *inter alia*, the amount of cash on hand at the beginning of the reporting period, *see* 2 U.S.C. § 434(b)(1); the total amounts of the committee's receipts for the reporting

-2-

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

1   period and for the calendar year to date, *see* 2 U.S.C. § 434(b)(2); and the total amounts of the

2   committee's disbursements for the reporting period and the calendar year to date. *See* 2 U.S.C.

3   § 434(b)(4).

4            5.      The Act states that no person shall make contributions to any political

5   committee that, in the aggregate, exceed $5,000 in any calendar year, with an exception for

6   political committees established and maintained by a state or national political party. *See*

7   2 U.S.C. § 441a(a)(1)(C). Further, the Act states that no political committee shall knowingly

8   accept any contribution in violation of the limitations imposed under this section. *See* 2 U.S.C.

9   § 441a(f).

10           6.      Under certain circumstances, organizations established under I.R.C. § 527

11  may not qualify as political committees. The disclosure reports generally required of such

12  Section 527 organizations are different from those required of political committees in format,

13  timing and level of detail. There is substantial overlap in the content of disclosures required of

14  such Section 527 organizations and the disclosures required of political committees; however,

15  the Act has some additional disclosure requirements for political committees that are not

16  required under the Internal Revenue Code. Unlike a political committee, a Section 527 may

17  avoid disclosing certain receipts if it pays the highest corporate tax rate on such fund. In

18  addition, an organization which does not trigger political committee status may accept

19  contributions larger than $5,000 and accept (for limited purposes) funds from corporate or union

20  sources.

21                              Factual Background

22           7.      EIMF is an entity organized under Section 527 of the Internal Revenue

23  Code. EIMF operated from an office located at 1816 Garfield Avenue, Aurora, Illinois 60505

1  under the direction of its President, Jeffrey D. Davis  Its sister organization, Empower Illinois

2  ("EI"), also is an entity organized under Section 527 of the Internal Revenue Code and operated

3  from the same location.

4          8.      EIMF filed a Notice of 527 Status with the Internal Revenue Service

5  ("IRS") on August 20, 2004 as a political organization under 26 U.S.C. § 527

6          9.      EIMF did not register as a political committee with the Federal Election

7  Commission.

8          10.     From October 11, 2004 through October 24, 2004, EIMF spent $69,780 on

9  a television advertisement and $5,762 on a radio advertisement that were broadcast in Illinois.

10  The advertisements opposed Barack Obama's candidacy in the 2004 race for U S. Senator from

11  Illinois.

12          11.     The advertisements debuted on October 12, 2004, the same day Obama

13  and Alan Keyes, the Republican candidate for U.S. Senate, were scheduled to debate, only weeks

14  before the election. The radio ad sought to reach out to voters by declaring, "On November 2nd,

15  Illinoisans are going to make an important decision in the US Senate Race." The ad then asked

16  listeners a series of questions designed to make them become critical of Obama, such as "did you

17  know that Obama opposed tougher penalties for gang bangers who kill innocent children? . . .

18  And that Obama supported abortion even after the child was born alive?" At the end, the ad

19  urges listeners to "stop . . . look . . . and listen," to learn the "real" truth about Obama, and to log

20  onto truthaboutobama.org so that they could "make an informed decision."

21          12.     Similarly, the television advertisement also asked viewers whether they

22  knew "Obama opposes tougher sentences for gangs who kill . . . innocent children . . . Obama

23  wants schools to teach sex . . . to kindergarteners .    Obama supports aborting children even

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

1   when they are . . . born alive." In the end, the advertisement tells viewers: "STOP; LOOK;

2   LISTEN; LEARN THE TRUTH ABOUT OBAMA."

3          13.    During the 2004 election cycle, EIMF's disbursements totaled $83,042,

4   most of which ($75,542) was spent on the production and placement of two advertisements on

5   radio ($5,762) and television ($69,780) opposing Barack Obama's candidacy. EIMF spent the

6   remaining $7,500 on its two websites: empowerillinoismediafund org and truthaboutobama.org,

7   which were wholly dedicated to criticizing Obama's voting record as a state senator and his

8   candidacy for U.S. Senate.

9          14.    EIMF conducted most of its fundraising through meetings with individuals

10  and used scripts that largely focused on the need to finance a media campaign targeting Barack

11  Obama. At these meetings, Barack Obama was the only candidate who was clearly identified or

12  referred to when EIMF solicited funds from potential donors.

13         15.    One script, entitled EIMF and EI Fall 2004 Plan, stated that EIMF's

14  purpose was to educate "potential voters" and the "Conservative Base" about Obama's liberal

15  voting record through an electronic media campaign which would include radio and television

16  ads and two websites: empowerillinoismediafund.org and truthaboutobama.org EIMF hoped to

17  make a "splash" with the conservative base by running a television spot concerning Obama from

18  August 30th through September 2, 2004 to coincide with the Republican National Convention

19  They were also told that the advertisement would "'wake' up the base to say, 'hey, that's right,

20  we have to fight.'" EIMF told donors it would "be the first organization to begin running any

21  kind of ads *for the U.S. Senate race in Illinois*" and that the ad *"would be seen as the first*

22  *'negative' or issue comparison ad for the general election."* In other words, EIMF solicited

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

1  funds to put the ad on the air by stating specifically that the ad was in connection with the Senate

2  race and would be a "negative" ad against Obama.

3          16.    Another script, the EI and EIMF Power Point Presentation, stated that the

4  organizations' objectives were: "Educating Potential Voters"; "Energizing the Conservative

5  Base"; "Turning out Conservative Voters (increasing turnout in targeted areas)." The script also

6  informed donors that both organizations had extensive research on Obama to counter the

7  "honeymoon" that Obama was receiving from the media. Despite Obama's recent attempts "to

8  tame his voting record," the script informed donors that "when you look at fact versus fiction

9  you find an extremely liberal State Senator who has not accomplished much."

10          17.    The Power Point Presentation asserted that the "most efficient way to

11  reach voters is through paid media" and that the "paid media's objective is to educate voters

12  about Obama's true voting record, where he gets his support, and get them to visit

13  www.truthaboutobama.org." The script further stated that this time, EIMF would begin reaching

14  the conservative base by placing the first television ad concerning Obama on October 11, 2004,

15  one day before the first debate between Obama and Keyes.

16          18.    In addition to the fundraising meetings with individuals, EIMF sent a

17  solicitation via electronic mail on October 11, 2004. The solicitation informed potential donors

18  about EIMF's media campaign designed to expose the "gap of information about Obama's

19  record and his public profile" and asked whether they knew that "AS CHAIRMAN OF THE

20  HEALTH & HUMAN SERVICES COMMITTEE OBAMA VOTED TO HAVE SEX

21  EDUCATION TAUGHT TO CHILDREN IN KINDERGARTEN?" The solicitation then

22  requested them to contribute and help EIMF "reach THOUSANDS OF ILLINOIS VOTERS."

-6-

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

1    19.   The Commission concludes that contributions received in response to

2  EIMF's solicitations that clearly indicated the funds received would be used to defeat Barack

3  Obama in the 2004 general election caused EIMF to surpass the $1,000 statutory threshold. *See*

4  2 U.S.C. § 431(4)(A). EIMF received its first $1,000 in contributions in August 2004. During a

5  fundraising meeting held on August 23, 2004, EIMF raised $30,000 when it used the EIMF and

6  EI Fall 2004 Plan script described in paragraph 15.

7    20.   EIMF accepted contributions from individuals in amounts exceeding

8  $5,000  During the 2004 election cycle, EIMF accepted approximately $70,000 in contributions

9  in amounts exceeding $5,000 per individual.

10    21.   Since the 2004 election, EIMF has effectively ceased active operations. It

11  has raised no contributions and limited its disbursements to legal and administrative costs.

12    22.   EIMF contends that it acted with a good faith belief that its activities in

13  connection with the 2004 elections were in compliance with applicable laws and regulations

14  V.   EIMF committed the following violations:

15    1.   EIMF violated 2 U.S.C. §§ 433 and 434 by failing to register and report as a

16  political committee as of August 2004.

17    2.   EIMF violated 2 U.S.C. § 441a(f) by knowingly accepting contributions in

18  amounts exceeding $5,000 from individuals.

19  VI.   EIMF will cease and desist from violating 2 U.S.C. §§ 433 and 434 by failing to

20  register and report as a political committee  EIMF will cease and desist from violating 2 U.S.C.

21  § 441a(f) by accepting contributions in excess of the limits set forth in the Act.  In addition,

22  Jeffrey D. Davis will cease and desist from engaging in activities that result in violations of

23  2 U.S.C. §§ 433, 434, and 441a(f).

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

1      VII.    EIMF will pay a civil penalty to the Federal Election Commission in the amount

2    of Three Thousand dollars ($3,000), pursuant to 2 U.S.C. § 437g(a)(5)(A).

3      VIII    EIMF will file reports with the Commission containing all information required to

4    be disclosed by federal political committees for its activities from August 20, 2004 until

5    December 31, 2006. The Commission agrees that EIMF may fulfill this obligation by submitting

6    copies of reports filed with the Internal Revenue Service ("IRS") for activities during this period,

7    if supplemented with additional information required of federal political committees. Such

8    supplementation would include, but not be limited to, the information contained on the summary

9    pages of reports filed by political committees. To the extent that EIMF's reports filed with the

10    IRS do not cover all of EIMF's activities from August 20, 2004 until December 31, 2006, EIMF

11    will file the appropriate FEC reports with the Commission.

12      IX.    EIMF agrees to register and report to the Commission as a political committee in

13    the event that it receives additional contributions and/or makes expenditures for the purpose of

14    influencing federal elections, and will comply with any and all applicable provisions of the Act

15    and Commission regulations.

16      X.    The Commission, on request of anyone filing a complaint under 2 U.S.C.

17    § 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance

18    with this agreement. If the Commission believes that this agreement or any requirement thereof

19    has been violated, it may institute a civil action for relief in the United States District Court for

20    the District of Columbia.

21      XI.    This agreement shall become effective as of the date that all parties hereto have

22    executed same and the Commission has approved the entire agreement.

MUR 5568
Conciliation Agreement with Empower Illinois Media Fund

1      XII.    EIMF shall have no more than 30 days from the date this agreement becomes

2   effective to comply with and implement the requirements contained in this agreement and to so

3   notify the Commission

4      XIII.    This Conciliation Agreement constitutes the entire agreement between the parties

5   on the matters raised herein, and no other statement, promise, or agreement, either written or

6   oral, made by either party or by agents of either party, that is not contained in this written

7   agreement shall be enforceable.

8   FOR THE COMMISSION:

9

10   Thomasenia P. Duncan

11   Acting General Counsel

12

13

14   BY:                                7/24/07

15        Rhonda J. Vosdingh  Ann Marie Terzaken Date

16   Acting Associate General Counsel

17        for Enforcement

18

19

20   FOR EIMF:

21

22

23

24

25   Jeffrey D. Davis                 4-16-07

26   President                          Date

27   Empower Illinois

28   Empower Illinois Media Fund

29

EXHIBIT 9



FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

December 13, 2006

Gail Harmon, Esq.
Harmon, Curran, Spielberg & Eisenberg, LLP
1726 M Street, NW Suite 600
Washington, DC 20036

Kenneth Gross, Esq.
Lawrence M. Noble, Esq.
Skadden Arps Slate, Meagher & Flom, LLP
1440 New York Ave., N.W.
Washington, DC 20005

RE:    MUR 5753
       League of Conservation Voters 527
       League of Conservation Voters 527 II
       League of Conservation Voters Action Fund

Dear Ms. Harmon and Messrs. Gross and Noble:

On December 8, 2006, the Federal Election Commission accepted the signed conciliation agreement and civil penalty submitted by your clients, the League of Conservation Voters 527 and League of Conservation Voters 527 II in settlement of violations of 2 U.S.C. §§ 433, 434, and 441a(f), provisions of the Federal Election Campaign Act of 1971, as amended. Accordingly, the file has been closed in this matter. Further, after considering the circumstances of the matter, the Commission determined on December 8, 2006 to take no further action with respect to your clients, League of Conservation Voters Action Fund and Barbara Gonzalez-McIntosh, in her official capacity as treasurer, and closed the file as it pertains to them.

Documents related to the case will be placed on the public record within 30 days. *See* Statement of Policy Regarding Disclosure of Closed Enforcement and Related Files, 68 Fed. Reg. 70,426 (Dec. 18, 2003). Information derived in connection with any conciliation attempt will not become public without the written consent of the respondent and the Commission. See 2 U.S.C. § 437g(a)(4)(B).

Letter to League of Conservation Voters 527
Page 2

    Enclosed you will find a copy of the fully executed conciliation agreement for your files. Please note that the civil penalty is due within 30 days of the conciliation agreement's effective date. If you have any questions, please contact me at (202) 694-1650.

                              Sincerely,

                              Peter G. Blumberg
                              Attorney

Enclosure
· Conciliation Agreement

BEFORE THE FEDERAL ELECTION COMMISSION

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| League of Conservation Voters 527 | ) | MUR 5753 |
| | ) | |
| League of Conservation Voters 527 II | ) | |
| | ) | |

CONCILIATION AGREEMENT

This matter was initiated by a signed, sworn, and notarized complaint. The Federal

Election Commission ("Commission") found reason to believe that League of Conservation

Voters 527 and League of Conservation Voters 527 II (collectively, "the Respondents" or "LCV

527s") violated 2 U.S.C. §§ 433, 434, and 441a(f) of the Federal Election Campaign Act, as

amended, ("the Act") by failing to register as a political committee, by failing to disclose its

contributions and expenditures, and by knowingly accepting contributions in excess of $5,000.

NOW, THEREFORE, the Commission and the Respondent, having participated in

informal methods of conciliation, prior to a finding of probable cause to believe, do hereby agree

as follows:

I.     The Commission has jurisdiction over the Respondents and the subject matter of

this proceeding.

II.    Respondents have had a reasonable opportunity to demonstrate that no action

should be taken in this matter.

III.   Respondents enter voluntarily into this agreement with the Commission.

IV     The pertinent facts in this matter are as follows:

<u>Applicable Law</u>

1.      The Federal Election Campaign Act of 1971, as amended ("the Act"),

defines a political committee as "any committee, club, association, or other group of persons

which receives contributions aggregating in excess of $1,000 during a calendar year or which

makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C.

§ 431(4)(A).

2.      The Act defines the term "contribution" as including "anything of value

made by any person for the purpose of influencing any election for Federal office." 2 U.S.C.

§ 431(8)(A)(i); *see also FEC v. Survival Education Fund, Inc.*, 65 F.3d 285, 295 (2d Cir. 1995)

(where a statement in a solicitation "leaves no doubt that the funds contributed would be used to

advocate [a candidate's election or] defeat at the polls, not simply to criticize his policies during

the election year," proceeds from that solicitation are contributions).

3.      The Act defines the term "expenditure" as including "anything of value

made by any person for the purpose of influencing any election for Federal office." 2 U.S.C.

§ 431(9)(A)(i).

4.      Under the Commission's regulations, a communication contains express

advocacy when it uses phrases such as "vote for the President," "re-elect your Congressman," or

"Smith for Congress," or uses campaign slogans or words that in context have no other

reasonable meaning than to urge the election or defeat of one or more clearly identified

candidates, such as posters, bumper stickers, or advertisements that say, "Nixon's the One,"

"Carter '76," "Reagan/Bush," or "Mondale!" *See* 11 C.F.R. § 100.22(a); *see also FEC v.

Massachusetts Citizens for Life*, 479 U.S. 238, 249 (1986) ("[The publication] provides in effect

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 3

an explicit directive: vote for these (named) candidates. The fact that this message is marginally

less direct than "Vote for Smith" does not change its essential nature."). Courts have held that

"express advocacy also include[s] verbs that exhort one to campaign for, or contribute to, a

clearly identified candidate." *FEC v. Christian Coalition*, 52 F.Supp. 2d 45, 62 (D.D.C. 1999)

(explaining why *Buckley v. Valeo*, 424 U.S. 1, 44, n. 52 (1976), included the word "support," in

addition to "vote for" or "elect," on its list of examples of express advocacy communication).

     5.     The Supreme Court has held that "[t]o fulfill the purposes of the Act" and

avoid "reach[ing] groups engaged purely in issue discussion," only organizations whose major

purpose is campaign activity can be considered political committees under the Act. *See, e.g.,*

*Buckley v. Valeo*, 424 U.S. 1, 79 (1976); *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238,

262 (1986)("*MCFL*"). It is well-settled that an organization can satisfy *Buckley's* "major

purpose" test through sufficient spending on campaign activity. *MCFL*, 479 U.S. at 262-264; *see*

*also Richey v. Tyson*, 120 F. Supp. 2d 1298, 1310 n. 11 (S.D. Ala. 2002). An organization's

"major purpose" may also be established through public statements of purpose. *See, e.g., FEC v.*

*Malenick*, 310 F. Supp. 2d 230, 234-36 (D.D.C. 2004); *FEC v. GOPAC*, 917 F. Supp. 851, 859

(D.D.C. 1996)

     6.     The Act requires all political committees to register with the Commission

and file a statement of organization within ten days of becoming a political committee, including

the name, address, and type of committee; the name, address, relationship, and type of any

connected organization or affiliated committee; the name, address, and position of the custodian

of books and accounts of the committee; the name and address of the treasurer of the committee;

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 4

and a listing of all banks, safety deposit boxes, or other depositories used by the committee. *See*

2 U.S.C. § 433.

       7.    Each treasurer of a political committee shall file periodic reports of the

committee's receipts and disbursements with the Commission. *See* 2 U.S.C. § 434(a)(1). In the

case of committees that are not authorized committees of a candidate for Federal office, these

reports shall include, *inter alia*, the amount of cash on hand at the beginning of the reporting

period, *see* 2 U.S.C. § 434(b)(1); the total amounts of the committee's receipts for the reporting

period and for the calendar year to date, *see* 2 U.S.C. § 434(b)(2); and the total amounts of the

committee's disbursements for the reporting period and the calendar year to date. *See* 2 U.S.C.

§ 434(b)(4).

       8.    The Act states that no person shall make contributions to any political

committee that, in the aggregate, exceed $5,000 in any calendar year, with an exception for

political committees established and maintained by a state or national political party. *See*

2 U.S.C. § 441a(a)(1)(C). Further, the Act states that no political committee shall knowingly

accept any contribution in violation of the limitations imposed under this section. *See* 2 U.S.C.

§ 441a(f).

Factual Background

       9.    The LCV 527s claim an exemption from federal income tax under Section

527 of the Internal Revenue Code, and are associated with the League of Conservation Voters,

Inc. ("LCV Inc.") - a Section 501(c)(4) organization based in Washington, D.C.

       10.    LCV 527 was formed in 1997, and following a change in the applicable

law, filed a Notice of 527 Status with the Internal Revenue Service ("IRS") in 2000. LCV 527 II

Typical fundraising letters stressed:

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 ll
Page 6

Thank you for everything you have already done to make [the campaign] the most ambitious one in LCV's history ... and for everything you can still do to *support LCV's Environmental Victory Project, our uniquely strategic plan with the capacity to persuade independents, moderate Republicans and Nader-folk to cast deciding votes for John Kerry in what's sure to be a breathtakingly close election.* ... [Your contribution will] make it a lot easier to look in the mirror on November 3rd ... and by that I mean, you'll know you did all you possibly could to win this fight. *If the news is good, you can take credit for defeating George Bush and electing John Kerry;* if the news is bad, it will not be for lack of support or hard work from you and all of us at LCV. (emphasis added).

The first seven names on our 2004 Dirty Dozen have just been made public, so I'm writing to ask for your immediate support *in defeating these anti-environment lawmakers* on Election Day. ... That's why I'm counting on you to *help us defeat these anti-environment candidates by rushing a special contribution* to the League of Conservation Voters at this time. (emphasis added).

This is it! This is our chance to get the pro-environment majority to the polls *to prevent four more years* of George W. Bush's destructive environmental policies. And thanks to the support of LCV members like you, we're in a strong position. We've educated, registered and energized hundreds of thousands of pro-environment Americans *in key battleground states for this election.* Our savvy strategy and the enormous enthusiasm of our dedicated staff and volunteers have laid the groundwork *for success in five critical states that could tip the entire election in favor of the environment.* But what we do now will make all the difference. *We have to go all-out to get environmentalists to the polls on November 2 to vote for a pro-environment future. So, I'm asking you to dig deeper than you ever have before and give the most generous contribution you can possibly afford. I know I'm asking a lot. But, I promise you this, Your investment in a new environmental leadership – in our strategic work to defeat George W. Bush and elect John Kerry and other environmental leaders – will pay huge dividends through cleaner air and water,*

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 7

greater protections for wildlife and increased respect for our
wilderness and other natural wonders.   (emphasis added).

**You can help today!  LCV is soliciting leadership gifts
from $2,500-$50,000 targeted specifically to help elect
Cathy Woolard to Congress.** If you have already
contributed the legal limit to Cathy's campaign your
contribution to this independent campaign will provide
her with critical support.  **Contributions DO NOT
COUNT against individual federal contribution
limits, and your investment in Cathy's future can be
made either through LCV's 501c4 or 527 accounts.**
(emphasis in original).

13.    In addition to raising funds through mailed solicitations, the LCV

527s contacted potential donors by telephone and through face-to-face meetings, informing

them that their donations to the LCV 527s would be targeted to the defeat of Bush and

election of Kerry in the upcoming presidential election, or to influencing the election or

defeat of specific candidates in Congressional races.   One of the primary responsibilities of

LCV Inc. President Deb Callahan was "to solicit large-dollar donations (typically in excess

of $10,000) from individuals" with "oral communications with donors [that] were similar

to the solicitation letters [such as the ones cited above] in terms of the information

conveyed and the reasons I was requesting a donation for LCV." Solicitations for the LCV

527s emphasized that donors could make "the critical difference" in key Senate races

involving Erskine Bowles and Ken Salazar and that LCV is running ads in Florida "to

increase our visibility and expose Bush's faults in favor of John Kerry."

14.    Many of these solicitations clearly indicate that the funds received will be

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 8

used to defeat George W. Bush and elect John Kerry in the 2004 general election. All funds

received in response to these solicitations constituted contributions under the Act, and caused the

LCV 527s to surpass the $1,000 statutory threshold by April 2003. See 2 U.S.C. § 431(4)(A).

The LCV 527s subsequently accepted more than $6 million in individual contributions in excess

of the $5,000 individual limit.

## LCV 527 Expenditures

15.   The LCV 527s made more than $1,000 in expenditures for the so-called

Environmental Victory Project ("EVP"), a door-to-door canvass and phone bank project which

included express advocacy for the election of John Kerry and the defeat of George W. Bush with

both verbal and written messages. The EVP, funded jointly by the LCV 527s, LCV Inc. and

LCV Inc.'s PAC, was a project intended to "reach undecided voters … by contacting them

personally at their door three times" during the election campaign in order to "persuade them to

vote against the President and for John Kerry." EVP canvasser scripts, talking points and

training materials establish that LCV canvassers made express advocacy communications to the

homes of undecided voters. A typical script stated: "we think it's dangerous to have George

Bush in office another four years. So we encourage you to consider which candidate has the right

priorities for health and safety of our families and vote for John Kerry in November." Similarly,

the talking points provided to canvassers stated that the goal of the canvas was for "Kerry to win

on November 2nd" and the "Do's and Don'ts" instructions to canvassers urged them "GIVE

THEM A REASON TO VOTE FOR KERRY!" Materials relating to phone banks, including the

scripts, make clear that callers expressly advocated the defeat of George Bush and the election of

John Kerry. For instance, volunteers were invited to attend an event to "kick-off" a phone bank

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 9

project in Orlando where they would "phone Orlando voters and persuade them to vote for

Kerry." The LCV 527s spent approximately $850,000 for the EVP campaign.

     16. The LCV 527s made more than $1,000 in expenditures for a mailer

expressly advocating the defeat of Senate candidate Pete Coors in Colorado. The mailer depicts

a beer can labeled "Pete Coors for Senate" along with the candidate's picture, accompanied by

text intended to resemble the Surgeon General's warning label stating: "Warning: This candidate

cares more about his bottom line than our kids' safety. Elect at your own risk."

<u>Major Purpose</u>

     17. The LCV 527s' activities and statements demonstrate that its major purpose

was to elect John Kerry and other federal candidates and to defeat George W. Bush and other

federal candidates.

     18. Many of the solicitations of funds for the LCV 527s clearly indicated that

the funds would be targeted for the election or defeat of specific federal candidates, including the

defeat of Bush and the election of Kerry in the 2004 presidential election, or to elect or defeat

specific candidates in Congressional races. Consistent with the solicitations, the LCV 527s spent

funds it received to engage in political campaign activity. The LCV 527s made no disbursements

in connection with state or local elections during the 2004 cycle.

     19. Organizational planning documents and public statements also show that

LCV 527s' major purpose was political campaign activity. LCV's "National Electoral Strategic

Plan 2004" identified its "two electoral goals in the 2004 elections: Elect a pro-environment

president and strengthen the position of pro-environment forces in Congress, especially the

United States Senate" and noted that achieving these goals "will require new strategies at every

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 10

level of our program." One of the strategies was "to identify the best targets to impact a

shrinking number of swing states" and to engage a grassroots "field operation" that is "focused,

disciplined, and targeted in execution to our battleground states." Further, the LCV

organizations issued their "earliest presidential endorsement in its history" by endorsing John

Kerry in February 2004 before the New Hampshire primary. LCV Inc. President Deb Callahan

wrote in one fundraising letter that the LCV Inc. "board has elected to devote up to 70% of our

campaign resources to the defeat of George W. Bush." The budget figures were reiterated in an

internal planning document, which disclosed that 50-75% of the political budget for various LCV

organizations was intended for the presidential election. Other solicitation materials state that

LCV was "committing everything we've got to defeating George W. Bush" and that: "Simply

put, LCV's 2004 campaign will: Defeat the worst environmental president in American history"

and "Elect John Kerry ...."

   20.  Respondents contend that they acted with a good faith belief that their

activities in connection with the 2004 elections were in compliance with applicable laws and

regulations.

   V.     In order to settle this matter and avoid the cost and time of further proceedings,

and without admitting or denying each specific basis for the findings, Respondents will no longer

contest that:

   1.     While the League of Conservation Voters 527 and League of Conservation

Voters 527 II filed reports with the Internal Revenue Service disclosing their contributions and

expenditures pursuant to 26 U.S.C. § 527(j). they violated 2 U.S.C. §§ 433 and 434 by failing to

register and report as political committees during the 2004 election cycle.

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 11

2.    League of Conservation Voters 527 and League of Conservation Voters

527 II violated 2 U.S.C. § 441a(f) by accepting contributions in excess of $5,000 during the 2004

election cycle.

VI.    Respondents agree to do the following:

1.    Respondents will pay a civil penalty to the Federal Election Commission

in the amount of $180,000 pursuant to 2 U.S.C. § 437g(a)(5)(A).

2.    Respondents will cease and desist from violating 2 U.S.C. §§ 433 and 434

by failing to register and report as a political committee, and will cease and desist from violating

2 U.S.C. § 441a(f) by accepting any individual contributions in excess of the limits set forth in

the Act.  LCV 527 and LCV 527 II state that they have no present intention to accept

contributions or make expenditures as defined by the Act, and will register with and report to the

Commission if they should engage in activities that trigger federal political committee status in

connection with future elections.

3.    Respondents will submit to the FEC copies of their Form 8872 reports

filed with the Internal Revenue Service for activities from January 1, 2003 until December 31,

2004, supplemented with the additional information that Federal political committees are

required to include on page 2 of the Summary Page of Receipts and Disbursements of FEC Form

3X.  Respondents will have no further filing obligations in connection with the activities at issue

in this Matter.

VII.    The Commission, on request of anyone filing a complaint under 2 U.S.C.

§ 437g(a)(1) concerning the matters at issue herein or on its own motion, may review compliance

with this agreement.  If the Commission believes that this agreement or any requirement thereof

MUR 5753
Conciliation Agreement
LCV 527 and LCV 527 II
Page 12

has been violated, it may institute a civil action for relief in the United States District Court for

the District of Columbia

VIII.    This agreement resolves all matters arising from MUR 5753 and, except as

provided in Section VII·of the agreement, no further inquiry or action will be taken by the FEC

regarding the matters described herein as to possible violations of the Act by LCV, Inc.

501(c)(4), LCV Action Fund, LCV 527 or LCV 527 II in 2003-2004. Further, the FEC agrees

that no action will be taken against any contributor to the LCV 527 or LCV 527 II for the 2003-

2004 contributions that are the subject of this MUR.

IX.    This agreement shall become effective as of the date that all parties hereto have

executed same and the Commission has approved the entire agreement.

X.    Respondents shall have no more than 30 days from the date this agreement

becomes effective to comply with and implement the requirements contained in this agreement

and to so notify the Commission.

XI.    This Conciliation Agreement constitutes the entire agreement between the parties

on the matters raised herein, and no other statement, promise, or agreement, either written or

oral, made by either party or by agents of either party, that is not contained in this written

agreement shall be enforceable.