# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SPEECHNOW.ORG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 08-248 (JR) |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | OPPOSITION TO |
| | ) | PRELIMINARY INJUNCTION |
| Defendant. | ) | |
| | ) | |

### DEFENDANT FEDERAL ELECTION COMMISSION'S MEMORANDUM
### IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

Robert W. Bonham III (D.C. Bar No. 397859)
Senior Attorney

Steve N. Hajjar
Esa L. Sferra
Attorneys

COUNSEL FOR DEFENDANT
March 5, 2008                              FEDERAL ELECTION COMMISSION

# TABLE OF CONTENTS

**Page**

I.     FACTUAL BACKGROUND ........................................................1

     A.    The Federal Election Commission...........................................1

     B.    Plaintiffs ...........................................................................2

     C.    SpeechNow's Advisory Opinion Request...............................3

II.    STATUTORY AND REGULATORY PROVISIONS ..................4

     A.    Contributions and Expenditures ...........................................4

     B.    Political Committees ...........................................................4

     C.    Contribution Limits ...........................................................5

     D.    Independent Expenditures ....................................................6

ARGUMENT ...............................................................................7

III.   A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY
     REMEDY THAT REQUIRES THE PLAINTIFFS TO MEET
     A HEAVY BURDEN .............................................................7

IV.   PLAINTIFFS CANNOT DEMONSTRATE A SUBSTANTIAL
     LIKELIHOOD OF SUCCESS ON THE MERITS ......................8

     A.    The Act's Limit on Contributions to Political Committees is
          Constitutional As Applied ...................................................8

          1.    The Contribution Limits At Issue Are Subject to
               Intermediate Scrutiny.................................................8

          2.    The Supreme Court Has Made Clear That Limitations
               on Contributions to Political Committees that Purport
               to Make Only Independent Expenditures Are
               Constitutional ..........................................................13

        3.      As Applied to SpeechNow, the Act's Limit on Contributions to Political Committees is Closely Drawn to Match Sufficiently Important Governmental Interests...................18

            a.     Corruption and the Appearance of Corruption........18

            b.     Distorting Effects of Immense Aggregations of  Wealth....................................................23

            c.     Unlimited Contributions Would Undercut the Act's Disclaimer Requirements ...........................................26

    B.    The Act's Biennial Aggregate Contribution Limits are Closely Drawn to Match Sufficiently Important Governmental Interests As Applied.............................................................27

    C.    The Act's Reporting Requirements For Political Committees are Substantially Related to an Important Government Interest ....28

V.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE INJURY ...........................................................................31

    A.    Plaintiffs' Alleged Injuries Are Neither Actual Nor Certain............32

    B.    Plaintiffs Face No Imminent Injury .....................................36

    C.    None of Plaintiffs' Alleged Harms Is Beyond Remediation .............38

    D.    A Preliminary Injunction Temporarily Barring Enforcement Of The Act Could Not Prevent Plaintiffs' Alleged Harm .................39

VI.    THE RELIEF REQUESTED BY PLAINTIFFS WOULD HARM THE COMMISSION AND UNDERCUT THE PUBLIC INTEREST......41

    CONCLUSION ...................................................................44

# TABLE OF AUTHORITIES

*Page*

*Cases*

*Adarand Constr., Inc. v. Pena*, 515 U.S. 200 (1995).....................................................29

*Athens Lumber Company, Inc. v. FEC*, 689 F.2d 1006 (11th Cir. 1983) .......................8

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) ...............................23

*Bread Political Action Committee v. FEC*, 455 U.S. 577 (1982) ..................................8

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003) ....................32

*Buckley v. Valeo*, 519 F.2d 817 (D.C. Cir. 1975) ..........................................................8

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................passim

*California Medical Ass'n v. FEC*, 435 U.S. 182 (1981)........................................passim

*Chaplaincy of Full Gospel Churches*, 454 F.3d 290 (D.C. Cir. 2006) ................passim

*Christian Civic League of Maine, Inc., v. FEC,* 433 F. Supp. 2d 81 (D.D.C. 2006)....43

*Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v.*
  *District of Columbia*, 919 F.2d 148 (D.C. Cir. 1990)..............................................36

*Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981) .............1, 3, 20

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738
  (D.C. Cir. 1995) .........................................................................................7, 36, 41

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ..........................................................7

*Colorado Republican Federal Campaign Committee v. FEC*, 578 U.S. 604 (1996) ...20

*Committee on Jobs Candidate Advocacy Fund v. Herrera,*
  No. 07-03199, 2007 WL 2790351 (N.D. Cal. Sept. 20, 2007)...............................12

*Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1 (1961).................31

*Daggett v. Comm'n on Gov'tal Ethics and Election Practices,*
  205 F.3d 445 (1st Cir. 2000)...................................................................................33

*Donaldson v. United States Dep't of Labor*, 930 F.2d 339 (4th Cir. 1991).................40

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982) ................................................................40

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................35, 36

*FEC v. Beaumont*, 539 U.S. 146 (2003) ........................................................9, 10, 23, 25

*FEC v. Cal. Med. Ass'n*, 502 F. Supp. 196 (N.D. Cal. 1980)......................................17

*FEC v. Colorado Republican Federal Campaign Comm,*, 533 U.S. 431
 (2001)...........................................................................................................9, 10, 15

*FEC v. Malenick*, No. 02-1237, 2005 WL 588222 (D.D.C. Mar. 7, 2005) .................16

*FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986) ........................5, 18

*FEC v. National Conservative Political Action Committee*,
 470 U.S. 480 (1985).......................................................................................10, 20

*FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ...............................18, 20

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).............................13, 20

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980) ...............................................38

*Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993) ....................................39, 40

*Hicks v. Bush*, 397 F. Supp. 2d 36 (D.D.C. 2005) .......................................................36

*Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989) .................................................................36

*International Association of Machinists and Aerospace Workers v. FEC*,
 678 F.2d 1092 (D.C. Cir. 1982)................................................................................8

*Jacobus v. Alaska*, 338 F.3d 1095 (9th Cir. 2003).......................................................33

*James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991) ............................39, 40

*Khachaturian v. FEC*, 980 F.2d 330 (5th Cir. 1992) (en banc)......................................8

*Lincoln Club of Orange County v. City of Irvine*, 292 F.3d 934 (9th Cir. 2002) ..........12

*Mazurek v. Armstong*, 520 U.S. 968 (1997) .................................................................7

*McConnell v. FEC*, 540 U.S. 93 (2003)................................................................passim

*McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003).......................................passim

*Mobile Republican Assembly v. United States*, 353 F.3d 1357 (11th Cir. 2003)...........31

*Montana Right To Life Ass'n. v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003) ................33

*New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345
    (1977).............................................................................................................43

*Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377 (2000) ........................9, 10

*NTEU v. United States*, 927 F.2d 1253 (D.C. Cir. 1991).......................................31, 36

*OAKPAC v. City of Oakland*, No. 06-6366, 2007 Lexis 73736
    (N.D. Cal. Oct. 19, 2006).................................................................................12

*Perot v. FEC*, 97 F.3d 553 (D.C. Cir. 1996).................................................................37

*Piscottano v. Murphy*, 317 F. Supp. 2d 97 (D. Conn. 2004) ........................................36

*Randall v. Sorrell*, 548 U.S. 230 (2006) .........................................................................9

*Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974).........................38

*Sears Roebuck & Co. v. NLRB*, 473 F.2d 91 (D.C. Cir. 1973) ....................................38

*Suster v. Marshall*, 149 F.3d 523 (6th Cir. 1998) .........................................................40

*Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301 (1993)..................................................7

*United States v. Int'l Union of Operating Eng'rs, Local 701*, 638 F.2d 1161

    (9th Cir. 1979).................................................................................................41

*United States v. Tonry*, 433 F.Supp. 620 (E.D. La. 1977) ............................................41

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)...........................................................7

*Veitch v. Danzig*, 135 F. Supp. 2d 32 (D.D.C. 2001) .....................................................7

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987).................................................31, 36

*Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323 (1984) ..........................8

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)....................32, 36, 37, 38

*Wisconsin Right to Life  v. FEC, Inc.*, Civ. No. 04-1260, 2004 WL 3622736
    (D.D.C. Aug. 17, 2004)....................................................................................36

*Wisconsin Right to Life  v. FEC, Inc.*, Civ. No. 04-1260, 2006 WL 2666017
(D.D.C. Sept. 14, 2006) ........................................................................37, 38, 42, 43

*Wisconsin Right to Life, Inc. v. FEC*, 542 U.S. 1306 (2004)........................................42

## *Statutes and Regulations*

Federal Election Campaign Act of 1971, as amended, Pub. L. No. 92-225,
86 Stat 3. .................................................................................................1, 42

Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443,
88 Stat. 1236 ......................................................................................................42

Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283,
90 Stat. 475 ......................................................................................................42

2 U.S.C. § 431(4) ..........................................................................................................41

2 U.S.C. § 431(4)(A)........................................................................................................4

2 U.S.C. § 431(8)(A)(i)......................................................................................................4

2 U.S.C. § 431(9)(A)(i)......................................................................................................4

2 U.S.C. § 431(11) ............................................................................................................5

2 U.S.C. § 431(17) ........................................................................................................3, 6

2 U.S.C. § 432 ..................................................................................................................4

2 U.S.C. § 433 ..........................................................................................4, 28, 29, 41

2 U.S.C. § 434 ..........................................................................................4, 28, 29, 41

2 U.S.C. § 434(a)(4)..........................................................................................................4

2 U.S.C. § 434(b)(4)(H)(iii) .............................................................................................5

2 U.S.C. § 434(b)(6)(B)(iii) .............................................................................................5

2 U.S.C. § 434(c) ........................................................................................................6, 17

2 U.S.C. § 434(c)(2)(A)-(C) .............................................................................................6

2 U.S.C. § 434(g) ..............................................................................................................6

2 U.S.C. § 437c(c) ................................................................................................. 4, 38

2 U.S.C. § 437c(b)(1) ......................................................................................... 1, 37, 41

2 U.S.C. § 437d(a)(7) ............................................................................................ 2, 4

2 U.S.C. § 437d(a)(8) ............................................................................................... 2

2 U.S.C. § 437f ......................................................................................................... 2

2 U.S.C. § 437g(a)(2) ............................................................................................. 38

2 U.S.C. § 437g(a)(4) ............................................................................................. 38

2 U.S.C. § 437g(a)(4)-(6) ...................................................................................... 38

2 U.S.C. § 437g(a)(6) ............................................................................................. 38

2 U.S.C. § 437g(d) ................................................................................................. 41

2 U.S.C. § 437h ........................................................................................................ 8

2 U.S.C. § 438(a)(8) ................................................................................................. 2

2 U.S.C. § 438(d) ..................................................................................................... 2

2 U.S.C. § 441a(a)(1)(A)-(D) ................................................................................. 5

2 U.S.C. § 441a(a)(1)(C) .............................................................................. 5, 8, 42

2 U.S.C. § 441a(a)(3)(c) ......................................................................................... 28

2 U.S.C. § 441a(a)(3)(B) ........................................................................................ 42

2 U.S.C. § 441a(a)(7)(B) .......................................................................................... 3

2 U.S.C. § 441b ...................................................................................................... 24

2 U.S.C § 441d(a) ..................................................................................................... 6

2 U.S.C § 441d(a)(3) ................................................................................................ 6

2 U.S.C § 441d(d)(2) ............................................................................................... 6

2 U.S.C. § 441i(a)(1)...................................................................................11

26 U.S.C. § 527(c) ......................................................................................25

26 U.S.C. § 527(e)(2)...................................................................................25

26 U.S.C. § 2501..........................................................................................25

28 U.S.C. § 516............................................................................................37

11 C.F.R. Part 109.........................................................................................3

11 C.F.R. § 110.11(a)(1)................................................................................5

11 C.F.R. § 110.11(a)(2)..............................................................................30

District of Columbia Uniform Unincorporated Nonprofit Associations Act,

    D.C. Code § 29-971.01 ............................................................................2

    D.C. Code § 29-301.05(4)-(5)...................................................................2

    D.C. Code § 29-971.04-05 .....................................................................25

Section 527 of the Internal Revenue Code .......................................2, 25, 32

Cable Television Consumer Protection and Competition Act of 1992..........................7

### *Miscellaneous*

http://www.clubforgrowth.org/keating.php .....................................................2

http://saos.nictusa.com/aodocs/959641.pdf .................................................3, 4

http://saos.nictusa.com/aodocs/960630.pdf. ...................................................4

http://www.SpeechNow.org/supportpage .......................................................32

National Party Financial Activity Through the End of the Election Cycle:
http://www.fec.gov/press/press2007/partyfinal2006/demfederalye06.pdf..................30

National Party Financial Activity Through the End of the Election Cycle:
http://www.fec.gov/press/press2007/partyfinal2006/repfederalye06.pdf...................30

Summary of PAC Activity 1990-2006:
http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf ...........................30

Summary of PAC Independent Expenditures 2005-2006:
http://www.fec.gov/press/press2007/20071009pac/indepexp2006.pdf ......................30

Edward B. Foley, *The "Major Purpose" Test:  Distinguishing Between Election-Focused and Issue-Focused Groups*, 31 N. Ky. L. Rev. 341, 346 (2004) ..............23

Howard Jarvis Taxpayers Association, About Us, http://www.hjta.org/aboutus ...........2

Jim Kuhnhenn, *FEC Recommendation Could End Up in Court*, USA Today
    (Jan. 22, 2008)................................................................................................35

Jon Coupal, *Los Angeles the Trendsetter*, Howard Jarvis Taxpayer Ass'n Cal.
    Commentary, Vol. I, Issue 14, at 1-2 (May 5, 2003), *available at*
    http://hjta.webcommanders.com/HJTACommentary014.pdf ...............................22

*On Message*, Los Angeles Times (Feb. 15, 2008).........................................................35

*Suit Aims To Ease Campaign Funding Limit*, The Washington Times
    (Feb. 15, 2008)................................................................................................35

*Suit Could Unleash Surge Of Money In 2008 Presidential Race*, The New York
    Sun (Feb. 15, 2008)..........................................................................................35

Susan Crabtree, *New 527 Group Takes Aim At Campaign Contribution Limits*,
    The Hill, Dec. 3, 2007.......................................................................................2

*Unfettered Speech, Now*, Washington Post  (Feb 16, 2008).........................................35

SpeechNow.org ("SpeechNow") and five individual plaintiffs ask the Court to declare unconstitutional provisions of law that have been in place for over thirty years so that they can finance candidate advertisements with massive contributions and with less public disclosure. The Federal Election Commission ("Commission") opposes plaintiffs' Motion for Preliminary Injunction because, as applied to plaintiffs, the Federal Election Campaign Act's longtime contribution limits are closely drawn to match important interests in preventing corruption and its appearance. Similarly, the disclosure to the public that plaintiffs seek to avoid substantially relates to governmental interests in providing information to voters, deterring corruption and its appearance, and gathering data to detect violations of the contribution limits. Plaintiffs cannot, therefore, meet their burden of demonstrating a substantial likelihood of success on the merits. Plaintiffs also cannot demonstrate any irreparable harm that would arise in the absence of an injunction, as they may engage in all the candidate advocacy they intend by appealing to additional donors as a group or, in the case of SpeechNow's large-dollar contributor, by financing advertisements on his own. The Commission and the public have strong interests in continued enforcement of the challenged statutory provisions in order to minimize corruption or the appearance of corruption and to have an informed electorate.

## I.    FACTUAL BACKGROUND

### A.    The Federal Election Commission

The Commission is the independent agency of the United States with exclusive jurisdiction over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act of 1971, as amended ("Act" or "FECA"), 2 U.S.C. §§ 431-55, and other statutes. The Commission is empowered to "formulate policy" with respect to the Act, 2 U.S.C. § 437c(b)(1); "to make, amend, and repeal such rules . . . as are necessary to carry out the

provisions of [the] Act," 2 U.S.C. §§ 437d(a)(8), 438(a)(8),(d); and to issue written advisory opinions concerning the application of the Act and Commission regulations to any specific proposed transaction or activity, 2 U.S.C. §§ 437d(a)(7), 437f.

**B.    Plaintiffs**

Plaintiff SpeechNow is an unincorporated nonprofit association organized under the District of Columbia Uniform Unincorporated Nonprofit Associations Act, D.C. Code § 29-971.01, and section 527 of the Internal Revenue Code. (Compl. ¶ 7.) Plaintiffs David Keating and Edward H. Crane, III, are organizers and members of SpeechNow, and Mr. Keating is SpeechNow's President and Treasurer. (Keating Decl. ¶ 2 & Exhs. A, B.) Mr. Keating is also the executive director of Club for Growth (*id.* ¶ 27), an advocacy group with a well-financed affiliated political committee. *See* http://www.clubforgrowth.org/keating.php (visited Mar. 1, 2008). Mr. Crane is also the President of the Cato Institute, an established advocacy group that has been in existence for over thirty years. (Crane Decl. ¶ 8.) Jon Coupal, one of SpeechNow's named organizers and initial members, is the President of the Howard Jarvis Taxpayer Association, a California taxpayer organization with more than 250,000 supporters. Howard Jarvis Taxpayers Association, About Us, http://www.hjta.org/aboutus (visited Feb. 26, 2008). Plaintiffs Fred M. Young, Jr., Brad Russo, and Scott Burkhardt, as well as Messrs. Keating and Crane, are prospective donors to SpeechNow. (Compl. ¶¶ 8-12.)

SpeechNow's purpose is "expressly advocating the election of candidates who support rights to free speech and association and the defeat of candidates who oppose those rights, particularly by supporting campaign finance laws." (Compl. ¶ 8.) It was also formed in part to create a test case for challenging certain provisions of FECA. Susan Crabtree, *New 527 Group Takes Aim At Campaign Contribution Limits*, The Hill, Dec. 3, 2007. It seeks to accept

contributions from individuals in unlimited amounts to pay for its candidate advocacy and administrative costs.  (Compl. ¶¶ 17, 82-88.)  It alleges that it will not coordinate any of its expenditures, within the meaning of 2 U.S.C. § 441a(a)(7)(B) and 11 C.F.R. Part 109, with candidates, political parties, or other committees.  (Compl. ¶ 16.)  It also alleges that it will not accept any funds from candidates, political committees, corporations, labor organizations, national banks, Federal government contractors, or foreign nationals.  (Compl. ¶ 15.)

The plaintiff donors seek to influence federal elections by contributing money to SpeechNow so that it can make "independent expenditures" as defined in 2 U.S.C. § 431(17). (Compl. ¶ 27.)  SpeechNow will not make contributions to candidates and other political committees.  (Compl. ¶ 16.)  It will expressly advocate the election or defeat of candidates through advertisements on television and other media in the current election cycle and in future election cycles.  (Compl. ¶ 20.)  Plaintiffs allege that they have prepared four video and audio political advertisement scripts and wish to spend over $120,000 initially to produce and air the advertisements.  (Compl. ¶¶ 20-25.)  Plaintiffs plan to comply with FECA's disclaimer and reporting requirements for independent expenditures made by groups other than political committees, but do not wish to comply with the full disclosure requirements applicable to political committees.  (Compl. ¶¶ 28-30); *see infra* sections II.B, II.D.

C.     **SpeechNow's Advisory Opinion Request**

In November 2007, SpeechNow requested an advisory opinion pursuant to 2 U.S.C. § 437(f) concerning the application of the Act and Commission regulations to SpeechNow's status as a political committee and funds received by SpeechNow.  (*See* Simpson Decl. Exh. 1.)[1]

---

[1]     Plaintiffs submitted to the Court a copy of their advisory opinion request without the accompanying exhibits.  (*See* Simpson Decl. Exh. 1.)  A complete copy of the advisory opinion request is available at http://saos.nictusa.com/aodocs/959641.pdf.  SpeechNow also submitted

The Commission, which currently has two voting members, was unable to issue an advisory opinion to SpeechNow because issuance of an advisory opinion requires the affirmative vote of four members.  *See* 2 U.S.C. §§ 437c(c), 437d(a)(7); (Simpson Decl. Exh. 2).

## II.    STAUTORY AND REGULATORY PROVISIONS

### A.    Contributions and Expenditures

The Act defines "contribution" to include "any gift, subscription, loan, advance or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(8)(A)(i).  "Expenditure" is defined to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(9)(A)(i).

### B.    Political Committees

The Act defines "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A).  Any organization that qualifies as a political committee must register with the Commission and file periodic reports for disclosure to the public of all receipts and disbursements to or from a person in excess of $200 in a calendar year (and in some instances, of any amount), as well as total operating expenses and cash on hand.  *See* 2 U.S.C. §§ 433-34.

The Act requires political committees to file either monthly reports, or on the following schedule: quarterly reports during election years, a pre-election report no later than the 12th day before an election, a post-election report within 30 days after an election, and reports every six

supplements, available at http://saos.nictusa.com/aodocs/959641.pdf and http://saos.nictusa.com/aodocs/960630.pdf.

months during non election years.  2 U.S.C. § 434(a)(4); *see FEC v. Massachusetts Citizens for Life, Inc.* ("*MCFL*"), 479 U.S. 238, 253-54 (1986).  Political committees must disclose additional information about specific "independent expenditures" they make, *see infra* section II.D., in their regularly scheduled reports, including the date, amount, and candidates supported or opposed for each independent expenditure aggregating in excess of $200 in a calendar year.

2 U.S.C. § 434(b)(4)(H)(iii),(6)(B)(iii).  In addition, political committees must identify themselves through "disclaimers," *see infra* section II.D., on *all* of their general public political advertising, on their websites, and in mass emails.  11 C.F.R. § 110.11(a)(1).

In *Buckley v. Valeo*, 424 U.S. 1, 79 (1976), the Supreme Court found that the phrase "for the purpose of . . . influencing" had "vagueness problems" because it had the potential to encompass "both issue discussion and advocacy of a political result."  The Court also narrowly construed the term "political committee," holding that a group will not be deemed a political committee under the Act unless, in addition to crossing the $1,000 statutory threshold of contributions or expenditures, the organization is "under the control of a candidate" or its "major purpose … is the nomination or election of a candidate."  *Id.*

## C.    Contribution Limits

In addition to limiting the amount a person may contribute to a candidate, a candidate's authorized committee, or a political party committee, FECA limits the amount that a person may contribute to "any other political committee."  2 U.S.C. § 441a(a)(1)(A)-(D).  Persons, including individuals, may not contribute more than $5,000 per calendar year to such "other" political committees.  See 2 U.S.C. §§ 431(11), 441a(a)(1)(C).

**D.    Independent Expenditures**

The Act defines "independent expenditure" to mean an expenditure by a person "expressly advocating the election or defeat of a clearly identified candidate; and . . . that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents."  2 U.S.C. § 431(17).

Persons who are *not* a political committee are not required to file reports of all their receipts and disbursements.  Generally, they are only required to file reports for each quarter of the year in which they have made independent expenditures aggregating in excess of $250 during a calendar year.  2 U.S.C. § 434(c).  Each quarterly report contains information regarding the independent expenditure and each person who made a contribution in excess of $200 "for the purpose of furthering an independent expenditure."  2 U.S.C. § 434(c)(2)(A)-(C).  All persons, including political committees, who make independent expenditures shortly before election day that exceed certain thresholds must disclose information about the expenditures to the Commission within 24 or 48 hours.  2 U.S.C. § 434(g).

Every person, including a political committee, that makes independent expenditure communications through certain media must include in each such communication a disclaimer providing information about who paid for the communication.  *See* 2 U.S.C § 441d(a).  Disclaimers are required on express advocacy communications made through a broadcasting station, newspaper, magazine, outdoor advertising facility, or mailing, or through any other type of general public political advertising.  *Id.*  The disclaimer must provide the name and contact information for the maker of the independent expenditure, and state whether the communication is authorized by any candidate or candidate's authorized committee.  2 U.S.C § 441d(a)(3).

Radio or television independent expenditures must contain an additional oral and visual disclaimer stating that the person paying for the communication "is responsible for the content of this advertising." 2 U.S.C. § 441d(d)(2).

## ARGUMENT

### III. A PRELIMINARY INJUNCTION IS AN EXTRAORDINARY REMEDY THAT REQUIRES THE PLAINTIFFS TO MEET A HEAVY BURDEN

In seeking a preliminary injunction, plaintiffs bear a heavy burden to establish that they are entitled to such relief. To prevail, they must demonstrate: (1) a "substantial likelihood of success on the merits"; (2) that they would suffer irreparable harm if an injunction is not granted; (3) that an injunction would not cause substantial injury to other parties; and (4) that the public interest would be furthered by the injunction. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). "A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Plaintiffs shoulder a particularly heavy burden here because the requested relief "would alter, not preserve, the *status quo*." *Veitch v. Danzig*, 135 F.Supp.2d 32, 35 (D.D.C. 2001). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs, however, seek to *alter* the relative position of the parties while their request for permanent relief is pending by preventing the Commission from enforcing provisions of FECA that have been in effect for over thirty years. *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301 (1993) (Rehnquist, J., in chambers) (refusing to enjoin enforcement of the Cable Television Consumer Protection and Competition Act of 1992, despite First Amendment claim: "By

7

seeking an injunction, applicants request that I issue an order *altering* the legal status quo")
(emphasis in original). There is a "presumption of constitutionality which attaches to every Act
of Congress." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984)
(Rehnquist, J., in chambers). Plaintiffs fail to meet their burden of showing clearly that the
longtime status quo should be altered and a federal statute preliminarily enjoined.[2]

## IV.    PLAINTIFFS CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    The Act's Limit on Contributions to Political Committees is Constitutional As Applied

#### 1.    The Contribution Limits At Issue Are Subject to Intermediate Scrutiny

Although plaintiffs concede that they meet the criteria for political committee status (*see
infra* section IV.A.2.), they challenge, *inter alia*, the Act's $5,000 limit on *contributions* that
individuals may give to political committees like SpeechNow. 2 U.S.C. § 441a(a)(1)(C).
Plaintiffs contend that section 441a(a)(1)(C) should be considered an expenditure limit and
reviewed under a strict scrutiny analysis because this contribution limit may indirectly affect the
overall amount of money that SpeechNow can raise and then spend as it chooses. (*See, e.g.,* Pls.'

---

[2]    In their complaint, plaintiffs included in their prayer for relief a request that the Court immediately certify constitutional questions to the *en banc* court of appeals. (Prayer for Relief ¶ 1); 2 U.S.C. § 437h. Plaintiffs have not yet moved for such certification. Since plaintiffs have not yet framed the constitutional questions they wish to have certified to the *en banc* court of appeals, it is premature for the Commission to address these and related issues, such as statutory standing. *See, e.g., Cal. Med. Ass'n v. FEC* ("*Cal Med*"), 453 U.S. 182, 192 n.14 (1981); *Athens Lumber Co., Inc. v. FEC*, 689 F.2d 1006, 1009-1011 (11th Cir. 1983); *Int'l Ass'n of Machinists and Aerospace Workers v. FEC*, 678 F.2d 1092, 1098-1099 (D.C. Cir. 1982). Moreover, if the plaintiffs pursue this relief, the Court will need to develop a factual record for the *en banc* court of appeals. *Bread Political Action Comm. v. FEC*, 455 U.S. 577, 580 (1982). *See Khachaturian v. FEC*, 980 F.2d 330 (5th Cir. 1992) (*en banc*) (remanding to district court for further proceedings); *Buckley v. Valeo*, 519 F.2d 817, 818 (D.C. Cir. 1975) (*en banc*) (same). If the plaintiffs move for certification and identify the constitutional issues that they believe warrant *en banc* review, the Commission will respond appropriately at that time.

Memorandum of Law in Support of Motion for Preliminary Injunction ("Mem.") at 12.)

("[L]imits on contributions to groups that make independent expenditures are necessarily

restrictions on their expenditures.").  Plaintiffs confuse the difference between contribution and

expenditure limits, however, and numerous Supreme Court decisions dating back to *Buckley*

make clear that a lower level of scrutiny applies to contribution limits, including the one at issue

here.

The Supreme Court has explained that, unlike a "limitation upon expenditures for

political expression, a limitation upon the amount that any one person or group may contribute to

a candidate or political committee entails only a marginal restriction upon the contributor's

ability to engage in free communication."  *Buckley*, 424 U.S. at 20.

> A contribution serves as a general expression of support for the candidate and his
> views, but does not communicate the underlying basis for the support.  The
> quantity of communication by the contributor does not increase perceptibly with
> the size of the contribution, since the expression rests solely on the
> undifferentiated, symbolic act of contributing.  At most, the size of the
> contribution provides a very rough index of the intensity of the contributor's
> support for the candidate.  A limitation on the amount of money a person may
> give to a candidate or campaign organization thus involves little direct restraint on
> his political communication, for it permits the symbolic expression of support
> evidenced by a contribution but does not in any way infringe the contributor's
> freedom to discuss candidates and issues.  While contributions may result in
> political expression if spent by a candidate or an association to present views to
> the voters, the transformation of contributions into political debate involves
> speech by someone other than the contributor.

*Id.* at 21 (footnote omitted).  The Supreme Court has repeatedly reaffirmed this holding.  *See,*

*e.g., Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 386-88 (2000); *FEC v. Colorado*

*Republican Fed. Campaign Comm. ("Colorado II")*, 533 U.S. 431, 440-42, 456 (2001); *FEC v.*

*Beaumont*, 539 U.S. 146, 161-62 (2003); *McConnell v. FEC*, 540 U.S. 93, 135 (2003); *Randall v.*

*Sorrell*, 548 U.S. 230, __, 126 S.Ct. 2479, 2488, 2491 (2006) (plurality) (same).

Contribution limits leave contributors free to become members of associations and assist with their various efforts on behalf of candidates, and also "to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Buckley*, 424 U.S. at 28. Accordingly, *Buckley* held that even a contribution limit that involved a "significant interference with protected rights of political association may be sustained" if it is "closely drawn" to match "a sufficiently important interest." *Id*. at 25 (internal quotation marks omitted). Continuing through later cases such as *Shrink Missouri, Colorado II*, *Beaumont* and *McConnell,* the Court has consistently held that limits on contributions are subject to a lower level of scrutiny than limits on expenditures. *Shrink Missouri*, 528 U.S. at 387 ("It has . . . been plain ever since *Buckley* that contribution limits would more readily clear the hurdles before them."); *Colorado II*, 533 U.S. at 441 ("[W]e have routinely struck down limitations on independent expenditures …. while repeatedly upholding contribution limits.") (citations and footnote omitted).

The Act's limits on contributions to political committees do not limit SpeechNow's independent expenditures. SpeechNow remains free "to aggregate large sums of money to promote effective advocacy," *McConnell*, 540 U.S. at 136 (quoting *Buckley*, 424 U.S. at 22), and to spend without restriction on its express advocacy communications, *FEC v. Nat'l Conservative Political Action Comm.* ("*NCPAC*"), 470 U.S. 480, 494 (1985). In *NCPAC*, the Court distinguished the expenditure limit struck down in that case from the contribution limit that was upheld in *California Medical Ass'n v. FEC* ("*Cal Med*"), 435 U.S. 182 (1981):

> [N]othing in the statutory provision in question [in *Cal Med*] limit[ed] the amount an unincorporated association or any of its members may independently expend in order to advocate political views, but only the amount it may contribute to a multicandidate political committee. Unlike *California Medical Assn.,* [the provision at issue in *NCPAC*] involve[s] limitations on expenditures by PACs, not on the contributions they receive . . . .

470 U.S. at 494-95 (brackets, citation, and quotation marks omitted).

The Supreme Court has repeatedly rejected the kind of argument plaintiffs make here, *i.e.,* that a contribution limit should be scrutinized as an expenditure limit because it may reduce the total funds an organization has available to spend.  In *Buckley*, the Court explained that the "overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would [have] otherwise contribute[d] amounts greater than the statutory limits to expend such funds on direct political expression."  424 U.S. at 21-22.  More recently, in *McConnell* the Court addressed the Act's new prohibitions on national political parties' receiving or spending nonfederal money (and its limits on state party committees' spending nonfederal money on certain federal election activity).  *See, e.g.*, 2 U.S.C. § 441i(a)(1) (enacted in 2002) ("national committee of a political party . . . may not solicit [or] receive . . . a contribution . . . *or spend* any funds, that are not subject to the limitations . . . of this Act") (emphasis added).  Although these new provisions had the effect of prohibiting the use of nonfederal money to pay for certain activity, the Court analyzed these provisions solely as contribution limits.  The Court observed that "neither provision in any way limits the total amount of money parties can spend.  Rather, they simply limit the source and individual amount of donations."  540 U.S. at 139 (citation omitted).

In particular, the Court clarified that the level of scrutiny must be determined by whether the provision creates any burden on speech that would be greater than a simple, direct limit on contributions:

> The relevant inquiry is whether the mechanism adopted to implement the contribution limit, or to prevent circumvention of that limit, burdens speech in a

> way that a direct restriction on the contribution itself would not. That is not the
> case here.

*Id*. at 138-39. In this case, plaintiffs have challenged "direct restriction[s] on the contribution[s]"

to political committees that include no other "mechanism . . . to implement the contribution

limit." *Id.* The "relevant inquiry" in determining the level of scrutiny therefore begins and ends

here, because plaintiffs challenge only direct contribution limits that have been part of FECA for

more than 30 years.

Plaintiffs' reliance (Mem. at 18, 22 and 26) on two unpublished decisions from the

Northern District of California is misplaced. To the extent the decisions in *OAKPAC v. City of

Oakland*, No. 06-6366, 2006 Lexis 96900 (N.D. Cal. Oct. 19, 2006), and *Committee on Jobs

Candidate Advocacy Fund v. Herrera*, No. 07-03199, 2007 WL 2790351 (N.D. Cal. Sept. 20,

2007), treat contribution limits as expenditure limits because the former "act" as limits on

expenditures, *see Herrera*, 2007 WL 2790351, at * 3, they are wrongly decided under the

reasoning and holdings of *Buckley* and *McConnell*. Moreover, to the extent these decisions, and

the Ninth Circuit decision in *Lincoln Club of Orange County v. City of Irvine*, 292 F.3d 934 (9th

Cir. 2002), upon which they rely, involve ordinances that *directly* restrict independent

expenditures, they are inapplicable here. As the Ninth Circuit explained in *Lincoln Club*, the

Ordinance at issue there "does not merely restrict contributions. It also restricts expenditures by

barring an independent expenditure committee *from making any independent expenditures

whatsoever* if the source of the committee's money is membership dues that exceed the

Ordinance's prescribed maximum." *Id.* at 938 (emphasis added). *See also Herrera*, 2007 WL

2790351, at *3 (same). The FECA contains no such limitation on political committees'

independent expenditures, no matter how much money they raise or choose to spend.

12

Thus, plaintiffs' contention that strict scrutiny is applicable here has no basis in law, and their reliance on *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981), is also misplaced. That case, which involved a municipal restriction on contributions to a ballot measure committee, is clearly distinguishable from the long line of cases applying lesser scrutiny to contribution limitations involving candidate elections. In *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978), the Court explained that that the "risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." Indeed, the Court later quoted this very passage in *Citizens Against Rent Control* when it continued to rely on the distinction between limits involving candidate elections and those involving ballot measures. 454 U.S. at 298.

In sum, the direct contribution limits at issue here need only be closely drawn to match a sufficiently important interest, and the Court must apply this level of scrutiny when deciding whether plaintiffs are likely to prevail on the merits.

> **2.    The Supreme Court Has Made Clear That Limitations on Contributions to Political Committees that Purport to Make Only Independent Expenditures Are Constitutional**

It is undisputed that SpeechNow will meet all the requirements under federal law to qualify as a political committee within the meaning of FECA. It intends both to raise more than $1,000 in contributions (Compl. ¶¶ 32, 38) and make more than $1,000 in expenditures (Compl. ¶¶ 20 – 27, 41) this calendar year, and its major purpose is electing and defeating federal candidates (Compl. ¶¶ 7, 47). *See supra* sections I.B., II. When the Supreme Court narrowly construed the definition of political committees to such major purpose organizations, it explained that "[e]xpenditures of . . . 'political committees' so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related."

*Buckley*, 424 U.S. at 79.  SpeechNow thus falls "within the core area" Congress sought to address and contributions to it may constitutionally be limited, whether its expenditures are coordinated with candidates or not.

Drawing on *Buckley* and *Cal Med*, the Court in *McConnell* clearly explained that the First Amendment does not prohibit Congress from regulating contributions to political committees that make only independent expenditures.  In *Buckley*, the Court had upheld a $25,000 annual limitation on the total federal contributions an individual could make, whether those contributions were to candidates, political parties, or other political committees — without analyzing how those contributions might ultimately be spent.  424 U.S. at 38.  In *Cal Med*, the Court had upheld FECA's $5,000 limit on contributions to multicandidate political committees.  453 U.S. at 193-201.  When the Court in *McConnell* relied upon these and other decisions in upholding BCRA's limits on soft money, it explained how those cases have rejected a "crabbed view of corruption."  540 U.S. at 152.  In particular, it rejected the notion that only a "direct contribution to the candidate" can "threaten to create . . . a sense of obligation" from a candidate to a donor.  *Id.* at 144.  Rather, the Court explained that persons seeking influence with officeholders and candidates have shown a history of exploiting loopholes in the Act, and that indirect attempts to use money to gain influence can create actual corruption, or the appearance of corruption, that can justify congressional efforts to protect the integrity of the democratic process.  *See generally id.* at 143-154.

The Court further explained that federal officeholders "were well aware of the identities of the donors" who gave large contributions to political parties that could then use that money to help their candidates get elected.  *Id.* at 147.  That same awareness opened doors that gave large donors preferential access to officeholders.  As the Court explained, "[o]ur cases have firmly

established that Congress' legitimate interest extends beyond preventing simple cash-for-votes corruption to curing 'undue influence on an officeholder's judgment, and the appearance of such influence.'" *Id.* at 150 (quoting *Colorado II*, at 533 U.S. at 441). The Court then explicitly rejected the kind of argument that plaintiffs make here, and explained that its prior rulings in *Buckley* and *Cal Med* went beyond upholding contribution limits to political committees because those funds could in turn be used to make direct contributions to candidates:

> [W]e upheld [in *Buckley*] FECA's $25,000 limit on aggregate yearly contributions to candidates, *political committees,* and *party committees* out of recognition that FECA's $1,000 limit on candidate contributions would be meaningless if individuals could instead make huge contributions to the candidate's political party. Likewise, in *California Medical Assn. v. Federal Election Comm'n,* we upheld FECA's $5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates. Given FECA's definition of "contribution," the $5,000 and $25,000 limits restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also *the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures. If indeed the First Amendment prohibited Congress from regulating contributions to fund the latter, the otherwise-easy-to-remedy exploitation of parties as pass-throughs (e.g., a strict limit on donations that could be used to fund candidate contributions) would have provided insufficient justification for such overbroad legislation.*

*McConnell*, 540 U.S. at 152 n.48 (emphasis added in last two sentences) (quotation marks and internal citations omitted). Plaintiffs ignore this clear, dispositive reasoning from the Supreme Court even though this case indisputably involves such "noncoordinated expenditures" of "express advocacy."

As *McConnell* indicates, when the Court in *Cal Med* upheld FECA's limit on contributions to multicandidate political committees, it rejected the argument that Congress could only regulate contributions that would be used as "pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates." *McConnell*, 540 U.S. at 152 n.48. The

petitioner in *Cal Med* had argued that contributions earmarked for administrative support could not be regulated because such contributions lacked potential to corrupt the political process. 453 U.S. at 198 n.19. The Court, however, recognizing that because money was fungible and that contributions to the California Medical Association's political committee intended to pay for one type of expense could actually pay for anything, upheld the contribution limit without regard to the use to which a contribution would ultimately be put. *Id*. ("We . . . conclude that [the limit on contributions to a political committee] applies equally to all forms of contributions specified in [the Act]."). As *McConnell* further explained (540 U.S. at 152 n.48), if the Constitution precludes Congress from regulating contributions to political committees unless those funds are passed on as contributions to others, then the $5,000 limit on contributions to multicandidate political committees upheld in *Cal Med* would have been overbroad insofar as it regulated "not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage in express advocacy and numerous other noncoordinated expenditures." Thus, while explaining that the contribution limit upheld in *Cal Med* is not overbroad, the Court in *McConnell* rejected the argument plaintiffs make here.[3]

Plaintiffs rely heavily on Justice Blackmun's concurring opinion in *Cal Med*, in which he explained (453 U.S. at 203) his view that "a different result would follow if" the contribution limits at issue were applied to committees established to make only independent expenditures. As explained above, however, the *McConnell* decision rejects Justice Blackmun's view. In any event, Justice Blackmun's concurrence is dicta, because the entity at issue there made both

---

[3]     *Cf. FEC v. Malenick*, No. 02-1237, 2005 WL 588222 (D.D.C. Mar. 7, 2005) (explaining that *Cal Med* stands for the proposition that classifying funds as "contributions" under the Act is not a function of the subjective intent of the contributor as to how the money will be spent).

contributions and expenditures.  *See Cal Med*, 453 U.S. at 197 n.17 (plurality) (group of individuals making solely independent expenditures was a "hypothetical application of the Act" that the Court "need not consider."); *see also FEC v. Cal. Med. Ass'n*, 502 F. Supp. 196, 198 (N.D. Cal. 1980) (discussing federal contributions *and* expenditures made by California Medical Association's political committee).  The issue of contribution limits to political committees that make only independent expenditures was thus not directly before the Court.  Contrary to plaintiffs' argument (Mem. at 21), therefore, Justice Blackmun's concurrence cannot in any sense be considered "controlling":  the Court did not hold anything with respect to organizations that make only independent expenditures.  In any event, the actual holding of the majority in *Cal Med* — including Justice Blackmun — affirmed the constitutionality of limiting contributions to a political committee that *in part* spent funds on independent expenditures and administrative costs, and the majority upheld those limits even to the extent the contributions received would be used for something other than candidate contributions.[4]

Plaintiffs fail to address not only *McConnell*, but *MCFL*.  In that case the Court found that exempting a limited class of ideological nonprofit corporations — corporations that, *inter alia*, did not have candidate elections as their major purpose — from the Act's prohibition on corporate expenditures would not open the door to massive undisclosed political spending. Ideological corporations such as Massachusetts Citizens for Life, the Court explained, would still have to report their independent expenditures under 2 U.S.C. § 434(c).  479 U.S. at 262.  But the Court also indicated that a group could be classified as a political committee based solely on the

---

[4]     *See also McConnell v. FEC*, 251 F. Suppp. 2d 176, 766 (D.D.C. 2003) (Leon, J.) ("Restricting contributions to committees like the one at issue in *California Medical*, the Court maintained, is different than efforts to regulate groups expressing common political views.  In this sense, the nature of the organization — that it is established solely to benefit federal candidates — was enough to conclude that most, if not all, of its contributions and expenditures were for the purpose, and had the effect, of benefitting a federal candidate.") (citation omitted).

magnitude of its independent expenditures.  Most important, the Court stated that a group that

became a political committee by making extensive independent expenditures would have to

abide by the "restrictions applicable to those groups" — restrictions which include the

contribution limits challenged by plaintiffs here.  *Id.*

> [S]hould MCFL's independent spending become so extensive that the
> organization's major purpose may be regarded as campaign activity, the
> corporation would be classified as a political committee.  As such, *it would
> automatically be subject to the obligations and restrictions applicable to those
> groups* whose primary objective is to influence political campaigns.

*Id.* (emphasis added) (citation omitted).[5]  SpeechNow's "extensive," indeed exclusive, focus on

independent expenditures makes clear that it is a political committee that must obey the

restrictions on such organizations.  Plaintiffs have made no effort to address *McConnell* or

*MCFL*, and they are unlikely to succeed on the merits of their constitutional challenge.

> **3.     As Applied to SpeechNow, the Act's Limit on Contributions to
> Political Committees is Closely Drawn to Match Sufficiently
> Important Governmental Interests**

> **a.     Corruption and the Appearance of Corruption**

The Supreme Court "has long recognized the governmental interest in preventing

corruption and the appearance of corruption in election campaigns."  *FEC v. Wisconsin Right to

Life, Inc. ("WRTL")*, 127 S. Ct. 2652, 2672 (2007) (quoting *Buckley,* 424 U.S. at 45) (Roberts,

C.J.).  Plaintiffs assert (Mem. at 19) that only direct contributions to candidates have a potential

to create corruption or its appearance.  As explained *supra* pp. 13-15, however, the Supreme

Court has rejected that "crabbed view of corruption," *McConnell*, 540 U.S. at 203, and has

---

[5]     Justice O'Connor's reasons for concurring separately did not relate to this portion of the
Court's rationale.  479 U.S. at 265-66.

recognized that contributions for independent expenditures have the potential to corrupt or create the appearance of corruption.

Although the Supreme Court has held that the interest in avoiding corruption is inadequate under strict scrutiny to justify direct spending limits on independent expenditures by persons other than corporations or labor unions, the Court has never held that independent expenditures by other persons pose no risk of corruption. Rather, in *Buckley* the Court explained that the "independent advocacy restricted by the provision does not presently appear to pose dangers of real or apparent corruption *comparable* to those identified with large campaign contributions." 424 U.S. at 46 (emphasis added).[6] In analyzing FECA's earlier expenditure cap that applied to all persons, the Court in fact "assume[d], arguendo, that large independent expenditures pose the same dangers of actual or apparent *quid pro quo* arrangements as do large contributions." *Id.* at 45. The Court struck down the expenditure limit, but its holding rested not only on the independence of the speech, but also on the fact that the $1,000 ceiling on expenditures "heavily burden[ed] core First Amendment expression," *id.* at 48, and on the likely ineffectiveness of the particular provision at issue in preventing circumvention of the contribution limits, *id.* at 45.[7]

---

[6]    *See also McConnell*, 251 F. Supp. 2d at 624-25 (D.D.C. 2003) ("The Court in *Buckley* wrote that the threat of independent expenditures made by individuals did not 'presently appear' to pose a danger of possible corruption. Therefore, *Buckley* explicitly left open the possibility that a time might come when a record would indicate that independent expenditures made by individuals to support candidates would raise an appearance of corruption.") (Kollar-Kotelly, J.)

[7]    To avoid vagueness problems, the Court had construed the independent expenditure limit narrowly to apply only to "expenditures . . . that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S. at 44. Having thus limited the reach of the limit on independent expenditures, the Court then concluded that its own interpretation "thus undermine[d] the limitation's effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or office-holder." *Id.* at 45.

A contribution limit, on the other hand, "entails only a marginal restriction" upon the contributor's speech. *Id.* at 20; *see supra* section IV.A.1. The *Buckley* Court found that the absence of coordination only lessens or "*alleviates* the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." 424 U.S. at 47 (emphasis added). In *Colorado Republican Federal Campaign Committee v. FEC* ("*Colorado I*"), the Court reiterated that "'the absence of prearrangement and coordination' does not eliminate, but it does help to 'alleviate,' any 'danger' that a candidate will understand the expenditure as an effort to obtain a '*quid pro quo*.'" 518 U.S. 604, 616 (1996) (quoting *NCPAC*, 470 U.S. at 498). As Chief Justice Roberts explained just last term in the controlling opinion in *WRTL*, *Buckley* "suggested that this [anti-corruption] interest might also justify limits on electioneering *expenditures* because it may be that, in some circumstances, 'large independent expenditures pose the same dangers of actual or apparent quid pro quo arrangements as do large contributions.'" *WRTL*, 127 S.Ct. at 2672 (quoting *Buckley* at 45) (emphasis in original).[8]

In *Colorado I*, the Court observed not only that independent expenditures can corrupt, but that Congress can properly address such risks through contribution limits to entities that make such expenditures (in that case, a political party committee):

> A party may not simply channel unlimited amounts of even undesignated contributions to a candidate, since such direct transfers are also considered contributions and are subject to the contribution limits on a "multicandidate political committee." *The greatest danger of corruption, therefore, appears to be from the ability of donors to give sums up to $20,000 to a party which may be*

---

[8]     *See also McConnell*, 251 F. Supp. 2d at 765 (Leon, J.) ("Supreme Court precedent . . . intimates that donations closely connected to a candidate's campaign — even if they are not direct contributions or coordinated expenditures — raise, at a minimum, the specter of corruption."); *id.* at 767 ("Reading *Colorado I* together with *Buckley*, *Bellotti*, *Citizens Against Rent Control*, and *California Medical* leaves one with a clear impression:  donations used directly for the purpose of uncoordinated federal activity, like express advocacy, can engender corruption, or the appearance thereof, and are therefore regulable.").

> *used for independent party expenditures for the benefit of a particular candidate.*
> We could understand how Congress, were it to conclude that the potential for
> evasion of the individual contribution limits was a serious matter, might decide to
> change the statute's limitations on contributions to political parties.

518 U.S. at 616-17 (emphasis added) (internal citations omitted).  The result that plaintiffs seek

would create exactly that danger, only worse:  *unlimited* sums could be contributed to

SpeechNow which could then use those funds for the benefit of particular candidates.

        The record in the *McConnell* litigation further established the danger of corruption and its

appearance from independent expenditures.  *McConnell* involved so-called "issue advocacy,"

which, unlike the ads that SpeechNow plans to broadcast, does not include express words of

candidate advocacy.  Nevertheless, the record compiled there demonstrated that candidates know

and feel indebted to those who made such expenditures to help elect them.  The Supreme Court

explained that "[w]hile the public may not have been fully informed about the sponsorship of so-

called issue ads, the record indicates that candidate and officeholders often were."  *McConnell*,

540 U.S. at 128-29.  In the court below, Judge Kollar-Kotelly had found not only "that Members

of Congress and federal candidates are very aware of who ran advertisements on their behalf,"

but also that such members and candidates "feel indebted to those who spend money to help

them get elected. . . .  In fact, Members will also be favorably disposed to those who finance

these groups when they later seek access to discuss pending legislation."  *McConnell*, 251 F.

Supp. 2d at 556 (Kollar-Kotelly, J.).

        Having made significant expenditures to elect or defeat particular candidates,

organizations that paid for such expenditures, or their members, often informed the officeholder

that benefited of the outlay, either directly or otherwise.  *Id.* ("[I]nterest groups can be the ones

who apprise politicians of the advertisements that they run on their behalf."); *id*. at 557 ("Groups

aggressively push to be recognized for the role they played in helping a candidate get elected to

office.").[9]  As one lobbyist testified in *McConnell*, "'unregulated expenditures — whether soft money donations to the parties or issue ad campaigns — can generate far more influence than direct campaign contributions.'"  *Id.* at 556.

The Supreme Court has rejected a "crabbed view of corruption" that "ignores precedent, common sense, and the realities of political fundraising exposed by the record . . . ."  *McConnell*, 540 U.S. at 152; *see also supra* section IV.A.2.  Jon Coupal, a SpeechNow organizer and initial member, has himself contended that a form of *quid pro quo* corruption has occurred as a result of independent expenditures.  He alleged that there was a corrupt relationship between Los Angeles city officeholders and municipal employee unions, writing:

> Local politicians and the public sector have formed an alliance that benefits both. The city is such an excellent provider that it is regarded as "the land of milk and honey" to those seeking public employment. In turn, public employee unions and city workers provide millions of dollars worth of campaign support to their favored candidates in each election cycle — often through independent expenditures to get around the city's campaign contribution limits.

Jon Coupal, *Los Angeles the Trendsetter*, Howard Jarvis Taxpayer Ass'n Cal. Commentary, Vol. I, Issue 14, at 1-2 (May 5, 2003), *available at* http://hjta.webcommanders.com/HJTACommentary014.pdf (Sadio Decl. Exh I).

Were plaintiffs to prevail in their constitutional claim and free "major purpose" groups from contribution limits, donors could contribute millions of dollars in an election year for express candidate advocacy and gain unprecedented influence over candidates and elected officials.  It is easy to imagine, for example, the proliferation of independent expenditure political committees devoted to supporting or opposing a single federal candidate or officeholder

---

[9]    Although plaintiffs contend that SpeechNow will operate "wholly independently" of candidates, Mem. at 3, it is unclear from its by-laws whether its donors may inform candidates of the group's efforts after expenditures are made, or of generally publicizing them.  (Keating Decl. Exh. E, Art. X § 7.)

and funded entirely by very large contributions.[10]  This type of corruption and its appearance are precisely why the Supreme Court has indicated that contributions can be limited to groups making independent expenditures.

### b. Distorting Effects of Immense Aggregations of Wealth

The $5,000 limit on contributions to political committees is substantially related to an additional government interest.  The Supreme Court has recognized that a "different type of corruption in the political arena," *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 660 (1990), can justify restrictions on independent expenditures by entities that take advantage of unique state-created benefits to amass large political war chests.  Applying strict scrutiny to an expenditure limit, the Court in *Austin* upheld Michigan's restriction on independent expenditures by corporations.  The Court explained that among the compelling interests supporting the prohibition was avoiding the "corrosive and distorting effects of immense aggregations of wealth" accumulated with the help of special advantages bestowed by the state, such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets. *Id*. at 658-60.

The government's compelling interest in avoiding the corrosive and distorting effects of immense aggregations of wealth on elections applies to for-profit business corporations and not-for-profit advocacy corporations alike.  In *Austin* itself, the Court upheld an independent expenditure restriction as applied to a nonprofit corporation.  *Id*. at 661-65.  And in *FEC v.*

---

[10]    *See also* Edward B. Foley, *The "Major Purpose" Test:  Distinguishing Between Election-Focused and Issue-Focused Groups*, 31 N. Ky. L. Rev. 341, 346 (2004) ("[W]hen a political committee is focused on electing one particular candidate (or defeating that candidate's opponent), a large-dollar gift to that political committee is almost as good as a large-dollar gift to the candidate's own campaign would be as a means to secure improper favoritism from that candidate once in office.").

*Beaumont*, 539 U.S. 146, 159-60 (2003), the Court noted specifically that the "different type" of corruption that justified the prohibition in *Austin* applied in full to nonprofit corporations.[11]  The Court observed that nonprofit corporations could also aggregate significant wealth through state-conferred advantages, including limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets, to the same detrimental effect (539 U.S. at 159-60):

> [C]oncern about the corrupting potential underlying the corporate ban may indeed be implicated by advocacy corporations.  They, like their for-profit counterparts, benefit from significant state-created advantages, and may well be able to amass substantial political war chests.  Not all corporations that qualify for favorable tax treatment under § 501(c)(4) of the Internal Revenue Code lack substantial resources, and the category covers some of the Nation's most politically powerful organizations, including the AARP, the National Rifle Association, and the Sierra Club.

The government's interest in combating the corrosive and distorting effects of substantial aggregations of wealth on elections applies here as well.  SpeechNow has the advantage of government-created benefits under the District of Columbia Uniform Unincorporated Nonprofit Associations Act.  (Comp. ¶ 7.)  Like a corporation, SpeechNow is a separate legal entity from its members, and unlike the individuals who join SpeechNow, the organization enjoys limited liability under DC law.  Thus, SpeechNow's members are not liable in tort or contract, merely because of their membership status, for the association's acts or omissions.  D.C. Code § 29-971.06.  For example, a SpeechNow member, even though he or she might fund the entirety of one of the association's ad campaigns, might not be held liable if the ad campaign were

---

[11]    *Beaumont* specifically concerned "*MCFL* corporations," a small class of nonprofit ideological corporations described in *MCFL* that cannot constitutionally be limited in their independent expenditures.  In *Beaumont*, the Court applied intermediate scrutiny and upheld the FECA's corporate contribution prohibition, 2 U.S.C. § 441b, as applied to *MCFL* corporations.

libelous.  Nor could that member be liable if SpeechNow were to breach an advertising contract.[12]

Moreover, as a section 527 organization, SpeechNow enjoys favorable treatment in the accumulation and distribution of its assets.  Unlike individuals, SpeechNow will not have to pay any income or gift taxes on its receipts:  Section 527 of the Internal Revenue Code shields from federal taxation funds raised and spent by "political organizations" for "influencing or attempting to influence" the nomination or election of federal officials received.  26 U.S.C. § 527(c),(e)(2), § 2501(a).  "Political Organizations" include unincorporated associations organized and operated primarily for the purpose of accepting contributions or making expenditures for advocacy related to candidate elections.  26 U.S.C. § 527(e)(2).  Thus, unincorporated 527 organizations, like SpeechNow, are generally not taxed on any amounts received, segregated, and used to influence a federal election.[13]  SpeechNow thus benefits from favorable tax treatment in a way that an individual making independent expenditures would not.

Armed with such legal and tax advantages, organizations like SpeechNow could, like nonprofit corporations, amass significant political war chests.  Indeed, plaintiffs themselves allege that one of the reasons they wish to operate as an unincorporated association is to amplify the voices of SpeechNow's members "beyond what any individual could achieve on his own." (Compl. ¶ 14.)  "[P]olitical war chests may be amassed simply from the members' contributions."  *Beaumont*, 530 U.S. at 160 n.6 (internal quotation marks omitted).  The

---

[12]    An unincorporated District of Columbia association such as SpeechNow is also, much like a D.C. non-profit corporation, a separate legal entity that can acquire, hold, and transfer real or personal property in its own name.  *Compare* D.C. Code § 29-971.04-05 (unincorporated associations) *with* D.C. Code § 29-301.05(4)-(5) (nonprofit corporations).

[13]    As a section 527 organization, SpeechNow generally must make some disclosures regarding its donors in reports to the Internal Revenue Service, but it has the option of paying taxes and not making such disclosures.  *See infra* n.17.

government interest in preventing a corrosive and distorting effect on the political marketplace is sufficiently important under the less rigorous level of scrutiny applied to contribution limits to uphold the Act's limits on contributions to political committees like SpeechNow.

### c.    Unlimited Contributions Would Undercut the Act's Disclaimer Requirements

Under plaintiffs' view of the law, SpeechNow should not be required to reveal the donors behind its expenditures in the disclaimers required in its express advocacy communications, even though the Supreme Court has held that the Act's disclosure provisions serve important governmental interests. *See infra* section III.C. The Act requires that these communications include informational disclaimers: stating who is making the independent expenditure, providing contact information, and stating whether the communication was authorized by any candidate. *See supra* section II.D.2. Disclaimers on independent expenditures by political committees need not include information regarding who contributed to the political committee. When a political committee pays to broadcast expensive independent expenditures, however, no one person could have contributed more than $5,000 annually to help pay for the ad. In contrast, if SpeechNow prevails here, individuals would be able to donate unlimited funds to pay for independent expenditures, but SpeechNow's disclaimers would still only name the organization as the person responsible for the ad. Although candidates and officeholders whose elections were influenced would likely know the identity of the big donors behind SpeechNow's ads, *see supra* section II.D, the public would not receive this information contemporaneously.[14] In *McConnell*, for

---

[14]    Although the identity of individuals who paid for the ads through SpeechNow may eventually be disclosed in SpeechNow's independent expenditure reports, Congress and the Supreme Court have recognized the public's interest in learning who is responsible for election ads at the moment they are aired. *See supra* pp.6-7; *McConnell* 540 U.S. at 231 (upholding the application of disclaimer requirements to electioneering communications and explaining that

example, the Supreme Court found that "Republicans for Clean Air, which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals — brothers who together spent $25 million on ads supporting their favored candidate." 540 U.S. at 128. However, if individuals cannot hide behind the façade of an independent expenditure organization but instead pay for such communications themselves, the disclaimers will then directly reveal the true source of the communications' funding. Thus, by accepting unlimited contributions and acting as a conduit, SpeechNow would deprive the public of accurate disclaimers that help prevent corruption.

For example, although plaintiff Fred Young could provide all the funding for SpeechNow's planned ad campaign targeting Representative Dan Burton (Compl. ¶ 22), the ad itself would only indicate that "SpeechNow is responsible for the content of this advertising." More generally, through independent membership associations, wealthy donors could target specific candidates for election or defeat while hiding behind "dubious and misleading names" like "The Coalition – Americans Working for Real Change," "Citizens for Better Medicare," and "Republicans for Clean Air." *See McConnell*, 540 U.S. at 197 (quoting *McConnell*, 251 F. Supp. 2d at 237 (D.D.C.)). The Act's limits on contributions to political committees like SpeechNow helps prevent this kind of evasion of the disclaimer requirements.

### B. The Act's Biennial Aggregate Contribution Limits are Closely Drawn to Match Sufficiently Important Governmental Interests As Applied

In *Buckley*, the Supreme Court upheld the Act's limit on total individual contributions to $25,000 each calendar year, even though this limit restricts the number of candidates and committees with which an individual may associate. *Id*. at 38. The Court found that this

---

doing so bore "a sufficient relationship to the important governmental interest of 'shed[ding] the light of publicity' on campaign financing.") (quoting *Buckley*, 424 U.S. at 81).

aggregate contribution limit was a "modest restraint" and a mere "corollary" of the individual contribution limit that was closely drawn to match sufficiently important interests. *Id.* The aggregate limit "serve[s] to prevent evasion of the [candidate] contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate." *Id.* The aggregate contribution limits have since been increased and indexed to inflation so that individuals may make up to $42,700 in contributions to candidates and up to $65,500 in contributions to other political committees. 2 U.S.C. § 441a(a)(3),(c); Contribution Limits 2007-08, http://www.fec.gov/pages/brochures/contriblimits.shtml (visited Mar. 4, 2008) (Sadio Decl. Exh. A)

*Buckley* and subsequent cases have affirmed the constitutionality of the Act's contribution limits to candidates, *id.* at 23-35, political committees, *Cal Med,* 453 U.S. at 182, and political party committees*, McConnell*, 540 U.S. at 142-89. The biennial aggregate contribution limit remains a constitutional corollary of those limits. The fact that SpeechNow will not make contributions to candidates is of no moment because, as we have explained *supra* section IV.A.2, contribution limits to political committees that only make independent expenditures are also constitutional.

      **C.**     **The Act's Reporting Requirements For Political Committees are Substantially Related to an Important Government Interest**

As a political committee, SpeechNow will be required to periodically report all of its receipts and disbursements to or from a person that are in excess of $200 in a calendar year. *See* 2 U.S.C. §§ 433-34. The Supreme Court upheld these reporting requirements in *Buckley*. 424 U.S. at 66-68. The Court analyzed the reporting requirements under "exacting scrutiny," which requires that the compelled disclosure bear a "substantial relation" to an important government

interest. *Buckley*, 424 U.S. at 64, 66, 75. "Exacting scrutiny," as courts apply it to disclosure statutes, is identical to the constitutional standard more commonly known as intermediate scrutiny. *See Adarand Constr., Inc. v. Pena*, 515 U.S. 200, 220 (1995) (noting that intermediate scrutiny standard requires statute to be "substantially related to the achievement of an important governmental objective").

Applying this intermediate level of scrutiny, the Supreme Court found that the Act's reporting requirements vindicate important government interests: (1) "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office," (2) "deter[ring] actual corruption and avoid[ing] the appearance of corruption by exposing large contributions and expenditures to the light of publicity," and (3) providing the "essential means of gathering the data necessary to detect violations of the contribution limitations." *Buckley*, 424 U.S. at 66-68 (internal quotation marks and footnote omitted); *see also McConnell*, 540 U.S. at 121 ("We upheld [in *Buckley*] all of the disclosure and reporting requirements in the Act . . ."). The disclosure protects the "'First Amendment interests of individual citizens seeking to make informed choices in the political marketplace.'" *Id.* at 197 (quoting *McConnell*, 251 F. Supp. 2d at 237).

If SpeechNow prevails here, the public will be provided with significantly less information about its contributors and its spending. Political committees must report all their receipts and disbursements to or from a person in excess of $200 in a year. *See* 2 U.S.C. §§ 433-34. Plaintiffs contend that none of SpeechNow's expenditures other than its noncoordinated expenditures for express candidate advocacy should be reported. The only contributors that SpeechNow would need to identify would be, for each independent expenditure, each person

who made a contribution in excess of $200 "for the purpose of furthering the reported independent expenditure." *See supra* section II.D.  Thus, SpeechNow would not be required by FECA to identify those who funded a significant fraction of the organization's disbursements, including administrative expenses and overhead.[15]  If a single wealthy individual could pay for all of these expenses, this person would be in a position to exert significant control over the organization, choose its anointed candidates, and gain significant influence over candidates — all without sufficient disclosure to the public.  *Cf. Cal Med*, 453 U.S. at 198 n.19.  Plaintiffs have not even assured the Court that they would report receipts and disbursements for various election-related expenses such as opposition research on candidates and polling done to test different potential campaign messages.  Of the over $1 billion that political committees — not including candidate campaigns and political parties — spent last election cycle, approximately half was spent on independent expenditures and direct contributions to candidates, political parties and other political committees.[16]  Thus approximately *$500 million* of the spending by the approximately 5000 major-purpose entities was spent on other costs.  As the Supreme Court

---

[15]     In addition, if it were exempt from the political committee disclosure requirements, SpeechNow would be required to include a disclaimer only on its public communications that contain express advocacy or solicit contributions.  Political committees, on the other hand, must include disclaimers on all their public communications.  *See* 11 C.F.R. § 110.11(a)(1),(2); *supra* sections III.C., III.D.

[16]     *See generally* Summary of PAC Activity 1990-2006, http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf (last visited Mar. 2, 2008) (5,091 committees disbursed approximately $1.055 billion, including $372 million in contributions to candidates) (Sadio Decl. Exh. B);  2005-2006 Summary of PAC Independent Expenditures, http://www.fec.gov/press/press2007/20071009pac/indepexp2006.pdf (last visited Mar. 2, 2008) (independent expenditures of approximately $38 million) (Sadio Decl. Exh. C) National Party Financial Activity Through the End of the Election Cycle, http://www.fec.gov/press/press2007/partyfinal2006/demfederalye06.pdf (visited Mar. 5, 2008) (receipts of Democratic political party committees) (Sadio Decl. Exh. D); National Party Federal Financial Activity Through the End of the Election Cycle, http://www.fec.gov/press/press2007/partyfinal2006/repfederalye06.pdf (visited Mar. 5, 2008) (receipts of Republican political party committees) (Sadio Decl. Exh. E).

has explained, *Buckley*, 424 U.S. at 79, expenditures of major purpose organizations, are "by definition, campaign related." Under its theory of the case, SpeechNow and organizations like it would thus no longer have to report to the Commission a wealth of information that the Court has deemed to be "campaign related."[17]

Congress can constitutionally require organizations like SpeechNow to disclose more than the reporting required for independent expenditures in order to vindicate the important government interest in the "free functioning of our national institutions" identified in *Buckley*. 424 U.S. at 66 (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961)). Large swaths of information helpful to voters attempting to make informed political choices will be lost if SpeechNow and groups like it no longer have to report as federal political committees.

## V.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE INJURY

Plaintiffs fail to meet their burden of demonstrating that they will suffer irreparable harm without the requested temporary relief, the second factor the Court must consider. To obtain a preliminary injunction, "[a] litigant must do more than merely *allege* the violation of First Amendment rights" because "the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant." *Wagner v. Taylor*, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987) (quotation omitted); *see also NTEU v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991).

Instead, "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will

---

[17]    As a section 527 organization, SpeechNow generally must make some disclosures to the Internal Revenue Service regarding its donors and expenses, but it has the option of paying taxes on donations in lieu of disclosure. *See Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1360 (11th Cir. 2003).

prevent the feared deprivation of free speech rights." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003)).  This requirement sets a "high standard for irreparable injury." *Id.* at 297.  The "injury must be both certain and great," and "actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Plaintiffs must also "show that [t]he injury complained of [is] of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (internal citation and quotation marks omitted). Further, the prospective injury must be "beyond remediation." *Chaplaincy*, 454 F.3d at 297.

### A.     Plaintiffs' Alleged Injuries Are Neither Actual Nor Certain

Plaintiffs fail to establish a constitutional burden resulting from the Act's requirements regarding political committees.  The facts demonstrate that plaintiffs have taken ample steps toward achieving their goals, despite their view of the Act; the facts do not demonstrate that plaintiffs will be constitutionally burdened if they abide by the Act's contribution limits.

Contrary to plaintiffs' conclusory factual assertion that the contribution limits "mak[e] it impossible for SpeechNow to function" (Mem. at 25), they have adopted articles of organization and bylaws, appointed an agent for service of process, registered with the District of Columbia, and filed a Notice of Section 527 status with the Internal Revenue Service.  (Keating Decl. Exhs. A-E.)  *See also* Sadio Decl. Exh. F (Notice of Business Tax Registration). In addition, plaintiffs have developed a working website, including a "sign-up page for people who are interested in supporting the organization's activities."  (Keating Decl. ¶ 4.)  Visitors who submit their names and addresses are encouraged to check a box indicating whether they would "consider making a donation to SpeechNow.org."  http://www.SpeechNow.org/supportpage (visited Feb. 22, 2008).  In addition, plaintiffs have developed proposed written solicitations for

contributions from the general public.  Sadio Decl. Exhs. G-H.  Finally, plaintiffs have prepared

scripts for advertisements they allege they wish to run in connection with elections in Indiana

and Louisiana this year.  (Keating Decl. Exh. F; Traz Decl. Exhs. B-C.)  Plaintiffs contend that

all these activities have occurred without its raising or spending more than the threshold $1,000

amount for political committee status or the $5,000 individual contribution limit.  (Keating

Decl. ¶ 31.)

Moreover, plaintiffs have provided no evidence that would explain why the effects of the

contribution limit create a unique and unconstitutional burden that would render the Supreme

Court's facial holding in *Buckley* inapposite as applied to them.  In any event, the Court has

explained that the "overall effect" of dollar limits on contributions is

> merely to require candidates and political committees to raise funds from a greater
> number of persons and to compel people who would otherwise contribute
> amounts greater than the statutory limits to expend such funds on direct political
> expression, rather than to reduce the total amount of money potentially available
> to promote political expression.

*Buckley*, 424 U.S. at 21.  *See also Montana Right To Life Ass'n. v. Eddleman*, 343 F.3d 1085,

1091 (9th Cir. 2003); *Jacobus v. Alaska*, 338 F.3d 1095, 1110 (9th Cir. 2003); *Daggett v. Comm'n*

*on Gov'tal Ethics and Election Practices*, 205 F.3d 445, 461 (1st Cir. 2000).

As noted above, SpeechNow's website already is soliciting the names and addresses of

potential contributors, and plaintiffs have prepared a draft solicitation letter to be sent to potential

contributors.  Plaintiffs have not explained why these potential donors could not help finance

SpeechNow's current or future advertisements, thus reducing SpeechNow's reliance on large

donors such as Mr. Young.  Assuming that SpeechNow's planned advertisements will cost

$120,000, the organization could finance these advertisements with contributions from as few as

24 individual contributors (assuming each contributor gives the maximum of $5,000).[18]

Alternatively, the political expression plaintiffs wish to make could be effected through the

second avenue identified in *Buckley,* 424 U.S. at 21: Mr. Young could spend his $110,000 "on

direct political expression" rather than "contribut[ing] amounts greater than the statutory limits."

For example, plaintiffs have alleged that they could produce and air advertisements in a single

media market (Indianapolis, Baton Rouge, or New Orleans) for less than $70,000. Thus,

Mr. Young, who allegedly is willing to contribute $110,000, could finance these or similar

advertisements himself.

Regarding the other potential donors, plaintiff Crane and non-plaintiff Richard Marder

reportedly would donate $6,000 and $5,500, respectively, if not for the $5,000 contribution limit.

(Mem. at 5.) But the relatively small amounts above the statutory threshold that they are

prepared to contribute are not of constitutional dimension — they are "distinctions in degree,"

not significant "differences in kind." *Buckley*, 424 U.S. at 30; *see also id.* ("a court has no

scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000") (citation and

quotation marks omitted). Similarly, plaintiffs allege that Scott Burkhardt and Brad Russo

would contribute $100 each. But these amounts are well below the $5,000 limit and may be

given freely even if SpeechNow registers and operates as a political committee; these individuals

face no obstacle whatsoever on their ability to make their desired contributions.

The gist of plaintiffs' allegations of harm, therefore, seems to be that the individual

plaintiffs other than Mr. Young are injured because they cannot pool their resources through

SpeechNow with *all $110,000* of Mr. Young's proposed contribution, which will provide

---

[18]    As discussed *supra* section IV.C., the recordkeeping and disclosure requirements that
apply once a major purpose organization accepts more than $1,000 in contributions or spends
more than $1,000 in expenditures do not impose an unconstitutional or irreparable harm.

approximately 90% of the funds to pay for plaintiffs' $120,000 ad campaign.  But under *Buckley*, it is clear that Congress can enact contribution limits, even if the indirect effect of those limits is to require these smaller donors to reach out to more like-minded individuals and for Mr. Young to spend his reservoir of cash on his own direct political expression.

Plaintiffs have affiliations with several prominent advocacy groups and have received, as a result of this litigation, publicity in a number of national newspapers.[19]  They are thus situated better in their "start-up" phase (Mem. at 20, 25) than many of the thousands of major-purpose entities that have managed to comply with the Act's contribution limits and reporting requirements for the last thirty plus years.  *See* Summary of PAC Activity 1990-2006, *supra* n.16.  There are additional individuals willing to contribute money to SpeechNow, (Keating Decl. ¶ 33), and it is plaintiffs' voluntary choice — rather than any prohibition in the Act — not to accept contributions in amounts up to $5,000 while they are pursuing this case.

Finally, in their argument concerning irreparable harm, plaintiffs rely (Mem. at 24) heavily on *Elrod v. Burns*, 427 U.S. 347 (1976), but that case does not support their position.  In that case the Supreme Court held that employee dismissal based on political party patronage was an unconstitutional infringement on employees' First Amendment rights.  *Id.* at 372.  But that holding rested on the specific finding that government employees had already been "threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge," and it was "clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought."  *Id.* at 373.  Here, however, plaintiffs have

---

[19]    *See supra* section I.B.; *Suit Aims To Ease Campaign Funding Limit*, The Washington Times  (Feb. 15, 2008); *Suit Could Unleash Surge Of Money In 2008 Presidential Race*, The New York Sun (Feb. 15, 2008); *On Message*, Los Angeles Times (Feb. 15, 2008); *Unfettered Speech, Now*, Washington Post  (Feb 16, 2008) (Sadio Decl. Exhs. J-M).  *See also FEC Recommendation Could End Up in Court*, USA Today (Jan. 22, 2008) (Sadio Decl. Exh. N)

not alleged any governmental action against it of any kind, let alone the kind of imminent or actual threats that were present in *Elrod*. The D.C. Circuit has clearly explained that *Elrod* did not eliminate a First Amendment plaintiff's burden to show that its interests are actually threatened or in fact being impaired. *NTEU*, 927 F.2d at 1254-55; *Wagner*, 836 F.2d at 576-77 n.76; *see also Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 919 F.2d 148, 149-150 (D.C. Cir. 1990) (rejecting preliminary injunction sought by Ku Klux Klan to require local government to issue parade permit for planned march longer than one for which it had received permit, finding *Elrod* not controlling on irreparable harm because shorter parade allowed in permit was not total denial of First Amendment rights); *Wisconsin Right to Life, Inc. v. FEC*, Civ. No. 04-1260, 2004 WL 3622736, at *4 (D.D.C. Aug. 17, 2004) (rejecting WRTL's reliance on *Elrod*).[20]

Because plaintiffs have made "no showing of irreparable injury, 'that alone is sufficient' for a district court to refuse to grant preliminary injunctive relief." *Hicks v. Bush*, 397 F. Supp. 2d 36, 40 (D.D.C. 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747); *see also Wisconsin Gas*, 758 F.2d at 674 ("[A]nalysis of [irreparable harm] disposes of these motions . . . ."). Since plaintiffs are unable to establish any such constitutional burden that is actual and certain, plaintiffs clearly fall short of meeting the "high standard" necessary for a preliminary injunction.

### B.    Plaintiffs Face No Imminent Injury

Plaintiffs also fail to establish that "[t]he injury complained of [is] of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Wisconsin Gas*, 758 F.2d at 674 (internal citation and quotation marks omitted). Indeed, plaintiffs have

---

[20]    *See also*, *e.g.*, *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) ("[A]ssertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits."); *Piscottano v. Murphy*, 317 F. Supp. 2d 97, 102 (D. Conn. 2004).

provided only a hypothetical sequence of events, which demonstrates that there is no "clear and present need for equitable relief." *Wisconsin Gas*, 758 F.2d at 674. Hypothetical injuries are "far too speculative to warrant preliminary injunctive relief." *Chaplaincy*, 454 F.3d at 298.

Plaintiffs' irreparable harm resulting from the alleged "civil and criminal liability" (Mem. at 10) depends upon the institution and completion of an investigation by the Commission or the Department of Justice.[21] Setting aside the fact that the Commission, the sole defendant here, has no criminal jurisdiction and that never in its history has it tried to enforce a prior restraint on anyone's speech, the harm plaintiffs fear is far from imminent. Congress carefully designed the Act's enforcement procedures "to ensure fairness . . . to respondents." *See Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996). As Congress presumably was aware, under the Act's elaborate enforcement procedures — which include multiple opportunities for a respondent to file briefs and permit only a court to impose a remedy on a respondent unwilling to agree to one — "complaints filed shortly before elections . . . might not be investigated and prosecuted until after the event." *Id.* at 559 (recounting statutory enforcement procedures). Accordingly, the likelihood that plaintiffs would suffer anything beyond an investigative proceeding during the life of a preliminary injunction is remote. *Wisconsin Right to Life, Inc. v. FEC*, No. 04-1260, 2006 WL 2666017, at *5 (D.D.C. Sept. 14, 2006) ("[A]n FEC administrative investigation . . . carries little threat of imminent or certain sanction."). Even if an administrative proceeding during that time then concluded with the institution of an enforcement suit against plaintiffs, they would then have a full opportunity to present their constitutional arguments *de novo* to a federal court before they could be subject to any penalties for their conduct. *See generally* 2 U.S.C.

---

[21]    The Commission has "exclusive jurisdiction with respect to the civil enforcement" of FECA, 2 U.S.C. § 437c(b)(1), and the Department of Justice has criminal jurisdiction, 28 U.S.C. § 516.

§ 437g(a)(4)-(6).  That distant eventuality is manifestly not imminent.  *Wisconsin Right to Life*,

2006 WL 2666017, at *5 ("It is clear that even if an administrative investigation is opened, the

investigation likely would not conclude until long after the . . . ad has been broadcast.").[22]

### C.    None of Plaintiffs' Alleged Harms Is Beyond Remediation

Finally, plaintiffs must demonstrate that their alleged injury is "beyond remediation."

*Chaplaincy*, 454 F.3d at 297, or "*irreparable*," *Wisconsin Gas*, 758 F.2d at 674.  As the D.C.

Circuit has explained, "[m]ere injuries, however substantial, in terms of money, time and energy

necessarily expended in the absence of a stay are not enough.  The possibility that adequate

compensatory or other corrective relief will be available at a later date, in the ordinary course of

litigation weighs heavily against a claim of irreparable harm."  *Chaplaincy*, 454 F.3d at 297-98.

None of plaintiffs' claimed harms is irreparable.  For example, the administrative burdens

on political committees that arise from complying with the disclosure requirements constitute

"[m]ere injuries" of "money, time and energy."  454 F.3d at 297.  In addition, having to respond

to an administrative enforcement proceeding is simply not irreparable harm.  As the Supreme

Court has explained:

> [The plaintiff] argues that the expense and disruption of defending itself in
> protracted adjudicatory proceedings constitutes irreparable harm.  As indicated
> above, we do not doubt that the burden of defending this proceeding will be
> substantial. . . .  As we recently reiterated: "Mere litigation expense, even
> substantial and unrecoupable cost, does not constitute irreparable injury."
> *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).

*FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *see also Sears Roebuck & Co. v.*

*NLRB*, 473 F.2d 91, 93 (D.C. Cir. 1972).  Thus, any burden associated with responding to a

---

[22]    Moreover, at the moment the Commission is functioning with only two sitting
Commissioners.  Because it takes four votes to institute an investigation, find probable cause to
believe the Act has been violated, and institute a civil enforcement action, 2 U.S.C. §§ 437c(c),
437g(a)(2),(4),(6), the votes necessary to begin and pursue the investigation SpeechNow
allegedly fears cannot be imminent.

possible future FEC enforcement proceeding cannot constitute irreparable harm warranting preliminary injunctive relief.

**D.    A Preliminary Injunction Temporarily Barring Enforcement Of The Act Could Not Prevent Plaintiffs' Alleged Harm**

At its core, plaintiffs' allegation of harm is that they are afraid to engage in their proposed activities because they fear being found liable for violating the Act. The emergency relief plaintiffs seek here, however, provides no real protection against that eventuality, and it would therefore not redress the subjective fear plaintiffs allege. As we explain below, because a preliminary injunction would not permanently immunize unlawful actions taken during the pendency of the preliminary relief, plaintiffs cannot "demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (citation and quotation marks omitted).

Even if this Court were to enter the preliminary injunction sought by plaintiffs, if in subsequent proceedings the provisions of the Act plaintiffs challenge were found by the D.C. Circuit or the Supreme Court to be constitutional — or if the preliminary injunction itself were reversed on appeal — plaintiffs could be subject to a civil enforcement action by the Commission under the retroactivity doctrine. *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 532 (1991); *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 97-98 (1993). Under that doctrine, if upon further review a court determines that a legislative enactment was in fact constitutional, it is applied as if it was always in effect. "[A]n opinion announcing a rule of federal law ... 'appl[ies] retroactively to the litigants then before the Court.'" *Harper*, 509 U.S. at 97-98 (quoting *Beam*, 501 U.S. at 539 (opinion of Souter, J.)).

Moreover, "when th[e] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all

cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Harper*, 509 U.S. at 97.  As Justice Scalia has put it, the decision of an Article III court announces the law "as though [it] were 'finding' it — discerning what the law is, rather than decreeing what it is … changed to, or what it will tomorrow be." *Beam*, 501 U.S. at 549 (Scalia, J., joined by Marshall, J., and Blackmun, J., concurring) (emphasis omitted).  Thus, in this case, if plaintiffs' constitutional challenge ultimately fails on the merits, entry of a preliminary injunction would not remove the prospect of a civil enforcement action by the Commission that plaintiffs allege will deter them from abiding by the rules applicable to political committees.

More specifically, because a preliminary injunction is by its very nature a temporary remedy meant to preserve the status quo, it does not create a permanent or appeal-proof blanket of immunity for actions taken during the period in which it is in effect.  "Neither the terms of the preliminary injunction nor prior equity practice provides any support for an interpretation of the District Court's order as a grant of total immunity from future prosecution.  More fundamentally, federal judges have no power to grant such blanket dispensation from the requirements of valid legislative enactments." *Edgar v. MITE Corp.*,  457 U.S. 624, 648-49 (1982) (Stevens, J. concurring).[23]  *See also Suster v. Marshall*, 149 F.3d 523, 527 (6th Cir. 1998) ("If this Court were to determine that the district court erred in issuing the preliminary injunction, then the legal interests and positions of Plaintiffs … would be compromised as they have received no assurances that grievances will not be pursued") (citing Justice Stevens' concurrence in *MITE*); *Donaldson v. United States Dep't of Labor*, 930 F.2d 339, 346 (4th Cir. 1991) (parties' action

---

[23]    Although Justice Stevens' concurrence was not joined by any other Justice, only Justices Marshall and Brennan, in dissent, expressed the view that the "injunction would have barred the Secretary from seeking either civil or criminal penalties for violations of the Act that occurred during [the] period" the preliminary injunction was in effect. *Id*. at 656.

during the period of the preliminary injunction "was taken under the manifest legal and practical risk that their underlying claim might ultimately fail on the merits, thereby exposing them to whatever remedy, other than the preventive one they had forestalled, might then be available") (footnote omitted).[24]

## V.    THE RELIEF REQUESTED BY PLAINTIFFS WOULD HARM THE COMMISSION AND UNDERCUT THE PUBLIC INTEREST

Permitting plaintiffs to evade the Act's requirements regarding contributions to political committees — including both the individual and aggregate contribution limits, and the requirements that political committees register with and report their receipts to the Commission — would hinder the public interest and substantially injure the Commission. To prevail on their application for a preliminary injunction, plaintiffs must establish precisely the opposite. *CityFed. Fin. Corp.*, 58 F.3d at 746. Because of the strong public and Commission interest in enforcement of the federal campaign finance laws, plaintiffs' proposed injunction would substantially injure other parties and would not further the public interest.

The statutory provisions challenged by plaintiffs have been on the books for more then thirty years. Indeed, the requirements for registration and reporting by political committees in 2 U.S.C. §§ 432, 433 and 434, and the definition of political committee in 2 U.S.C. § 431(4)

---

[24]    In addition, a preliminary injunction against enforcement by the Commission in this case would do nothing to prevent the Attorney General of the United States from exercising his independent authority to bring a criminal prosecution for knowing and willful violations of the Act. *United States v. Int'l Union of Operating Eng'rs, Local 701*, 638 F.2d 1161, 1163-68 (9th Cir. 1979); *United States v. Tonry*, 433 F.Supp. 620, 622 (E.D. La. 1977); *see* 2 U.S.C. § 437g(d) (criminal penalties for violating FECA); 2 U.S.C § 437c(b)(1) ("The Commission shall have exclusive jurisdiction with respect to the *civil enforcement* [of the Act.]") (emphasis added). Because plaintiffs have only sought a preliminary injunction restraining the Commission, and because neither the United States nor the Attorney General are parties before this Court, the injunction that plaintiffs seek would be ineffective in preventing law enforcement proceedings against them even during the limited time a preliminary injunction would be in effect.

were enacted by Congress in 1971.[25]  The individual contribution limits in 2 U.S.C.

§§ 441a(a)(1)(C) and 441a(a)(3)(B) and were enacted in 1974 and 1976.[26]  The Act's

contribution limits and registration and reporting provisions were generally upheld by the

Supreme Court in *Buckley* in 1976.

"The public has a strong interest in the enforcement of laws passed by Congress and

signed by the President." *Wisconsin Right to Life*, 2006 WL 2666017, at *5.  As explained

above, *see supra* at 8, there is a "presumption of constitutionality which attaches to every Act of

Congress," and that presumption is "an equity to be considered in favor of . . . [the government]

in balancing hardships." *Walters*, 468 U.S. at 1324.  As Chief Justice Rehnquist stated in the

similar context of a requested injunction pending appeal, "barring the enforcement of an Act of

Congress would be an extraordinary remedy." *Wisconsin Right to Life, Inc. v. FEC*, 542 U.S.

1306, 1306 (2004) (Rehnquist, C.J.) (citation omitted).

The public interest both in the limits on contributions to political committees and the

registration and reporting requirements for political committees, is abundantly clear.

As discussed *supra* section IV.A.2, the Supreme Court has already upheld the limit on

contributions to political committees, the aggregate annual ceiling on individual contributions to

candidates and political committees, and the registration and reporting requirements for political

committees.  A temporary lifting of the Act's contribution limits during the 2008 election, even

limited to SpeechNow, could easily undermine the public's confidence in the federal campaign

financing system.

---

[25]    Federal Election Campaign Act of 1971, Pub. L. No. 92-225, §§ 301-306, 86 Stat. 3, 11-16 (Feb. 7, 1972).

[26]    Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 101, 88 Stat. 1263 (Oct. 15, 1974); Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, Title I, § 112(2), 90 Stat. 475 (May 11, 1976).

In addition, relieving SpeechNow of its registration and reporting obligations would deprive the public of important information regarding who is financing advertisements that Congress mandated be disclosed.  While plaintiffs concede that they must file reports pursuant to 2 U.S.C. § 434(c) for each independent expenditure they make, those reports provide less information than the periodic reports filed by political committees.  *See supra* section II.B. Thus, the relief sought by plaintiffs would prevent the achievement of Congress's goals of "'shed[ding] the light of publicity' on campaign financing," *McConnell*, 540 U.S. at 231 (quoting *Buckley*, 424 U.S. at 81), and protecting the "'First Amendment interests of individual citizens seeking to make informed choices in the political marketplace,'" *id.* at 197 (quoting *McConnell*, 251 F. Supp. 2d at 237).

Granting plaintiffs' motion for preliminary injunction would also "substantially injure" the Commission and the public.  *CityFed Fin.*, 58 F.3d at 746.  As Justice Rehnquist explained, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers . . . injury."  *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).  The Commission and the public are similarly harmed when a court proscribes enforcement of a federal statute.  "[E]njoining the FEC from performing its statutory duty constitutes a substantial injury to the FEC."  *Wisconsin Right to Life*, 2006 WL 2666017, at *5; *see also Christian Civic League of Maine, Inc. v. FEC*, 433 F. Supp. 2d 81, 90 (D.D.C. 2006).

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court deny plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Thomasenia P. Duncan (D.C. Bar No. 424222)
General Counsel

David Kolker (D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

Robert W. Bonham III (D.C. Bar No. 397859)
Senior Attorney

/s/ Steve N. Hajjar
Steve N. Hajjar
Attorney

Esa L. Sferra
Attorney

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
Dated:  March 5, 2008                    (202) 694-1650

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
SPEECHNOW.ORG, et. al.,        )
                              )
              Plaintiffs,      )
                              )
       v.                      )        Civ. No. 08-248 (JR)
                              )
FEDERAL ELECTION COMMISSION,   )
                              )
              Defendant.       )
_____)


**DECLARATION OF
JAYCI A. SADIO**

Jayci A. Sadio hereby declares as follows:

1.     My name is Jayci A. Sadio.  I am a resident of Upper Marlboro, Maryland.  I am

over 21 years of age.

2.     I am a Paralegal Specialist employed in the Office of General Counsel at the

Federal Election Commission ("FEC" or "Commission").  Unless otherwise indicated, I make

this declaration based on my personal knowledge.  I make this declaration in support of the

Commission's opposition to plaintiffs' motion for a preliminary injunction in this litigation and,

if called as a witness, I could and would testify competently to the matters set forth herein.

3.     Attached as Exhibit A is a true and accurate copy of a table on the Commission's web

site, Contribution Limits 2007-2008, available at

http://www.fec.gov/pages/brochures/contriblimits.shtml.

4.     Attached as Exhibit B is a true and accurate copy of a table on the Commission's web

site, Summary of PAC Activity, 1990-2006, available at

http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.

5.      Attached as Exhibit C is a true and accurate copy of a table on the Commission's web site, Summary of PAC Independent Expenditures, 2005-2006, available at http://www.fec.gov/press/press2007/20071009pac/indepexp2006.pdf.

6.      Attached as Exhibit D is a true and accurate copy of a table on the Commission's web site, National Party Federal Financial Activity Through the End of the Election Cycle, available at http://www.fec.gov/press/press2007/partyfinal2006/demfederalye06.pdf.

7.      Attached as Exhibit E is a true and accurate copy of a table on the Commission's web site, National Party Federal Financial Activity Through the End of the Election Cycle, available at http://www.fec.gov/press/press2007/partyfinal2006/repfederalye06.pdf.

8.      Attached as Exhibit F is a true and accurate copy of the Notice of Business Tax Registration for SPEECHNOW.ORG, available at http://saos.nictusa.com/aodocs/959641.pdf (pages 76).

9.      Attached as Exhibit G is a true and accurate copy of a draft written solicitation submitted by counsel for SpeechNow.org to the Commission on November 27, 2007, available at http://saos.nictusa.com/aodocs/959641.pdf (pages 78-79).

10.     Attached as Exhibit H is a true and accurate copy of another draft written solicitation submitted by counsel for SpeechNow.org to the Commission on November 29, 2007, available at http://saos.nictusa.com/aodocs/960630.pdf (pages 2-4).

11.     Attached as Exhibit I is a true and accurate copy of a commentary by Jon Coupal, *Los Angeles, The Trendsetter,* Howard Jarvis Taxpayers Association California Commentary (week of May 5, 2003), available at http://hjta.webcommanders.com/HJTACommentary014.pdf.

12.    Attached as Exhibit J is a true and accurate copy of an article by Bradley A. Smith and Steve Simpson, *Unfettered Speech, Now*, in The Washington Post (Feb. 16, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/02/15/AR2008021502963_pf.html.

13.    Attached as Exhibit K is a true and accurate copy of an article by Jim McElhatton, *Suit Aims to Ease Campaign Fundraising Limits*, in The Washington Times (Feb. 15, 2008), available at http://www.washingtontimes.com/apps/pbcs.dll/article?AID=/20080215/NATION/451161542/1002&template=printart.

14.    Attached as Exhibit L is a true and accurate copy of an editorial entitled *On Message*, in the Los Angeles Times (Feb. 15, 2008), available at http://www.latimes.com/news/printedition/opinion/la-ed-speechnow15feb15,1,3704948,print.story?ctrack=5&cset=true.

15.    Attached as Exhibit M is a true and accurate copy of an article by Josh Gerstein, *Suit Could Unleash Surge of Money in 2008 Presidential Race*, in The New York Sun (Feb. 15, 2008), available at http://www.nysun.com/pf.php?id=71349&v=8841474021.

16.    Attached as Exhibit N is a true and accurate copy of an article by Jim Kuhnhenn, *FEC Recommendation Could End Up In Court*, USA Today (Jan. 22, 2008), available at http://usatoday.printthis.clickability.com/pt/cpt?action=cpt&title=FEC+recommendation+could+end+up+in+court+-+USATODAY.com&expire=&urlID=26508258&fb=Y&url=http%3A%2F%2Fwww.usatoday.com%2Fnews%2Fpolitics%2F2008-01-22-2192405311_x.htm&partnerID=1660.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct and that this declaration was executed at Washington, D.C. on the 5th day of March,

2007.

Jayci A. Sadio
Paralegal Specialist

# Sadio Declaration Exhibit A





# FEDERAL ELECTION COMMISSION

Skip Navigation

ABOUT THE FEC    PRESS OFFICE    QUICK ANSWERS    SEARCH    enter search here

HOME / COMPLIANCE HELP / BROCHURES / CONTRIBUTIONS / CONTRIBUTION LIMITS 2007-08

## Contribution Limits 2007-08

**Campaign Finance Reports and Data**

**Commission Meetings**

**Enforcement Matters**

**Help with Reporting and Compliance**

**Law & Regulations**



**Commission Calendar**

| | To each candidate or candidate committee per election | To national party committee per calendar year | To state, district & local party committee per calendar year | To any other political committee per calendar year[1] | Special Limits |
|---|---|---|---|---|---|
| Individual may give | $2,300* | $28,500* | $10,000 (combined limit) | $5,000 | $108,200* overall biennial limit: <br>• $42,700* to all candidates<br>• $65,500* to all PACs and parties[2] |
| National Party Committee may give | $5,000 | No limit | No limit | $5,000 | $39,900* to Senate candidate per campaign[3] |
| State, District & Local Party Committee | $5,000 (combined limit) | No limit | No limit | $5,000 (combined limit) | No limit |

| | | | | | |
|---|---|---|---|---|---|
| may give | | | | | |
| PAC (multicandidate) [4] may give | $5,000 | $15,000 | $5,000 (combined limit) | $5,000 | No limit |
| PAC (not multicandidate) may give | $2,300* | $28,500* | $10,000 (combined limit) | $5,000 | No limit |
| Authorized Campaign Committee may give | $2,000[5] | No limit | No limit | $5,000 | No limit |

\* These contribution limits are increased for inflation in odd-numbered years.

1 A contribution earmarked for a candidate through a political committee counts against the original contributor's limit for that candidate. In certain circumstances, the contribution may also count against the contributor's limit to the PAC. 11 CFR 110.6. See also 11 CFR 110.1 (h).

2 No more than $42,700 of this amount may be contributed to state and local party committees and PACs.

3 This limit is shared by the national committee and the Senate campaign committee.

4 A multicandidate committee is a political committee with more than 50 contributors which has been registered for at least 6 months and, with the exception of state party committees, has made contributions to 5 or more candidates for federal office. 11 CFR 100.5(e)(3).

5 A federal candidate's authorized committee(s) may contribute no more than $2,000 per election to another federal candidate's authorized committee(s). 2 U.S.C. 432(e)(3)(B).

**What's New     Library     FOIA     USA.gov     Privacy     Links     eFiling     Inspector General     ✉ Subscribe**

Federal Election Commission, 999 E Street, NW, Washington, DC 20463 (800) 424-9530 In Washington (202) 694-1000
For the hearing impaired, TTY (202) 219-3336 Send comments and suggestions about this site to the **web manager**.

Sadio Declaration
Exhibit B

**Summary of PAC Activity**
**1990-2006**

| Committee Type | No. of Cmte's | Total Receipts | Total Disbursements | Contributions to Candidates | Cash on Hand | Debts owed By |
|---|---|---|---|---|---|---|
| **Corporate** | | | | | | |
| 2005-2006 | 1,808 | $278,345,927 | $277,846,209 | $135,925,970 | $85,453,476 | $174,098 |
| 2003-2004 | 1,756 | $238,984,115 | $221,602,957 | $115,641,547 | $77,887,321 | $238,885 |
| 2001-2002 | 1,741 | $191,656,789 | $178,277,372 | $99,577,798 | $60,419,821 | $602,558 |
| 1999-2000 | 1,725 | $164,454,559 | $158,329,869 | $91,525,699 | $47,911,630 | $276,063 |
| 1997-98 | 1,821 | $144,115,389 | $137,570,423 | $78,018,750 | $41,087,447 | $573,964 |
| 1995-96 | 1,836 | $133,793,654 | $130,624,843 | $78,194,723 | $34,362,856 | $792,307 |
| 1993-94 | 1,875 | $114,995,661 | $116,814,143 | $69,610,433 | $31,182,618 | $233,601 |
| 1991-92 | 1,930 | $112,517,482 | $112,389,798 | $68,430,976 | $32,935,787 | $146,736 |
| 1989-90 | 1,972 | $106,474,773 | $101,055,267 | $58,131,722 | $32,863,915 | $124,988 |
| **Labor** | | | | | | |
| 2005-2006 | 312 | $218,185,504 | $197,386,182 | $55,815,069 | $79,880,417 | $4,253,743 |
| 2003-2004 | 328 | $191,651,043 | $182,949,736 | $52,103,572 | $60,642,326 | $3,202,361 |
| 2001-2002 | 337 | $167,820,067 | $157,972,836 | $53,897,795 | $53,357,427 | $135,603 |
| 1999-2000 | 350 | $136,011,151 | $128,692,390 | $51,573,364 | $43,648,139 | $138,558 |
| 1997-98 | 353 | $111,312,402 | $98,247,303 | $44,606,983 | $44,098,132 | $395,730 |
| 1995-96 | 358 | $104,059,450 | $99,768,350 | $47,980,492 | $28,993,830 | $1,119,229 |
| 1993-94 | 371 | $90,303,181 | $88,437,349 | $41,867,393 | $25,569,813 | $105,353 |
| 1991-92 | 372 | $89,935,941 | $94,604,526 | $41,357,222 | $23,759,915 | $250,603 |
| 1989-90 | 372 | $88,926,833 | $84,615,373 | $34,732,029 | $27,983,139 | $77,785 |
| **Non Connected** | | | | | | |
| 2005-2006 | 1,797 | $352,947,674 | $354,532,003 | $70,217,568 | $50,523,057 | $5,240,017 |
| 2003-2004 | 1,650 | $289,423,580 | $255,174,076 | $52,467,328 | $43,774,829 | $8,999,470 |
| 2001-2002 | 1,401 | $166,652,339 | $165,680,186 | $46,362,859 | $23,576,577 | $7,817,072 |
| 1999-2000 | 1,362 | $144,266,748 | $139,662,019 | $37,297,383 | $20,248,157 | $13,409,452 |
| 1997-98 | 1,326 | $114,321,557 | $107,775,031 | $28,154,544 | $17,223,500 | $9,805,704 |
| 1995-96 | 1,259 | $81,165,399 | $81,265,563 | $23,960,110 | $10,734,975 | $9,520,705 |
| 1993-94 | 1,318 | $76,860,606 | $75,060,494 | $18,201,369 | $12,704,604 | $10,017,850 |
| 1991-92 | 1,376 | $73,810,989 | $76,232,864 | $18,326,404 | $10,362,731 | $10,735,908 |
| 1989-90 | 1,321 | $71,569,940 | $71,382,835 | $15,070,009 | $11,638,505 | $9,979,974 |
| **Trade/Membership/Health** | | | | | | |
| 2005-2006 | 1,019 | $218,448,147 | $208,862,724 | $101,803,507 | $64,340,251 | $1,459,007 |
| 2003-2004 | 986 | $181,837,429 | $170,064,226 | $83,221,870 | $53,368,093 | $1,118,162 |
| 2001-2002 | 956 | $145,781,414 | $141,276,055 | $75,146,673 | $41,056,855 | $1,351,440 |
| 1999-2000 | 900 | $142,870,952 | $137,150,301 | $71,802,756 | $36,309,930 | $1,008,024 |
| 1997-98 | 921 | $119,576,494 | $114,365,202 | $62,322,845 | $30,968,879 | $1,531,525 |
| 1995-96 | 896 | $105,956,146 | $105,355,853 | $60,153,725 | $25,607,325 | $1,279,293 |
| 1993-94 | 852 | $96,372,055 | $94,122,563 | $52,853,630 | $24,725,908 | $770,934 |
| 1991-92 | 835 | $95,740,556 | $97,471,784 | $53,870,702 | $22,933,660 | $557,168 |
| 1989-90 | 801 | $92,516,400 | $88,095,809 | $44,804,886 | $25,055,781 | $414,278 |
| **Cooperative** | | | | | | |
| 2005-2006 | 40 | $6,166,566 | $5,623,900 | $3,454,915 | $2,936,503 | $0 |
| 2003-2004 | 38 | $4,187,378 | $3,895,437 | $2,872,363 | $2,362,987 | $0 |
| 2001-2002 | 41 | $3,680,041 | $3,645,829 | $2,656,875 | $2,188,944 | $0 |
| 1999-2000 | 41 | $3,716,550 | $3,297,957 | $2,360,236 | $2,201,864 | $0 |
| 1997-98 | 45 | $4,468,403 | $4,345,123 | $2,411,076 | $1,862,833 | $0 |
| 1995-96 | 45 | $3,897,164 | $4,195,374 | $3,006,471 | $1,727,426 | $0 |
| 1993-94 | 56 | $4,377,763 | $4,516,979 | $3,035,003 | $2,011,400 | $0 |
| 1991-92 | 61 | $4,794,929 | $4,891,433 | $2,961,140 | $2,151,806 | $48,046 |
| 1989-90 | 60 | $4,974,122 | $4,830,175 | $2,950,960 | $2,264,517 | $35,869 |
| **Corporation without Stock** | | | | | | |
| 2005-2006 | 115 | $11,441,713 | $11,063,119 | $4,885,718 | $3,309,865 | $458,418 |
| 2003-2004 | 109 | $9,639,838 | $9,247,934 | $4,182,321 | $3,681,822 | $368,697 |
| 2001-2002 | 118 | $9,714,903 | $9,618,199 | $4,399,446 | $3,680,856 | $372,424 |
| 1999-2000 | 121 | $13,591,109 | $12,225,794 | $5,270,336 | $3,314,652 | $424,940 |
| 1997-98 | 133 | $8,782,595 | $8,527,765 | $4,429,368 | $2,805,540 | $335,468 |
| 1995-96 | 134 | $8,500,508 | $8,677,836 | $4,535,098 | $2,481,467 | $399,973 |
| 1993-94 | 149 | $8,850,851 | $9,151,115 | $4,063,291 | $2,773,239 | $336,452 |
| 1991-92 | 153 | $8,730,610 | $9,195,491 | $3,981,324 | $3,011,989 | $219,349 |
| 1989-90 | 151 | $7,629,909 | $7,669,098 | $3,431,890 | $3,534,686 | $159,796 |
| **Total** | | | | | | |
| 2005-2006 | 5,091 | $1,085,535,531 | $1,055,314,137 | $372,102,747 | $286,443,569 | $11,585,283 |
| 2003-2004 | 4,867 | $915,723,383 | $842,934,366 | $310,489,001 | $241,717,378 | $13,927,575 |
| 2001-2002 | 4,594 | $685,305,553 | $656,470,477 | $282,041,446 | $184,280,480 | $10,279,097 |
| 1999-2000 | 4,499 | $604,911,069 | $579,358,330 | $259,829,774 | $153,634,372 | $15,257,037 |
| 1997-98 | 4,599 | $502,576,840 | $470,830,847 | $219,943,566 | $138,046,331 | $12,642,391 |
| 1995-96 | 4,528 | $437,372,321 | $429,887,819 | $217,830,619 | $103,907,879 | $13,111,507 |
| 1993-94 | 4,621 | $391,760,117 | $388,102,643 | $189,631,119 | $98,967,582 | $11,464,190 |
| 1991-92 | 4,727 | $385,530,507 | $394,785,896 | $188,927,768 | $95,155,888 | $11,957,810 |
| 1989-90 | 4,677 | $372,091,977 | $357,648,557 | $159,121,496 | $103,340,543 | $10,792,690 |

Sadio Declaration
Exhibit C

**2005-2006**
**Summary of PAC Independent Expenditures**

|  | For | Against | Total |
|---|---|---|---|
| **Presidential** | $199,116 | $140,140 | $339,256 |
| **Senate** | $9,444,064 | $1,753,882 | $11,197,946 |
| **House** | $13,376,401 | $12,908,656 | $26,285,057 |
| **Total** | $23,019,581 | $14,802,678 | $37,822,259 |

**Independent Expenditures**
**by Committee Type**

|  | For | | Against | | |
|---|---|---|---|---|---|
|  | # of Cmte's | Amount | # of Cmte's | Amount | Total |
| **Corporation** | 16 | $247,273 | 2 | $3,072 | $250,345 |
| **Labor Organization** | 25 | $4,190,105 | 8 | $5,866,342 | $10,056,447 |
| **No Connected Organization** | 59 | $3,782,315 | 34 | $4,300,698 | $8,083,013 |
| **Trade/Membership/Health** | 54 | $14,439,440 | 19 | $4,611,300 | $19,050,740 |
| **Cooperative** | 1 | $3,865 | 0 | $0 | $3,865 |
| **Corp. w/o Stock** | 7 | $356,583 | 3 | $21,266 | $377,849 |
| **Total** | 162 | $23,019,581 | 66 | $14,802,678 | $37,822,259 |

Note: Includes expenditures made in 2005-2006 for candidates involved in prior elections.

The following amounts were spent on 2006 campaigns:

|  | **For** | **Against** |
|---|---|---|
| **President** | $0 | $0 |
| **Senate** | $9,308,217 | $1,753,882 |
| **House** | $13,193,910 | $12,904,845 |
|  | $22,502,127 | $14,658,727 |

Sadio Declaration
Exhibit D

**National Party Federal Financial Activity Through the End of the Election Cycle**

| | 2005-2006 | 2003-2004 | 2001-2002 | 1999-2000 | 1997-98 | 1995-96 | 1993-94 | 1991-92 | 1989-90 |
|---|---|---|---|---|---|---|---|---|---|
| **Democratic National Committee** | | | | | | | | | |
| Receipts | $130,821,232 | $394,411,997 | $67,497,257 | $123,997,509 | $64,779,752 | $108,372,562 | $41,843,770 | $65,790,724 | $14,483,089 |
| Individuals | $117,948,743 | $356,975,734 | $55,623,021 | $112,157,217 | $48,338,828 | $93,197,921 | $34,946,393 | $54,806,713 | $10,514,648 |
| Other Cmte's | $2,737,905 | $31,151,303 | $1,142,286 | $4,097,236 | $1,557,487 | $1,978,737 | $1,979,746 | $2,987,339 | $1,264,319 |
| Disbursements | $133,162,338 | $389,861,948 | $73,313,094 | $121,977,874 | $65,341,939 | $105,584,924 | $43,956,218 | $65,018,428 | $18,544,110 |
| Contributions | $12,000 | $7,000 | $11,000 | $10,215 | $6,894 | $29,287 | $86,227 | $3,101 | $46,150 |
| Coord. Expend. | $361,557 | $16,079,570 | $346,216 | $13,548,520 | $6,029,492 | $6,695,323 | ($348,251) | $11,269,458 | $117,427 |
| Indep. Expend. | -$23,104 | $120,333,466 | $0 | $0 | $0 | $0 | | | |
| Cash-on-Hand | $3,710,299 | $6,051,811 | $1,559,645 | $4,732,517 | $1,974,119 | $2,396,812 | $744,653 | $2,844,664 | $1,353,638 |
| Debts By | $4,000,000 | $0 | $1,666,350 | $6,701,284 | $7,360,362 | $6,189,620 | $2,264,202 | $450,018 | $957,982 |
| | | | | | | | | | |
| **Democratic Senatorial Campaign Committee** | | | | | | | | | |
| Receipts | $121,376,959 | $88,655,573 | $48,391,653 | $40,488,666 | $35,645,188 | $30,798,424 | $26,429,878 | $25,450,835 | $17,536,049 |
| Individuals | $87,232,426 | $57,756,029 | $20,168,297 | $17,506,809 | $18,374,655 | $17,986,267 | $15,933,353 | $15,808,257 | $11,487,985 |
| Other Cmte's | $19,892,704 | $19,187,981 | $6,714,634 | $5,461,746 | $5,472,801 | $5,280,504 | $4,648,948 | $4,359,902 | $4,238,636 |
| Disbursements | $121,670,095 | $88,336,773 | $49,791,913 | $41,542,806 | $35,788,156 | $30,797,941 | $26,415,333 | $25,494,157 | $17,573,560 |
| Contributions | $596,800 | $694,500 | $409,900 | $290,530 | $300,500 | $540,000 | $535,000 | $593,500 | $431,893 |
| Coord. Expend. | $5,795,969 | $4,394,396 | $181,789 | $127,157 | $8,424 | $8,397,129 | $12,295,902 | $11,235,712 | $4,524,922 |
| Indep. Expend. | $42,627,470 | $18,725,520 | $0 | $133,000 | $1,329,000 | $1,386,022 | | | |
| Cash-on-Hand | $63,369 | $356,504 | $37,704 | $203,356 | $71,210 | $102,315 | $20,423 | $5,878 | $49,199 |
| Debts By | $6,614,775 | $2,500,000 | $6,195,089 | $4,350,000 | $3,223,242 | $6,211,885 | $2,325,710 | $1,914,441 | $1,235,909 |
| | | | | | | | | | |
| **Democratic Congressional Campaign Committee** | | | | | | | | | |
| Receipts | $139,891,645 | $93,168,931 | $46,436,093 | $48,394,476 | $25,180,286 | $26,623,493 | $19,424,492 | $12,815,844 | $9,088,467 |
| Individuals | $83,158,357 | $50,690,882 | $19,393,788 | $21,844,053 | $16,218,464 | $9,054,093 | $5,105,398 | $3,628,183 | |
| Other Cmte's | $11,736,217 | $12,115,201 | $8,367,394 | $9,166,490 | $6,608,736 | $5,281,840 | $3,598,533 | $3,785,601 | $3,387,996 |
| Disbursements | $140,806,970 | $92,409,908 | $47,011,986 | $49,324,279 | $24,655,488 | $26,412,934 | $19,356,663 | $12,654,760 | $9,115,127 |
| Contributions | $2,429,908 | $449,497 | $640,860 | $574,765 | $424,781 | $1,035,753 | $990,989 | $837,828 | $447,732 |
| Coord. Expend. | $2,365,467 | $2,440,937 | $1,805,937 | $2,593,614 | $2,969,951 | $5,689,644 | $7,730,815 | $4,135,861 | $2,877,283 |
| Indep. Expend. | $64,141,248 | $36,923,726 | $1,187,649 | $1,933,246 | $0 | $0 | | | |
| Cash-on-Hand | $776,980 | $1,638,051 | $1,150,753 | $1,331,989 | $1,014,731 | $466,458 | $247,742 | $181,105 | $20,022 |
| Debts By | $9,311,416 | $11,151,871 | $6,080,908 | $5,219,628 | $2,547,289 | $2,416,997 | $2,638,916 | $1,547,845 | $2,100,490 |
| | | | | | | | | | |
| **Democratic State and Local** | | | | | | | | | |
| Receipts | $161,852,953 | $171,231,821 | $114,175,460 | $149,341,257 | $63,354,386 | $93,194,978 | $55,572,758 | $73,652,909 | $44,650,551 |
| Individuals | $53,714,303 | $62,570,629 | $44,195,717 | $43,324,182 | $31,077,093 | $43,897,886 | $37,777,889 | $45,670,211 | $30,741,656 |
| Other Cmte's | $17,576,699 | $20,832,578 | $9,728,955 | $11,969,522 | $5,273,344 | $6,624,185 | $2,548,330 | $3,927,945 | $2,549,815 |
| Disbursements | $147,554,522 | $153,690,066 | $97,803,479 | $139,978,101 | $58,544,211 | $88,886,957 | $52,087,864 | $68,729,475 | $45,639,557 |
| Contributions | $1,018,920 | $653,549 | $1,272,792 | $485,089 | $485,247 | $612,805 | $569,627 | $506,464 | $531,642 |
| Coord. Expend. | $12,171,366 | $10,198,896 | $4,723,349 | $4,720,581 | $9,635,289 | $1,793,904 | $1,534,705 | $1,409,872 | $1,204,601 |
| Indep. Expend. | $1,354,610 | $508,984 | $513,643 | $243,929 | $160,707 | $109,068 | $0 | $0 | |
| Cash-on-Hand | $6,665,795 | $9,548,110 | $14,452,341 | $8,312,583 | $2,963,313 | $2,528,517 | $2,827,521 | $3,792,441 | $1,959,608 |
| Debts By | $2,319,256 | $691,501 | $1,481,060 | $1,695,257 | $1,956,291 | $2,548,864 | $3,224,833 | $886,186 | $1,400,756 |
| | | | | | | | | | |
| **Total Democratic** | **(Total receipts and disbursements do not include monies transferred among the listed committees)** | | | | | | | | |
| Receipts | $483,141,404 | $678,759,807 | $217,245,185 | $275,230,680 | $159,961,869 | $221,613,028 | $132,786,892 | $163,279,568 | $78,546,942 |
| Individuals | $342,053,829 | $527,993,274 | $139,380,823 | $194,832,261 | $111,482,775 | $171,300,538 | $97,711,728 | $121,390,579 | $56,372,472 |
| Other Cmte's | $51,943,525 | $83,287,063 | $25,953,269 | $30,694,994 | $18,912,368 | $19,165,266 | $12,775,557 | $15,060,787 | $11,440,766 |
| Disbursements | $472,392,540 | $655,590,180 | $208,665,194 | $265,831,832 | $155,332,051 | $214,306,327 | $131,332,072 | $157,466,076 | $83,661,140 |
| Contributions | $4,057,628 | $1,804,546 | $2,334,552 | $1,360,599 | $1,217,422 | $2,217,845 | $2,181,843 | $1,940,893 | $1,457,417 |
| Coord. Expend. | $20,694,359 | $33,113,799 | $7,057,291 | $20,989,872 | $18,643,156 | $22,576,000 | $21,213,171 | $28,050,903 | $8,724,233 |
| Indep. Expend. | $108,100,265 | $176,491,696 | $1,701,292 | $2,310,175 | $1,489,707 | $1,495,090 | | | |
| Cash-on-Hand | $11,216,443 | $17,594,476 | $17,200,443 | $14,580,445 | $6,023,373 | $5,494,102 | $3,840,339 | $6,824,088 | $3,382,467 |
| Debts By | $22,245,447 | $14,343,372 | $15,423,407 | $17,966,169 | $15,087,184 | $17,367,366 | $10,453,661 | $4,798,490 | $5,695,137 |

**Note: This table includes only federal activity**

# Sadio Declaration Exhibit E

**National Party Financial Activity Through the End of the Election Cycle**

| | 2005-2006 | 2003-2004 | 2001-2002 | 1999-2000 | 1997-98 | 1995-96 | 1993-94 | 1991-92 | 1989-90 |
|---|---|---|---|---|---|---|---|---|---|
| **Republican National Committee** | | | | | | | | | |
| Receipts | $243,007,131 | $392,413,393 | $170,099,094 | $212,798,761 | $104,048,689 | $193,029,129 | $87,392,680 | $85,447,469 | $68,713,896 |
| Individuals | $213,453,376 | $350,368,907 | $157,825,892 | $193,181,420 | $80,146,222 | $152,801,268 | $79,732,496 | $78,821,547 | $58,924,487 |
| Other Cmte's | $2,287,386 | $3,128,405 | $717,934 | $1,661,005 | $438,640 | $680,915 | $427,210 | $865,236 | $550,699 |
| Disbursements | $254,566,224 | $382,609,848 | $186,832,988 | $187,365,943 | $105,068,513 | $192,362,899 | $85,327,701 | $81,919,094 | $70,425,931 |
| Contributions | $456,880 | $251,992 | $376,336 | $400,000 | $442,494 | $486,404 | $544,153 | $785,003 | $255,578 |
| Coord. Expend. | $2,914,371 | $16,143,042 | $14,126,279 | $23,670,006 | $3,891,039 | $22,766,118 | $4,709,624 | $11,250,113 | $46,344 |
| Indep. Expend. | $14,022,675 | $18,268,870 | $500,000 | $0 | $0 | $0 | | | |
| Cash-on-Hand | $3,108,218 | $14,667,311 | $4,863,768 | $24,061,917 | $1,588,316 | $1,051,374 | $724,762 | $2,256,421 | $527,005 |
| Debts By | $500,000 | $0 | $0 | $0 | $2,000,000 | $5,000,000 | $1,600,000 | $0 | $50,000 |
| | | | | | | | | | |
| **National Republican Senatorial Committee** | | | | | | | | | |
| Receipts | $88,812,386 | $78,980,487 | $59,161,387 | $51,475,156 | $53,423,388 | $64,541,312 | $65,325,336 | $73,810,640 | $65,063,462 |
| Individuals | $65,214,270 | $60,811,444 | $41,533,725 | $33,999,707 | $42,947,511 | $51,539,674 | $59,383,678 | $64,150,648 | $60,099,349 |
| Other Cmte's | $13,758,911 | $12,565,773 | $3,943,050 | $4,107,825 | $3,963,548 | $3,339,314 | $1,775,855 | $1,222,418 | $1,430,182 |
| Disbursements | $89,719,455 | $78,720,852 | $59,577,432 | $50,686,021 | $53,666,737 | $66,064,117 | $65,393,995 | $71,303,095 | $67,616,170 |
| Contributions | $346,782 | $812,897 | $455,977 | $382,334 | $276,359 | $696,500 | $621,279 | $692,195 | $696,009 |
| Coord. Expend. | $8,784,685 | $8,449,099 | $553,206 | $172 | $36,775 | $308,319 | $10,905,500 | $16,477,387 | $7,684,154 |
| Indep. Expend. | $19,159,901 | $19,383,692 | $0 | $267,600 | $216,874 | $9,734,445 | | | |
| Cash-on-Hand | $109,911 | $1,016,976 | $757,342 | $1,228,069 | $347,109 | $77,908 | $241,036 | $299,675 | $179,071 |
| Debts By | $1,322,263 | $2,500,000 | $348,847 | $406,518 | $604,031 | $5,942,281 | $0 | $6,397,295 | $2,759,297 |
| | | | | | | | | | |
| **National Republican Congressional Committee** | | | | | | | | | |
| Receipts | $179,549,131 | $185,719,489 | $123,615,586 | $97,314,513 | $72,708,311 | $74,224,879 | $26,696,951 | $35,272,672 | $33,224,093 |
| Individuals | $112,066,248 | $145,858,047 | $79,175,394 | $67,010,001 | $49,661,821 | $62,937,307 | $17,798,639 | $26,828,540 | $27,985,841 |
| Other Cmte's | $41,531,868 | $33,122,687 | $21,126,356 | $19,934,493 | $15,341,357 | $8,170,168 | $1,920,102 | $1,566,569 | $1,154,435 |
| Disbursements | $178,063,132 | $184,784,300 | $130,742,694 | $95,379,672 | $71,748,092 | $73,613,354 | $26,273,836 | $34,314,253 | $34,362,238 |
| Contributions | $368,547 | $545,693 | $792,947 | $698,769 | $782,742 | $1,259,825 | $787,941 | $728,444 | $946,667 |
| Coord. Expend. | $1,611,478 | $3,184,358 | $453,564 | $3,696,877 | $5,069,215 | $7,329,880 | $3,930,314 | $5,189,740 | $2,830,485 |
| Indep. Expend. | $82,059,161 | $47,254,064 | $1,321,880 | $548,800 | $0 | $0 | | | |
| Cash-on-Hand | $1,401,618 | $3,154,980 | $1,597,873 | $405,641 | $1,442,684 | $537,373 | $726,391 | $236,109 | $151,417 |
| Debts By | $14,386,925 | $40,311 | $7,258,785 | $636,139 | $3,617,055 | $1,539,592 | $3,734,068 | $4,592,640 | $3,304,559 |
| | | | | | | | | | |
| **Republican State and Local** | | | | | | | | | |
| Receipts | $157,545,803 | $182,945,385 | $132,475,112 | $176,556,202 | $89,392,101 | $128,444,139 | $74,974,114 | $72,768,188 | $39,349,372 |
| Individuals | $94,955,360 | $97,852,018 | $81,062,920 | $100,596,124 | $68,023,268 | $94,840,516 | $61,590,291 | $53,148,774 | $32,709,177 |
| Other Cmte's | $5,170,858 | $6,969,709 | $2,671,581 | $3,212,955 | $1,692,476 | $1,589,907 | $657,170 | $875,673 | $397,165 |
| Disbursements | $152,514,436 | $164,164,378 | $111,088,732 | $165,864,117 | $80,014,531 | $120,223,376 | $66,724,020 | $68,588,442 | $41,089,568 |
| Contributions | $709,460 | $965,534 | $3,098,916 | $812,647 | $1,117,233 | $1,271,041 | $998,128 | $808,834 | $985,638 |
| Coord. Expend. | $846,392 | $1,324,897 | $817,974 | $2,231,910 | $6,699,116 | $554,834 | $1,071,486 | $936,195 | $177,183 |
| Indep. Expend. | $404,650 | $3,125,756 | $122,236 | $740,402 | $46,772 | $292,096 | $0 | $0 | |
| Cash-on-Hand | $8,181,485 | $13,592,737 | $5,310,813 | $7,379,543 | $5,601,508 | $3,804,848 | $2,931,948 | $2,272,711 | $1,361,998 |
| Debts By | $2,024,962 | $1,200,894 | $3,190,900 | $1,422,796 | $2,448,008 | $2,500,931 | $2,152,492 | $2,430,863 | $1,487,169 |
| | | | | | | | | | |
| **Total Republican** | (Total receipts and disbursements do not include monies transferred among the listed committees) | | | | | | | | |
| Receipts | $602,256,988 | $782,410,369 | $424,140,589 | $465,840,139 | $285,007,168 | $416,513,249 | $244,101,180 | $264,915,932 | $202,042,881 |
| Individuals | $485,689,254 | $654,890,416 | $359,597,911 | $394,787,252 | $240,778,822 | $362,118,765 | $218,505,104 | $222,949,509 | $179,718,854 |
| Other Cmte's | $62,749,023 | $55,786,574 | $28,458,921 | $28,916,278 | $21,436,021 | $13,780,304 | $4,780,337 | $4,529,896 | $3,532,481 |
| Disbursements | $608,205,784 | $752,630,993 | $427,031,256 | $426,991,260 | $275,932,552 | $408,537,536 | $232,139,659 | $251,659,480 | $209,185,965 |
| Contributions | $1,881,669 | $2,576,116 | $4,724,176 | $2,293,750 | $2,618,828 | $3,713,770 | $2,951,501 | $3,014,476 | $2,883,892 |
| Coord. Expend. | $14,156,926 | $29,101,396 | $15,951,023 | $29,598,965 | $15,696,145 | $30,959,151 | $20,616,729 | $33,853,435 | $10,738,166 |
| Indep. Expend. | $115,646,387 | $88,032,382 | $1,944,116 | $1,556,802 | $263,646 | $10,026,541 | | | |
| Cash-on-Hand | $12,801,232 | $32,432,004 | $12,529,796 | $33,075,170 | $8,979,617 | $5,471,503 | $4,624,137 | $5,064,916 | $2,219,491 |
| Debts By | $18,234,150 | $3,741,205 | $10,798,532 | $2,465,453 | $8,669,094 | $14,982,804 | $7,486,560 | $13,420,798 | $7,601,025 |

**Note: This table includes only federal activity**

Sadio Declaration
Exhibit F

0000016



Government of the District of Columbia
Office of the Chief Financial Officer
Office of Tax and Revenue

941 North Capitol Street, NE
Washington, D.C. 20002

## NOTICE OF BUSINESS TAX REGISTRATION

Date of Notice: November 7, 2007

Notice Number: 5044293071030

SPEECH NOW.ORG
PO BOX 18773
WASHINGTON DC 20036-8773

EIN: 26-1288587

You have been registered for the tax(es) shown below. Your filing basis has been determined as shown. It is important that the Employer Identification Number referenced above be used on all correspondence and returns.

| TAX TYPE | ACCOUNT ID | FILING FREQUENCY | TAX YEAR END |
|---|---|---|---|
| UNINCORPORATED FRANCHISE TAX | - | ANNUAL | FY12 |

Any tax returns currently due are enclosed with this notice. Tax returns that are due in the future will be mailed separately to you prior to the due date. If you have tax returns that are delinquent, you will be notified by the Office of Tax and Revenue.

If applicable you will also be registered for Unemployment Compensation Taxes and will be contacted by the Office of Unemployment Compensation regarding your filing requirements. Any questions concerning your liability for Unemployment Compensation may be answered by calling (202) 724-7457.

A Declaration of Estimated Franchise Tax (Form D-20 ES or D-30 ES) must be filed by every corporation and unincorporated business whose franchise tax may reasonably be expected to exceed $1,000 for the taxable year.
Should you have any questions please call (202) 727-4TAX (4829) or send correspondence to:

Customer Service Administration
Business Tax Registration Section
P.O. Box 470
Washington, DC 20044

Sadio Declaration
Exhibit G

Draft Solicitation for Speech Now.org

The First Amendment to the Constitution says "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble."

What could be clearer than that?

Still, Congress ignores our most precious right. Politicians who wish to restrict pesky citizen groups have passed a thicket of laws suppressing our free speech rights.

Things have gotten so bad that a group of citizens looking to speak out about a politician's voting record should consult a lawyer first.

One example of speech censorship is the McCain Feingold law that made it illegal for most nonprofit groups to mention the name of a candidate in a TV ad within 60 days of an election. A recent Court decision loosened that restriction somewhat, but left a confusing set of regulations to navigate in order to avoid possible criminal charges of illegal speech.

The assault on the First Amendment is bipartisan and it continues.

The real motivation for passage of so-called campaign finance "reforms" was to limit criticism of members of Congress and protect incumbents at reelection time.

House Republicans passed a bill in 2006 that would have extended the McCain Feingold restrictions on TV ads to a year-round ban for some nonprofit groups. As columnist George Will reported, "[Rep.] Candice Miller (R-Mich.) said that [the bill] would combat 'nauseating ugliness, negativity and hyperpartisanship.' Oh, so that is what the First Amendment means: Congress shall make no law abridging freedom of speech unless speech annoys politicians."

Democrats criticized this GOP bill in 2006, but key Democratic leaders now appear to support it.

In the current Congress, the top Republican on the Senate Judiciary Committee teamed up with the Democratic Senatorial Campaign Committee chairman to introduce a constitutional amendment to dismantle the First Amendment and allow unlimited regulation of political speech by Congress and state legislatures.

Political speech censorship by politicians has to stop. We need free speech now.

The best way to stop the censorship is to speak in a language that all politicians understand and to speak out when politicians and the voters are most likely to pay attention. That's election time.

We need to tell our fellow Americans who supports, and who opposes, free speech and the First Amendment. We need to defeat some candidates who are against free speech and elect the ones who support the First Amendment.

That will take money. A lot of it.

Speech Now.org is an independent speech group of individuals dedicated to promoting and protecting our First Amendment rights to free speech and for the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

We believe that working together as citizens in an election environment is the best way to liberate speech from the grip of politicians who have successfully passed laws aimed at preserving their power by squelching criticism.

We have adopted rigorous restrictions on our activities to eliminate even the appearance of corruption of candidates. We will never give a cent to politicians and our advertising will be strictly independent. Our charter also guarantees our independence from parties, candidates and special interest money. Finally, our charter also ensures that donors give solely because they believe in what we do, not because of a hotel discount for members.

Please give your maximum donation to SpeechNow.org today. Free speech is too important to leave to the politicians.

Paid for by SpeechNow.org, PO Box 18773, Washington DC 20036.

Not authorized by any candidate or candidate committee.

Donations are not tax deductible and may be used for political purposes such as supporting or opposing candidates. Donations are not accepted from business corporations, labor organizations, national banks, federal government contractors, foreign nationals, or political committees. All donations will be spent according to the sole discretion of SpeechNow.org.

Sadio Declaration
Exhibit H

Draft Solicitation for Speech Now.org

The First Amendment to the Constitution says "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble."

What could be clearer than that?

Still, Congress ignores our most precious right. Politicians who wish to restrict pesky citizen groups have passed a thicket of laws suppressing our free speech rights.

Things have gotten so bad that a group of citizens looking to speak out about a politician's voting record should consult a lawyer first.

One example of speech censorship is the McCain Feingold law that made it illegal for most nonprofit groups to mention the name of a candidate in a TV ad within 60 days of an election. A recent Court decision loosened that restriction somewhat, but left a confusing set of regulations to navigate in order to avoid possible criminal charges of illegal speech.

The assault on the First Amendment is bipartisan and it continues.

The real motivation for passage of so-called campaign finance "reforms" was to limit criticism of members of Congress and protect incumbents at reelection time.

House Republicans passed a bill in 2006 that would have extended the McCain Feingold restrictions on TV ads to a year-round ban for some nonprofit groups. As columnist George Will reported, "[Rep.] Candice Miller (R-Mich.) said that [the bill] would combat 'nauseating ugliness, negativity and hyperpartisanship.' Oh, so that is what the First Amendment means: Congress shall make no law abridging freedom of speech unless speech annoys politicians."

Democrats criticized this GOP bill in 2006, but key Democratic leaders now appear to support it.

In the current Congress, the top Republican on the Senate Judiciary Committee teamed up with the Democratic Senatorial Campaign Committee chairman to introduce a constitutional amendment to dismantle the First Amendment and allow unlimited regulation of political speech by Congress and state legislatures.

Political speech censorship by politicians has to stop. We need free speech now.

The best way to stop the censorship is to speak in a language that all politicians understand and to speak out when politicians and the voters are most likely to pay attention. That's election time.

We need to tell our fellow Americans who supports, and who opposes, free speech and the First Amendment. We need to defeat some candidates who are against free speech and elect the ones who support the First Amendment.

That will take money. A lot of it.

To start our campaign, we need to run ads in areas where the media, and other politicians, will pay attention. We've identified two such races.

First is Louisiana Senator Mary Landrieu, who is up for election in 2008. We don't know who her opponent is yet, but he can't be any worse on free speech than she has been. Landrieu voted for the McCain-Feingold law that banned broadcast ads by most nonprofit groups within 60 days of a general election if a candidate's name was mentioned. We have prepared an ad urging Louisiana voters to defeat her because of her vote for this horrible bill.

A second initial target for defeat is Congressman Dan Burton. He voted for that 2006 bill that would have extended the McCain Feingold restrictions on TV ads to a year-round ban for some nonprofit groups. He has a credible primary opponent who is a supporter of free speech rights. We have an ad urging his defeat ready to run in the local TV market, where air time is reasonably priced. Defeating a Republican incumbent in a primary on this free speech issue would help other Republicans who voted with Burton to return to their prior beliefs of supporting free speech.

Speech Now.org is an independent speech group of individuals dedicated to promoting and protecting our First Amendment rights to free speech and for the freedom to assemble. We operate independently of any candidate and expressly advocate to other people to vote for federal candidates who support these First Amendment rights and to vote against candidates who oppose such rights.

We believe that working together as citizens in an election environment is the best way to liberate speech from the grip of politicians who have successfully passed laws aimed at preserving their power by squelching criticism.

We have adopted rigorous restrictions on our activities to eliminate even the appearance of corruption of candidates. We will never give a cent to politicians and our advertising will be strictly independent. Our charter also guarantees our independence from parties, candidates and special interest money. Finally, our charter also ensures that donors give solely because they believe in what we do, not because of a hotel discount for members.

Please give your maximum donation to SpeechNow.org today so we can run these and other ads at a level that will make a huge impact. Free speech is too important to leave to the politicians.

Paid for by SpeechNow.org, PO Box 18773, Washington DC 20036.

Not authorized by any candidate or candidate committee.

Donations are not tax deductible and may be used for political purposes such as supporting or opposing candidates. Donations are not accepted from business corporations, labor organizations, national banks, federal government contractors, foreign nationals, or political committees. All donations will be spent according to the sole discretion of SpeechNow.org.

Sadio Declaration
Exhibit I

Howard Jarvis Taxpayers Association

# California Commentary

Volume 1, Issue 14                                                                                    Week of May 5, 2003

## Los Angeles the Trendsetter

### By Jon Coupal

"This is the city," Jack Webb used to tell us. Los Angeles, with over 10 percent of California's population wields influence well beyond its numbers. It is a state and national trendsetter. Much of America's self image is defined right here through the production of scores of movies each year and, perhaps more important, hundreds of hours of television each month.

From skateboards to hot tubs to cell phones, you saw it here.

Unfortunately, for California taxpayers Los Angeles also sets some very bad examples.

Los Angeles Mayor Jim Hahn has managed to increase spending on his office 20 percent in two years, from $5.9 million to $7.3 million. While spending on the mayor grows, the city anticipates a shortfall of $169 million next fiscal year beginning July 1, which will result in service cuts and higher taxes.

So it would appear that at a time when the mayor is asking sacrifices of others he is willing to spend more on himself.

But not so fast. According to a spokesman for the mayor, most of the increase is due to cost-of-living adjustments to salaries. Indeed, the city administrative officer confirms that 8 percent of the increase is due to pay raises, raises which most city employees are receiving at a rate that is twice the rate of inflation.

Many Los Angeles taxpayers find little comfort in knowing that much of the increased spending is due to raises for the mayor's staff. Los Angeles residents, like most Californians, are feeling the bite of recession and are painfully aware of the growing pressure from state and local governments for higher taxes. A recent field poll shows 7 in 10 area residents regard these as "bad economic times."

But increased spending on those who work in the mayor's office is just the tip of the iceberg. The city has nearly 40,000 other employees that are sharing in this generous compensation.

A review by one of the city's major newspapers revealed that payroll has jumped more than 40 percent in the last seven years while the work force has expanded only 7.7 percent. Inflation for those years totaled 15.5 percent.

While revenue has increased substantially during this period, 90 percent has gone into salaries. Only savings in pension and retirement costs due to the stock market boom prevented the city from having payroll growth exceed revenue growth.

However, Hahn and the City Council are just maintaining a long tradition of generosity to city workers. Mayors Bradley and Riordan supported handsome settlements with the city's public employee unions, and Riordan was famous for the lavish bonuses he bestowed on department heads and his office staff.

Local politicians and the public sector have formed an alliance that benefits both. The city is such an excellent provider that it is regarded as "the land of milk and honey" to those seeking pub-

For more information, contact: Kris Vosburgh, Executive Director

Howard Jarvis Taxpayers Association ● 621 S. Westmoreland Ave., Suite 202 ● Los Angeles, CA 90005 ● (213) 384-9656

Permission to reproduce this commentary in any format — print or electronic — is hereby granted, as long as proper attribution is included.

lic employment. In turn, public employee unions and city workers provide millions of dollars worth of campaign support to their favored candidates in each election cycle — often through independent expenditures to get around the city's campaign contribution limits.

Still, taxpayers would not have much to complain about if they could be convinced that higher pay resulted in more productivity and better public services. Unfortunately, this is far from the case. A Reason Foundation study of 44 major American cities several years ago, found Los Angeles ranked last in efficiency. A more recent study noted some improvements but Los Angeles still ranked seventh of the 10 largest California cities.

In fact, many locals regard city services as so bad, last year two-fifths of the city tried to secede and form two new communities.

Although the break-away effort was rejected at the ballot box, the poor quality of public services remains on residents' minds, along with the uneasy feeling that they are being asked to pay more for less.

To taxpayers, Los Angeles is not a good role model.

* * *

*JON COUPAL is an attorney and president of the Howard Jarvis Taxpayers Association — California's largest taxpayer organization with offices in Los Angeles and Sacramento. He can be reached through the Association's website: http://www.hjta.org.*

For more information, contact:  Kris Vosburgh, Executive Director

Howard Jarvis Taxpayers Association ● 621 S. Westmoreland Ave., Suite 202 ● Los Angeles, CA  90005 ● (213) 384-9656

Permission to reproduce this commentary in any format — print or electronic — is hereby granted, as long as proper attribution is included.

Sadio Declaration
Exhibit J

washingtonpost.com

# Unfettered Speech, Now

Advertisement

By Bradley A. Smith and Steve Simpson
Saturday, February 16, 2008; A21

Most Americans probably assume that they can gather with friends and neighbors to say whatever they want about politics to whoever is willing to listen. They presume that the First Amendment protects their right to get together and buy yard signs, publish newsletters or pay for radio or television ads urging people to vote for or against a candidate -- and to do so free of government interference.

Unfortunately, most Americans would be wrong. Today, when Americans band together and spend even small amounts of money to advocate the election or defeat of a candidate, they must submit to government regulation and limits on the funds they can raise. Because of these campaign finance laws, the presumption in favor of free speech rooted in the First Amendment has largely given way to a presumption of regulation.

The case of SpeechNow.org shows how far the pendulum has swung away from constitutionally protected political expression.

Political activist David Keating created SpeechNow.org to give individual Americans a way to speak about candidates free of the byzantine campaign finance regulations that apply to modern political speech. The group's particular mission is to protect First Amendment rights at the ballot box -- to buy ads urging citizens to vote for politicians who support free speech and against those who do not -- but its model could be applied to any issue or candidate a group of voters cares about.

SpeechNow.org is an independent group of citizens spending their own money on their own speech. It does not accept corporate or union contributions, makes no donations to politicians or parties and does not coordinate its activities with them. It will also fully disclose its contributions and expenditures to the Federal Election Commission.

SpeechNow.org is simply Americans pooling their resources to talk to other Americans about whom to elect to office.

Nonetheless, according to federal campaign finance laws and the FEC, SpeechNow.org must become a "political committee," a PAC, and comply with a host of regulations that rival the tax laws in burden and complexity. Failure to do so could result in up to five years in prison for contributors and the principals of the group.

Political committees cannot accept more than $5,000 per year from any one person. With the high cost of radio and television ads, this contribution limit effectively bars all but the most sophisticated groups -- those with professional fundraisers and the time to accumulate millions of dollars in small increments -- from competing in the political marketplace of ideas. No wonder politics has become an insider's game.

These laws are allegedly justified by the need to prevent "corruption." But how can a group of individuals who will never give a penny to a political candidate raise any concerns about corruption? If simply urging citizens to vote one way or another is corrupt, democracy itself is corrupt.

In fact, the U.S. Supreme Court has long held that the government cannot limit what an individual spends to promote her political views, even if she tells people how to vote. It is common sense that groups of individuals should have the same rights. No one should have to sacrifice the First Amendment right to associate in order to exercise the First Amendment right to speak.

Imposing limits on groups such as SpeechNow.org ends up hurting the very people whom backers of campaign finance regulation always claim they're trying to help -- people of average means who must pool their resources to be heard -- while leaving the field to the very wealthy to spend what they please.

Those are among the claims SpeechNow.org and its members made in a lawsuit filed this week in the U.S. District Court for the District of Columbia. It challenges the constitutionality of requiring independent groups of citizens to register and organize as political committees. For the first time, federal courts will be asked to decide whether independent political speech by groups of individual American citizens has the full protection of the First Amendment.

Would a victory for SpeechNow.org allow groups of citizens to spend unlimited funds to influence the outcome of elections? Yes. And that is exactly why SpeechNow.org should prevail.

The First Amendment guarantees the right of citizens to urge political change, and elections present an ideal opportunity to affect policy by affecting the political futures of those who make it. That requires telling voters how they should vote.

A victory for SpeechNow.org would bring federal campaign finance laws into line with the constitutional principles of free speech and association, and bring them closer to the First Amendment that most Americans already believe we have.

*Bradley A. Smith is chairman of the Center for Competitive Politics and a former Federal Election Commission chairman. Steve Simpson is a senior attorney at the Institute for Justice. They represent SpeechNow.org.*

**Post a Comment**

**View all comments** that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

You must be logged in to leave a comment. Login | Register



Submit

## © 2008 The Washington Post Company

**Ads by Google**

**Ben Stein confronts**
The freedom of speech in science Expelled: No Intelligence Allowed
www.Expelledthemovie.com

**Ron Paul in 2008?**
Do You Think He Can Win the GOP Nomination? Give Us Your Opinion!
www.SodaHead.com/RonPaul2008

**Media Ownership**
The Democracy Papers examine threats to our freedom of speech.
seattletimes.nwsource.com

Sadio Declaration
Exhibit K

This is a printer friendly version of an article from **www.washingtontimes.com**
To print this article open the file menu and choose Print.

---

Article published Feb 15, 2008
# Suit aims to ease campaign fundraising limits

February 15, 2008

By Jim McElhatton - A free-speech group that wants to raise unlimited cash from its supporters to run ads for or against federal candidates is suing the Federal Election Commission in a case that could loosen some campaign-finance restrictions.

The lawsuit, filed yesterday in federal court in Washington by SpeechNow. org, comes weeks after FEC lawyers said the group should form as a political committee and that it could not take more than $5,000 from contributors.

But attorneys for the group, which aims to support or oppose candidates based on their First Amendment views, argue that it should not be subject to political action committee restrictions.

They say the group doesn't coordinate with politicians or political parties and that it refuses to accept union or corporate donations. Founder David Keating said individuals can spend unlimited sums to sway elections.

"If one can do it, then why can't two?" asked Mr. Keating, who is also executive director of the anti-tax group Club for Growth.

Two FEC commissioners split last month on whether SpeechNow.org should be subject to $5,000 contribution limits.

But the ruling wasn't official because four seats on the six-member FEC board remain vacant as a result of a political stalemate in the Senate over pending nominations to the board.

According to court papers, SpeechNow.org had planned to run ads during the 2008 election cycle against several candidates, including Republican Rep. Dan Burton of Indiana and Democratic Sen. Mary L. Landrieu of Louisiana.

The cost for producing and running the ads would be at least $400,000. But attorneys for SpeechNow.org said the group can't raise the money to pay for the ads if supporters are limited to giving $5,000 per year.

Attorneys for two nonprofit groups that study campaign-finance issues — Democracy 21 and the Campaign Legal Center — previously urged the FEC to rule that SpeechNow.org is subject to contribution limits.

Paul Ryan, associate general counsel for the Campaign Legal Center, said the lawsuit raises issues that the courts should decide. He also said several similar cases challenging campaign laws have been filed in recently in California.

"Regardless of which case makes it to the Supreme Court first, the decision will undoubtedly be far-reaching," he said. "The simple fact of the matter is that the Supreme Court has never addressed this issue head-on."

Mr. Ryan said the group's lawsuit, if successful, would make it easier for groups from all political backgrounds to spend vast sums of cash to sway elections. He cited recent FEC fines for fundraising problems in the 2004 presidential election against groups such as Swift Boat Veterans for Truth, which opposed Democratic Sen. John Kerry, and the liberal America Coming Together, which opposed President Bush.

But Bradley A. Smith, former FEC chairman, now chairman of the Center for Competitive Politics, which is one of two groups representing SpeechNow.org in the lawsuit, disagreed. He said the case could "pave the way for other groups of citizens to make their voices heard in elections without being hamstrung by harmful government limits on speech."

Sadio Declaration
Exhibit L

 

Non-drowsy, 24-hour relief for
Nothing works stronger, faster, longer.

Live Claritin Clear.™ ▸

http://www.latimes.com/news/printedition/opinion/la-ed-
speechnow15feb15,1,6451632.story?ctrack=1&cset=true
*From the Los Angeles Times*

# On message

**Campaign finance laws that regulate political ads by interest groups also infringe on free speech.**

February 15, 2008

Let's say you want to spend your own money on a TV commercial that will urge your fellow citizens not to vote for Candidate X. You want to air it widely enough to have an impact on the outcome of the election. But you're not rich, so you get together with some friends and form a loose coalition.

Your group does not contribute to, or coordinate with, any campaign, nor does it accept contributions from labor unions or corporations. In fact, let's imagine you're so well-versed in the minutiae of campaign finance law that you even know to avoid such recondite infractions as hiring vendors with ties to politicians. So if you jumped through all those hoops, would you be allowed to air your ad? No, according to the 1974 Federal Election Campaign Act and a recent advisory opinion by the Federal Election Commission.

According to federal law, two or more people who combine resources to support or oppose a federal candidate become a "political committee" subject to government regulations and limits. But a lawsuit filed Thursday by the group SpeechNow.org, which had planned to air TV spots condemning Sen. Mary L. Landrieu (D-La.) and Rep. Dan Burton (R-Ind.), will reopen the question of how much freedom of speech must be curtailed in the name of legitimate campaign finance reform.

SpeechNow selected Landrieu and Burton because of their support of legislation that curtails political participation by public interest groups. The ads the FEC advised against were set up as a test case of the 1974 law, and the resulting Catch-22 tautology -- you can't agitate effectively against political speech regulations because that would require you to oppose politicians who support those regulations, which would violate political speech regulations -- was a result SpeechNow had in mind. The advisory opinion by the commission's general counsel seems well within the language of the law.

And that's the problem. The FEC, and perhaps Congress, need to revisit the overreaching rules on campaign ads. Courts have repeatedly stated that the only compelling state interest in limiting political speech is to avoid corruption or the appearance of corruption in government -- this was the idea when the McCain-Feingold law rightly banned soft-money donations to political parties. But that is very different from a group of unaffiliated citizens

trying to have their say. SpeechNow's suit against the FEC turns on complex regulations, but it speaks to something basic: the 1st Amendment right to petition the government for redress of grievances.

A victory for the group would restore some sanity to the campaign finance regulatory structure.

---

If you want other stories on this topic, search the Archives at latimes.com/archives.

**TMSReprints**
Article licensing and reprint options

Copyright 2008 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

partners:

Sadio Declaration
Exhibit M



February 15, 2008 Edition > Section: **National** > Printer-Friendly Version

# Suit Could Unleash Surge of Money in 2008 Presidential Race

BY JOSH GERSTEIN - Staff Reporter of the Sun
February 15, 2008
URL: http://www.nysun.com/article/71349

ADVERTISEMENT

ADVERTISEMENT

A new lawsuit could unleash a late surge of multimillion-dollar contributions in this fall's presidential race by allowing independent groups to use large gifts to run advertisements directly attacking and promoting candidates. A group seeking to unseat lawmakers who support strict campaign finance regulation, SpeechNow.org, filed a lawsuit yesterday to block the Federal Election Commission from enforcing the $5,000 limit that generally applies to an individual's contribution to a political action committee.

The executive director of SpeechNow, David Keating, said the cap violates the First Amendment. He pointed to court rulings that individuals have the right to spend unlimited amounts on political ads as long as there is no coordination with candidates or their campaigns.

"Everyone agrees that one person can spend as much as he or she wants to say anything about any candidate. So why can't two?" Mr. Keating asked at a news conference yesterday.

SpeechNow, represented by the Institute for Justice and the Center for Competitive Politics, is asking Judge James Robertson for a hearing within 20 days on the group's request for a preliminary injunction. It is unclear how quickly the case will move, but it could be in front of a federal appeals court by spring or summer. The group's central argument is that the usual justification for campaign finance laws, namely the desire to avoid real or apparent corruption, does not apply when individuals band together to speak while keeping a distance from any candidates.

ADVERTISEMENT

"There's no possible road to corruption under this structure," Edward Crane, the president of the Cato Institute, who is involved with the group, said. SpeechNow's rules call for immediate disclosure of all donations.

A law professor at the University of Virginia who has advised advocates of tighter campaign finance laws, Daniel Ortiz, said the promises such groups make about not coordinating with candidates are often illusory. "They actually tend to be run by people who are pretty much doppelgangers of the candidates or the parties," the professor said. That makes the involvement of groups more prone to corruption than expenditures donors might make on their own, he said.

Mr. Ortiz said the lawsuit, which could end up at the Supreme Court, is a logical step for those seeking to undermine campaign finance laws. "It's not a stupid move on their part, because the membership of the court has changed," he said.

In 2004, more than $400 million flowed into the presidential race and other federal contests through so-called 527 organizations, named for a section of the tax code. Those groups ran ads about candidates but did not engage in the "express advocacy" planned by SpeechNow. The FEC launched investigations into many of the groups and donors that were active in 2004 and levied millions of dollars in penalties, which has left many donors wary of making similar gifts in 2008.

A Democratic campaign finance lawyer, Marc Elias, said a win by SpeechNow could lift that chill. "It would obviate some of the fear and risk that people have, but it might not completely solve the problem," he said. However, the attorney said it was unclear whether the case would be resolved in time to impact this November's election. "Political planning doesn't happen on a dime," he said.

**February 15, 2008 Edition > Section: National > Printer-Friendly Version**

Sadio Declaration
Exhibit N





Pow

# FEC recommendation could end up in court

**By Jim Kuhnhenn, Associated Press Writer**

WASHINGTON — Federal regulators recommended Tuesday that a newly formed political group cannot accept unlimited contributions from donors if it wants to advocate for or against candidates for federal office.

The draft opinion opens the way for SpeechNow.org to challenge a key provision of campaign finance law in federal court.

SpeechNow.org was formed last year by critics of government restrictions on political advocacy. Tuesday's recommendation by lawyers for the Federal Election Commission would have to be approved or rejected by the six-member commission.

But the FEC has only two active members because the Senate has not acted on four pending nominations. Democrats have refused to confirm Hans von Spakovsky, a former Justice Department official, and Republicans want all four nominees voted on as a package.

The two remaining commissioners planned to meet Thursday to discuss the staff recommendation, but without a quorum they will be unable to vote on it.

SpeechNow.org organized last year as a nonprofit organization, typically called a 527 for the section of the Internal Revenue Code that authorizes such groups. The groups can raise unlimited amounts of money and can conduct lobbying activities, including airing ads promoting issues. But SpeechNow.org organizers, in a test of FEC regulations, wanted to support candidates in 2008 "who favor returning America to the state of political freedom and advocate the defeat of candidates who favor speech restrictions in the name of campaign finance reform."

FEC lawyers said the group could do that only if it registered as a political committee, which would limit its contributions to $5,000 from individuals.

SpeechNow.org president David Keating said any restrictions on the ability of individuals to associate by forcing them to abide by FEC regulations would violate free speech guarantees in the Constitution.

Advertisement



"We'll probably have to ask the courts to let us do it," he said.

In the past two years, the FEC found that several prominent 527 organizations, both pro-Democrat and pro-Republican, violated the law by advocating for or against candidates. Several of the groups, under agreements where they did not acknowledge wrongdoing, paid fines totaling hundreds of thousands of dollars.

Paul S. Ryan, of the Campaign Legal Center, said the draft opinion was in keeping with those past findings. The legal center supports the FEC staff proposal.

"It's really the only outcome that the commission's general counsel's office could have put forth," Ryan said.

Already this election cycle, several groups have been accepting contributions in excess of federal limits to spend money in support of candidates but have not specifically advocated for their election.

A successful court challenge by SpeechNow.org would permit groups to raise money without limits and to advocate for the election or defeat of a candidate. SpeechNow.org, however, does disclose the identities of its donors and its expenditures.

*Copyright 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

**Find this article at:**
http://www.usatoday.com/news/politics/2008-01-22-2192405311_x.htm

☐ Check the box to include the list of links referenced in the article.

Copyright 2008 USA TODAY, a division of Gannett Co. Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
SPEECHNOW.ORG, et al.,                              )
                                                    )
                    Plaintiffs,                     )
                                                    )
            v.                                      )       Civ. No. 08-248 (JR)
                                                    )
FEDERAL ELECTION COMMISSION,                        )
                                                    )
                    Defendant.                      )
_____)


**ORDER**


         This matter having come before the Court upon Plaintiffs' Motion for Preliminary

Injunction (Docket No. 2) and Defendant Federal Election Commission's opposition thereto, and

the Court having read and considered the positions of all parties therein, it is hereby ORDERED

that Plaintiffs' motion is DENIED.




                                    _____
                                            JAMES ROBERTSON
                                            United States District Judge