# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SPEECH NOW.ORG, *et al.*,                )
                                          )
                    Plaintiffs,           )
                                          )          No. 1:08-cv-00248 (JR)
          v.                              )
                                          )          Assigned to Judge James Robertson
FEDERAL ELECTION COMMISSION,              )
                                          )
                    Defendant.            )
                                          )

## MEMORANDUM OF CAMPAIGN LEGAL CENTER
## AND DEMOCRACY 21 AS *AMICI CURIAE* IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Donald J. Simon
(D.C. Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE
ENDRESON & PERRY, LLP
1425 K Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 682-0240

Fred Wertheimer
(D.C. Bar No. 154211)
DEMOCRACY 21
1875 I Street, N.W.
Suite 500
Washington, D.C. 20005
(202) 429-2008

Counsel for *Amicus Curiae*
  Democracy 21

J. Gerald Hebert
(D.C. Bar No. 447676)
Paul S. Ryan
(D.C. Bar No. 502514)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., N.W.
Suite 650
Washington, DC  20036
Tel: (202) 736-2200

Counsel for *Amicus Curiae*
  Campaign Legal Center

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES..................................................................................iii

I.    Introduction...................................................................................1

II.   Summary of Argument.....................................................................  1

III.  Statutory and Factual Background...................................................... 2

    A.    Political Committees.............................................................  2

    B.    Section 527 Groups.............................................................   5

IV.   The Motion for A Preliminary Injunction Should be Denied................................ 9

    A.    Plaintiffs Have Not Demonstrated A Substantial Likelihood of Success on the Merits.............................................................................. 9

        1.    The Limit Imposed On Contributions to Political Committees – Even Those Making Only Independent Expenditures – Is Constitutional.............. 9

            a.    Contribution Limits Impose Only a "Marginal" Restriction on First Amendment Interests and Therefore Are Subject to a "Less Rigorous" Standard of Review................................................. 9

            b.    The *McConnell* Court Found that the Regulation of Contributions Used for Independent Expenditures by the Political Parties Was Supported by Important Government Interests............................ 14

            c.    Limits on Contributions to Independent Expenditure Committees Are Necessary to Avoid Circumvention of the Limits Enacted by BCRA to End the Corrupt Soft Money System........................   16

                i.    Anti-circumvention measures serve important governmental interests.................................................................. 16

                ii.    527 groups serve as vehicles to circumvent the BCRA limits on soft money................................................   18

                    (a)    The post-BCRA soft money donors to 527 groups were pre-BCRA soft money donors to the parties.......................................................19

i

(b)  The 527 groups, even if nominally "independent," are closely tied to parties and candidates..................... 20

(c)  Independent expenditure committees share essential features of party committees as vehicles for circumvention................................................25

d.  The *McConnell* Decision Makes Clear that *CalMed* Necessarily Applies to Political Committees Making Independent Expenditures............................................. 29

2.  Requiring SpeechNow.org to Register and Report Under FECA Serves Important Governmental Interests............................................. 31

B.  Granting A Preliminary Injunction Would Injure Other Interested Parties and Harm the Public Interest....................................................... 34

1.  Enjoining an Act of Congress Constitutes Irreparable Harm................................................................................... 34

2.  Granting an Injunction Would Impair the Compelling Interests Underlying FECA's Regulations of Political Committees.............. 35

V.  Conclusion................................................................................................. 36

93385.2

# TABLE OF AUTHORITIES

**Page**(s)

Cases:

*Buckley v. Am. Constitutional Law Found.,*
  525 U.S. 182 (1999) .................................................................................... 13

*\*Buckley v. Valeo,*
  424 U.S. 1 (1976) ................................................................................. passim

*Burroughs v. United States,*
  290 U.S. 534 (1934) ................................................................................. 35

*California Medical Ass'n. v. FEC,*
  453 U.S. 182 (1981) ............................................................................ passim

*Citizens Against Rent Control v. City of Berkeley,*
  454 U.S. 290 (1981) ................................................................................. 13

*Citizens for Clean Government v. City of San Diego,*
  No. 04-56964, 850 (9th Cir. 2007) ......................................................... 14

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
  58 F.3d 738 (D.C. Cir.1995) ..................................................................... 9

*Cobell v. Norton,*
  391 F.3d 251 (D.C. Cir. 2004) .................................................................. 9

*Colorado Republican Campaign Committee v. FEC (Colorado Republican I),*
  518 U.S. 604 (1996) ............................................................................... 10

*Communist Party v. Subversive Activities Control Bd.,*
  367 U.S. 1 (1961) ................................................................................ 32-33

*FEC v. Beaumont,*
  539 U.S. 146 (2003) .......................................................................... 10, 17

*FEC v. Colorado Republican Federal Campaign Comm.(Colorado Republican II),*
  533 U.S. 431 (2001) ....................................................................... passim

*FEC v. Malenick,*
  310 F. Supp. 2d 230 (D.D.C. 2004) ........................................................ 4-5

*FEC v. Massachusetts Citizens for Life,*
    479 U.S. 238 (1986) ................................................................................ 4, 34

*FEC v. Nat'l Conservative Political Action Comm.,*
    470 U.S. 480 (1985) ................................................................................ 10

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ................................................................................ 13

*\*McConnell v. FEC,*
    540 U.S. 93 (2003) ................................................................................ passim

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ................................................................................ 35

*Nixon v. Shrink Missouri PAC,*
    528 U.S. 377 (2000) ................................................................................ 12

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir.1998) ................................................................ 9

*Walters v. Nat'l Ass'n of Radiation Survivors,*
    468 U.S. 1323 (1984) ................................................................................ 35


**Statutes and Regulations:**

*Bipartisan Campaign Reform Act of 2002,*
    Pub. L. No. 107-155, 116 Stat. 81 .......................................................... 6
    § 323(a) ................................................................................................ 15, 18
    § 323(b) ................................................................................................ 15

2 U.S.C. § 431(4) ........................................................................................ 3

2 U.S.C. § 431(8)(A)(i) ................................................................................ 3

2 U.S.C. § 431(9)(A)(i) ................................................................................ 3

2 U.S.C. § 431(17) ...................................................................................... 5

2 U.S.C. § 432 ............................................................................................ 31, 36

2 U.S.C. § 432(c) ........................................................................................ 32
2 U.S.C. § 432(d) ........................................................................................ 32

2 U.S.C. § 433 ............................................................................................ 3, 31, 36

93385.2

2 U.S.C. § 434…………………………………………………………………………3, 31

2 U.S.C. § 434(a)……………………………………………………………… 36

2 U.S.C. § 434 (b)………………………………………………………… 32

2 U.S.C. § 434(c)……………………………………………………………passim

2 U.S.C. § 441a(a)(1)(C)………………………………………………… 4,17, 36

2 U.S.C. § 441a(a)(7)(B)(i)………………………………………………20

2 U.S.C. § 441a(a)(7)(B)(ii)……………………………………………… 20

2 U.S.C. § 441(a)(c)(1)(B)………………………………………………… 4

2 U.S.C. § 441a(a)(3)……………………………………………………… 4, 36

2 U.S.C. § 441b(a)…………………………………………………………… 3

2 U.S.C. § 441(d)(2)……………………………………………………… 3

2 U.S.C. § 441(d)(a)……………………………………………………3, 31, 33

2 U.S.C. § 441d(d)(2)……………………………………………… 31, 33

2 U.S.C. § 441i(a)………………………………………………………… 6, 13, 15

2 U.S.C. § 441i(b)………………………………………………………… 6, 15

26 U.S.C. § 527(e)(1)……………………………………………………… 5

26 U.S.C. § 527(e)(2)……………………………………………………… 5

26 U.S.C. § 527(j)(3)(B)…………………………………………………… 26

11 C.F.R. § 100.5(a)………………………………………………………… 3

11 C.F.R. § 109.21(d)………………………………………………………28

11 C.F.R. § 110.1(d)………………………………………………………… 4

11 C.F.R. § 114.2…………………………………………………………… 3

11 C.F.R. § 110.1(n)………………………………………………………… 4

11 C.F.R. § 110.5(d)………………………………………………………4

v

**Federal Rules**:

Fed.R.Civ.P. 65(a) ....................................................................................... 9

**Additional Materials**:

*Democracy 21 et al. v. America Coming Together* (MUR 5403)
(FEC June 22, 2004)................................................................... 22

*Democracy 21 et al. v. Economic Freedom Fund et al.*, (FEC Oct. 12, 2006)........... 7

FEC Advisory Opinion Request 2007-32 (filed Nov. 19, 2007)....................... 4, 26

FEC Conciliation Agreement With America Coming Together (MUR 5403 and
5466) (Aug. 2007)........................................................................... 8, 23

FEC Conciliation Agreement With The Media Fund (MUR 5440) (Nov. 2007)............8

FEC Conciliation Agreement With Progress For America Voter Fund
(MUR 5487) (Feb. 2007)....................................................................... 8

FEC Conciliation Agreement With Swift Boat Veterans and POWs for
Truth (MURs 5511 and 5525) (Dec. 2006)................................................. 8

FEC MUR 5440, Notification with Factual and Legal Analysis to
The Media Fund (Oct. 20, 2004)............................................................ 28

Steve Weissman & Kara D. Ryan, "Soft Money in the 2006 Election
and the Outlook for 2008" (Campaign Finance Institute 2007)....................... 7, 8

Steve Weissman & Ruth Hassan, *BCRA and the 527 Groups*, in
THE ELECTION AFTER REFORM: MONEY, POLITICS AND THE BIPARTISAN
CAMPAIGN REFORM ACT (Michael J. Malbin ed. 2005)............................... passim

Thomas Edsall & James Grimaldi, "On Nov. 2, GOP Got More Bang
for its Billion, Analysis Shows," WASH. POST, Dec. 30, 2004............................ 23

93385.2

## I.     Introduction

Contrary to the arguments made by plaintiffs, this case is not about whether SpeechNow.org, or similar groups, will have the capacity to make expenditures in unlimited amounts to expressly advocate the election or defeat of their preferred federal candidates. That right, long since established in *Buckley v. Valeo,* 424 U.S. 1 (1976), is not in dispute here. Nor is this case about whether individuals can freely associate in order to pool resources so that their collective voice will be amplified to fund such independent advocacy. That right is part of the structure of the campaign finance laws, which allows individuals to associate in the form of a political committee and to pool resources – in amounts up to $10,000 from each donor in each two-year election cycle – in order to engage in collective campaign-related speech.

Instead, this case is about whether wealthy donors can each contribute hundreds of thousands, or indeed, millions of dollars to sophisticated committees often run by Washington political operatives, closely associated with parties and candidates, in order to finance campaign advocacy that takes place wholly outside of federal campaign finance rules. Just years after Congress, with Supreme Court approval, ended a system of soft money that flowed through political party committees to influence federal elections, this case is about whether the Constitution requires the establishment of a new soft money regime – this time with the money from wealthy donors flowing through section 527 groups, such as plaintiff here. It does not.

## II.     Summary of Argument

Plaintiffs principally challenge the constitutionality of limits on contributions to political committees that engage only in independent expenditures. Because a limit on contributions (unlike a limit on expenditures) entails only a "marginal restriction" on rights of speech and association, *Buckley,* 424 U.S. at 20-21, it warrants a "less rigorous degree of scrutiny" and is

93385.2

valid if it "satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *McConnell v. FEC,* 540 U.S. 93, 136-37 (2003).

Here, that scrutiny is satisfied because nominally "independent" 527 groups, like SpeechNow.org, have a track record of serving as conduits for large donors seeking to avoid the limits on contributions to the political parties – limits that were recently enacted by Congress, and upheld by the Supreme Court, to shut down the corrupt soft money system. The experience of the 2004 campaign demonstrates how political party operatives in both parties, working in close conjunction with party officials, set up 527 groups which received multi-million dollar contributions from former party soft money donors who simply shifted their soft money giving to these new vehicles. These 527 groups thus became "soft money surrogates," *McConnell,* 540 U.S. at 177, for the circumvention of the law.

In a long line of cases, the Supreme Court has recognized that laws which prevent the circumvention of contribution limits thereby serve important governmental interests by protecting the integrity of the campaign finance laws. *E.g., McConnell,* 540 U.S. at 144. Those interests are directly served here, because absent a limit on contributions to "independent expenditure committees," such committees threaten to become "effective conduits for donors desiring to corrupt federal candidates and officeholders." *Id.* at 156 n.51.

### III.     <u>Statutory and Factual Background</u>

**A. Political Committees.** The legal framework for the regulation of "political committees" was established in 1974 with the enactment of the Federal Election Campaign Act (FECA), and has applied without significant revision to the present.

FECA defines the term "political committee" to mean "any committee, club, association or other group of persons which receives contributions aggregating in excess of

2

93385.2

$1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4); *see also* 11 C.F.R. § 100.5(a). The Act, in turn, defines "expenditure" and "contribution" to encompass any spending or fundraising, respectively, "for the purpose of influencing any election for Federal office." *Id.* §§ 431(8)(A)(i) (defining "contribution"), (9)(A)(i) (defining "expenditure"). In *Buckley*, the Supreme Court resolved constitutional concerns that this statutory definition of "political committee" was overbroad, by construing the term narrowly to "only encompass organizations that are under the control of a candidate <u>or the major purpose of which is the nomination or election of a candidate.</u>" 424 U.S. at 79 (emphasis added). *See also McConnell,* 540 U.S. at 170 n.64 (restating the "major purpose" test for political committee status).

   If an organization meets both the "major purpose" test and the statutory definition, it is deemed a "political committee" subject to the applicable requirements under federal law. "Political committees" are required to register with the FEC, *see* 2 U.S.C. § 433, and to file regular reports with the FEC that disclose all of their receipts and disbursements exceeding $200, *see id.* § 434. These registration and reporting requirements are more extensive than the disclosure required from entities that are not "major purpose" groups and that make only occasional independent expenditures. *See* 2 U.S.C. §§ 434(c), 441d(a), (d)(2).

   FECA also imposes two important contribution limits on political committees.[1] First, the law establishes a $5,000 limit on contributions by individuals to a political committee, other than

---

[1]    In addition, the Act establishes source restrictions for political committees, prohibiting the acceptance of contributions from corporations, labor unions and national banks. 2 U.S.C. § 441b(a); 11 C.F.R. § 114.2. Plaintiffs are not challenging the constitutionality of these source prohibitions as applied to "independent expenditure groups." Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl. Mem") at 3, 18 n.2. Thus, plaintiffs implicitly concede the constitutionality of at least some of the rules that constrain the funds received by "independent expenditure groups."

93385.2

to an authorized committee of a candidate or a political party committee.  2 U.S.C. §

441a(a)(1)(C); *see also* 11 C.F.R. § 110.1(d).  This is a calendar year limit, so individuals may

contribute up to $10,000 to a committee per two-year election cycle.  Second, the law provides

for an aggregate cap of $42,700 on the total contributions that an individual can make to all

political committees in a two-year election cycle.  2 U.S.C. §441a(a)(3).[2]

Commission regulations reiterate that these contribution limits "apply to contributions

made to political committees making independent expenditures."  11 C.F.R. §§ 110.1(n),

110.5(d).   Neither the statute nor the courts have exempted committees engaging in only

independent spending from regulation as political committees.  In formulating the "major

purpose" test, the Supreme Court did not condition political committee status on an

organization's connection to, or control by, a candidate.  To the contrary, the Court stated in *FEC*

*v. Massachusetts Citizens for Life (MCFL)*, 479 U.S. 238 (1986), that a non-profit ideological

corporation "would be classified as a political committee" if its "<u>independent spending</u> becomes

so extensive that the organization's major purpose may be regarded as campaign activity."  479

U.S. at 262 (emphasis added).

SpeechNow.org does not contest that it will meet the test for "political committee" status.

It has previously admitted that "[i]ts mission and <u>major purpose</u> is to advocate the election of

candidates -- in the 2008, 2010, and future federal election cycles."  FEC Advisory Opinion

Request 2007-32 (filed Nov. 19, 2007) at 2 (emphasis added).  *See, e.g., FEC v. Malenick*, 310 F.

---

[2]      During the two-year period beginning on January 1 of an odd-numbered year and ending on
December 31 of the next even-numbered year, "no individual may make contributions aggregating more
than ... $37,500, in the case of contributions to candidates" and "$57,500 in the case of any other
contributions, of which not more than $37,500 may be attributable to contributions to political
committees which are not political committees of national political parties."  2 U.S.C. § 441a(a)(3).
These amounts have each been increased for inflation.  *Id.* § 441a(c)(1)(B).

93385.2

Supp. 2d 230, 234-36 (D.D.C. 2004) (finding an organization evidenced its "major purpose" through its own statements). And it states that it intends to receive contributions in excess of $1,000, *see* Pl. Mem. at 4, and to make "expenditures" in excess of $1,000, *see id.* at 4-5,[3] thus satisfying both prongs of the statutory standard. Speech Now.org, however, has not yet registered with the FEC as a political committee and seeks through this lawsuit to avoid doing so, and to avoid the contribution limits applicable to funds received by a political committee.

**B. Section 527 Groups.** Section 527 of the Internal Revenue Code provides for the non-profit tax status of "political organizations," defined to mean a group "organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function." 26 U.S.C. § 527(e)(1). An "exempt function," in turn, is defined to mean "the function of influencing or attempting to influence the selection, nomination, election or appointment of any individual" to Federal, State or local public office. *Id.* § 527(e)(2). In *McConnell*, the Supreme Court pertinently observed that "Section 527 'political organizations' are, unlike § 501(c) groups, organized for the express purpose of engaging in partisan political activity." 540 U.S. at 174 n.67. The Court noted that 527 groups "by definition engage in partisan political activity." *Id.* at 177.

All FECA political committees (including party committees, candidate committees, non-connected committees and separate segregated funds associated with corporations and labor unions (or "PACs")) are 527 groups – they register as such with the IRS for purposes of establishing their non-profit tax status. But not all 527 groups are FECA political committees.

---

[3]     There is no question "independent expenditures" are treated as "expenditures" for the purposes of the Act. *See also* 2 U.S.C. § 431(17) (defining "independent expenditure" as "an expenditure by a person expressly advocating the election or defeat" of a candidate).

Those involved solely with non-Federal campaigns, for instance, are not required to register with the FEC or to abide by federal campaign finance laws.

Particularly following the enactment of the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107–155, 116 Stat. 81 (2002) (BCRA), a broader chasm opened between FECA "political committees" and section 527 "political organizations." After BCRA halted the flow of soft money through political party committees into federal elections following the 2002 campaign,[4] a number of 527 groups, such as The Media Fund, America Coming Together, Progress for America Voter Fund, and Swift Boat Veterans for Truth began spending money overtly to influence federal elections, particularly the 2004 presidential campaign. These, and other similar 527 groups, spent hundreds of millions of dollars of non-federal soft money funds, primarily on television advertising campaigns expressly advocating the election or defeat of the presidential candidates, and on partisan voter mobilization activities. Nevertheless, these groups took the position they were not making "expenditures" or receiving "contributions" under FECA, and thus did not have to register as FECA "political committees" or abide by the rules – including the limits on contributions – that apply to such committees.

Donations in excess of the federal contribution limits that had previously flowed as soft money to the political parties, including huge donations from wealthy individuals, were channeled instead to these 527 groups, which became the new vehicles for the flow of illegal soft money into federal campaigns. In the 2004 election, section 527 groups raised more than $405 million in soft money and spent more than $398 million, almost half of which was spent just by

---

[4]    BCRA prohibited the national party committees from raising or spending any non-federal funds, 2 U.S.C. § 441i(a), and prohibited state party committees from spending non-federal funds for specified activities that were deemed to influence federal campaigns (including "public communications" that refer to a federal candidate, and various voter drive activities). *Id.* § 441i(b).

93385.2

the four groups mentioned above.[5] Just 24 individual donors gave a total of $142 million in contributions to 527 groups in 2004, which represented more than half of all money raised from individuals by these groups. *Id.* at 92. One donor, George Soros, gave $24 million to 527 groups; another, Peter Lewis, gave $22.5 million. *Id.* at 94 (Table 5.2). In total, 52 individual donors each gave $1 million or more to 527 groups in 2004, and 265 gave $100,000 or more. *Id.* at 92 (Table 5.1).

Soft money spending by section 527 groups continued in 2006. Such groups "played a significant role in federal congressional elections during the 2005-06 cycle, raising $117 million and spending $143 million."[6] One group, the Economic Freedom Fund (EFF), received $5 million from a single donor, Bob Perry (who, in 2004, had given $4.45 million to Swift Boat Veterans for Truth and $3 million to Progress for America Voter Fund).[7] EFF spent its funds for television ads and direct mail to influence selected congressional elections. *Id.* at ¶¶ 14-21. Perry alone gave a total of $9.75 million to 527 groups in the 2006 cycle, while other large donors included Jerry Perenchio ($6 million), George Soros ($3.9 million), Linda Pritzker ($2.3 million) and Peter Lewis ($1.7 million). Weissman & Ryan, *supra* n.6 at 22 (Table 2). "Nearly

---

[5]     *See* Steve Weissman & Ruth Hassan, *BCRA and the 527 Groups*, *in* THE ELECTION AFTER REFORM: MONEY, POLITICS AND THE BIPARTISAN CAMPAIGN REFORM ACT (Michael J. Malbin ed., 2005) (hereafter "Weissman & Hassan") at 105 (Table 5.4) (listing contributions to and expenditures by "Federal 527 Organizations in the 2004 Election Cycle.") According to the Table, the Media Fund, America Coming Together, Progress for America Voter Fund and Swift Boat Veterans for Truth collectively spent $188.4 million. (For the Court's convenience, we attach a copy of the Weissman and Hassan chapter as Attachment A.)

[6]     *See* Steve Weissman & Kara D. Ryan, "Soft Money in the 2006 Election and the Outlook for 2008" at 1-2, a study published by the Campaign Finance Institute and available at http://www.cfinst.org/books_reports/pdf/NP_Softmoney_06-08.pdf. The fact that less money was raised by 527 groups in 2006 than in 2004 reflects that there was no presidential election that year.

[7]     *See Democracy 21 et al. v. Economic Freedom Fund et al.* (FEC Complt filed Oct. 12, 2006) at ¶ 12, available at http://www.democracy21.org/vertical/Sites/{3D66FAFE-2697-446F-BB39-85FBBBA57812}/uploads/{6CA0AFC4-3A4C-4489-88E6-90000F5C9DB5}.PDF.

93385.2

half of total contributions [to 527 groups] – $53 million – came from 104 individual $100,000+ donors, mainly from 15 individuals who gave between $600,000 and $9.75 million." *Id.* at 2.

In 2006 and 2007, the FEC concluded enforcement actions against the major 527 groups active in the 2004 campaign, finding in each case that the group met the test for "political committee" status and should have registered as such. Thus, the Commission concluded, these 527 groups violated FECA by failing to abide by the contribution limits that apply to political committees – the same limits at issue here.[8]

SpeechNow.org has registered with the IRS as a 527 group. Pl. Mem. at 3. Like those 527 groups that functioned in the 2004 and 2006 elections, Speech Now.org states that it too will operate independently of any candidate or party, and will engage only in making independent expenditures. Based on this characterization, and even though it admits it will meet the requirements for FECA political committee status, SpeechNow.org contends that the contribution limits applicable to political committees cannot constitutionally be imposed on it, because those limits serve no governmental interest and infringe its First Amendment speech rights. The remedy it seeks would, in practical import, enshrine the ability of 527 groups – like

---

[8]    In November 2006, the FEC began entering into settlement agreements with multiple 527 organizations to resolve enforcement actions brought against the groups. These agreements were based on the Commission's position that various independent 527 groups were "political committees" subject to FECA, because they had a "major purpose" to influence federal elections, and had made "expenditures" and received "contributions." *See, e.g.*, FEC Conciliation Agreement With Swift Boat Veterans and POWs for Truth (MURs 5511 and 5525) (Dec. 2006) (civil penalty of $299,500), *available at* http://eqs.nictusa.com/ eqsdocs/000058ED.pdf; FEC Conciliation Agreement With Progress For America Voter Fund (MUR 5487) (Feb. 2007) (civil penalty of $750,000), *available at* http://eqs.nictusa.com /eqsdocs/00005AA7.pdf.; FEC Conciliation Agreement With The Media Fund (MUR 5440) (Nov. 2007) (civil penalty of $580,000), *available at* http://eqs.nictusa.com/ 000066D5.pdf; FEC Conciliation Agreement With America Coming Together (MUR 5403 and 5466) (Aug. 2007) (civil penalty of $775,000), *available at* http://eqs.nictusa.com/eqsdocs/000061A1.pdf. To date, the Commission has found that at least eight 527 groups active in the 2004 election spent hundreds of millions of dollars in violation of FECA because they operated outside the rules that apply to political committees. The Commission has collected, in aggregate, more than two million dollars of civil penalties for these violations.

93385.2

Progress for America Voter Fund or The Media Fund – to continue to raise and spend donations from individuals unlimited in size for the purpose of influencing federal campaigns, much as such groups did in the 2004 and 2006 campaigns, and notwithstanding the Commission's subsequent determination that these groups acted illegally by failing to register as political committees and to comply with contribution limits on the funds they received.

## IV.    The Motion for A Preliminary Injunction Should Be Denied.

A preliminary injunction is "an extraordinary remedy." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A party seeking one must "by a clear showin[g] carr[y] the burden of persuasion" on four separate elements. *Id.* It must, in particular, "demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without injunctive relief, (3) that an injunction would not substantially harm other interested parties, and (4) that issuance of the injunction is in the public interest." *Id.* (citing *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C. Cir.1998)*; CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir.1995); and Fed.R.Civ.P. 65(a)). SpeechNow.org fails to carry its burden on showing any of the four elements.

## A.  Plaintiffs Have Not Demonstrated A Substantial Likelihood of Success on the Merits.

### 1.    The Limit Imposed On Contributions to Political Committees – Even Those Making Only Independent Expenditures – Is Constitutional.

#### a.    Contribution Limits Impose Only a "Marginal" Restriction on First Amendment Interests and Therefore Are Subject to a "Less Rigorous" Standard of Review.

This case concerns limits on "contributions" by individual donors to SpeechNow.org, not limits on "expenditures" by Speech Now.org, nor limits on "expenditures" by the individual donors to SpeechNow.org.

9

With regard to the First Amendment interests at stake, the Supreme Court has found a "fundamental constitutional difference" between limits on contributions and limits on expenditures. *Colorado Republican Campaign Committee v. FEC,* 518 U.S. 604, 614 (1996) (*Colorado Republican I*) quoting *FEC v. Nat'l Conservative Political Action Comm.* (*NCPAC*), 470 U.S. 480, 497 (1985).

Beginning with *Buckley,* the Court has held "that expenditure limits bar individuals from "any significant use of the most effective modes of communication," and therefore represent "substantial ... restraints on the quantity and diversity of political speech." *Buckley,* 424 U.S. at 19. Consequently, a statutory limit on expenditures must satisfy strict scrutiny review. *Id.* at 44-45.

By contrast, a contribution limit "entails only a marginal restriction upon [one's] ability to engage in free communication," because "a contribution serves as a general expression of support ..., but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of the contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Id.* at 20, 21; *see also McConnell,* 540 U.S. at 134-35; *FEC v. Beaumont,* 539 U.S. 146, 161 (2003). Thus, a limit on contributions "involves little direct restraint on ... political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* The "symbolic communicative value of a contribution bears little relation to its size...." *Colorado Republican I,* 518 U.S. at 615.

"[T]he transformation of contributions into political debate involves speech by someone other than the contributor." *Beaumont*, 539 U.S. at 161-62 *quoting Buckley,* 424 U.S. at 21. A

10

contribution, therefore, is "speech by proxy," *California Medical Ass'n. v. FEC,* 453 U.S. 182,

1976 (1981) (*CalMed*) (plurality opinion), because "the communicative value of large

contributions inheres mainly in their ability to facilitate the speech of their recipients…."

*McConnell,* 540 U.S. at 135.

 In the context of this case, the donors to SpeechNow.org are engaged only in indirect

speech by making contributions to the group, because it is SpeechNow.org that uses the money

to speak, not the donor.[9]  Thus, the "quantity" of the donor's symbolic communication expressed

by the act of making a contribution does not increase with the size of the contribution.  The

$5,000 per year contribution a donor is permitted to make under the FECA limits has, for First

Amendment purposes, the same "communicative value" as a $100,000 contribution that a donor

might wish to make.

 Plaintiffs press the point that contribution limits also impact First Amendment rights of

association, and particularly do so here, where donors are free individually to make unlimited

independent expenditures in their own name, but are subject to a limit on their ability to pool

those resources to make independent expenditures as a group.

---

[9] SpeechNow.org argues that contributions to independent expenditure committees represent more than "speech by proxy," and instead are akin to expenditures in that they "convey[] agreement with [the committee's] message." Pl. Memo at 17.  But that is <u>always</u> true of contributions; few would contribute to a candidate or political committee whose message the donor was not in agreement with.  As the Court said in rejecting this argument in *CalMed,* "Of course, CMA would probably not contribute to CALPAC unless it agreed with the views espoused by CALPAC, but this sympathy of interests alone does not convert CALPAC's speech into that of CMA." 453 U.S. at 196.

 What the Court said about CALPAC is true also of SpeechNow.org: it is "untenable" to claim that it is "merely the mouthpiece" of its donors; it is instead "a separate legal entity that receives funds from multiple sources and engages in independent political advocacy." *Id.*  The fact that contributors to SpeechNow.org agree with the "views espoused" by the group does not convert the group's speech into the donor's speech.

93385.2

Yet the Court has held otherwise. Although it has recognized that contribution limits may bear "more heavily on the associational right than on freedom to speak," *McConnell,* 540 U.S. at 135 *quoting Nixon v. Shrink Missouri PAC,* 528 U.S. 377, 388 (2000), it has also said that in terms of practical effect, a contribution limit (unlike an expenditure limit) leaves donors free "to become a member of any political association and to assist personally in the association's efforts on behalf of candidates," and to "assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." Contribution limits accordingly "allow associations 'to aggregate large sums of money to promote effective advocacy.'" *McConnell,* 540 U.S. at 136 *quoting Buckley,* 424 U.S. at 21-22.

Because a contribution limit thus imposes a lesser burden on First Amendment rights than does an expenditure limit, it warrants a "less rigorous degree of scrutiny," *McConnell,* 540 U.S. at 137, and is constitutionally "valid" if it "satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id.* at 136, *quoting Beaumont,* 539 U.S. at 162 (internal quotations omitted).

Plaintiffs confuse the issue by claiming that limits on contributions to "independent expenditure committees" should nevertheless be subject to strict scrutiny because they "automatically operate to limit the group's expenditures." Pl. Memo at 14. This is a theory made up from whole cloth, and one which collapses the Court's "fundamental" distinction between contributions and expenditures. All limits on contributions – including those made to candidates and parties – necessarily also serve to limit the funds which the recipient has available to make expenditures, and in that sense to limit the recipient's expenditures. But the Court has never held that that alone transforms a contribution limit into an expenditure limit. In rejecting this argument in *Buckley,* the Court instead noted that the "overall effect" of a contribution limit

12

"is merely to require candidates and political committees to raise funds from a greater number of persons...." 424 U.S. at 21-22.

This argument was again rejected by the *McConnell* Court in its review of the BCRA provisions which ban the national political parties from raising any soft money, and thus require all of a party's receipts to conform to federal contribution limits, regardless of whether the funds are ultimately to be used for candidate contributions, coordinated expenditures or independent expenditures. *See* 2 U.S.C. § 441i(a). The Court said that BCRA's soft money provisions do not "in any way limit[] the total amount of money parties can spend," but only restrict the "source and individual amount" of donations. 540 U.S. at 139. That "does not render them expenditure limitations." *Id.*[10]

Three conclusions follow from the foregoing:

First, in terms of the donors to SpeechNow.org, the $5,000 per year limit on the contributions they may make to the group imposes only a "marginal restriction" on their First Amendment interests, for their donations are transformed into speech "by someone other than the contributor" and, as donors, they are engaging in only "symbolic" or "indirect" speech. By their contributions, they are not directly speaking; SpeechNow.org is speaking as their "proxy."

---

[10]    The legal authority SpeechNow.org cites for its theory is inapposite. *NCPAC* considered a law setting a $1,000 limit on expenditures made by independent political committees, not contributions accepted by such committees. That *NCPAC* applied strict scrutiny in its review of an expenditure limit does not suggest that this level of review is appropriate for a contribution limit.

In *Citizens Against Rent Control (CARC)* v. *City of Berkeley*, 454 U.S. 290 (1981), the Court considered a $250 limit on contributions to ballot measure groups. However, regulation of ballot measure advocacy is distinguishable from candidate advocacy because "the risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978) (internal citations omitted); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 203 (1999) (noting that "ballot initiatives do not involve the risk of 'quid pro quo' corruption present when money is paid to, or for, candidates"). Because the instant case considers the regulation of committees engaging in express advocacy for candidates, it is not comparable to *CARC*, where the potential corruption of candidates and officeholders was not at issue.

13

Second, in terms of SpeechNow.org itself, the $5,000 per year limit on the contributions

it may receive from its donors restricts only the size of each separate donation made to it, but not

the number of separate donations it can raise, nor the amount of aggregate funds it can amass,

nor, therefore, the amount it can spend on independent political advocacy. It is free to raise and

spend as much money as the public appeal of its views can attract.

And third, the $5,000 contribution limit at issue does not warrant application of strict

scrutiny, but rather the "less rigorous" scrutiny that the Court has repeatedly applied to the

review of contribution limits.[11]

> **b.    The *McConnell* Court Found that the Regulation of Contributions
> Used for Independent Expenditures by the Political Parties Was
> Supported by Important Government Interests.**

The Court's decision in *McConnell* to uphold BCRA's soft money provisions directly

supports the proposition that the regulation of contributions to committees making independent

expenditures meets the applicable standard of review, and is constitutionally permissible. If

contributions that were eventually used as independent expenditures in federal elections had no

corruptive potential – if they were always and necessarily constitutionally protected – then the

Court would have had to strike down many of the soft money provisions it upheld in *McConnell*.

Instead, the Court found that the soft money provisions were justified by the state's interest in

preventing actual and apparent corruption, broadly defined as "undue influence on an

---

[11]    Plaintiffs respond that the level of scrutiny that normally pertains to review of a contribution limit is different here solely because the recipient is an "independent expenditure committee." Pl. Mem. at 17-18. But the statute "regulates contributions, not activities." *McConnell*, 540 U.S. at 154. As one court has recently noted, "the act of contribution, rather than the context in which contribution occurs, determines the standard of review." *Citizens for Clean Government v. City of San Diego*, No. 04-56964, 850-51 (9th Cir. 2007) (refusing to apply strict scrutiny to limit on contributions to ballot measure committees).

14

officeholder's judgment, and the appearance of such influence." *Id.* at 150, *quoting Colorado II*, 533 U.S. at 441.

The "core" soft money provision considered in *McConnell*, BCRA Section 323(a), codified at 2 U.S.C. § 441i(a), subjects all funds solicited, received, directed, or spent by the national parties to federal contribution limits, "regardless of how those funds are ultimately used," including for independent expenditures. *Id.* at 155. Section 323(b) extends this principle to state and local party committees, imposing federal limits on contributions to such committees which are used to finance "federal election activity," including voter registration, voter identification, and public communications that promote or oppose a clearly identified federal candidate. *See* 2 U.S.C. § 441i(b). Significantly, none of these "federal election activities" necessarily involves contributions to candidates, and most such activities are undertaken independently of candidates.

*McConnell* held that Sections 323(a) and (b) of BCRA are constitutional, even though they subject to contribution limits those funds ultimately used by parties for independent expenditures and other independent activities. The *McConnell* majority construed the state's anti-corruption interest broadly, and expressly rejected the reasoning of Justice Kennedy's dissenting opinion, which asserted that only contributions "made <u>directly to</u>" or used "in <u>coordination with</u>" a federal office holder or candidate are potentially corrupting. 540 U.S. at 152 (emphasis added); *see also id.* at 286-341 (Kennedy, J., concurring in judgment in part, and dissenting in part). The majority instead determined that large contributions, even those used by the parties for independent expenditures, threaten the integrity of the political system, because they allow contributors to gain access and influence over federal candidates. *See id.* at 146-48 (influence), 149-51 (access and influence). As the Court noted, "large soft-money contributions

… are likely to create actual or apparent indebtedness on the part of federal officeholders, regardless of how those funds are ultimately used." *Id.* at 155 (emphasis added).

In upholding BCRA's soft money provisions, then, *McConnell* necessarily found that contributions to party political committees can corrupt federal candidates and officeholders, regardless whether such contributions are used for coordinated or independent expenditures. The Court's key observation was that a contribution's ultimate use is not the basis for identifying its corruptive potential. Rather, the potential for corruption stems from the ability of donors to gain undue access to and influence over candidates and officeholders as a result of their contributions. And for the reasons discussed below, the same potential for corruption exists whether the independent spending is done by party committees or by independent spending committees, such as plaintiff here.

> **c.    Limits on Contributions to Independent Expenditure Committees Are Necessary to Avoid Circumvention of the Limits Enacted by BCRA to End the Corrupt Soft Money System.**

Given the "realities of political fundraising," *McConnell,* 540 U.S. at 152, and the recent history of 527 organizations in federal elections, a limit on donations to independent expenditure committees is necessary to prevent circumvention of the limits on contribution to candidates and parties, and thus is justified by the compelling state interests in preventing corruption and the appearance thereof.

> **i.    Anti-circumvention measures serve important governmental interests.**

In *McConnell*, the Supreme Court once again recognized the important role played by anti-circumvention measures in protecting the integrity of the campaign finance laws. With reference to the compelling interests of deterring corruption and the appearance of corruption, the Court said that precisely "because the First Amendment does not require Congress to ignore

16

the fact that 'candidates, donors, and parties test the limits of the current law,' these interests have been sufficient to justify not only contribution limits themselves, but laws preventing the circumvention of such limits." *McConnell,* 540 U.S. at 144 *quoting FEC v. Colorado Republican Federal Campaign Comm.* (*Colorado Republican II*), 533 U.S. 431, 457 (2001).

Previously, in *Beaumont,* where it upheld a ban on contributions by non-profit corporations, the Court said that "[q]uite aside from war-chest corruption and the interests of contributors and owners," the restriction on non-profit corporations is separately justified because it "hedges against their use as conduits for 'circumvention of [valid] contribution limits.'" 539 U.S. at 155, *quoting Colorado Republican II,* 533 U.S. at 456.

While non-profit corporations were the vehicle threatening circumvention in *Beaumont,* it was the political parties that posed the same danger in *Colorado Republican II.* There, the Court upheld limits on party coordinated expenditures in order to prevent the use of parties "as conduits for contributions meant to place candidates under obligation," 533 U.S. at 452, and to forestall their "exploitation as channels for circumventing contribution and coordinated spending limits binding on other political players," *id.* at 455.

Similarly, in *CalMed,* 453 U.S. at 197-98, the Court upheld 2 U.S.C. § 441a(a)(1)(C) – the limit on contributions to political committees – in order "to prevent circumvention of the very limitations on contributions that this Court upheld in *Buckley.*" And in *Buckley,* the Court sustained the aggregate annual limit on contributions by an individual because it "serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through….huge contributions to the candidate's political party." *Buckley,* 424 U.S. at 38.

17

In short, as the Court noted in *Colorado Republican II,* "all Members of the Court agree that circumvention is a valid theory of corruption...." 533 U.S. at 456.

**ii.**    **527 groups serve as vehicles to circumvent the BCRA limits on soft money.**

Here, the limit on contributions to independent expenditure committees serves to prevent circumvention of the BCRA provisions enacted to end the corrupt soft money system, and thus circumvention of the limits on contributions to candidates and parties.

527 groups that seek to influence federal elections, such as SpeechNow.org, undermine the campaign finance system because they provide a route for large donors to circumvent the federal contribution limits, and in particular, to evade the BCRA ban on soft money that was enacted to restore the vitality to those limits.

As the Court said in a related context in *McConnell,* "Congress knew that soft-money donors would react to [the national party soft money ban] by scrambling to find another way to purchase influence." 540 U.S. at 165.[12] Congress therefore chose in BCRA also to close the flow of soft money through state political parties, an anti-circumvention measure approved by the Court. *Id.* at 165-66 ("Preventing corrupting activity from shifting wholesale to state committees and thereby eviscerating FECA clearly qualifies as an important governmental interest."). And in the wake of BCRA's enactment, it is apparent that the donors who have given most significantly to "independent" 527 groups are those who have simply shifted their soft money giving from the political parties to 527 groups.

---

[12]    The Court noted, "It was neither novel nor implausible for Congress to conclude that political parties would react to §323(a) by directing soft-money contributions to the state committees, and that federal candidates would be just as indebted to these contributors as they had been to those who had formerly contributed to the national parties." 540 U.S. at 165.

18

**(a)    The post-BCRA soft money donors to 527 groups were pre-BCRA soft money donors to the parties.**

A leading study of the role played by 527 groups in the post-BCRA campaign finance system noted, "Analysis of the donors who provided the bulk of individual contributions [to 527 groups] in the last two election cycles reveals that they were mainly drawn from the ranks of individual soft money donors to parties." *See* Weissman & Hassan, *supra* n.5 at 80 (Attachment A).

Of the 113 individuals who contributed at least $250,000 to 527 groups in the 2004 cycle (and gave an aggregate total of $207 million), 73 of them (or 65 percent) had been soft money donors to the political parties in the 2000 and 2002 election cycles, having given a total of over $50 million of soft money to the national party committees in that period. *Id.* at 93. This group of 73 former party soft money donors gave $157 million to 527 groups in 2004 – or almost 40 percent of all of the money received by such groups. *Id.* These donors, who turned to 527 groups as the vehicle of choice to circumvent BCRA's soft money ban, included George Soros (who gave $24 million to 527 groups in 2004), Peter Lewis ($22.5 million), Stephen Bing ($13.9 million), Bob Perry ($8 million), Dawn Arnall ($5 million), Alex Spanos ($5 million), Ted Waitt ($5 million), Boone T. Pickens ($4.6 million) and Jerry Perenchio ($4 million). *See id.* at 94-96 (Table 5.2) (listing former party soft money donors who contributed to 527 groups in 2004).

It is fair to say that these party soft money donors, now blocked by BCRA, shifted their soft money contributions to 527 groups in order to circumvent the limitations imposed by BCRA. As Weissman and Hassan conclude, "Without question, a segment of former party individual soft money donors have been the main funders of 527s." *Id.* at 96.

If independent expenditure committees, such as SpeechNow.org, remain unregulated by FECA, they will continue to serve as the principal vehicle for big donors seeking to bypass

19

federal contribution limits on candidates and parties in order to gain political influence. What the Supreme Court said of multi-million dollar soft money donations to the political parties is true here as well: "It is not only plausible, but likely, that candidates would feel grateful for such donations and that donors would seek to exploit that gratitude." *McConnell,* 540 U.S. at 145.

<blockquote>

**(b)    The 527 groups, even if nominally "independent," are closely tied to parties and candidates.**
</blockquote>

The potential for corruption is not hedged simply by the fact that these 527 groups purport to be independent of candidates and the major political parties. The evidence is strongly to the contrary. As the discussion below illustrates, the political parties and their key operatives played a central role in the formation and operation of the major 527 groups active in the 2004 presidential campaign. Indeed, after chronicling the relationship between the political parties and several of the largest 527 groups in the 2004 election, Weisman and Hassan concluded that "[d]uring the 2004 cycle, the two major parties, including their leading paid consultants and active notables, were involved, in varying degrees, in the creation, operation, or funding of several prominent 527 groups." Weissman & Hassan, *supra* at 84.

Although these 527 groups were careful to avoid formally "coordinating" their expenditures with candidates or party committees as defined by FECA, *see, e.g.*, 2 U.S.C. §§ 441a(a)(7)(B)(i), (ii), and thus to maintain a prescribed legal "independence," their close relationship with the parties and their overlapping leadership signaled to donors that large contributions to these 527 groups could purchase access and influence over candidates and officeholders, just as their previous donations to the political parties had done prior to BCRA.

Three of the major 527 groups active in the 2004 presidential election, The Media Fund (TMF) and America Coming Together (ACT) (both aligned with Democrats), and Progress for America Voter Fund (PFA-VF) (aligned with Republicans) demonstrate the close ties between

93385.2

these supposedly "independent" 527 groups and the national parties. These three groups alone spent a total of $166 million in soft money in 2004, or over 40 percent of all expenditures by 527 groups that year. Weissman & Hassan at 104-05 (Table 5.4). The FEC subsequently concluded that the soft money spending by these groups was illegal. *See* n.8, *supra*.

The Media Fund was a 527 group founded to run political advertising to aid the 2004 Democratic presidential nominee. Weissman & Hassan, *supra* at 85. TMF was the product of a task force established in 2002 by the chairman of the Democratic National Committee (DNC), Terry McAuliffe, to analyze the effects of BCRA on Democratic fundraising. The Media Fund was conceived as a means to offset the loss of soft money outlawed by BCRA, as Chairman McAuliffe informed Democratic Party donors two years before the 2004 election. *Id.*

Named to head The Media Fund was Harold Ickes, the White House Deputy Chief of Staff to former President Clinton, and a member of the DNC's Executive Committee. *Id.* at 86. Ickes' leadership of The Media Fund, given his extensive ties to the Democratic Party and to former President Clinton, established a reliable connection between TMF and the Democratic Party in the eyes of many donors. "Ickes' credibility flowed from his long Democratic political history and ties with Democratic Party leaders...." *Id.* He served as a DNC delegate to the party's national convention, and visibly made the rounds at the convention soliciting party donors for The Media Fund and circulating with party officials. He ran TMF's convention activities from an office in the Four Seasons Hotel in Boston, just down the hall from the DNC's finance division, which focused on large Democratic donors. *Id.* at 87. This "conspicuous cohabitation undoubtedly burnished the groups' perceived identification with the party and presidential campaign." *Id.*

21

Former President Clinton personally did fundraising for the group, which sent a clear signal to donors as to TMF's legitimacy. *Id.* at 87. "He koshered us," one of TMF's leaders said of Clinton's involvement. *Id.* Clinton was also "extremely active in DNC fundraising and spoke 'frequently' to McAuliffe…" *Id.* Thus, while nominally independent from the DNC, The Media Fund was very much allied with it, and these ties were made abundantly clear to potential large donors. *Id.* at 86-87. TMF ultimately raised over $59.4 million, of which over $46 million was in soft money contributions from individuals in excess of the $5,000 limit. TMF Conciliation Agreement, *supra* n.8, at 5, 8. It spent 57.6 million, over 90 percent of which was for television, radio and newspaper advertisements, and direct mail that "attacked the character, qualifications and fitness for office of George Bush, or supported the character, qualifications, and fitness for office of John Kerry." *Id.* at 6, 9. TMF was subsequently found by the FEC to have violated the law because it did not register as a political committee and abide by the contribution limits applicable to such committees.

Closely aligned with TMF was its sister 527 group, America Coming Together, which originated from the same DNC taskforce that produced TMF. Weissman & Hassan, *supra* at 86.[13] ACT focused on voter mobilization efforts to complement The Media Fund's political advertising, and raised over $103 million dollars in soft money which it spent for activities in "17 'battleground' states" for the purpose of "defeating President George W. Bush in his bid for

---

[13]    ACT's leadership, like that of the Media Fund, consisted of power players in the Democratic Party. For instance, ACT's president was Ellen Malcolm, who was a member of the DNC's Executive Committee and president of EMILY's List, a large political committee that fundraises for Democratic women candidates. Minyon Moore, another member of ACT's executive committee, was a former White House political director under President Clinton. *See* Complaint, *Democracy 21 et al. v. America Coming Together* (FEC June 22, 2004) (MUR 5403), at ¶ 16 *available at* http://eqs.nictusa.com/eqsdocs/0000614E.pdf. Harold Ickes served as ACT's chief of staff. ACT Conciliation Agreement, *supra* n.8, at 2.

93385.2

re-election." ACT Conciliation Agreement, *supra* n.8 at 3. As ACT developed it plans, DNC chair McAuliffe "was 'probably' kept informed by some participants and was formally notified by Malcolm before the group was unveiled in August." Weissman & Hassan at 86. In their fundraising activities for ACT, Ickes and Malcolm "assured many donors of their relationship to the party and the campaigns. Their message was, 'We don't talk to the campaigns, are not connected with them, but they know and appreciate us and contributions are part of the public record and they are aware.'" *Id.* ACT was subsequently found by the FEC to have violated the law because it impermissibly spent soft money for activities to influence federal elections. ACT Conciliation Agreement, *supra* n.8, at 6-12.

There was a similar alignment with PFA-VF which, "[f]rom the beginning…was closely associated with the Bush administration, the RNC and their consultants." Weissman & Hassan at 87. The founder of PFA-VF was Tony Feather, a partner at Feather, Larson and Synhorst-DCI (FLS-DCI), a campaign consulting firm with ties to the Republican National Committee (RNC). In the 2004 campaign, for instance, FLS-DCI did over $19 million of work for the Bush campaign and the RNC.[14] Tom Synhorst, another partner at FLS-DCI, served as a "strategic advisor" to PFA-VF and a leading fundraiser. Synhorst was also a Republican insider, having advised the Bush-Cheney campaign in 2000. The presence of Synhorst created a clear link between PFA-VF and the RNC, as his activities "were certainly visible to his firm's political clients and his political relationships were presumably known to many donors." *Id.* at 88.

PFA-VF "received the ultimate wink and nod from the Republican Party and the Bush campaign." *Id.* at 89. In May of 2004, the chairman of the Bush-Cheney '04 campaign (Marc

---

[14]    Thomas Edsall & James Grimaldi, "On Nov. 2, GOP Got More Bang for its Billion, Analysis Shows," WASH. POST, Dec. 30, 2004, at A1.

93385.2

Racicot) and the RNC Chairman (Ed Gillespie) declared that the FEC's inaction regarding 527 groups "had given a green light" to 527 groups "to forge full steam ahead in their efforts to affect this year's Federal elections." Racicot and Gillespie named PFA-VF as a right-leading 527 group, thus signaling to prospective contributors that the 527 group had the RNC's blessing. *Id.* at 89. "PFA leaders considered the statement an official blessing that was central to their fundraising." *Id.*

PFA-VF raised $45 million in soft money, "70% of which came from just thirteen donors," and spent $26.4 million on television advertisements in key presidential battleground states, all of which "praised George W. Bush's leadership as President and/or criticized Senator Kerry's ability to provide similar leadership." PFA-VF Conciliation Agreement, *supra* n.8 at 5. PFA-VF was subsequently found by the FEC to have violated the law because it did not register as a political committee and abide by the contribution limits applicable to such committees.

Weissman and Hassan aptly summarized how the political parties responded to BCRA "in broadly similar ways":

> They permitted some of their leading political consultants, who
> were strongly identified with them, to serve their interests by
> generating new soft money pots. And party officials or politically
> active notables put the party imprimatur on selected 527
> fundraising to reassure potential donors.

Weissman & Hassan at 89. As a coda to their careful study of how the parties used 527 groups in 2004, Weissman and Hassan frame the problems caused by the soft money flowing through such groups:

- "If 527 groups spend independently to support or oppose candidates in large enough
  amounts – and some of their donors give in the megamillions – is there a danger that
  candidates and parties will feel obligated? Will this sentiment permit 527 groups and
  donors, in the Supreme Court's words, to "exert undue influence on an officeholder's
  judgment" (or appear to do so)?"

24

- "If individuals who are closely associated with party and campaign leaders establish, manage and fundraise for certain 527 organizations, is there a danger that these 527s will become more or less identified with the parties, recreating the corruption threat of the former party soft money system?"

*Id.* at 98. Now that the FEC has taken the position that the major 527 groups active in the 2004 campaign should have registered as federal political committees and abided by the applicable contribution limits, these same problems are presented with full force by plaintiffs' claim that such political committees should not be subject to contribution limits.

        **(c)**    **Independent expenditure committees share essential features of party committees as vehicles for circumvention**.

Plaintiffs attempt to discount the governmental interest here, claiming that only committees making contributions to candidates or coordinating activities with candidates raise the possibility of *quid pro quo* corruption. Pl. Mem. at 18-19. In so arguing, plaintiffs rely upon a simplistic vision of electoral politics wherein a group's formal independence from candidates means that its contributors will be unable to peddle financial support for political influence. This view is in stark contrast to the far more realistic understanding of politics that informed the Supreme Court's decision in *McConnell*, where it expressly <u>rejected</u> plaintiffs' "crabbed view of corruption" as contrary to "precedent" and "common sense." 540 U.S. at 152. The Court recognized that large contributions to political parties – even those funding independent party expenditures – are potentially corruptive because the contributors can leverage party power and political connections to obtain access to candidates.

So, too, large donors to non-party committees – such as the 527 groups discussed above – can leverage the spending power of those committees to obtain access and influence with candidates and officeholders. Party committees and non-party committees share essential

93385.2

features that make both entities "effective conduits for donors desiring to corrupt federal candidates and officeholders." *Id.* at 156 n.51.

*First*, both party committees and independent political committees draw political power from their narrow concentration on election-related activity. SpeechNow.org acknowledges that its major – indeed exclusive – purpose is to expressly advocate on behalf of its preferred federal candidates. AOR 2007-32 at 2. Because of this, non-party committees, like parties, have the "capacity to concentrate power to elect candidates." *Colorado II*, 533 U.S. at 455. By pooling individual resources, and by monitoring, rewarding, and punishing the behavior of candidates and officeholders more effectively than could any individual operating on his or her own, non-party political committees "marshal the same power and sophistication for the same electoral objectives as the political parties themselves." *Id.* What the Court said about party committees – that they speak "by aggregating contributions and broadcasting messages more widely than individual contributors generally could afford to do" and that they "marshal[] this power with greater sophistication than individuals generally could," *id.* at 453 – applies as well to non-party committees, such as SpeechNow.org.

*Second*, the informational exchange documented by *McConnell* that took place between political parties, their soft money donors and candidates, *McConnell*, 540 U.S. at 145-47, can also occur between non-party committees, their soft money donors, and the candidates they support. Federal officeholders "were well aware of the identities of the donors" to their party's soft money account, for "donors themselves would report their generosity to officeholders." *Id.* at 147. So too, nothing prevents generous contributors to 527 groups from simply informing candidates of their largess. Indeed, even if they fail to do so, donations to 527 groups are subject to public disclosure. 26 U.S.C. § 527(j)(3)(B) (requiring 527 groups to disclose to the IRS the

26

names of all donors of $200 or more, and size of donations). In the same way that candidates noticed large soft money contributions to their party committees, and "feel grateful," 540 U.S. at 145, so too common sense suggests that candidates would notice large contributions that go to non-party committees, and that "donors would seek to exploit that gratitude." *Id.* at 145.[15]

Further, any argument that the *McConnell* decision turned on the "special" relationship between party committees and candidates overlooks the fact, discussed above, that non-party committees have close relationships with parties and their candidates as well, and indeed, are often founded and operated by persons with longstanding ties to the parties. To be sure, SpeechNow.org claims it is not established or controlled by a candidate, and that it will refrain from making expenditures in "coordination" with candidates. Pl. Memo at 3-6. However, left unacknowledged by SpeechNow.org is the broad range of activities that are not captured by FECA's narrow standard for coordinated expenditures, but yet may in practical effect be functionally aligned with the candidate who is the beneficiary of the spending.

---

[15]    George Soros, the largest individual donor to pro-Kerry 527 groups in 2004, for instance, told a reporter that he has "been trying to exert some influence over our policies and I hope I'll get a better hearing under Kerry." Weissman & Hassan at 86-87.

The Center for Responsive Politics has documented the connection between contributions to the pro-Republican 527 groups in the 2004 election, and the post-election receipt of ambassadorships. Sam Fox, President Bush's recess appointee to the position of ambassador of Belgium, both gave to the Republican Party directly, and also donated $50,000 to the Swiftboat Veterans for Truth. *See* http://www.opensecrets.org/bush/ambassadors/fox.asp. Marilyn Ware, appointed to be ambassador of Finland in February 2006, contributed over $500,000 to 527 groups in 2004, including to PFA-VF. *See* http://www.opensecrets.org/bush/ambassadors/ware.asp. L. Francis Rooney III, appointed to serve as ambassador to the Holy See (Vatican), reportedly contributed $100,000 to PFA-VF, in addition to several hundred thousand dollars to the Republican Party and candidates. *See* http://www.opensecrets.org/ bush/ambassadors/rooney.asp. Finally, Frank E. Baxter was appointed to serve as ambassador to Uruguay in November of 2006; he gave approximately $100,000 to 527 groups, including to PFA-VF and to the Club for Growth, as well as making generous contributions to the Republican Party. *See* http://www.opensecrets.org/bush/ambassadors/baxter.asp.

93385.2

The close connections between The Media Fund/ACT and PFA-VF with their respective

parties demonstrate how the rules leave plenty of room for *de facto* coordination between an

"independent" 527 group and a candidate or his party.  An "independent expenditure

organization" may not go so far as to spend funds at the "request or suggestion" of a candidate or

party, or engage in "substantial discussion" with party officials or candidates about the specifics

of the committee's spending.  *E.g.* 11 C.F.R. § 109.21(d) (defining "conduct" standards for

coordination).  But just as the political parties have close ties to their candidates even when party

money is spent "independently," so too, non-party committees can and do have close ties to the

parties and their candidates even though their expenditures remain nominally independent.  The

2004 experience confirms that the coordination laws and regulations allow a broad swath of

contacts and communications between so-called "independent expenditure" 527 groups, on the

one hand, and the parties and their candidates, on the other.[16]

Because of these similarities and connections, both party and non-party committees pose

the potential for circumvention.  *See Colorado II*, 533 U.S. at 455-56.  Given their narrow focus,

electoral power and relationships with parties and their operatives, independent committees, like

party committees, are "entities uniquely positioned to serve as conduits for corruption."

*McConnell*, 540 U.S. at 156 n.51.  Indeed, the *McConnell* Court recognized that tax-exempt

organizations, including 527 groups, pose a threat as "soft money surrogates" for the

circumvention of FECA.  *Id.* at 177.

---

[16]    Indeed, the FEC examined the connections between The Media Fund, the DNC, and John Kerry's presidential campaign, based in large part on the dual roles Ickes played as both founder of TMF and as member of DNC Executive Committee, but ultimately took no action on the claim that those connections amounted to coordination within the meaning of the statute.  *See* FEC MUR 5440, Notification with Factual and Legal Analysis to The Media Fund (Oct. 20, 2004) at 9, *available at* http://eqs.nictusa.com/ eqsdocs/ 00006671.pdf; FEC MUR 5440, General Counsel Report #6 (June 7, 2007) ("Report #6") at 22-28, *available at* http://eqs.nictusa.com/eqsdocs/0000668B.pdf.

93385.2

Here, SpeechNow.org presents an attractive opportunity for wealthy donors to launder large donations through an "independent" entity to support their preferred candidates. And even if donors to independent committees such as SpeechNow.org are not actually seeking to "corrupt" candidates, this situation certainly gives rise to the appearance that donors are attempting to circumvent federal campaign finance statutes to acquire political influence over candidates and officeholders.

> **d.    The *McConnell* Decision Makes Clear that *CalMed* Necessarily Applies to Political Committees Making Independent Expenditures.**

The Supreme Court in *CalMed* reviewed and upheld the $5,000 limit on contributions to political committees also at issue here, and made clear that the limit served the government's interest in preventing actual or apparent corruption, and preventing circumvention of FECA's other contribution restrictions. 453 U.S. at 195-98 (plurality op.).

Although the plurality opinion in *CalMed* did not address the constitutionality of limits on contributions to committees making only independent expenditures, the *McConnell* decision has eliminated doubt on this issue.[17] In *McConnell,* the Court noted that its earlier *CalMed*

---

[17]    In *CalMed*, the Court reviewed the constitutionality of the limit as applied to a committee making both contributions and independent expenditures. The plurality opinion avoided considering "the hypothetical application" of FECA to political committees that make only independent expenditures. 453 U.S. at 197 n.17. In a separate opinion, Justice Blackmun, whose fifth vote was necessary for the decision, indicated that FECA's $5,000 limit could not apply to such committees. *Id.* at 203 (Blackmun, J., concurring in judgment) ("[a] different result would follow if [the $ 5,000 limit] were applied to contributions to a political committee established for the purpose of making independent expenditures.")

Plaintiffs make much of Justice Blackmun's concurrence, stating that his narrower position on the constitutionality of the contribution limits "controls." Pl. Mem. at 21. However, Justice Blackmun's reservation was only dictum regarding a hypothetical situation, because the committee at issue in the case did not make only independent expenditures.

93385.2

decision had necessarily upheld limits on contributions to committees used to make independent expenditures:

> [In *CalMed*], we upheld FECA's $ 5,000 limit on contributions to multicandidate political committees. It is no answer to say that such limits were justified as a means of preventing individuals from using parties and political committees as pass-throughs to circumvent FECA's $1,000 limit on individual contributions to candidates. Given FECA's definition of "contribution," the $5,000 … limi[t] restricted not only the source and amount of funds available to parties and political committees to make candidate contributions, but also the source and amount of funds available to engage <u>in express advocacy and numerous other noncoordinated expenditures.</u>

540 U.S. at 152 n.48 (emphasis added). As the last sentence makes clear, in the view of the *McConnell* Court, *CalMed* held that Congress could limit contributions to entities that would use those funds for independent expenditures.

The *McConnell* Court continued by noting that *CalMed* could not have upheld FECA's broad limit on contributions to multicandidate political committees without necessarily deciding this point. With respect to party committees, the type of committee at issue in this portion of *McConnell*, the Court wrote in the very next sentence after the passage quoted above:

> If indeed the First Amendment prohibited Congress from regulating contributions to fund [express advocacy and numerous other independent expenditures], the otherwise-easy-to-remedy exploitation of parties as pass-throughs (e.g., a strict limit on donations that could be used to fund candidate contributions) would have provided insufficient justification for such overbroad legislation.

*Id.* at 152 n.48. In other words, if donations given to a committee that were ultimately used to make independent expenditures had no corruptive potential, the overall limit on all contributions to multicandidate committees would have been unsustainable. Congress could have justified the limit only insofar as it limited funds given to a committee that the committee then donated to candidates – and thus remedied so-called "pass-through" corruption. In that case, much more narrowly tailored remedies, like "a strict limit on donations that could be used to fund candidate

93385.2

contributions," could have fully addressed such pass-through corruption concerns. Thus, the limit on contributions to political committees that used the funds for both contributions and independent expenditures would have been unconstitutionally overbroad if contributions used for independent expenditures were constitutionally sacrosanct. *McConnell* thus clarifies that *CalMed* necessarily stands for the proposition that the state may limit contributions to political committees making independent expenditures.

**2.      Requiring SpeechNow.org to Register and Report Under FECA Serves Important Governmental Interests.**

Plaintiffs additionally claim that requiring SpeechNow.org to comply with FECA's political committee registration and reporting requirements, *see* 2 U.S.C. §§ 432, 433 and 434, would violate SpeechNow.org's First Amendment rights to freedom of speech and association. Complaint, ¶¶ 112-18.

To say that plaintiffs' reasoning for this proposition is scant would be an understatement. SpeechNow.org concedes the constitutionality of FECA's provisions requiring disclosure and disclaimers in connection to independent expenditures, *see* 2 U.S.C. §§ 434(c), 441d(a) and 441d(d)(2), and pledges to comply with these less extensive disclosure requirements. Pl. Memo at 6. Without providing any legal support, SpeechNow.org then announces that its promised compliance with these lesser requirements will "address any interest the governmental has in disclosure," and that consequently, the more extensive political committee requirements are burdensome. Pl. Memo at 2.[18]

---

[18]      A political committee has more extensive reporting and record-keeping requirements than do individuals and groups that make only occasional independent expenditures. A political committee is required to register with the FEC by filing a statement of organization containing its name, address, the name of its treasurer, and lists of its banks or other depositories. 2 U.S.C. § 433. All committees must also file periodic reports that disclose <u>all</u> receipts and disbursements exceeding $200 received or made by the committee. *Id.* § 434. The treasurer is required to keep an account of every contribution regardless of

31

SpeechNow.org's position is flatly contradicted by the Supreme Court's decision in *Buckley* to affirm the constitutionality of FECA's registration and reporting requirements. *Buckley,* 424 U.S. at 60-74. The Court said that a disclosure requirement is constitutional so long as there is a "'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Buckley*, 424 U.S. at 64. This lower standard is appropriate because disclosure requirements "impose no ceiling on campaign-related activities," and "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 64, 68. Although the *Buckley* Court acknowledged that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights," it found "that there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." *Id.* at 66 *quoting Communist Party v. Subversive*

---

amount, the name and address of any person who makes a contribution in excess of $50, and the name and address of any person to whom a disbursement is made regardless of amount; and to preserve these records for three years. *See id.* §§ 432(c), (d).

By contrast, "non-major purpose" groups making independent expenditures are not required to register with the FEC or meet record-keeping standards. These groups are only required to report on (1) individuals who contribute over $200 annually to the group to fund independent expenditures; and (2) individuals who receive disbursements totaling over $200 annually from the group in connection with an independent expenditure and the purpose of such independent expenditure. *Id.* § 434(c).

SpeechNow.org contends that its observance of the independent expenditure reporting requirements will suffice to satisfy the government's informational interests. However, the minimal information required by these provisions will not provide adequate confirmation that SpeechNow.org is in compliance with federal laws. For instance, SpeechNow.org admits that the state has an interest in regulating contributions and expenditures made by corporations and unions, see Pl. Memo at 18 n.2, but without comprehensive disclosure of SpeechNow.org's receipts, as required by § 434(b), ascertaining whether SpeechNow.org has accepted funds from corporations or other prohibited sources is impossible. Similarly, without disclosure of all disbursements by SpeechNow.org, the public will not be able to confirm that SpeechNow.org has adhered to its pledge not to give funds to candidates, political committees or other organizations involved in electoral advocacy.

93385.2

*Activities Control Bd.*, 367 U.S. 1, 97 (1961). It described three state interests that justified

FECA's registration and reporting requirements:

1. "[P]rovid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office"

2. "[D]eter[ing] actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity."

3. "[G]athering the data necessary to detect violations of the contribution limitations described above."

*Id.* at 66-68 (internal quotations omitted).

Under the holding of *Buckley*, the application of FECA's registration and reporting

requirements to SpeechNow.org is constitutional because those requirements serve the

governmental interests in promoting disclosure, deterring corruption and gathering information.

SpeechNow.org's pledge to comply with the independent expenditure provisions at 2

U.S.C. §§ 434(c), 441d(a) and 441d(d)(2) in no way changes this analysis. The *Buckley* Court

was fully aware of both FECA's political committee registration and reporting requirements, *id.*

at 62-68, and the different independent expenditure disclosure requirements applicable to groups

that make only occasional expenditures, *id.* at 74-82. It upheld both sets of requirements as valid

for different classes of speakers.

Because political committees are groups whose "major purpose" is to influence elections,

*see Buckley,* 424 U.S. at 79 (narrowly construing the term "political committee"), the more

extensive registration and reporting requirements applicable to them are appropriate, since the

activities of such groups "are assumed" to be "campaign related." *Id.* By contrast, groups whose

"major purpose" is not campaign-related, which only make occasional independent expenditures,

need only comply with FECA's less extensive independent expenditure disclosure provisions.

The two-tiered nature of this statutory disclosure system is demonstrated by *MCFL*.
MCFL was a small, non-profit ideological corporation that conducted only limited election
activity. The Court determined that the registration and reporting requirements inherent in
establishing a political committee would be burdensome for such a group, but noted that this
conclusion was based upon the fact that MCFL was <u>not</u> a "major purpose" organization. The
Court stressed that "should MCFL's independent spending become so extensive that the
organization's <u>major purpose</u> may be regarded as campaign activity" then it would be "classified
as a political committee." 479 U.S. at 262. As such, MCFL would be "subject to the obligations
and restrictions applicable to those groups whose primary objective is to influence political
campaigns." *Id.*

Unlike MCFL, SpeechNow.org has a "major purpose … to advocate the election of
candidates." AOR 2007-32 at 2; Pl. Memo at 4-5. Because it meets the requirements for
political committee status, it can be required to comply with the applicable registration and
reporting requirements without causing constitutional offense, as made clear in the *Buckley* and
*MCFL* decisions.

**B.     Granting A Preliminary Injunction Would Injure Other Interested Parties and Harm the Public Interest.**

SpeechNow.org's motion for a preliminary injunction should not be granted for the
additional reason that enjoining the contribution and disclosure rules applicable to political
committees would manifestly injure other parties as well as the broader public interest.

**1.     Enjoining an Act of Congress Constitutes Irreparable Harm.**

FECA, as strengthened by BCRA, was enacted by Congress and upheld by the Supreme
Court "to confine the ill effects of aggregated wealth on our political system." *McConnell*, 540
U.S. at 224. The "presumption of constitutionality which attaches to every Act of Congress is

93385.2

not merely a factor to be considered in evaluating success on the merits, but an equity to be considered ... in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

Setting aside a duly enacted Act of Congress – even for a short period of time – irreparably injures both the government and the public, the beneficiary of that law. Thus, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). Similarly, when a lower court enjoins enforcement of an Act of Congress, the harm to the public is immediate; and if that judgment is later reversed on appeal, the harm incurred is irreparable. *Cf. Nat'l Ass'n of Radiation Survivors*, 468 U.S. at 1324 (Rehnquist, J., in chambers). These injuries are particularly great in this case. As the Supreme Court has noted, "to say that Congress is without power to pass appropriate legislation to safeguard ... an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection." *McConnell*, 540 U.S. at 223-24 *quoting Burroughs v. United States,* 290 U.S. 534, 545 (1934).

## 2. Granting an Injunction Would Impair the Compelling Interests Underlying FECA's Regulations of Political Committees.

In the absence of an injunction, the only speech interest impacted by the existing contribution limit is the indirect interest of donors who turn their money over to SpeechNow.org to speak for them. And even those donors are free to make contributions to the group up to the limit of $5,000 per year (or $10,000 per two-year election cycle) – a sum that generously exceeds the financial capabilities of the vast majority people in this country. Only a tiny minority of citizens – typically those with great wealth – can afford to contribute more than the FECA contribution limit already permits.

93385.2

By contrast, granting the preliminary injunction sought here would ensure, for at least the rest of this election cycle, that the wealthiest individuals in the country would be able to continue to funnel – not just $5,001 donations – but multi-million dollar donations into federal elections, through unlimited contributions to "independent" 527 groups, such as plaintiff, that will then engage in direct advocacy for or against federal candidates. The evidence from 2004 and 2006 demonstrates that there is a small set of very wealthy donors who will seize the opportunity to use such 527 groups as conduits for the deployment of their wealth to support or oppose federal candidates. The public interest in deterring corruption and the appearance of corruption will be impaired if such 527 groups are allowed to be vehicles for circumvention of the important reforms enacted through BCRA in the congressional effort to close down the soft money system.

## V.    Conclusion

For the foregoing reasons, the application of FECA's contribution limits, *see* 2 U.S.C. §§ 441a(a)(1)(C), (a)(3), and its registration and reporting requirements, *see* 2 U.S.C. §§ 432, 433 and 434(a), to SpeechNow.org does not violate the First Amendment. An injunction will impair the public interest. Accordingly, this Court should find that plaintiffs have not met their burden of demonstrating a "substantial likelihood" of success on the merits of their challenge to these provisions, and deny plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

<u>/s/ J. Gerald Hebert</u>

Donald J. Simon, (D.C. Bar No. 256388)          J. Gerald Hebert, (D.C. Bar No. 447676)
SONOSKY, CHAMBERS, SACHSE,                       Paul S. Ryan,  (D.C. Bar No. 502514)
ENDRESON & PERRY, LLP                            THE CAMPAIGN LEGAL CENTER
1425 K Street, N.W., Suite 600                   1640 Rhode Island Ave., NW, Suite 650
Washington, D.C. 20005                           Washington, D.C.  20036
(202) 682-0240                                   Tel: (202) 736-2200

Fred Wertheimer, (D.C. Bar No. 154211)          Counsel for *Amici Curiae*
DEMOCRACY 21                                     Campaign Legal Center
1875 I Street, N.W., Suite 500
Washington, D.C. 20005
(202) 429-2008

Counsel for *Amicus Curiae*
   Democracy 21


Dated:  March 5, 2008

93385.2

# ATTACHMENT  A

Steve Weissman & Ruth Hassan, *BCRA and the 527 Groups*, in
THE ELECTION AFTER REFORM: MONEY, POLITICS AND THE BIPARTISAN
CAMPAIGN REFORM ACT (Michael J. Malbin ed. 2005)

# The Election After Reform

*Money, Politics, and the Bipartisan Campaign Reform Act*

Edited by
Michael J. Malbin

ROWMAN & LITTLEFIELD PUBLISHERS, INC.
*Lanham • Boulder • New York • Toronto • Oxford*

# 5

## BCRA and the 527 Groups

*Stephen R. Weissman and Ruth Hassan*

In the wake of the 2004 election, press commentary suggested that rising "527 groups" had undermined the 2002 Bipartisan Campaign Reform Act's ban on unlimited corporate, union, and individual contributions to political parties and candidates. According to the *National Journal*, backers of the new law who had "sought to tamp down dire warnings" that close to $500 million in banned soft money "would simply migrate from the parties to 527 organizations" were now "singing a different tune" (Carney 2004a). A *New York Times* editorial lamented, "No sooner had the [campaign finance reform] bill become law than party financiers found a loophole and created groups known as 527s, after the tax-code section that regulated them" (*New York Times* 2004c). The Federal Election Commission (FEC) had refused to subject 527s to contribution restrictions so long as their stirring campaign ads and voter mobilization programs steered clear of formal candidate endorsements such as "vote for" and "vote against." The result, reported the *Washington Post*, was a new pattern of soft money giving, with "corporate chieftains and companies such as Microsoft, Boeing, and General Electric" displaced as "key contributors" by "two dozen superwealthy and largely unknown men and women . . . each giving more than $1 million" (Grimaldi and Edsall 2004). Billionaire George Soros would top the list at $24 million.

While there is considerable truth in this emerging portrait, it is vastly incomplete and significantly distorted. Deeper analysis reveals that while 527 soft money was important in 2004, new 527 dollars did not replace most of the party soft money banned by BCRA. In addition, BCRA eradicated a significant sum of soft money collected by congressional "leaders" via 527 accounts. The simple image of Republican-created vs. Democratic-created 527s overlooks important political distinctions, particularly between groups that existed before BCRA and those that were constructed afterwards. It also understates the degree to which

many of these partisan ties developed subsequent to the act of creation and became institutionalized.

Furthermore, the press's focus on about two dozen big 527 donors has distracted attention from broader 527 fundraising trends between 2002 and 2004 and what they portend in the future. These trends include a remarkable jump in trade union contributions, both stagnation and transformation in business giving, and, most important, a cross-sector increase in the willingness of donors to contribute at high levels. Analysis of the donors who provided the bulk of individual contributions in the last two election cycles reveals that they were mainly drawn from the ranks of individual soft money donors to parties. Yet it also shows that these ex-soft money donors gave far more to 527s in 2004 than they had previously given as soft money to parties. We conclude that while 2004 was the year in which small donors began to alter the financing of presidential campaigns, it was also one in which the unprecedented generosity of ex-party soft money donors demonstrated the potential for dramatic future expansion of 527 activities.

## 527S REPLACED SOME, BUT NOT THE MAJORITY, OF SOFT MONEY

In order to discover whether 527 money replaced traditional soft money in 2004, we had to determine how much the 527s received for federal elections in 2004 compared to 2002. In pursuing our research we were aware that some public discussion of 527 group finances had inflated the numbers by encompassing groups oriented to state elections—such as the Democratic and Republican Governors' Associations—and some had deflated the numbers by omitting labor union 527s with extensive federal activities.[1]

Limiting our analysis to 527s that were primarily or very substantially involved in federal elections, including those controlled by federal officeholders and candidates, we used an electronic database on 527 finances in the 2002 cycle provided by the Center for Public Integrity and electronic data on the 2004 cycle from the Internal Revenue Service 527 groups' website. To determine which groups were federal, we examined how they spent their money and described or presented their activities. The overwhelming majority of our eventual "federal" 527s were pretty thoroughly committed to federal races. Several others, mainly some of the labor union 527s, were heavily involved but also did substantial state and local work. We included a labor union 527 among our federal 527s only if we were able to clearly attribute *at least* a third of its total expenditures to specific federal elections. This is a conservative estimate because the IRS does not require that 527 expenditures for administration, personnel, media, and state party assistance be identified by specific election. Based on both the available data and statements by major union representatives, we are confident that a substantial majority of the $89 million reported spent by our eight union federal 527s in 2004 (as of December 12) went for federal elections.[2]

*BCRA and the 527 Groups*                                                    81

We restricted our analysis to federal 527s that reported at least $200,000 in donations in either the 2002 or 2004 election cycles, which includes almost all of the money that went into our federal 527s.[3] While it is possible that our data are incomplete because some 527s are not complying with federal financial reporting requirements, we found only one major instance in 2004. This was Moving America Forward, a political action committee (PAC) headed by Bill Richardson, the Governor of New Mexico and Chairman of the Democratic Convention. This group raised at least $2.9 million and, by its own account, was involved in some partisan voter mobilization efforts in federal as well as state and local contests in several presidential "battleground" states. It reported its finances only to the state of New Mexico (Armendariz 2004; Richardson 2004; Anderson 2004; Couch 2004). In a phone communication with the Campaign Finance Institute (CFI), Moving America Forward's counsel asserted that it was exempt from federal reporting under a provision of the law that, to the contrary, only excuses groups that are "solely" aiding the election of "any individual to any State or local public office . . . or political organization" (Public Law 107-276).[4]

### Total Activity

After accounting for duplication due to intergroup transfers, we found that total contributions to federal 527s rose from $151 million in 2002 (including $37 million for soft money accounts of congressional "leadership PACs" later abolished by BCRA) to $424 million in 2004—an increase of $273 million. It is clear that there is a significant, post-BCRA increase in contributions to these non-party soft money vehicles. However, the national parties raised $496 million in soft money in the 2002 cycle; and state parties raised an estimated $95 million in soft money for federal elections in the same cycle.[5] This made a total of $591 million in soft money abolished by BCRA. But since the 527s raised only $273 million more in 2004 than in the last year of party and candidate soft money, this 527 money failed to replace $318 million of the $591 million.

- Pre-BCRA Party Soft Money                        — $591 million
- Post-BCRA *Increase* in Federal 527 Soft Money   — $273 million
- Post-BCRA *Decrease* in Total Soft Money         — $318 million

But even this figure overestimates the 527s' importance in substituting for traditional soft money. National party soft money receipts had tripled between 1992 and 1996 and doubled from 2000–2004. And congressional leadership PAC soft money was also growing rapidly. There is little doubt that considerably more soft money than $591 million would have been collected for the 2004 elections in the absence of BCRA. This judgment is reinforced by the vast expansion of corporate and other soft money giving to party-connected "host committees" for the 2004 presidential nominating conventions (an increase from $56 million to $138 million since 2000), as well as the unanticipated high levels of donations to 527s by

ex-soft money donors in 2004 that we explore below. In sum, BCRA made a great deal of difference in the amount of soft money available in 2004.

We should also be cautious about attributing all of the increase in 527 fund-raising from 2002 to 2004 to the post-BCRA environment. With the added cost of a presidential election in 2004, 527 groups might have increased their receipts over 2002 anyway. And some of the increased contributions may have also resulted from the unusual passion the presidential contest election inspired, which appears to have been associated with large increases in campaign giving generally.

All of the subsequent analysis of 527s in 2004 in this chapter is based on nearly final contributions and expenditures data made available by the IRS by December 12, 2004. The data cover $405 million of the $424 million raised during the full cycle and encompass all the relevant 527s except for the following, which reported raising approximately $5 million very late in the cycle: America Votes 2004, Colorado Conservative Voters, LCV II, Mainstream 2004, Reclaim Our Democracy, Republican National Lawyers, Save American Medicine, and The NEA Fund for Children and Public Education.

Tables 5.3 and 5.4 (see appendix) list federal 527s active in 2002 (with a separate subcategory for the soft money branches of leadership PACs) and 2004 along with their contributions and expenditures. The tables indicate which of the 527s were largely oriented to supporting Democrats or Republicans. After adjusting for transfers (mainly by the pro-Democratic Joint Victory Campaign in 2004, which served as the fundraising arm for America Coming Together and The Media Fund), the Democrats held major advantages in net contributions during both cycles ($106-$44 million in '02 and $321-$84 million in '04). The nearly four-to-one funding ratio in favor of the Democrats in 2004 is even higher than the three-to-one ratio that would have been obtained in '02 ($85-$29 million) without the now abolished leadership PACs.

## "REPEATERS" AND "FIRST TIMERS" IN 2004

The 527 groups active in 2004 may be usefully divided into two categories. "Repeaters" (twenty-nine groups) were active in both the 2002 and 2004 cycles, while "First Timers" were active only in 2004 (fifty-one groups). See tables 5.5 and 5.6 in the appendix for details on these groups and their contributions.

These categories were also distinguished by their political characteristics. As the tables indicate, sponsors of twenty-two of the twenty-nine Repeaters groups also sponsored political action committees that contributed to candidates.[6] In their relationships to these entities as well as their political self-definitions, Repeaters generally represented relatively stable, more deeply rooted and longer term political interests. Some groups were associated with broad issue constituencies. Examples included the pro-free market Club for Growth, environmental organizations like the Sierra Club, and the labor unions. Other groups were anchored in issue-based party factions. Among these were EMILY's List, which

supports Democratic pro-choice women candidates, and two centrist groups, the Republican Leadership Council and New Democratic Network (NDN).

In contrast, only seven of fifty-one First Timers in 2004 had associated PACs. The largest First Timer, the pro-Democratic America Coming Together [ACT] had a PAC, but it was of slight importance. For most of the cycle, ACT expended just 2 percent of its funds through its "hard money" PAC account). First Timers mainly represented relatively transient or recently organized party or candidate interests. A prominent First Timer was Swift Boat Vets and POWs for Truth organized by veterans critical of Democratic presidential candidate John Kerry's Vietnam War performance. Other major groups included Citizens for a Strong Senate, established by former aides to Democratic Vice Presidential candidate John Edwards and active in several Senate races; The Media Fund, which was formed to promote the Democratic presidential candidate; the pro-Bush Progress for America, organized by former Bush campaign officials and consultants; and Americans for Jobs, an especially short-lived "drive-by" 527 that ran ads ambushing Democratic presidential aspirant Howard Dean shortly before the Iowa caucuses.

In 2004, as figure 5.1 illustrates, after adjusting for intergroup transfers, Repeaters raised $131 million (up from $96 million in 2002), but First Timers held sway with an imposing $274 million.

Figure 5.1  Federal 527s in 2004: Repeaters vs. First Timers



Among Repeaters, some groups did better in fundraising in 2004 and some did worse, as the percentage increases and decreases in table 5.5 show (see appendix). Large dollar increases were recorded by Service Employees International Union (SEIU), American Federation of State, County, and Municipal Employees (AFSCME), 21st Century Democrats, Club for Growth Inc., League of Conservation Voters, National Association of Realtors, National Federation of Republican Women, NDN, Progressive Majority, Planned Parenthood, and the Sierra Club. Groups showing large decreases included Communication Workers of America (CWA), College Republican National Committee, Republican Leadership Council, Republican Main Street Partnership, and the United Food and Commercial Workers Union (UFCW).

So while many observers have looked at the 2004 election through the prism of the biggest fundraisers—First Timer groups like America Coming Together and The Media Fund on the Democratic side and Swift Boat Vets, POWs for Truth, and Progress for America on the Republican one—it is important to remember that the Repeaters are also a very important part of the 527 picture.

## PARTIES, PRESIDENTIAL CAMPAIGNS, AND THE NEW 527s

During the 2004 cycle, the two major parties, including their leading paid consultants and active notables, were involved, in varying degrees, in the creation, operation, or funding of several prominent 527 groups. The same was true of the Bush campaign and its associates. We reached this conclusion based on both press reports (which are cited in endnotes) and confidential interviews with knowledgeable individuals. The 527s in question included the largest fundraisers and spenders: America Coming Together and The Media Fund on the Democratic side and Progress for America on the Republican one. Other Democratic groups—America Votes and Grassroots Democrats—also benefited from party support. After accounting for transfers, the above groups raised a total of $186 million, or 46 percent of the $405 million in total 527 funds—but 67 percent of the $274 million in total First Timer funds.

Although parties and campaigns, and their close associates, helped foster major 527 groups, there is no available evidence that they engaged in illegal requests for soft money or illegal coordinated communications. On the contrary, the individuals involved in supporting the 527s appear to have been rather scrupulous in following the letter of the law and its regulations, which forbade parties, candidates, and their agents, after November 6, 2002, from requesting or spending soft money in federal elections. After that date, the key supporters of 527s defined their roles publicly as independent of party and campaign structures, took steps to formally separate themselves (or, more precisely, parts of themselves) from close financial relationships with such structures, and seem to have refrained from coordinating their communications with the political campaigns. However, there is little doubt that *both before and after November 6, 2002,* the parties, the Bush campaign, and their close associates were at times complicit in, and actively facilitated, the rise of 527s. They acted through:

- permissiveness toward the activism of paid consultants with high standing and identification in both parties;
- the fundraising clout of a former president (Bill Clinton) who was closely linked to his party's national committee and presidential candidate; and
- various official winks and nods.

The area in which the parties and campaigns were most influential was fundraising.

### Democrats

The Democratic effort began when Democratic National Committee (DNC) Chairman Terry McAuliffe established a Task Force on BCRA, which really got going when the law passed in 2002. Members included Harold Ickes, a paid adviser to McAuliffe, President Clinton's former Deputy Chief of Staff and a member of the DNC's Executive Committee; Minyon Moore, DNC Chief Operating Officer; Josh Wachs, DNC Chief of Staff; Joe Sandler, DNC counsel; Michael Whouley, a leading Democratic consultant; and former White House officials John Podesta and Doug Sosnik (Edsall 2002). Ickes thought the Democratic Party was far behind the Republicans in adopting technologies to attract hard rather than newly banned soft money. And he believed the Democratic 2004 presidential nominee would participate in the public primary financing system with its spending ceilings, leaving that candidate broke by spring. At the same time, President Bush would opt out of the public system and be flush with private contributions. The eventual outgrowth of the Task Force's deliberations was two 527 groups, The Media Fund and Grassroots Democrats. At a gathering of Democratic donors in October 2002, McAuliffe discussed Ickes' plans for The Media Fund. He also appealed for financial aid to a new organization to be established by Joe Carmichael, president of the DNC's Association of State Democratic Chairs (Stone 2002; Van Natta and Oppel 2002). This would meet the need for an organization outside the national party that could relate to state parties, give them guidance, and help them raise limited "Levin funds" and other soft money. Ickes would subsequently head up The Media Fund and help select the board and staff of Grassroots Democrats, led by Carmichael after resigning his DNC position.

The following month—with BCRA now in effect—Ickes attended a meeting at a Washington restaurant of pro-Democratic interest groups. It was convoked by Gina Glantz, Assistant to the President of the SEIU and former Campaign Manager for Bill Bradley's presidential campaign. Others in attendance included SEIU President Andrew Stern, former AFL-CIO Political Director Steve Rosenthal, EMILY's List President Ellen Malcolm (also on the DNC Executive Committee and a veteran of many "coordinated campaigns" with national and state Democratic committees), and Sierra Club Executive Director Carl Pope. The discussion concerned "taking on Bush" in the 2004 election where the Republicans seemed to enjoy a large financial advantage. Rosenthal and Stern discussed plans

for a new, labor-backed organization that would emphasize ground operations (as opposed to TV and radio "air wars"). Participants also focused on the need to better coordinate interest group campaign operations (Cummings 2003). Ickes, who had obtained legal advice before attending this first post-BCRA meeting, was dropping the part of his portfolio with McAuliffe and the DNC that concerned campaign finance but continuing his consultancy on such matters as the party convention, nominating rules, and political advice. The consultancy would last until February 2004. (In 2002, The Ickes and Enright Group received $112,521 from the DNC through November 7. In 2003–2004, it received $123,860 from March 13, 2003, through February 18, 2004.)[7]

Ickes also attended a larger follow-up meeting in early May 2003, which discussed the establishment of America Votes to avoid duplication of effort by politically active groups. In reaction to a split between Rosenthal's Partnership for American Families and some of its previous labor backers, the group also contemplated creation of a new, broader-based voter mobilization group called America Coming Together (ACT) (Edsall 2003b).

As plans developed for ACT and America Votes, McAuliffe was "probably" kept informed by some participants and was formerly notified by Malcolm before the group was unveiled in August. By that time businessmen George Soros and Peter Lewis—armed with a brief from two consultants who had been recommended by ex-DNC BCRA Task Force Member John Podesta—had decided to pledge an initial $20 million to seed the new groups on the condition that ACT centralize its operations under Rosenthal and expand its planned ground-war activities from just a few to as many as seventeen "battleground" states. Malcolm and Ickes would soon lead a broad fundraising effort for both ACT and The Media Fund through still another 527 group called the Joint Victory Campaign (Cummings 2003; Mayer 2004; Stone and Barnes 2003).

Malcolm had "credibility" with certain cause-oriented donors because of her success as the leader of EMILY's List, which supported pro-choice Democratic women. Ickes' credibility flowed from his long Democratic political history and ties with Democratic Party leaders (he was the "political hack," joked one of his admirers). To engage potential donors, Malcolm and Ickes explained their well thought out campaign plans and their long-term goal of investing not just in an election but also in building a campaign infrastructure for the party. They felt they were giving the donors much more information than the party had and were therefore more accountable to them. They also assured many donors of their relationship to the party and the campaigns. Their message was, "We don't talk to the campaigns, are not connected with them, but they know and appreciate us and contributions are part of the public record and they are aware."

It quickly became clear that more political clout was needed with both major categories of potential donors: those, like Soros, seeking to realize "ideological" goals by getting rid of Bush and those interested in "access" to potential decision-makers. (This distinction should not be taken as absolute. Soros, for example, told reporter Jane Mayer, "I would be very happy to advise Kerry, if he's willing to listen to me, and to criticize him, if he isn't. I've been trying to exert

some influence over our policies and I hope I'll get a better hearing under Kerry.") (Mayer 2004). It was decided to bring in former President Bill Clinton, who was extremely active in DNC fundraising and spoke "frequently" to Terry McAuliffe, whom he had selected as DNC chief. In other words, Clinton was not only the best-known Democrat but "a major force" in the DNC (VandeHei 2002b, 2003; Kaplan 2002). The goal was "to show the donors this was the real deal," to communicate, "I know them, you can trust them, this is the strategy." In October 2003—the same month in which he starred in party fundraisers in New York and Washington, DC (Theimer 2003; Lakely 2003)—the former president attended a dinner meeting of about fifteen people, mostly potential donors, at Soros's 5th Avenue New York City apartment. He told them that ACT met a critical need and that if ACT had existed in 2000 the Democrats would have won. As one of the 527 group leaders put it, "He koshered us. He gave the donors confidence, both ideological ones and the access ones." Clinton also encouraged about a dozen potential donors to The Media Fund at a meeting in Los Angeles in February 2004, a year in which he energetically raised money for both the DNC and Senator John Kerry's presidential campaign (Stone 2004a; Haberman 2004; Sweet 2004; *China Daily* 2004; *The Frontrunner* 2004). The leaders of ACT and The Media Fund were quite visible soliciting party donors and hobnobbing with the party and presidential campaign during the Democratic National Convention in Boston. They set themselves up on the second floor of the Four Seasons Hotel, down the hall from the DNC Finance Division which catered to large donors. Ickes, who was a delegate and member of the DNC Executive Committee, and Malcolm, who had resigned from the Committee when ACT was established, were also visible on the convention floor. Whatever their intentions, such conspicuous cohabitation undoubtedly burnished the groups' perceived identification with the party and presidential campaign (Rutenberg and Justice 2004a; Farhi 2004b).

### Republicans

Republican efforts to foster independent groups developed more slowly. They centered at first on a 501(c)(4) advocacy group, Progress for America (PFA), which was doing grassroots work in favor of Bush administration policies. From the beginning this group was closely associated with the Bush administration, the RNC, and their consultants.

PFA was founded in 2001 by Tony Feather, Political Director of the 2000 Bush-Cheney campaign and partner in Feather, Larson, & Synhorst-DCI (FLS-DCI), a campaign consulting firm that worked for the RNC. On its website (www.fls-dci.com), the firm featured a tribute from Karl Rove, Bush's chief political adviser. From 2001 through 2003, PFA itself paid no salaries, benefits, or occupancy costs according to the group's Form 990 annual returns filed with the IRS. To avert a potential legal conflict between FLS-DCI's party and anticipated presidential campaign work and PFA's status as an independent political group, Feather relinquished his leadership of PFA as BCRA came into effect. He chose

Chris LaCivita, former Political Director of the National Republican Senatorial Committee, as the new president. During his service with PFA, LaCivita was a paid contractor with DCI Group, a public affairs and lobbying entity that shared a common partner with FLS-DCI—Tom Synhorst. Like Feather, Synhorst had extensive national Republican political experience, having served as an adviser to Bush-Cheney 2000 and in key roles in the floor operations of the 1996 and 2000 Republican conventions (Cillizza 2003b; Stone 2003).[8]

PFA's LaCivita spent much of 2003 wrestling with the problem of how to achieve the organization's goal of running pro-Republican federal political campaigns through a soft money 501(c)(4) group that was prohibited from having a primary mission of influencing elections. At one point he produced plans to spend about half of PFA's funds on campaign-oriented "issue advocacy" directed to the general public and half on express candidate advocacy directed to an enlarged group of "members." (The notion was that the IRS would not count "internal communications" as "political expenditures.") At PFA's October 2003 Issues Conference, an assemblage of political operatives, lobbyists, and donors was addressed by Ed Gillespie, RNC Chair, Ken Mehlman, Bush-Cheney 2004 Director; and Benjamin Ginsberg, counsel to both PFA and the presidential campaign (Drinkard 2004). The political operatives excused themselves when the question of donations came up.

When LaCivita departed PFA in the spring of 2004 to work on two Republican Senate campaigns, he was succeeded as president by DCI partner Brian McCabe. LaCivita would soon be better known as senior strategist for the anti-Kerry 527 group, Swift Boat Vets and POWs for Truth. The fledgling Swift Boat group had approached PFA for assistance, and the latter had recommended LaCivita. While handling the Swift Boat operation, LaCivita also returned briefly to PFA as a contractor.

By the late spring of 2004, FLS-DCI, the DCI Group, and PFA were all involved in the Bush campaign. FLS-DCI conducted message phone calls and telemarketing, respectively, for the Bush and RNC campaigns for which it was ultimately paid at least $19 million (Edsall and Grimaldi 2004).[9] DCI Group had a small contract for services at the Republican convention. And PFA had decided to organize a pro-Bush 527 in May 2004, following the FEC's decision not to regulate 527s. While each of these organizations was a separate unit with distinctive functions, they also had important relationships. The linchpin was FLS-DCI partner Tom Synhorst. He had established and was a partner in the DCI Group, which frequently used FLS-DCI as a vendor for phone work. Synhorst was also a "strategic adviser" and leading fundraiser for PFA both before and after it moved its campaign work from a 501(c)(4) "advocacy" group to a 527 political organization. Like Harold Ickes, Synhorst maintained that his personal 527 group work was in a separate "silo" from his firm's (FLS-DCI) work for the party and campaign. And like Ickes' efforts, Synhorst's activities were certainly visible to his firm's political clients, and his political relationships were presumably known to many potential 527 donors (Edsall 2004a; Stone 2004b; Getter 2004).[10]

As it sought funds, PFA confronted even more daunting obstacles than ACT

and The Media Fund. Not only did the organization, like its Democratic coun-
terparts, lack a long track record, but the Republican National Committee had
called upon the FEC to limit the financing of 527s (Bolton 2004b). (President
Bush would reiterate this position in reaction to the controversial Swift Boat
group attack on Democratic nominee John Kerry (Bumiller and Zernike 2004).
Moreover, the corporations that PFA initially looked toward as a main source of
funds proved reluctant to contribute, often citing warnings from counsel about
the uncertain legality of 527s (Cummings 2004a; Edsall 2004c). In response, PFA
hired three "traditional Republican fundraisers." Ensconced at the Ritz-Carlton
Hotel during the Republican convention in New York, it succeeded in enlisting
both funds and fundraising assistance from two of President Bush's most ardent
financiers: Alex Spanos and Dawn Arnall. Most important, it received the ulti-
mate wink and nod from the Republican Party and the Bush campaign.

In a joint statement on May 13, 2004, RNC Chair Ed Gillespie and Bush-
Cheney Campaign Chairman Marc Racicot declared that the FEC's inaction on
527s "has given the 'green light' to all non-federal '527s' to forge full steam ahead
in their efforts to affect the outcome of this year's Federal elections, and, *in par-
ticular, the presidential race* [emphasis added]. . . . The 2004 elections will now
be a free-for-all. Groups like the Leadership Forum, Progress for America, the
Republican Governors' Association, GOPAC and others now know that they can
legally engage in the same way Democrat leaning groups like ACT, The Media
Fund, MoveOn, and Moving America Forward have been engaging" (Bush-
Cheney Campaign and the Republican National Committee 2004). It should be
noted that of the four pro-Republican groups named, the last two were not sub-
stantially engaged in federal elections, and the Leadership Forum was not
involved in the presidential contest.

The phrasing was careful in avoiding words that the FEC might interpret as
illegally "soliciting" and "directing" soft money, but PFA leaders considered the
statement an official blessing that was central to their fundraising. As one key
strategist commented, "If we weren't on the list, it would have been over. Our
message had been we don't like 527s. Then the Republican Party and campaign
said, 'Don't fight them anymore.' From there it was all up. We didn't have a
Clinton to encourage donors like the Democrats had." PFA viewed its eventual
donors as "ideological" supporters of the Bush administration rather than as
seekers of special access.

In sum, the parties responded to BCRA in broadly similar ways. They permit-
ted some of their leading political consultants, who were strongly identified with
them, to serve their interests by generating new soft money pots. And party offi-
cials or politically active notables put the party imprimatur on selected 527 fund-
raising to reassure potential donors. The Democrats started early and were legally
able to use the party apparatus to launch The Media Fund and Grassroots Demo-
crats before BCRA fell into place. Then they forged relations with initiatives by
interest groups and party factions. The Republicans got off the ground late, and
party and campaign leaders were compelled to issue a careful official statement
in order to overcome numerous obstacles. At the end of the day, though, each

*Stephen R. Weissman and Ruth Hassan*

party committee and at least one presidential campaign were, to a significant degree, identified with a major 527 group (America Coming Together and Progress for America, respectively) that aspired to be active in future campaigns.

## THE CHANGING MIX OF 527 DONORS

We analyzed contributions of $5,000 or more to our list of federal 527 groups. These accounted for all but $16,070,872 million of total receipts in 2002 and $15,134,945 million of total receipts in 2004. We discovered that there was a dramatic evolution in the three main categories of 527 donors from 2002 to 2004.[11] Labor union contributions increased from $55 million to $94 million, a major, but frequently overlooked, development. To put it another way, unions gave pro-Democratic 527s about four times as much as billionaire George Soros did. The major increase in labor donations to 527s signified that labor more than made up for the $36 million in soft money it gave (mainly through 527s) to national parties in the 2002 cycle.[12] On the other hand, business donations (meaning those not of individual businessmen but of corporations, trade associations, and individual incorporated entities like lawyers' and doctors' practices) declined from $32 million to $30 million (actually to $26 million if one omits a large contribution by the "Sustainable World Corporation," widely regarded as a nonfunctioning business representing Linda Pritzker, a member of one of the world's wealthiest families) (Wallison 2004). So business contributions to 527s in no way made up for the $216 million in soft money that business entities had given to national parties in the 2002 cycle.[13] The biggest change, though, came in donations by individuals, which rocketed from a mere $37 million to $256 million. Figure 5.2 illustrates all the changes.

Examining these three categories more closely, table 5.7 (see appendix) shows that the jump in union contributions between the two cycles was essentially the work of two large unions that were already giving to 527s: SEIU and AFSCME.

In 2002 a substantial part of labor's money ($21 million out of $55 million) went to labor 527s and was transferred to national and other Democratic Party Committees for federal elections. In 2004, labor's enlarged federal effort consisted mainly of labor 527s making cash transfers and furnishing in-kind assistance to new pro-Democratic 527s, particularly America Coming Together, Grassroots Democrats, The Media Fund, Moving America Forward, The Partnership for America's Families, and Voices for Working Families.

Within the business sector, there was more turbulence despite an overall stagnation in funds. Business donors who had given nearly $15 million of $21 million in business contributions to leadership PACs in 2002 vanished along with the soft money leadership PACs themselves in 2004. Also departing were businesses that had given almost $5 million to both federal organizations and leadership PACs. Making up for those losses, continuing business donors upped their giving from $12 million to $16 million, and more than $13 million more flowed in from new donors.

Contributions from certain categories of business plunged: communications,

Figure 5.2  Federal 527 Donors by Sector, 2002 and 2004 Election Cycles ($ *millions*)



pharmaceutical, insurance, energy and transport corporations especially. Others ascended, including trial lawyers, private holding companies, realtors, and the U.S. Chamber of Commerce. The top recipient of business's donations continued to be the Repeater New Democratic Network. But in 2004 business turned away from previously favored Republican groups such as the Republican Leadership Coalition, Republican Leadership Council, and Republican Main Street Partnership, and toward the National Association of Realtors and newer pro-Republican groups like the November Fund and Progress for America.

Unlike both the business and labor sectors, new donors supplied the brunt of individual contributions in 2004 ($157 million). But continuing donors raised their giving as well: from $18 million to $99 million. Less significantly, donors who had provided $19 million in 2002 abandoned the 527 ship in 2004. There was once again a striking change in the recipients of donations. Of the ten top 527s benefiting from individual contributions in 2002, the first nine were Repeaters; but in 2004, only two of the first eight were Repeaters.

## MORE DONORS GAVE AT HIGH LEVELS IN 2004

Probably the most remarkable development between the two election cycles was the increase in the size of top contributions in all three sectors.

Among labor unions the donor base remained relatively stable (rising from forty to forty-six unions). As we have seen, the two main givers (SEIU and AFSCME) were almost entirely responsible for the near doubling of union contributions between 2002 and 2004. As a result, their donations rose from 58 percent ($32 million) to 78 percent ($73 million) of total donations.

Although business giving was stagnant, and the number of businesses giving at least $5,000 fell dramatically (from 1,034 to 361), between 2002 and 2004 the average business contribution rose from $30,286 to $81,886. This was largely the result of increased giving by the top-most supporters. In 2002, it required seventy-eight businesses to generate 50 percent of the total money—in 2004 it took only seven donors.

But the most important change occurred among individuals. This was the sector that mainly powered the 2004 surge in giving to 527s. In 2002, there were 1,232 individuals who provided an average donation of $30,112. But in 2004, 1,887 donors produced an average contribution of $135,805—more than four times as high as 2002, with 50 percent more donors. The amount given by the typical donor didn't change very much: the *median* donation rose from $10,000 to $12,000. The *average* contribution went up dramatically because of the increased generosity of higher end givers in 2004. As table 5.1 indicates, this was overwhelmingly the result of two trends:

- multifold increases since 2002 in the number of donors who were willing to give $100,000 or more, which increased from 66 to 265; and
- the special 2004 role of twenty-four $2 million+ donors who provided 56 percent of all individual contributions over $5,000.

What has often been forgotten is that while the top twenty-four donors provided $142 million, other individual large donors (especially $100,000+ ones) gave $114 million. The *general* willingness to give more at the high end was the basis of the expansion of individual giving from $37 million in 2002 to $256 million in 2004.

Table 5.1    Changing Patterns of Individual Giving to Federal 527s

| Range of Donation | 2002 Cycle | | | 2004 Cycle | | |
|---|---|---|---|---|---|---|
| | *n* | *Amount* | *% of Total* | *n* | *Amount* | *% of Total* |
| $2 Million and Over | 0 | $0 | — | 24 | $142,497,241 | 56 |
| $1 Million to $1,999,999 | 2 | 2,152,000 | 6 | 28 | 35,216,957 | 14 |
| $500,000 to $999,999 | 8 | 6,132,190 | 17 | 25 | 16,380,500 | 6 |
| $250,000 to $499,999 | 13 | 4,238,550 | 11 | 36 | 12,297,148 | 5 |
| $100,000 to $249,000 | 43 | 5,872,372 | 16 | 152 | 20,360,946 | 8 |
| $5,000 to $100,000 | 1,165 | 18,672,941 | 50 | 1,617 | 29,511,550 | 12 |
| Total | 1,231 | 37,068,053 | 100 | 1,882 | 256,264,342 | 100 |

## THE LARGE DONORS GAVE MUCH MORE THAN PREVIOUS SOFT MONEY DONATIONS

Who exactly were these generous individuals who, along with a few unions, powered the overall boost in 527 finances from one cycle to the other? Do the data show that those who gave big money to 527s in 2002 and 2004 were mainly ex-party soft money donors? Yes. Does the scale of giving in 2004 indicate that such donors were mainly switching their soft money from one legalized vehicle to another? Not at all.

Table 5.2 provides a closer look at the 113 people who donated at least $250,000 to federal 527s in the '04 cycle. These donations accounted for $207 million of the $256 million in $5,000 and over contributions, that is, 81 percent of these donations.

As the table indicates, this group was replete with wealthy players in the private, corporate economy. (Several of the more modest descriptions under "Employer," though, fail to indicate the donor's economic base. For example, Alice Walton of "Rocking W. Ranch Inc." is a member of the family that owns 38 percent of Wal-Mart; Marian Ware of "Ware Family Office/Retired" is a member of the family that founded American Waterworks and ran it until 2003; Maconda O'Connor, "self/social worker" is the daughter of Houston business icon George Brown; and John Templeton is not only "Templeton Foundation/retired" but a world renowned financial investor who named and owned a major mutual fund.)

The two columns on the right side of the table show that 73 of the 113 large donors in 2004 (65 percent) had indeed been active in the former soft money system. Over the previous two cycles, 2000 and 2002, they had furnished a total of $50 million in soft money to national party committees. (In some instances, attributing to the individual the total soft money contributions of his or her company and those associated with it would have raised contribution levels, but not so much to have significantly changed the overall total.)[14] At the same time, eleven of these seventy-three individuals had given a little over $4 million to 527s in 2002. Yet in 2004 alone, as the table notes, the seventy-three former soft money donors provided $157 million to 527s—three times the combined amount they had given to parties in 2000 and 2002 and 527s in 2002. *Clearly what was happening was not only a shift in their soft money giving—from party to 527—but also a vast escalation in their total donations.*

It is also important to understand that these seventy-three ex-soft money donors, a dozen of whom had given the parties less than $100,000, comprised a relatively small percentage of individual soft money donors in the 2000 and 2002 cycles. According to www.fecinfo.com, there were 516 individuals or couples who gave at least $100,000 in soft money to the parties in 2000 and 319 who did the same in 2002.

It should also be noted, in view of the past predominance of corporate organizational party soft money, that only fourteen of the seventy-three large individual donors were specifically tied to the top 500 corporations that donated soft money in either 2000 or 2002.[15]

94 *Stephen R. Weissman and Ruth Hassan*

**Table 5.2   Individuals' $250,000+ Contributions to Federal 527s in the 2004 Cycle and Their Recent National Party Soft Money Donations**

| Name | Money to 527s | Employer | Party Soft Money 2000 & 2002 | |
|---|---|---|---|---|
| | | | Dem | Rep |
| Soros, George | 24,000,000 | Soros Fund Management | 208,000 | |
| Lewis, Peter | 22,545,000 | The Progressive Group | 75,000 | 500 |
| Bing, Stephen | 13,902,682 | Shangri-La Entertainment | 7,385,000 | |
| Sandler, Herb & Marion | 13,007,959 | Golden West Finance Group | | |
| Perry, Bob | 8,060,000 | Perry Homes | | 140,000 |
| Arnall, Dawn | 5,000,000 | Ameriquest Capital | 250,000 | 1,000,000 |
| Spanos, Alex | 5,000,000 | AG Spanos Companies | | 866,500 |
| Waitt, Ted | 5,000,000 | Gateway | 87,500 | 75,000 |
| Pickens, Boone T. | 4,600,000 | PB Capital | | 145,000 |
| Perenchio, Jerry/Living Trust | 4,000,000 | Chartwell Partners LLC | | 1,231,500 |
| Rappaport, Andrew | 3,858,400 | August Capital | 150,000 | |
| Simmons, Harold | 3,700,000 | Contran Corp | | 21,700 |
| Messinger, Alida | 3,447,200 | None | 730,000 | |
| Levy Hinte, Jeanne | 3,425,000 | Self/Writer | | |
| Pritzker, Linda | 3,365,000 | Self/Investor | | |
| Eychaner, Fred | 3,075,000 | Newsweb Corp | 8,295,000 | |
| Cullman, Lewis | 2,651,000 | Self/Philanthropist | 6,000 | |
| Walton, Alice | 2,600,000 | Rocking W Ranch Inc. | | 100,000 |
| Glaser, Robert | 2,229,000 | Real Networks Inc. | 90,000 | |
| Lindner, Carl H. | 2,225,000 | American Financial Group | 745,000 | 1,630,000 |
| Varis, Agnes | 2,006,000 | AgVar Chemicals | 808,000 | |
| DeVos, Richard | 2,000,000 | Amway | | 425,000 |
| Ragon, Terry | 2,000,000 | Intersystems | | |
| van Andel, Jay | 2,000,000 | Alticor | | 100,000 |
| McHale, Jonathan | 1,800,000 | Self/Investor | | |
| Singer, Paul | 1,785,000 | Elliot Capital Advisors | | 570,500 |
| Harris, John IV | 1,660,700 | None | | |
| Hunting, John | 1,627,000 | None/Retired | 25,000 | |
| Mcclendon, Aubrey | 1,625,000 | Chesapeake Energy | | |
| Field, Joseph | 1,575,000 | Entercom | | 50,000 |
| McNair, Robert | 1,551,000 | Palmetto Partners | | |
| Abraham, S. Daniel | 1,320,000 | Slim Fast Foods | 2,543,000 | |
| Rowling, Robert B. | 1,250,000 | TRT Holdings | | 4,300 |
| Mattso, Christine | 1,200,000 | Self/Homemaker | | |
| Gund, Louise | 1,155,000 | Self/Philanthropist | 1,028,000 | |
| McCormack, Win | 1,125,000 | Tinhouse | 20,000 | |
| Lewis, Daniel | 1,100,000 | Retired | | |
| Bing, Peter | 1,089,257 | Self | | |
| Chambers, Anne Cox | 1,082,000 | Cox Enterprises/Philanthropist | 225,000 | |
| Gill, Tim | 1,065,000 | Gill Foundation | 495,700 | |
| Marcus, Bernard | 1,050,000 | Retired | | 804,500 |
| Sillerman, Robert | 1,050,000 | The Sillerman Companies | 990,000 | |
| Jensen, G. J. | 1,038,000 | Housewife | | 75,000 |
| Brunckhorst, Frank | 1,025,000 | Boars Head Provisions | | |
| Buell, Susie Tompkins | 1,020,000 | Self/Retired | 344,300 | |
| Ortenberg, A&E Claiborne | 1,017,000 | Retired | | |
| Rosenthal, Richard | 1,007,000 | Uptown Arts | | |

| Name | Amount | Affiliation | | |
|---|---|---|---|---|
| Aronson, Theodore | 1,000,000 | Aronson, Johnson, Oritz LP | | |
| Carsey, Marcy | 1,000,000 | Self/Producer | | |
| Clark, James | 1,000,000 | Self/Investor | | |
| Earhart, Anne Getty | 1,000,000 | Self/Investor | | |
| Ragon, Susan | 1,000,000 | Intersystems | | |
| Bacon, Louis | 950,000 | Moore Capital Management | | 205,000 |
| Ward, Tom | 875,000 | Chesapeake Energy | | |
| Dyson, Robert | 850,000 | DysonKissnerMoran Corp | 855,000 | |
| Lewis, Jonathan | 821,800 | Progressive Insurance | | |
| Huizenga, H. Wayne | 820,000 | Self/Investor | | |
| Leeds, Gerald & Lilo | 805,500 | Retired | 192,000 | |
| Crow, Harlan | 775,000 | Crow Holdings | | 7,500 |
| Lee, Barbara | 770,000 | Self/Philanthropist | 232,000 | |
| Ware, Marian | 750,000 | Ware Family Office/Retired | | 345,200 |
| Stephens, Jackson | 750,000 | EOE Inc. | | 25,000 |
| Sussman, S. Donald | 720,000 | Caremi Partners | 1,545,000 | 100,000 |
| Foos, Richard & Shari | 662,500 | Self/Psychotherapist | 85,000 | |
| O'Connor, Maconda | 650,000 | Self/Social worker | | |
| Gilder, Richard | 620,000 | Gilder Gagnon Howe & Co. LLC | | 250,000 |
| Childs, John | 590,000 | JW Childs Associates | | 750,000 |
| Ware, Marilyn | 550,000 | Ware Family Office/Retired | | 186,800 |
| Snyder, Harold | 550,000 | HBJ Investments | 770,000 | |
| Stephenson, James | 550,000 | Yancy Brothers Co. | | 10,000 |
| Recanati, Michael | 525,000 | Maritime Overseas Corp | 50,000 | |
| Templeton, John | 520,000 | Templeton Foundation/Retired | | 585,900 |
| McKay, Rob | 520,000 | McKay Investment Group | 15,000 | |
| Lindner, Robert | 510,000 | United Dairy Farmers | | 380,000 |
| Colombel, Andrea | 500,000 | The Trace Foundation | | |
| Hughes, B. Wayne Sr. | 500,000 | Public Storage Inc | | 956,200 |
| Nicholas, Peter | 500,000 | Boston Scientific Corp | | |
| Searle, Dan | 500,000 | Retired | | |
| Troutt, Kenny | 500,000 | Mt. Vernon Investment Group | | |
| Kieschnick, Michael | 481,030 | Working Assets | 35,000 | |
| Bass, Anne T. | 480,000 | Self/Investor | | |
| Schwartz, Bernard | 470,000 | Loral Space & Comm Ltd | 3,536,300 | |
| Benter, William | 463,750 | ACUSIS LLC | | |
| Bass, Robert | 450,000 | Keystone | | |
| Corzine, Jon | 450,000 | US Senator | 2,416,000 | |
| Matthews, George | 450,000 | Retired | | |
| Soros, Jonathan | 439,000 | Soros Management | 50,000 | |
| Burnett, Nancy | 400,000 | Sea Studios Foundation | | |
| Orr, Susan | 400,000 | Telosa Software | 145,000 | |
| Bonderman, David | 370,000 | Texas Pacific Group | 215,000 | |
| Cofrin, Gladys | 360,000 | Self/Counselor | 35,000 | |
| Bridges, Rutt | 350,000 | Big Horn Center for Public Policy | 30,000 | |
| Maltz, David | 332,050 | Self/Developer | | |
| Paulson, Wendy Judge | 323,000 | None/Volunteer NYC Teacher | | |
| Manheimer, Virginia | 316,295 | Investor | | |
| Day, Robert | 300,000 | Trust Co of the West | | 143,700 |
| Entenza, Matthew | 300,000 | Attorney/Self | | |
| Saunders, Thomas | 300,000 | Saunders Karp & Megrue | | 366,000 |
| Schiffrin, Richard | 300,000 | Schiffrin Barroway LLP | 20,000 | |
| Daniels, George | 298,503 | Daniel Manufacturing Corp | | |

*(continues)*

96                          Stephen R. Weissman and Ruth Hassan

**Table 5.2    Continued**

| Name | Money to 527s | Employer | Party Soft Money 2000 & 2002 | |
|---|---|---|---|---|
| | | | Dem | Rep |
| Gruener, Garrett | 282,915 | Alta Partners | 75,300 | |
| Bastian, Bruce | 277,000 | Self/Retired | 310,000 | |
| Hogan, Wayne | 275,000 | PathCanada | 290,000 | |
| Resnick, Stewart | 275,000 | Roll Intern Corp | 125,000 | |
| Lieberman, Leonard | 263,000 | Self/Consultant | | |
| Doerr, John | 260,000 | Kleiner Perkins Caufield | 475,000 | |
| Gilmore, Elizabeth | 260,000 | Mertz Gilmore Foundation | 20,000 | |
| Buttenweiser, Peter | 257,535 | Buttenweiser & Associates | 1,252,500 | |
| Perry, Lisa | 257,300 | Philanthropist | 775,200 | |
| Kendrick, E. G. (Ken) | 250,000 | Datatel, Inc. | | 146,900 |
| Powers, William | 250,000 | PIMCO | | 300 |
| Schmidt, Wendy | 250,000 | Homemaker | | |
| Stephens, Warren | 250,000 | * | | |
| **From All Donors (n=113)** | | | (n=46) | (n=32) |
| Total | 206,990,376 | | 38,054,100 | 11,693,700 |
| Average Donation | 1,831,773 | | 827,263 | 365,428 |
| Median Donation | 820,000 | | 220,000 | 166,850 |
| **From Soft Money Donors (n=73)** | | | | |
| Total | 157,299,562 | | 49,747,800 | |
| Average Donation | 2,154,789 | | 681,477 | |
| Median Donation | 775,000 | | 208,000 | |

*No entry.

 

Table 5.8 (see appendix) profiles the sixty-six individuals who gave at least $100,000 to federal 527s in 2002. They accounted for more than $18 million of $37 million in contributions, that is, 50 percent of the total. Only twenty-three individuals gave at least $250,000 in 2002 (compared to 113 in 2004), and they provided only 34 percent of total individual donations (compared to 81 percent in 2004).

We expected that the forty-two soft money donors among the sixty-six individuals who contributed at least $100,000 to 527s in 2002 would have been less generous than their 2004 successors. After all, the party soft money system was still available to large donors in 2002. And that was the case. This smaller group of party donors had actually given the parties more soft money ($52 million rather than $50 million) over the 2000 and 2002 election cycles than the 2004 cadre. But they generated just $11 million for 527s in 2002—fourteen times less than the 2004 group did.

Without question, a segment of former party individual soft money donors have been the main funders of 527s. However post-BCRA *levels* of giving are not simply explained by the "hydraulic theory" that money, like water, inevitably finds its way around an obstacle. *Most* former individual soft money donors have

not given large donations to 527s. But for those who did in 2004, one may say that a river of party soft money has turned into an ocean of 527 money.

## THE FUTURE OF 527s

Despite the hard money fundraising success of both major parties in 2004, two of the leading First Timer 527s in 2004, ACT and PFA, indicated they planned to continue on in future federal elections (Cillizza 2004a; Justice 2004b; Cummings 2004b; VandeHei 2005). (ACT subsequently put their plans on hold.) And there are reasons to believe that 527s in general could play even larger roles in future elections than they did in 2004. First, the genie of huge contributions is out of the bottle, and it is unlikely to return, considering past trends in party soft money and convention host committee funding. Secondly, if the legal status of 527s and the relation of some of them to parties become institutionalized, or particular lobbying issues arise, some trade associations and corporations might be persuaded to overcome their current reluctance to provide soft money donations without direct political pressure from candidates. (During the 2000 cycle, a 527 representing the pharmaceutical industry, Citizens for Better Medicare, spent an estimated $65 million.) Thirdly, despite the presence of seventy-three individuals who had given parties soft money among the large 2004 527 contributors, the fundraising potential of ex-soft money donors has hardly been tapped. In 2000 alone, 214 individuals gave the parties at least $200,000 and 516 gave more than $100,000, according to www.fecinfo.com. Even if the passions that propelled campaign donors in 2004 subside somewhat in the nonpresidential year of 2006, they are likely to revive during the presidential contest of 2008.

However, developments in both the federal campaign finance and nonprofit legal regimes spawned the 527 phenomenon, and further changes in policy could influence its future. During the 1996 presidential campaign, a number of 501(c)(5) labor unions, 501(c)(6) trade associations, and 501(c)(4) advocacy groups made substantial expenditures unhampered by any contribution limits. Their entry in force was fostered by federal court decisions that seemed to liberate "issue advocacy" communications and partisan voter mobilization activities from campaign law restrictions (Common Cause 2000). It was also facilitated by the Internal Revenue Service's lack of clarity about which of these groups' activities were political and could therefore not be pursued as part of the organizations' primary missions (Hill 2001).

But after the election, a congressional investigation, the IRS's rejection of the Christian Coalition's longstanding application for 501(c)(4) status, and innovative proposals by nonprofit group tax lawyers helped make 527 groups the "loophole of choice" for unregulated contributions in the 2000 election. The 527s' advantages over other nonprofits included the ability to make elections their primary, even exclusive activity; absence of the 35 percent tax on the lesser of their political expenditures or investment income; and the exemption of their donations from a steep gift tax (Trister 2000). Despite new laws mandating public

disclosure of 527 group finances (other nonprofits do not have to reveal their contributors), 527s have grown rapidly.

Proposals have been submitted to Congress and the FEC to restrict soft money contributions to 527 groups. If such a proposal were adopted, it is likely that efforts would be made to utilize the less efficient nonprofit vehicles that were so prominent in 1996. These kind of groups continue to be active in elections, with the 501(c)(6) U.S. Chamber of Commerce and Americans for Job Security and 501(c)(5) AFL-CIO leading recent examples. PFA's earlier efforts to develop ways to better utilize its 501(c)(4) structure for campaign purposes are also instructive. Much would depend on whether or not the FEC and IRS developed a common and coherent policy in determining when such groups had a major purpose of influencing elections.

With reformers raising the issue of 527 regulation with the FEC and Congress, a leading response to restrictive proposals is sure to be, "Where is the threat of corruption (or its appearance) that is the sole justification under current constitutional doctrine for limiting political speech?" After all, the 527s are not making contributions to candidates or parties; nor are they coordinating their spending with them. And many of the donors are promoting their ideologies rather than looking for individual favors. Aren't the 527 donors simply furthering independent political expression, and, in the words of one tax attorney, "allowing causes to have angels?" (Eilperin 2000).

However one might answer this question in the abstract, it will in fact be answered by Congress and the FEC in a real world context. It is this context that we have endeavored to portray as accurately as possible in this chapter. With our findings in mind, we might rephrase the question about potential corruption or its appearance in three parts:

- If 527 groups spend independently to support or oppose candidates in large enough amounts—and some of their donors give in the megamillions—is there a danger that candidates and parties will feel obligated? Will this sentiment permit 527 groups and donors, in the Supreme Court's words, to "exert undue influence on an officeholder's judgment" (or appear to do so)? (*McConnell v. Federal Election Commission* (540 U.S. 93 [2003]);
- If some organizations sponsoring 527 independent groups also sponsor PACs that channel contributions to candidates (as, for example, the Club for Growth and New Democratic Network do), is there a danger that the candidates and parties will look at 527 spending as simply another form of contribution? Will contributions to 527s thus foster, or appear to foster, "politicians too compliant with the wishes of large contributors"? (*McConnell v. Federal Election Commission*); and
- If individuals who are closely associated with party and campaign leaders establish, manage, and fundraise for certain 527 organizations, is there a danger that these 527s will become more or less identified with the parties, recreating the corruption threat of the former party soft money system?

There is nothing more hazardous in politics than predictions. But in the absence of policy change, we can expect that the 527 system will generally expand and become more complex. Repeater 527s, generally well rooted in interest group structures, will attempt to build on their recent growth. A few of the 2004 First Timers (notably PFA) are already beginning to seek ways of institutionalizing their successes in representing broad party interests. But the elections of 2006 and 2008 will probably again feature a host of new groups geared to shorter term candidate and party interests. The emerging 527 system may make campaigns somewhat more interesting but also more difficult to hold accountable. Finally, the preponderance of large donors is likely to raise—even more seriously than it does now—the question of what BCRA has really accomplished.

## NOTES

1. The otherwise excellent listing of 527 groups active in federal races on the Center for Public Integrity website (see www.publicintegrity.org/527) omits all labor unions including those that were predominantly active in such races.

2. See, for example, the statements of Service Employees International Union representatives regarding the union's largely federal 2004 election activities in "A Union Chief's Bold New Tack," (Business Week Online 2004) and SEIU press release, "Anatomy of an Election Strategy" (Service Employees International Union 2004). Together, SEIU and its New York affiliate spent $51 million of the $89 million union federal 527 total in 2004.

3. Data from 2000, when the 527 phenomenon came into its own, is incomplete because public disclosure of 527 group finances was not established until the last six months of the cycle. According to the Center for Public Integrity, there were forty "federal-oriented" 527s that reported less than $200,000 in donations for the 2004 cycle; these groups collected only $2.5 million (see www.publicintegrity.org/527).

4. Adding subparagraph (3)(5)(i) to Section 527 of the Internal Revenue Code.

5. National party soft money contributions data are from www.fec.gov. Prof. Ray La Raja provided additional information on state party soft money spending for federal elections in the 2002 cycle based on his research in FEC databases. He also suggested the methodology we employ to calculate the state party-raised component in state party soft money spending through deducting national party transfers to state and local parties. For further information on this methodology, see Ray La Raja and Elizabeth Jarvis-Shean, "Assessing the Impact of a Ban on Soft Money" (La Raja and Jarvis-Shean 2001).

6. Information on PACs, which either shared expenses with their 527 soft money counterparts or were separately maintained by the same organizational sponsor, was obtained from Robert Biersack, Deputy Press Officer, Federal Election Commission, and from searches of committees on the FEC website (www.fec.gov).

7. See www.fecinfo.com (DNC expenditures, consultant fees, 2002); www.opensecrets.org/parties/expend.asp?cmte=DNC&cycle=2004 (for 2004).

8. See also www.dcigroup.com.

9. See also www.opensecrets.org/parties/expend.asp?cmte=RNC&cycle=2004.

10. DCI Group's Republican Party payments for the convention are listed at www.opensecrets.org.

11. In 2002 the additional "other" category comprised mainly party committees, but also 527s and their sponsors and Indian tribes. In 2004, with party soft money abolished, it consisted largely of 527s and to a much lesser extent, Indian tribes.

12. See discussion above on p. 3 of labor 527s' "federal" election spending, and www.fecinfo.com.

*Stephen R. Weissman and Ruth Hassan*

13. See www.fecinfo.com.

14. Most notably, Robert Rowling provided no soft money but those associated with the company he chaired (TRT Holdings) gave, in rounded numbers, $134,000; Aubrey McClendon and Tom Ward of Chesapeake Energy also gave no soft money while their firm provided $100,000. Peter Nicholas did not give, but his company gave $165,000. Among the soft money donors, George Soros provided $208,000 of Soros Fund Management's total of $743,000, Harlan Crow of Crow Holdings gave $7,500, but those associated with Crow Holdings provided a total of $335,000; Ted Waitt gave $162,500 while Gateway Inc. donated a total of $778,000; Harold Simmons of Contran Corp. gave $22,000, but his company provided $863,000, and Paul Singer of Elliot Capital Advisers gave $570,5000 while his firm provided $1.303 million.

15. Data on corporate giving of soft money from www.fecinfo.com.

# APPENDIX

**Table 5.3     Federal 527 Organizations in the 2002 Election Cycle (>$200,000)**

| 527 Committee Name | Contributions | Expenditures |
|---|---|---|
| **General—Democratic Oriented** | | |
| AFSCME Special Account | $ 19,575,709 | $ 19,375,052 |
| SEIU Political Education and Action Local Fund | 7,674,610 | 5,505,063 |
| IMPAC 2000 | 6,948,686 | 7,029,821 |
| EMILY'S List | 6,821,112 | 7,714,815 |
| AFL-CIO COPE—Treasury Fund | 5,533,588 | 5,732,568 |
| Comm. Workers of America Non-Fed. Sep. Segregated Fund | 4,511,305 | 6,970,539 |
| 1199 SEIU New York State Political Action Fund | 4,298,508 | 4,536,751 |
| New Democrat Network Non Federal | 4,235,722 | 3,662,273 |
| Laborers' Political League Education Fund | 4,097,455 | 4,105,741 |
| League of Conservation Voters, Inc. | 3,524,000 | 1,694,248 |
| Sierra Club Voter Education Fund | 3,351,200 | 3,930,028 |
| UFCW Active Ballot Club Education Fund | 3,156,510 | 2,987,351 |
| NEA Fund for Children & Public Education | 2,556,846 | 2,430,841 |
| SMWIA Political Education League | 2,178,975 | 2,171,907 |
| Campaign Money Watch | 1,504,184 | 1,441,646 |
| Mainstreet USA, Inc. | 1,146,000 | 966,057 |
| Working Families 2000 | 954,944 | 70,310 |
| Campaign for Americas Future (Labor) | 847,500 | 823,403 |
| 21st Century Democrats | 772,908 | 856,329 |
| Pro Choice Vote | 654,300 | 642,911 |
| Citizens for Michigan's Future | 616,000 | 616,005 |
| Voters for Choice Non-Federal | 541,935 | 607,716 |
| Every Child Matters | 515,857 | 384,198 |
| Participation 2000 Inc. | 509,650 | 173,541 |
| Great Lakes '92 Fund, Inc. | 494,690 | 592,850 |
| Progressive Majority | 295,765 | 118,782 |
| Daschle Democrats, Inc. | 244,489 | 229,921 |
| Planned Parenthood Votes | 228,642 | 1,010,869 |
| | | |
| Total (n=28) | 87,791,092 | 86,381,538 |
| Net Total: After Transfers Among Groups | 85,366,851 | 83,957,297 |
| | | |
| **General—Republican Oriented** | | |
| College Republican National Committee, Inc. | $ 8,445,903 | $ 10,650,711 |
| Club for Growth, Inc. | 4,215,967 | 4,905,651 |
| Republican Leadership Coalition | 3,915,342 | 4,132,661 |
| Bush-Cheney 2000, Inc-Recount Fund | 3,897,036 | 9,243,360 |
| Republican Leadership Council (RLC)—State | 2,237,025 | 2,861,762 |
| Republican Main Street Partnership | 1,802,548 | 1,880,577 |
| The Leadership Forum | 1,000,000 | 1,000,000 |
| Wish List | 864,800 | 1,046,375 |
| Council for Better Government | 721,354 | 707,980 |
| National Federation of Republican Women | 592,599 | 3,814,520 |
| American Council of Life Insurers Non Federal PAC | 520,952 | 489,600 |
| National Association of Realtors 527 Fund | 484,000 | 530,572 |

Stephen R. Weissman and Ruth Hassan

**Table 5.3    Continued**

| 527 Committee Name | Contributions | Expenditures |
|---|---|---|
| Republicans Abroad Non Federal | 419,865 | 413,267 |
| Republican Majority Issues Committee | 267,555 | 311,374 |
| Total (n = 14) | 29,384,946 | 41,988,410 |
| Net Total: After Transfers Among Groups | 29,129,946 | 41,733,410 |
| | | |
| **Leadership PACs—Democratic Oriented** | | |
| New American Optimists | $ 4,621,154 | $ 4,617,824 |
| DASHPAC Nonfederal Account | 2,722,454 | 2,847,765 |
| Searchlight Leadership Fund Non Federal | 1,670,152 | 1,971,083 |
| Lone Star Fund Non Federal Account | 1,506,131 | 1,511,718 |
| Effective Government Committee-Nonfederal Account | 1,381,750 | 1,320,549 |
| Citizen Soldier Fund—Nonfederal Account | 1,353,400 | 1,365,460 |
| National Leadership PAC Non Federal | 1,051,266 | 1,126,257 |
| Blue Dog Non Federal PAC | 965,867 | 886,141 |
| Glacier PAC Nonfederal | 783,650 | 827,695 |
| Congressional Black Caucus Political Action Committee | 672,524 | 257,180 |
| 21st Century Leadership Fund | 620,650 | 237,946 |
| Mainstream America Political Action Committee | 498,814 | 420,445 |
| Committee for a Democratic Majority | 455,704 | 536,434 |
| Democratic Majority PAC | 444,021 | 487,208 |
| HillPAC-NY | 356,100 | 351,043 |
| Building Our Leadership Diversity PAC Non Federal | 320,250 | 322,370 |
| Leadership in the New Century PAC Non Federal | 306,068 | 286,657 |
| Florida 19 PAC | 286,450 | 271,144 |
| Committee for Leadership and Progress-NY | 280,714 | 286,600 |
| McAuliffe for Chair | 266,378 | 308,902 |
| DAKPAC Non Federal Account | 231,759 | 242,515 |
| Silver State 21st Century PAC Non Federal | 222,423 | 223,548 |
| Rhode Island Political Action Committee Non Federal | 220,150 | 287,914 |
| Bob Graham Leadership Forum | 218,000 | 217,451 |
| For Dems Non Federal | 217,012 | 216,998 |
| JFC Leadership Committee | 210,900 | 95,750 |
| Total (n = 26) | 21,883,739 | 21,524,600 |
| Net Total: After Transfers Among Groups | 21,833,739 | 21,318,100 |
| | | |
| **Leadership PACs—Republican Oriented** | | |
| Americans for a Republican Majority Non Federal Account | 2,341,634 | 1,901,435 |
| Rely On Your Beliefs Fund | 1,716,776 | 1,719,831 |
| KOMPAC State Victory Fund | 1,134,595 | 1,088,088 |
| New Majority Project PAC | 1,026,900 | 1,098,198 |
| Volunteer PAC Non Federal | 955,785 | 953,254 |
| Republican Majority Fund Non Federal Account | 910,226 | 687,003 |
| America's Foundation Non Federal Account | 881,939 | 894,019 |
| Congressman Tom Davis Virginia Victory Fund | 837,349 | 856,477 |
| Together for Our Majority Political Action Committee Non Federal | 817,975 | 808,416 |
| New Republican Majority Fund—State PAC | 680,772 | 684,991 |
| Campaign for America's Future (Utah) | 549,373 | 338,073 |
| Majority Leader's Fund | 537,620 | 241,628 |

| | | |
|---|---|---|
| Battle Born State PAC | 506,787 | 453,089 |
| American Success PAC Non-Federal Account | 462,528 | 332,881 |
| Committee for a United Republican Team Non Federal | 269,853 | 255,272 |
| George Allen Committee | 264,941 | 261,389 |
| 7th District Congressional Republican Committee | 264,716 | 218,383 |
| Friends of the Big Sky Non Federal Account | 228,162 | 160,731 |
| Washington Fund-State Account | 201,910 | 207,317 |
| GROWPAC Non Federal | 201,147 | 210,873 |
| | | |
| Total (n = 20) | 14,790,987 | 13,371,347 |
| Net Total: After Transfers Among Groups | 14,557,053 | 13,137,413 |
| | | |
| **Federal 527s and Leadership PACs** | | |
| Total Democratic & Republican: | $153,850,755 | $163,265,895 |
| Net Total: After Transfers Among Groups | $150,731,079 | $160,146,219 |

Table 5.4   Federal 527 Organizations in the 2004 Election Cycle (>$200,000)

| 527 Committee Name | Contributions | Expenditures |
|---|---:|---:|
| **Democratic Oriented** | | |
| America Coming Together—Non Federal Account | $ 78,652,163 | $ 76,270,931 |
| Joint Victory Campaign 2004[a] | 71,809,666 | 72,347,983 |
| The Media Fund | 59,394,183 | 54,429,053 |
| SEIU Political Education & Action Fund | 40,995,542 | 43,681,298 |
| AFSCME Special Account | 22,135,127 | 22,112,744 |
| MoveOn.org Voter Fund | 12,517,365 | 21,205,288 |
| New Democrat Network Non Federal Account | 12,221,608 | 12,194,451 |
| Citizens For A Strong Senate | 10,848,730 | 10,143,121 |
| Sierra Club Voter Education Fund | 8,727,127 | 6,147,176 |
| EMILY's List Non Federal | 7,684,046 | 7,983,328 |
| 1199 SEIU Non Federal Committee | 7,477,295 | 7,445,101 |
| Voices For Working Families | 7,466,056 | 6,809,102 |
| League of Conservation Voters Inc. 527 | 6,552,500 | 5,621,288 |
| AFL-CIO COPE—Treasury Fund | 6,336,464 | 6,332,448 |
| Democratic Victory 2004 | 3,930,969 | 2,603,654 |
| Laborers Political League Education Fund | 3,665,284 | 3,486,802 |
| The Partnership for America's Families | 3,071,211 | 2,880,906 |
| Grassroots Democrats | 2,818,883 | 2,468,622 |
| Stronger America Now | 2,789,817 | 2,664,919 |
| America Votes, Inc. | 2,622,636 | 2,533,523 |
| 21st Century Democrats | 2,542,116 | 1,255,859 |
| SMWIA Political Ed League | 2,164,830 | 2,051,382 |
| Coalition to Defend the American Dream | 1,935,844 | 1,609,000 |
| CWA Non Federal Separate Segregated Fund | 1,924,455 | 1,641,536 |
| Music For America | 1,667,820 | 1,507,324 |
| Win Back Respect | 1,382,227 | 1,083,184 |
| Americans for Progress & Opportunity | 1,306,092 | 1,305,667 |
| Young Democrats of America | 1,109,840 | 719,894 |
| Environment2004, Inc. | 1,107,080 | 1,117,370 |
| Environmental Accountability Fund | 1,084,807 | 965,107 |
| American Family Voices Voters' Alliance, Inc. | 1,060,000 | 1,108,628 |
| Campaign Money Watch | 1,022,842 | 993,921 |
| Americans for Jobs | 1,000,000 | 994,137 |
| Democracy for America Non Federal | 879,500 | 520,981 |
| Planned Parenthood Votes | 799,683 | 595,288 |
| Revolutionary Women | 789,640 | 827,417 |
| Focus South Dakota, Inc. | 687,450 | 619,767 |
| Progressive Majority | 659,300 | 766,104 |
| PunkVoter, Inc. | 636,161 | 1,020,593 |
| Compare Decide Vote | 600,000 | 538,294 |
| The Real Economy Group | 585,000 | 570,750 |
| Campaign for America's Future—CC Fund | 550,651 | 41,249 |
| UFCW Active Ballot Club Education Fund | 543,550 | 602,033 |
| National Progress Fund | 517,149 | 426,199 |
| Environment2004 Action Fund | 507,750 | 491,554 |

| | | |
|---|---|---|
| Organizing and Campaign Training Center | 501,765 | 445,821 |
| NJDC Victory Fund | 484,461 | 421,782 |
| Defenders of Wildlife Action Fund 527 Account | 484,000 | 526,980 |
| Arts PAC | 464,753 | 189,211 |
| Communities Voting Together | 412,096 | — |
| Bring Ohio Back | 400,681 | 574,256 |
| Click Back America | 398,000 | 219,162 |
| American Democracy Project | 364,500 | 480,334 |
| Clean Water Action Education Fund | 343,300 | 231,796 |
| ! Si Se Puede ! Boston 2004, Inc. | 331,000 | 239,182 |
| Uniting People for Victory | 284,000 | 228,194 |
| Roofers Political Ed and Legislative Fund | 232,432 | 263,152 |
| Texans for Truth | 225,495 | 486,929 |
| National Democratic Ethnic Leadership Council | 212,040 | 96,122 |
| | | |
| Total (n = 59) | 403,918,982 | 397,137,897 |
| Net Total: After Transfers Among Groups | 321,185,549 | 314,404,464 |

| | | |
|---|---|---|
| **Republican Oriented** | | |
| Progress For America Voter Fund | $44,929,174 | $35,437,204 |
| Swift Boat Vets and POWs for Truth | 17,068,390 | 22,424,420 |
| Club for Growth | 7,863,572 | 9,257,228 |
| College Republican National Committee, Inc. | 6,372,843 | 8,207,393 |
| Club for Growth.net | 4,115,037 | 3,927,530 |
| National Association of Realtors 527 Fund | 3,215,263 | 3,149,895 |
| The November Fund | 3,150,054 | 3,075,978 |
| CA Republican National Convention Delegation 2004 Account | 1,600,750 | 1,506,499 |
| Republican Leadership Coalition, Inc. | 1,456,876 | 1,439,110 |
| National Federation of Republican Women | 1,301,811 | 3,321,249 |
| Americans United to Preserve Marriage | 1,192,090 | 1,056,962 |
| Americas PAC | 1,081,700 | 1,056,666 |
| Florida Leadership Council | 878,500 | 729,366 |
| Republican Leadership Council (RLC) | 753,303 | 772,625 |
| The Leadership Forum | 696,973 | 501,255 |
| Softer Voices | 676,100 | 764,436 |
| Wish List Non Federal | 585,197 | 703,997 |
| Main Street Individual Fund | 471,600 | 253,612 |
| Republicans Abroad Non Federal | 444,057 | 501,717 |
| Council For Better Government | 294,000 | 297,000 |
| Concern for Better Government | 236,000 | 187,100 |
| | | |
| Total (n = 21) | 98,383,290 | 98,571,242 |
| Net Total: After Transfers Among Groups | 83,922,290 | 84,110,242 |

| | | |
|---|---|---|
| **Republican and Democratic Oriented Committees** | | |
| Total (n = 80) | $502,302,272 | $495,709,139 |
| Net Total: After Transfers Among Groups | $405,107,839 | $398,514,706 |

*Joint Victory Campaign 2004, a fundraising conduit for other 527s, represents $70,879,391 of the $97,194,433 in total transfers.

*Stephen R. Weissman and Ruth Hassan*

**Table 5.5    Repeaters: Federal 527 Organizations Active in Both the 2002 and 2004 Cycles (>$200,000)**

| Committee Name | Associated PAC | 2002 Contributions | 2004 Contributions | % Δ |
|---|:---:|---:|---:|---:|
| 1199 SEIU New York State Political Action Fund | X | $ 4,298,508 | $ 7,477,295 | 74 |
| 21st Century Democrats | X | 772,908 | 2,542,116 | 229 |
| AFL-CIO COPE—Treasury Fund | X | 5,533,588 | 6,336,464 | 15 |
| AFSCME Special Account | X | 19,575,709 | 22,135,127 | 13 |
| Campaign for Americas Future (Labor) | X | 847,500 | 550,651 | −35 |
| Campaign Money Watch (Reform Voter Project) | | 1,504,184 | 1,022,842 | −32 |
| Club for Growth Inc. | X | 4,215,967 | 7,863,572 | 87 |
| College Republican National Committee, Inc. | | 8,445,903 | 6,372,843 | −25 |
| Communications Workers of America Non Fed. Separate Segregated Fund | X | 4,511,305 | 1,924,455 | −57 |
| Council for Better Government | | 721,354 | 294,000 | −59 |
| EMILY's List | X | 6,821,112 | 7,684,046 | 13 |
| Laborers' Political League—Education Fund | X | 4,097,455 | 3,665,284 | −11 |
| League of Conservation Voters, Inc. | X | 3,524,000 | 6,552,500 | 86 |
| Mainstreet USA, Inc. (American Family Voices Voters Alliance) | | 1,146,000 | 1,060,000 | −8 |
| National Association of Realtors 527 Fund | X | 484,000 | 3,215,263 | 564 |
| National Federation of Republican Women | X | 592,599 | 1,301,811 | 120 |
| New Democrat Network Non Federal | X | 4,235,722 | 12,221,608 | 189 |
| Planned Parenthood Votes | X | 228,642 | 799,683 | 250 |
| Progressive Majority | X | 295,765 | 659,300 | 123 |
| Republican Leadership Coalition | | 3,915,342 | 1,456,876 | −63 |
| Republican Leadership Council (RLC)—State | X | 2,237,025 | 753,303 | −66 |
| Republican Main Street Partnership (Main Street Individual) | X | 1,802,548 | 471,600 | −74 |
| Republicans Abroad Non Federal | | 419,865 | 444,057 | 6 |
| SEIU Political Education and Action Local Fund | X | 7,674,610 | 40,995,542 | 434 |
| Sierra Club Voter Education Fund | X | 3,351,200 | 8,727,127 | 160 |
| SMWIA Political Education League | X | 2,178,975 | 2,164,830 | −1 |
| The Leadership Forum | | 1,000,000 | 696,973 | −30 |
| WISH List | X | 864,800 | 585,197 | −32 |
| UPCW Active Ballot Club Education Fund | X | 3,156,510 | 543,550 | −83 |
| Total (n=29) | | $98,453,097 | $150,517,915 | 53 |
| Net Total: After Transfers Among Groups | | $95,952,004 | $131,174,015 | 37 |

Table 5.6   First Timers: Federal 527 Organizations Active Only in the 2004 Cycle (>$200,000)

| Committee Name | Associated PAC | Contributions |
|---|---|---|
| America Coming Together Nonfederal Account | X | $78,652,163 |
| Joint Victory Campaign 2004 | X | 71,809,666 |
| Media Fund | | 59,394,183 |
| Progress For America Voter Fund | | 44,929,174 |
| Swift Boat Vets and POWs for Truth | | 17,068,390 |
| MoveOn.org Voter Fund | X | 12,517,365 |
| Citizens For A Strong Senate | | 10,848,730 |
| Voices For Working Families | | 7,466,056 |
| Club for Growth.net | | 4,115,037 |
| Democratic Victory 2004 | X | 3,930,969 |
| The November Fund | | 3,150,054 |
| The Partnership for America's Families | | 3,071,211 |
| Grassroots Democrats | | 2,818,883 |
| Stronger America Now | | 2,789,817 |
| America Votes, Inc. | | 2,622,636 |
| Coalition to Defend the American Dream | | 1,935,844 |
| Music for America | | 1,667,820 |
| CA Republican National Convention Delegation 2004 Account | | 1,600,750 |
| Win Back Respect | | 1,382,227 |
| Americans for Progress & Opportunity | | 1,306,092 |
| Americans United to Preserve Marriage | | 1,192,090 |
| Young Democrats of America | | 1,109,840 |
| Environment2004, Inc. | | 1,107,080 |
| Environmental Accountability Fund | | 1,084,807 |
| Americas PAC | | 1,081,700 |
| Americans for Jobs | | 1,000,000 |
| Democracy for America Non Federal | X | 879,500 |
| Florida Leadership Council | | 878,500 |
| Revolutionary Women | | 789,640 |
| Focus South Dakota, Inc. | | 687,450 |
| Softer Voices | | 676,100 |
| PunkVoter, Inc. | | 636,161 |
| Compare Decide Vote | | 600,000 |
| The Real Economy Group | | 585,000 |
| National Progress Fund | | 517,149 |
| Environment2004 Action Fund | | 507,750 |
| Organizing and Campaign Training Center | | 501,765 |
| NJDC Victory Fund | | 484,461 |
| Defenders of Wildlife Action Fund 527 Account | X | 471,600 |
| Arts PAC | X | 464,753 |
| Communities Voting Together | | 412,096 |
| Bring Ohio Back | | 400,681 |
| Click Back America | | 398,000 |
| | | *(continues)* |

108    *Stephen R. Weissman and Ruth Hassan*

**Table 5.6    Continued**

| Committee Name | Associated PAC | Contributions |
|---|---|---|
| American Democracy Project | | 364,500 |
| Clean Water Action Education Fund | | 343,300 |
| ! Si Se Puede ! Boston 2004, Inc. | | 331,000 |
| Uniting People for Victory | | 284,000 |
| Concern for Better Government | | 236,000 |
| Roofers Political Education and Legislative Fund | | 232,432 |
| Texans for Truth | | 225,495 |
| National Democratic Ethnic Leadership Council | | 212,040 |
| Total (n = 51) | | $351,771,957 |
| Net Total: After Transfers Among Groups | | $273,925,859 |

Table 5.7    Labor Union Donations to Federal 527s in the 2002 and 2004 Cycles (>$5,000)

| Donor | 2002 Contributions | 2004 Contributions | %Δ |
|---|---|---|---|
| AFGE | $    25,000 | $    145,000 | 480 |
| AFL-CIO | 5,803,532 | 6,941,559 | 20 |
| AFSCME | 19,807,709 | 22,550,324 | 14 |
| American Federation Of Teachers | 71,000 | 1,815,000 | 2,456 |
| American Postal Workers Union | 100,000 | 500,000 | 400 |
| Communications Workers Of America | 4,244,242 | 2,407,038 | −43 |
| IBEW | 134,500 | 1,087,750 | 709 |
| IBPAT | 15,000 | 375,000 | 2,400 |
| Ironworkers International | 21,000 | 45,000 | 114 |
| LIUNA | 3,741,387 | 3,070,428 | −18 |
| International Association Of Machinists | 610,000 | 105,000 | −83 |
| National Education Association | 2,477,000 | 207,500 | −92 |
| SEIU | 12,085,613 | 50,636,054 | 319 |
| SMWIA | 2,131,200 | 1,990,000 | −7 |
| United Auto Workers | 275,000 | 1,145,000 | 316 |
| UFCW | 3,203,510 | 869,050 | −73 |
| UNITE | 55,000 | 275,000 | 400 |
| United Steel Workers | 135,000 | 210,000 | 56 |
| IAFF | 5,000 | 10,000 | 100 |
| Total (n = 19) | $54,940,693 | $94,384,703 | 72 |

110    *Stephen R. Weissman and Ruth Hassan*

Table 5.8    Individuals' $100,000+ Contributions to Federal 527s in the 2002 Cycle and Their Recent National Party Soft Money Donations

| Name | Money to 527s | Employer | Party Soft Money 2000 & 2002 | |
|---|---|---|---|---|
| | | | DEM | REP |
| Messinger, Alida | $ 1,088,000 * | | $ 730,000 | |
| Kirsch, Steven | 1,064,000 | Proper Software Corp | 3,904,000 | |
| Bing, Stephen | 999,089 | Shangri-La Entertainment | 7,385,000 | |
| Hunting, John/Living Trust | 949,000 | Self/Retired | 25,000 | |
| Harris, Jay | 849,000 * | | | |
| Hiatt, Arnold | 814,000 | Stride Rite Foundation | | |
| Searle, Dan | 730,000 | Kinship Corporation | | |
| Harris, John | 716,000 * | | | |
| Fonda, Jane | 638,100 | Self/Seymour 1989 Trust | | |
| Gund, Louise | 527,000 | Self | 1,028,000 | |
| Perry, Bob | 480,000 | Perry Homes/Self | | 140,000 |
| Distler, Stephen | 470,000 | EM Warburg Pincus & Co. | | 136,600 |
| Stephens, Jackson | 368,500 | EOE Inc. | | 25,000 |
| Corzine, Jon | 354,500 | US Government | 2,416,000 | |
| Buttenwieser, Peter | 327,500 | Peter Buttenwieser & Assoc. | 1,252,500 | |
| Wagenfeld, Sandra | 306,000 | Aviatech Inc. | | |
| O'Connor, Maconda | 300,000 | Self | | |
| Brooks, Paula J. | 299,050 | Self/Royal Wolff Ventures | | 276,500 |
| Crow, Harlan | 280,000 | Crow Family Holdings | | 7,500 |
| Paulson, Wendy | 278,000 * | | | |
| Gilder, Richard | 275,000 | Gilder Gagnono Howe & Co. | | 250,000 |
| Cofrin, Gladys | 250,000 | Self | 35,000 | |
| Levine, S. Robert | 250,000 | Armstrong Investments Corp. | | |
| Williams, John | 235,000 | Self | | |
| Lecompte, Janet | 205,729 | | | |
| Malcolm, Ellen | 200,000 | EMILY's List | 1,000 | |
| Burnett, Jason | 200,000 | AEI/Brookings | | |
| Motley, Ronald | 200,000 | Ness Motley | | |
| Perenchio, Jerry | 199,000 | Chartwell Partners LLC | | 1,231,500 |
| Turner, Tab | 189,000 | Turner & Assoc. | 15,000 | |
| Chambers, Merle | 185,000 | Leith Ventures | 489,000 | |
| Hull, Blair | 170,000 | Hull Group/Retired/Philanthropist | 25,000 | |
| Cofrin, Mary Ann | 165,000 | Self | 130,000 | |
| Greenwood, Amalia | 162,044 | Retired | | 750 |
| Eychaner, Fred | 160,000 | Newsweb Corp. | 8,295,000 | |
| Schwartz, Bernard | 158,000 | Loral Space & Communications | 3,536,300 | |
| Hume, William | 154,000 | Basic American Inc. | | 100,000 |
| O'Quinn, John | 150,000 | O'Quinn & Laminack | 2,615,000 | |
| Trumpower, Mike | 150,000 | Retired | | |
| Palevsky, Max | 150,000 * | | | |
| Powers, John | 145,000 | Self | | |
| Reuss, Margaret M. | 141,450 * | | | |
| Rooney, J. Patrick | 132,000 | Woodland Group | | 17,500 |
| Hindery, Leo | 130,000 | YES Network | 1,440,200 | |
| Devos, Richard | 120,000 | Amway | | 425,000 |

*BCRA and the 527 Groups*

111

| Name | Donation / Employer | (N=29) | (N=13) |
|---|---|---|---|
| Pacey, O. E. | 115,966 Retired | | |
| Saban, Haim | 115,000 Saban Entertainment/Self | 12,655,000 | |
| Guerrera, Domenic | 113,882 Retired | | 1,500 |
| Orr, Susan | 109,701 TRAC | 145,000 | |
| Cumming, Ian | 105,000 Self/Lacadia National Corp. | 985,000 | |
| Hoffman, Shepard | 105,000 Self/Stanley Mandel & Iola | 5,000 | |
| Corzine, Joanne | 105,000 Self | | 3,000 |
| Shaw, Gregory | 101,000 Microsoft | 92,000 | |
| Manheimer, Virginia | 100,300 Self | | |
| Donahoe, Eileen | 100,200 Self | | |
| Byrd, Wade | 100,000 Self | 46,000 | |
| Leeds, Gerald & Lilo | 100,000 Institute for Student Achievement | 192,000 | |
| Baron, Frederick | 100,000 Self | 345,000 | |
| Alameel, David | 100,000 Aflan Group | 100,000 | |
| Eisenberg, Lewis | 100,000 Granite Capital Corp. | 215,900 | |
| Gilchrist, Berg | 100,000 * | | |
| Hyde, Joseph | 100,000 * | | |
| Mars, Jacqueline | 100,000 * | | |
| Patterson, Cary | 100,000 Nix Petterson & Roach LLP | 905,500 | |
| Reaud, Wayne | 100,000 Reaud Morgan & Quinn | 605,000 | |
| Sandler, Steven | 100,000 Self | | |

| **From All Donors (n=66)** | | (N=29) | (N=13) |
|---|---|---|---|
| Total | $18,485,011 | $49,400,500 | $2,827,750 |
| Average Donation | $280,076 | $1,703,466 | $217,519 |
| Median Donation | $163,522 | $489,000 | $136,600 |

| **From Soft Money Donors (n=42)** | | | |
|---|---|---|---|
| Total | $11,460,266 | $52,288,250 | |
| Average Donation | $272,863 | $1,243,530 | |
| Median Donation | $161,022 | $203,950 | |

*No entry.