**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SPEECHNOW.ORG, *et al.*,　　　　　：
　　　　　　　　　　　　　　　　：
　　　　　Plaintiffs,　　　　　：
　　　　　　　　　　　　　　　　：
　　　v.　　　　　　　　　　　　：　Civil Action No. 08-0248 (JR)
　　　　　　　　　　　　　　　　：
FEDERAL ELECTION COMMISSION,　：
　　　　　　　　　　　　　　　　：
　　　　　Defendant.　　　　　　：

**MEMORANDUM ORDER**

In this as-applied challenge, plaintiffs assert that it is unconstitutional to require groups making only "independent expenditures" to observe the contribution limits applicable to political committees regulated by the Federal Election Commission, 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3).  Plaintiffs seek to enjoin the Commission from enforcing these contribution limits against them.  For the reasons explained below, plaintiffs' motion for preliminary injunction [Dkt. 2] is **denied.**

**I. Background**

A. Plaintiffs' planned activities

SpeechNow.org is an unincorporated non-profit association organized under the District of Columbia Uniform Unincorporated Nonprofit Associations Act, D.C. Code § 29-971.01 et seq., and a registered "political organization" under Section 527 of the Internal Revenue Code. Compl. at ¶ 7.  The following individuals join SpeechNow in bringing this suit: David Keating, SpeechNow's president and treasurer; Edward H. Crane, III, a

member of SpeechNow; and Fred M. Young, Jr., Brad Russo, and
Scott Burkhardt, three prospective donors to SpeechNow.

SpeechNow was founded for the purpose of "expressly
advocating the election of candidates who support rights to free
speech and association and the defeat of candidates who oppose
those rights, particularly by supporting campaign finance laws."
Compl. at ¶ 8.  SpeechNow's bylaws require that it be funded
solely by donations from private individuals, and not from unions
or corporations.  Under its bylaws, SpeechNow may not make
contributions or donations to FEC-regulated candidates or
political committees and may not "coordinate" its activities, as
defined in 2 U.S.C. § 441a(a)(7)(B) and 11 C.F.R. Part 109, with
candidates, or national, state, and local political parties.
Keating Decl., Ex. E. [Dkt. 2, Ex. 3].

SpeechNow says that its goal is to run political
advertisements during the 2008 election and in future election
cycles.  At the time the instant motion was heard, however, all
of SpeechNow's activities had been focused on the prosecution of
this test case.  It says that it has scripts for four television
ads.  Two of the ads call for the defeat of Dan Burton, a four-
term Republican Congressman from Indiana currently running for
re-election.  The audio script for the first Burton ad reads, in
part, that:

> [P]oliticians like Dan Burton don't like
> free speech.  Burton voted for a bill to

restrict the speech of many public interest
groups.  Under this bill you could go to
jail for criticizing politicians.

Hey Dan Burton.  This is America, not
Russia.

But we still have the right to vote.  Say
no to Burton for Congress.  Say no to
censorship.

Id., Ex. F.  The second Burton ad proceeds along similar lines,

stating that "Dan Burton voted to restrict our rights.  Don't let

him do it again."  Id. The third and fourth ads target Mary

Landrieu, a Democratic Senator running for re-election in

Louisiana.  One urges voters to "Say no to Landrieu for Senate."

The other intones that "Our founding fathers made free speech the

First Amendment to the Constitution.  Mary Landrieu is taking

that right away.  Don't let her do it again."  Id.

        Plaintiffs submitted declarations to the effect that

David Keating would give $5,500 to SpeechNow for the production

and broadcast of these advertisements; that Edward Crane would

give $6,000; that Richard Marder would donate $5,500; and that

Fred Young would give $110,000.  [Dkt. 2, Ex. 3].  None of these

donations have in fact been made, however, because, under

longstanding provisions of the Federal Election Campaign Act

("FECA"), 2 U.S.C. §§ 431-55, donors to SpeechNow would be

subject to an annual contribution limit of $5000 per person, 2

U.S.C. § 441a(a)(1)(C), and biennial aggregate limits of $42,700

- 3 -

for combined contributions to political committees and political parties and $108,200 for combined contributions to candidates, political parties, and political committees.  2 U.S.C. § 441a(a)(3).[1]  Brad Russo and Scott Burkhardt say that they would be willing to contribute $100 each, but they have not done so, because, since SpeechNow.org is unable to accept donations above $5000, "it cannot operate at all and thus cannot accept donations even below the contribution limits."  Mot. for Prelim. Injunc. at 6.

B. Legal Framework

        Plaintiffs contend that limiting the dollar amounts that can be contributed to independent expenditure committees, that is, to groups that fit the definition of FEC-regulated "political committees" but make only "independent expenditures," violates the First Amendment.

        "Independent expenditures," in FECA-speak, "expressly advocat[e] the election or defeat of a clearly identified candidate" but are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents."  2 U.S.C. § 431(17).  Persons making independent expenditures have relatively limited

---

        [1]  The exact dollar amounts of the biennial limits are not fixed by statute but are instead adjusted in odd-numbered years to account for inflation.  See 11 C.F.R. § 11.05(b).

disclosure obligations if they are not political committees. Essentially, they need only give timely notice to the FEC of expenditures that are made shortly before election day.  2 U.S.C. § 434(g).

More extensive reporting and disclosure obligations are imposed on "political committees," defined as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year."[2]  2 U.S.C. § 431(4)(A).  In <u>Buckley v. Valeo</u>, 424 U.S. 1 (1976), the Supreme Court construed this definition narrowly, holding that the term "political committee" "only encompass[es] organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate."  424 U.S. at 79.  Given that SpeechNow's stated purpose is to finance advertisements that call for the election or defeat of candidates for federal office, plaintiffs concede that if SpeechNow were to accept more than $1000 in donations, it would become an FEC-regulated political committee. <u>Compl</u>. at ¶¶ 39-40.

---

[2]  FECA defines "expenditures" and "contributions" as spending and fundraising "for the purpose of influencing any election for Federal office." 2 U.S.C. §§ 431(8)(A)(I); 431(9)(A)(I).

Political committees are required to register with the Federal Election Commission and file regular reports publicly disclosing all receipts and disbursements that exceed $200 per person per annum, as well as total operating expenses and cash on hand. 2 U.S.C. §§ 433-434. In addition, political committees are required to disclose, for every independent expenditure over $200, the date, amount, and candidates supported or opposed. 2 U.S.C. §§ 434(b)(4)(H)(iii), (6)(B)(iii). In all of their public communications, political committees must identify themselves through specific disclaimers. 11 C.F.R. §§ 110.11(a)(1),(2).

Although plaintiffs' complaint broadly challenges the constitutionality of applying the registration, reporting, and disclosure requirements for political committees to SpeechNow, the motion for preliminary injunction that is now before me focuses solely on the contribution limits that would be applicable to SpeechNow and its donors. Again, the annual limit on contributions to a non-party, non-candidate political committee is $5000, and biennial limits are imposed on donors' total giving to all political committees, candidates, and political parties. 2 U.S.C. §§ 441a(a)(1)(C), 441a(a)(3).

There is nothing new about these requirements. Both the general regulatory framework for political committees and the contribution limits that they must observe have been on the books

for decades.[3]  What has changed, however, is the context in which these provisions operate.  In 2002, Congress passed the Bipartisan Campaign Reform Act ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, the chief effect of which was to prohibit national political parties and their agents from soliciting, receiving, or spending so-called "soft money" – contributions of unlimited size from corporations, unions, and individuals that were not subject to FECA's requirements and prohibitions.[4]  In <u>McConnell v. FEC</u>, 540 U.S. 93 (2003), the Supreme Court upheld the ban on soft money and the other major provisions of BCRA that were intended to prevent contributors from circumventing the ban.  It was after BCRA, and after <u>McConnell</u>, that a number of new "Section 527

_____

[3]  The registration and reporting requirements contained at 2 U.S.C. §§ 432, 433, and 434, and the definition of political committees contained at 2 U.S.C. § 431(4) were passed as part of the original Federal Election Campaign Act of 1971, Pub. L. No. 92-224, §§ 301-306, 86 Stat. 3, 11-16 (Feb. 7 1972).  The contribution limits at 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3)(B) were enacted as amendments to FECA in 1974 and 1976. Pub. L. No. 93-443, § 101, 88 Stat. 1263 (Oct. 15, 1974); Pub. L. No. 94-283, § 112(2), 90 Stat. 475 (May 11, 1976).

[4]  "Soft money" included donations to "non-federal" or mixed federal-nonfederal accounts of national parties as well as contributions to state parties to fund activities that aided federal candidates but were deemed outside of FECA's scope because they did not involve coordinated expenditures or contributions, or express advocacy on behalf of federal candidates.  <u>See</u> Richard Briffault, <u>The 527 Problem . . . and the Buckley Problem</u>, 73 Geo. Wash. L. Rev. 949, 962 (2005).  For example, ads funded with soft money could mention the names of federal candidates so long as they stopped short of expressly calling for that candidate's election or defeat.  <u>See</u> FEC Advisory Op. 1995-25.

groups" were formed and began overtly spending money to influence federal elections, particularly the 2004 presidential campaign.

Named after the section of the Internal Revenue Code under which they are organized, 527 groups are "political organizations" that have as their primary purpose "influencing or attempting to influence the selection, nomination, election or appointment of any individual" to federal, state, or local office.  26 U.S.C. § 527(e).  Section 527 groups "by definition engage in partisan political activity."  McConnell, 540 U.S. at 177.  All FECA political committees register with the IRS as 527 groups in order to establish their non-profit tax status, but not all 527 groups are FECA political committees.  For example, a 527 focusing only on state and local races would not be required to register as a political committee with the FEC.  Following the enactment of BCRA's ban on soft money, the gulf between 527 political organizations that are regulable as FECA political committees and those that are not gained real significance.  Federal law places no limit on donations to the latter, while the former are bound by FECA's $5000 annual contribution limit.

With the passage of BCRA, the money flowing through federal 527s rose significantly – up from $151 million in 2002 to $424 million in 2004.  Steve Weissman & Ruth Hassan, BCRA and the 527 Groups at 81, in THE ELECTION AFTER REFORM: MONEY, POLITICS, AND THE BIPARTISAN CAMPAIGN REFORM ACT (Michael J. Malbin ed. 2005).  More than

two-thirds of the 527 money spent in 2004 was raised by newly created organizations.  Id. at 83.  These millions were generally not being raised by political novices.  Weissman and Hassan's detailed study concludes that "[d]uring the 2004 cycle, the two major parties, including their leading paid consultants and active notables, were involved, in varying degrees, in the creation, operation, or funding of several prominent 527 groups." Id. at 84.  Indeed, partisan operatives were so involved in the founding and leadership of these groups that some in the popular press referred to them as "shadow parties"[5] or "shadow groups."[6]

In 2004, 24 individual donors gave a total of $142 million to 527 groups.  Id. at 92.  Professor Briffault notes that this amount "is roughly equal to the aggregate of $149.2 million in public funds provided to the two presidential nominees for the general election campaign."  Briffault, The 527 Problem,

---

[5]  Thomas B. Edsall, Democrats' Financing Plan Challenged, Watchdog Groups File Complaint with FEC Over Party's 'Soft Money' Network, WASH. POST at A4 (Jan. 16, 2004) ("The shadow party is a network of organizations established to fill the vacuum created by the McCain-Feingold law's ban on party-raised "soft money," or large contributions from corporations, unions and rich individuals. . . .  The organizations in the shadow party include America Coming Together, run by former AFL-CIO political director Steve Rosenthal; the Media Fund, run by former Clinton aide Harold Ickes; and America Votes, run by Cecile Richards, former aide to House Democratic leader Nancy Pelosi[.]").

[6]  Editorial, Check Writing in the Luxury Suites, N.Y. TIMES at A18 (Aug. 31 2004); Lisa Getter, The Race to the White House: Legal Roles in Campaigns Put Spotlight on Shadow Groups, L.A. TIMES at A20 (Aug. 26, 2004).

73 Geo. Wash. L. Rev. at 964.  In other words, two dozen "megadonors" used 527s as a vehicle to funnel almost as much money into the 2004 election as the entire American public contributed via public funding.  Id.

In 2004, 113 individuals contributed at least $250,000 to 527 groups.  Two-thirds of this group had previously been active soft money donors, contributing $50 million to national parties during the 2000 and 2002 election cycles and another $4 million to 527s in 2002.  Weissman & Hassan at 93.  The 113 individuals who gave more than $250,000 in 2004 provided $207 million to 527 groups.  Id.  These figures indicate that since BCRA shut off "soft money," there has been a shift in individual donations from political parties to 527s and also a "vast escalation" in the total giving of the wealthiest donors.  Id.

At least ten 527 groups have been found to have violated FECA during the 2004 election by operating, in whole or in part, outside of the rules applicable to political committees.[7] Three of the groups fined – The Media Fund, America Coming Together, and the Progress for America Voter Fund – are notable both for the massive amounts of money they raised in violation of

---

[7]  See, e.g., FEC Conciliation Agreement with Swift Boat Veteran and POWs for Truth (MURs 5511 and 5525) (Dec. 2006); FEC Conciliation Agreement with Progress For America Voter Fund (MUR 5487)(Feb. 2007); FEC Conciliation Agreement with The Media Fund (MUR 5440) (Nov. 2007); FEC Conciliation Agreement with America Coming Together (MUR 5403 and 5466) (Aug. 2007). All of these documents are available at http://eqs.nictusa.com/eqs/searcheqs.

federal law, and, as discussed _infra_, for their close ties to either the Democratic or Republican Party. During the 2004 election these three groups spent approximately $166 million, accounting for over 40% of all 527 expenditures that year. _Id._ at 104-05. Notwithstanding the close relationships between party operatives and the persons running prominent 527 organizations (who were in some instances one and the same),[8] following the 2004 election, the FEC has not found that any of them violated the letter of the law on independence and non-coordination. SpeechNow states that it too will operate independently of political candidates and parties, making only independent expenditures.

In response to an inquiry from SpeechNow, the FEC's Office of General Counsel issued a draft advisory opinion confirming that, upon raising its first $1000, SpeechNow would meet the requirements for FECA political committee status, and would accordingly be required to abide by the applicable contribution limits. _Simpson Decl._, Ex. 3. Plaintiffs assert that these limits cannot be constitutionally applied to them because doing so would not serve any cognizable government interests. The real import of this case is not, however, about

_____

[8] For example, Harold Ickes was both the founder and president of The Media Fund and a member of the Democratic National Committee's executive committee. _See_ Notification with Factual and Legal Analysis to The Media Fund at 9 (MUR 5440)(Oct. 20, 2004).

whether the FEC ought be enjoined from taking action against a group that has raised no money and exists only on paper.  In practical terms, the remedy that plaintiffs seek is a declaration that the First Amendment prevents Congress from imposing any limit on contributions to the kind of nominally independent "shadow party" groups that have gained prominence in the wake of BCRA.

## II. Analysis

To demonstrate entitlement to a preliminary injunction, plaintiffs must show "1) a substantial likelihood of success on the merits, 2) that [they] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

## A. Likelihood Of Success

Plaintiffs argue that they are substantially likely to succeed on the merits because, as applied to SpeechNow and its supporters, the challenged contribution limits are: 1) subject to strict scrutiny, and 2) fail to further any government interest because independent expenditure committees, by their nature, cannot be used as vehicles for the corruption of elected officials and candidates.  The FEC maintains that intermediate

scrutiny is the applicable standard and argues that the
government interests promoted by the challenged limits include:
1) the prevention of corruption and its appearance, and 2) the
effective functioning of FECA's disclaimer requirements.

For the reasons explained below, I conclude that
intermediate scrutiny is appropriate and that §§ 441a(a)(1)(C)
and 441a(a)(3) are closely drawn to match sufficiently important
government interests. McConnell, 540 U.S. at 136 (2003); FEC v.
Beaumont, 539 U.S. 146, 162 (2003).

### 1. Appropriate Level of Scrutiny

Although both contribution and expenditure limits
implicate First Amendment freedoms, they do not do so in the same
manner or to the same degree. Colo. Republican Fed. Campaign
Comm. v. FEC, 518 U.S. 604, 615 (1996). Since Buckley, the
Supreme Court has treated expenditure limits as direct restraints
on speech that are subject to strict scrutiny. Buckley, 424 U.S.
at 39; see Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 386
(2000). In contrast, contribution limits involve "little direct
restraint on [] political communication," because they permit
"the symbolic expression of support evidenced by a contribution"
without infringing on "the contributor's freedom to discuss
candidates and issues." Buckley, 424 U.S. at 22. Because of the
lesser burden imposed on speech and associational rights, the
Supreme Court has generally upheld contribution limits when they

are "closely drawn" to a sufficiently important government interest.  Id. at 25; McConnell, 540 U.S. at 138, n.40.

Plaintiffs argue that the analytic distinction between contributions and expenditures should be collapsed in this case and the challenged contribution caps subjected to strict scrutiny.  They reach this conclusion first, by emphasizing that the Supreme Court has applied strict scrutiny to limits on independent expenditures, FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 493 (1985), and second, by arguing that limits on contributions to independent expenditure committees automatically operate to limit their expenditures.

According to plaintiffs, because independent expenditures "produce speech at the core of the First Amendment," id., contributions to independent expenditure committees must be viewed as implicating the same First Amendment interests and likewise be subjected to the most demanding judicial scrutiny. Underlying plaintiffs' argument on this point is the recognition that the activities of independent expenditure committees blur the conceptual distinctions that the Supreme Court has long relied on in differentiating contributions from expenditures. For example, in Buckley the Court reasoned that limiting contributions to candidates entails only a "marginal restriction" on contributors' speech because contributions serve "as a general expression of support for the candidate and his views, but do[]

not communicate the underlying basis for the support." 424 U.S. at 20-21. In contrast, SpeechNow's ads convey the basis for its opposition to particular candidates. Nevertheless, contributors to SpeechNow are not, through their donations, engaging in direct speech. SpeechNow, as a legally separate organization, is speaking as their proxy. The fact that donors would not contribute to SpeechNow unless they agreed with its views is beside the point; "sympathy of interests alone does not convert" SpeechNow's speech into that of its donors. California Medical Association v. FEC ("CalMed"), 453 U.S. 182, 196 (1981).

Plaintiffs' second contention – that strict scrutiny applies because § 441a(a)(1)(C) operates to limit expenditures – has been repeatedly rejected by the Supreme Court, most recently in McConnell, where the Court explained that BCRA's prohibition on the receipt or expenditure of non-federal money by national parties did not warrant strict scrutiny because it did not "in any way limit[] the total amount of money parties can spend" but instead simply "limit[s] the source and individual amounts of donations." 540 U.S. at 139. As in Buckley, the "overall effect" of the challenged contribution limits is "merely to require [SpeechNow] to raise funds from a greater number of persons and to compel people would who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression." 424 U.S. at 22.

Contrary to plaintiffs' argument, the decision in Citizens Against Rent Control v. Berkeley ("CARC"), 454 U.S. 290 (1981), does not require the application of strict scrutiny in this case.  In CARC, the Supreme Court applied "exacting judicial scrutiny" and struck down a municipal ordinance limiting contributions to ballot measure campaign committees to $250.  454 U.S. at 298.  Although plaintiffs urge that CARC's exacting scrutiny is the same thing as strict scrutiny, the majority opinion in CARC not only "avoided any direct statement regarding the standard of review," it also "seemed to apply the [less demanding] level of scrutiny described in Buckley." Citizens for Clean Gov't v. City of San Diego, 474 F.3d 647, 651 (9th Cir. 2007); see CARC, 454 U.S. at 299 ("It is clear, therefore, that [the ordinance] does not advance a legitimate governmental interest significant enough to justify its infringement of First Amendment rights.") (emphasis added).

Rather than the application of strict scrutiny, the result in CARC turned on the lack of a legitimate government interest in limiting contributions to ballot committees: "The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue."  454 U.S. at 298 (quoting First National Bank of Boston v. Bellotti, 435 U.S. 765, 790 (1978)).  This case is critically different from CARC precisely because it does involve candidate

elections, and, as discussed below, an accompanying potential for corruption.

### 2.   Government Interests Underlying § 441a(a)(1)(C)

#### *a. Prevention of Actual and Apparent Corruption*

The prevention of actual and apparent corruption are the chief government interests that the Commission asserts in support of constitutionally applying FECA's $5000 contribution limit to independent expenditure committees.  Plaintiffs do not quarrel with the fact that the Supreme Court has repeatedly found these interests sufficient to sustain contribution limits against First Amendment challenge.  Instead, they assert that "independent expenditures, by definition, cannot raise any concerns about corruption," and, they argue, as if the second proposition logically followed from the first, that if independent expenditures pose no corruption problem, neither can contributions to committees that make only independent expenditures.  Mot. for Prelim. Injunc. at 19.

Plaintiffs' argument presents a false syllogism that relies on a "crabbed view of corruption, and particularly of the appearance of corruption" that is at odds with Supreme Court precedent.  McConnell, 540 U.S. at 152.  First of all, the Supreme Court has never held that, by definition, independent expenditures pose no threat of corruption.  In Buckley, the Court explained that independent expenditures made by individuals

"d[id] not presently appear" to pose a danger of corruption.  424

U.S. at 46.  The Court "explicitly left open the possibility that

a time might come when . . . independent expenditures made by

individuals to support candidates would raise an appearance of

corruption."  McConnell v. FEC, 251 F. Supp. 2d 176, 624-25

(D.D.C. 2003)(Kollar-Kotelly, J.).  Second, that SpeechNow cannot

literally funnel contributions to candidates, and therefore

cannot serve as a vehicle for the direct exchange of dollars for

political favors, is not dispositive.  The Supreme Court has long

acknowledged that "corruption," in the sense that word is used in

campaign finance law, "extends beyond explicit cash-for-votes

agreements to 'undue influence on an officeholder's judgment.'"

Id. at 143 (quoting FEC v. Colo. Republican Fed. Campaign Comm.

("Colorado Republican II"), 533 U.S. 431, 441 (2001)).

In upholding BCRA's major provisions, McConnell

affirmed Congress's power to enact prophylactic measures aimed at

the "more subtle but equally dispiriting forms of corruption,"

such as the sale of access, that can occur even when

contributions are made to entities that are legally independent

of candidates' own campaign organizations.  Id. at 153; see id.

at 154-56 (upholding limits on contributions to national

political parties); id. at 161-73 (upholding limits on

contributions to state parties); id. at 174-81 (upholding ban on

party solicitations for donations to tax-exempt organizations);

- 18 -

id. at 184-85 (upholding limitations on the source and amount of contributions that can be spent by state and local candidates to directly impact federal elections).  The Court also made clear Congress has a strong interest in preventing the circumvention of otherwise valid contribution limits.  Id. at 185-86; see also Colorado Republican II, 533 U.S. at 456 ("[A]ll members of the Court agree that circumvention is a valid theory of corruption.").

The McConnell Court addressed both of these forms of corruption in discussing BCRA's § 323(f), which forbids state and local candidates and officeholders from spending soft money on public communications.  In upholding § 323(f), the Court accepted as reasonable two predictions made by Congress: first, that with national parties banned from taking soft money, donors seeking to buy access would next target state and local candidates because of their ties to federal officeholders; and second, that political parties themselves would seek out new ways to circumvent BCRA's ban on soft money.  McConnell, 540 U.S. at 156 n.51 & 185.  Both of these predictive judgments apply with equal force to Congress's decision to prohibit political committees, even those that make only independent expenditures, from receiving annual contributions larger than $5000.  "Independence" does not prevent candidates, officeholders, and party apparatchiks from being made aware of the identities of large

- 19 -

donors, and people who operate independent expenditure committees can have the kind of "close ties" to federal parties and officeholders that render them "uniquely positioned to serve as conduits for corruption," both in terms of the sale of access and the circumvention of the soft money ban.  Id. at 156 n.51.

These propositions are demonstrated – if not exactly establish by record evidence – by the history of 527 groups in the 2004 presidential election.  The Media Fund evolved out of the Democratic National Committee's Task Force on BCRA.  It was headed by Harold Ickes, who had been President Clinton's Deputy Chief of Staff and, who was, for a time, a paid adviser to then DNC-chair Terry McAuliffe, who discussed Ickes' plans for The Media Fund at a gathering of Democratic Party donors in 2002. Weissman & Hassan at 85.  Ickes also led the 527 group Americans Coming Together ("ACT").[9]  Id. at 86. President Clinton was involved in multiple fundraising events with major donors to ACT, telling them, at one particular fundraising event, that "ACT met a critical need and that if ACT had existed in 2000 the Democrats would have won."  As one person leading a 527 group put it, "He

---

[9]  ACT maintained both a federal account, which was registered with the FEC as a non-connected political committee under 11 C.F.R. 106.6(a), and a non-federal account, housed under Section 527.  ACT violated FECA through improperly allocating funds between the two accounts. In other words, ACT used monies from its 527 to fund activities that were required to have been carried out by its political committee arm.  See FEC Conciliation Agreement with America Coming Together (MUR 5403 and 5466).

koshered us.  He gave the donors confidence, both the ideological ones and the access ones." <u>Id.</u> at 87.

Close ties between party officials and independent 527s existed on the Republican side as well.  Progress for America ("PFA"), originally formed under Section 501(c)(4) and later, in part, under Section 527, was founded in 2001 by Tony Feather, a partner in a consulting firm that worked for the Republican National Committee.  <u>Id.</u> at 87.  The speakers at PFA's October 2003 conference included Republican National Committee Chairman Ed Gillespie, Bush-Cheney 2004 Director Ken Mehlman, and Benjamin Ginsberg, counsel to both PFA and the Bush campaign.  <u>Id.</u> at 88. Both before and after PFA moved its campaign work to its 527, one of its leading fundraisers was Tom Synhorst, a partner in a campaign consulting firm that received over $19 million in business from the Bush-Cheney and RNC campaigns.  <u>Id.</u>  On May 13, 2004, Progress for America was listed by name in a joint public statement by RNC Chairman Gillespie and Bush-Cheney Campaign Chairman Marc Racicot.  While the statement made no direct solicitation, Racicot and Gillespie stated that the FEC's 2004 regulatory inaction had:

> given the 'green light' to all non-federal
> '527s' to forge full steam ahead in their
> efforts to affect the outcome of this year's
> Federal elections, and, in particular, the
> presidential race. . . .  The 2004 elections
> will now be a free-for-all. . . .  Groups
> like the Leadership Forum, Progress for
> America, the Republican Governors'
> Association, GOPAC and others now know that

> they can legally engage in the same way
> Democrat leaning groups like ACT, The Media
> Fund, MoveOn, and Moving America Forward
> have been engaging.

Id. at 89; *full statement available at*

www.gwu.edu/~action/2004/money/bushrnc051304st.html (last visited

Jun. 1, 2008).

Clearly, legally independent 527 groups can and do bear

seals of approval from political parties.  SpeechNow's carefully

constructed test-case embodiment of "independence" does not

shield it from reasonable campaign finance regulation.  "[T]he

First Amendment does not require Congress to ignore the fact that

'candidates, donors, and parties test the limits of the current

law.'"  McConnell, 540 U.S. at 144 (quoting Colorado Republican

II, 533 U.S. at 457).  Nor does the First Amendment require

Congress to ignore the corrosive effects that the perception of

collusion and the circumvention of contribution limits have on

public confidence in the integrity of federal elections.  Shrink

Mo., 528 U.S. at 390.  And finally, neither does the First

Amendment require Congress to ignore what its members surely

know – that an organization may be legally independent under FEC

rules while nonetheless functioning as a fully integrated arm of

a major political party.

In arguing that Congress does not have the power to

regulate independent expenditure committees, plaintiffs rely

heavily on a single source: Justice Blackmun's concurrence in

California Medical Association v. FEC, 453 U.S. 182 (1981).  In
that case, the Court upheld FECA's $5000 limit on contributions
to multicandidate political action committees, defined as
registered political committees that contribute to at least 5
federal candidates and have received contributions from 50 or
more donors.  2 U.S.C. § 441a(a)(4).  Justice Blackmun provided
the fifth vote for the decision and stated in his concurrence
that he would have reached a different result if:

> § 441a(a)(1)(C) were applied to contributions to a
> political committee established for the purpose of
> making independent expenditures, rather than
> contributions to candidates.  By definition, a
> multicandidate political committee like CALPAC
> makes contributions to five or more candidates for
> federal office.  § 441a(a)(4).  Multicandidate
> political committees are therefore essentially
> conduits for contributions to candidates, and as
> such they pose a perceived threat of actual or
> potential corruption.  In contrast, contributions
> to a committee that makes only independent
> expenditures pose no such threat.

CalMed, 453 U.S. at 203 (Blackmun, J., concurring).  Although
Justice Blackmun took a narrower position on the
constitutionality of § 441a(a)(1)(C) than the plurality, he did
so in regard to a then-hypothetical situation (CALPAC did not
only make independent expenditures), and, as a result, the
reservations he expressed are neither controlling nor
precedential.  Most importantly, a majority of the Supreme Court
in McConnell rejected Justice Blackmun's reasoning, and explained
that CalMed upheld § 441(a)(1)(C) on its face even though the
provision limits "not only the source and amount of funds

available to parties and political committees to make candidate
contributions, but also the source and amount of funds available
to engage in express advocacy and <u>numerous other noncoordinated
expenditures</u>." 540 U.S. at 152 n.48 (emphasis added). The Court
went on to explain that "[i]f indeed the First Amendment
prohibited Congress from regulating contributions to fund the
latter, the otherwise-easy-to-remedy exploitation of parties as
pass-throughs (e.g., a strict limit on donations that could be
used to fund candidate contributions) would have provided
insufficient justification for such overbroad legislation." <u>Id.</u>
In <u>N.C. Right to Life v. Leake</u>, Judge Michael cogently explained
the significance of the <u>McConnell</u> Court's interpretation of
<u>CalMed</u>:

> [I]f the governmental interests only justified
> regulation of coordinated expenditures -- as Justice
> Blackmun argued -- the statute would have been
> facially overbroad (and therefore unconstitutional)
> because it imposed limits on *all* groups making
> expenditures. But <u>Cal-Med</u> held that the provision
> was not facially overbroad, so (according to
> <u>McConnell</u>) the First Amendment must allow
> legislatures to regulate contributions to fund
> independent political expenditures.

2008 U.S. App. LEXIS at *168 (4th Cir. May 1, 2008) (Michael, J.,
dissenting) (internal citation omitted). In other words,
<u>McConnell</u> and <u>CalMed</u> together provide still more support for the
conclusion that Congress may regulate independent expenditure
committees because the government interest in preventing
corruption is not limited to policing organizations that serve as

"pass-throughs" for candidate contributions.  540 U.S. at 152
n.48.

      *b. Effective Functioning of FECA's Disclaimer*
      *Provisions*

      Section 441a(a)(1)(C) also promotes the important
government interests underlying the Act's disclaimer
requirements.  See Buckley, 424 U.S. at 66-68.  All independent
expenditure communications must include a disclaimer explaining
what group is responsible for the advertisement and stating that
the ad is not authorized by a candidate or candidate's authorized
committee.  2 U.S.C. § 441d(a).  Of course, political committees
are not required to individually list all of their donors in the
disclaimers included in their ads.  At present, however, no one
person could have contributed more than $5000 to the group
running the ad.  Were plaintiffs to prevail, ads by organizations
such as SpeechNow could be funded entirely by one or more large
donors.  While candidates and officeholders would likely know the
identity of the persons funding such ads, the public would not
receive this information from the advertisement itself.  As
applied to independent expenditure committees, § 441a(a)(1)(C)
thus functions to prevent a handful of wealthy donors from hiding
behind "dubious and misleading names" and evading the Act's
disclaimer requirements.  See McConnell, 540 U.S. at 197.[10]

---

     [10]  The Commission also argues that avoidance of the
"corrosive and distorting effects of immense aggregations of

- 25 -

3. Tailoring of § 441a(a)(1)(C)

Finally, the Act's $5000 annual contribution limit is a proportional response to the government interests at stake.  The limit is quite accommodating; a $5000 contribution to a political organization is substantial. The contribution cap places no ceiling on the total amount of funds that groups such as SpeechNow can amass and expend.  It does not limit the number of persons from whom funds can be solicited.  It functions in a manner that is consonant with First Amendment values by requiring political committees to "increase the dissemination of information by forcing [them] to solicit from a wider array of potential donors."  McConnell, 540 U.S. at 140.

In sum, because § 441a(a)(1)(C) is closely drawn to match the government interests in preventing corruption and the circumvention of the Act's disclaimer requirements, plaintiffs

---

wealth" is an important government interest supporting the constitutionality of § 441a(a)(1)(C).  See Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 660 (1990).  The Supreme Court relied on this rationale in upholding limits on corporate campaign expenditures, and it is best understood to be limited to that context.  The Austin Court reasoned that the corporate form allowed for "immense aggregations of wealth that . . . that have little or no correlation to the public's support for the corporation's political ideas."  Id.  This concern is inapposite to an unincorporated, political organization such as SpeechNow.  Moreover, the Supreme Court has long held that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."  Davis v. FEC, No. 07-320, slip op. at 15-16, 554 U.S. __ (2008)(quoting Buckley, 424 U.S. at 48-49).

have failed to demonstrate a likelihood of success on their claim that FECA's $5000 contribution limit is unconstitutional as applied to independent expenditure committees.

### 4. Challenge to Biennial Aggregate Limits

Plaintiffs have not separately addressed the constitutionality of the biennial aggregate limits set out at 2 U.S.C. § 441a(a)(3) at any length. The Court in <u>Buckley</u> upheld a similar aggregate ceiling notwithstanding the fact that it imposed a restriction on the number of "candidates and committees with which an individual may associate himself by means of financial support." 424 U.S. at 38. As in <u>Buckley</u>, the aggregate limits challenged here prevent the evasion of constitutionally valid limits on contributions to candidates, <u>id.</u> at 23-25, party committees, <u>McConnell</u>, 540 U.S. 142-189, and political committees, <u>supra</u>. Plaintiffs have not demonstrated a likelihood of success in their challenge to § 441a(a)(3).

### III. Conclusion

The motion for injunctive relief is denied. Plaintiffs cannot show that they are so irreparably harmed as to justify setting aside these duly enacted provisions of FECA. Even with these contribution caps in place, the individual plaintiffs retain the ability to associate with and contribute to SpeechNow – each must simply limit his contribution to $5000 per year. "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in

- 27 -

evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." <u>Walters v. Nat'l Ass'n of Radiation Survivors</u>, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers).

As this memorandum was in the process of being filed, plaintiffs' motion to certify questions under 2 U.S.C. § 437h came to the Court's attention. Because the denial of a preliminary injunction is appealable as of right under 28 U.S.C. § 1292(a)(1), <u>Belbacha v. Bush</u>, 520 F.3d 452, 454 (D.C. Cir. 2008), plaintiffs' certification motion [Dkt. 31] will also be **denied**. Plaintiffs should take up their request for *en banc* hearing directly with the Court of Appeals.


                        JAMES ROBERTSON
                   United States District Judge