UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— )<br>SPEECHNOW.ORG, )<br>DAVID KEATING, )<br>FRED M. YOUNG, JR., )<br>EDWARD H. CRANE, III, )<br>BRAD RUSSO, and )<br>SCOTT BURKHARDT )<br> )<br>       Plaintiffs, )<br> )<br>   v. )<br> )<br>FEDERAL ELECTION COMMISSION )<br> )<br>      Defendant. )<br>————————————————) | Civil Case No. 1:08-cv-00248 (JR) |

**PLAINTIFFS' OPENING BRIEF ON PROPOSED FINDINGS OF
FACT FOR CERTIFICATION UNDER 2 U.S.C. § 437h**

Pursuant to the parties' agreed schedule and this Court's orders of July 29, 2008 and

October 17, 2008, Plaintiffs respectfully submit this statement of proposed findings of fact in

support of their motion for certification under 2 U.S.C. § 437h.  Included with this brief are the

following supporting documents:  the Declaration of Steven M. Simpson with Exhibits 1-34; the

Declaration of David Keating with Exhibits A-O; the Declarations of Plaintiffs' expert witnesses

Jeffrey Milyo and Rodney Smith with Exhibits; and the Declarations of Edward H. Crane, III,

Fred M. Young, Jr., Brad Russo, and Scott Burkhardt.  Plaintiffs will submit any additional facts

in support of their rebuttal to the FEC's facts, if any, in their response to the FEC's proposed

findings of fact.

## PROPOSED FINDINGS OF FACT

### I.    SpeechNow.org

1.    Plaintiff SpeechNow.org is an independent group of citizens whose mission is to engage in express advocacy in favor of candidates who support the First Amendment and against those who do not.  Declaration of David Keating in Support of Proposed Findings of Fact (hereinafter, "Keating Decl.") at ¶¶ 2, 3; Keating Decl. Ex. H, Bylaws of SpeechNow.org (hereinafter, "*Bylaws*"), Art. II.  Toward that end, SpeechNow.org planned to run television advertisements during the 2008 election cycle in the states and districts of political candidates whose records demonstrate that they do not support full protections for First Amendment rights. Keating Decl. at ¶ 15.  While it appears that SpeechNow.org will not be able to run advertisements in this election, it would like to run advertisements in future elections, including the 2010 election, similar to those it intended to run during the 2008 election season.  *Id*. at ¶¶ 15, 30.

2.    Plaintiff David Keating created SpeechNow.org because he believes that the issue of free speech and the threats posed to it by campaign finance laws are vital to the future of the nation.  Keating Decl. at ¶ 3.  He wants individuals who share this concern to be able pool their funds so they can speak out as loudly and effectively in favor of First Amendment rights as possible.  *Id*.  Because federal elections provide a rare opportunity both to impact public policy—by affecting the political futures of the candidates who make it—and to influence public debate, Mr. Keating believes that running advertisements calling for the election or defeat of candidates based on their support for free speech and association is the most effective way for private citizens to protect those rights.  *Id*.  In his view, if an individual is permitted to spend unlimited amounts of money advocating the election or defeat of candidates for office, there is

no reason why groups of individuals should be prevented from doing so.  He created

SpeechNow.org to give ordinary Americans the ability to band together to achieve these

purposes.  *Id*.

### A.     Structure and Operations of SpeechNow.org

3.      SpeechNow.org is an unincorporated nonprofit association organized under the

District of Columbia Uniform Unincorporated Nonprofit Associations Act, D.C. Code § 29-

971.01 *et seq*., and registered as a "political organization" under section 527 of the Internal

Revenue Code.  Keating Decl. Ex. G, SpeechNow.org Internal Revenue Form 8871.

4.      The general powers of SpeechNow.org lie with five voting "Members."  *Bylaws*,

Art. I, § 5; Art. III, §§ 1, 2.  They are David Keating, Jon Coupal, Edward Crane, Daniel Shapiro,

and Richard Marder.  *Id*.  The bylaws also designate four officers of the association:  President,

Vice President, Secretary, and Treasurer.  *Id*., Art. V, § 1.  David Keating is the President and

Treasurer of SpeechNow.org, and he administers all of the association's affairs.  Keating Decl. at

¶ 2.  Jon Coupal is the Vice President and Secretary.  Keating Decl. Ex. D, Member Action by

Written Consent in Lieu of an Organizational Meeting of SpeechNow.org.

5.      SpeechNow.org will operate solely on private donations from individuals.

Keating Decl. at ¶ 8; *Bylaws*, Art. II.  Under its bylaws, SpeechNow.org cannot accept, directly

or indirectly, any donations or anything of value from business corporations, labor organizations,

national banks, federal government contractors, foreign nationals, political parties, or political

committees.  Keating Decl. at ¶ 8; *Bylaws*, Art. VI, § 9; Art X, § 1.

6.      Under its bylaws, SpeechNow.org cannot engage in business activities, including

the provision of any goods or services that results in income to SpeechNow.org or any

advertising or promotional activity that results in income to SpeechNow.org, other than in the

form of membership dues or donations.  Keating Decl. at ¶ 12.  Similarly, SpeechNow.org

cannot offer to any donors or members any benefit that is a disincentive for them to disassociate

themselves with SpeechNow.org on the basis of the organization's position on a political issue,

and it cannot offer its donors or members credit cards, insurance policies or savings plans,

training, education, business information, or any other benefits other than those that are

necessary to enable recipients to engage in promotion of SpeechNow.org's political ideas.  *Id*.;

*Bylaws*, Art. VI, §§ 6, 8.

      7.    SpeechNow.org is independent of any political candidates, political committees,

and political party committees, and its bylaws require it to operate wholly independently of any

of these entities.  Keating Decl. at ¶ 9; *Bylaws,* Art. VI, § 9; Art. X, §§ 2-10.  SpeechNow.org

cannot make contributions or donations of any kind directly or indirectly to any FEC-regulated

candidate or political committee, and it cannot coordinate its activities, as defined in 2 U.S.C.

§§ 441a(a)(7)(B) & (C) and 11 C.F.R. Part 109, with any candidates, national, state, district or

local political party committees, or their agents.  *Id*., Art. VI § 10; Art. X §§ 2-10.

      8.    SpeechNow.org's bylaws prohibit it from using any vendors for services in

producing or distributing its communications featuring a candidate for federal office if that

vendor was also engaged during the same election cycle by the candidate featured in the

communication.  *Bylaws*, Art. X, § 2.  The bylaws similarly prohibit SpeechNow.org from

employing any individuals who were employed during the same election cycle by any candidate

featured in any of SpeechNow.org's communications.  *Id*., Art. X, § 3.

      9.    SpeechNow.org's bylaws also ensure the independence of the association's

speech by, among other things, requiring members, officers, employees, and agents of the

association to read and understand the FEC's rules concerning coordination, 11 C.F.R. § 109.21,

*Bylaws*, Art. X, § 4, and by prohibiting them from engaging in activities that might lead to coordination with candidates.  *Id*., Art. X, §§ 5-10.

10.     Under SpeechNow.org's bylaws, all of the obligations in the previous two paragraphs must be communicated to all members, officers, employees, agents, and donors of SpeechNow.org and employees and agents must sign an acknowledgement of these obligations as a condition of participating in any association activities.  *Bylaws*, Art. X, § 11. SpeechNow.org's members and officers have each signed such an acknowledgment.  Keating Decl. Ex. I, SpeechNow.org Affirmation.

11.     SpeechNow.org will solicit donations from individuals for funds to cover operating expenses and to buy public, political advertising to promote the election or defeat of candidates based on their positions on free speech and associational rights.  Keating Decl. at ¶ 11.  Some of SpeechNow.org's solicitations will refer to particular candidates for federal office by name.  *Id*.; Declaration of Steven M. Simpson in Support of Plaintiffs' Proposed Findings of Fact (hereinafter, "Simpson Decl.") Ex. 1, Supplement to AOR 2007-32 (Sample SpeechNow.org Solicitation).

12.     SpeechNow.org's solicitations will inform potential donors that their donations may be used for political advertising that will advocate the election or defeat of candidates to federal office based on their support for First Amendment rights.  Keating Decl. at ¶ 11.  Under its bylaws, SpeechNow.org must also advise donors that their donations are not tax deductible and that they will be spent according to the sole discretion of SpeechNow.org.  *Id*. at ¶ 13; *Bylaws*, Art. VI, § 11.

**B.      SpeechNow.org's Planned Political Advertisements**

13.      SpeechNow.org plans to run advertisements on television and in other media during the 2008 election cycle and other future election cycles.  Keating Decl. at ¶¶ 15-20, 30. SpeechNow.org has prepared television scripts for four such advertisements.  Keating Decl. Ex. J, SpeechNow.org Television Scripts.  Two of the advertisements call for the defeat of Dan Burton, a Republican Congressman currently running for reelection in the fifth district of Indiana.  Both ads criticize Representative Burton for voting for a bill that would restrict the speech of many public interest groups.  The first urges voters to "Say no to Burton for Congress."  The second states that "Dan Burton voted to restrict our rights.  Don't let him do it again."  *Id*.; Keating Decl. at ¶ 18.  SpeechNow.org would like to broadcast these advertisements in the fifth district of Indiana, where Representative Burton is running for office.  *Id*. at ¶¶ 20-24.

14.      The other two advertisements call for the defeat of Mary Landrieu, a Democratic Senator currently running for reelection in Louisiana.  Keating Decl. at ¶ 19.  Both ads criticize Landrieu for voting for a law to restrict the speech of public interest groups.  The first urges voters to "Say no to Landrieu for Senate."  The second concludes by saying that "Our founding fathers made free speech the First Amendment to the Constitution.  Mary Landrieu is taking that right away.  Don't let her do it again."  *Id*.; Keating Decl. Ex. J.  SpeechNow.org would like to broadcast these advertisements in Louisiana, where Senator Landrieu is running for office. Keating Decl. at ¶¶ 20-24.

15.      The production costs for these advertisements would be approximately $12,000. Keating Decl. at ¶ 21; Simpson Decl. Ex. 2, Declaration of Ed Traz in Support of Plaintiffs' Motion for Preliminary Injunction with Exhibits, dated February 8, 2008 at ¶¶ 3-5.

16.     The cost to air the advertisements depends on the number of times they are run and the size of the audience SpeechNow.org wants to reach.  Keating Decl. at ¶¶ 21-24; Simpson Decl. Ex. 2 at ¶¶ 3-5.

17.     Ideally, Mr. Keating would like to be able to run the ads enough times so that the target audience could view the ads at least ten times, but that would cost roughly $400,000.  Keating Decl. at ¶ 24.  A less expensive option is simply to run the ads fewer times.  *Id*. at ¶¶ 21-24.  In either event, the total costs to produce and run advertisements in Indianapolis and either Baton Rouge or New Orleans would exceed $120,000.  *Id*. at ¶ 22.

18.     Mr. Keating made and will in the future make the decisions about where and in what races to run SpeechNow.org's advertisements, although he expects to keep the other members of SpeechNow.org apprised of his decisions.  Keating Decl. at ¶ 25.  Mr. Keating will base his decisions primarily on two factors:  (1) the candidates' records on freedom of speech and/or campaign finance laws; and (2) whether the race is close enough that SpeechNow.org's ads might have an impact on the outcome.  *Id*. at ¶ 26.

19.     Thus, Mr. Keating decided that SpeechNow.org should run ads in Congressman Burton's primary because the Congressman voted for H.R. 513, a bill that restricted the free speech rights of certain nonprofits, as did the majority of House Republicans, and Mr. Keating felt that he was vulnerable to defeat.  Keating Decl. at ¶ 27.  Mr. Keating spoke to Congressman Burton's opponent, John McGoff, and discovered that he supported freedom of speech and opposed campaign finance laws that infringed on freedom of speech.  *Id*.  As a result, Mr. Keating concluded that running ads highlighting Congressman Burton's record on campaign finance laws would be a good way to convey to Republicans that they should support freedom of speech and oppose campaign finance laws that would infringe on rights to free speech.  *Id*.

20.     In his conversation with Mr. McGoff, Mr. Keating discussed only Mr. McGoff's position on issues.  Mr. Keating understands that in order to avoid any questions about coordination and to comply with the FEC's coordination rules, he cannot speak to candidates, campaigns, or political party committees about their plans, projects, or needs.  Keating Decl. at ¶ 27.

21.     Mr. Keating decided that SpeechNow.org should run ads against Mary Landrieu because her election is a high-profile race, and she has consistently supported campaign finance legislation that infringed on freedom of speech.  Keating Decl. at ¶ 28.  As a result, Mr. Keating concluded that her opponent could not be worse than she is and that running ads in her race would increase the chances of her defeat and garner attention for SpeechNow.org and its message and mission.  *Id*.

22.     SpeechNow.org would run ads in additional races during this election cycle if it were able to do so.  Candidates in whose elections SpeechNow.org would consider broadcasting advertisements include any candidate who has voted for or against the Bipartisan Campaign Reform Act; any candidate who voted for or sponsored or opposed H.R. 513 as passed by the House of Representatives in 2006 or similar legislation; any candidate who supports or opposes legislation to create a Federal Election Administration such as that proposed by H.R. 421 in the current Congress.  Keating Decl. at ¶ 29.  More specifically, for this election cycle, SpeechNow.org would like to run advertisements opposing Democratic congressional candidate Paul Kanjorski in the 11th district of Pennsylvania.  *Id*.

23.     If it is able to, SpeechNow.org will run ads in future election cycles as well.  For instance, in the 2010 election cycle, SpeechNow.org would like to run advertisements opposing North Dakota Democratic Senator Byron Dorgan and Colorado Democratic Senator Ken Salazar.

Keating Decl. at ¶ 30.  SpeechNow.org would consider running advertisements opposing Alaska Republican Senator Lisa Murkowski as well, if she has a credible primary opponent.  *Id.*

24.      Assuming SpeechNow.org is able to function and run ads in future elections, it will make decisions about where to run such ads consistent with the general approach described above.  Keating Decl. at ¶ 26.  If SpeechNow.org is able to raise enough funds, it intends to use methods such as candidate research to determine the past statements and positions of candidates on free speech as well as public opinion polling to obtain more information about the viability of particular candidates in particular races.  *Id.* at ¶ 32.

25.      SpeechNow.org will disclose its activities under the disclosure and disclaimer provisions in the Federal Election Campaign Act that apply to independent expenditures. Keating Decl. at ¶¶ 6, 33-36.

26.      Accordingly, pursuant to 2 U.S.C. § 434(c), SpeechNow.org will file statements with the FEC reporting the identities of those who contributed to its advertisements and other communications that are independent expenditures under FECA along with the amounts contributed and the other information required by this provision.  Keating Decl. at ¶ 35.

27.      SpeechNow.org will not accept any targeted or "earmarked" funds, and, as a result, it will disclose all of its contributors in its independent expenditure disclosures.  Keating Decl. at ¶ 36.  Thus, for each independent expenditure SpeechNow.org makes, Mr. Keating will disclose all donors whose contributions have been used to fund any portion of the independent expenditure at issue.  *Id.*  All donors to SpeechNow.org will thus be disclosed in the association's independent expenditure disclosures.  *Id.*

28.     Pursuant to 2 U.S.C. § 441d(d)(2), SpeechNow.org's advertisements will include a statement indicating that SpeechNow.org is responsible for the content of the advertisement. Keating Decl. at ¶ 34.

29.     Pursuant to 2 U.S.C. § 441d(a), all of SpeechNow.org's advertisements and other communications will include its name, address, and telephone number or World Wide Web address, along with a statement indicating that the communication was paid for by SpeechNow.org and was not authorized by any candidate or candidate's committee.  Keating Decl. at ¶ 33.

30.     In addition, as an association organized under section 527 of the Internal Revenue Code, SpeechNow.org must make regular disclosures of all contributions and expenditures. Keating Decl. at ¶ 37, Keating Decl. Ex. L, SpeechNow.org IRS Form 8872; Simpson Decl. Ex. 25, Deposition Transcript of Gregory Scott, taken September 24, 2008 (hereinafter, "Scott Dep.") at 105:2-106:3.

### C.     SpeechNow.org's Other Activities

31.     In addition to creating advertisements for the Burton and Landrieu races, Mr. Keating has also set up a website, www.speechnow.org, on which he has posted general information about the association, news stories and editorials about SpeechNow.org, and information about this lawsuit.  Keating Decl. at ¶ 4; Keating Decl. Ex. A, Web Pages from www.speechnow.org (Home Page).

32.     The website allows individuals interested in SpeechNow.org to sign up to receive more information about the association and to check a box if they might in the future consider making a donation to SpeechNow.org if it is legally able to accept donations.  Keating Decl. Ex. A (Sign-up Page).  Since the website was created late last year, about 180 individuals have

signed up to receive more information and about 75 of them have indicated that they would consider making a donation to SpeechNow.org in the future.  Keating Decl. at ¶ 5.  Mr. Keating has sent articles and other information concerning SpeechNow.org to the individuals on this list. *Id*. at ¶ 4; Keating Decl. Ex. O, Information Sent to Interested Visitors of www.SpeechNow.org.

33.     Mr. Keating has also set up a PayPal account to allow individuals to donate money to SpeechNow.org in the event that the association is legally able to accept donations. Keating Decl. at ¶ 53; Keating Decl. Ex. M, Email from PayPal.com confirming SpeechNow.org account.

## II.     The Individual Plaintiffs

34.     In addition to being the President and Treasurer of SpeechNow.org, Mr. Keating would also like to donate money to the association to support its mission and activities.  Keating Decl. at ¶ 39.  If and when SpeechNow.org is legally able to accept donations, Mr. Keating will immediately donate $5,500 to the group, and he would like to donate more in the future.  *Id*. at ¶¶ 39, 51-52.

35.     Other individuals are also ready, willing, and able to immediately donate funds that would allow SpeechNow.org to produce and broadcast the ads it has created, or other similar ads, enough times to have an impact on the audience in the relevant markets.  Keating Decl. at ¶ 39.  Edward Crane is willing to donate $6,000.  Declaration of Edward Crane in Support of Proposed Findings of Fact (hereinafter, "Crane Decl.") at ¶ 6.  Richard Marder is willing to donate $5,500.  Keating Decl. at ¶ 39; Simpson Decl. Ex. 3C, SpeechNow.org Request for Advisory Opinion and Supporting Materials, dated November 14, 2007 (hereinafter, "Advisory Opinion Request") at 6-8 (Declaration of Richard Marder in Support of SpeechNow.org

Advisory Opinion Request). Fred M. Young is willing to donate $110,000. Declaration of Fred

M. Young, Jr. in Support of Proposed Findings of Fact (hereinafter, "Young Decl.") at ¶ 6.

36.     Plaintiff Ed Crane is the President of the Cato Institute and a long-time supporter

of free speech and opponent of campaign finance laws. Crane Decl. at ¶¶ 3, 10. Mr. Crane is an

acquaintance of Mr. Keating's who agreed both to serve as a member of SpeechNow.org and to

contribute money to the association when Mr. Keating asked him during the summer of 2007.

*Id*. at ¶ 2. Mr. Crane would like to be able to make additional contributions to SpeechNow.org in

the future. *Id*. at ¶ 8.

37.     Mr. Crane supports SpeechNow.org's mission and believes that calling for the

election or defeat of candidates based on their support for First Amendment rights is an ideal

way both to affect policy—by affecting the political futures of those who make it—and to

promote the importance of free speech. Crane Decl. at ¶ 3. However, Mr. Crane lacks the time

or individual resources to do things like produce television advertisements about free speech and

candidates that can reach a wide segment of the population. *Id*. at ¶ 4. Thus, the best way for

him to speak effectively against candidates who support restrictions on free speech is to associate

with other like-minded individuals and a group like SpeechNow.org. *Id*.

38.     Plaintiff Fred Young is the former CEO of Young Radiator Co. in Racine,

Wisconsin. Simpson Decl. Ex. 4, Excerpts from the Deposition Transcript of Fred M. Young,

Jr., taken October 3, 2008 at 22:1-4. Mr. Young has supported various libertarian and classical

liberal causes through the years, including the Cato Institute and the Club for Growth. *Id*. at

32:5-7, 87:7-9. Mr. Keating knew Mr. Young through Mr. Keating's employment as the

executive director of the Club for Growth. *Id*. at 32:14-33:1. Mr. Keating contacted Mr. Young

and asked if he would agree to contribute money to SpeechNow.org during the summer of 2007.

Young Decl. at ¶ 2.  Mr. Young would like to be able to make additional contributions to

SpeechNow.org in the future.  Young Decl. at ¶ 8.

39.     Mr. Young supports SpeechNow.org's mission and believes that calling for the

election or defeat of candidates based on their support for First Amendment rights is an ideal

way both to affect policy—by affecting the political futures of those who make it—and to

promote the importance of free speech.  Young Decl. at ¶ 3.  However, Mr. Young is not a

political activist and lacks the time and experience to do things like produce television

advertisements that can reach a wide segment of the population.  *Id.* at ¶ 4.  Thus, the best way

for him to do speak effectively against candidates who support restrictions on free speech is to

associate with other like-minded individuals and a group like SpeechNow.org.  *Id.*

40.     Two other individuals, Plaintiffs Brad Russo and Scott Burkhardt, would like to

make immediate donations to SpeechNow.org of $100 each.  Keating Decl. at ¶¶ 50-51.

41.     Brad Russo first heard about SpeechNow.org from an acquaintance who works

for the Institute for Justice.  Declaration of Brad Russo in Support of Plaintiffs' Proposed

Findings of Fact (hereinafter, "Russo Decl.") at ¶ 2.  Because he believes strongly in free speech

and opposes many campaign finance laws, Mr. Russo would like to be able to support

SpeechNow.org and its mission.  *Id.* at ¶ 3.

42.     Scott Burkhardt first heard about SpeechNow.org in a news story and located the

association's website through an internet search.  Declaration of Scott Burkhardt in Support of

Plaintiffs' Proposed Findings of Fact (hereinafter, "Burkhardt Decl.") at ¶ 2; Simpson Decl. Ex.

5, Excerpts from the Deposition Transcript of Scott Burkhardt, taken September 16, 2008 at 9:4-

6.  Mr. Burkhardt has supported various libertarian and conservative causes through the years

and wanted to donate money to SpeechNow.org.  Burkhardt Decl. at ¶ 2; Simpson Decl. Ex. 5 at

9:10-16.  He wrote an email to SpeechNow.org inquiring about how to donate money to the association, but Mr. Keating wrote back indicating that SpeechNow.org was not accepting donations.  Keating Decl. at ¶ 50.

43.     Both Mr. Russo and Mr. Burkhardt support SpeechNow.org's mission and believe that calling for the election or defeat of candidates based on their support of First Amendment rights is an ideal way both to affect policy—by affecting who serves in Congress, which makes significant policy regarding those rights—and to promote the importance of free speech.  Russo Decl. at ¶ 3; Burkhardt Decl. at ¶ 3.

44.     Even though Plaintiffs Russo and Burkhardt could not themselves finance the production and broadcast of SpeechNow.org's ads, they wish to associate with SpeechNow.org's other supporters in order to amplify their voices and reach an audience far greater than they would be able to achieve without SpeechNow.org.  Russo Decl. at ¶ 4; Burkhardt Decl. at ¶ 4.

45.     All of the individual Plaintiffs have read, understood, and will abide by SpeechNow.org's bylaws, in particular, sections 9 and 10 of Article X of those bylaws.  Keating Decl. at ¶¶ 8, 9; Crane Decl. at ¶ 5; Young Decl. at ¶ 5; Russo Decl. at ¶ 5; Burkhardt Decl. at ¶ 5.  They further understand that their donations will be used to fund speech, including advertisements that will advocate the election and/or defeat of candidates to federal office based upon their positions on freedom of speech and campaign finance laws, and they understand that SpeechNow.org is an independent group that will not make any contributions to candidates, political committees or political parties (or any of their agents) and will not coordinate its activities with candidates, candidate committees or political party committees.  Keating Decl. at ¶ 9; Crane Decl. at ¶ 5; Young Decl. at ¶ 5; Russo Decl. at ¶ 5; Burkhardt Decl. at ¶ 5.

**III.**       **SpeechNow.org's Advisory Opinion Request**

46.       Mr. Keating set up SpeechNow.org specifically to avoid any concerns about corruption under the campaign finance laws.  Keating Decl. at ¶¶ 6, 38.  However, he understood when he created the association that it would be necessary to seek approval from the FEC to operate without becoming a political committee and being subjected to the contribution limits and organizational, administrative, and continuous reporting obligations for political committees. *Id*. at ¶ 38.  He also recognized that it might be necessary to challenge the application of these provisions to SpeechNow.org in court.  *Id*.

47.       Accordingly, on November 19, 2007, SpeechNow.org filed a request for an advisory opinion (AOR) with the FEC pursuant to 2 U.S.C. § 437f.  The request presented, in essence, three questions: (1) Must SpeechNow.org register as a political committee as defined in 2 U.S.C. § 431(4), and, if so, when?  (2) Are donations to SpeechNow.org "contributions" (as defined in 2 U.S.C. § 431(8)) subject to the limits described in 2 U.S.C. § 441a(a)(1)(C)?  (3) Must an individual donor to SpeechNow.org count his donations to SpeechNow.org among the contributions applicable to his biennial aggregate contribution limit described in 2 U.S.C. § 441a(a)(3)?  *See* Simpson Decl. Exh. 3A, Advisory Opinion Request, at 4-5.

48.       Under FEC rules, the Commission is required to issue a written advisory opinion within sixty days of accepting a request.  11 C.F.R. § 112.4(a).  If it is unable to render an advisory opinion within that time, the rules state that the FEC "shall issue a written response stating that the Commission was unable to approve" the request by a required vote of four commissioners.  *Id*.  The FEC issued its response to SpeechNow.org's AOR on January 28, 2008.  Because the FEC at the time was without a full complement of commissioners, it lacked a quorum and thus could not issue an advisory opinion in response to SpeechNow.org's request.

Accordingly, under FEC rules, SpeechNow.org's request was not approved.  *See* Simpson Decl.

Ex. 6, Letter from the Federal Election Commission to Bradley A. Smith and Stephen M.

Hoersting from the Center for Competitive Politics and William H. Mellor, Steven Simpson, and

Paul Sherman from the Institute for Justice, dated January 28, 2008.

  49. However, the general counsel's office of the FEC issued a draft advisory opinion

in response to SpeechNow.org's AOR.  Simpson Decl. Ex. 7, Draft Advisory Opinion 2007-32

from the Federal Election Commission, dated January 25, 2008.  The draft advisory opinion

concluded that, among other things, SpeechNow.org's planned advertisements constitute

"express advocacy," *id.* at 9:9-12; the donations that Richard Marder and Plaintiffs Keating,

Crane, and Young wish to make to SpeechNow.org would be "contributions" under 2 U.S.C.

§ 431(8), *id.* at 4:26-28; expenditures by SpeechNow.org on advertisements calling for the

election or defeat of candidates for federal office would be "expenditures" under 2 U.S.C.

§ 431(9), *id.* at 4:26-28; SpeechNow.org has a "major purpose" of campaign activity; accepting

the contributions noted above to fund its advertisements would make SpeechNow.org a "political

committee" under § 431(4), *id.* at 12:13-20; as a political committee, SpeechNow.org would be

subject to the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) and the

registration, administrative and reporting requirements for political committees contained in 2

U.S.C. §§ 432, 433, and 434, *id.* at 12:13-20, 13:19-14:5; and SpeechNow.org would be required

to register as a political committee once it received contributions of more than $1,000 regardless

of whether it had made any expenditures, *id.* at 12:13-20.  In short, the draft advisory opinion

concluded that the campaign finance laws prohibit SpeechNow.org from accepting donations that

exceed the contribution limits in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) to fund its

advertisements.  *Id.* at 14:6-12.

50.     The draft advisory opinion was consistent with the FEC's position on other groups that make independent expenditures.  The FEC has required such groups both to register as political committees and to abide by contribution limits.  *See* Simpson Decl., Exs. 8-13, FEC Conciliation Agreements.

51.     The FEC's current position with respect to SpeechNow.org does not differ from the positions stated in the draft Advisory Opinion.  Thus, according to the FEC, SpeechNow.org's planned advertisements constitute "express advocacy," Simpson Decl. Exs. 7 at 9:9-14, and 14, Excerpts from FEC Responses to Plaintiffs' First Set of Discovery Requests, dated August 25, 2008; the donations that Richard Marder and Plaintiffs Keating, Crane, Young, Burkhardt and Russo wish to make to SpeechNow.org would be "contributions" under 2 U.S.C. § 431(8) and the expenditures by SpeechNow.org on its proposed advertisements "expenditures" under 2 U.S.C. § 431(9), *id.* (FEC Response to Request for Admission No. 3); SpeechNow.org has a "major purpose" of campaign activity; accepting the contributions noted above to fund its advertisements would make SpeechNow.org a "political committee" under § 431(4), *id.* (FEC Response to Request for Admission No. 1); as a political committee, SpeechNow.org would be subject to the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) and the registration, administrative, and reporting requirements for political committees contained in 2 U.S.C. §§ 432, 433, and 434, *id.* (FEC Responses to Requests for Admission Nos. 5-12).

52.     The FEC's then-chairman, David Mason, issued his own opinion in response to the draft advisory opinion issued by the FEC office of general counsel.  Simpson Decl. Ex. 15, Dissenting Opinion of FEC Chairman Mason to Draft Advisory Opinion 2007-32.  Chairman Mason concluded that SpeechNow.org ought to be permitted to operate without contribution limits, although he believed that SpeechNow.org should have to register as a political committee

and comply with the administrative, organizational, and reporting obligations for PACs.  *Id*. at 5-6.

53.     David Keating, as treasurer of SpeechNow.org, is directly responsible for complying with the reporting requirements that apply to SpeechNow.org and signing all reports. Keating Decl. at ¶ 14; *Bylaws*, Art. V, § 8.

54.     Under 2 U.S.C. § 437g(d) and the FEC's practices and policies, David Keating, as treasurer of SpeechNow.org, would be liable in his official capacity for any violations of the contribution limits or reporting obligations that apply to SpeechNow.org.  Simpson Decl. Ex. 14 (FEC Responses to Requests for Admission Nos. 10 & 11).

55.     Under 2 U.S.C. § 437g(d) and the FEC's practices and policies, David Keating, as treasurer of SpeechNow.org, would be liable in his personal capacity for any knowing and willful violations of the contribution limits or reporting obligations that apply to SpeechNow.org. Simpson Decl. Ex. 14 (FEC Responses to Requests for Admission Nos. 10 & 11).

56.     The FEC believes that the plaintiffs in this case are aware of the contribution limits, registration requirements, and disclosure requirements that will apply to them if SpeechNow.org engages in the activities described in its AOR and its Amended Complaint.  *Id*. (FEC Response to Request for Admission No. 2).

57.     If David Keating, Ed Crane, Fred Young, or Richard Marder made contributions to SpeechNow.org in the amounts and for the purposes stated in their declarations, their contributions would violate the law because they exceed the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3).  Simpson Decl. Ex. 14 (FEC Response to Request for Admission No. 12).

58.     If SpeechNow.org were able to accept the contributions of the individual plaintiffs and Richard Marder, SpeechNow.org would have enough money to fund advertisements in at least two election contests.  Keating Decl. at ¶ 22; Simpson Decl. Ex. 2 at 4; *see* Keating Decl. Ex. K, Traz Group Bid for Burton and Landrieu Advertisements.

59.     Without those contributions, however, SpeechNow.org lacks the funds to run such advertisements.  *Id*. at ¶ 40.

**IV.     The Effect of Contribution Limits on the Plaintiffs**

60.     The contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) prevent plaintiffs Keating, Crane, and Young and Richard Marder from making the donations to SpeechNow.org that they currently wish to make.  Simpson Decl. Ex. 14 (FEC Responses to Requests for Admission Nos. 1-3, 5-13); Advisory Opinion Request at 6-8 (Declaration of Richard Marder in Support of SpeechNow.org Advisory Opinion Request); Keating Decl. at ¶ 39; Crane Decl. at ¶ 6; Young Decl. at ¶ 6.

61.     Both SpeechNow.org and David Keating as its treasurer face a credible threat of prosecution if SpeechNow.org accepts contributions over the limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3), and David Keating, Ed Crane, Fred Young and Richard Marder face a credible threat of prosecution if they make contributions to SpeechNow.org above those limits.  Simpson Decl. Ex. 14 (FEC Responses to Requests for Admission Nos. 1-3, 5-13).

62.     The laws and the FEC's regulations contained in 2 U.S.C. § 441a(a)(1)(C) and 11 CFR § 110.1(d) prevent SpeechNow.org and/or David Keating from accepting additional donations above the contribution limits.  Simpson Decl. Ex. 14 (FEC Responses to Requests for Admission Nos. 1-3, 5-13); Keating Decl. at ¶ 39.

63.     Based on the cost estimates for SpeechNow.org's ads targeted at the elections of Representative Burton and Senator Landrieu, to run ads in only two elections in the future would cost SpeechNow.org at least $120,000.  Keating Decl. at ¶ 31.  Thus, without the donations that David Keating, Ed Crane, Fred Young, and Richard Marder wish to make to SpeechNow.org, or other donations of the same amount, SpeechNow.org will not have sufficient funds to pay for the advertisements it wishes to produce and broadcast in the future.  *Id*. at ¶ 40.

**A.     Contribution Limits Increase the Cost and Burden of Raising Money**

64.     Raising money under contribution limits is more difficult than raising money outside of those limits.  Simpson Decl. Ex. 16, *Mariani v. United States*, 212 F.3d 761 (3d Cir. 2000) at 768; Simpson Decl. Ex. 17, Excerpt of District Court Findings of Fact in *Mariani v. United States*, 80 F. Supp. 2d 352 (M.D. Pa. 1999) at 370.

65.     During the 1999-2000 election cycle, approximately 3.5 million Americans made a political contribution at the federal level.  Declaration of Rodney Smith in Support of Plaintiffs' Proposed Findings of Fact (hereinafter, "Smith Decl.") at ¶ 24.  This figure represents only about 1.2% of the total voting age population.  *Id*.  Eighty percent of those donors, or roughly 2.7 million people, gave less than $200.  *Id*.

66.     In terms of donors who give more than $200, there is roughly one donor for every 350 people or one donor out of every 200 households in the average congressional district. Smith Decl. at ¶ 25.

67.     There is an inverse functional relationship between a group's fundraising costs and its average contribution.  The higher the average contribution, the lower fundraising costs will be as a percentage of gross receipts.  The reverse is also true.  The lower the average contribution, the higher the fundraising cost will be.  Smith Decl. at ¶ 32.

68.     Due to contribution limits, political fundraising has shifted from a low-volume, high-dollar process to a low-dollar, high-volume process.  Smith Decl. at ¶ 9.

69.     When the average contribution amount decreases and the number of contributions received increases, the cost of generating additional contributions increases.  Smith Decl. at ¶ 32. To make up for lost revenue resulting from the imposition of contribution limits, the volume of smaller contributions must increase as the average contribution amount declines.  *Id*.

70.     Thus, contribution limits result in unavoidably higher fundraising costs.  Smith Decl. at ¶ 32.

71.     Every fundraising operation must spend money to acquire new donors.  Smith Decl. at ¶ 35.  The goal of this process, commonly referred to as "prospecting," is to avoid losing money.  *Id*.

72.     The cost of acquiring a new donor is often higher than the amount actually received from that donor.  Smith Decl. at ¶ 37.

73.     If an organization breaks even in the prospecting process, it is using the first contribution it receives from a new donor to finance the cost of acquiring that new donor.  Smith Decl. at ¶ 35.  But if an organization cannot break even in its prospecting, then its growth must be partially funded out of general operating funds.  *Id*.

74.     There are only two ways a fundraising operation can grow.  The first is by increasing the average contribution.  Smith Decl. at ¶ 37.  The other is by prospecting for more donors.  Because contribution limits limit every group's ability to increase its average contribution amount, the only alternative is to acquire more donors.  *Id*.

75. Acquiring more donors is extremely difficult if not virtually impossible without adequate cash reserves or a donor-acquisition program that can be operated on a break-even basis. Smith Decl. at ¶ 37.

**B. Contribution Limits Inhibit the Ability of Groups Like SpeechNow.org to get Started.**

76. The data on average contributions to the top 10 non-party, federally focused 527 organizations in 2004 demonstrate that newly formed 527 political organizations tend to raise funds from a few large contributors, compared to more established 527 organizations. Declaration of Jeffrey Milyo, Ph.D., in Support of Plaintiffs' Proposed Findings of Fact (hereinafter, "Milyo Decl.") at ¶ 87.

77. With the exception of Swift Vets and POWs for Truth, those 527s with the smallest average contributions (and most numerous contributors) were all either established prior to 2003, or are associated with a well-established organization. Milyo Decl. at ¶ 88. Newer groups such as America Coming Together, the Joint Victory Fund, the Media Fund, Progress for America, and Citizens for a Strong Senate all relied on relatively few large contributors. *Id*.

78. America Coming Together received seed funding from four individuals, in the amount of $ 2.025 million, before there was a public announcement of its existence. It then received additional seed funding—including $ 2 million apiece from George Soros and Peter Lewis—that was widely reported in the media and served the purpose of quickly and effectively assuring political donors of the credibility and competence of this new organization, while at the same time signaling that among the many competing groups that would be working to support progressive ideas and candidates, this was one that political contributors should focus on. Milyo

Decl. at ¶ 89.  Swift Vets & POWs for Truth received nearly all of its seed funding from just three donors.[1]  *Id*. at ¶ 90.

79.     Without large initial contributions, new political organizations, especially those that are issue-oriented and do not benefit from an association with some pre-existing trade association or labor union, are less effective participants in the public debate.  Milyo Decl. at ¶ 92.  Limits on contributions to political groups are likely to be particularly harmful to new and independent political organizations.  *Id*. at ¶ 93.

80.     Under contribution limits, unless a start-up group happens to be advocating or opposing a high-profile issue that is receiving tens of millions of dollars of free publicity via the national media, or the group has some special connection to a corporation or labor union, that group will not be able to raise enough money to have a meaningful impact on any election. Smith Decl. at ¶ 11.

81.     Most of the big money raised via the Internet has been the direct result of a candidate and/or cause benefitting from a huge amount of free publicity.  Smith Decl. at ¶ 42. This makes raising money via the Internet out of reach for the vast majority of non-wealthy candidates and start-up organizations.  *Id*.

82.     Because the cost of acquiring new donors is often greater than the amount received from a new donor, small groups usually start at a loss and remain there until they go into debt and/or cease to exist.  Smith Decl. at ¶ 10.

83.     As a result, it is crucial for new organizations to have seed money that allows them to begin to advance their mission before a successful program of larger-scale fundraising can take place.  Smith Decl. at ¶ 35.  This is particularly true when an organization is working on

---

[1] Since the 2004 elections, the FEC has determined that several of these 527s should have registered as political committees and been subject to contribution limits.  *See* Simpson Decl. Exs. 8-13.

an issue for which there is not an overwhelming and sustained amount of outrage throughout all quarters of the public and the media that generates a strong demand for the change favored by the organization.  *Id*. at ¶ 11; Keating Decl. at ¶ 41; Crane Decl. at ¶ 10.

84.     Right now, the issue of restrictions on free speech from campaign finance laws is not such an issue.  Keating Decl. at ¶ 41.

85.     SpeechNow.org will need to spend substantial funds on advertisements in order to raise the profile of this issue and thus add more donors, both large and small, to the cause. Keating Decl. at ¶ 41.  However, without initial seed funding, SpeechNow.org lacks the funds necessary to convince donors that it is a viable going concern that has already produced advertisements consistent with its mission.  *Id*.; Crane Decl. at ¶ 10.

86.     Convincing donors that SpeechNow.org is a viable going concern—which SpeechNow.org can only do by producing and running advertisements—is a prerequisite to the success of any larger-scale fundraising effort.  Keating Decl. at ¶ 41; Crane Decl. at ¶ 10; Smith Decl. at ¶ 22.

87.     Because of the contribution limits, SpeechNow.org and groups like it cannot receive the seed funding, in the form of large donations over the limits, that they need to get started and have an effective impact on elections.  Keating Decl. at ¶ 41; Smith Decl. at ¶ 22.

88.     The longer SpeechNow.org has to go without seed funding, the more it will be delayed in producing and running its political advertisements and thus in undertaking larger-scale fundraising based on a reputation for taking actions that advance its mission in the real world.  Keating Decl. at ¶ 43.

89.     Even assuming that SpeechNow.org could somehow raise enough money in increments of $5,000 or less per donor to pay for its advertisements, the contribution limits

applicable to political committees would, by making it harder to gather funds, still greatly limit the number of times it could run those ads.  Keating Decl. at ¶ 44.  The limits would also restrict SpeechNow.org's ability to run additional advertisements concerning other federal candidates in other races.  *Id.*

90.     Contribution limits not only deprive groups like SpeechNow.org of the large donations necessary to get off the ground, but they also deprive such groups of the signal that a large donation sends to potential donors:  that the new organization has the potential to be effective.  Milyo Decl. at ¶ 54.  Large donations also resolve the uncertainty of potential donors who would otherwise either not contribute or would be forced to "play it safe" and donate to other, more established groups, even when those groups do not represent the donors' most favored cause.  *Id.*

**C.     Contribution Limits Make it Harder for the Individual Plaintiffs to Associate for the Purpose of Speaking Effectively.**

91.     The basic economic concepts of specialization and division of labor apply in the setting of groups that engage in any sort of advocacy, including independent express advocacy: some individuals have a comparative advantage in funding a cause, some in articulating a message for a cause, and some in developing a strategy for disseminating that message.  For this reason, individuals who come together as political groups do so because such a voluntary association makes them more effective in their cause.  Milyo Decl. at ¶ 50.

92.     The individual plaintiffs wish to join together and associate with each other and with SpeechNow.org in order to take advantage of the specialization, division of labor, and economies of scale that association affords them.  For example, David Keating possesses the knowledge and experience to produce and broadcast advertisements and to operate a group like SpeechNow.org, but, alone, he lacks the financial resources.  Keating Decl. at ¶ 48.  Ed Crane

has a relatively large donation to offer SpeechNow.org, but he lacks the time to operate the group or to produce and broadcast ads. Crane Decl. at ¶ 4. Fred Young has the financial resources to fund some of SpeechNow.org's advertisements, but he lacks the time, knowledge, and experience to produce ads or operate a group like SpeechNow.org. Young Decl. at ¶ 4. Brad Russo and Scott Burkhardt lack both the time and experience and the resources to fund or operate SpeechNow.org, but by donating to SpeechNow.org and associating with its supporters and members, they are able to amplify their voices beyond what they would be able to achieve on their own. Russo Decl. at ¶ 4; Burkhardt Decl. at ¶ 4.

93.    However, contribution limits make it impossible for individuals to take full and effective advantage of the specialization, economies of scale, and division of labor that group association affords. The effect of a contribution limit on SpeechNow.org and groups like it is to punish individuals, such as the individual Plaintiffs in this case, who associate in groups for the purpose of advocating for or against political causes by limiting the funds they can devote to such causes. Milyo Decl. at ¶¶ 49-51.

94.    This, in turn, will dissuade some individuals from participating in political groups at all. Instead, such individuals must "go it alone" or even abandon their desire for political expression, when in the absence of contribution limits they would have been more effective as part of a group. Milyo Decl. at ¶¶ 49-51.; Keating Decl. at ¶ 52; Young Decl. at ¶¶ 4, 6; Crane Decl. at ¶¶ 4, 6, 10; Russo Decl. at ¶¶ 4, 6; Burkhardt Decl. at ¶¶ 4, 6.

95.    Contribution limits also inhibit the information that large contributions convey about which groups are more or less desirable from the donors' standpoint. Milyo Decl. at ¶¶ 52-57. Economies of scale in political communication mean that one large group with a mission can be more effective than many small groups with the same mission. Potential donors

know this and would prefer to focus their giving on one group, but they must determine which group is best. *Id*. at ¶ 55. A political patron's large initial contribution to a group sends an unambiguous signal to other political contributors as to which group to focus their giving on. This facilitates the ability of individuals to associate more efficiently and to articulate their political opinion more effectively. *Id*. at ¶¶ 53-56.

96.     Limits on contributions to groups like SpeechNow.org prevent political patrons from either seeding new groups or helping to organize individuals into joining and supporting more effective political groups. Milyo Decl. at ¶ 57.

97.     In sum, limits on contributions to political groups restrict the amount and effectiveness of political expression by these groups, as well as the amount and effectiveness of political expression by individuals that wish to contribute to such groups. Milyo Decl. at ¶ 58.

**D.      Contribution Limits Restrict the Amount of Funds Available to Groups Like SpeechNow.org for Independent Expenditures.**

98.     Communicating a political message to a large group of voters is an expensive proposition that requires a significant amount of money for the message to be heard. Smith Decl. at ¶ 8; Keating Decl. at ¶¶ 22-24.

99.     As a result, any group that wants to speak out effectively will want to raise money in the most efficient way possible—that is, at the lowest cost per contributed dollar—in order to allow it to raise sufficient funds quickly enough to have an impact on the election. Smith Decl. at ¶ 26; Milyo Decl. at ¶ 37. Put another way, the more money that a group spends to raise its funds, the less money it will have to spend on its independent expenditures. Milyo Decl. at ¶¶ 37-39.

100.     A number of basic economic principles support this conclusion. First, under the "equi-marginal principle," a group will pursue contributions from that donor pool that involves

the lower marginal cost of raising funds per donor dollar.  Milyo Decl. at ¶ 37.  Groups are

limited in the amount of time, effort, and resources that they may devote to fundraising and are

thus forced to make choices about how to allocate their scarce resources in order to maximize the

amount of money that they have.  Thus, if given the opportunity to pursue funds from large

donors or small donors, a group seeking to maximize its funds available for independent

expenditures will allocate its efforts to the group of donors that involve the lowest cost per donor

dollar raised.  *Id.*  If the costs are higher for one group of donors—small donors, for example—

the organization can still reallocate resources to raising money from the group of large donors in

order to be able to raise enough funds to finance its independent expenditures.  *Id.* at ¶ 38.

101.    Under contribution limits, however, an organization is forced to raise funds from

one group—small donors—because large donors are prohibited from contributing money to the

group.  Milyo Decl. at ¶ 39.  According to the "law of increasing opportunity costs," (also known

as "the law of diminishing returns") the cost of raising funds from two pools of donors—one of

small donors and one of large donors—will increase with the amount of money already raised

from either pool of donors.  *Id.* at ¶ 37.  Put another way, by restricting the donor pool,

contribution limits make donor dollars more scarce, requiring groups trying to raise funds to

pursue greater numbers of donors—at a greater marginal cost per dollar raised—for the money

they need to fund their independent expenditures.  *Id.* at ¶ 39.  Thus, the equi-marginal principle

implies that any constraint on fundraising will lower a group's total funds received, and therefore

also lower its ability to make independent expenditures.  *Id.*

102.    Second, the concept of "Revealed Preference" also implies that any constraint on

fundraising, such as contribution limits, will restrict a group's ability to make independent

expenditures.  Milyo Decl. at ¶ 40.  In an unconstrained environment, a group's mix of donations

from small and large contributors represents the group's maximal ability to raise funds for independent expenditures.  *Id*. at ¶ 41.  In other words, the mix reveals the group's best effort at maximizing the funds it has available for independent expenditures.  *Id*.  Any contribution limit will cause a deviation from the mix of donations that would have occurred in the unconstrained environment, and will yield a less preferred outcome for the group and its ability to make independent expenditures.  *Id*. at ¶ 43.

103.    In sum, any contribution limit that generates a deviation from the pattern of contributions that would be observed in an unconstrained environment must be an actual impediment to a group's ability to raise and spend funds, and so must yield a less preferred outcome for the group—that is, lower independent expenditures.  Milyo Decl. at ¶ 43.  Consequently, if evidence shows that political groups raise money from large contributors when permitted to do so, "revealed preference" would indicate that contribution limits do in fact harm the groups and result in less spending on independent expenditures.  *Id*.

104.    An analysis of data from the 2004 election cycle demonstrates that, in fact, groups do reveal a preference for larger over smaller contributions.  Milyo Decl. at ¶ 76.

105.    Plaintiffs' expert, Dr. Jeffrey Milyo, compared the pattern of individual contributions in the 2004 election cycle to the top (in terms of total receipts) non-party, federally focused 527 organizations and to their associated federal PACs.  Milyo Decl. at ¶¶ 76-79.  At the time, those 527 organizations were not subject to contribution limits, while the PACs were.  As a result, the comparison demonstrates the impact of contribution limits on PACs as opposed to 527s.  *Id*. at ¶¶ 75, 79.

106.     Half of the 527 groups received average contributions that are well above the
$5,000 limit for PACs, including several groups with average contributions of $100,000 to more
than $500,000.  Milyo Decl. at ¶ 76.

107.     For several of the groups, contributions above the $5,000 limit accounted for the
vast majority of funds they raised.  Milyo Decl. at ¶ 80.  For example, large individual
contributions (those over $5,000) accounted for 98.3% of the funds from individual contributors
to America Coming Together, 79.7% of the contributions to MoveOn.org, 88.6% of
contributions to the New Democrat Network, and 76.5% of contributions to the Club for Growth.
*Id*.  In addition, between 48% and 82% of the individual contributions to these groups were in
amounts of $100,000 or more.  *Id*.  Thus, most of the funds raised by these organizations were in
amounts that would have exceeded the annual limit on individual donor contributions to political
committees, as well as the biennial aggregate limit on individual donors.  *Id*.

108.     Five hundred and fifty-five persons made contributions of $5,000 to the PACs
associated with these groups.  Milyo Decl. at ¶ 82.  Given the distribution of contributions to the
associated 527 organizations—that is, many people contributed more than $5,000 to 527s—it is
reasonable to assume that many of the donors to PACs would have given larger amounts to the
PACs had they been allowed to do so.  *Id*.

109.     For example, had the top 271 maximum contributions to the America Coming
Together PAC exhibited a similar distribution across contribution amounts as did the large
contributions to the America Coming Together 527, then the PAC would have raised over $22
million more dollars than it did in 2003-2004 (or about a 66% increase).  Milyo Decl. at ¶ 79.

110.     For the top 527 political organizations without PACs (Joint Victory Campaign
2004, Media Fund, Progress for America, Swift Vets & POW for Truth, College Republican

National Committee, Citizens for a Strong Senate), four of these six groups raised more than 99% of their funds from individual contributors in amounts greater than $5,000; in fact, all but one of these groups raised most of its funds from individual contributors in amounts of $100,000 or more.  Milyo Decl. at ¶ 83.

111.    A random sample of 527 organizations outside the top ten 527s (Marijuana Policy Project, International Brotherhood of Electrical Workers, League of Conservation Voters, Young Democrats, Ocean Champions Voter Education Fund, Justice for America) shows that, in most cases, 80-99% of the individual contributions to these groups were in amounts greater than $5,000, and a majority of these funds were contributed in amounts of $100,000 or more.  Milyo Decl. at ¶ 84.

112.    In sum, data on the size distribution of contributions to prominent 527 organizations and PACs confirm that limits on contributions to political groups reduce the funds available to those groups and impose significant burdens on their ability to speak effectively. Milyo Decl. at ¶¶ 83, 85, 86.

113.    According to the California Fair Political Practices Commission, "If the top 25 independent expenditure committees in California had to adhere to the same contribution committee limits as candidate controlled committees, there would have been a reduction of $61,705,519 in special interest money from 2001 through 2006."  Simpson Decl. Ex. 18, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, a report of the California Fair Political Practices Commission, dated June 2008 at 4; Simpson Decl. Ex. 19, Excerpts from the Deposition Transcript of Susan Swatt, taken October 1, 2008 at 41:23-42:20; Simpson Decl. Ex. 20, Excerpts from the Deposition Transcript of Ross Johnson, taken October 1, 2008 at 59:7-60:5, 71:22-73:18 ("If at some time, hypothetically in the past or hypothetically in the future, a

limit had been placed on the size of their independent expenditures—I'm sorry, on the contributions that they could receive—these groups at least would not have been able to spend the kinds of money that they did."); Milyo Decl. at ¶ 71.

114.   State legislative candidates spend significantly less on their campaigns in states with contribution limits.  Milyo Decl. at ¶ 65.

## V.   SpeechNow.org Poses no Threat of Corruption

115.    SpeechNow.org's mission and purpose is to expressly advocate the election or defeat of candidates based on those candidates' positions on issues affecting free speech; its mission and purpose is not to allow individuals to gain access to or obtain gratitude of any candidates.  Keating Decl. at ¶¶ 2-3, 10; *Bylaws*, Art. II.

116.   The individual plaintiffs wish to donate money to SpeechNow.org to support its speech-related mission, not to use their contributions to obtain access to or gratitude of candidates or officeholders.  Keating Decl. at ¶ 52; Young Decl. at ¶ 9; Crane Decl. at ¶ 9; Russo Decl. at ¶ 7; Burkhardt Decl. at ¶ 7.

117.   The individual plaintiffs either do not care whether any candidates or officeholders know about contributions they intend to make to SpeechNow.org or they would prefer that candidates not know about such contributions.  Keating Decl. at ¶ 52; Young Decl. at ¶ 9; Crane Decl. at ¶ 9; Russo Decl. at ¶ 7; Burkhardt Decl. at ¶ 7.

118.   Based on the research by Clyde Wilcox, the FEC's expert in this case, most individuals who donate money to political candidates and committees do so for ideological reasons.  Simpson Decl. Exs. 21, Excerpts from the Deposition Transcript of Clyde Wilcox, taken September 22, 2008 at 145:6-17, 157:10-14, 219:10-13, 226, 229, and 22, Excerpts from

Wilcox et al., The Financiers of Congressional Elections: Investors, Ideologues and Intimates (2003) at 45, 48-49, 67.

119.     Individuals are legally able to make unlimited independent expenditures as long as they are not coordinated with candidates or political party committees.  Thus, for instance, the FEC admits that Fred Young could spend his own money to produce and broadcast the advertisements that SpeechNow.org wants to run as long as he follows the FEC's rules concerning coordination.  FEC's Mem. in Opp'n to Pls.' Mot. Prelim. Inj. 34 (Mar. 5, 2008, Docket No. 13) ("Thus Mr. Young, who allegedly is willing to contribute $110,000, could finance these or similar advertisements himself.").

120.     According to the FEC, Fred Young could hire consultants to produce and broadcast advertisements like those SpeechNow.org wants to run without having to register as a political committee and be subject to contribution limits.  Simpson Decl. Ex. 4, Excerpts from the Deposition Transcript of Fred M. Young, Jr., taken October 3, 2008 at 92:11-93:4.  However, Fred Young would like to associate with SpeechNow.org and its supporters for that purpose.  *Id.* ("Q: Could you hire someone with the time and expertise? THE WITNESS:  Well, I'm hoping that I can quote/unquote hire SpeechNow.org to do that sort of thing.").

121.     Individuals may make independent expenditures in aggregate amounts of greater than $1,000 and may coordinate their efforts with other individuals who make independent expenditures in aggregate amounts of greater than $1,000, without having to register as a political committee as long as they do not have a "major purpose" of nominating or electing a candidate for office.  Simpson Decl. Ex. 23, Excerpts from FEC Responses to Plaintiffs' Second Set of Discovery Requests, dated September 25, 2008 (FEC Response to Request for Admission No. 24).

122.     Whatever concerns about corruption may be raised by a group's independent expenditures would also be raised by an individual's independent expenditures.  Simpson Decl. Exs. 23 (FEC Response to Request for Admission No. 26) and 21 (Wilcox Deposition Excerpts) at 178:7-179:2; *see also* Milyo Decl. at ¶¶ 26-28.

123.     If SpeechNow.org's bylaws are followed by SpeechNow.org and its members, officers, agents, employees and donors, SpeechNow.org will not make coordinated communications.  Simpson Decl. Ex. 23 (FEC Response to Request for Admission No. 32).

124.     The FEC effectively utilizes its rules against coordination, 11 C.F.R. § 109.21, to handle allegations of coordination.  Simpson Decl. Ex. 23 (FEC Response to Request for Admission No. 31).

125.     It is a well-established result in game theory and human subject experiments that collusive behavior is, in general, *less* likely to occur when the number of persons involved in the potentially-collusive arrangement increases.  Milyo Decl. at ¶ 26.

126.     Thus, while research has found that implicit cooperation can occur even without explicit contracting mechanisms in relationships involving two people, where the number of people involved in the relationship is increased, implicit cooperation becomes much less feasible. The reason is that in group settings, it is harder to know how much control or influence any one individual or sub-group of individuals has over the group as a whole.  Milyo Decl. at ¶ 28. Further, any political favors directed by an office holder to some members of the group may not be equally valued by all members of the group, or even recognized by all members of the group. *Id*.  In other words, there is less reason to be concerned that a political candidate and a group will establish and maintain a collusive relationship than there is for a political candidate and a single person.  *Id*. at ¶ 26.

127.    SpeechNow.org will spend contributions it receives according to the sole discretion of the association.  Keating Decl. at ¶¶ 25, 36; *Bylaws*, Art. VI § 11.  Accordingly, individual donors will not be able to direct their contributions to particular advertisements or particular candidates' races.  Keating Decl. at ¶ 36.

128.    Political candidates do not necessarily approve of independent expenditures made in support of their campaigns or in opposition to their opponent's campaigns.  For instance, both presidential candidates in this year's election, as well as other candidates, have asked donors to their campaigns not to contribute to independent groups.  Simpson Decl. Exs. 14 (FEC Response to Request for Admission No. 14), 23 (FEC Responses to Requests for Admission Nos. 28-30), and 24, News Articles concerning Candidate Disapproval of Independent Expenditures.

129.    There is no scientific empirical evidence to support the contention that limits on contributions to groups like SpeechNow.org have any impact whatsoever on either corruption or the appearance of corruption.  Milyo Decl. at ¶ 62.

130.     In the last six election cycles, numerous groups and individuals have reported making independent expenditures but no contributions or coordinated expenditures.  Simpson Decl. Exs. 14 (FEC Response to Interrogatory No. 3), 23 (FEC Response to Request for Admission 33), and 33, Attachment I03 to FEC Responses to Plaintiffs' First Set of Discovery Requests, dated August 25, 2008.  In non-presidential elections during that time period, the number of groups and individuals reporting independent expenditures but no contributions or coordinated expenditures grew from 65 (1997-1998 election cycle) to 93 (2001-2002 election cycle) to 128 (2005-2006 election cycle).  Simpson Decl. Ex. 33.  In presidential elections the number grew from 126 in the 1999-2000 election cycle to 169 in the 2003-2004 election cycle.  *Id.*  Through August 22, 2008 of the 2007-2008 election cycle, 167 groups or individuals had

reported making independent expenditures but no contributions or coordinated expenditures. Simpson Decl. Exs. 14 and 33.

## VI.     The Administrative, Organizational, and Continuous Reporting Requirements for Political Committees.

131.     A political committee must organize, register, and report according to FECA and BCRA and applicable Commission regulations.  Scott Dep. at 78:17-79:5; Simpson Decl. Ex. 7 at 10:5-13.  Failure to follow these regulations could result in civil penalties for the committee and for the treasurer in his official and even personal capacity.  Scott Dep. at 116:15-117:19.

132.     If SpeechNow.org begins accepting donations that, in the aggregate, are in excess of $1,000, it will have to register as a political committee and be subject to the administrative, organizational, and continuous reporting requirements for political committees.  Keating Decl. at 45; Simpson Decl. Ex. 14 (FEC Response to Request to Admit No. 1); Scott Dep. at 93:3-14.

133.     SpeechNow.org does not want to be identified as a PAC because the term would imply that the association gives to and works with candidates, political parties, or both.  Keating Decl. at ¶ 49.  Mr. Keating believes that many people, including those in the media, donors, and voters, have a negative view of PACs because of the reputation of PACs as colluding with elected officials, political parties, and candidates.  *Id.*

134.     Mr. Keating also does not want SpeechNow.org to have to register as a political committee or have to refer to it as a political committee, because that will make it more difficult to raise funds.  Keating Decl. at ¶ 49.  Donors are aware of the contribution limits that apply to political committees and parties, and many of them will be reluctant to contribute more than $5,000 or they will conclude that their contributions will count towards their biennial aggregate limits if SpeechNow.org is subject to contribution limits.  *Id.*

135.     If SpeechNow.org were deemed to be a political committee, it would be classified as a "non-connected" committee.  Scott Dep. at 17:14-18:2.

136.     When an organization becomes a political committee, it must obtain a tax identification number from the IRS and establish a bank account in a federally insured institution.  Scott Dep. at 108:16-109:3, 123:18-21.

137.     Non-connected committees must register with the FEC using a "Statement of Organization," or FEC Form 1.  Among other things, the four-page form requires committees to list the committee name and address, to designate a treasurer and custodian of records, and to list all bank accounts in which committee funds are deposited.  Simpson Decl. Ex. 26, FEC Form 1, Statement of Organization; Scott Dep. at 122:15-123:14.  Any changes to the Statement of Registration must be made within 10 days.  Scott Dep. at 123:22-124:6.  The form comes with an additional five pages of instructions.  Simpson Decl. Ex. 27, Instructions for FEC Form 1.

138.     Non-connected committees must periodically disclose all contributions and expenditures using a "Report of Receipts and Disbursements," or FEC Form 3X.  Simpson Decl. Ex. 28, FEC Form 3X, Report of Receipts and Disbursements for Other than an Authorized Committee, and associated schedules; Scott Dep. at 124:7-16.  The form includes five pages for summary information concerning receipts and disbursements and an additional 16 pages of "schedules" on which committees are required to disclose detailed information on all contributors and the amounts they donate (schedule A); all disbursements and to whom they are made (schedule B); any loans the committee receives (schedule C); any loans and lines of credit the committee receives from lending institutions (schedule C-1); all debts and obligations of the committee (schedule D); any itemized independent expenditures the committee makes (schedule E); any itemized coordinated party expenditures the committee makes (schedule F); the

committee's activities relating to state or local elections (schedule H1-H6); and the committee's

"Levin" funds (schedules L, L-A, and L-B).  Simpson Decl. Ex. 28; Scott Dep. at 125:22-127:5.

Form 3X and the various schedules are accompanied by 31 pages of instructions.  Simpson Decl.

Ex. 29, Instructions for FEC Form 3X and Related Schedules.

139.    A non-connected committee must file Form 3X and the various schedules that go

along with it four times in an election year, and must file two semiannual reports in a non-

election year.  It must file a 12-day pre-primary report in any state in which it participates.

Additionally, it must file a pre-general election report and a 30-day post-general election report if

it participates in any general election.  A non-connected committee must also file these pre- and

post-reports for any special election in which it participates.  Alternatively, it can choose to file

monthly rather than quarterly, and thus avoid pre- and post-election reports.  It may change its

filing schedule only once per year and only after giving the FEC written notice.  After the 20th

day before an election, it must file an independent expenditure report within 24 hours each time

it spends more than $1,000.  Before that, it must file a report within 48 hours each time it spends

more than $10,000 on an election.  *See* 11 CFR §§ 104.5(c) and (g); Scott Dep. at 131:3-132:14.

140.    Mr. Keating currently operates SpeechNow.org out of his home.  Keating Decl. at

¶ 47.

141.    If an individual administers a non-connected committee from his home and is

being paid for his services by the committee, that individual must allocate costs for the use of his

home to the committee, lest the expense be treated as in-kind contribution from the individual to

the committee.  Scott Dep. at 136:8-137:8.  The costs are to be determined by assessing the usual

and normal charge for, or fair market value of, that portion of the home.  *Id*. at 138:7-16.  The

same is true for expenses associated with using the home computer, telephone, or personal

internet connection.  *Id.* at 139:6-20.  These cost allocations—based on the individual's determination of their fair market value—have to be reported on Form 3X.  *Id*. at 123:7-16; Simpson Decl. Ex. 29 at 10-11 (Instructions for Schedule A, Itemized Receipts).

142.    All costs associated with a fundraiser for a non-connected committee, even in a person's home, must be treated as expenses to be paid by the committee lest any costs for the event—including the costs associated with using the home, or the costs of food or invitations— be treated as an in-kind contribution attributable to the committee.  Scott Dep. at 142:1-143:7. The costs are to be determined by assessing the usual and normal charge for, or fair market value of, that portion of the home, invitations and food.  *Id*. at 143:8-14.  These costs must be reported on Form 3X. *Id*. at 123:7-16; Simpson Decl. Ex. 29 at 10-11 (Instructions for Schedule A, Itemized Receipts).

143.    If a non-connected committee also made independent expenditures in state or local elections, it would have to allocate its costs for fundraising and communications according to regulations at 11 CFR Part 106.  Scott Dep. at 143:15-144:5.  The committee would also report the allocations using various Schedules H, which are accompanied by seven pages of instructions.  Scott Dep. at 146:12-148:9; Simpson Decl. Ex. 29 at 23-30.

144.    The FEC has an entire division, the Information Division, a large part of whose resources are devoted to providing information to those who must comply with the laws.  Scott Dep. at 11:3-21:11, 53:16-54:20.  The Division answers telephone and email inquiries, it publishes manuals and guides, and it conducts training sessions.  *Id*. at 11:12-12:1, 13:10-14:13, 56:1-12.  The Information Division recommends that those complying with the campaign finance laws always consult its guides, instructions for forms, and other publications.  *Id*. at 37:11-22.

145.     However, reliance on the information provided by the FEC is not a shield to liability.  Scott Dep. at 158:17-20.  In fact, the information division "always caution[s]" and advises those complying with the obligations for political committees to consult the statutes and applicable regulations and not rely solely on information provided by the FEC.  *Id*. at 34:19-35:7.

146.     Political committees often hire accountants and attorneys to assist them in complying with the federal campaign finance laws and regulations.  Scott Dep. at 87:4-20.  There are also hundreds of experts, professionals, and specialists who make their livings by aiding organizations to comply with the requirements for political committees.  *Id*. at 84:17-22, 88:15-89:2.

147.     The FEC's Information Division has 14 employees, ten of whom answer questions from the general public on matters of campaign finance law and compliance.  Scott Dep. at 12:3-9.  While the number of calls has declined since the Commission provided information over the Internet, the division still receives thousands of calls each year from the general public and political committee administrators in the regulated community.  *Id*. at 29:13-30:6.

148.     The FEC publishes several documents to explain and provide information concerning the laws and regulations with which political committees must comply.  The Campaign Guide for Non-Connected Committees, which is 134 pages long, is periodically updated to include additional rules and interpretations by the Commission.  Scott Dep. at 18:3-20:3; FEC Campaign Guide: Nonconnected Committees, May 2008, available at http://www.fec.gov/pdf/nongui.pdf (last visited October 28, 2008).  Between updates to the Guide, the FEC issues a series of brochures and monthly supplements containing any new rules, interpretations or policies of the Commission that are pertinent to political committees.  *Id*. at

18:3-19:2, 22:1-23:3.  Committee treasurers must keep abreast of these supplements in order to keep their knowledge of FEC rules, policies, and interpretations current.  *Id*. at 34:8-18.

149.     However, reliance on this information is not a shield to liability.  *Id*. at 158:17-20. Treasurers may be personally liable for violations in political committee reporting.  2 U.S.C. §§ 432(c), 434(a)(1); *see also* Statement of Policy Regarding Treasurers Subject to Enforcement Proceedings, 70 Fed. Reg. 3 (January 3, 2005).  SpeechNow.org's bylaws provide that the Treasurer is responsible for compliance with statutory reporting requirements.  *Bylaws*, Art. V, § 8.

150.     The FEC holds training conferences for the administrators of political committees and other employees of or consultants to political committees three to four times per year.  Scott Dep. at 56:13-57:1, 59:12-17.  The conferences typically last two days and consist of approximately six hours of substance per day.  *Id*. at 56:13-57:13.  The FEC also provides periodic training seminars and workshops.  *Id*. at 57:21-59:7, 62:10-22.  All of these training sessions cover topics related to the obligations of administering political committees.  *Id*. at 63:1-7.  Like its publications, training sessions must periodically be updated to reflect new rules, interpretations, and policies.  *Id*. at 65:19-67:3.

151.     Non-connected committees that receive or intend to spend over $50,000 of contributions in a calendar year must report electronically.  Scott Dep. at 38:18-39:4.  The FEC publishes an introductory manual for its electronic filing system called "Getting Started with FECfile," which is 50 pages long.  *See* Getting Started with FECFile (For PAC and Party Committees), http://www.fec.gov/support/GettingStartedManual_U.doc (last visited Oct. 20, 2008).  The primary manual for using the electronic filing system is 351 pages long.  *See*

FECFile User Manual for PACs & Party Committees, http://www.fec.gov/elecfil/

unauthorized_manual/entireUNAUTHmanual.pdf (last visited Oct. 20, 2008).

152.    Non-connected committees are subject to audits for cause, which exists when the

committee's reports demonstrate compliance, accounting, or reporting problems.  Scott Dep. at

150:1-151:9.  During an audit, the FEC must access and review the committee's records.  *Id.* at

154:13-18.  Audits can trigger enforcement actions against a committee that can lead to civil

penalties.  *Id.* at 156:8-12.  As a result, some committees employ accountants and lawyers to

represent them in audits. *Id.* at 154:19-155:6.

153.    The Commission has a Reports Analysis Division (RAD) whose purpose is to

analyze reports filed by committees and other entities and to determine whether they are in

compliance with campaign finance laws and regulations.  Scott Dep. at 67:7-11.  Employees of

RAD often send committee treasurers Requests for Additional Information (RFAI) that seek

information necessary for the Commission to determine whether a committee is complying with

the law.  Scott Dep. at 71:13-72:1.  A failure of a political committee to answer an RFAI can

result in an investigation and a recommendation that the Commission seek a conciliation

agreement with the committee that results in a civil penalty.  *Id.* at 73:7-20.

154.    The Commission sends out approximately 5,000 RFAIs in a calendar year, all of

which are related to administering and reporting of political committees.  Scott Dep. at 75:16-

76:7.  There are approximately 8,000 political committees registered with the Commission, not

all of which are active.  *Id.* at 76:8-16.

155.    All administrative fines issued by the Commission relate to the failure to properly

report the activities of a political committee.  Scott Dep. at 80:19-81:6.  The Commission

resolves approximately 100 administrative fine matters per year, and the amount of fines

collected is $201,963 from the Administrative Fines Program alone.  Simpson Decl. Ex. 30, Federal Election Commission 2006 Annual Report, at 7.  This is an average civil penalty of at least $2,000.  Still other civil penalties for failing to properly administer or report the activities of political committees are collected through the Commission's standard enforcement process, and alternative dispute resolution programs.  Scott Dep. at 82:3-12.

156.    The FEC can investigate alleged violations of the campaign finance laws that are brought to its attention through administrative complaints filed under 11 CFR § 111.4 or that its staff discovers and has "reason to believe" that a violation has occurred.  Simpson Decl. Ex. 14 (FEC Response to Interrogatory No. 6).  Alleged violations discovered in this manner are assigned a "Matter Under Review" number.  *Id*.

157.    Since October 1, 1999, the FEC has found reason to believe that one or more violations have occurred in 427 Matters Under Review and it has conducted an investigation in 118 of these MURs.  Simpson Decl. Ex. 14 (FEC Response to Interrogatory No. 6).  Of those 118 investigations, matters were pending an average of 544 days from the date the MUR was opened until it was closed with respect to the last respondent.  *Id*. (FEC Response to Interrogatory No. 8).

158.    Complying with the administrative and continuous reporting requirements for political committees would be burdensome for SpeechNow.org.  Keating Decl. at ¶ 47.  Mr. Keating operates SpeechNow.org alone in his spare time.  He has no employees nor anyone else working with him, and complying with the obligations for political committees would be time consuming and difficult.  *Id*.

159.    It would be particularly burdensome for David Keating to shoulder these obligations before SpeechNow.org can spend money on political advertisements or other

activities that advance its mission.  Keating Decl. at ¶ 47.  In such a situation, Mr. Keating would

be spending a great deal of time ensuring that SpeechNow.org complied with above-mentioned

obligations, but he would be unable to spend that time advancing SpeechNow.org's mission. *Id.*

at ¶ 47; Simpson Decl. Ex. 34, Excerpts from the Deposition Transcript of David Keating, taken

September 25, 2008.

160.    SpeechNow.org cannot accept donations under $1,000 even though David

Keating has been contacted through the website and other means by potential donors who want

to make such donations.  Keating Decl. at ¶ 50.  This is because such donations would inch

SpeechNow.org closer to being a "political committee," but they would not give it nearly enough

money to produce and run advertisements, which are a necessary precondition to a successful

fundraising effort. *Id.*  Accepting even small donations could expose SpeechNow.org to the

administrative and reporting requirements for political committees without providing it enough

money to speak out through advertisements in support of its mission and become a going

concern. *Id.*  Thus, SpeechNow.org cannot accept the $100 donations that Brad Russo and Scott

Burkhardt are ready, willing, and able to make. *Id.*

**VII.    Reporting Requirements for Independent Expenditures**

161.    SpeechNow.org will report its contributions and expenditures under the reporting

requirements for those who make independent expenditures.  Keating Decl. at ¶ 35.  Complying

with these reporting requirements is less burdensome than complying with the obligations for

political committees. *Id.* at ¶ 48.

162.    Groups "other than political committees" that make independent expenditures

must report their activities pursuant to the FEC regulations at 11 CFR §§ 104.4(a), (e) and (f),

and § 109.10.  Scott Dep. at 95:7-98:14.

163.    To report its independent expenditures, a group like SpeechNow.org that was not a political committee would use the "Report of Independent Expenditures Made and Contributions Received," or FEC Form 5.  Simpson Decl. Ex. 31, FEC Form 5, Report of Independent Expenditures Made and Contributions Received; Scott Dep. at 101:6-102:1.  This form requires the filer to list the total contributions received and the total expenditures made during the period on a one-page form, and then to list those who contributed to the independent expenditure and the payees for the independent expenditures.  It is accompanied by three pages of instructions.  Simpson Decl. Ex. 32, Instructions for FEC Form 5 and Related Schedules.

164.    The FEC requires that all costs associated with the independent expenditure must be disclosed.  This would include costs for airtime for broadcast communications; production costs for broadcast communications; postage and printing costs for communications made by mail; research costs to determine the most optimal form of communication; fees for the media buyer or direct mail vendor; costs associated with producing newspaper ads; the costs of news-page space; and the costs associated with producing and distributing internet banner ads.  Scott Dep. at 102:4-105:1.

165.    If an organization like SpeechNow.org that was not a political committee decided to make independent expenditures against candidates for State or local office, its reporting obligations to the FEC would not change or increase.  Scott Dep. at 107:7-108:5.

Dated: October 28, 2008.

Respectfully submitted,

/s/ Steven M. Simpson
Steven M. Simpson (DC Bar No. 462553)
William H. Mellor (DC Bar No. 462072)
Robert Gall (DC Bar No. 482476)
Paul M. Sherman (DC Bar No. 978663)
Robert P. Frommer (DC Bar No. 497308)

INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: ssimpson@ij.org

Stephen M. Hoersting*
Bradley A. Smith*
CENTER FOR COMPETITIVE POLITICS
124 W. Street South, Suite 201
Alexandria, VA 22314
Tel: (703) 894-6800
Email: shoersting@campaignfreedom.org,
BSmith@law.capital.edu

*Attorneys for Plaintiffs*
*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th Day of October, 2008, a true and correct copy of the **PLAINTIFFS' OPENING BRIEF ON PROPOSED FINDINGS OF FACT FOR CERTIFICATION UNDER 2 U.S.C. § 437h, THE DECLARATION OF STEVEN M. SIMPSON WITH EXHIBITS 1-34; THE DECLARATION OF DAVID KEATING WITH EXHIBITS A-O; THE DECLARATIONS OF PLAINTIFFS' EXPERT WITNESSES JEFFREY MILYO AND RODNEY SMITH WITH EXHIBITS; AND THE DECLARATIONS OF EDWARD H. CRANE III, FRED M. YOUNG, JR., BRAD RUSSO, AND SCOTT BURKHARDT** were electronically filed using the court's ECF system and sent via the ECF electronic notification system to the following counsel of record:


Robert W. Bonham, III
David B. Kolker
Steve N. Hajjar
Kevin Deeley
FEDERAL ELECTION COMMISSION
999 E. Street, N.W.
Washington, DC  20463


/s/ Steven M. Simpson