UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPEECHNOW.ORG, *et. al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civ. No. 08-248 (JR) |
| v. | ) |
| | ) |
| FEDERAL ELECTION COMMISSION, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
PROPOSED FINDINGS OF FACT**

Thomasenia P. Duncan
(D.C. Bar No. 424222)
General Counsel

David Kolker
(D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

Robert W. Bonham III
(D.C. Bar No. 397859)
Senior Attorney

Vivien Clair
Steve N. Hajjar
Greg J. Mueller
(D.C. Bar No. 462840)
Graham Wilson
Attorneys

October 28, 2008

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
(202) 694-1650

## TABLE OF CONTENTS

I.    The Parties ...................................................................................................1

    A.    Defendant Federal Election Commission ................................................1

    B.    Plaintiffs ...................................................................................................1

II.   SpeechNow Was Formed to Serve as a "Test Case" ........................................5

III.  SpeechNow's Advertisements Constitute the Speech of David Keating – Who Is
    Solely Responsible for Its Activities, and Not the Speech of Its Contributors.................10

IV.   Unlimited Contributions To an Association Devoted to Independent Candidate
    Expenditures Pose a Danger of Corruption or its Appearance ..........................18

    A.    Independent Expenditures Are Effective in Determining the Outcome of
         Elections and Have Gotten More Effective Over Time, Even Though They
         Are Not Coordinated with a Campaign ..............................................19

         1.    Independent Expenditures Can Have a Significant Impact on
               Elections Generally....................................................................19

         2.    There Are Many Specific Examples of Independent Expenditures
               Having a Significant Impact on an Election. ................................24

         3.    Independent Expenditures Have Become More Effective over
               Time ............................................................................................30

         4.    Technical Coordination with a Candidate Is Unnecessary for an
               Independent Expenditure to Effectively Supplement a Campaign...........32

    B.    Independent Expenditures Lead to Gratitude, Indebtedness, and Access,
         Pose a Danger of Quid Pro Quo Arrangements, and Create the Appearance
         of Corruption..........................................................................................37

         1.    Large Direct Contributions Raise the Danger of Quid Pro Quo
               Arrangements, Undue Influence, and the Appearance of
               Corruption ...................................................................................37

         2.    Donors Are Also Willing to Make Large Indirect Contributions to
                Secure Access and Influence Policymaking ................................39

         3.    The History of Contributions to Party Soft Money Committees
               Illustrates that Donors Are Willing to Invest Their Contributions
               Indirectly and Officeholders Seek Such Contributions. ...........40

i

4.  Donors Seeking Access and Influence Give to Non-Party Organizations As Well .............................................................................43

5.  Contributions to Groups that Make Independent Expenditures Can Lead to Corruption in the Same Way as Direct and Other Kinds of Indirect Contributions ...............................................................................47

6.  Unregulated Contributions to Groups that Make Independent Expenditures in California Illustrates the Potential for Corruption and Circumvention ...................................................................................48

7.  People Have Established Independent Groups Devoted to Electing or Defeating a Single Candidate. ............................................................53

C.  Candidates Are Usually Aware of the Identity of Individuals Making Large Contributions to Fund Independent Expenditures ......................................54

D.  Candidates Feel Indebted, Grateful, or Are Inappropriately Disposed to Favor Individuals Who Paid for Such Ads or Independent Expenditures ............60

1.  Unlimited Contributions to Independent Expenditure Groups Are More Likely to Lead to Corruption than Direct Candidate Contributions Under the Legal Limits. .......................................................64

2.  Ad Campaigns Run By Interest Groups Allow Candidates to Conserve Resources and Keep Their Hands Clean....................................66

3.  The Likelihood of Candidate Indebtedness Increases When the Amounts of Independent Expenditures Are High Relative to Candidate Spending ................................................................................71

E.  Large Donations Are a Tool Used By Donors Seeking Access and Influence Over Candidates....................................................................................72

F.  If Contributions to Groups Making Independent Expenditures Were No Longer Limited, Influence-Seeking Donors Would Quickly Give Massive Amounts............................................................................................................77

G.  Financers of Independent Expenditures Are Given Preferential Access to, and Have Undue Influence Over, Officeholders....................................................80

H.  Large Contributions for Independent Expenditures Can Influence Legislative Votes or Other Official Action, and Thereby Pose a Danger of Actual Quid Pro Quo Arrangements....................................................................85

1.  A Group with an Interest in Gaming Issues Attempted to Bribe Former Congressman Snowbarger by Signaling That They Would Conduct an Independent Spending Campaign on His Behalf...................86

2.      Former Wisconsin Senate Majority Leader Chvala Extorted Funds In Return For Legislative Action, Including Funds For Purportedly Independent Campaign Spending ............................................................90

3.      Additional Incidents Further Illustrate the Danger of Large Contributions for Independent Spending Influencing Official Action or Leading to Quid Pro Quos. ......................................................97

I.      Large Contributions for Independent Expenditures Create an Appearance of Corruption....................................................................................................99

1.      A Coal Company Executive's Contributions for Independent Expenditures In a 2004 West Virginia Supreme Court Race Illustrate the Appearance of Corruption ................................................100

2.      The Public Views Large Election-Related Contributions As Corrupting, Regardless of the Recipient...................................................105

3.      Coordination Is Inherently Very Difficult to Police and Candidate Campaigns Are Often Involved With "Independent" Spending Below the Level of Involvement That Constitutes "Coordination" Within the Meaning of the Law. ...........................................................108

J.      Money Raised through Associations with Many Protections of the Corporate Form Pose a Danger of "Corrosive and Distorting Effects of Immense Aggregations of Wealth"....................................................................109

K.      Independent Expenditures Through Groups are Less Transparent to the Public than Independent Expenditures Made by Individuals .............................110

L.      The Disclosure of All Receipts and Expenditures Ensures that Vital Information About Who is Supporting Candidates is Made Publicly Available. ......................................................................................................113

V.      Robust Fundraising Has Occurred Within Federal Contribution Limits and Large Sums Can Be Raised For Independent Expenditures Through the Aggregation of Money From a Number of Donors..................................................................................119

A.      Both the Number of Nonconnected Committees and Their Total Receipts Have Consistently Risen Since 1990 and Increased Dramatically This Decade.....................................................................................................119

B.      The National Political Parties Successfully Recruited New Donors When They Were No Longer Permitted to Receive Unlimited Contributions .............121

C.      SpeechNow is Capable of Raising Significant Sums Within the Contribution Limits............................................................................................122

VI.     Political Committee Reporting Requirements Do Not Threaten the Survival of
        SpeechNow or Other Campaign Groups..........................................................................134

**DEFENDANT FEDERAL ELECTION COMMISSION'S
PROPOSED FINDINGS OF FACT**

I.     **The Parties.**

       A.     **Defendant Federal Election Commission.**

       1.     The defendant Federal Election Commission ("Commission" or "FEC") is the

independent agency of the United States with exclusive jurisdiction over the administration,

interpretation, and civil enforcement of the Federal Election Campaign Act of 1971, as amended

("Act" or "FECA"), 2 U.S.C. §§ 431-55, and other statutes.  The Commission is empowered to

"formulate policy" with respect to the Act (2 U.S.C. § 437c(b)(1)); "to make, amend, and repeal

such rules . . . as are necessary to carry out the provisions of [the] Act" (2 U.S.C. §§ 437d(a)(8),

438(a)(8),(d)); and to issue written advisory opinions concerning the application of the Act and

Commission regulations to any specific proposed transaction or activity (2 U.S.C. §§ 437d(a)(7),

437f).  The Commission has "exclusive jurisdiction" with respect to "civil enforcement" of

the Act.  (2 U.S.C. § 437g(d).)

       B.     **Plaintiffs.**

       2.     Plaintiff SpeechNow.org ("SpeechNow") is an unincorporated nonprofit

association organized under the District of Columbia Uniform Unincorporated Nonprofit

Associations Act, D.C. Code § 29-971.01 *et seq.*, and registered as a "political organization"

under section 527 of the Internal Revenue Code.  (Am. Compl. (Doc. 28-2) ¶ 7; SNK0003-0004,

SNK0011, SNK0019-0041, SNK0061-0066, FEC Exh. 20.)

       3.     SpeechNow's purpose is "expressly advocating the election of candidates who

support rights to free speech and association and the defeat of candidates who oppose those

rights, particularly by supporting campaign finance laws."  (Am. Compl. (Doc. 28-2) ¶ 8.)

Plaintiffs have drafted solicitations for contributions.  (SNK0259-0273, FEC Exh. 20.)

SpeechNow seeks to accept contributions from individuals in unlimited amounts to pay for candidate advocacy and administrative costs.  (Am. Compl. (Doc. 28-2) ¶¶ 17, 84-90.)  It alleges that it will not coordinate any of its expenditures, within the meaning of 2 U.S.C. § 441a(a)(7)(B) and 11 C.F.R. Part 109, with candidates, political parties, or other committees.  (Am. Compl. (Doc. 28-2) ¶ 16.)  It also alleges that it will not accept any funds from candidates, political committees, corporations, labor organizations, national banks, Federal government contractors, or foreign nationals.  (Am. Compl. (Doc. 28-2) ¶ 15.)

4.      SpeechNow will not make contributions to candidates and other political committees.  (Am. Compl. (Doc. 28-2) ¶ 16.)  It will expressly advocate the election or defeat of candidates through advertisements on television and other media in the current election cycle and in future election cycles.  (Am. Compl. (Doc. 28-2) ¶ 20.)  Plaintiffs have prepared scripts for four video and audio political advertisement scripts and wish to spend over $120,000 initially to produce and air the advertisements.  (Am. Compl. (Doc. 28-2) ¶¶ 20-25; SNK0242-0254, FEC Exh. 20.)  Plaintiffs state SpeechNow plans to comply with FECA's disclaimer and reporting requirements for independent expenditures made by groups other than political committees, but do not wish to comply with the full disclosure requirements applicable to political committees.  (Am. Compl. (Doc. 28-2) ¶¶ 28-30.)

5.      SpeechNow intends both to raise more than $1,000 in contributions (Am. Compl. (Doc. 28-2) ¶¶ 32, 38) and make more than $1,000 in expenditures (Am. Compl. (Doc. 28-2) ¶¶ 20-27, 41), the threshold amounts specified in the Act, and its major purpose is electing and defeating federal candidates.  (Am. Compl. (Doc. 28-2) ¶ 47.)

6.      Plaintiffs concede that SpeechNow would meet all the requirements under federal law to qualify as a political committee within the meaning of the FECA.  (Am. Compl. (Doc. 28-2) ¶¶ 2, 31, 39-40, 42, 117, 125.)

7.      All five individual plaintiffs David Keating, Edward Crane, Fred M. Young, Jr., Brad Russo, and Scott Burkhardt are prospective donors to SpeechNow.  (Am. Compl. (Doc. 28-2) ¶¶ 8-12.)  The individual plaintiffs seek to influence federal elections by contributing money to SpeechNow so that it can make "independent expenditures" as defined in 2 U.S.C. § 431(17).  (Am. Compl. (Doc. 28-2) ¶ 27.)

8.      The Act limits contributions by individuals to nonconnected political committees to $5,000 per calendar year.  (2 U.S.C. §§ 431(11), 441a(a)(1)(C).)

9.      Plaintiffs Keating and Crane wish to contribute $5,500 and $6,000, respectively, to SpeechNow to fund its independent expenditures.  (Am. Compl. (Doc. 28-2) ¶¶ 8-9.)  These contributions would exceed the Act's limit on contributions to nonconnected political committees by $500 and $1000, respectively.  (2 U.S.C. §§ 431(11), 441a(a)(1)(C).)

10.     Plaintiff Young wishes to contribute $110,000 to SpeechNow.  (Am. Compl. (Doc. 28-2) ¶ 10.)  In addition to exceeding the Act's limit on contributions to a political committee, Mr. Young's desired contribution would exceed the Act's biennial aggregate limit of $108,200 on contributions by an individual to all candidates and committees by $1,800.  (2 U.S.C. §§ 431(11), 441a(a)(1)(C), 441a(a)(3); *see* 72 Fed. Reg. 5294, 5295 (Feb. 5, 2007).)

11.     Plaintiffs Russo and Burkhardt wish to contribute $100 each to SpeechNow.  (Am. Compl. (Doc. 28-2) ¶ 11-12.)  Russo and Burkhardt currently have no plans to contribute more than $100.  (Russo Dep. at 27, FEC Exh. 13; Burkhardt Dep. at 22-23, FEC Exh. 7.)

12.     Russo, who is an attorney, cannot identify anything in the Act that might prevent his proposed contribution to SpeechNow.  (Russo Dep. at 29-30, FEC Exh. 13.)

13.     In the past, Russo and Burkhardt have only made small contributions to federal candidates and political committees, and have not reached their aggregate contribution limits. (Burkhardt Dep. at 25-26, 31-32, FEC Exh. 7; Russo Dep. at 30-32, FEC Exh. 13.)

14.     The contributions by Russo and Burkhardt are below the Act's limit on contributions by individuals to nonconnected committees, and there is nothing in the Act that precludes such contributions.  (2 U.S.C. §§ 431(11), 441a(a)(1)(C), 441a(a)(3); *see* 72 Fed. Reg. 5294, 5295 (Feb. 5, 2007).)

15.     The Act requires political committees to identify the source of receipts from a source that, in the aggregate, exceeds $200 in a calendar year.  (2 U.S.C. § 434(b)(3)(G).)  Since plaintiff Brad Russo and Scott Burkhardt's proposed $100 contributions to SpeechNow are less than $200, the dollar amount above which political committees must itemize contributions and disclose the identify to the contributor, their contributions would not need to be disclosed by SpeechNow.  (2 U.S.C. § 434(b)(3)(G).)

16.     Brad Russo and Scott Burkhardt have already been identified as potential contributors to SpeechNow in this litigation.  (Am. Compl. (Doc. 28-2) ¶¶ 11-12.)

17.     Neither Brad Russo nor Scott Burkhardt, the individual plaintiffs who wish to contribute $100 to SpeechNow, would be deterred from contributing by the prospect that SpeechNow might disclose their names on SpeechNow's disclosure reports filed with the Commission.  (*See infra* Facts 18-19.)

18.     Even if SpeechNow disclosed his identity on reports SpeechNow filed with the Commission, plaintiff Brad Russo would not suffer any ill effects, such as harassment, threats,

reprisals, or losing his job, from such disclosure.  (Russo Dep. at 30, FEC Exh. 13.)  Similarly,

plaintiff Scott Burkhardt does not believe he is more likely to face harassment from such

disclosure than anyone else in the country.  Mr. Burkhardt is not deterred from contributing to

SpeechNow.  As he stated, "It doesn't bother me either way.  I don't mind having my name out

there."  (Burkhardt Dep. at 23-24, 30-31, FEC Exh. 7.)

19.     Brad Russo has not made any contributions to entities that, in turn, make

independent expenditures.  (Russo Dep. at 34, FEC Exh. 13.)

## II.     SpeechNow Was Formed to Serve as a "Test Case."

20.     David Keating created SpeechNow to serve as a "test case" for a constitutional

challenge to longstanding contribution limits and public disclosure requirements as part of a

"joint project" with two legal advocacy groups.  (*See infra* Facts 21-40.)

21.     The statutory provisions challenged by plaintiffs have been on the books for more

than thirty years.  The requirements for registration and reporting by political committees in

2 U.S.C. §§ 432, 433 and 434, and the definition of political committee in 2 U.S.C. § 431(4)

were enacted by Congress in 1971.  (Federal Election Campaign Act of 1971, Pub. L. No. 92-

225, §§ 301-306, 86 Stat. 3, 11-16 (Feb. 7, 1972).)    The individual contribution limits in

2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3)(B) were enacted in 1974 and 1976.  (Federal Election

Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 101, 88 Stat. 1263 (Oct. 15, 1974);

Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, Title I, § 112(2),

90 Stat. 475 (May 11, 1976).)  In 2002, the aggregate biennial contribution limits were increased

and indexed for inflation by the Bipartisan Campaign Reform Act of 2002, Pub.L. No. 107-155,

116 Stat. 81 (2002) ("BCRA"), popularly known as "McCain-Feingold."  (*See* 2 U.S.C.

§ 441a(a)(3),(c))  The Federal Election Commission adjusts the amounts for inflation in odd-numbered years.  (72 Fed. Reg. 5294, 5295 (Feb. 5, 2007).)

22.     The Act's contribution limits and registration and reporting provisions were generally upheld by the Supreme Court, *Buckley v. Valeo*, 424 U.S. 1 (1976), and subsequent decisions.  (*Buckley v. Valeo*, 424 U.S. 1 (1976); *California Medical Association v. FEC*, 453 U.S. 182 (1981); *McConnell v. FEC*, 540 U.S. 93, 142-189 (2003).)

23.     The limits on contributions made by individuals to political committees exclusively for independent expenditures, and the aggregate limits for such contributions, were challenged in 1979, but were upheld by the United States District Court for the District of Columbia and summarily affirmed by the United States Court of Appeals for the District of Columbia Circuit.  (*Mott v. FEC*, 494 F. Supp. 131, 133-134 (D.D.C. 1980), *aff'd mem.*, *sub nom*, *National Conservative Political Action Committee v. FEC*, 672 F.2d 896 (D.C. Cir. 1981).)

24.     The Center for Competitive Politics and the Institute for Justice are two public interest law firms, both of whom are representing plaintiffs in these matters.  (Am. Compl. (Doc. 28-2) ¶¶ 27-28.)

25.     The Center for Competitive Politics is a non-profit section 501(c)(3) organization founded in August, 2005, by Bradley Smith, former Chairman of the Federal Election Commission, and Stephen Hoersting, a campaign finance attorney and former General Counsel to the National Republican Senatorial Committee, that is dedicated to reducing campaign finance restrictions on speech.  (SNK0520-0521, FEC Exh. 20; *see* http://www.campaignfreedom.org//about_ccp/.)

26.     The Institute for Justice ("IJ") was founded in 1991 and describes itself as "our nation's only libertarian public interest law firm."  (*See* http://www.ij.org/index.php?option=com_content&task=view&id=566&Itemid=192.)

27.     Plaintiff Fred Young is a financial supporter of the Center for Competitive Politics.  He has provided financial support to the Center for Competitive Politics since its inception.  (Young Dep. at 39-40, 90, FEC Exh. 19.)  Plaintiff Fred Young also has provided financial support to the Institute for Justice.  (Young Dep. at 91, FEC Exh. 19.)  Mr. Young believes that the Center for Competitive Politics and the Institute for Justice both share SpeechNow's views.  (Young Dep. at 89, FEC Exh. 19.)

28.     SpeechNow was created in 2007 by plaintiff David Keating.  (Am. Compl. (Doc. 28-2) ¶ 8; SpeechNow Response to FEC Interrogatory 1, FEC Exh. 105 at 16.)

29.     David Keating began the work necessary to organize SpeechNow in the summer of 2007.  (Keating Dep. at 116, FEC Exh. 11.)

30.     In 2007, David Keating recruited the board members of SpeechNow, including three of the five plaintiffs in this case.  Mr. Keating contacted Edward Crane, Jon Coupal and Richard Marder, and at least one other person (who declined to become involved), and solicited them to join SpeechNow as board members.  (Keating Dep. at 118-121, 128-129, FEC Exh. 11; Coupal Dep. at 34, FEC Exh. 8.)  Other than becoming board members and later plaintiffs in this litigation, Coupal and the others had no role in the formation or operation of SpeechNow. (Keating Dep. at 118-121, FEC Exh. 11; Coupal Dep. at 27-28, FEC Exh. 8.)

31.     When David Keating created SpeechNow in 2007, it was already contemplated that SpeechNow would pursue legal action to challenge the application of the Act to SpeechNow and its activities. (*See infra* Facts 32-40.)

32.     The idea to bring a new challenge to the statutory limits and other requirements at issue in this suit originated with plaintiff David Keating and/or counsel at the Center for Competitive Politics or the Institute for Justice.  When SpeechNow was formed, David Keating and others believed that nothing like it existed and nothing like it had been attempted before. They believed that it would be necessary to "test" the application of FECA to SpeechNow by requesting an advisory opinion from the FEC and likely filing a constitutional challenge to the application of certain provisions of FECA to SpeechNow.  SpeechNow was formed with the knowledge that these actions would be necessary.  (SpeechNow Responses to FEC Request for Admission 1 and FEC Interrogatory 1, FEC Exh. 105 at 7-8, 16-18; Keating Dep. at 118-121, FEC Exh. 11; Young Dep. at 34, 45, 58, FEC Exh. 19; YOU0007-008 at YOU0008, FEC Exh. 24; Young Privilege Log 1, FEC Exhibit 123.)  SpeechNow claims that these actions were a means to the end of allowing SpeechNow to function free of contribution limits and PAC requirements, not ends in themselves.  (SpeechNow Response to FEC Request for Admission 1, FEC Exh. 105 at 8.)

33.     Mr. Keating knew Fred Young because Mr. Young is a Club for Growth member and financial supporter.  (Keating Dep. at 134, FEC Exh. 11.)  In August 2007, David Keating asked Fred Young to assist in bringing a test case to challenge federal campaign finance provisions.  Mr. Young mistakenly believed that the statutory provisions had been enacted as part of the McCain-Feingold bill.  As Mr. Young described it in a July 25, 2007 email message to Sean Parnell, president of the Center for Competitive Politics,

> David Keating of Club for Growth called me recently with a proposition to work with Brad Smith and Institute for Justice to bring a test case before the FEC, then DC Court of Appeals to try to push back some of McCain-Feingold.
> (Young Exh. 4 at YOU0007, FEC Exh. 24.)

Mr. Young encouraged Mr. Parnell to "[p]lease discuss with Brad [Smith] before our visit."
(Young Exh. 4 at YOU0007, FEC Exh. 24.)  Parnell agreed, saying "[w]ill do," adding "[t]he
Keating thing is a joint project between the Center for Competitive Politics and the Institute for
Justice."  (Young Exh. 4 at YOU0007, FEC Exh. 24.)

34.    David Keating also asked Jon Coupal to become a member of SpeechNow,
informing him that an advisory opinion request to the FEC was contemplated and that litigation
was likely to follow.  Mr. Coupal was not surprised because he is aware that "litigation is
frequently used to advance public policy ends," as in this litigation.  (Coupal Dep. at 35-37,
FEC Exh. 8.)

35.    In November 2007, SpeechNow, through its counsel, filed a request for an
advisory opinion from the Federal Election Commission, pursuant to 2 U.S.C. § 437f.
SpeechNow's request sought an opinion concerning the application of the Act and Commission
regulations to SpeechNow's status as a political committee and funds received by SpeechNow.
(AOR 2007-32, Simpson Decl. (Doc. 2-9) Exh. 1 at 4-24; FEC Exh. 39, 136 (AOR 2007-32 and
supplements); SNK0264-0273, FEC Exh. 20.)

36.    SpeechNow considered creating a radio ad for the purpose of lending "credence"
to the group's "initiative."  After receiving an email about the filing of SpeechNow's advisory
opinion request, board member Ed Crane wondered in an email to Fred Young, "Should we
prepare an actual radio ad to lend credence to this initiative?"  (YOU0023-0024, FEC Exh. 24.)

37.    The Commission, which had only two voting members at the time of the advisory
opinion request, was unable to issue an advisory opinion to SpeechNow because issuance of an
advisory opinion requires the affirmative vote of four members.  (*See* 2 U.S.C. §§ 437c(c),

437d(a)(7); Simpson Decl. (Doc. 2-9) Exh. 3 at 26-48); s*ee generally* FEC Exhs. 31, 40-42, 44, 122, 124, 133-134.)

38.     Plaintiff Brad Russo, who wishes to contribute $100 to SpeechNow, learned about SpeechNow from an attorney with the Institute for Justice, Valerie Bayham.  (Russo Dep. at 20, FEC Exh. 13.)  Ms. Bayham described SpeechNow to Mr. Russo and "it was obvious from the context, there was some connection with the Institute for Justice."  (Russo Dep. at 39, FEC Exh. 13.)  After the initial conversation with Valarie Bayham, Russo visited SpeechNow's web site, was contacted by Ms. Bayham, and then was contacted by Steve Simpson, lead counsel for plaintiff.  (Russo Dep. at 20-23, FEC Exh. 13.)

39.     Plaintiff Scott Burkhardt, who also wishes to contribute $100, learned of SpeechNow after finding the organization's web site while conducting an Internet search.  After corresponding with Mr. Keating about a possible contribution to SpeechNow, Mr. Burkhardt was contacted by Steve Simpson, lead counsel for plaintiffs, regarding serving as a plaintiff in this litigation.  (Burkhardt Dep. at 9-14, 16-17, 20-21, FEC Exh. 7; Burkhardt Exh. 4, FEC Exh. 143.)

40.     Plaintiffs are not paying legal fees for representation.  (Keating Dep. at 121-122, FEC Exh. 11; Young Dep. at 94, FEC Exh. 19.)  The Center for Competitive Politics and the Institute for Justice are representing plaintiffs with their own funds.  (Young Dep. at 94, FEC Exh. 19.)

## III.    SpeechNow's Advertisements Constitute the Speech of David Keating – Who Is Solely Responsible for Its Activities, and Not the Speech of Its Contributors.

41.     SpeechNow's contributors had no role in the creation of SpeechNow's advertising campaign and will not have a role in the future.  David Keating chose the candidates on whom

SpeechNow's advertising would focus and created the advertisements; indeed, he is solely responsible for all of SpeechNow's activities.  (*See infra* Facts 42-77.)

42.     Plaintiff David Keating is President and Treasurer of SpeechNow.  (Keating Decl. (Doc. 2-4) ¶ 2; Articles of Organization, Keating Decl. (Doc. 2-4) at 16-18; Member Action By Written Consent In Lieu Of Organizational Meeting, Keating Decl. (Doc. 2-4) at 20-22; SpeechNow Response to FEC Interrogatory 1, FEC Exh. 105 at 16.)

43.     Jon Coupal is Vice-President and Secretary of SpeechNow.  (Articles of Organization, Keating Decl. (Doc. 2-4) at 16-18; Member Action By Written Consent In Lieu Of Organizational Meeting, Keating Decl. (Doc. 2-4) at 20-22.)  Mr. Coupal's role as vice-president and secretary of SpeechNow has been "minimal to nonexistent," solely reviewing the articles of organization and the by-laws.  (Coupal Dep. at 30, FEC Exh. 8.)

44.     Plaintiffs Fred Young, Brad Russo and Scott Burkhardt do <u>not</u> hold any office or other position with SpeechNow.  (Articles of Organization, Keating Decl. (Doc. 2-4) at 16-18; Member Action By Written Consent In Lieu Of Organizational Meeting, Keating Decl. (Doc. 2-4) at 20-22.)  They are merely potential contributors to SpeechNow.  (Am. Compl. (Doc. 28-2) ¶¶ 9-12.)

45.     SpeechNow's contributors or potential contributors, described as "supporters," have no role in the operation of the organization.  (Keating Dep. at 135-137, FEC Exh. 11.)

46.     David Keating is solely responsible for SpeechNow's day-to-day activities. (SpeechNow Response to FEC Interrogatory 1, FEC Exh. 105 at 16; Keating Dep. at 149, FEC Exh. 11.)

47.     Mr. Keating created SpeechNow's web site, participates in the creation of all advertisements SpeechNow wishes to publish or broadcast, and administers all of SpeechNow's

affairs.  (Am. Compl. (Doc. 28-2)  ¶ 8.)  At present, there is no plan for that to change.  (Keating

Dep. at 150, FEC Exh. 11.)

48.     David Keating decides in what elections SpeechNow will run advertisements

supporting or opposing particular candidates.  Keating keeps the other officer (vice-president

Jon Coupal) and four board members of SpeechNow apprised of his decisions and expects to

consult them from time to time.  (SpeechNow Response to FEC Interrogatory 7, FEC Exh. 105

at 22-23.)

49.     While SpeechNow has five board members, none of the board members (other

than David Keating), was involved in the selection of candidates to support or development of

the advertisements SpeechNow wished to finance.  (Keating Dep. at 162, FEC Exh. 11.)

50.     David Keating has expended his personal funds for SpeechNow's operating

expenses, such as postage, post office box rental, and internet domain name registration.  Those

expenses through July 2008 total only $282.  (Keating Dep. at 181-182, FEC Exh. 11;

Spreadsheet, Keating Exh. 15, SNK0220-0221, FEC Exh. 20.)

51.     SpeechNow has received no donations other than small amounts that David

Keating has expended on behalf of SpeechNow.  (SpeechNow Response to FEC Interrogatory 3,

FEC Exh. 105 at 20.)

52.     None of the individual plaintiffs has made direct financial contributions to

SpeechNow, because SpeechNow has chosen not to accept donations, not even contributions of

$5,000 or less.  (Keating Dep. at 165-166, FEC Exhibit 11; SpeechNow Response to

FEC Interrogatory 9, FEC Exh. 105 at 23.)

53.     Other than David Keating, who is president and treasurer of SpeechNow, none of the plaintiffs has a role in creating SpeechNow's independent expenditure communications, and none will have a role in the future.  (*See infra* Facts 54-77.)

54.     David Keating personally selected the candidates for SpeechNow to support or oppose in 2008.  (Keating Dep. at 162, FEC Exh. 11.)  Mr. Keating also expects to pick the future candidates that SpeechNow will support or oppose through independent expenditures.  (Keating Dep. at 162, FEC Exh. 11.)

55.     Among the candidates David Keating initially considered selecting as targeted candidates for SpeechNow's advertisements was 2008 presidential candidate and former Senator Fred Thompson, and then, at a later time, candidates Senator Hillary Clinton and former Senator John Edwards.  Keating dropped the plan for Clinton and Edwards advertisements when SpeechNow's consultant took too long and SpeechNow's advisory opinion request was submitted too late to receive a response in time.  (SNK0083-0084, SNK0231, SNK0236-0237, SNK0242-0251, FEC Exh. 20.)

56.     Mr. Keating ultimately selected Representative Dan Burton and Senator Mary Landrieu as the targeted candidates for SpeechNow's first two advertisements.  (Keating Dep. at 157-159.)

57.     Mr. Keating spoke with Congressman Burton's primary election opponent, John McGoff, to learn of his position on free speech issues but never ascertained what Landrieu's opponent's position was on speech issues.  (Keating Dep. at 157-58, 160-161, FEC Exh. 11; SpeechNow Response to FEC Interrogatory 7, FEC Exh. 105 at 22.)

58.     David Keating personally wrote the scripts for SpeechNow's advertisements opposing Representative Burton and Senator Landrieu, and then the scripts were reviewed by

SpeechNow's consultant, Ed Traz.  David Keating expects that future advertisements by
SpeechNow will be created in the same manner.  (Keating Dep. at 162-163; FEC Exh. 11.)  In
the future, Mr. Keating hopes that Ed Traz, or any other media consultants with whom
SpeechNow might work, "would take on more of the creative process."  (Keating Dep. at 165.
FEC Exh. 11.)  Mr. Keating also hopes that in the future SpeechNow will test its advertisements
with focus groups.  (Keating Dep. at 163-164, FEC Exh. 11.)

     59.     David Keating sent informational email messages, often including press clippings
or links to articles regarding SpeechNow's advisory opinion request, to SpeechNow's board
members.  (SNK0114-0117, SNK0175-0180, FEC Exh. 20; CRA0004-005, FEC Exh. 22.)
In addition, Mr. Keating forwarded at least some of these messages to Fred Young and other
supporters.  (YOU0033-0034, FEC Exh. 24; SNK0175-0180, FEC Exh. 20.)

     60.     On December 6, 2007, Fred Young asked David Keating to include him on the
"insiders" email list.  (Young Exh. 6, FEC Exh. 29.)  Mr. Keating complied with this request,
adding Mr. Young on emails sent to the five board members of SpeechNow.  (Young Dep.
at 51-54, FEC Exh. 11; Young Exh. 6, FEC Exh. 29; YOU0002-0006, YOU0009-0019,
YOU0025-0030, FEC Exh. 24; SNK0110-0112, SNK0173-0174, SNK0181-0187 (Dec. 6, 2007),
SNK0198-0205, SNK0211-0219, SNKN0463-0465, FEC Exh. 20; CRA0001-003,
FEC Exh. 22.)  According to Mr. Keating, Fred Young has "probably gotten every significant
e-mail I've sent out."  (Young Dep. at 51-54, FEC Exh. 11.)

     61.     While David Keating granted Mr. Young's request to receive email
messages sent by Mr. Keating to the board members of SpeechNow, this was a courtesy
accorded because Mr. Young was a prospective large contributor to SpeechNow.
(Keating Dep. at 138-139.)

62.     Fred Young does not wish to be involved in SpeechNow's advertisements.  (*See*

*infra* Facts 63-66, 74, 76-77.)

63.     Fred Young's involvement with SpeechNow has been limited.  He communicated

with David Keating, Sean Parnell and counsel for plaintiffs, agreed to serve as a plaintiff in this

litigation, signed statements for submission with SpeechNow's advisory opinion request and

plaintiffs' motion for a preliminary injunction (Young Exh. 5, FEC Exh. 28; Young Exh. 7,

FEC Exh. 30), and responded to the Commission's discovery requests (Young Exh. 2 and 3,

FEC Exh. 25-26), and sat for his deposition.  (Young Dep., FEC Exh. 19.)  In all other respects,

Fred Young's role is "passive."  (Young Dep. at 34-51, FEC Exh. 19.)

> I'm the recipient of numerous e-mails from CCP and supporters sharing press
> coverage and press releases, et cetera.  But as far as affirmatively advancing the
> cause of SpeechNow or our involvement – its involvement with the FEC, my role
> is completely passive, except as instructed to sign an affidavit, et cetera.  (Young
> Dep. at 50-51, FEC Exh. 19.)

64.     The dollar amount of the ostensibly desired contribution from Fred Young to

SpeechNow was not Mr. Young's selection.  (Young Dep. at 58, FEC Exh. 19.)  The dollar

amount was suggested by counsel for plaintiffs.  (Young Dep. at 58, FEC Exh. 19.)  When asked

at deposition who selected the $110,000 amount, Mr. Young testified that "it involved counsel in

terms of explaining the laws that stood between us and the mission of SpeechNow.  I don't know

which counsel explained the detail to me."  (Young Dep. at 58, FEC Exh. 19.)

65.     Other than donating to SpeechNow, Fred Young does not anticipate any

involvement with SpeechNow in the future.  "I really don't expect to be involved other than as a

donor."  (Young Dep. at 88, FEC Exh. 19.)

66.     Fred Young has never contemplated financing independent expenditures himself.

(Young Dep. at 93, FEC Exh. 19.)  "My role is to be a donor.  That's my selected role," Fred

Young testified.  (Young Dep. at 93, FEC Exh. 19.)

67.     Two individual plaintiffs, Brad Russo and Scott Burkhardt, both of whom reportedly wish to contribute $100 to SpeechNow, had virtually no involvement with SpeechNow, other than agreeing to serve as plaintiffs, executing declarations in support of plaintiffs' motion for a preliminary injunction, receiving and responding to the Commission's discovery requests, and appearing to be deposed by the Commission.  (*See infra* Facts 68-70.)

68.     Prior to getting involved with SpeechNow, Mr. Russo did not know anyone involved with SpeechNow, other than Ms. Bayham, who told him about SpeechNow. (Russo Dep. at 24, FEC Exh. 13.)  Brad Russo's only communications (other than visits to the SpeechNow web site and signing up for organization's mailing list, and receiving email messages from SpeechNow) have been with counsel for plaintiffs.  Mr. Russo has never emailed, spoken or met with David Keating, Fred Young or any of the other plaintiffs in this case, or any of the other organizers of SpeechNow (other than its counsel).  (Keating Dep. at 147, FEC Exh. 11; Russo Dep. at 24-25, 37-38, FEC Exh. 13; *see generally* Russo Dep. at 20-25, 26-27, FEC Exh.13.)

69.     Russo's only specific plan for future involvement is to make a donation.  (Russo Dep. at 27, FEC Exh. 13.)  In addition, he will see how he can be helpful.  (Russo Dep. at 27, FEC Exh. 13.)

70.     Scott Burkhardt's involvement also has been extremely limited.  Other than the email exchange between David Keating and Scott Burkardt, Mr. Keating does not recall any communication with Mr. Burkhardt.  (Keating Dep. at 146-147, FEC Exh. 11.)

71.      Mr. Coupal only knows two of the other members of SpeechNow: David Keating and Edward Crane.  (Coupal Dep. at 32, FEC Exh. 8.)  Jon Coupal has known Mr. Keating for many years, primarily through Mr. Keating's involvement and employment by the National

Taxpayers Union ("NTU"). (Coupal Dep. at 32-33, FEC Exh. 8.) NTU sponsors taxpayer conferences, and Jon Coupal has run into David Keating at those meetings, participated in the conferences with him and frequently gone to dinner with him. (Coupal Dep. at 32-33, FEC Exh. 8.) Jon Coupal has only met Edward Crane two or three times, when Mr. Coupal has spoken at Cato Institute events, and Mr. Coupal has had the opportunity to talk with Mr. Crane. (Coupal Dep. at 33, FEC Exh. 8.)

72.     Mr. Coupal is aware that other individuals are willing to contribute to SpeechNow, but does not know who those individuals are, other than himself. (Coupal Dep. at 49, FEC Exh. 8.)

73.     SpeechNow has five board members: plaintiffs David Keating and Edward H. Crane III, and non-plaintiffs Daniel Shapiro, Richard Marder and Jon Coupal. Under SpeechNow's by-laws, these five people have certain responsibilities and certain authorities. Under SpeechNow's by-laws, there are five "members" of the association who essentially function like a board of directors and control SpeechNow. (Keating Dep. at 132-137; By-Laws, AOR 2007-32 at 23-33, FEC Exh. 39.) As David Keating wrote to one person concerned about potential liability, "keep in mind that 'members' are really to be thought of as directors of regular incorporated groups." (SNK0158-0159, FEC Exh. 20.)

74.     SpeechNow is not a membership organization. (Keating Dep. at 137, FEC Exh. 11.) Under SpeechNow's by-laws, the only "members" are the five people who act as the board of directors. Board members are replaced through election by the existing members. (By-Laws, Article 3, Section 3, Keating Decl. (Doc. 2-4) Exh. E at 29-39, SNK0025-0035 at SNK0026. *See also* Articles of Organization, Keating Decl. (Doc. 2-4) Exh. A at 16-18,

SNK0022-0024, FEC Exh. 20; Member Action By Written Consent In Lieu Of Organizational

Meeting, Keating Decl. (Doc. 2-4) Exh. B at 20-22, SNK0019-0021, FEC Exh. 20.)

75.     Mr. Keating refers to people who are not board members, but who sign up for

SpeechNow's mailing list or want to donate money to SpeechNow, as "supporters."

(Keating Dep. at 135-136, FEC Exh. 11.)

76.     While plaintiffs Fred Young, Brad Russo and Scott Burkhardt are potential

contributors to SpeechNow, they are not members and have no other role in the organization or

its activities.  Young, Russo and Burkhardt are merely "supporters" of SpeechNow.  Supporters

do not have any role in the governance of SpeechNow.  (Keating Dep. at 137, FEC Exh. 11.)

77.     SpeechNow's solicitations make clear that SpeechNow — i.e., the five board

members — will exclusively direct SpeechNow's spending, not SpeechNow's donors, stating:

"All donations will be spent according to the sole discretion of SpeechNow.org."  (Draft

Solicitations for SpeechNow, SNK0259-0273 at 0260, 0263, 0268, 0273, FEC Exh. 20.)

**IV.     Unlimited Contributions To an Association Devoted to Independent Candidate Expenditures Pose a Danger of Corruption or its Appearance.**

78.     Independent expenditures — expenditures not made in coordination with a

candidate — are effective in helping candidates win elections or defeating candidates.  Given the

ability of interest groups to closely monitor a candidate's campaign themes and strategy, often

made easier by technological developments and the revolving door of individuals working for

both candidates and independent groups, unlawful coordination is not necessary for independent

expenditures to have a substantial impact on an election.  *See infra* Section A.  Because they are

so effective, candidates appreciate independent expenditures made on their behalf, and therefore

individuals attempt to influence or gain access to candidates through contributions to groups that

make independent expenditures; independent expenditure groups are used to circumvent direct

contribution limits; and independent expenditures then lead to indebtedness or access, pose a danger of quid pro quo arrangements, and create the appearance of corruption. *See infra* Sections B-H.  Furthermore, there are several important reasons why independent expenditures made by groups raise more concerns than independent expenditures made by individuals.  First, many groups that make independent expenditures share many characteristics of the corporate form and pose a danger of "corrosive and distorting effects of immense aggregations of wealth." *See infra* Section J.   Also, independent expenditures made through groups are less transparent to the public.  *See infra* Section K.  Finally, with groups especially, it is important for the public to have total disclosure of receipts and expenditures, not just direct expenses and contributions for the purpose of furthering electioneering communications.  *See infra* Section L.

### A. Independent Expenditures Are Effective in Determining the Outcome of Elections and Have Gotten More Effective Over Time, Even Though They Are Not Coordinated with a Campaign.

#### 1. Independent Expenditures Can Have a Significant Impact on Elections Generally.

79.     There is broad consensus that independent expenditures are generally designed to help candidates win elections and they are effective in this goal.  (Wilcox Rept. at 13, FEC Exh. 1).  Independent expenditures influence votes and hurt or help the candidates targeted.  (Wilcox Rept. at 13, FEC Exh. 1.)

80.     Empirical analyses confirm the effectiveness of independent expenditures. Political Scientists Richard Engstrom and Christopher Kenny conducted a statistical analysis of the spending reported for independent expenditures by PACs, and concluded that "independent expenditures can significantly affect vote choice. . . .  In general, our results seem to conform to the conventionally accepted account of the 20-year history of independent expenditures in U.S. elections."  (Wilcox Rept. at 13, FEC Exh.1 (quoting Richard N. Engstrom and Christopher

Kenny, *The Effects of Independent Expenditures in Senate Elections*, Pol. Research Quarterly 55 (4):885-905 at 885, (2002).)

81.     Similarly, in a "careful statistical analysis of the impact of the AFL-CIO's candidate-focused issue advocacy campaigns in 1996," "[p]olitical scientist Gary Jacobson, one of the leading experts on Congressional elections," concluded that "'labor can plausibly claim responsibility for defeating a majority of first term [Republican] losers.  Thus, money spent outside the regular campaigns on 'voter education' can have a major effect on election results.'" (Wilcox Rept. at 13-14, FEC Exh.1 (quoting Gary C. Jacobson, *The Effect of the AFL-CIO's "Voter Education" Campaigns on the 1996 House Elections*, 61 J. Pol. (1): 185-94).)

82.     "Consultants, candidates, and party officials almost universally say that independent advertising and candidate-focused issue advocacy influence outcomes."  (Wilcox Rept. at 14, FEC Exh.1; *see also infra* Facts 83-91.)

83.     According to Elaine Bloom, a Congressional candidate in 2000, independent ads run by a group called Citizens for Better Medicare, along with ads independently run by the Republican party, were the "deciding factors" in her election race.  (Bloom Decl. ¶ 6, *McConnell*, FEC Exh. 36; *see also* Wilcox Rept. at 18, FEC Exh.1.)

84.     As former Majority Leader Tom Daschle explains, "[i]ndependent advertising campaigns can provide huge benefits to candidates."  (Wilcox Rept. at 8, FEC Exh.1.)

85.     National Republican Senatorial Campaign Committee staffer Allen Raymond claimed that Democratic Senator Russ Feingold benefited substantially in the 1998 election by independent spending from NARAL, the Sierra Club, and the League of Conservation Voters. (Wilcox Rept. at 14, FEC Exh. 1.)

86.     As former California state Senate Majority Leader and now Chairman of the California Fair Political Practices Commission ("FPPC") Ross Johnson explained, "[g]enerally, independent expenditures are effective because the groups that make them produce ads and mailers just as professional and persuasive as those that come from the candidates themselves; in its effect, independent advertising is essentially indistinguishable from candidate advertising." (Johnson Decl. ¶ 9, FEC Exh. 2.)

87.     "There is [also] a consensus among interest group activists and campaign consultants that independent expenditures and candidate-focused issue advocacy help candidates. Campaign managers for both winning and losing candidates almost always agree."  (Wilcox Rept. at 14, FEC Exh. 1.)

88.     Republican consultant Rocky Pennington concluded that "[i]nterest group broadcast ads had a very significant effect on the outcome of the 2000 Congressional race, especially the ads run by the Club for Growth."  He reports that one of these ads, run just before the primary, led directly to the failure of a Republican primary candidate to win the primary.  He argues that radio ads by interest groups also mattered, concluding that "one ad against Mr. Sublette [his candidate in the race]… cost us a couple of points."  (Pennington Decl. ¶ 16, McConnell, FEC Exh. 33;  *see also* Wilcox Rept. at 14, FEC Exh. 1.)

89.     In fact, as conceded by SpeechNow president David Keating, the majority of Club for Growth PAC's independent expenditures were effective in advancing the candidacies they supported and the majority of Club for Growth PAC's independent expenditures were not counterproductive to the candidacies of the individuals they supported.  (David Keating's Response to FEC Request for Admission 1 and 2, FEC Exh. 106 at 9.)

90.     Joe Lamson, a consultant who managed Democratic candidate Bill Yellowtail's 1996 congressional campaign in Montana, reported that ads run by a group called Citizens for Reform were important in the election.  Polling data before these ads aired showed Yellowtail ahead by eight points, and that polling just after the ads ended showed that he trailed by five points.  Mr. Lamson concludes that 'I believe the Citizens for Reform Ads were a big factor in this change, and in Mr. Hill's victory in the election.'" (Lamson Decl. ¶ 11, *McConnell*, FEC Exh. 34; *see also* Wilcox Rept. at 14, FEC Exh. 1.)

91.     Terry Beckett, a Democratic consultant, concluded that "based on my observations, these ads affected the outcome of the Republican primary ad run-off and the general elections" in the 2000 congressional race in the 8th District of Florida.  She argues that ads by groups such as the Club for Growth were primarily responsible for the outcome in that race between Linda Chapin (D) and Ric Keller (R)  (Beckett Decl. ¶ 12, *McConnell*, FEC Exh. 35; *see also* Wilcox Rept. at 14, FEC Exh. 1.)

92.     Finally, perhaps the most obvious indicator of how effective independent ads is the extent that they're used.  *See infra* section 4.3.  "An indication of the confidence that groups and individuals place in the effectiveness of electoral issue advocacy is the large investment they make in it."  (Wilcox Rept. at 13, FEC Exh. 1 (quoting David B. Magleby and Jonathan W. Tanner, *Interest Group Electioneering in the 2002 Congressional Elections*, in *The Last Hurrah? Soft Money and Issue Advocacy in the 2002 Congressional Elections* (David B. Magleby et al. eds., 2004)).)

93.     "Not all independent ads help candidates"; similarly, "advertising run by candidates themselves sometimes backfires."  (Wilcox Rept. at 15, FEC Exh. 1.)  Thus, "[i]n a few rare cases, candidates have even asked groups to stop airing broadcast ads, because they

believed that they were hurting their campaigns."  (*Id.*)  The ads in those rare cases "have almost always been aired by ideological groups with unsophisticated advertising campaigns," and "[a]ccess-oriented donors are likely to avoid contributions to those organizations in favor or more effective groups."  (Wilcox Rept. at 15, FEC Exh. 1; *see infra* Section 3.24 (discussing access-oriented donors).)  "More frequently," the "ads run by interest groups are <u>more</u> valuable than a direct contribution to the candidate."  (Wilcox Rept. at 15, FEC Exh. 1.)  As discussed below, independent ads can be even more effective than ads from a candidate because, among other reasons, independent ads can say things that would damage a candidate if they came directly from him or her.  (*See infra* Section D, 2.)

94.     Candidate-focused issue advocacy campaigns, which have been funded through unlimited contributions, have also been successful at helping candidates, even without the advantage of direct candidate advocacy, which is likely to be somewhat more effective than issue advocacy.  (Wilcox Rept. at 13, FEC Exh. 1).

95.      "Prior to BCRA, interest groups aired issue advocacy campaigns that mentioned candidates by name but avoided the 'magic words' that indicated express advocacy.  Political scientists have distinguished between genuine issue advocacy campaigns aimed at persuading the public on an issue or pressuring government to adopt a particular policy, and candidate-focused issue advocacy campaigns that are aimed at helping or hurting candidates.  After BCRA, candidate-focused issue advocacy could still be aired before the official campaign period, and through mail, phone calls, and door-to-door campaigning during the election campaign.  Because large contributions to fund express advocacy is banned, donors have given large sums to the committees that air these [candidate-focused] issue advocacy spots."  (Wilcox Rept. at 8, FEC Exh. 1.)

**2.     There Are Many Specific Examples of Independent Expenditures Having a Significant Impact on an Election.**

96.     In addition to observations from candidates, experts, and political insiders about independent expenditures generally, there are many specific elections where such ads appeared to have a dramatic affect on the final result.  (*See infra* 97-115; *supra* Facts 88-91.)

97.     For example, "[t]he "Willie Horton" ad developed and run by the National Security Political Action Committee on behalf of George Bush in 1988 is widely believed to have had great impact on that race."  (Wilcox Rept. at 15, Exh. 1.)  The ad used "harsh language and imagery" in linking Michael Dukakis to a Massachusetts furlough plan which allowed William Horton, who was serving a sentence of life without parole, temporarily out of prison, whereupon he committed rape and assault.  (Wilcox Rept. at 15, Exh. 1.)

98.     Another one of the most famous examples of an independent expenditure campaign that was effective at influencing an election was the ads run by the Swift Boat Veterans and P.O.W.s for Truth ("Swift Boat Vets") in the 2004 presidential election, which attacked Senator John Kerry's war record.  (*See infra* Facts 99- 106.)

99.     After the election, there was a broad consensus among political analysts and reporters that the independent expenditures made by the Swift Boat Vets played a substantial role in President Bush's victory.  The final three months of the campaign were described, for example, as "a period in which groups like Swift Vets and P.O.W.s for Truth proved effective in attacking Mr. Kerry and helping Mr. Bush win by more than three million votes."  (Michael Janofsky, *Advocacy Groups Spent Record Amount of 2004 Election*, N.Y. Times, Dec. 17, 2004, FEC Exh. 48.)  As one observer put it, "[i]n terms of political impact, the Swift Boat Veterans for Truth ads were easily the most successful amid the overwhelming din of paid propaganda throughout the year."  (*Id.* (quoting Charles Lewis, executive director of the Center for Public

Integrity).  "The group's TV ads, which claimed that Sen. John Kerry exaggerated his military record in Vietnam, were viewed as a major factor in the Massachusetts Democrat losing the election."  (AP, *Bush Uses Recess Appointment Power to Install GOP Fundraiser Sam Fox as Ambassador*, FoxNews.com, Apr. 4, 2007, available at http://www.foxnews.com/story/0,2933,264090,00.html, FEC Exh. 84.)  According to Republican pollster Frank Luntz, Bush won the election due to his superior credibility when compared with Kerry, and the Swift Boat Vets' independent expenditures were one of two key campaign events that accomplished this task.  Frank Luntz, *Why Bush Won the Credibility Factor*, Wash. Times, Nov. 5, 2004, at A21, FEC Exh. 103.)

100.    Both Democratic and Republican consultants believe "that the Swift Boat ad hurt Kerry badly."  (Wilcox Rept. at 15, FEC Exh. 1 (quoting David B. Magleby et al., *The Morning After: The Lingering Effects of a Night Spent Dancing*, in *Dancing Without Partners: How Candidates, Parties, and Interest Groups Interact in the Presidential Campaign*, 25 (David B. Magleby et al., eds. 2007)).).

101.    One of the founders of the Swift Boat Vets described the organization's goal as preventing Kerry from being commander in chief and stated that "I don't think there is any doubt that we succeeded."  Tyler Whitley, *Group Glories in Kerry's Defeat; Swift Boat Veterans Pleased Ad Campaign Paid Off, Says Local Organizer of Effort*, Richmond Times Dispatch, Nov. 8, 2004, at B1, FEC Exh. 52).

102.    Political scientists confirm that the Swift Boat Veterans ads in 2004 helped undo John Kerry's momentum and increase voter distrust of Kerry.  (Wilcox Rept. at 15, FEC Exh. 1.)  Survey data of voters showed that the Swift Boat ads were widely seen and on net hurt the Kerry campaign.  (Wilcox Rept. at 15, FEC  (citing David B. Magleby et al., *The Morning After: The*

*Lingering Effects of a Night Spent Dancing*, in *Dancing Without Partners: How Candidates, Parties, and Interest Groups Interact in the Presidential Campaign*, 25 (David B. Magleby et al., eds. 2007)).)

103.    One survey confirmed that the Swift Boat Vets' message had an impact on viewers.  In an open-ended survey about Kerry and Bush's military service, 79% of respondents referred to issues or concerns that had been advanced by the Swift Boat Vets.  (Center for the Study of Elections and Democracy, *527s Had a Substantial Impact on the Ground and Air Wars in 2004, Will Return /Swift Boat Veterans 527 Played Historic Role* (Dec. 16, 2004), FEC Exh. 51.)

104.    As Chris LaCivita, the chief strategist for Swift Boat Vets, explained, "[i]n post election surveys the ads run by Swift Boat Veterans for Truth were either the first or second most memorable ads run during the entire issue debate.  A survey conducted by [Public Opinion Strategies] showed that the Swift Boat ads in Florida were the most remembered by all demographics.  So obviously we had an impact, we had an effect."  (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View,* (Kathleen Hall Jamieson ed., 2005), at 194, FEC Exh. 50.)

105.    As additional evidence of the penetration that the Swift Boat Vets were able to achieve with key voters, "[a] poll of 1,000 voters in a dozen swing states conducted on Election Day showed that almost three out of four voters recognized the Swift Vets group, according to the Republican polling company Fabrizio, McLaughlin & Associates."  (Michael Janofsky, *Advocacy Groups Spent Record Amount of 2004 Election*, N.Y. Times, Dec. 17, 2004, FEC Exh. 48.)  Similarly, a survey conducted by the Annenberg Public Policy Center from August 9 through 16 in 2004 found that 60% of those surveyed knew or heard about the ad.  (Annenberg

Public Policy Center, *Electing the President, 2004: The Insiders' View,* (Kathleen Hall Jamieson ed., 2005), at 185 FEC Exh. 50.)

106.    Furthermore, when the independent expenditures are compared to a similar ad funded by direct contributions, "[t]he Swift Boat ads were more effective than a similarly-sized gift to the Bush-Cheney campaign, because they would have invoked more suspicion if they were paid for by the campaign."  (Wilcox Rept. at 15.)

107.    A different ad campaign by Progress for America Voter Fund ("Progress for America") in 2004 was similarly effective.  The $17.5 million campaign centered around an advertisement called "Ashley's Story" which featured a young girl whose mother was killed in the 9/11 attacks and President Bush's compassion for her situation.  (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View,* (Kathleen Hall Jamieson ed., 2005), at 179-183, FEC Exh. 50.)  The campaign included advertising in nine "battleground states plus national cable" and was supplemented with "direct mail, e-mail, personal appearances, and a general 'surround' campaign that will emphasize her impact."  It was "the largest financial effort behind one message in political history."  (Memorandum from McCabe to Spanos, (undated), FEC Exh. 53.)   The ad reached millions of people in the closing weeks of the 2004 presidential campaign.  (Email from McKenna to Orfanos and attachments, Oct. 21, 2004, FEC Exh. 53.)

108.    Independent ads run by the group Club for Growth, of which SpeechNow founder David Keating is executive director, have also effectively influenced the outcome of candidate races.  As Stephen Moore, then-President of the Club for Growth, explained, "The Club for Growth actually intervenes quite heavily in primary races.  We think that's where our money can be best spent. . .  Our most important impact in 2004 was that in virtually every primary that we intervened in, and these were Republican primaries and our idea is to try and elect the most free

market, conservative person in every Republican primary around the country, we were able to have great success, partly because if you pour half a million dollars into a primary race, you could have a very dramatic impact in the outcome of that election." (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View,* (Kathleen Hall Jamieson ed., 2005), at 196-97, FEC Exh. 50.)

109.    An ad regarding Howard Dean that the Club for Growth ran was likely the single most effective ad during the Iowa caucuses in 2004. As Mr. Moore explained, "After the Iowa primary was over, there was a political roundtable of reporters who were in Iowa. One of the questions they asked was what do you think was the most effective and memorable ad of the political season there. Th[e Club for Growth's] was the ad that almost everyone remembered, which was remarkable because it ran probably one-tenth as many times as many of the ads that Kerry and Dean ran. When we ran this ad, Dean was up by 15 points in the primary. We made a bit of a miscalculation, we actually at this point thought that Howard Dean was going to be the Democratic candidate. We wanted to take the first punch at him. Inadvertently, I think that this ad did wound him . . . ." (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View,* (Kathleen Hall Jamieson ed., 2005), at 199 FEC Exh. 50.)

110.    Similarly, an ad regarding former Majority Leader Tom Daschle during his 2004 Senate race was, as Mr. Moore put it, "a highly effective ad in the Thune-Daschle race. Daschle did everything he could to get the ad taken off the air. And in fact, this issue was very, very damaging to Daschle." (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View,* (Kathleen Hall Jamieson ed., 2005), at 199 FEC Exh. 50 .)

111.    Just as the Club for Growth ads have been "highly effective," David Keating's SpeechNow ads are similarly likely to influence the outcomes of candidate elections; Mr.

Keating is involved in advertising by both.  (Keating Dep. at 28, 86, FEC Exh. 11; Compl. (Doc. 28-2) ¶ 8.)

112.    Although the Democratic candidate did not prevail in 2004, independent spending to support Senator Kerry's campaign was effective and helpful.  With respect to America Coming Together, one of the primary Democratic-leaning groups. President Clinton stated at one fundraising event that "'ACT met a critical need and that if ACT had existed in 2000 the Democrats would have won.'"  (*The Election After Reform, Money Politics and the Bipartisan Campaign Reform Act,* (Michael J. Malbin ed. 2006) (excerpts, Chapter 5, Weissman & Hassan and Ch. 6, Boatright, Malbin, Rozell, and Wilcox), at 87, FEC Exh. 55)

113.    Communications from independent 527 groups often highlight the organizations' electoral effectiveness.  One letter from the Gay & Lesbian Victory Fund to major donor Peter Lewis explained:  "Your recent support of $100,000.00 to the Gay and Lesbian Victory Fund is *critical to helping elect openly gay and lesbian officials in every state in the country* . . . Support from committed donors like you has enabled the Victory Fund to invest over $12 million dollars in LGBT candidates over the last decade and secure thousands of wins." (Letter from Wolf to Lewis, Sept. 17, 2004, FEC Exh. 54, Peter B. Lewis 00002).  Another letter explained how Peter Lewis's "generous $100,000 gift" had "already shown a return" through candidate victories.  (Letter from Wolf to Lewis, Nov. 21, 2005 FEC Exh. 54, Peter B. Lewis 00010.)

114.    In California, a state where contributions to groups that make independent expenditures are not limited, the FPPC recently identified several close State Assembly races in the 2006 election cycle where "'independent expenditures' may have assured victory" and many other 2004 and 2006 statewide and legislative races where they had a significant impact.  (FPPC,

*Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 37-40 and 23-36, FEC Exh. 47).

115.     Independent expenditures can also affect who runs for office, as illustrated by an example from California.  There is an independent expenditure committee already set up for the 2010 California gubernatorial race, as explained by FPPC Chairman Ross Johnson: "Reed Hastings, the founder of Netflix, has already, more than two years before the election, very publicly contributed a million dollars to [the] group, [which was] created to support State Superintendent of Public Instruction, Jack O'Connell.  This one individual's contribution to a committee, at a level approximately 41 times higher than what he could give directly to a campaign, has, by itself, made O'Connell a credible candidate."  (Johnson Decl. ¶ 9, FEC Exh.2.)

### 3.     Independent Expenditures Have Become More Effective over Time.

116.     "Over the past several election cycles, the quality and impact of independent expenditures and candidate-focused issue advocacy ha[ve] increased, as a network of professional activists ha[s] developed mechanisms to study what works and to adapt their campaigns to these lessons.  Thus, increasingly the value of a contribution to an independent expenditure committee has increased, and the likelihood that it is at least as valuable as a direct contribution to the candidate has increased as well."  (Wilcox Rept. at 16, FEC Exh. 1.)

117.     "Most independent expenditures and issue advocacy campaigns are designed by professionals, pretested by professionals, and their impact is studied by professionals in order to create more effective campaigns for the next election."  (Wilcox Rept. at 16, Exh. 1.)   As a large study of specific elections in 2000 concluded, "'interest groups in 2000 . . . mounted the equivalent of full-fledged campaigns for and against specific candidates.  The campaigns were

fully professional, and included pollsters, media consultants, general strategists, mail consultants, and so forth.'"  (Wilcox Rept. at 16, FEC Exh. 1 (quoting David B. Magleby, *Conclusions and Implications for Future Research*, in *The Other Campaign: Soft Money and Issue Advocacy in the 2000 Congressional Elections*, (David Magleby, ed. 2003).  Groups are also now using tracking polls to make sure that their campaigns are working.  *Id.*

118.    Another development that has led to the recent increase in quality of independent expenditures is the fact that now "[m]any organizations design their strategy over several election cycles.  The AFL[-]CIO did substantial polling and focus groups after the 1996 election, and again after the 2002 election campaigns, and used this information to design a different type of effort in 2004. Similarly the NRA has studied the best ways to do independent expenditures. They have developed lists not only of their members but also of groups that might be especially important in a campaign, such as union members who also have hunting licenses. Their sophisticated campaign in the 2000 presidential election in West Virginia is frequently attributed with boosting Bush to victory."  (Wilcox Rept. at 16, FEC Exh. 1.)  "In 2001 the National Federation of Independent Businesses conducted extensive experimental studies in the best ways to contact and mobilize voters, contacting more than 850 members and 11,000 additional small business voters, and conducting a post-election survey to determine which techniques worked best."  (*Id.* (citing David B. Magelby and J. Quin Monson, *Interest Groups in American Campaigns: the New Face of Electioneering*, in *The Last Hurrah? Soft Money and Issue Advocacy in the 2002 Congressional Elections* (David B. Magleby et al. eds., 2004)).

119.    "The extensiveness of the professionalism of many of these campaigns is evidenced by Steve Rosenthal, former AFL-CIO political director who headed Americans Coming Together in 2004.  Rosenthal noted at a Press Conference in 2007 that his effort was

based on previous election testing at the AFL-CIO in 2003, and that his organization contacted newly registered voters about 12 times after they registered by a combination of mail, phone, and personal contact.  He also commissioned a post-election poll in Ohio, in exurban and rural areas, testing contacting and vote choice."  (Wilcox Rept. at 16, FEC Exh. 1 (citing Center for the Study of Elections and Democracy at Brigham Young University, transcript, release of *Dancing Without Partners*, Feb. 7, 2005).

120.    Similarly, in 2004, "the Sierra Club 527 … reach[ed] out to over 400,000 targeted voters in nine key states.  The Sierra Club 527 targeted these voters with from 8 to 12 contacts (phone, mail, and door-to-door) between August 1 and the close of polls on Election Day." (Center for the Study of Elections and Democracy, *527s Had a Substantial Impact on the Ground and Air Wars in 2004, Will Return /Swift Boat Veterans 527 Played Historic Role* (Dec. 16, 2004) FEC Exh. 51.)

121.    "All of this research by groups and networks of activists has increased the value of independent spending campaigns, and thus makes them more valuable to candidates." (Wilcox Rept. at 16; *see supra* Facts 116-120.)

### 4.    Technical Coordination with a Candidate Is Unnecessary for an Independent Expenditure to Effectively Supplement a Campaign.

122.     "Although independent expenditure campaigns are not directly coordinated with candidates, there are many ways for committees to determine the maximum way to help candidates."  (Wilcox Rept. at 17, FEC Exh. 1.)  As discussed below, this includes accessing campaign information, which is readily available via the internet, taking advantage of the numerous political operatives moving back and forth between campaigns and independent groups, and creating broad networks of independent groups that coordinate with each other.  (For additional discussion of the role of party insiders in groups that make independent expenditures

*see infra* Facts 251- 265).  Ultimately, the result is groups being able to closely integrate their independent expenditures with campaigns much more effectively than they could have thirty years ago.

123.    "In an era of tight networks, there is no need to coordinate in order to help candidates win. Over the past two decades, activists have moved throughout their careers between jobs in the campaigns, in the party, as consultants, and in interest groups, thus making it easier to know what is valuable to campaigns.  Increasingly, interest group leaders are people who have worked full time on campaigns and for parties in the past, and thus understand how to echo and supplement candidate messages, which they can easily discern by following coverage of the campaign by media, and monitoring media buys. Even without these connections, the internet makes it easy to find information to maximize the value of expenditures.  Campaign strategies are broadly known, tracking polls are widely available, and strategies can be designed to help candidates even without consulting with them."  (Wilcox Rept. at 17, FEC Exh. 1.)

124.    "Interest groups share information with each other about what they will do and when to others who are interested in the same races, and meet regularly throughout the campaign to discuss their strategies.  Although the candidates are not part of these discussions, the collaboration of interest group networks helps assure that groups use their money in an optimal way to help elect candidates."  (Wilcox Rept. at 17, FEC Exh. 1.)

125.    As Michael J. Malbin, Executive Director of the Campaign Finance Institute, testified before the Senate Committee on Rules and Administration: "Many of the organizations sponsoring 527 groups concurrently sponsor separate Political Action Committees (PACs) that provide or channel hard money contributions to candidates and parties. ... In these cases, it is unrealistic to assume that candidates and officeholders will regard the sponsor's 527 and its

donors as 'independent' of and disassociated from the same sponsor's PAC contributions." (Senate Committee on Rules and Administration, Hearing to Examine and Discuss S.271, a Bill Which Reforms the Regulatory and Reporting Structure of Organizations Registered Under Section 527 of the Internal Revenue Code,  109th Cong. (March 8, 2005) (written testimony of Michael J. Malbin, Executive Director of the Campaign Finance Institute) (available at http://rules.senate.gov/hearings/2005/MalbinTestimony.pdf), FEC Exh. 116.)

126.    "For example, Let Freedom Ring was formed in 2004 as a 501(c)[(4)] organization that produced a video for distribution in evangelical churches touting Bush's personal faith, funded initially by a $1,000,000 contribution from John Templeton."  (Wilcox Rept. at 17, FEC Exh. 1 (citing Clyde Wilcox and Carin Larson, *Onward Christian Soldiers: The Christian Right in American Politics*, 3rd ed., 2006).  The group did not need to consult with Bush-Cheney campaign officials to learn that evangelical voters were a key part of the campaign's strategy; campaign strategist Karl Rove publicly proclaimed the central importance of mobilizing evangelicals as early as 2001, and there was widespread coverage of the efforts by the Bush campaign to secure membership of conservative churches. (Wilcox Rept. at 17, FEC Exh. 1 (citing Richard Berke, *Aide Says Bush Will Do More to Marshal Religious Base*, N.Y. Times, Dec. 12, 2001, and David D. Kirkpatrick, *Bush Appeal to Churches Seeking Help Raises Doubts*, N.Y. Times, July 2, 2004, at A15).)  And they did not need to talk directly with campaign officials to know which states were in play – this information is available and updated continually on the internet.  They therefore concentrated their distribution in the swing states of Ohio and Pennsylvania, coordinating with other groups such as the Ohio Christian Coalition and the Pennsylvania Family Institute. The value of this group's efforts was not diminished by the lack of coordination; indeed it ran a very cost-effective campaign. (Wilcox Rept. at 17, FEC Exh.

1.)

127.    As Republican strategist Paul Manafort has explained, "national-campaign operatives understand the limitations of collusion. At the same time, because they are experienced, they are able to understand the strategies of who[m]ever they are trying to help or damage.  And as a consequence, smart people can figure out pretty easily how to run a campaign that's consistent with or in concert with candidates they oppose or support."  (Wilcox Rept. at 18, FEC Exh. 1 (quoting Interview with Paul Manafort by Jules Witcover, The Buying of the President, Center for Public Integrity, March 20, 2007, available at http://www.buyingofthepresident.org/index.php/interviews/paul_manafort.)

128.    Given the easy available information and  tight networks of political operatives and groups described above, "interest group spending is frequently well integrated into campaign themes."  (Wilcox Rept. at 17, FEC Exh. 1).  "'Going into 2002, for example, Republicans and their interest-group allies were concerned about prescription drug benefits for seniors. Both the Republican Party and the United Seniors Association took the offensive, praising those who voted for the plan passed by the House and criticizing the Senate for its failure to act. A conservative group, the Seniors Coalition, mailed a flyer to New Mexico's First Congressional District, which read 'While the Liberals were talking, Congresswoman Heather Wilson was helping to pass the first comprehensive Medicare prescription drug benefit.''" (Wilcox Rept. at 17, FEC Exh. 1 (quoting David B. Magleby and Jonathan W. Tanner, *Interest Group Electioneering in the 2002 Congressional Elections*, in *The Last Hurrah? Soft Money and Issue Advocacy in the 2002 Congressional Elections* (David B. Magleby et al. eds., 2004)).)  "This kind of helpful campaign did not require explicit coordination."  (Wilcox Rept. at 17, FEC Exh. 1.)

129.    "[I]t is not difficult to devise advertising strategies that correlate closely with campaigns, without explicit coordination."  (Wilcox Rept. at 17, FEC Exh. 1.)  Indeed, officials with both MoveOn.org and The Media Fund explained their ability to achieve "striking synchronicity" with the advertising of the Kerry Campaign by "noting that it is relatively easy to monitor the media purchases by candidates."  (*Id.*; Jim Rutenberg, *Democrat's Ads in Tandem Provoke G.O.P.*, N.Y. Times, Mar. 27, 2004, FEC Exh. 56.)  Monitoring Senator Kerry's and President Bush's advertising purchases through services that tracked such advertising was all that was necessary to determine where and when to run the most effective pro-Kerry ads.  (Jim Rutenberg, *Democrat's Ads in Tandem Provoke G.O.P.*, N.Y. Times, Mar. 27, 2004, FEC Exh. 56.)

130.    Chairman Ross Johnson of the California FPPC has described another example of this synchronicity: "during the 2006 election cycle, there was a clear pattern of a candidate's committee inundating voters' mailboxes with campaign materials for three or four days, and then stop, while for the next three or four days, independent expenditure committees would inundate mailboxes with campaign material, and then back and forth.  So the mailings alternated almost exactly between the candidate's committee and independent expenditure committees."  (Johnson Decl. ¶ 10, FEC Exh. 2.)

131.    Thanks to modern campaign techniques, groups can assist candidates without coordinating with them to a much greater extent than they could thirty years ago.  "The kind of groups that are around today which were not around when the [*Buckley*] court made their decision are much more professional.  They have much better networks.  They focus group test their materials.  They do exit polls.  They do tracking polls.  I think the world is fundamentally different."  According to Professor Wilcox, "the court was not considering . . . really huge

contributions."  Although independent expenditures "occasionally . . . can be

counterproductive[,] . . . for the most part, they do help candidates" and "the scope of their

activity is much, much, much bigger than it ever was when the court ruled."  (Wilcox Dep. at

199-200, FEC Exh. 1.)

     **B.**     **Independent Expenditures Lead to Gratitude, Indebtedness, and Access, Pose a Danger of Quid Pro Quo Arrangements, and Create the Appearance of Corruption.**

It is well established that large contributions to candidates can lead to access and quid pro

quo arrangements.  *See infra* Section B(1).   However, because of limitations on direct

contributions, individuals who seek to influence policy or gain access to officeholders are willing

to make large contributions in an indirect manner.  *See infra* Section B(2).   The history of

massive "soft money" contributions to political parties illustrates this point.  *See infra* Section

B(3).   However, access-oriented donors have also been more than willing to give large

contributions to non-party groups.  *See infra* Section B(4).   If individuals are allowed to give

unlimited contributions to groups that make independent expenditures, they will seek access and

influence through this vehicle as well.  *See infra* Section B(5).   The current state of affairs in

California, where there are currently no limits on contributions to groups that make independent

expenditures, clearly illustrates this point.  *See infra* Section B(6).   Finally, even on the national

level, groups have been formed with the sole purpose of electing or defeating a single federal

candidate.  *See infra* Section B(7).

     **1.**     **Large Direct Contributions Raise the Danger of Quid Pro Quo Arrangements, Undue Influence, and the Appearance of Corruption.**

132.   "The danger of large direct contributions to candidates is well established in

political science.  In U.S. history and across the world, large contributions to candidates and

parties have been frequently associated with special access and particularistic policy favors for

donors.  Large direct contributions have been associated with explicit and implicit quid-pro-quo relationships, and with special access for and influence by large donors."  (Wilcox Rept. at 5, FEC Exh. 1.)  A "very strong majority" of political scientists believe that "at some point really large contributions create the possibility for corruption."  (Wilcox Dep. at 170, FEC Exh. 1.)

133.    Such large contributions to candidates and parties have pervasively undermined democratic processes.  (Wilcox Rept. at 5, FEC Exh. 1, citing Mark E. Warren, *What Does Corruption Mean in a Democracy?*, 48 Am. J. Pol. Sci. 328-43 (2004) and Dennis F. Thompson, *Ethics in Congress: From Individual to Institutional Corruption* (1995).)  "Large contributions can also lead to increased public perceptions of corruption, which can itself have harmful effects on democracy."  (Wilcox Rept. at 5, FEC Exh. 1 (citing Mark E. Warren, *Democracy and Deceit: Regulating Appearances of Corruption*, 50 Am. J. Pol. Sci. 160-74 (2006) and Robert Y. Shapiro, *Public Attitudes Toward Campaign Finance Practice and Reform* in *Inside the Campaign Finance Battle* (Anthony Corrado et al., eds., 2003)).)

134.    When large contributions are permitted, policymakers have pressured potential donors to give large sums before their issues are addressed by government.  These efforts might be thought of as harassment or "rent seeking" by politicians, but "'whatever the language, the record is replete with fully documented examples from 1972 onward.  This is not about appearances.  The problem is real, it cannot possibly be rooted out with disclosure, and it is stimulated by unlimited contributions.'"  (Wilcox Rept. at 17, FEC Exh. 1 (quoting Michael J. Malbin, *Rethinking the Campaign Finance Agenda*, 6 The Forum, Iss. 1 Art. 3, at 3 (2008)).)

135.    "Contribution limits aim to limit the danger of corruption by limiting the amount that donors can offer to candidates, and that candidates can ask from donors."  (Wilcox Rept. at 5, FEC Exh. 1)

136.     The notion that unlimited contributions to organizations that make independent

expenditures pose a danger of corruption or its appearance is uncontroversial in the political

science field.  "[M]ost people" in the field, were they to review Professor Wilcox's report that

reached this conclusion, would say "[S]o what?  We know that."  (Wilcox Dep. at 319, FEC Exh.

1.)

### 2.     Donors Are Also Willing to Make Large Indirect Contributions to Secure Access and Influence Policymaking.

137.     In general, "[i]ndividuals make contributions to candidates for a variety and

mixture of motives.  Many are 'investors' who give in part or primarily to protect or promote

their business interests. A survey of congressional donors of $1000 or less in 1996 showed that

nearly three in four admit that they give for business reasons at least some of the time, and that

nearly 25% say that they give for business reasons most of the time."  (Wilcox Rept. at 6, FEC

Exh. 1 (citing Peter L. Francia et al., *The Financiers of Congressional Elections: Investors,*

*Ideologues, and Intimates* (2003)).

138.     "These donors are willing to give to any type of entity that will incur the gratitude

of incumbent politicians.  Large donors have in the past given to multiple entities simultaneously

as a way to increase the magnitude of their contributions and the gratitude of politicians."

(Wilcox Rept. at 6, FEC Exh. 1.)  In fact, "[s]ome donors . . . are willing to invest far more

money [than the hard money contribution limit] in order to gain access to politicians or to affect

public policy."  *Id.* The entities they have given to include candidate committees; leadership

PACs sponsored by the same candidate; national, state, and local political parties; and "a variety

of PACs and 527 organizations that help candidates."  *Id.*

139.     "Donors who seek to gain access and influence care primarily that their

contribution is noticed and appreciated, not that it is handled directly by the candidate's

campaign treasurer." (Wilcox Rept. at 6, FEC Exh. 1.)

**3.      The History of Contributions to Party Soft Money Committees Illustrates that Donors Are Willing to Invest Their Contributions Indirectly and Officeholders Seek Such Contributions.**

140.    "Between the mid 1980s and 2002, when soft money contributions were banned through BCRA, individuals gave increasingly large sums to the soft money accounts of political parties. Wealthy donors were repeatedly asked to give, and asked for increasingly large contributions in settings which guaranteed donors access to make policy arguments.  These contributions were not made to specific candidates, but . . . these contributions clearly gave donors special access to policymakers, and . . . created the appearance and reality of undue influence over policymakers as well." (Wilcox Rept. at 6-7, FEC Exh. 1.)

141.    "Because there was no legal limit on the size of soft-money contributions, it was far easier for party leaders to raise soft money than hard money. . . .  It took a few years for party leaders to understand and fully use the soft money system; in the early years the amount raised increased gradually, but by the late 1990s the growth was explosive." (Wilcox Rept. at 7, FEC Exh. 1).

142.    "Parties quickly became increasingly dependent on this easy money.  Between 1992 and 2002, total Democratic soft money increased from $46 million to more than $246 million, while total Republican soft money increased from $64 million to $250 million." (Wilcox Rept. at 7, FEC Exh. 1).

143.    "The rapid growth of soft money was the result of active and persistent solicitation by policymakers and their agents, and by party officials." (Wilcox Rept. at 7, FEC Exh. 1.)  As explained by Gerald Greenwald, the chairman emeritus of United Airlines, corporations and unions gave soft money because "'experience has taught that the consequences

of failing to contribute (or to contribute enough) may be very negative.'" (Wilcox Rept. at 7,
FEC Exh. 1 (quoting Gerald Greenwald, *Corporate America Contributes Soft Money Under
Pressure*, in *Inside the Campaign Finance Battle* (Anthony Corrado ed., 2003)).)  "Corporate
executives complained in the late 1990s at the repeated and escalating requests for contributions .
. . ."  (Wilcox Rept. at 7, FEC Exh. 1.)

144.     Much of the party soft money came from very large contributions by individuals.
"In 2002 more than 365 individuals gave at least $120,000 apiece in soft money."  (Wilcox Rept.
at 7, FEC Exh. 1.)  "In many cases they did so because they were explicitly promised greater
access to policymakers if they gave.  In 1996 for example the Democratic National Committee
offered a membership category of 'Executive Committee' to soft money donors of $100,000 or
more, and promised opportunities to meet with party officials and exchange views with
policymakers.  The Republican National Committee made a similar promise to those who gave
$100,000 – and called them 'Team 100.'"  (Wilcox Rept. at 7, FEC Exh. 1 (citing Mark J. Rozell
and Clyde Wilcox, *Interest groups in American Campaigns: the New Face of Electioneering*
(1999)).)

145.     "Soft money was raised in circumstances where its connection with access was
explicit. The Clinton campaign raised soft money in intimate White House coffees and
congressional Republicans held soft money fundraisers before they marked up legislation of
interest to various industries.  The money was often spent to benefit particular candidates, but
even candidates who did not benefit directly from soft money spending in their particular races
were grateful for the impact of these funds on their party's overall fortunes. Policymakers have
greater influence when their party is in the majority, and thus appreciate contributions that help
those few party candidates who are involved in close elections to win. Party leaders reminded all

members of the caucus which individuals and groups had made large soft money contributions."
(Wilcox Rept. at 7 , FEC Exh. 1.)

146.    As former Senator Alan Simpson explained, "'Often, donors would give large
sums of soft money to attend events with elected officials. . . .  Party leaders would inform
Members at caucus meetings who the big donors were. . . .  At these events, it was not
uncommon for the donors to mention certain legislation that affected them.'"  (Wilcox Rept. at 7,
FEC Exh. 1.)

147.    "Businessman Roger Tamraz contributed repeatedly to national and state
Democratic Party soft money committees [including $300,000 in 1996], and noted 'It's the only
reason -- to get access.'  Tamraz did not ultimately prevail in his efforts to win U.S. approval of
his oil pipeline project, but proclaimed that 'I think next time I'll give $600,000.'  What Tamraz
did get, however, was both repeated solicitations for additional gifts, and unusual access to
policymakers.  There are countless other examples of large soft money donors who received
special access to policymakers."  (Wilcox Rept. at 8, , FEC Exh. 1; *see also* David Rosenbaum,
*Campaign Finance: The Hearings; Oilman Says He Paid For Access by Giving Democrats*
*$300,000*, N.Y. Times, Sept. 19, 1997, FEC Exh. 57.)

148.    "Thus unlimited soft money contributions allowed some 'investors' to make very
large contributions, and to gain access to policymakers – even though the contribution was not
made directly to the candidate."  (Wilcox Rept. at 8, FEC Exh. 1.)

149.    "[T]he history of soft money contributions shows that donors who seek access
give money not only directly to candidates, but also to other organizations that will help the
candidates."  (Wilcox Rept. at 8; *see supra* Facts 140-148).

### 4. Donors Seeking Access and Influence Give to Non-Party Organizations As Well.

150. "Large donors seeking to establish relationships with policymakers have also historically given large contributions to non-party committees which are working to help candidates win election[s]." (Wilcox Rept. at 8, FEC Exh. 1.) Because donors were not in the past allowed to make large contributions to express advocacy political committees, "they have in the past made contributions to 501(c) and 527 organizations which aid candidates. . . . [T]hese precedents . . . suggest the likely development of large contributions to [groups making independent expenditures] if unlimited contributions were permitted for these groups." (*Id.*)

151. A past example of the danger from large electoral contributions to 501(c) nonprofit organizations is the past activity of Charles Keating, a banker whose support for several U.S. Senators — through direct contributions, bundled contributions from friends and colleagues, and through a contribution to a voter mobilization organization — led to a broad investigation and in some cases Senate sanctions. (Wilcox Rept. at 8, FEC Exh. 1). "Keating hoped that these Senators would help him defeat new rules prohibiting direct investments by savings and loans." (Wilcox Rept. at 8, FEC Exh. 1.) "He made the motives for his financial contributions clear when he proclaimed that 'One recent question, among others raised in recent weeks, had to do with whether my financial support in any way influenced several political figures to take up my cause. I want to say in the most forceful way I can: I certainly hope so.'" (Wilcox Rept. at 8, FEC Exh. 1.)

152. "Keating's largest contribution was to a nonprofit organization headed by Alan Cranston's son, which was created to mobilize Democratic voters to help Cranston win his next Senate election. Cranston acknowledged the connection between this indirect contribution and

Keating's request for policy intervention, when he patted Mr. Keating on the back at a dinner at

the Belair Hotel and said 'Ah, the mutual aid society.'" (Wilcox Rept. at 8, FEC Exh. 1.)

153.    "Clearly this contribution to a 501(c) organization was intended as an indirect

contribution to Senator Cranston, who valued this contribution as a way to improve his chances

of reelection.  Cranston's chief fundraiser discussed with Keating both his contributions and

possible regulatory relief in the same conversations.  The Senate ethics committee treated

Cranston's behavior as the most serious offense of the Keating Five."  (Wilcox Rept. at 8, FEC

Exh. 1.)

154.    Even more striking was the recent massive increase in contributions has been the

amazing rise in contributions to 527 that formed to affect federal election but did not register as

political committees with the FEC.  As former Senate Majority Leader Tom Daschle has

explained, "[t]here is no question that people use them as a way around contribution limits — it

is a loophole the size of the Washington monument. . . .  Some of the contributors to these

independent expenditure campaigns are clearly avoiding contribution limits in order to gain

access or to influence policy making."  (Wilcox Rept. at 8, FEC Exh. 1.)

155.    As observed by news reports after the 2004 election concluded, " [t]he so-called

527 committees, with the ability to raise unlimited soft money contributions, played a huge role

in the elections for both Republicans and Democrats. … The organizations raised hundreds of

millions of dollars, tapping a long list of wealthy partisan contributors for money and, in the

process, prompting major battles over their legality. They focused tightly on about a dozen swing

states, running a blizzard of television commercials and employing legions of campaign

workers."  (Glen Justice, *Advocacy Groups Reflect on Their Role in the Election,* N.Y. Times,

Nov. 5, 2005, FEC Exh. 111).

156.     In some cases, the "organizations" that undertake supportive candidate spending are "mere vehicles for large contributions to aid candidates."  (Wilcox Rept. at 9, FEC Exh. 1.) "For example, in 2000 'Republicans for Clean Air' ran television advertisements designed to help George Bush defeat John McCain in the New York primary.  The group had no mailing address or phone number, merely a post office box. It was primarily a vehicle for two Texas donors who had already contributed the maximum allowed under the law to further aid the Bush campaign."  (*Id.*)

157.     Similar to soft money donations to political party committees, contributions for "candidate-focused issue advocacy campaigns have given individual donors a mechanism to avoid contribution limits."  (Wilcox Rept. at 11, FEC Exh. 1.)  With the passage of BCRA, the money flowing through federal 527s rose significantly — up from $151 million in 2002 to $424 million in 2004.  (*The Election After Reform, Money Politics and the Bipartisan Campaign Reform Act,* (Michael J. Malbin ed. 2006) (excerpts, Chapter 5, Weissman & Hassan and Ch. 6, Boatright, Malbin, Rozell, and Wilcox) (hereinafter, "Weissman & Hassan") at 81, FEC Exh. 55).  Contributions of $5000 or more to those 527s accounted for all but approximately $16 million of the $151 million raised in 2002 and all but approximately $15 million of the $405 million received in 2004.  (Weissman and Hassan at 90, FEC Exh. 55.)  Despite the addition of approximately 50% more donors (1,232 to 1,887), the average donation increased from approximately $30,000 to $136,000, more than four times as high.  (*Id.* at 92.)

158.     Data on contributions to 527 organizations from the two full election cycles since the soft money ban went into effect "show that some donors give far more than they are permitted through hard money limits, and it is clear that they did so to influence election outcomes."  (Wilcox Rept. at 11, FEC Exh. 55.)

159.    "In the 2004 election cycle, 113 individuals contributed at least $250,000 to 527

groups; 2/3 of these had previously given substantial sums of party soft money." (Wilcox Rept.

at 11.) Those 113 individuals provided more than $207 million to 527 groups." (Weissman &

Hassan at 93, FEC Exh. 55). Twenty-four individuals gave over $2 million apiece to 527 groups,

totaling more than $142 million." *Id.* This was 56 % of the funds 527s received from

individuals. (SpeechNow.org Response to FEC Request for Admission 10, FEC Exh. 106 at 14.)

Overall, individuals associated with the business community gave more to 527s in 2004 than

they had given in party soft money in 2000, although the giving was more concentrated and

centered outside of the large publicly traded corporations." (Wilcox Rept. at 11, FEC Exh. 1

(citing Robert Boatright et al., *Interest Groups and Advocacy Organizations After BCRA*, in *The

Election After Reform* (2006), 119).)

160.    Two individuals – George Soros and Peter Lewis – by themselves each

contributed over $20 million to 527 organizations during the 2004 election cycle.

(SpeechNow.org Response to FEC Request for Admission 11, FEC Exh. 106 at 15.)

161.    In the 2006 midterm election, total individual contributions to 527 organizations

were predictably lower than in a presidential election, but 51 individuals gave more than

$200,000 or more to 527s. (Stephen R. Weissman and Kara D. Ryan, *Soft Money in the 2006

Election and the Outlook for 2008/The Changing Nonprofits Landscape*, at 22-23 (Campaign

Finance Institute Report 2007), (hereinafter "Weissman and Ryan") FEC Exh. 58.) "Nearly half

of total contributions — $53 million — came from 104 individual $100,000+ donors, mainly

from 15 individuals who gave between $600,000 and $9.75 million." (Weissman and Ryan at 2,

FEC Exh. 58.) Donors of more than $100,000 also "gave a median $75,000 to federal

committees in 2006, so their contributions to these 527 organizations served to supplement hard

money contributions and allowed them to contribute beyond the legal hard money limit."
(Wilcox Rept. at 11, FEC Exh. 1; Weissman and Ryan at 2, FEC Exh. 58.)

162.     Ultimately, at least ten 527 groups have been found to have violated FECA during
the 2004 election by operating, in whole or in part, outside of the rules applicable to political
committees.  (See, e.g., FEC Conciliation Agreements with Swift Boat Veterans and POWs for
Truth (MURs 5511, 5525) (Dec. 2006); Progress for America Voter Fund (MUR 5487 (Feb.
2007); The Media Fund (MUR 5440) (Nov. 2007); America Coming Together (MURs 5403,
5466) (Aug. 2007), available at http://eqs.nictusa.com/eqs/searcheqs, *see also* S. Simpson Decl.,
Exhs. 4-9)

### 5.     Contributions to Groups that Make Independent Expenditures Can Lead to Corruption in the Same Way as Direct and Other Kinds of Indirect Contributions.

163.     Large contributions to groups whose principal purpose is to make independent
expenditures have a similar potential for corruption as large direct contributions to candidates.
(Wilcox Rept. at 5, FEC Exh. 1; *see infra* Sections B(1)-B(4).)

164.     Large contributions to groups making independent expenditures "can be
conceived as indirect contributions – instead of giving the money directly to the candidate's
campaign committee, they are given to an independent committee that also helps the candidate
win."  (Wilcox Rept. at 5, FEC Exh. 1.)

165.     "The danger of large campaign contributions comes not from the fact that the
candidate's campaign treasurer uses the money directly to pay for campaign expenses – it comes
from the ability of the contribution to help the candidate win election."  (Wilcox Rept. at 5, FEC
Exh. 1.)  Large contributions raise concerns about corruption, whether the recipient is a
candidate, a party, or an independent group.  "[A] large amount of money that helps the

candidate win the election . . . creates the possibility of corruption [] whether it's given directly to the candidate, whether you give it to the party first.  It doesn't matter who cashes the check.  It matters whether the money is spent to help elect the candidate."  (Wilcox Dep. at 176-77, FEC Exh. 1).

166.    Because "[i]ndependent expenditure spending can help a candidate as surely as a direct contribution," it has a similar "potential for evoking gratitude and special favors." (Wilcox Rept. at 5, FEC Exh. 1.)

167.    As Michael J. Malbin, Executive Director of the Campaign Finance Institute, testified before the Senate Committee on Rules and Administration: "With almost all of the 527s associating themselves with the two major parties and their candidates, and with the great majority of contributions coming from donors giving in the millions, rather than thousands or even tens of thousands of dollars, big 527 donors today are positioned to garner more attention and consideration from parties and candidates than those who give the maximum direct contribution of $2,000-$25,000." (Senate Committee on Rules and Administration, Hearing to Examine and Discuss S.271, a Bill Which Reforms the Regulatory and Reporting Structure of Organizations Registered Under Section 527 of the Internal Revenue Code,  109th Cong. (March 8, 2005) (written testimony of Michael J. Malbin, Executive Director of the Campaign Finance Institute) (available at http://rules.senate.gov/hearings/2005/MalbinTestimony.pdf), FEC Exh. 116.)

>    **6.    Unregulated Contributions to Groups that Make Independent Expenditures in California Illustrates the Potential for Corruption and Circumvention.**

168.    Contributions to groups that make independent expenditures can be used to circumvent limits on direct contributions to candidates and candidate campaign committees.

Campaign spending in state races in California provides a clear example of this phenomenon. (*See infra* Facts 169-180 .)

169.    The people of California have repeatedly voted to limit the size of contributions and create campaign finance regulations, including the passage of propositions in 1988 and 1996 that sought to limit the size of contributions to candidates.  While the contribution limits enacted in 1996 were tied up in court battles, there were several election cycles without any limits on direct contributions to state candidates in California.  (Johnson Decl. ¶ 4, Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 3, FEC Exh. 47).

170.    In 2000, California voters once again voted to limit the amount of money that individuals can contribute to candidates for state office and candidates' associated parties and political committees.  The new contribution limits applied to legislative candidates during the 2002 election cycle and began to apply to statewide candidates during the 2004 election cycle. The proposition did not, however, create any limitations on contributions to groups that supposedly do not coordinate their spending with candidates, nor did it contain any aggregate annual limit on gifts to this type of group.  (Johnson Decl. ¶ 4, Exh.2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 3, FEC Exh. 47.)

171.    Since candidate contribution limits were imposed in California, independent expenditures have "skyrocketed."  (Johnson Decl. ¶ 5, Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 3, FEC Exh. 47).

172.    In the 2000 legislative races, when there were no limits on contribution to candidates, the total amount of independent expenditures was $376,000.  By 2006, with the candidate limits in place, total independent expenditures on behalf of legislative candidates rose

to $23.48 million.  That is a 6,144% increase in just 6 years.  In the 2002 statewide races, when there were no candidate contribution limits, independent expenditures totaled $526,000.   In 2006, independent expenditures soared to $29.47 million – that is a 5,502% increase in only four years.  In total, there was almost $100 million spent on independent expenditures benefiting candidates for state offices in California.  (Johnson Decl. ¶ 5, FEC Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 8-10, FEC Exh. 47).

173.    The sharp increase in independent expenditure spending, which has followed imposition of candidate contribution limits, represents the spending of persons and groups who previously could seek to influence campaigns by large, direct contributions to candidates. (Johnson Decl. ¶ 5, FEC Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 8-10, FEC Exh. 47).

174.    The amount of contributions to independent expenditure committees that are above what individuals would be able to give directly to the candidates is instructive.  By avoiding contribution limits, the 25 groups making the most independent expenditures in California funneled $61,705,919 into campaigns for state elective office between January 2001 and December 2006 beyond what they could have given directly to the benefited candidates. This includes contributions from individuals to independent expenditure committees, contributions that benefit a specific candidate, that are hundreds of times more than donors would be able to give to the candidate directly.  (Johnson Decl. ¶ 6, FEC Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 41-48, FEC Exh. 47).

175.    Some of the biggest contributions to groups that make independent expenditures in California have come from individuals.  Angelo K. Tsakopoulos and his daughter, Eleni

Tsakopoulos-Kounalakis gave $6,130,000 and $2,570,000, respectively, to "Californians for a Better Government, A Coalition of Firefighters, Deputy Sheriffs, Teachers, Home Builders and Developers."  In total, the Tsakopoulos' contributions amounted to more than 80 % of those received by Californians for Better Government.  Californians for a Better Government only participated in the 2006 Democratic Primary Election and all $9,855,582 spent by the committee was for independent expenditures benefiting one candidate, State Treasurer Phil Angelides.  Mr. Tsakopoulos' contributions to this independent expenditure committee amounted to more than 274 times what he could, and did, contribute to Mr. Angelides directly.  (Johnson Decl. ¶ 7, FEC Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 11-14; FEC Exh. 47.)

176.    Similarly, Reed Hastings, CEO of Netflix, contributed $1 million to an entity for independent expenditures in support of Jack O'Connell should he decide to run for governor. (Johnson Decl. ¶ 9, FEC Exh. 10; Wilcox Rept. at 12, FEC Exh. 1.)

177.    The "explosive growth" in contributions to California entities making independent expenditures shows that such groups became "conduits for large donor contributions designed to create gratitude from candidates, once direct contributions [we]re banned."  (Wilcox Rept. at 12, FEC Exh. 1.)

178.    As Chairman Ross Johnson of the FPPC explains, "faced with [the new] contribution limits, so-called independent expenditures have provided sophisticated, wealthy individuals . . . the means to circumvent these limits and create the appearance of, or gain undue influence on, candidates and officeholders.  A handful of very powerful special interests are putting their money into independent expenditures because they can no longer make unlimited direct contributions.  This is simply thwarting the will of the people.  The people have voted

repeatedly to limit contributions and therefore limit the appearance of corruption or undue influence over state elected officials.  But, because of the dramatic rise in independent expenditures, this has not occurred."  (Johnson Decl. ¶ 6, FEC Exh. 2).  Simply put, "large independent expenditures by very powerful special interest contributors, who prior to the passage of [the new law] would have been contributing directly to candidates[,] have used the device of independent expenditures to avoid those limits on what they could give directly to candidates."  (Johnson Dep. at 45:19-25, FEC Exh. 10)

179.    Jon Coupal, SpeechNow Vice President, Secretary and organizer, has himself contended that a form of *quid pro quo* corruption has occurred as a result of individuals being able to circumvent contribution limits via independent expenditures in California.  He alleged that there was a corrupt relationship between Los Angeles city officeholders and municipal employee unions, writing:

> Local politicians and the public sector have formed an alliance that benefits both. The city is such an excellent provider that it is regarded as "the land of milk and honey" to those seeking public employment. In turn, public employee unions and city workers provide millions of dollars worth of campaign support to their favored candidates in each election cycle — often through independent expenditures to get around the city's campaign contribution limits.

(SpeechNow Response to FEC Request for Admission 9, FEC Exh.106 at 13; Jon Coupal, *Los Angeles the Trendsetter*, Howard Jarvis Taxpayer Ass'n Cal. Commentary, Vol. I, Issue 14, at 1-2 (May 5, 2003), *available at* http://hjta.webcommanders.com/HJTACommentary014.pdf**,** FEC Exh. 119).

180.    In other writings, Coupal further elaborated on independent expenditures as a path for circumvention of contribution limits and how this can lead to undue influence:

> Since the [Los Angeles] has imposed strict contribution limits on direct campaign contributions to candidates, the power and influence of those who can afford to

> run independent expenditure campaigns is compounded.  For public employee
> unions, like the United Firefighters of Los Angeles, this is a great opportunity to
> elect their supporters to positions of power.  A relatively small investment of a
> few hundred thousand dollars can return million in raises when union
> representatives are seated on both sides of the bargaining table.

(Jon Coupal, *Burning Through Taxpayer Dollars,* Howard Jarvis Taxpayers Association:

California Commentary, Vol. 2 Iss. XIII, March 29, 2004, FEC Exh. 118).  Coupal has also

recognized that independent expenditures would allow individuals to circumvent other campaign

finance regulations, publicly financed campaigns for example, stating that "it will just drive the

money elsewhere, like independent expenditures."  (Lisa Vorderbrueggen, *Run a 'clean'*

*campaign, get public funds,* The Contra Cost Times, January 6, 2006 at F4, FEC Exh. 117).

### 7.      People Have Established Independent Groups Devoted to Electing or Defeating a Single Candidate.

181.      Increasing the likelihood that they can be used to circumvent direct contribution

limits, lead to undue influence and access, and create the appearance of corruption, "[s]ome

'groups' have formed for specific races, usually designed to hide the identity of the individuals

spending the money."  (Wilcox Rept. at 29 n.12, FEC Exh. 1.)

182.      In California, for example, there are more and more candidate-specific

independent groups being set up, such as "California Citizens for John Doe."  They are also

being created earlier and earlier.  According to FPPC Chairman Ross Johnson, "[t]hey may

spend more than the candidates themselves, and they send a very clear and early signal to the

candidates who will be benefiting.  That message could make the candidate more inclined to

support the people behind the independent expenditure committee.   Candidates are grateful for

independent expenditures."  (Johnson Decl. ¶ 11, FEC Exh. 2; FPPC, *Independent Expenditures:*

*The Giant Gorilla in Campaign Finance*, June 2008, FEC Exh. 47).

183.     As another state example, in 2004, an organization called "And for the Sake of the Kids" was established solely to defeat West Virginia Supreme Court Justice Warren McGraw. The CEO of a coal company which had on appeal to the court a $50 million verdict against it provided almost 70% of the $3.6 million raised by the group in its independent efforts to defeat Justice McGraw.  (*See infra* Section I(1).)

184.     On the federal level, a number of the 527s that were active in 2004 essentially existed solely to advocate for the election or defeat of either George Bush or John Kerry.  (See, e.g., FEC Conciliation Agreements with Swift Boat Veterans and POWs for Truth (MURs 5511, 5525) (Dec. 2006); Progress for America Voter Fund (MUR 5487 (Feb. 2007), available at http://eqs.nictusa.com/eqs/searcheqs; *see also, e.g.,* S. Simpson Decl., Exhs. 4-9)

**C.     Candidates Are Usually Aware of the Identity of Individuals Making Large Contributions to Fund Independent Expenditures**

185.     According to Professor Wilcox, who has spent more than two decades speaking regularly with candidates, campaign managers and consultants, candidates care a great deal about who is spending money for or against them.  "I never heard anyone, a pollster, a campaign manager, campaign consultant or candidate ever say, 'You know what?  There was a big independent expenditure in my district and we don't know who it was and we don't care.'" (Wilcox Dep. at 118-19, FEC Exh. 18.)

186.     "Candidates usually know, or are able to discover who is funding independent spending campaigns."  (Wilcox Rept. at 18, FEC Exh. 1.).  *See also* SpeechNow.org Response to FEC Request for Admission 4, FEC Exh. 24 at 10-11 (Candidates are able to learn the identities of publicly disclosed individuals who made contributions to entities that make independent expenditures.)

187.     As explained by veteran lobbyist Robert Rozen, Members and candidates would not only find independent spending financed with unlimited contributions useful to their campaigns, but they "would be very aware of who the large contributors to independent candidate groups are, regardless of whether the spending was coordinated within the legal definition of that term."  (Rozen Decl. ¶ 16, FEC Exh. 3.)

188.     According to Ross Johnson, Chairman of the California Fair Political Practices Commission and longtime California legislator, "[t]o presume that the only way to unduly influence a candidate is to actually hand him or her a check is absurd.  Candidates are not oblivious.  They know who got them elected.  Candidates are well aware of independent expenditures on their behalf, and everyone else on the inside of the political process is aware of it, too. There are frequently conversations among political insiders about who is contributing, who is making independent expenditures – that a particular association will be making an independent expenditure for a particular candidate, for example."  (Johnson Decl. ¶ 11, FEC Exh. 2.).  "Candidates don't live in caves."  (Johnson Dep. at 46:9-10, FEC Exh.10.).

189.     SpeechNow's by-laws do not prohibit SpeechNow's members and donors from making candidates and officeholders aware of independent expenditures SpeechNow has run. (SpeechNow Response to FEC Req. for Admission 5, FEC Exh. 24 at 11-12.)

190.     Candidates and party activists have for a long time carefully learned who gives to their campaigns and those of their opponents.  They have gotten more organized over time, even tracking who solicited contributions so that they could be properly credited.  (Wilcox Rept. at 18, FEC Exh. 1.)

191.     Both parties have also tracked the records of political contributions of lobbyists. "The Republican K Street Project involved in part collecting records of the contributions of

lobbyists and sharing them with the chairs of congressional committees where that lobbyist

might have business."  (Wilcox Rept. at 18, FEC Exh. 1 (citation omitted).)  Congressman

Thomas Davis, then-chair of the National Republican Congressional Committee, "predicted that

committee chairs would be anxious to examine a copy, noting that contributions to the wrong

party can 'buy you enemies.'"  (Wilcox Rept. at 18, FEC Exh. 1 (citation omitted).)  Democrats

"are similarly keeping track of contributions of lobbyists now that they have regained majority

control."  (Wilcox Rept. at 18, FEC Exh. 1 (citation omitted).)

192.    "In the tightly networked political environment of Washington, the identity of

those who contribute to independent expenditures and issue advocacy is broadly known.  The

people who solicit large contributions for these efforts are former or current party officials,

former officeholders, and others who can easily keep score."  (Wilcox Rept. at 18, FEC Exh. 1.)

As noted below, (*see* Fact 260), "Ellen Malcolm and Harold Ickes reassured donors that 'they

know and appreciate us and contributions are part of the public record and they are aware.'"

(Wilcox Rept. at 18, FEC Exh. 1.)

193.    "Donors have the capacity to signal to candidates and party leaders that they have

given to independent campaigns – they do not want this to be a secret.  Individual donors who

hope that their contribution will increase their influence on the policy process will gladly tell

candidates and party leaders of their contributions to groups that have helped the candidate, or of

their role in establishing these groups.  Thus donors who wish to contribute to create influence

will be anxious to claim credit, and members will be grateful for the help."  (Wilcox Rept. at 19,

FEC Exh. 1.)

194.    For example, two individuals provided more than 80% of the nearly $10,000,000

spent by Californians for Better Government on behalf of California State Treasurer Phil

Angelides. In some cases these expenditures are officially made by candidate-specific

independent expenditure committees.  Candidates are aware of, and grateful, these large indirect

contributions to aid their campaigns.  (Wilcox Rept. at 12, FEC Exh. 1.)

195.    Before BCRA, donors were specifically asked to contribute to independent groups

by federal candidates and their campaigns.  As Robert W. Hickmott, senior vice president at a

lobbying firm and former employee of the DNC and DSCC, explained at the time, "Once you

have helped a federal candidate by contributing hard money … you are sometimes asked to do

more for the candidate…[by giving to] an outside group planning on doing independent

expenditure or issue advertisements to help the candidate's campaign."  (Wilcox Rept. at 13,

FEC Exh. 1 (citing Robert W. Hickmott, *Large Contributions Given to Influence Legislation*, in

*Inside the Campaign Finance Battle* (2003)) (Mr. Hickmott's declaration from McConnell is

attached as FEC Exh. .).  Although candidates themselves are no longer permitted to solicit

donations of unlimited amounts for candidate-focused issue advocacy campaigns, "access-

seeking donors" have continued to be solicited "by a network of partisan activists, consultants,

and lobbyists" who have "directed them to the most effective committees."  (Wilcox Rept. at 13,

FEC Exh. 1.)

196.    "It is certain that if large contributions are allowed to fund groups whose principal

purpose is independent expenditures, access-seeking donors will be directed to make large

contributions to the most effective of these committees."  (Wilcox Rept. at 13, FEC Exh. 1.)

197.    The typically dense web of relations between independent expenditure groups and

candidates and parties ensures that the candidate knows of the help provided by the groups and

that their efforts are helpful.  Although in many cases their activities do not meet the standard for

"coordination" under the law, groups that make independent expenditures are often financed,

organized, and operated by individuals with strong connections to candidate campaigns and political parties.  (*See supra* Section A(3)-(4), *infra* Facts 198-203.)

198.    As one example, the Swift Boat Vets received the bulk of its initial financing from two men with close ties to President George W. Bush and his family: one, Bob J. Perry, was a longtime political associate of Karl Rove, Bush's chief political aide; the other, Harlan Crow, was a trustee of the foundation for Mr. Bush's father's presidential library.  Mr. Rove made a statement that he and Mr. Perry were longtime friends but had not spoken for a year before the 2004 election.  Mr. Perry contributed $200,000 in initial funding to the Swift Boat Veterans for Truth and ultimately gave $4,350,000 to the group.  Mr. Crow was one of the largest donors to Republicans in Texas and had given money to President Bush and his father throughout their careers.  Mr. Crow was also law partners with Margaret Wilson, who became Bush's general counsel when he was governor and then served as deputy counsel for the Department of Commerce when George W. Bush became president.  (Kate Zernike and Jim Rutenberg, *Friendly Fire: the Birth of an Attack on Kerry*, N.Y. Times, Aug. 20, 2004, FEC Exh. 60.).

199.    As the Swift Boat Vets grew, many other longtime supporters and contributors to President George W. Bush came together to fund the group.  As summarized in press reports: "The largest contributor was T. Boone Pickens, a famous Texas oilman and longtime Republican supporter who was a major political backer of Mr. Bush's father, who gave $500,000 to the Swift boat group.  Audrey McClendon, chief executive of Chesapeake Energy in Oklahoma, gave $250,000; … and Albert Huddleston, a Texas energy executive who raised money for Mr. Bush, gave $100,000, records show.  Sam Wyly, the wealthy Texas entrepreneur who financed commercials attacking Senator John McCain in the 2000 Republican primary against Mr. Bush,

also made the list at $10,000, as did his brother Charles, records show.  At least two Swift boat

donors are also listed as Bush Pioneers, meaning they raised at least $100,000 for Bush."  (Glen

Justice and Eric Lichtblau, *Bush Backers Donate Heavily to Veteran Ads*, N.Y. Times, Sept. 11,

2004, FEC Exh. 61 ).

200.    In addition to the aid it received from its contributors, Swift Boat Vets was helped

in its operations by individuals with connections to President Bush.  For example, Merrie Spaeth,

a public relations executive, helped coordinate the efforts of the group.  Previously, Ms. Spaeth

was spokeswoman for Republicans for Clean Air, the group that ran negative ads against Senator

John McCain when he challenged President Bush in the 2000 Republican primary.  (Kate

Zernike and Jim Rutenberg, *Friendly Fire: the Birth of an Attack on Kerry,* N.Y. Times, Aug.

20, 2004, FEC Exh. 60.).  Additionally, President Bush's "top outside lawyer" during the 2004

election had to resign after acknowledging that he had been working with the Swift Boat Vets.

(Glen Justice and Jim Rutenberg, *Advocacy Groups and Campaigns: An Uneasy Shuttle*, N.Y.

Times, Sept. 8, 2004, FEC Exh. 62).  Republican Representative Christopher Shays described the

overlap of people working for campaigns and groups that make independent expenditures as

follows: "This smells – it smells real bad.  It shouldn't be happening.  There shouldn't be all this

back-and-forth going on. It smacks of coordination and there's no good reason for it."  (*Id.*)

201.    Three of the groups found to have violated FECA during the 2004 election cycle

— The Media Fund, America Coming Together, and the Progress for America Voter Fund —

were known for their close ties to either the Democratic or Republican Party and spent

approximately $166 million, which was more than 40% of all 527 expenditures that year.

(Weissman & Hassan at 104-05, FEC Exh. 55.)

202.    Another example of the revolving door of individuals working directly for candidates' campaigns and groups that make independent expenditures is for former White House Chief of Staff, Karl Rove.  As reported in the National Journal, Rove advises Freedom Watch, an independent conservative group set up to counter MoveOn.org, as well as other groups and major Republican donor Sheldon Adelson: "No longer constrained by his role as President Bush's top political adviser, Rove has been talking to Republican donors, including Adelson, and strategists about options for setting up independent groups this election cycle that could spend millions of dollars on issue ads in the presidential contest and congressional races. [One] GOP consultant adds that Rove is now involved 'up to his eyeballs' in discussions about 'who is going to do the presidential, who is going to do the Senate, and who is going to do the House.'"  (Peter H. Stone, *Betting Man*, Nat'l J., May 10, 2008, FEC Exh. 63.).

**D.      Candidates Feel Indebted, Grateful, or Are Inappropriately Disposed to Favor Individuals Who Paid for Such Ads or Independent Expenditures.**

203.    "Because independent expenditures help candidates win elections, it stands to reason that candidates are grateful for the help."  (Wilcox Rept. at 18, FEC Exh. 1.)

204.    Giving to independent groups is similar to giving to political party committees during the soft money era, with similar detrimental effect.  (Rozen Decl. ¶ 15, FEC Exh. 3.)

205.    Robert Rozen, long-time Washington lobbyist and former staffer to Senators Wendell Ford and George Mitchell, witnessed first-hand the noxious effects of the soft money system on the legislative process.  "The soft money system allowed big money from private interests to get into the federal election system.  The system worked in a very pernicious way that undermined public trust.  The general public did not even begin to understand the degree to which moneyed private interests were able to influence public policy through their campaign

contributions.  The sense of obligation created by large contributions naturally led legislators to

be more responsive to those donors."  (Rozen Decl. ¶ 14, FEC Exh. 3.)

206.    Permitting unlimited contributions to non-party independent groups would have a

similar effect.  "While some contributors give for ideological reasons, other contributors to

independent groups give for economic reasons.  Giving to groups that help get candidates elected

puts the contributor in a position to exert influence because of the sense of obligation that a

candidate naturally feels to their political benefactor."  (Rozen Decl. ¶ 14, FEC Exh. 3.)

207.    "Loosening the federal campaign finance rules so that groups devoted to

independent candidate advocacy could raise money in unlimited amounts would foster most of

the pernicious effects of the soft money system.  There are a lot of ways to get things done when

business and politics mix. Giving to such groups would become just another way for some

individuals to further their economic interests and permit them to influence public policy.  As

with soft money to political parties, you would likely see some economic interests giving both to

groups supporting Democratic Party candidates and to groups supporting Republican Party

candidates. . . .  There would be a difference in that the contributor would be one step removed in

the sense that Members would not be raising the money themselves.  It would be naïve, however,

to think that allowing such contributions would not undermine public trust and allow moneyed

private interests to shape public policy."  (Rozen Decl. ¶ 16, FEC Exh. 3.)

208.    "'[C]andidates know who gives to independent expenditure groups, and those

who benefit from those expenditures are grateful. In the current 'team sport' approach to

campaigns, there is an implicit division of labor so that independent groups can do the most

hard-hitting, negative attacks, allowing the candidate to stand apart, and above them.  This only

furthers the candidate's appreciation for the independent expenditures.'"  (Wilcox Rept. at 18, FEC Exh. 1 (quoting political science professor David Magleby).)

209.    As Democratic consultant Terry Beckett explains, "[o]f course candidates often appreciate the help that these interest groups can provide, such as running attack ads for which the candidate has no responsibility."  (Beckett Decl., *McConnell*, ¶ 16, FEC Exh. 35; *see also* Wilcox Rept. at 19, FEC Exh. 1.)

210.    According to Democratic consultant Joe Lamson, "if you are in a close race and there are interest groups out there helping you with things like broadcast 'issue ads,' you usually appreciate the support."  (Lamson Decl., *McConnell*, ¶ 19, FEC Exh. 34; *see also* Wilcox Rept. at 19, FEC Exh. 1.)

211.    As former Senator Dale Bumpers put it, "[c]andidates whose campaigns benefit from these ads greatly appreciate the help of these groups.  In fact, Members will also be more favorably disposed to those who finance these groups when they later seek access to discuss pending legislation."  (Bumpers Decl., McConnell, ¶ 27, FEC Exh. 64; *see also* Wilcox Rept. at 19, FEC Exh. 1.)

212.    As explained by former Senator Alan Simpson, "[t]hese ads are very effective in influencing the outcome of elections, and the people who admit to running these ads will later remind Members of how the ads helped get them elected. Members realize how effective these ads are, and they may well express their gratitude to the individuals and groups who run them." (A. Simpson Decl. ¶ 13, *McConnell*, FEC Exh. 65; *see also* Wilcox Rept. at 19, FEC Exh. 1.)

213.    Republican consultant Rocky Pennington testified, "[U]sually the ads are helpful and candidates appreciate them."  (Pennington Decl. ¶ 11, *McConnell*, FEC Exh. 33; *see also* Wilcox Rept. at 19, FEC Exh. 1.)

214.     Elaine Bloom, a congressional candidate in 2000, "appreciated" the ads that were run by interest groups in her race.  (Bloom Decl. ¶17,  *McConnell*, FEC Exh. 36; *see also* Wilcox Rept. at 19, FEC Exh. 1.)

215.     "Candidates see these independent ads as equivalent of contributions – very large contributions."  (Wilcox Rept. at 20, FEC Exh. 1.)  As former Montana Representative Pat Williams explains, party and outside interest advertisements "can be the functional equivalent of a campaign contribution."  (Williams Decl. ¶ 8, *McConnell*, FEC Exh. 67; *see also* Wilcox Rept. at 20, FEC Exh. 1.)

216.     "Candidates are grateful for independent expenditures.  The notion that campaign funds must be given directly to candidates before they feel obligated to a major financial backer is, simply, not true. … It would be unreasonable to conclude that direct contributions are the only way to gain influence or that only direct contributions pose a danger of corruption."  (Johnson Decl. ¶ 11, FEC Exh. 2.).

217.     "Federal candidates appreciate interest group electioneering ads like those described above that benefit their campaigns, just as they appreciate large donations that help their campaigns."  (Chapin Decl. ¶ 16, *McConnell*, FEC Exh. 68; *see also* Wilcox Rept. at 20, FEC Exh. 1).  Former Congressional candidate Linda Chapin testified that she "appreciated the ads run by EMILY's List on my behalf.  In general, candidates in the midst of a hard-fought election like mine appreciate any help that comes their way."  (Chapin Decl. ¶ 16 , *McConnell*, FEC Exh. 68; *see also* Wilcox Rept. at 20, FEC Exh. 1).  EMILY's List had run ads for her based on gun safety issues, which was not an issue of concern to the organization, in order to help her campaign.  (Chapin Decl. ¶ 13, *McConnell*, FEC Exh. ); *see also* Wilcox Rept. at 20, FEC Exh. 1).

218.     The National Federation of Independent Business spent $100,000 to help

Congressman Randy Forbes win a special election for Congress in Virginia in 2001, primarily

through radio ads.  Forbes called NFIB President Jack Farris "to thank him, saying 'If it hadn't

been for your people, I wouldn't have won.'"  (Wilcox Rept. at 19, FEC Exh. 1 (citation

omitted).)

219.     "Of course, a few scattered independent expenditure campaigns may be less

helpful, but donors seeking access and influence can easily find advice on where to invest their

money.  This is why the networks of party activists were important to the 527 efforts in 2004,

why Bill Clinton helped reassure donors that their money would go to good effect.  More

recently, Democratic activists have formed the Democracy Alliance to screen and certify groups

that are engaged in official or unofficial electioneering, thereby vetting these groups for donors."

(Wilcox Rept. at 18, FEC Exh. 1 (citing David B. Magleby and Kelly D. Patterson, *War Games:*

*Issues and Resources in the Battle for Control of Congress*, in *Center for the Study of Elections*

*and Democracy Report* (2007)).)

220.     "Donors seeking to maximize the gratitude or obligation of an incumbent can

easily find activists in the web of consultants and party activists to help direct their contributions

to the types of independent spending most likely to be effective. Thus a careful donor could

make their contributions almost always valuable to the candidate."  (Wilcox Rept. at 20, FEC

Exh. 1.)

> **1.     Unlimited Contributions to Independent Expenditure Groups Are**
> **More Likely to Lead to Corruption than Direct Candidate**
> **Contributions Under the Legal Limits.**

221.     The potential for contributions to groups that make independent expenditures to

lead to undue influence over elected officials, quid pro quo arrangements, corruption, and the

appearance thereof, is often greater than with direct contributions because of the extreme size of the potential contributions.  (*See infra* (the next few facts).)

222.   "A large contribution to an independent-expenditure campaign is always worth more to the candidate than a smaller, regulated contribution to the candidate."  (Wilcox Rept. at 14, FEC Exh. 1.)  As political scientist Michael Bailey explains, "[i]ndependent expenditures almost always benefit a candidate. They are used to mobilize voters or to poison opinion against an opponent. While a candidate would typically prefer to have direct control [of campaign spending], he would almost always prefer [a] $100,000 independent expenditure over a direct contribution of $5,000."  (*Id.*).

223.   "With no limits on contributions to . . . groups [making independent expenditures], individuals could give them far more than $100,000, allowing groups to spend very large sums."  (Wilcox Rept. at 14-15, FEC Exh. 1.)

224.   As Chairman Johnson of the FPPC explained with regard to independent expenditures in California, "[t]he law in California presumes that a contribution directly to a candidate for governor in the 2010 election, it would probably be in the neighborhood of $26,0000, something on that order.  … The law presumes that that has the potential for undue influence or corruption – the appearance of corruption over the candidate[.]  [T]o say that you can give, you know, 30 or 40 times that amount and it doesn't because you don't write the check directly to him, you do it independently is, I think an absurd notion." (Johnson Dep. at 29:23 – 20:6, FEC Exh. 10.)

225.   A good example is the contribution of Reed Hastings, founder of Netflix, in support of State Superintendent of Public Instruction, Jack O'Connell's potential gubernatorial race in 2010 (*see supra* Fact 115).  Mr. Hastings contributed a million dollars to an independent

expenditure group created exclusively to support Mr. O'Connell.  As explained by Chairman Johnson of the FPPC, "[i]t should be obvious that a huge contribution like this has a much greater likelihood of creating the appearance of corruption or gaining undue influence over a candidate than a direct contribution made within the statutory limits."  (Johnson Decl. ¶ 9, FEC Exh. 2.).  Chairman Johnson elaborated as follows: "I would think any reasonable person looking at this would say, you know, the potential for undue influence over Mr. O'Connell is obvious. He doesn't live in a cave.  He reads the same newspapers I do. He knows about this. And the notion that the only way you can exercise undue influence over a candidate or officeholder is by handing them a check directly, I think, is absurd on its face. Now, let me ask you, do you think that if Reed Hastings calls Jack O'Connell this afternoon that Jack will take his call."  (Johnson Dep. at 28:20 – 29:8, FEC Exh. 10.).

## 2. Ad Campaigns Run By Interest Groups Allow Candidates to Conserve Resources and Keep Their Hands Clean.

226.    Ads run by interest groups can be more valuable than a direct contribution to the candidate's campaign because "independent groups can make attacks on opposing candidates that would backfire if directly associated with the candidate."  (Wilcox Rept. at 15, FEC Exh. 1.)

227.    "Terry Dolan, director of the National Conservative Political Action committee (NCPAC) – the first PAC to make substantial independent expenditures in the 1980 Senate campaigns, summed up this advantage succinctly when he said that 'A group like ours could lie through its teeth, and the candidate it helps stays clean.'"  (Wilcox Rept. at 15, FEC Exh. 1.)

228.    "'Because ads from the party and interest groups are not controlled by the candidate, there is a certain amount of plausible deniability – if the ad backfires the candidate can disavow the content and deny responsibility.'"  (Wilcox Rept. at 15, FEC Exh. 1 (quoting David B. Magleby and J. Quin Monson, *The Consequences of Noncandidate Spending, and a*

*Look to the Future* in *The Last Hurrah? Soft Money and Issue Advocacy in the 2002 Congressional Elections* (David B. Magleby et al. eds., 2004)).)

229.    Although candidates often disavow independent expenditures publicly, party insiders or individuals associated with a campaign will just as often call for support from independent groups, or otherwise give their "blessing" to independent expenditure campaigns. (*See infra* (the next few facts).)

230.    As explained by Republican consultant Rocky Pennington, independent ads "allow the candidate to conserve his limited resources and focus them on getting out a positive message about himself.  At the same time, the candidate can disavow the negative ads, saying – with a wink – I didn't know anything about it and I condemn these things.  I think this now happens in virtually every campaign." (Pennington Decl. ¶ 11, *McConnell*, FEC Exh. 33; *see also* Wilcox Rept. at 15, FEC Exh. 1.)

231.    As Stephen Moore, then-President of Club for Growth, observed, candidates tacitly approve negative ads while publicly condemning them.  "527s by law, as I think everyone in this room knows, have to be totally independent.  There can be no quote unquote coordination with the campaign.  We've been involved in campaigns where the campaigns said, 'we really protest that ad that the Club for Growth is running.' The truth is we think it's sort of a wink and a nod."   (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View*, (Kathleen Hall Jamieson ed., 2005), at 207, FEC Exh. 50.).

232.    The Swift Boat Veterans campaign, for example, was "masterful" because the group "delivered a message that the Bush campaign and the RNC could not, and Bush got the best of both worlds because he could decry 527s and benefit from their activities at the same time." Center for the Study of Elections and Democracy, *527s Had a Substantial Impact on the*

*Ground and Air Wars in 2004, Will Return /Swift Boat Veterans 527 Played Historic Role* (Dec. 16, 2004), FEC Exh. 51 (quoting Professor David Magleby).)

233.    In this year's presidential campaign, for example, both candidates at the outset publicly discouraged outside groups from running ads financed through unlimited contributions but it has been reported that they eventually sent more discreet signals to encourage the activity. (*See infra* the next few facts.)

234.    It has been widely reported that Senator John McCain eventually stopped discouraging outside 527s from forming and running ads.  (*See, e.g.*, Hillary Chabot, *'I Can't Be a Referee': Drops 2004 crusade against '527' attack ads*, Boston Herald, June 12, 2008, at 5, FEC Exh. 69; Jim Rutenberg and Michael Luo, *Interest Groups Step Up Efforts in a Tight Race*, N.Y. Times, Sept. 16, 2008, FEC Exh. 70.)

235.    It has also been reported that, after an upturn in 527 organization activity on behalf of Senator McCain and as the election race tightened, the Obama campaign stopped discouraging independent 527s.  Responding to what they believed to be encouraging signals from the Obama campaign, Democratic-leaning independent groups, flush with new donations, unrolled advertising plans to counter the pro-McCain activity.  Aides to both candidates accused the other campaign of illegally coordinating with the independent groups.  (Jim Rutenberg and Michael Luo, *Interest Groups Step Up Efforts in a Tight Race*, N.Y. Times, Sept. 16, 2008, FEC Exh. 70; Marc Ambinder, *Quietly, Obama Campaign Calls in the Cavalry*, Sept. 8, 2008, http://marcambinder.theatlantic.com/archives/2008/09/quietly_obama_campaign_flashes.php, FEC Exh. 71.)

236.    After a year of publicly discouraging groups from making independent expenditures, it was reported that "Obama's strategists have changed their approach.  An Obama

adviser privy to the campaign's internal thinking on the matter says that, with less than two

months before the election and with the realization that Republicans have achieved financial

parity with Democrats, they hope that Democratic allies –what another campaign aide termed

'the cavalry' – will come to Obama's aid.  The Obama campaign can't ask donors to form

outside groups; it can only communicate, through the public and the media, with body language,

tells and hints."   (Marc Ambinder, *Quietly Obama Campaign Calls in the Calvary*, Marc

Ambinder: The Atlantic Monthly, Sept. 9, 2008, available at

http://marcambinder.theatlantic.com/archives/2008/09/quietly_obama_campaign_flashes.php,

FEC Exh. 71.)  Similarly, several sources reported that "top Democratic Party operatives are

privately urging the party's major donors to get serious about putting big money into outside

groups looking to attack John McCain in key battleground states. . . .  The call is just yet another

sign that donors and outside operatives – who had earlier gotten that message from Obama the he

doesn't want such activity – now recognize that Team Obama is privately hoping such efforts

gear up in earnest."  Greg Sargent, *Top Democrats Privately Urging Major Donors to Fund*

*Outside Groups to Attack McCain*, Talking Points Memo, available at

http://tpmelectioncentral.talkingpointsmemo.com/2008/09/top_democrats_privately_urging.php,

Sept. 15, 2008, FEC Exh. 73.).  For example, a "source close to [the Obama] campaign" told a

Democratic-leaning blog that "Senator Barack Obama will start looking the other way when it

comes to the role 527s and other independent groups play in the election."  Sam Stein, *Source:*

*Obama to Start Looking the Other Way on 527s*, Huffington Post, Aug. 11, 2008, available at

http://www.huffingtonpost.com/2008/08/11/source-obama-to-start-loo_n_118240.html, FEC

Exh. 72.)

     237.    After an independent group aired the "Willie Horton" ad during the 1988 election,

(*see supra* Fact 97), the Bush-Quayle campaign began to air an ad the day after the "Horton" ad

went off the air.  "The harsh language and imagery of this independent advertisement allowed

the subsequent Bush-Quayle campaign ad . . . to both remind voters of the strong imagery of the

independent advertisement while appearing to be far more restrained."  (Wilcox Rept. at 15, FEC

Exh. 1.)

238.    "The Swift Boat ads were more effective than a similarly-sized gift to the Bush-

Cheney campaign, because they would have invoked more suspicion if they were paid for by the

campaign."  (Wilcox Rept. at 15, FEC Exh. 1.)

239.    Stephen Moore, Club for Growth's former president, explained the phenomenon.

When asked if "independent groups have freedom to say things . . . that the candidate themselves

cannot say about their opponent," Mr. Moore responded: "Is that a trick question? No that's an

obvious yes. . . .  First of all the answer to your question is clearly yes.  It's much better to allow

the candidates themselves to do positive ads about themselves and an outside group to do a

negative ad.  The rule of thumb is if you're a candidate and if it's an effective negative ad, you'll

drive your opponent's numbers down, but you'll also drive your own numbers down, too.  That's

just the way politics work.  Negative ads can be risky.  So one of the virtues of third party groups

is they can take the collateral hit.  It can be Swift Boat Veterans or Club for Growth that takes

the negative [hit] from running the negative ad, even though it does significant damage to the

candidate."  (Annenberg Public Policy Center, *Electing the President, 2004: The Insiders' View,*

(Kathleen Hall Jamieson ed., 2005), at 203-4, FEC Exh. 50.)

240.    "Thus an indirect contribution to an independent expenditure committee or to an

organization that does candidate-focused issue advocacy can in some cases help a candidate even

more than a direct contribution to the candidate.  In some cases the value may be slightly less

than that of a direct contribution [of an equivalent amount], but far more than the maximum legal

contribution[, a considerably smaller amount].  A careful donor will be able to direct his or her

money to groups that maximally help the candidate."  (Wilcox Rept. at 15-16, FEC Exh. 1.)

3. **The Likelihood of Candidate Indebtedness Increases When the Amounts of Independent Expenditures Are High Relative to Candidate Spending.**

241.   The potential for contributions to groups that make independent expenditures to

lead to undue influence over elected officials is also greater than with direct contributions

because the amounts of independent spending have become so large relative to spending by the

candidates themselves.  (*See infra* Facts 242-247).

242.   The higher the amount spent by a group on a candidate's behalf relative to the

amount spent by the candidate, the more likely it is the candidate would feel grateful to the

group.  (Wilcox Dep. at 294, FEC Exh. 18.)

243.   Several races in California provide striking examples of this reality.  (Johnson

Decl. ¶ 8, FEC Exh. 2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign

Finance*, June 2008, at 23-36; FEC Exh. 47.)

244.   For the first time in California history, seven candidates benefited from

independent expenditures exceeding $1,000,000 in the 2006 elections.  (FPPC, *Independent

Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 49-52, FEC Exh. 47.)

245.   "In many California state legislative elections since the law was changed,

independent expenditures by groups exceed spending by candidates."  (Wilcox Rept. at 12, FEC

Exh. 1; *see also* Wilcox Dep. at 246-47, FEC Exh. 18.)

246.   Independent expenditures have constituted more than 50% of the total amount of

money spent in a number of Californian legislative and state-wide election contents.  The 2006

statewide race for Controller is one example.  The total amount of spending in the race was nearly $9 million.  However, the two candidates only spent $3,176,811 combined. Independent expenditures amounted to 64% of the total spending in the race.  There have been at least 14 other California races since 2002 where independent expenditures have similarly dwarfed regulated spending.  (Johnson Decl. ¶ 8, FEC Exh.2; FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 23-36, FEC Exh. 47.)

247.    The $142 million given to 527s in 2004 by the top 24 individual donors 'is roughly equal to the aggregate of $149.2 million in public funds provided to the two presidential nominees for the general election campaign.'" (Press Release, FEC, *2004 Presidential Campaign Financial Activity Summary,* Feb. 3, 2005, *available at* http://www.fec.gov/press/press2005/20050203pressum/20050203pressum.html.)

**E.     Large Donations Are a Tool Used By Donors Seeking Access and Influence Over Candidates.**

248.    As with party soft money contributions, contributions to 527s was "solicited by partisan activists who reassured donors that their contributions would be appreciated by party officials and policymakers."  This was achieved through "a network of partisan activists and consultants" who "created a significant number of 527 organizations in the 2000s."  (Wilcox Rept. at 9, FEC Exh. 1; *see infra* Facts 249 - 266.)

249.    "Although technically many of these groups claimed not to have sought to elect or defeat particular candidates, this is a polite fiction.  During a press event at the Center for the Study of Elections and Democracy at Brigham Young University, Harold Ickes noted that 'I wasn't in this to either elect or defeat anybody.  I want to make that very clear – for those of you out there with subpoenas.' The transcript then notes that this claim was greeted with laughter." (Wilcox Rept. at 11, FEC Exh. 1 (citation omitted).)  The Commission ultimately concluded that

the predominant 527s in 2004 had the major purpose of electing federal candidates.  (S. Simpson

Decl. (Doc. 2-9 & 2-10), Simpson Exhs. 4-9).

250.   "[B]oth before and after November 6, 2002, the parties, the Bush campaign, and

their close associates were at times complicit in, and actively facilitated, the rise of 527s.  They

acted through:

- Permissiveness toward the activism of paid consultants with high standing and identification in both parties
- The fundraising clout of a former president (Bill Clinton) who was closely linked with his party's national committee and presidential candidate, and
- Various official winks and nods."

(Wilcox Rept. at 9, FEC Exh. 1 (quoting Weissman & Hassan, at 84-85, FEC Exh. 55).)

251.   "Democratic activists [had] worried that the ban on soft money would prevent

them from harnessing large contributions and therefore make it harder for John Kerry to win the

White House. Democratic Party chairman Terry McAuliffe gathered a group of DNC leaders to

seek a way to continue to deploy large contributions after the BCRA soft money ban went into

effect."  (Wilcox Rept. at 9, FEC Exh. 1 (citation omitted).)

252.   "These party activists later met with leaders of Democratic-leaning interest groups

including the AFL-CIO, SEIU, EMILY's List, and the Sierra Club to plan the creation of a series

of 527 organizations that would solicit large contributions to fund broadcast advertising, voter

registration and mobilization, and a variety of other efforts.  Out of these discussions came a

variety of new organizations, including Partnership for America's Families, America Votes,

Americans Coming Together (ACT), and the Media Fund."  (Wilcox Rept. at 9, FEC Exh. 1.)

253.   "The goal of these organizations was undeniably to help elect a Democratic

presidential candidate in 2004. … These efforts included Harold Ickes, former Clinton [Deputy]

Chief of Staff, and then paid consultant to the DNC.  Ickes later ran the Media Fund, and helped

to coordinate fundraising for the large Democratic 527s through the Joint Victory Campaign."

(Wilcox Rept. at 9, FEC Exh. 1 (citation omitted)**;** (S. Simpson Decl. (Doc. 2-9), Simpson Exh.

5, at 69-84.)

254.    Republican-leaning organizations such as Swift Boat Veterans and Progress for

America (PFA) were similarly formed and facilitated by party activists and consultants with ties

to campaigns and the party.  (Wilcox Rept. at 10, FEC Exh. 1; S. Simpson Decl. Exhs. 4 (Doc. 2-

9) & 6 (Doc. 2-10); *see infra Facts* 198-200.)

255.    "PFA was founded by Tony Feather, Political Director of the Bush-Cheney

campaign, who then worked as a consultant in a firm that worked for the RNC. To avoid the

appearance of coordination, Feather resigned as head of the organization and chose Chris

LaCivita as the new head. LaCivita was former Political Director of the National Republican

Senatorial Committee.  LaCivita later left PFA and consulted on two GOP Senate campaigns,

and eventually became senior strategist[] for Swift Boat Veterans. . . ."  (Wilcox Rept. at 10,

FEC Exh. 1 (citation omitted).)

256.    The network of party activists and consultants who orchestrated the formation,

fundraising, and activities of 527s and other groups that spend to help candidates was so dense

that it led journalists and some scholars to refer to the 527s as "shadow parties" and other

scholars to refer to them as "party allies."  "These activists cycle through jobs in the party, in

campaigns, in interest groups, and as consultants, sometimes holding more than one

simultaneously.  They are therefore ideally situated to direct individuals who are willing to make

large donations to an organization that is likely to spend their money effectively."  (Wilcox Rept.

at 10, FEC Exh. 1 (citations omitted).)

257.    "Party officials clearly sent signals to donors which groups were officially

sanctioned, and that contributions to these organizations were encouraged and would be appreciated. Large donors who sought to win favor with policymakers in either political party did not have to work hard to find 527 organizations willing to take their money and which were in some way part of this loose party network." (Wilcox Rept. at 10, FEC Exh. 1.)

258.    "[L]eaders of Democratic-leaning 527 organizations needed to persuade both ideological and access donors that these efforts were serious and recognized by the party." (Wilcox Rept. at 10, FEC Exh. 1.)

259.    "'To engage potential donors, (Ellen) Malcolm and Ickes explained their well thought out campaign plans and their long-term goal of investing not just in an election but also in building a campaign infrastructure for the party. . .  They also assured many donors of their relationship to the party and the campaigns.  Their message was 'We don't talk to the campaigns, are not connected to them, but they know and appreciate us and contributions are part of the public record and they are aware.''" (Wilcox Rept. at 10, FEC Exh. 1 (quoting Weissman & Hassan at 86, FEC Exh. 55).)

260.    "To further signal donors of the close connection between the party and these groups, they recruited former President Bill Clinton, whose close ties to DNC chair Terry McAuliffe were well known. He reassured donors – one 527 leader said that 'He koshered us. He gave the donors confidence, both ideological ones and access ones.'" (Wilcox Rept. at 10, FEC Exh. 1 (citation omitted).)

261.    "Clinton solicited contributions during the campaign for the DNC, for John Kerry's campaign, and for the Media Fund.  The leaders of these 527s were visible at the Democratic National Convention, with an office down the hall from the DNC Finance division." (Wilcox Rept. at 10, FEC Exh. 1.)

262.     George Soros's contributions to 527 groups in 2004, for example, were admittedly intended to provide access and influence over Senator Kerry.  In a 2004 interview, Soros explained that he had sought to influence American policy since the late 80's.  "On my own, I was trying to do things, but if I could influence American policy I could be much more effective."  "I would be very happy," he continued, "to advise Kerry, if he's willing to listen to me, and to criticize him if he isn't.  I've been trying to exert some influence over our policies, and I hope I'll get a better hearing under Kerry."  (Jane Mayer, *The Money Man:  Can George Soros's Millions Insure the Defeat of President Bush,* New Yorker, Oct. 18, 2004, FEC Exh. 107.)

263.     "On the Republican side, groups benefitted from visible signals from party leaders."  (Wilcox Rept. at 10, FEC Exh. 1.)  The speakers at PFA's October 2003 conference included RNC Chairman Ed Gillespie, Bush-Cheney 2004 Director Ken Mehlman, and Benjamin Ginsberg, counsel to both PFA and the Bush campaign.  (Weissman & Hassan at 88, FEC Exh. 55..)  "RNC Chair Ed Gillespie and Bush-Cheney Campaign chair Marc Racicot listed Progress for America as a group that could legally engage Democratic groups.  Progress for America Leaders believed that this signal from party leaders helped them raise money."  (Wilcox Rept. at 10-11, FEC Exh. 1 (citation omitted).)  One of Progress for America's leading fundraisers was Tom Synhorst, a partner in a campaign consulting firm that was paid over $19 million from the Bush-Cheney campaign and the Republican National Committee in 2004. (Weissman & Hassan at 88, FEC Exh. 55.)

264.     The efforts of party activists, consultants, the parties, and the presidential campaigns to facilitate the rise of particular 527s "enabled donors who sought to influence elections to determine where they could most reliably invest their money."  (Wilcox Rept. at 11,

FEC Exh. 1.)

265.   "If the ban on large individual contributions to express advocacy political committees were lifted, a similar network would stand ready to help donors spend money in express advocacy" and ensure that their contributions would used effectively and appreciated by officeholders.  (Wilcox Rept. at 11, FEC Exh. 1.)

266.   One way that donors have heightened the influence of their donation is to personally hand large contribution checks to officeholders or party insiders.  (*See* FEC Exh. 110 , P 0005, P 0002-4.)  For example, records maintained by donor Bob Perry indicate that a $1,000,000 dollar check for the Republican Governors Association was "[g]iven to Governor Mitt Romney in Houston at the Four Seasons Hotel" on October 3, 2006.  (FEC Exh. 110, P 0005).  Although he wasn't technically a federal "candidate" at that time for purposes of federal campaign law, Governor Romney's presidential campaign was well under way at that time.  (*See, e.g.*, Scott Helman, *Romney Seeks to be Alternative to McCain*, Boston Globe, September 23, 2006, at A1, FEC Exh. 74.).  Earlier $100,000 checks had been "[g]iven direct to Gov. Matt Blunt + Gov. Mitt Romney."  (*See* FEC Exh. 110, P 0002-4.)

**F.**   **If Contributions to Groups Making Independent Expenditures Were No Longer Limited, Influence-Seeking Donors Would Quickly Give Massive Amounts.**

267.   Influence-seeking donors would rapidly take advantage if contribution limits were lifted for entities making independent expenditures.  *See infra* Facts 268-275.

268.   As experienced lobbyist and former Senate staffer Robert Rozen explains, "if the court rules that the law permits independent groups funded solely by individuals to advocate for the election of federal candidates, this will eventually [be] used by those whose primary motive is to exert influence over elected officials."  (Rozen Decl. ¶ 17, FEC Exh. 3.)

269.    "The number of Political Action Committees and the amount that they gave to candidates increased dramatically for several election cycles after the passage of FECA. . . ." (Wilcox Rept. at 11, FEC Exh. 1).

270.    "At the national level, direct large contributions to candidates have been banned since 1974, and investors then gave large sums directly to party soft money accounts."  (Wilcox Rept. at 12, FEC Exh. 1.)  "[T]he number of soft money donors and the total amount they gave grew gradually for a time and then explosively afterward."  (Wilcox Rept. at 11.)

271.    "After BCRA banned soft money, party activists created 527 organizations to receive large contributions from donors, assuring them that these contributions would be recognized and that candidates would be grateful."  (Wilcox Rept. at 12, FEC Exh. 1.) Enormous sums were then given for candidate-focused issue advocacy, *see supra* Section B(4)-(5), even though such giving "is in its early days of development" and has been "hampered by legal uncertainty."  (Wilcox Rept. at 11, FEC Exh. 1.)

272.    Interest groups frequently now consist of several entities that make up "a commonly managed organization network."  (Steve Weissman and Margaret Sammon, *Fast Start for Soft Money Groups in 2008 Election[:] 527s Adapt to New Rules, 501(c)(4)s on the Upswing*, (Report from the Campaign Finance Institute, Apr. 3, 2008, http://www.cfinst.org/pr/prRelease.aspx?ReleaseID=188, FEC Exh. 75.)  David. Keating, for example, now puts on various hats and assists with the operation of Club for Growth's 501(c)(4), 527, PAC, and unincorporated association.  (Keating Dep. at 8-81, FEC Exh. 11.)  So although one entity in a group of affiliated organizations may be devoted solely to making independent expenditures, a PAC that is another part of the group may at the same time be making contributions and doing direct fundraising for candidates.  Indeed, "the bulk of 527s are part of a

commonly managed organization network."  (Steve Weissman and Margaret Sammon, *Fast Start for Soft Money Groups in 2008 Election[:] 527s Adapt to New Rules, 501(c)(4)s on the Upswing*, (Report from the Campaign Finance Institute, Apr. 3, 2008, http://www.cfinst.org/pr/prRelease.aspx?ReleaseID=188, FEC Exh. 75.)  "Whatever perspective one takes on the rise of soft money groups in national election, one thing is clear:  it cannot help one's understanding to look at each soft money group and its donors in isolation from others and from 'hard money' groups and donors.  They are, for better or worse, all part of a single campaign finance system."  *Id.*

273.    The Club for Growth provides another example of interest groups adapting to changes in the regulatory environment.  Following the passage of BCRA, which required corporations to fund certain pre-election broadcast communications (termed "electioneering communications") through money raised by their separate segregated funds in limited amounts, Club for Growth personnel formed a connected entity — Club for Growth.net — that was unincorporated in order to continue to fund electioneering communications with unlimited contributions.   (Keating Dep. at 33-34, FEC Exh. 11.)  Similarly, following the Commission's determination that many 527s, including Club for Growth, were entities that should have registered as political committees and abided by contribution limits, Club for Growth formed a 501(c)(4) entity that became the principal entity through which Club for Growth activities were run.  As Mr. Keating explained, the "most important reason" for the creation of the new entity was the Club's perception that "Section 527 status is very restrictive in the types of activities an organization can do."  (Keating Dep. at 23-24, FEC Exh. 11.)

274.    "Should the ban on large contributions to independent expenditure political committees be lifted, many donors would prefer to give to groups that expressly advocate the

election of candidates, and it is likely that this avenue of large giving would grow, and once the

system is institutionalized the amount of money contributed to these committees would grow

rapidly."  (Wilcox Rept. at 11, FEC Exh. 1.)  The "explosion in large contributions by donors

seeking access and influence" would "certainly" be similar to the astronomic increases in

unlimited contributions to 527 organizations that occurred following BCRA.  (*Id.* at 12.)

> **G.**     **Financers of Independent Expenditures Are Given Preferential Access to, and Have Undue Influence Over,  Officeholders.**

275.     As former Senator Dale Bumpers put it, "[M]embers will . . . be more favorably

disposed to those who finance the[] groups [running independent ads] when they later seek

access to discuss pending legislation."  (Bumpers Decl. ¶ 27, *McConnell*, FEC Exh.64;Wilcox

Rept. at 19, FEC Exh. 1.)

276.     Similarly, a Republican consultant Rocky Pennington explains, "[i]n addition to

trying to elect candidates, these groups are often trying to create appreciation or even obligation

on the part of successful candidates. And candidates usually do appreciate this kind of help, even

when they deny it publicly, which they usually do."  (Pennington Decl. ¶ 8, *McConnell*, FEC

Exh. 33; *see also* Wilcox Rept. at 19.)

277.     The treatment of contributors to the Swift Boat Vets provides a recent, prominent

example, even though the Swift Boat Vets claimed at the time to be running "issue advocacy"

rather than candidate advocacy.  As discussed above, the ads created by the Swift Boat Vets were

very effective in their attack against Senator Kerry; many believe that these ads had a significant

impact on the 2004 presidential election.  *See supra* Facts 98-106.  Several of the people who

had a large role in funding these ads, as discussed in the following paragraphs, later apparently

received favors from or access to the President.

278.    T. Boone Pickens, for example, had already given maximum contributions directly to the Bush campaign, the Republican National Committee, and the National Republican Congressional Committee in 2003, and then gave one million dollars to the Swift Boat Vets in 2004.  (Federal Election Commission disclosure reports of Bush-Cheney, '04, Republican National Committee, National Republican Congressional Committee, and the Swift Boat Vets and POWs for Truth, FEC Exh. 76).  Pickens, "the oilman from Oklahoma," believes in "energy independence" and "more drilling onshore or offshore in the U.S." and he stated that "he has 'had some influence' on President Bush's position" on those issues.  (John Fund, *Energy Independent: Maverick Oilman Boone Pickens Talks About Fuel Prices And His Love For Philanthropy*, Wall Street J., June 2, 2007, at 2, FEC Exh. 78).  During his second term, President Bush invited Pickens to an exclusive state dinner at the White House with Queen Elizabeth II, signed a resolution into law re-naming the post office in Pickens' home town after him, and delivered the commencement address at Boone Pickens Stadium at Oklahoma State University with Boone in attendance.  (White House News Release, *Guest List for the State Dinner in Honor of Her Majesty Queen Elizabeth II and His Royal Highness the Prince Philip, Duke of Edinburgh*, May 7, 2007, FEC Exh. 77; White House News Release, *Statement on House and Senate Resolutions*, Aug. 2, 2005, FEC Exh. 77; White House News Release, *President Bush Delivers Commencement Address at Oklahoma State University*, May 6, 2006, FEC Exh. 77; John Fund, *Energy Independent: Maverick Oilman Boone Pickens Talks About Fuel Prices and His Love For Philanthropy*, Wall Street J., June 2, 2007, at 2, FEC Exh. 78).  The connections between Pickens' support of the Swift Boat Vets and favors from Republicans was frequently noted.  For example, a Washington Post article entitled *Swift Rewards for Pickens*, pointed out: "T. Boone Pickens, the oilman who gave $1 million to Swift Boat Veterans

for Truth's assault on the presidential campaign of Sen. John F. Kerry (D-Mass), is feeling the Republican love.  Sen. James M. Inhofe (R-Okla.) has introduced a bill to name the post office in Holdenville, Oka. – birthplace of the longtime Bush-family backer – the 'Boone Pickens Post Office.'  Inhofe said in a statement that Pickens 'emulates the Oklahoma spirit of hard work, entrepreneurship and,' ahem, 'philanthropy.'"  (Mike Allen, *Swift Rewards for Pickens*, Wash. Post, June 27, 2005, at A04, FEC Exh. 79).

279.    Another contributor to the Swift Boat Vets who has gotten attention from the Bush White House is Sam Fox.  Mr. Fox, who had already given $2,000 directly to the Bush campaign, $25,000 to the Republican National Committee both in 2003 and 2004, and raised at least $200,000 as one of the Bush campaign's "Rangers," then contributed $50,000 to the Swift Boat Vets in 2004.  (Federal Election Commission disclosure reports, FEC Exh. 80; AP, *Bush Withdraws "Swift Boat" Nominee*, CBS News, March 28, 2007, FEC Exh. 81).  In 2006, President Bush nominated him to be Ambassador of the United States to Belgium despite a lack of foreign policy experience.  (White House Press Release, *Personnel Announcement*, December 4, 2006, FEC Exh. 82).  Bush withdrew the nomination, believing that it would have been voted down by the Senate Foreign Relations Committee, after the Committee pointedly asked Mr. Fox about his connection to the Swift Boat Vets.  As noted by press reports referring to Mr. Fox as the "'Swift Boat' Nominee," "[b]ig-money contributors are often rewarded with ambassador posts."  (AP, *Bush Withdraws "Swift Boat" Nominee*, CBS News, March 28, 2007, FEC Exh. 81).

280.    Despite the opposition, when the Senate left on its spring break a week later, President Bush immediately used his recess appointment power to install Mr. Fox as the Ambassador.  (AP, *Bush Uses Recess Appointment Power to Install GOP Fundraiser Sam Fox*

*as Ambassador*, Fox News, Apr. 4, 2007, FEC Exh. 84).  News publications pointed out the connection between recess appointment and Mr. Fox's contribution to the Swift Boat Vets for the public.  (Al Kamen, *Recess Appointments Granted to 'Swift Boat' Donor, 2 Other Nominees*, Wash. Post, Apr. 5, 2007, at A06, FEC Exh. 84; Susan Page and David Jackson, *Bush Bypasses Senate to Appoint 'Swift Boat' Donor*, USA Today, Apr. 5, 2007, FEC Exh. 84).  Senator Kerry, a member of the Senate Foreign Relations Committee, decried the apparent connection between an ambassadorship and the contributions: "It's sad but not surprising that this White House would abuse the power of the presidency to *reward a donor* over the objections of the Senate. … Unfortunately, when this White House can't win the game, they just change the rules, and America loses.  Our country would be stronger if this Administration spent more time getting body armor for our soldiers in Iraq than it did *helping their powerful friends*."  (AP, *Bush Uses Recess Appointment Power to Install GOP Fundraiser Sam Fox as Ambassador*, Fox News, Apr. 4, 2007, FEC Exh. 84) (emphasis added).  John Edwards similarly criticized President Bush stating, "It was appalling when President Bush attempted to repay the financial patron of the 'Swift Boat veterans' with a diplomatic assignment."  (Mary Ann Akers, *Biden Slams Sam Fox Recess Appointment,* The Washington Post, April 5, 2007, FEC Exh. 84).

281.    Fox was not the only funder of independent expenditures that President Bush rewarded with an appointment to an ambassadorship.  Roland Arnall and his wife Dawn contributed more than $5 million dollars to political organizations that backed President Bush in his reelection campaign.  One of these groups was Progress for America Voter Fund, which made numerous independent expenditures.  (Glenn R. Simpson, *Lender Lobbying Blitz Abetted Mortgage Mess*, Wall Street J., Dec. 31, 2007, FEC Exh. 85).  President Bush then nominated Mr. Arnall to be the Ambassador to the Netherlands on July 28, 2005.  (White House Press

Release, *Personnel Announcement*, July 28, 2005, FEC Exh. 86).  In reference to Arnall's contributions and the ambassador nomination, the Los Angeles Times quoted one observer as saying that "[t]his isn't campaign money – it's government access money, and that's what we should call it."  (E. Scott Reckard, *Ambassador Nominee's Company is Scrutinized*, L.A. Times, Aug. 7, 2005, at A-1, FEC Exh. 87).

282.    Regarding access to elected officials gained through independent expenditures, some groups that run their own ads, offer forums for their contributors to meet the candidates they support.  For example, Citizens Club for Growth and Club for Growth have sponsored conferences attended by both CFG's members and Members of Congress.  Club for Growth members have an opportunity, if they wish, to speak with Members of Congress.  (Keating Dep. at 102-103, 110-112, FEC Exh. 11).  CFG members paid an admission fee of $1,000 to $2,000 to attend the conference, and some sat at tables with Members of Congress.  *Id.*  Sponsors of the conference paid more and received better tables.  (Keating Dep. at 103-105, FEC Exh. 11).

283.    There was at least one forum where CFG members interviewed candidates; others were held by telephone conference call.  (Keating Dep. at 70, 105-106, FEC Exh. 11; Young Dep. at 70, FEC Exh. 19).  Federal candidates, including Katherine Harris and John Sununu, addressed the audience, and appealed for support then answered questions from the audience.  (Young Dep. at 30-32, FEC Exh. 19).  Fred Young attended one forum where approximately three dozen people attended to interview candidates for federal office .  (Young Dep. at 30, FEC Exh. 19).

284.    Club for Growth also sponsored at least one luncheon in Washington, D.C., where members could meet federal candidates and officeholders.  (Young Dep. at 77-79, FEC Exh. 19).

Mr. Young sat at a table with the Congressman from his home district.  (Young Dep. at 79, FEC Exh. 19).

285.    Club for Growth also sponsored conference call where contributors could question federal candidates.  Between 50 and 150 people participated in the telephone conference calls.  (Keating Dep. at 107, FEC Exh. 11).  During the forums, candidates would be introduced by Club for Growth's president, and given an opportunity to state his or her position on issues.  (Young Dep. at 71-72, FEC Exh. 19).  CFG members could ask the candidates questions.  (Keating Dep. at 107-109, FEC Exh. 11; Young Dep. 71-72, FEC Exh. 19).  Fred Young participated in approximately six telephone conference calls during which he interviewed federal candidates.  (Young Dep. at 71, FEC Exh. 19).  Fred Young also posed questions to the candidates at the forum he attended in person.  (Young Dep. at 73-74, FEC Exh. 19).

286.    The candidate fora were not available to the entire Club for Growth membership.  Members were invited based upon their past history of donating to Club for Growth.  (Keating Dep. at 105-106, FEC Exh. 11).  The contribution threshold varied depending upon how expensive the conference call was expected to cost.  *Id*.  David Keating believed that the persons who donated the most to Club for Growth received an invitation.  (Keating Dep. at 106-107, FEC Exh. 11).  Fred Young's understanding was that he was invited to participate in the candidate forums because "I was a potential donor."  (Young Dep. at 73, FEC Exh. 19).

**H.     Large Contributions for Independent Expenditures Can Influence Legislative Votes or Other Official Action, and Thereby Pose a Danger of Actual Quid Pro Quo Arrangements.**

287.    If contributions were not limited for groups devoted to federal independent expenditures, large donors would have the ability to unduly influence officeholders, and their contributions would pose a clear danger of actual quid pro quo arrangements.  Currently,

contributions to such groups are limited under federal law, but several past examples, involving

state elections and federal candidate-focused issue advocacy, discussed below, demonstrate the

danger of corruption.  (*See infra* Section H(1)-(3).)

> **1.     A Group with an Interest in Gaming Issues Attempted to Bribe Former Congressman Snowbarger by Signaling That They Would Conduct an Independent Spending Campaign on His Behalf.**

288.    One example of independent expenditures providing a vehicle for groups to try to

make quid pro quo arrangements with elected officials is the Wyandotte Tribe of Oklahoma's

attempt to get Congressman Vincent Snowbarger from Kansas's Third District to change his

position on certain legislation in exchange for the group making a substantial independent

expenditure in support of his re-election campaign.  (Yowell Decl., FEC Exh. 4; Jack Cashill,

*Moore of the Same Old Stuff,* Ingrams Magazine, November 1999 at 19-20, FEC Exh. 112).

289.    In the summer and fall of 1998, Congressman Snowbarger was running for re-

election to the House of Representatives against the Democratic challenger, Dennis Moore.  The

race was one of the closest contests in the country.  One of the issues in the campaign, and of

importance to Congressman Snowbarger's home district, was whether or not the Wyandotte

Tribe of Oklahoma would be allowed to build and operate a casino on a piece of land next to the

Woodlands Racetrack in Kansas City.  (Yowell Decl. ¶ 3, FEC Exh. 4; Jack Cashill, *Moore of

the Same Old Stuff,* Ingrams Magazine, November 1999 at 19-20, FEC Exh. 112)

290.    Although the Wyandotte Tribe of Oklahoma wanted to build a casino next to the

struggling Woodlands Racetrack, they had no sovereign claim to any land in that area.  Their

only colorable claim to any land in Kansas was to a portion of the Huron Indian Cemetery in

downtown Kansas City.  Even as to this parcel, the Wyandotte Nation of Kansas and several

other tribes contested the Oklahoma Wyandottes' claim and opposed the construction of any

casino.  The dispute over the rights to the cemetery land involved federal legislation and legal

battles in its own right, but the Oklahoma Wyandottes raised the possibility of building a casino

next to or over the burial grounds and then negotiated for the rights to build elsewhere, such as

next to the Woodlands Racetrack.  (Yowell Decl. ¶ 4, FEC Exh. 4; Steven Nicely, *Tribe Again*

*Pushes for KCK Bingo Hall,* Kansas City Star, Oct. 3, 1998, FEC Exh. 88.)

291.    Gambling in Kansas was illegal at the time, although some tribes were in the

process of seeking approval for gaming.  Casinos run by tribes were required by law to get

approval from the Kansas governor.  Congressman Don Young, Republican Representative from

Alaska, nevertheless introduced a bill in Congress that would have allowed the Oklahoma

Wyandottes to build their casino at the Woodlands Racetrack. (H.R. 3797, 105th Congress, 2d

Sess., 1998).  Because that measure would have circumvented the governor's right to approve

acquisitions of land for gambling purposes, Governor Bill Graves, also a Republican, opposed

the legislation and requested that Congressman Snowbarger oppose the bill.  Congressman

Snowbarger agreed to oppose it both because he generally opposed gambling and because

Governor Graves had asked him to in order to protect the Governor's prerogative under the law.

(Yowell Decl. ¶ 5, FEC Exh. 4; Jack Cashill, *Moore of the Same Old Stuff,* Ingrams Magazine,

November 1999 at 19-20, FEC Exh. 112)

292.    Despite Congressman Snowbarger's known opposition to the bill, on September

10, 1998, Kevin Yowell, his campaign manager and spokesman, received a fax which expressly

linked available campaign assistance – in the form of substantial independent spending – to the

Congressman's support for the Wyandotte bill.  The fax included a letter from C.J. Zane to Rep.

Young regarding the Wyandotte Indian Tribe.  (Yowell Decl. ¶ 6, FEC Exh. 4). Zane had

formerly served as Chief of Staff to Young, but at that point was working with the lobbying firm

Baker, Zane, Edmonds & O'Malley L.L.C., which represented the Oklahoma Wyandottes.

Zane's letter noted that they would have a "good shot of moving the Wyandotte bill, H.R. 3797"

if they were able to work with the Kansas congressional delegation.  Zane then outlined a "win-

win" solution where, if Congressman Snowbarger backed their bill, the Wyandottes would pay

for an independent direct mail and phone campaign in the closing days of the election contest

praising the Congressman for his support; the tribe would get its casino, and Congressman

Snowbarger would win re-election.  This proposal was supported by other materials in the fax: a

poll and a memo put together by a respected Republican pollster with strong Kansas ties who did

polling for the governor.  Wyandotte County was a key county in the election contest and a

majority of the people there supported the casino.  The poll and memo sent to Snowbarger

purported to show that he would win re-election if in fact the Wyandottes did independent

spending in that county.  Zane's letter concluded by stating that he would get the poll to

Congressman Snowbarger, and by asking Rep. Young's help in getting the materials to the

Speaker of the House.  The campaign ultimately received the fax from a staffer at the National

Republican Congressional Committee who was told to make sure it went to Snowbarger.

(Yowell Decl. ¶ 6, FEC Exh. 4; Rick Alm and Jim Sullinger, *Congressman Calls Lobbyist's*

*Tactics Illegal – Lobbyist Argued Monday Over Whether Papers Faxed to the Congressman's*

*Office Last Month Were A Veiled Attempt to Buy His Vote,* Kan. City Star, Oct. 6, 1998, FEC

Exh. 89; Tim Carpenter, *Kansas Lawmaker Alleges Bribery Try on Gaming Issue,* Journal-World

(Lawrence, Kan.), Oct. 8, 1998, FEC Exh. 89.)

293.    Congressman Snowbarger and his campaign manager interpreted the offer by the

Wyandottes to independently spend substantial sums to support the campaign as an attempted

quid pro quo.  The documents faxed to the campaign stated "*Should the Congressman end up*

*supporting this proposal*, I would strongly recommend that we not advertise his support district-wide, but rather limit our efforts to a *very aggressive mail and phone campaign over the last five or six days of this campaign targeted solely to Wyandotte County.*"  (Emphasis added). According to Mr. Yowell, "[t]hese were people who knew what they were doing, knew that it would take a huge effort and a huge amount of money to win in the last few days, and were ready to do it."  (Yowell Decl. ¶ 7, FEC Exh. 4)  The memo concluded as follows: "There is no question that we can move some Wyandotte County voters toward Snowbarger *if he gives this issue his support.*" (Emphasis added).  Yowell believed that the offer "was an attempt to get [Congressman Snowbarger] to change his position by offering to do independent spending that would help him win re-election.  In the highly competitive race that we were in, the extra spending they proposed would have been very helpful." *Id.*

294.    Shortly after receiving the materials, Congressman Snowbarger held a press conference to publicly discuss the Wyandottes' offer.  (Yowell Decl. ¶ 8, FEC Exh. 4; Jack Cashill, *Moore of the Same Old Stuff,* Ingrams Magazine, November 1999 at 19-20, FEC Exh. 112).  Congressman Snowbarger stated that "when I read the fax, I was both angry and offended; angry that anyone would make such a brazenly illegal offer, and offended at the suggestion that my vote on any issue would be for sale.  Bribery is always a serious offense. But attempting to bribe an elected official is doubly serious, since it undermines the trust that people should expect to have in their elected leaders."  (Yowell Decl. ¶ 8, FEC Exh. 4; Rick Alm and Jim Sullinger, *Congressman Calls Lobbyist's Tactics Illegal – Lobbyist Argued Monday Over Whether Papers Faxed to the Congressman's Office Last Month Were A Veiled Attempt to Buy His Vote,* Kan. City Star, Oct. 6, 1998, FEC Exh. 89; Tim Carpenter, *Kansas Lawmaker Alleges Bribery Try on Gaming Issue,* Journal-World (Lawrence, Kan.), Oct. 8, 1998, FEC Exh. 89.)

295.    Soon after receiving the Zane materials, Congressman Snowbarger and Mr. Yowell turned them over to the Kansas Attorney General, the Federal Election Commission, and the U.S. Attorney for Kansas.  Snowbarger and Yowell were concerned that "gambling interests and other groups might be improperly interfering in the electoral process." (Yowell Decl. ¶ 8, FEC Exh. 4; Jack Cashill, *Moore of the Same Old Stuff,* Ingrams Magazine, November 1999 at 19-20, FEC Exh. 112)

296.    As Mr. Yowell explained, "the people behind th[e] effort offered to do an independent expenditure rather than make contributions because contributions are limited.  If only a small number of people are involved, they are unable to promise to give that much.  Even a corrupt Congressman would not risk accepting a bribe of only $5,000.00 or $6,000.00.  Independent expenditures, on the other hand, can involve sums of money of an entirely different magnitude."  (Yowell Decl. ¶ 9, FEC Exh. 4)

297.    Congressman Snowbarger did not win re-election in 1998.  According to Yowell, the Congressman's decision to go public with the Wyandottes' independent spending offer "reminded voters who disagreed with Congressman Snowbarger that he opposed the casino legislation.  The mail and phone campaign that was offered might have made the difference in the race had it gone forward." (Yowell Decl. ¶ 10, FEC Exh. 4.)

**2.    Former Wisconsin Senate Majority Leader Chvala Extorted Funds In Return For Legislative Action, Including Funds For Purportedly Independent Campaign Spending.**

298.    The actions of former Wisconsin State Senator Charles Chvala demonstrate that large contributions to groups doing purportedly independent campaign work pose a danger of quid pro quo arrangements for legislative actions.  (*See infra* Facts 299-308.)

299.     Senator Chvala, a Democrat, was first elected to the Wisconsin State Senate in 1984.  In 1995, Senator Chvala was elected as the Minority Leader, and in 1996, he became the Majority Leader of the Wisconsin State Senate.  (*Wisconsin v. Chvala,* Crim. Compl. at 5, ¶ 2, FEC Exh. 90).  Sen. Chvala served in this position until 2004 when he did not seek re-election amidst corruption charges relating to political fundraising.  (Steven Walters and Patrick Marley, *Chvala Reaches Plea Deal*, Milwaukee J. Sentinel, Oct. 24, 2005 at 2, FEC Exh.  91).

300.     In connection with the criminal investigation of his fundraising techniques, numerous witnesses testified about Sen. Chvala's practice of conducting "cattle calls" with lobbyists.  According to these witnesses, at these meetings Chvala would encourage entities to contribute to groups that made independent expenditures after they had maxed out their giving to other sources.  (*Wisconsin v. Chvala,* Crim. Compl. at 7, ¶ 8, FEC Exh. 90; Bright Decl. ¶ 5, FEC Exh. 6; Steven Walters and Patrick Marley, *Chvala Reaches Plea Deal*, Milwaukee J. Sentinel, Oct. 24, 2005 at 2,, FEC Exh. 91; Steve Schultze and Richard P. Jones, *Chvala Charged With Extortion*, Milwaukee J. Sentinel, Oct. 18, 2002, at 2, FEC Exh. 92).  Michael Bright, one lobbyist who met frequently with the Senator, stated that Chvala would conduct these "cattle calls" with lobbyists at the beginning of each legislative session.  In these quick meetings, often lasting only 15 minutes, he would go through a list of each lobbyist's clients, ask what their legislative interests were, discuss what each of the lobbyist's clients were willing to contribute to support Democratic senatorial candidates, and sometimes suggest specific dollar amounts for each client to give.  As Bright describes, "[t]here was essentially a 'menu' of different ways that clients could contribute: they could give directly to candidates in contested races, to the parties, *or to groups that made independent expenditures or independent candidate-focused 'issue' ads.* Some of these independent groups were registered state political action committees (PACs), but

because of contribution limits, some clients would reach their maximums or 'PAC-out.'  After

'PACing-out' a client could give to independent 'issue' groups."  (Bright Decl. ¶ 5, FEC Exh. 6)

(emphasis added).

301.     According to witnesses, it did not matter to Senator Chvala how interested parties

gave money; contributions to candidates, political parties, and groups that made independent

expenditures were all greeted with similar appreciation.  As lobbyist Michael Bright describes,

"[t]hese were all acceptable ways to meet Chvala's contribution expectations, to get 'credit' in

Chvala's world.  Chvala made implications that really weren't ambiguous.  He would use

phrases like 'we can do this or that,' 'I'll make sure the money comes back,' 'we'll make sure it

gets to the right place,' or the candidate 'will know,' to indicate that *whichever bucket you put

the money into, it would be used effectively to support Democratic senate candidates and would

be appreciated by those candidates*.  What he was saying was partly implied, but there was not

any ambiguity about it: he was suggesting that the candidates benefited would properly credit the

client for the contributions no matter which entity they were made to, and the candidate would be

just as appreciative as if the money had all been given directly to the candidate's campaign."

(Bright Decl. ¶ 6, FEC Exh. 6) (emphasis added).

302.     According to witnesses and the criminal complaint, during Senator Chvala's time

as Majority Leader, he was able to demand that various types of contributions be made,

including contributions to groups that made purportedly independent expenditures, because of

his enormous power over the legislative process in Wisconsin.  According to Michael Bright, a

lobbyist who met frequently with Chvala, "[a]ll of this corruption was possible because Senator

Chvala wielded an incredible amount of power over the Wisconsin State Legislature.  In

actuality, his power in the Senate could not be overstated; it was complete.  Without Chvala's

approval, nothing got passed, bills wouldn't get a vote, amendments wouldn't be added, and your clients wouldn't get meetings. Because of his de facto and de jure powers over committee appointments and scheduling, as well as influence over other senators in the democratic majority, he controlled what happened in the Senate. Chvala leveraged this power to create a money machine for Democratic causes." (Bright Decl. ¶ 4, FEC Exh. 6). Nothing moved through the Senate without Chvala's approval, and accordingly, he was able to tell interested parties that there would not be votes on their bills if they didn't contribute to Democratic candidates or to independent groups that supported the candidates. (Steven Walters and Patrick Marley, *Chvala Reaches Plea Deal*, Milwaukee J. Sentinel, Oct. 24, 2005 at 2, FEC Exh. 91; *Wisconsin v. Chvala,* Crim. Compl. at 6, ¶¶ 4-6; 14, ¶ 33; 66, ¶ 257; FEC Exh. 90).

303. According to witnesses, one of the independent groups that Chvala directed contributions to was Independent Citizens for Democracy (PAC) ("ICD-PAC"). When speaking with lobbyist Michael Bright, Chvala identified ICD-PAC as one of the groups to which Mr. Bright's clients should contribute. ICD-PAC was registered with the State of Wisconsin Elections Board and as part of the registration process, it filed an Oath for Committees and Individuals Making Independent Disbursements on behalf of Independent Citizens for Democracy (PAC). The form stated that ICD-PAC supported Wisconsin senate candidate Mark Meyer, one of Chvala's political allies. The form also contained a notarized oath by the group's treasurer that the group would not to act in concert, cooperation, or consultation with the candidate or any agent or authorized committee of the candidate. ICD-PAC subsequently made independent expenditures in support of Mark Meyer totaling more than $100,00. (*Wisconsin v. Chvala,* Crim. Compl., at 45-46, ¶¶ 141-48; 49, ¶ 169, FEC Exh. 90).

304.     Another one of the lobbyists with whom Chvala discussed ICD-PAC was William Broydrick, according to his testimony.  Mr. Broydrick is a registered lobbyist in Wisconsin and operates the largest lobbying firm in the state.  Mr. Broydrick attended numerous political fund raising meetings with Chvala at which Chvala asked for contributions to be made to specific political committees, including ICD-PAC.  Referring to ICD-PAC, Chvala told Broydrick that "these people do good things."  In response, Mr. Broydrick had one of his clients, Plumber Local 75, give $5,000 to ICD-PAC.  (*Wisconsin v. Chvala,* Crim. Compl., at 50, ¶¶ 170-176; FEC Exh. 90).

305.     According to Mr. Broydrick, Sen. Chvala also encouraged him to get his clients to give to Democratic Legislative Campaign Committee ("DLCC"), an entity which funneled money back to ICD-PAC for independent expenditures in support of Chvala's legislative allies.  Sen. Chvala told Mr. Broydrick that his clients could keep their political contributions "under the radar" by directing monies "across the Potomac" to the DLCC.  Accordingly, many of Mr. Broydrick's clients contributed to DLCC, sometimes by delivering checks made out to the DLCC directly to Senator Chvala.  As a matter of routine, Sen. Chvala wanted DLCC contribution checks to be physically routed through him so that he would get credit for them.  The DLCC funneled $292,000 to ICD-PAC in 2000 alone.  (*Wisconsin v. Chvala,* Crim. Compl., at 50, ¶¶ 170-172; FEC Exh. 90).

306.     According to witnesses and the criminal complaint, Chvala used the money raised from lobbyists for purportedly independent expenditures to enter into what appear to be quid pro quo arrangements.  One example is the case of Ameritech, one of Mr. Broydrick's clients.  A provision in the Senate version of the Wisconsin State Budget for 2001 was highly unfavorable to Ameritech.  Accordingly, Mr. Broydrick discussed with Sen. Chvala Ameritech's desire to

have the provision removed.  In consultation with Mr. Broydrick, Ameritech then made a

contribution of $40,000 to the DLCC.  Mr. Broydrick believes that he gave Ameritech's check to

the DLCC directly to Sen. Chvala.  After this contribution was made, the unfavorable tax

provision was removed from the budget bill by the legislative conference committee.  Ameritech

made another donation of $40,000 to the DLCC in early 2002.  (*Wisconsin v. Chvala,* Crim.

Compl., at 50, ¶¶ 171-175; FEC Exh. 90; Steve Schultze and Richard P. Jones, *Chvala Charged*

*With Extortion*, Milwaukee J. Sentinel, Oct. 18, 2002, at 3-4, FEC Exh. 92).

307.    According to witnesses and documentation discussed in the criminal complaint,

another one of the purportedly independent groups that Chvala directed contributions to was

Independent Citizens for Democracy-Issues, Inc. ("ICD-Issues"), a group that was not a

Wisconsin state PAC and thus did not have contribution limits.  ICD-Issues ran purportedly

independent advertisements in support of Chvala's allies in the Wisconsin State Senate.  The

connection between Chvala's meetings with lobbyists, contributions to ICD-Issues, and the

legislative issues being simultaneously considered by the Wisconsin Senate creates, at a

minimum, the appearance of corruption and quid pro quo arrangements.  For example, Chvala

was scheduled to meet with Lee Fanshaw on June 8, 2001.  Mr. Fanshaw was a registered

lobbyist for American Family Mutual Insurance Company.  On June 18, 2001, American Family

Mutual Insurance Company made a $20,000 contribution to ICD-Issues.  At the same time,

American Family Insurance had an interest in a budget amendment to build a bridge in Burke,

Wisconsin.  Another example is the case of Tom Hanson and Dairyland Greyhound Park.

Chvala was scheduled to meet with Tom Hanson on May 30, 2001.  Tom Hanson was a

registered lobbyist for Dairyland Greyhound Park, Inc.  On June 12, 2001, Rime Management

Group, the owner of Dairyland Greyhound Park, contributed $10,000 to ICD-Issues.  At the

time, Dairyland Greyhound Park was to benefit from a budget amendment allowing dog track

owners to retain unclaimed winnings.  As another example, Chvala was also scheduled to meet

with Robert Bartlett on June 28, 2001.  Mr. Bartlett was a registered lobbyist and president of the

Petroleum Marketers Association of Wisconsin.  On July 12, 2001, three members of the

Petroleum Marketers Association of Wisconsin each gave $5,000 to ICD-Issues.  At the time, the

Petroleum Marketers Association of Wisconsin strongly opposed a budget amendment repealing

the gasoline minimum mark-up law.  Finally, Chvala was scheduled to meet jointly with Joe

Strohl and John Matthews on May 16, 2001.  Mr. Strohl and Mr. Matthews were registered

lobbyists for Dominion Assets Services LLC, the owner of a private prison in Stanley, WI. On

June 1, 2001, Dominion Asset Services contributed $50,000 to ICD-Issues.  At the time,

Dominion Assets Services LLC sought a budget amendment funding the State of Wisconsin's

purchase of the prison they owned.  (*Wisconsin v. Chvala,* Crim. Compl., at 54, ¶¶ 130-195; FEC

Exh. 90).

308.    A number of lobbyists whose clients made contributions to ICD-Issues offered

testimony illustrating the potential for quid pro quo arrangements via an independent expenditure

group.  For example, Patrick Essie, a lobbyist for Distilled Spirits Council of the United States

(DISCUS) had a fundraising meeting with Sen. Chvala in the spring of 2001 at which Chvala

advised him that ICD-Issues could accept corporate monies from Mr. Essie's clients.  Mr. Essie

was then referred by Chvala's chief of staff to ICD-Issues.  DISCUS subsequently contributed a

total of $85,000 to ICD-Issues.  Mr. Essie assumed that Sen. Chvala would be aware of these

contributions.  (*Wisconsin v. Chvala,* Crim. Compl., at 55, ¶ 197, FEC Exh. 90.)  Similarly,

Walter Kunicki, a lobbyist for Wisconsin Energy Corporation testified that he had a fundraising

meeting with Chvala in May of 2001 where Chvala told him that he wanted Wisconsin Energy

Corporation to contribute $100,000 to ICD-Issues.  Mr. Kunicki arranged for Wisconsin Energy

Corporation to give $50,000 that year and another $50,000 the following year.  Afterwards, he

received a call from Chvala who wanted to reiterate that he expected Wisconsin Energy

Corporation to contribute $100,000 to ICD-Issues.  While these contributions to the ICD-Issues

were being made, Mr. Kunicki stated that legislation known as "Power to the Future" was

pending in the Wisconsin legislature, and that this legislation was very important to Wisconsin

Energy Corporation.  (*Wisconsin v. Chvala,* Crim. Compl., at 55-56, ¶¶ 198-202, FEC Exh. 90.)

### 3.     Additional Incidents Further Illustrate the Danger of Large Contributions for Independent Spending Influencing Official Action or Leading to Quid Pro Quos.

309.    In 1998, Republican Majority Leader Mitch McConnell promised Republican

Senators that the tobacco industry would mount a television campaign to support senators who

voted to kill comprehensive tobacco legislation.  According to Senator McCain, the promise was

used to influence votes. (Wilcox Rept. at 21, FEC Exh. 1, (citing  McCain, John. 2003.

"Congress is Mired in Corrupt Soft Money," *Inside the Campaign Finance Battle*, ed. A.

Corrado, T. E. Mann and T. Potter. Washington, DC: Brookings).)  "After assessing the role of

tobacco contributions on voting by Senators on past legislation, the Wall Street Journal reported

that '(t)he lesson for the tobacco industry might be that hard hitting ads are more effective than

campaign contributions.'"  (Wilcox Rept. at 21, FEC Exh. 1.)

310.    One interest group "offered to provide campaign support" to congressional

candidate Linda Chapin if she "would agree to vote a certain way on their issues."  (Chapin Decl.

¶ 6, *McConnell*, FEC Exh. 68.)  "I let them know what my position was," Ms. Chapin testified,

"but they wanted me to change it somewhat and I did not agree to that."  (*Id.*)

311.     In addition to incident with the Wyandottes (*see infra* Section H(1)),

Congressman Snowbarger had in an earlier campaign become aware of possible independent

spending in his campaigns that was contingent upon a change in his policy position.  In 1996,

Mr. Yowell, who was also Congressman Snowbarger's campaign manager in that election, "had

the opportunity to get a group to make a significant independent expenditure in support of

Congressman Snowbarger, if he was willing to slightly change his position on congressional

term limits."  (Yowell Decl. ¶ 11, FEC Exh. 4)  Even though it would have been "very helpful,"

Congressman Snowbarger did not go along with the idea, "he did not even consider it, because

he thought it would be wrong to accept this kind of help in exchange for changing his position."

*Id.*

312.     FPPC Chairman also Ross Johnson gave the following example of a California

state legislator who was apparently unduly influenced by a independent expenditure: "How about

Bonnie Garcia, who was the recipient in 2006 of a very substantial … independent expenditure

by the California Peace Officers Association, and then in the closing days of the legislative

session last year, tried to get a bill enacted that would have gone around the contracting process

because the labor contract for the correctional peace officers association had at that point been at

loggerheads for a year, and tried to supersede that negotiating process and get a bill through the

legislature the last night of session to give them the raise they sought."  (Johnson Dep. at 95:25 –

96:17, FEC Exh. 10).

313.     "Because big money independent expenditures unduly influence election

outcomes, they also inevitably influence the legislative process because quid pro quo or not,

legislators can determine whose support they owe their election to.  There is a big difference

between one person spending a million dollars to influence an election outcome, and one million

people each contributing one dollar to arrive at the same sum.  The first is undue influence.  The latter gives people the voice that they are due."  (Testimony of Derek Cressman, Government Watchdog Director of Common Cause, Hearing of the California Fair Political Practices Commission, Feb. 14, 2008, at 2, FEC Exh. 93).

314.    Large contributions pose the danger that "policymakers will seek to do favors for donors, and that donors will be pressured to give increasing amounts in exchange for access to the policymaking process," and the favors will include not just roll call votes, but also influencing action at other stages of the legislative process.  "Rep. Snowbarger was offered an explicit quid pro quo; . . . State Senator Chvala refused to move bills in the state Senate without contributions to independent expenditure committees, and U.S. Senators in 1998 killed a bill that would have allowed the regulation of tobacco."  (Wilcox Rept. at 21, FEC Exh. 1.)  Thus, "there is a clear link between independent expenditures and not just special access, but also policy influence."  (*Id.*)  Just as soft money donations in unlimited amounts to political party committees influenced policymaking, large contributions to entities making independent expenditures will have "the same impact."  (Wilcox Rept. at 21-22, FEC Exh. 1.)

**I.      Large Contributions for Independent Expenditures Create an Appearance of Corruption.**

315.    The importance of preventing the appearance of corruption is well established.  "If the public believes that politicians give favors to large donors, then trust in the political system is undermined.  The appearance of corruption has a corrosive effect on the public's ability to judge whether their trust in government is warranted."  (Wilcox Rept. at 22, FEC Exh. 1  (citing Mark E. Warren, *Democracy and Deceit: Regulating Appearances of Corruption*, 50 Am. J. Pol. Sci. 160-74 (2006), and Dennis F. Thompson, *Ethics in Congress: From Individual to Institutional Corruption* (1995)).)  Allowing unlimited contributions to entities making

99

independent expenditures to help candidates win election "will likely contribute to the perception of corruption by the public."  (Wilcox Rept. at 23, FEC Exh. 1.)

316.    FPPC Chairman Ross Johnson explained independent expenditures and the appearance of corruption as follows: "Why do we have campaign finance requirements, reporting requirements, contribution limits, all the rest of it, the requirement of forming a committee and so on? It's because you as a citizen have a right to expect that your elected representatives are going to represent you, your community and in [my] case, the people of California.  And they have a right to not have to concern themselves or wonder. . .[:]  is my representative who's elected to represent me really making his or her decisions on the basis of who can throw the most money into a political campaign? And it doesn't matter if that is in the form of a direct contribution or an independent expenditure."  (Johnson Decl. at 49:9-25, FEC Exh. 2.).

> **1.     A Coal Company Executive's Contributions for Independent Expenditures In a 2004 West Virginia Supreme Court Race Illustrate the Appearance of Corruption.**

317.    Independent expenditures in a 2004 judicial election in West Virginia created an appearance of corruption.  Independent expenditures, paid for largely through the contributions of the chief executive of a coal company with a high-profile case pending before the West Virginia Supreme Court, played a significant role in defeating one of the court's incumbent justices.  (Starcher Decl., FEC Exh. 5.)

318.    Massey Energy Co. is the fourth largest coal company in the United States. Headquartered in Richmond, Virginia, Massey Energy controls approximately one-third of Appalachia's coal reserves.  Massey's CEO is Don Blankenship.  (Starcher Decl. ¶ 4, FEC Exh. 5.)

319.     In August, 2002, a Boone County West Virginia jury found Massey liable in tort

in a case brought by a rival coal company, Harman Mining Corporation, and its president, Hugh

Caperton, alleging, inter alia, tortious interference with existing and prospective contractual

relations and fraudulent misrepresentation.  The jury returned a verdict against Massey that

included more than $50,000,000 in damages.  A few days later, Blankenship told his employees

that he intended to appeal.  Almost two years later, in June 2004, the trial judge denied Massey's

Motion to Set Aside the Verdict.  (Starcher Decl. ¶ 5, FEC Exh. 5.)

320.     In 2004, West Virginia Supreme Court Justice Warren McGraw was running for

reelection.  Justice McGraw was seen as more likely to uphold the judgment against Massey than

his opponent.  (Starcher Decl. ¶ 6, FEC Exh. 5.)

321.     On August 20, 2004, less than two months after Massey's Motion to Set Aside the

Verdict was denied, a section 527 organization called "And for the Sake of the Kids" registered

with the West Virginia Secretary of State.  According to its website, "And for the Sake of the

Kids" was established solely to defeat Justice Warren McGraw.  (Starcher Decl. ¶ 7, FEC Exh. 5;

Mot. Of Resp't Corporations for Disqualification of Justice Benjamin, Oct. 19, 2005, FEC Exh.

104 at 8-9.)

322.     On the same day it registered with the state, "And for the Sake of the Kids"

received its first two contributions, for $500 and $100,000, from Blankenship.  During the rest of

2004, and leading up to the November election, Blankenship provided almost 70% of the funding

for "And for the Sake of the Kids," contributing approximately $2.5 million of its $3.6 million

raised.  Much of the remaining funds raised by "And for the Sake of the Kids" came from

interests tied to the coal industry or from organizations solicited by Blankenship himself.

(Starcher Decl. ¶ 8, FEC Exh. 5; Mot. Of Resp't Corporations for Disqualification of Justice

Benjamin, Oct. 19, 2005, FEC Exh. 104 at 8-14.)

323.    During the 2004 election, "And for the Sake of the Kids" spent more than $3.2

million, almost entirely on ads advocating Justice McGraw's defeat.  One notorious ad accused

Justice McGraw of assigning a convicted child rapist to a West Virginia School as a janitor.

According to Justice Larry Starcher, a colleague of Justice McGraw on the court, the ads were

misleading and untruthful.  (Starcher Decl. ¶ 9, FEC Exh. 5; Mot. Of Resp't Corporations for

Disqualification of Justice Benjamin, Oct. 19, 2005, FEC Exh. 104 at 8-14.)

324.    Don Blankenship also spent around $500,000 in independent expenditures in his

own name supporting Justice McGraw's challenger, Brent Benjamin.  (Starcher Decl. ¶ 10, FEC

Exh. 5; Mot. Of Resp't Corporations for Disqualification of Justice Benjamin, Oct. 19, 2005,

FEC Exh. 104 at 11-12.)

325.    Justice McGraw lost the general election to Brent Benjamin, largely due to the

massive contributions Mr. Blankenship made for independent advertisements.  According to

Justice Starcher, "(t)he election was bought; by funding an ad campaign through a group with an

absurdly misleading name, Don Blankenship purchased a seat on the Supreme Court while a $50

million verdict against his company was on appeal.  Thanks to the huge contributions

Blankenship made to "And for the Sake of the Kids" to run negative ads and the money he spent

independently to support his favored candidate, Justice McGraw was not really defeated by an

unknown lawyer named Brent Benjamin.  Justice McGraw was defeated by Don Blankenship, a

wealthy Richmond, Virginia resident, who poured about three million dollars into defeating him.

It's obscene that a seat on the Supreme Court was bought and I'm highly offended by it.  I've

been criticized because I said publicly that seeing a seat bought makes me want to puke, but that's how we describe it out here."  (Starcher Decl. ¶ 11, FEC Exh. 5.)

326.    In November 2007, the Supreme Court held in favor of Massey in its appeal of the verdict in the case brought against it by Harman.  By that time, the verdict in the case had, due to interest, increased to $76 million.  Justice Benjamin, whose 2004 campaign was supported by more than $3.5 million dollars from Blankenship and/or Massey associates, voted with the majority.  In late January 2008, the Court vacated its November decision and voted to rehear the appeal when photos surfaced of another justice, Chief Justice Maynard, vacationing on the French Riviera with Don Blankenship.  Justice Benjamin refused to recuse himself from the case. (Starcher Decl. ¶ 12, FEC Exh. 5; Chris Dickerson, *Company Asks Benjamin to Recuse Himself Again, This Time with Poll Numbers*, Legal Newsline.com, Mar. 8, 2008, FEC Exh. 94.)  On April 3, 2008, the Court reversed the judgment in the case.  Three members of the Court, including Justice Benjamin, ruled in favor of Don Blankenship's firm.  (Starcher Decl. ¶ 13, FEC Exh. 5.)

327.    As a result of Mr. Blankenship's funding of independent expenditures, the public doubted that Justice Benjamin could be fair.  (*See infra* Facts 328-329.)

328.    In a telephone poll of 753 West Virginia voters, more than 2/3 of those polled doubted that Justice Benjamin could be fair and impartial regarding Massey's appeal of the Harman case.  Interviewees were asked whether the $3.5 million spent by Massey's CEO to help elect Justice Benjamin caused them to doubt that Justice Benjamin could be fair.  Sixty-seven% said they had such doubts. (Chris Dickerson, *Company Asks Benjamin to Recuse Himself Again, This Time with Poll Numbers*, Legal Newsline.com, Mar. 8, 2008, FEC Exh. 94; Second Renewed Jt. Mot. for Disqualification of Justice Benjamin, Aff. of Robert Drake, Mar. 28, 2008,

FEC Exh. 95.)  This is "a clear sign of appearance of corruption."  (Wilcox Rept. at 23, FEC Exh. 1.)

329.    "Public confidence in the court's decision in the *Massey* case is close to zero," says Justice Starcher, who continues, "I hardly know a soul who could believe that a justice who benefited to this extent from a litigant could rule fairly on cases involving that litigant or his companies."  Starcher concludes that "The pernicious effect of Mr. Blankenship's bestowal of his personal wealth has created a cancer on the affairs of the Supreme Court."  (Starcher Decl. ¶¶ 12, 14, FEC Exh. 5.)

330.    The funds expended by Blankenship through "And for the Sake of the Kids" to elect Justice Benjamin created an appearance of corruption.  As Justice Starcher explains, "[m]illions of dollars in electoral support by the CEO of an active litigant in the court is clearly sufficient to create an appearance of corruption. …  In essence, Mr. Blankenship used a few million dollars in contributions to take over $60 million from Harman and Hugh Caperton [Harman's CEO], and is getting away with it scot-free."  (Starcher Decl. ¶¶ 12 – 14, FEC Exh. 5.)

331.    West Virginia Supreme Court Justice Richard Neely explains the results of such unlimited contributions: "These ads and this kind of campaign works.  Now every seat on the Supreme Court is for sale. … Judges will be required to dance with the one that brung them . … A 12-year term makes you a little more independent than a short term would make you.  But, at the end of the day, people tend to associate with and support the people who have helped them. When someone like Don Blankenship offers you $3 million, you can't turn it down."  (Mot. Of Resp't Corporations for Disqualification of Justice Benjamin, Oct. 19, 2005, FEC Exh. 104 at 18.)

332.     Just as there was a clear appearance of corruption as a result of unlimited

contributions in this judicial election, a similar appearance of corruption would arise in

legislative elections in which unlimited contributions were permitted.  Justice Starcher explains:

"I have personally seen how massive contributions to a misleadingly named 527 organization

can corrupt the judicial system.  I do not see why elections for legislative office are any different.

. . .  Reasonable restrictions on the amounts that individuals can contribute to organizations like

the one that defeated Justice McGraw, such as the $5,000 limit on contributions to political

committees under federal law, properly respect both an individual's right to speak out on

important issues, including the selection of judges, and the public's right to fair and honest

democratic processes."  (Starcher Decl. ¶ 15, FEC Exh. 5.)

### 2.     The Public Views Large Election-Related Contributions As Corrupting, Regardless of the Recipient.

333.     Recent polling shows that the public views contributions to groups running ads

supporting candidates are as likely to lead to corruption as contributions made directly to

candidates.  In a nationwide poll conducted in August 2008, by Zogby International, an almost

identical majority of survey respondents indicated that both direct contributions to candidates

*and* contributions to groups to spend on advertising campaigns supporting congressional

candidates would be likely to lead to corruption.  (Results of Nationwide Poll, Zogby

International, Aug. 25, 2008, FEC Exh. 96.)

334.     The Commission paid Zogby International to ask four questions when Zogby

conducted an omnibus telephone survey of 1,207 adults randomly drawn from a national sample.

Identical majorities of survey respondents thought it likely that a congressional candidate would

do a political favor for a contributor once elected to office, whether the contributor made a

contribution of $100,000 or more to the candidate's campaign, or a contribution of $100,000 or

more to a group to spend on an advertising campaign supporting that candidate.  For both types of contributions, 82% of survey respondents thought it likely that the candidate would do a political favor for the contributor.  (Results of Nationwide Poll, Zogby International, Aug. 25, 2008, FEC Exh.96 at 2; Calogero Decl. ¶ 3, FEC Exh. 97.)

335.    Similarly, nearly identical majorities of survey respondents thought it likely that a congressional candidate would give a contributor's opinion special consideration once elected to office, whether the contributor made a contribution of $100,000 or more to the candidate's campaign, or a contribution of $100,000 or more to a group to spend on an advertising campaign supporting that candidate.  For contributions directly to the candidate's campaign, 77% of survey respondents thought it likely that the candidate would give the contributor's opinion special consideration.  For contributions to a group to spend on an advertising campaign supporting a candidate, 79% of survey respondents thought it likely that the candidate would give the contributor's opinion special consideration.  (Results of Nationwide Poll, Zogby International, Aug. 25, 2008, FEC Exh. 96 at 3-4.)

336.    According to Georgetown University Professor Clyde Wilcox, who has taught courses and lectured in public opinion survey research, the results of the Zogby survey suggest that the "public views a contribution made to a group that's helping a candidate the same way they view a direct contribution to the candidate."  Contributions to a group to spend on the advertising campaign would, Wilcox explains, "have in the public's view the same possibility of generating special consideration and political favors."  The public would view such contributions as "indirect contributions."  (Wilcox Dep. at 303-04, FEC Exh. 18.)

337.    The public views preferential access or other special favors granted by candidates to donors as corrupt, whether those special favors are done for someone who has contributed

directly to the candidate, or for someone who has contributed to an independent group to help the candidate.  (Wilcox Dep. at 45-46, FEC Exh. 18.)

338.    The public perception of an appearance of corruption evident from the poll regarding Mr. Benjamin's contributions and the Zogby poll is consistent with earlier research. (*See infra* (the next two facts).

339.    "The public believes that large direct contributions to candidates, and also large indirect contributions to party soft money committees lead to preferential access and influence over policymaking."  (Wilcox Rept. at 22-23, FEC Exh. 1 (citing Robert Y. Shapiro, *Public Attitudes Toward Campaign Finance Practice and Reform* in *Inside the Campaign Finance Battle* (Anthony Corrado et al., eds., 2003).)

340.    A survey conducted during the *McConnell* litigation revealed that an overwhelming majority of the public believed that large contributions to political parties and large independent expenditures to benefit candidates would lead to special consideration by Members of Congress.  (Wilcox Rept. at 23, FEC Exh. 1.)

341.    "The public is unlikely to believe that large direct contributions to candidates are corrupting, that large indirect contributions made through political parties are corrupting, but that large indirect contributions made through interest groups are not corrupting. …  Allowing unlimited contributions to [entities making independent expenditures] that help candidates win election will likely contribute to the perception of corruption by the public."  (Wilcox Rept. at 23, FEC Exh. 1.)

### 3. Coordination is Inherently Very Difficult to Police and Candidate Campaigns Are Often Involved With "Independent" Spending Below the Level of Involvement That Constitutes "Coordination" Within the Meaning of the Law.

342.    Limits on contributions to political committees are also important because coordination is inherently very difficult to police and candidate campaigns are often involved with "independent" spending below the level of involvement that constitutes "coordination" within the meaning of the law.

343.    There is reason to believe that cooperation, even if it doesn't rise to the legal of "coordination," occurs in various ways.  Several incidents from California state races illustrate this point.  For example, Chairman Ross Johnson of the FPPC recalls the following incident: "while I was serving as the Republican leader in the [California State] Assembly, an Assembly candidate came to me for an endorsement.  To demonstrate the legitimacy of the campaign, the candidate told me that a professional association had directly committed to making a $75,000 independent expenditure in support.  Subsequently, that association did, in fact, make such an independent expenditure on the candidate's behalf.  The candidate won the election."  (Johnson Decl. ¶ 10, FEC Exh. 2).

344.    As another example from California, during the 2006 election cycle, there was a clear pattern of a candidate committee inundating voters' mailboxes with campaign materials for three or four days, and then stopping, while for the next three or four days, independent expenditure committees would inundate mailboxes with campaign material, and then back and forth.  The mailing alternated almost exactly between the candidate's committee and independent expenditure committees.  According to Chairman Johnson, "[i]f there was no coordination, it was an unbelievable coincidence."  (Johnson Decl. ¶ 10, FEC Exh. 2).

J.      **Money Raised through Associations with Many Protections of the Corporate Form Pose a Danger of "Corrosive and Distorting Effects of Immense Aggregations of Wealth."**

345.    Organizing SpeechNow as an Unincorporated Non-Profit Association under DC law provides its members the same kind of limited liability as they would have under a corporate form.  (*See* FEC Exh. 20 at SNK0159.)

346.    Even though the Uniform Unincorporated Nonprofit Association Act ("UUNAA"), on which the D.C. statute is based, is relatively new, some individuals have already taken advantage of its protections.  *See infra* facts

347.    One such example involved a lawsuit following the 1996 election for the Fourth Congressional District of Colorado U.S. House of Representatives seat.   Guy Kelley, a Democrat, unsuccessfully challenged Bob Schaffer, the Republican incumbent, that year. Following the campaign, two of his campaign workers sued him in his individual capacity for back wages they claimed they never received.  These claims were dismissed because the court found that the employees were actually hired by Kelley's campaign committee, that the committee was formed as an unincorporated nonprofit association under Colorado's version of the UUNAA, and, accordingly, Kelley was not personally liable for the actions of the committee. *Mohr v. Kelley,* 8 P.3d 543, 544 (Colo. Ct. App. 2000).

348.    As the Colorado Court of Appeals explained, "the Association Act makes a nonprofit unincorporated association a legal entity separate and apart from its members. Therefore, logically, nonprofit unincorporated associations are more in the nature of corporations, limited partnerships, or limited liability companies."  *Id.* at 545.

349.    SpeechNow itself has used the protection from liability afforded by the D.C. statute as an inducement to potential members.  In an email from David Keating to a prospective

member, Keating explained that the D.C. statute "provides some substantial protection" from

"possible lawsuits."  (FEC Exh. 20 at SNK0159; Keating Dep. at 130-31, FEC Exh. 11.)

> **K.     Independent Expenditures Through Groups are Less Transparent to the Public than Independent Expenditures Made by Individuals.**

350.     "Individuals can now spend unlimited amounts on independent expenditures, but

their names must be included as a disclaimer for the source of the advertisement.  This allows

voters to assess the reliability of the information and arguments in the advertisements, and

perhaps discount them if they perceive a self interest on the part of the individual."  (Wilcox

Rept. at 24, FEC Exh. 1.)

351.     It is not difficult for individuals who are capable of making large contributions

for independent expenditures to hire consultants to create ads, but "many prefer to shield their

identity by creating groups with positive sounding names to list in the disclaimer."  (Wilcox

Rept. at 24, FEC Exh. 1.)

352.     "And for the Sake of the Kids," the entity established by a coal company CEO

and other coal company executives, illustrates the potential for an individual to shield his identity

behind a group with a misleading name.  (*See supra* Section 3.2805.)  Disclaimers on the ads that

Mr. Blankenship himself ran (positive ads in support of Justice Benjamin) would have made his

funding of the ad transparent to the public from the advertisement itself.  Including the group's

misleading name in the disclaimer on the group's negative advertisements (against Justice

McGraw), on the other hand, provided little information to the public about the group of coal

executives funding "And for the Sake of the kids."  "Voters who saw these ads would have been

better able to evaluate them had they included a disclaimer that they were paid for by the

president of a coal company with significant business before the Court."  (Wilcox Rept. at 24,

FEC Exh. 1.)

353.     While candidates know who's making independent expenditures, the public has more difficulty when the only information in the ad is a deceptive group  name.  In California, for example, "'[i]independent expenditure' committees make it easy to hide the true source of contributions.  The names sound good—Californians for a Better Government, California Alliance for Progress and Education, Alliance for a Better California, and Working Californians.  But how are California voters to know who these groups really are? For the average voter it involves far too much detective work to figure out who is really behind a particular 'independent expenditure' committee or effort."   (FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 6, FEC Exh. 47.)

354.     Despite the generically positive names of many committees, nearly 60% of all the money spent by the largest independent expenditure groups in California came from just 10 contributors consisting of Indian tribes, developers, labor unions and consumer attorneys. (FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 21, FEC Exh. 47.).

355.     FPPC Chairman Ross Johnson describes this phenomenon as follows: "They have nice sounding names, but the public rarely knows who is funding the groups' independent expenditures when their television or radio advertisements are aired.  They will call themselves 'friends of education,' for example.  This can hide who the true special interests are behind an expenditure, or mask a close relationship between an individual donor and the candidate.  For example, in the June primary [in California], there was a large independent expenditure that attacked a member for the state assembly who was running for state senate.  It was sponsored by an Indian gaming interest whose plan for a new casino the Assembly-member had opposed.  But the name of the Indian tribe's expenditure committee was "Education Leaders for High

Standards," and the independent expenditure focused on an education issue; voters had little reason to suspect that the attack ads were actually finance by gaming interests."  (Johnson Decl. ¶ 12, FEC Exh. 2.).

356.    With the case of independent expenditure campaigns, misleading group names make it much more difficult "for voters and citizens and the media to understand who is behind these efforts." (Johnson Dep. at 26:10-13, FEC Exh. 10.).

357.    A number of independent expenditure groups in California are creating and funding sub-groups that support specific candidates. Accordingly, when the sub-group discloses who funded its independent expenditures, it merely lists the name of another group that makes independent expenditures.  To find out who is actually funding the ads, the public now needs to peel away another layer of "the onion."  The report prepared by the FPPC discusses a number of groups using this and other similar tactics.  (FPPC, *Independent Expenditures: The Giant Gorilla in Campaign Finance*, June 2008, at 53-59, FEC Exh. 47).

358.    "It seems likely that single donors will create organizations as they have done with organizations such as Republicans for Clean Air and Let Freedom Ring. . . .  [B]y making these expenditures through the name of a group which may be little more than a front for their personal contributions, they mislead voters in their evaluation of the source of the ads."  (Wilcox Rept. at 25, FEC Exh. 1.)

359.    Using "positive sounding group names that may represent little more than a checking account, individuals can avoid taking responsibility for harshly negative ads."  (Wilcox Rept. at 25, FEC Exh. 1.)  As former Senator Tom Daschle explains, "'[s]ometimes it is hard for voters to know where the money is coming from for these ads.'"  Independent ads run under the guise of a group are frequently "'negative and harmful,'" and using such groups "'allows people

to make statements without taking responsibility for them.'"  (Wilcox Rept. at 25, FEC Exh. 1 (quoting Daschle).)

360.    "Republicans for Clean Air," which ran advertisements in the 2000 Republican Presidential primary (*see supra* Fact 156), was actually just two individuals – brothers who together spent $25 million on ads supporting their favored candidate.  The ads, however, only identified the organization, not the donors.  If groups like this could finance independent expenditure advertisements, wealthy donors could target specific candidates for election or defeat while hiding behind "dubious and misleading names" like "The Coalition – Americans Working for Real Change," "Citizens for Better Medicare," and "Republicans for Clean Air." *McConnell*, 540 U.S. at 197 (quoting *McConnell*, 251 F. Supp. 2d at 237 (D.D.C.)).

**L.    The Disclosure of All Receipts and Expenditures Ensures that Vital Information About Who is Supporting Candidates is Made Publicly Available.**

361.    "If interest groups whose principal purpose is electoral advocacy are allowed to accept large contributions but required only to disclose those funds which are used for the direct costs of airing independent expenditures, it will limit disclosure in harmful ways.  Disclosure is important because it allows voters to hold candidates accountable for any special treatment they give to their supporters."  (Wilcox Rept. at 23, FEC Exh. 1.)

362.    "[G]roups engage in considerable research to develop successful advertising campaigns, and this research frequently involves considerable costs. Groups fund large surveys, focus groups, and other types of research, and spend money in pre-production and on ads. They have overhead costs that are part of their normal operations, and contributions that help pay for those costs are valuable to the group and therefore indirectly valuable to candidates.  The percentage of funds that are spent to buy television or radio time can often be a relatively small

portion of overall spending." (Wilcox Rept. at 24, FEC Exh. 1.)

363.    "Allowing groups to disclose only contributions that fund disbursements that buy advertising would . . . lead to the worst possible combination – citizens would not be able to trace the money that helped to develop and prepare advertisements, but candidates would know who gave.  Individuals could make large contributions to fund the overhead of these organizations and the research and other costs that go into preparing disbursements, but these contributions could be totally invisible to the public.  They could then pay for the advertisements with other contributions, perhaps from smaller donors." (Wilcox Rept. at 24, FEC Exh. 1.)

364.    "Meanwhile, there are ample ways that donors can signal their contributions to candidates, thereby claiming credit for their help.  Thus the candidate would know and be grateful for the contribution, but voters would not be able to see the connection between donor and politician." (Wilcox Rept. at 24, FEC Exh. 1.)

365.    Allowing journalists and voters to know donors behind advertising campaigns permits scrutiny of the donors' role in public policy formation.  With respect to the case of Republicans for Clean Air, "initially the donors who funded these ads were known to the Bush campaign but not to the public.  But after the identity of the donors was revealed by some clever journalistic sleuthing, there was increased scrutiny to the role of the two donors to the group in setting the administration's energy policy." (Wilcox Rept. at 24, FEC Exh. 1 (citing Jonathan S. Krasno and Frank Sorauf, *Issue Advocacy and the Integrity of the Political Process* in *Inside the Campaign Finance Battle* (Anthony Corrado et al. eds., 2003.)

366.    "'The public's interest in revealing these transactions is countered by the private interest of many groups and donors to keep them secret.  Thus the ability to route money to groups for candidate-oriented issue ads without disclosure has attracted an increasing amount of

money to this activity.  In the growing opaqueness of campaign financing, the opportunity for

donors and officeholders to forge close relationships or strike deals without risk of detection

grows too.'"  (Wilcox Rept. at 24, FEC Exh. 1 (quoting Jonathan S. Krasno and Frank Sorauf,

*Issue Advocacy and the Integrity of the Political Process* in *Inside the Campaign Finance Battle*

(Anthony Corrado et al. eds., 2003.)

367.    "Allowing individuals to make large contributions to groups which primarily air

independent expenditures, and to disclose only the funds used for the expenditures themselves,

risks allowing donors to hide their contributions from public scrutiny.  This weakens the ability

of voters, the media, and civil society groups to closely monitor the relationship between large

donors and policymakers.  The more avenues that donors can find to aid policymakers outside of

the disclosure system, the more opaque the system becomes."  (Wilcox Rept. at 25, FEC Exh. 1.)

368.    Disbursements for overhead and for polling and other background expenses are

can be substantial.  (*See infra* Facts 369-375).

369.    Political committees — not including candidate campaigns and political parties —

spent more than $1 billion during the 2005-2006 election cycle.  Nearly half was spent on

independent expenditures and direct contributions to candidates, political parties and other

political committees. Thus, approximately *$500 million* of the spending by the approximately

5000 major-purpose entities was thus spent on other costs.  (*See generally* Summary of PAC

Activity 1990-2006, http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf (last

visited Mar. 2, 2008) (5,091 committees disbursed approximately $1.055 billion, including $372

million in contributions to candidates) (Sadio Decl. B, FEC Exh. 99);  2005-2006 Summary of

PAC Independent Expenditures,

http://www.fec.gov/press/press2007/20071009pac/indepexp2006.pdf (last visited Mar. 2, 2008)

(independent expenditures of approximately $38 million) (Sadio Decl. C, FEC Exh. 107);

National Party Financial Activity Through the End of the Election Cycle,

http://www.fec.gov/press/press2007/partyfinal2006/demfederalye06.pdf (visited Mar. 5, 2008)

(receipts of Democratic political party committees) (Sadio Decl. D, FEC Exh. 107); National

Party Federal Financial Activity Through the End of the Election Cycle,

http://www.fec.gov/press/press2007/partyfinal2006/repfederalye06.pdf (visited Mar. 5, 2008)

(receipts of Republican political party committees) (Sadio Decl. E, FEC Exh. 107).)

370.    Independent expenditures and contributions to candidates have, in fact,

constituted a small percentage of disbursements by nonconnected committees for several election

cycles.  The total disbursements, contributions to candidates, and independent expenditures in

each of the last four election cycles are as follows:

| Election Cycle | Total Disbursements | Contributions to Candidates | Independent Expenditures |
|---|---|---|---|
| '99–'00 | $139,662,019 | $37,297,383 | $5,589,170 |
| '01–'02 | $165,680,186 | $46,362,859 | $2,221,561 |
| '03–'04 | $255,174,076 | $52,467,328 | $18,159,133 |
| '05–'06 | $354,532,003 | $70,217,568 | $8,083,013 |

FEC Summary of PAC Activity, 1990-2006, *available at*

http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf, FEC Exh. 99;

FEC Summary of PAC Independent Expenditures 1999-2000, 2001-2002, 2003-2004 and 2005-2006, FEC Exh. 108, *available at*
http://www.fec.gov/press/press2001/053101pacfund/pacie00.htm (1999-2000);
http://www.fec.gov/press/press2003/20030327pac/indepexp.xls (2001-2002);
http://www.fec.gov/press/press2005/20050412pac/indepexp.pdf (2003-2004);
http://www.fec.gov/press/press2007/20071009pac/indepexp2006.pdf (2005-2006).)

371.    Persons who are *not* a political committee are not required to file reports of all

their receipts and disbursements.  Generally, they are only required to file reports for each

quarter of the year in which they have made independent expenditures aggregating in excess of

$250 during a calendar year.  2 U.S.C. § 434(c).  Each quarterly report contains information regarding the independent expenditure and each person who made a contribution in excess of $200 "for the purpose of furthering an independent expenditure."  2 U.S.C. § 434(c)(2)(A)-(C); (Scott Dep. at 99-101, FEC Exh. 14.).

372.    The disbursements for the independent expenditure would be reported on FEC Form 5.  (Scott Dep. at 101-102, FEC Exh. 14.)  All persons, including political committees, who make independent expenditures shortly before election day that exceed certain thresholds must disclose information about the expenditures to the Commission within 24 or 48 hours.  2 U.S.C. § 434(g).  Reports filed by such persons provide less information than the periodic reports filed by political committees.  (*Compare* FEC Form 3x, FEC Exh. 128, *with* FEC Form 5, FEC Exh. 144).

373.    The only contributors that may be identified would be, for each independent expenditure, each person who made a contribution in excess of $200 "for the purpose of furthering the reported independent expenditure."  2 U.S.C. § 434(c)(2)(A)-(C).  The organization would not be required to identify those who funded the organization's other disbursements, including administrative expenses and overhead.  On average, half of the disbursements by major purpose entities fall into this category.  (*See supra* Fact 369.) SpeechNow has taken different positions regarding whether it would disclose all of its donors. For example, David Keating testified that, if SpeechNow makes independent expenditures without registering and reporting as a political committee, SpeechNow would disclose all of its donors of more than $200 on the independent expenditure reports filed by SpeechNow.  (Keating Dep. at 184, FEC Exh. 11.)  On the other hand, Mr. Keating testified at his combined individual and Rule 30(b)(6) deposition that he agreed with the position taken in a letter to the Commission

from the Club for Growth, insisting that disclosure was limited to contributors who had specified that that contribution was for the purpose of furthering an independent expenditure.  (Keating Dep. at 82-84, FEC Exh. 11.)

374.    SpeechNow also has not assured the Court that it would report receipts and disbursements for various election-related expenses such as opposition research on candidates and polling.  At his combined individual and Rule 30(b)(6) deposition, Mr. Keating took no position on whether SpeechNow would disclose its disbursements for expenses such as candidate research or public opinion polling on its independent expenditure reports.  (Keating Dep. 185-186, FEC Exh. 11.)

375.    The danger that relevant information about election-related expenses (such as opposition research on candidates and polling)and information about contributors to major purpose entities will go reported is illustrated by the Club for Growth.  In 2008, Club for Growth conducted polls in the district of congressional candidate Andy Harris that mentioned his name and then later made $157,777 in independent expenditures in connection with Andy Harris' congressional race.  (Keating Dep. 80-81, FEC Exh. 11.)  Club for Growth filed an independent expenditure report with the Federal Election Commission for these independent expenditures.  (Keating Dep. Exh. 6, FEC Exh. 131.)  The report does not disclose any donors and does not disclose any disbursements for polling.  (Keating Dep. Exh. 6, FEC Exh. 131.)  The Federal Election Commission sent Club for Growth a request for additional information regarding this report, and Club for Growth submitted a written response to the Commission.  (Keating Dep. 80-86, FEC Exh. 11; Keating Dep. Exh. 7, FEC Exh. 132.)  The Club for Growth took the position that it need not identify contributors that give to "support general programs without specifying" that the contribution was given for the purpose of making an independent expenditure.  (Keating

Dep. Exh. 7, FEC Exh. 132.)  Mr. Keating indicated that he personally agreed with the Club for

Groth's position that disclosure of such contributions was not required.  (Keating Dep. at 82-84,

FEC Exh. 11).

**V.     Robust Fundraising Has Occurred Within Federal Contribution Limits and Large
        Sums Can Be Raised For Independent Expenditures Through the Aggregation of
        Money From a Number of Donors.**

    **A.     Both The Number of Nonconnected Committees and Their Total Receipts
        Have Consistently Risen Since 1990 and Increased Dramatically This
        Decade.**

376.     In the 2005-2006 election cycle, nonconnected political committees raised and

spent more than $350 million.  (FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99,

*available at* http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

377.     The total number of nonconnected political committees and their total receipts

have increased since 1989-1990.  (FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99,

*available at* http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

378.     The number of nonconnected committees increased from 1,321 in the 1989-90

election cycle to 1,797 in the 2005-06 election cycle. (FEC Summary of PAC Activity, 1990-

2006, FEC Exh. 99, *available at*

http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

379.     The total receipts of nonconnected committees increased from approximately $72

million in the 1989-90 election cycle to approximately $352 million in the 2005-06 election

cycle. (FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99, *available at*

http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

380.     Between 1989-90 and 2005-06, the total receipts of nonconnected committees

increased from each presidential election cycle to the next and from each non-presidential

election cycle to the next.  (FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99, *available at* http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

381.    Total receipts of nonconnected committees doubled from the 1999-2000 election cycle to the 2003-04 election cycle, increasing from approximately $144 million to approximately $289 million.  (FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99, *available at* http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

382.    Total receipts of nonconnected committees more than doubled from the 2001-2002 election cycle to the 2005-06 election cycle, increasing from approximately $166 million to approximately $353 million.  (FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99, *available at* http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

383.    The total number of nonconnected political committees, their total receipts, disbursements, and contributions to candidates in each election cycle are as follows:

| Election Cycle | Nonconnected Committees | Total Receipts | Total Disbursements | Contributions to Candidates |
|---|---|---|---|---|
| '89-'90 | 1,321 | $71,569,940 | $71,382,835 | $15,070,009 |
| '91-'92 | 1,376 | $73,810,989 | $76,232,864 | $18,326,404 |
| '93-'94 | 1,318 | $76,860,606 | $75,060,494 | $18,201,369 |
| '95-'96 | 1,259 | $81,165,399 | $81,265,563 | $23,960,110 |
| '97-'98 | 1,326 | $114,321,557 | $107,775,031 | $28,154,544 |
| '99-'00 | 1,362 | $144,266,748 | $139,662,019 | $37,297,383 |
| '01-'02 | 1,401 | $166,652,339 | $165,680,186 | $46,362,859 |
| '03-'04 | 1,650 | $289,423,580 | $255,174,076 | $52,467,328 |
| '05-'06 | 1,797 | $352,947,674 | $354,532,003 | $70,217,568 |

(FEC Summary of PAC Activity, 1990-2006, FEC Exh. 99, *available at*

http://www.fec.gov/press/press2007/20071009pac/sumhistory.pdf.)

384.    In the 2008 election cycle, various independent groups have successfully raised funds within the legal limits.  According to Tom Matzzie, MoveOn.org's former Washington

director, "[T]here are a lot of groups with hard money capacity."  (Matthew Mosk, "Economic

Downturn Sidelines Donors to '527' Groups," *N.Y. Times*, Oct. 19, 2008.)

> **B.    The National Political Parties Successfully Recruited New Donors When They Were No Longer Permitted to Receive Unlimited Contributions.**

385.    Prior to the Bipartisan Campaign Reform Act of 2002, the national political party

committees were able to receive donations in unlimited amounts, and donations from

corporations and unions, into their soft money accounts.  (*McConnell v. FEC*, 540 U.S. 93, 122-

126 (2003).)  In their hard money accounts, they were only permitted to accept contributions up

to $20,000 per calendar year.  (Former 2 U.S.C. § 441a(a)(1)(B) (2002).)  Following BCRA, the

national political parties were only able to accept contributions into their hard money account, up

to $25,000 per calendar year.  This latter amount is indexed for inflation; the limit for the 2007-

2008 cycle is $28,500.  (2 U.S.C. § 441a(a)(1)(B); s*ee* 72 Fed. Reg. 5294, 5295 (Feb. 5, 2007).)

386.    Following BCRA, the national political party committees recruited hundreds of

thousands of new donors.  (Corrado and Varney, Party Money in the 2006 Elections: The Role of

National Party Committees in Financing Congressional Campaigns, Campaign Finance Institute

(2007) at 2, FEC Exh. 135.)

387.    The national political party committees raised as much in hard money alone in

2003-04 as they had raised in hard and soft money combined in the previous presidential election

cycle, 1999-2000.  (*Id*. at 3.)

388.    In 1999-2000, the national party committees raised $574,500,000 in hard money

and $495,100,000 in soft money for a combined total of $1,069,600,000 in receipts.  In the 2003-

2004 cycle, the national party committees raised $1,233,300,000 in hard money alone.  (*Id*. at 3.)

389.    The national political party committees raised almost 90 percent as much in hard

money alone in 2005-06 as they had raised in hard and soft money combined in the previous

non-presidential election cycle, 2001-2002.  (*Id*. at 3.)

390.    In 2001-2002, the national party committees raised $515,200,000 in hard money

and $496,100,000 in soft money for a combined total of $1,011,300,000 in receipts.  In the 2005-

2006 cycle, the national party committees raised $903,400,000 in hard money alone.  (*Id*. at 3.)

391.    When the national political party committees were no longer able to raise

contributions of unlimited amounts, they were able to continue to raise comparable amounts of

money within the hard money limits by recruiting new donors.  (*See supra* Facts 374-390.)

**C.      SpeechNow Is Capable of Raising Significant Sums Within the
          Contribution Limits.**

392.    The Act's limits on contributions to political committees do not limit the

aggregate receipts available to SpeechNow.  (*See* 2 U.S.C. § 441a(a).)

393.    Under the Act, potential contributors, including the individual plaintiffs,

may contribute directly to SpeechNow up to the Act's individual and aggregate contribution

limits.  (2 U.S.C. §§ 431(11), 441a(a)(1)(C), 441a(a)(3); *see* 72 Fed. Reg. 5294, 5295 (Feb. 5,

2007).)  A "limitation upon the amount that any one person or group may contribute to a . . .

political committee entails only a marginal restriction upon the contributor's ability to engage in

free communication."  (*Buckley v. Valeo*, 424 U.S. 1, 21 (1976).)  The "overall effect" of dollar

limits on contributions is

> merely to require candidates and political committees to raise funds from a
> greater number of persons and to compel people who would otherwise contribute
> amounts greater than the statutory limits to expend such funds on direct political
> expression, rather than to reduce the total amount of money potentially available
> to promote political expression.  (*Id.*)

394.     SpeechNow remains free "to aggregate large sums of money to promote effective advocacy."  To increase receipts, SpeechNow can raise funds from a greater number of persons. (*Buckley v. Valeo*, 424 U.S. 1, 21 (1976); Keating Dep. at 48-49, FEC Exh. 11.)

395.     SpeechNow has made only minimal efforts to locate supporters and raise funds but has nevertheless already attracted a number of supporters and potential contributors. (*See infra* Facts 396 - 401.)

396.     In addition to the individual plaintiffs, another individual, Richard Marder, is willing and able to contribute at least $5,000 to SpeechNow.  (Am. Compl. (Doc. 28-02) ¶ 32.)

397.     As of mid-August 2008, 182 people had signed up on SpeechNow's website indicating that they were interested in receiving SpeechNow's newsletters.  (SNK0370-0372, FEC Exh. 20.)  Seventy-five (75) of those people indicated that they would be interested in making a donation.  (*Id.*)

398.     SpeechNow has voluntarily chosen not to accept *any* contributions during the pendency of this case, even contributions of less than $5,000, and has declined the contributions that have been offered to date.  (Keating Dep. at 165-166, FEC Exhibit 11; SpeechNow Response to FEC Interrogatory 9, FEC Exh. 105 at 23.)  Its fundraising has thus been "very limited."  (Keating Dep. at 166, 169, FEC Exh. 11.)

399.     Indeed, SpeechNow has spent less than $1,000 to date.  (Keating Decl. ¶ 31; Keating Dep. at 166, FEC Exh. 11; Spreadsheet, Keating Exh. 15, SNK0220-0221, FEC Exh. 20.)

400.     If it had chosen to accept contributions of up to $5,000 during the pendency of this case, SpeechNow could immediately raise $22,200 from Mssrs. Keating, Marder, Young, Russo, and Burkhardt.  (Am. Compl. (Doc. 28-02) ¶ 32.)

401.    SpeechNow could have raised additional funds from the 75 people who have already indicated an interest in making a donation, as well as from others if it were actively seeking to raise funds.  (SNK0370-0372, FEC Exh. 20; Keating Dep. at 166, FEC Exh. 11.)

402.    SpeechNow has received a considerable amount of free publicity through the media.  (*See infra* Facts 403-408.)

403.    Plaintiffs have affiliations with several prominent advocacy groups.  (*See supra* Facts 33, 71, *infra* Facts 411-423, 433, 435.)  David Keating also knows columnists and reporters, such as John Fund at the Wall Street Journal.  David Keating often sees Mr. Fund at events, and as Mr. Keating testified, "We cross paths often."  David Keating often receives emails from Mr. Fund at work.  (Keating Dep. at 176-177; FEC Exh. 11.)  David Keating sent Mr. Fund information about SpeechNow.  (Keating Dep. at 176-178, FEC Exh. 11; SNK0190-0192, FEC Exh. 20.)  David Keating also emailed George Will information regarding SpeechNow.  (SNK0193-0194, FEC Exh. 20.)

404.    As a result of SpeechNow's advisory opinion request submitted to the Commission and as a result of this litigation, SpeechNow has received publicity in a number of national newspapers, as well as online.  (Keating Dep. at 178-180, FEC Exh. 11; Bauer, *A Major Question Before The FEC: SpeechNow's Case For Independent Activity* (Nov. 29, 2007), available at

http://www.moresoftmoneyhardlaw.com/moresoftmoneyhardlaw/updates/outside_groups.html?AID=1144, SNK0190-0192, FEC Exh. 20; Samples, *The Politics of Free Speech Change for the Better*, available at http://www.cato-at-liberty.org/2007/12/02/the-politics-of-free-speech-change-for-the-better/ (Dec. 2, 2007), YOU0020-0021, FEC Exh. 24; Crabtree, *New 527 Group Takes Aim At Campaign Contribution Limits*, The Hill (Dec. 3, 2007), YOU0033-0034,

FEC Exh. 24; Jacob Sullum, *Ad Lib* (Dec. 5, 2007), available at

http://www.townhall.com/columnists/JacobSullum/2007/12/05/ad_lib, SNK0175-0176,

FEC Exh. 20; Gerstein, *New Group Seeks Changes For Political Fundraising*, New York Sun

(Dec. 6, 2007), YOU0031-0032, FEC Exh. 24; Kuhnhenn, *FEC Recommendation Could End Up*

*in Court*, USA Today (Jan. 22, 2008), YOUO0009-0012, FEC Exh. 24; Editorial, *Free*

*SpeechNow*, New York Sun (Jan. 24, 2008), FEC Exh. 138; Salant, *Split FEC Vote Leaves*

*SpeechNow Silenced*, Bloomberg/Newsroom (Jan. 24, 2008), SNK0505-0506, FEC Exh. 20;

Weigel, *SpeechNow Goes to Court* (Feb. 14, 2008), available at

http://www.reason.com/blog/show/124990.html, SNK0173, FEC Exh. 20; Mullins, *Free-Speech*

*Group Targets Campaign-Finance Law* (Feb. 14, 2008), available at

http://blogs.wsj.com/washwire/2008/02/14/free-speech-group-targets-campaign-finance-law/,

SNK0173, FEC Exh. 20; Bauer, *SpeechNow, in CourtNow* (Feb. 15, 2008), available at

http://www.moresoftmoneyhardlaw.com/moresoftmoneyhardlaw/updates/outside_groups.html?

AID=1197, SNK0199-202, FEC Exh. 20; *Suit Could Unleash Surge Of Money In 2008*

*Presidential Race*, The New York Sun (Feb. 15, 2008), FEC Exh. 20; *On Message*, Los Angeles

Times (Feb. 15, 2008), YOU0013-0014, FEC Exh. 24; McElhatton, *Suit Aims To Ease*

*Campaign Fundraising Limits,* The Washington Times (Feb. 15, 2008), YOU0014-0015,

FEC Exh. 24; BNA, *FEC To Oppose Bid For Court Injunction By Group Seeking Unlimited*

*Contributions* (Feb. 15, 2008), SNK0198-0202, FEC Exh. 24; Editorial, *Speak Easier*,

Wall Street Journal (Feb. 23, 2008), SNK0211-0212, FEC Exh. 24; Farnam, *Conservative Group*

*Challenges Portions Of Finance Law*, Wall Street Journal (Mar. 8, 2008), SNK0203,

FEC Exh. 24; *Suit Aims To Lift Campaign Finance Donor Limits,* The Washington Times

(Mar. 9, 2008), FEC Exh. 139; Will, *McCain and the* Oath, Newsweek (Mar. 10, 2008),

SNK0216-0218, FEC Exh. 20; Bauer, *SpeechNow Put Off For A While; A Damage Report*

(July 2, 2008), available at

http://www.moresoftmoneyhardlaw.com/moresoftmoneyhardlaw/updates/outside_groups.html?

AID=1294, SNK00206-0210, FEC Exh. 20.)

405.    Counsel for plaintiffs wrote an op-ed column that was published in the

Washington Post two days after this litigation was filed.  *Unfettered Speech, Now*,

Washington Post (Feb 16, 2008), YOU0018-0019, FEC Exh. 24.  Counsel for plaintiffs also

posted a piece about SpeechNow on a blog.  (Smith, *An Acid Test For Campaign Finance*

*Reform* (Dec. 7, 2007), available at

http://www.redstate.com/blogs/brad_smith/2007/dec/06/an_acid_test_for_campaign_finance_ref

orm, FEC Exh. 101.)

406.    SpeechNow and its counsel issued press releases and held at a press conference,

and SpeechNow created a website, www.SpeechNow.org.  (SNK0114-115, SNK0181,

SNK0183-0185, SNK0186-0187, SNK0198-0202, SNK0206-208, SNK0367-0369, SNK0463-

0465, SNK0489-0450, SNK0491, SNK0538-0538, FEC Exh. 20; CRA0001, FEC Exh. 2;

YOU0002, YOU0013-0017, FEC Exh. 24.)

407.    SpeechNow's website has led reporters and radio talk show hosts to contact

SpeechNow, which has granted interview requests that generated publicity that increased the

number of individuals who signed up on SpeechNow's website as supporters.  (SpeechNow

Response to FEC Interrogatory 9, FEC Exh. 105 at 23-24.)

408.    The publicity resulting from SpeechNow's legal actions has been good for the

organization.  As Mr. Keating testified, "Certainly our organization's been discussed in

newspaper accounts.  * * *  Well, generally speaking, publicity is good." (Keating Dep. at 179, FEC Exh. 11.)

409.    SpeechNow's organizers and supporters include a number of prominent activists and donors.  (*See infra* Facts 410-425.)

410.    David Keating was previously executive vice-president of the National Taxpayers Union ("NTU").  (Keating Dep. at 10, FEC Exh. 11.)   Under his guidance, NTU developed a political action committee that had "much success" in the 1994 elections.  (Keating Exh. 2 at 5, FEC Exh. 140; Keating Dep. at 10-12, FEC Exh. 11.)

411.    David Keating has been Executive Director of Club for Growth (in its various incarnations under the Internal Revenue Code) since 2000.  (Keating Dep. at 8-9, 15-17, 20-21, FEC Exh. 11.)  When the group was created the year before Mr. Keating began working there, it had only a handful of members, essentially its board of directors.  (Keating Dep. at 45, FEC Exh. 11.)  Under Mr. Keating's direction, CFG's membership increased fifteen-fold in his first approximately five years with the group and raised over $15 million, including over $5 million in hard-money donations, in a single election cycle.  (Keating Exh. 2 at 5, FEC Exh. 140; Keating Dep. at 10-12, FEC Exh. 11.)  Every year the membership total increased.  By early 2007, Club for Growth had grown to around 20,000-25,000 members under Mr. Keating's direction.  (Keating Dep. at 46, FEC Exh. 11.)  Club for Growth now has approximately 35,000 members.  (Keating Dep. at 45, FEC Exh. 11.)

412.    Mr. Keating was involved in the efforts to increase the membership of Club for Growth.  He "would supervise writing the mailings or helping design the website and things of that nature and finding lists to rent to ask people to join the organization, all those kinds of details."  (Keating Dep. at 49, FEC Exh. 11.)

413.    Club for Growth has maintained a separate segregated fund that registered with and reported to the Federal Election Commission as a political committee, both when its primary operating entity was a section 527 organization under the Internal Revenue code up until early 2007 and subsequently when its primary operating entity was a section 501(c)(4) organization. (Keating Dep. at 8-9, 20-21, 29-30, FEC Exh. 11.)

414.    CFG members have contributed to Club for Growth's PAC.  CFG PAC made independent expenditures supporting or opposing federal candidates.  Every election cycle, Club for Growth PAC's total receipts increased.  The statutory limit on contributions to Club for Growth PAC remains $5,000.  (Keating Dep. at 17-19, 48-49, FEC Exh. 11.)  David Keating attributed the increase in Club for Growth PAC's total receipts to the increasing number of CFG members.  "Primarily there were more members asked to give money.  So they had more people to ask to give money, you wind up raising more money."  (Keating Dep. at 49, FEC Exh. 11.)  Mr. Keating was "reasonably pleased by the increase" in total receipts.  (Keating Dep. at 48-49, FEC Exh. 11.)

415.    Club For Growth PAC's activity during the 1999-2000 and subsequent election cycles was as follows.

| Election Cycle | 1999-2000 | 2001-2002 | 2003-2004 | 2005-2006 | 2007-2008 |
|---|---|---|---|---|---|
| Total Receipts: | $127,730 | $452,953 | $1,910,454 | $2,865,338 | $2,554,567 |
| Total Expenditures: | $119,366 | $390,286 | $1,938,903 | $2,758,513 | $1,798,462 |
| Contributions to federal candidates: | $91,432 | $297,385 | $221,184 | $11,792 | $19,026 |
| Independent Expenditures: | $0 | $7,049 | $1,499,446 | $2,753,238 | $1,558,610 |

Totals for the 2007-2008 election cycle include data released by the Federal Election Commission on September 8, 2008, except for the independent expenditure total, which is based

on data released on September 17, 2008.  (Keating Exh. 5, FEC Exh. 141; Keating Dep. at 50-55, FEC Exh. 11.)

416.     SpeechNow's vice-president Jon Coupal is also President of the Howard Jarvis Taxpayers Association ("HJTA"), a 501(c)(4) nonprofit organization with more than 250,000 supporters.  (Coupal Dep. at 13; Howard Jarvis Taxpayers Association, About Us, http://www.hjta.org/aboutus (visited Feb. 26, 2008).)  HJTA advocates on behalf of California taxpayers.  Mr. Coupal's responsibilities include serving as chief executive officer of the organization and managing the organization.  This includes overseeing HJTA's lobbying efforts, including visiting legislative offices and informing legislators and their staffs of HJTA's position on issues.  Mr. Coupal also directs HJTA's litigation efforts.  Coupal Dep. at 13.

417.     HJTA has multiple political action committees: a federal committee, a state PAC and two state committees for the purpose of engaging in political activity supporting or opposing ballot initiatives.  (Coupal Dep. at 20-21, FEC Exh. 8.)

418.     HJTA also has a connected organization, the Howard Jarvis Taxpayers Foundation, a 501(c)(3) organization, which is the principal organization for funding litigation efforts and academic studies.  (Coupal Dep. at 21, FEC Exh. 8.)

419.     The entities connected with HJTA have separate boards of directors, but Jon Coupal sits on all the boards.  (Coupal Dep. at 22, FEC Exh. 8.)

420.     In his capacity as President of HJTA, Mr. Coupal writes a weekly column, called "California Commentary," which is sent by email to HJTA members and frequently published by daily and weekly newspapers in California.  (Coupal Dep. at 23-24, FEC Exh. 8.)

421.     Plaintiff Edward Crane is also the President of the Cato Institute, an established advocacy group that has been in existence for over thirty years.  (Crane Decl. (Doc. 2-5) ¶ 8; Keating Dep. at 132-133, FEC Exh. 11; Young Dep. at 25, FEC Exh. 19.)

422.     Mr. Young urged the Cato Institute to publicize SpeechNow's lawsuit and Mr. Crane agreed.  Mr. Young wrote in a November 16, 2007 email message to Mr. Crane, "My understanding is that IJ/CCP/SpeechNow plan to publicize the eventual suit, I believe, soon after the FEC rules against us.  Perhaps Cato should play a role in this."  (Young Exh. 10, YOU0023-0024, FEC Exh. 24.)  Mr. Crane responded, "Not as a participant, but certainly with studies, op-eds and forums."  (*Id.*)  Mr. Young replies, "That would be great."  (*Id.*)  After this litigation was filed on February 14, 2008, the Cato Institute sponsored a Policy Forum held on March 8, 2008 entitled "Freeing SpeechNow:  Free Speech and Association vs. Campaign Finance Regulation."  (SNK0503-0504, FEC Exh. 20.)

423.     Plaintiff Fred Young was president of his family business, Young Radiator Company, until he sold it approximately ten years ago.  Mr. Young describes himself as "partially" retired, and an investor.  He serves on the board of directors of a couple of "think tanks," including the Cato Institute and Reason Foundation.  (Young Dep. at 21-27, FEC Exh. 19.)

424.     Plaintiff Fred Young has supported both Club for Growth and Club for Growth PAC financially, beginning in 2000.  Mr. Young contributed $2,000 and $5,000 to Club for Growth in 2000 and 2001, respectively.  In subsequent years, Mr. Young contributed amounts in excess of $5,000 to Club for Growth:  $10,000 in both 2002 and 2003; $15,000 in 2004; and $25,000 in both 2005 and 2006.  (Young Dep. at 32-33; FEC Exh. 19, FEC Exhs. 45-46.)

425.    Plaintiffs are thus in a strong position to raise funds from a great number of donors.  (*See infra* Facts 426-430.)

426.    Plaintiffs are situated better in their "start-up" phase than many of the thousands of major-purpose entities that have managed to comply with the Act's contribution limits and reporting requirements for the last thirty plus years.  (*See* Summary of PAC Activity 1990-2006, FEC Exh. 99.)

427.    SpeechNow's decision not to accept any contributions while plaintiffs pursue this litigation is a voluntary choice based on SpeechNow's alleged preference to avoid registering as a political committee.  This decision is not mandated by anything in FECA.  Mr. Keating testified, "If I wanted to be a political committee, I would have filed as a political committee." (Keating Dep. at 167-168, FEC Exh. 11.)

428.    Mr. Keating's decision not to register SpeechNow as a political committee is influenced, in part, by his personal choices and his views regarding how he wants to spend his time.  Mr. Keating testified: "I have a lot of things to do, three kids, and a full-time job." (Keating Dep. at 169, FEC Exh. 11.)

429.    While this case is pending, the potential donors already identified could have financed SpeechNow's proposed independent expenditures by themselves through contributions within FECA's limits.  SpeechNow had planned advertisements that would cost $120,000. (SNK0236, FEC Exh. 20.)  The organization could have financed these advertisements with contributions from the approximately eighty people already interested in giving at an average contribution of less than $2,000, or it could have financed the advertisements with as few as 24 individual contributors giving the maximum of $5,000.  (*Id.*)

430.     Robust amounts of fundraising have occurred within the federal limits, including fundraising by nonconnected committees by appealing to a broad base of donors.  At its creation, SpeechNow already possesses significant advantages:  supporters with a great deal of experience in hard money fundraising, a considerable amount of exposure in the media, prominent organizers and donors, and interested donors lining up to contribute.  (*See supra* Facts 376-429.)

431.     SpeechNow's contributors are able to express themselves not only through contributions to SpeechNow, but also through contributions to candidates they support, unlimited independent expenditures, and unlimited donations to non-candidate issue groups.  (*See infra* Facts 432-437.)

432.     The Act's limits on contributions to political committees do not in any way limit independent expenditures by SpeechNow or any of the individual plaintiffs.  (2 U.S.C. § 441a(a). *See FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480 (1985); *Buckley v. Valeo*, 424 U.S. 1, 39-51 (1976).)

433.     Contributors to SpeechNow, including the individual plaintiffs, have demonstrated alternative ways to convey their views aside from making large contributions to SpeechNow.  This includes becoming directly involved in such groups as an officer or director, as plaintiffs Keating, Crane, Young have done.  Plaintiff Keating served as executive director of Club for Growth and Citizens Club for Growth.  (Keating Dep. at 8-9, 15-17, 20-21, FEC Exh. 11.)  Plaintiff Edward Crane is President of the Cato Institute.  (Crane Decl. (Doc. 2-5) ¶ 8; Keating Dep. at 132-133, FEC Exh. 11; Young Dep. at 25, FEC Exh. 19.)  Plaintiff Fred Young serves as a member of the board of directors of the Cato Institute.  (Young Dep. at 21-27, FEC Exh. 19.)

434.     Contributors to SpeechNow, including the individual plaintiffs, have donated directly to candidates and groups who share their views on the First Amendment and campaign finance laws.  Plaintiffs Keating, Young, Russo and Burkhardt have all contributed to such candidates and groups.  Keating Contribution Report, FEC Exh. 130; Young Dep. at 60-61, 68 (approximately three dozen contributions to federal candidates and their committees in the past ten years), FEC Exh. 19; Russo Dep. at 35 (contributions to Paul and Bush campaigns), FEC Dep. at 13; Burkhardt Dep. at 25-29, FEC Exh. 7.)   Plaintiff Fred Young has contributed to Republican Party committees and Club for Growth's PAC.  (Young Dep. at 65, FEC Exh. 19.)

435.     Contributors to SpeechNow, including the individual plaintiffs, can donate unlimited amounts of money directly to non-candidate issue groups that share their views. For example, Fred Young has donated to Club for Growth, the Cato Institute, the Center for Competitive Politics, and the Institute for Justice.  (Young Dep. at 68-69, 87, 90-91, FEC Exh. 19.)  Plaintiff Scott Burkhardt has donated to the Cato Institute, Reason Foundation, Heritage Foundation and others.  (Burkhardt Dep. at 26-29, FEC Exh. 7.)

436.     Contributors to SpeechNow, including the individual plaintiffs, also can make independent expenditures themselves, either performing tasks themselves or hiring persons to perform those tasks.  For example, plaintiffs have alleged that they could produce and air advertisements in a single media market (Indianapolis, Baton Rouge, or New Orleans) for less than $70,000.  Thus, Mr. Young, who allegedly is willing to contribute $110,000, could finance these or similar advertisements himself.  (Young Dep. at 92-93, FEC Exh. 19.)

437.     Technology has made purchasing of advertisements easier than ever.  There are several companies that now provide the means for individuals to pay to air advertisements. One company, Wide Orbit, Inc. dba VoterVoter.com, allows citizens to finance advertisements

for as little as $500.  (Advisory Opinion Request 2008-10, FEC Exh. 120.  *See*

http://www.votervoter.com/wot-tvad/.)  Another company, SaysMe.tv, represented by one of the

counsel for SpeechNow, allows citizens to place their own television advertisements on cable

television for as little as $50.  (Comment by SaysMe.tv on AOR 2008-10, FEC Exh. 121.

*See* http://www.saysme.tv/.)

### VI.   Political Committee Reporting Requirements Do Not Threaten The Survival of SpeechNow or Other Campaign Groups.

438.    The registration, recordkeeping and reporting obligations for nonconnected

committees are straightforward and are not burdensome.  (*See infra* Facts 439-452.)

439.    Any organization that qualifies as a political committee must register with the

Commission by filing FEC Form 1, a four-page form.  (2 U.S.C. § 433; FEC Form 1 and

Instructions, FEC Exh. 125-126.)

440.    Registration with the Commission is pretty straightforward.  Committees just file

FEC Form 1.  (Scott Dep. at 108-109, FEC Exh. 14.)

441.    Approximately 8,000 political committees currently are registered with the

Commission, but not all are active in the current election cycle.  (Scott Dep. at 77-79, 127-130,

FEC Exh. 14.)

442.    Political committees must file periodic reports for disclosure to the public of all

receipts and disbursements to or from a person in excess of $200 in a calendar year (and in some

instances, of any amount), as well as total operating expenses and cash on hand.  (*See* 2 U.S.C.

§§ 433-34.)

443.    Nonconnected political committees file their reports on FEC Form 3X.  Scott

Dep. at 124.  Any independent expenditures by nonconnected political committees are disclosed

on Schedule E.  (Scott Dep. at 124-125, 127, FEC Exh. 14; FEC Form 3X and Instructions, FEC Exh. 127-128.)

444.    Generally, the reporting requirements that apply to nonconnected political committees are not complicated.  While there may be some provisions of the regulations that are more complicated that others, the basic provisions regarding registration, fundraising and reporting are not complicated.  (Scott Dep. at 156, FEC Exh. 14.)

445.    It is not "burdensome for a group or individual to file reports of its receipts and disbursements with the Federal Election Commission."  Robert Hickmott, former DNC Associate Finance Director and DSCC Deputy Executive Director, believes it would not be burdensome "[b]ased on [his] experience at the DNC and DSCC, and because of the reporting I must do as a registered lobbyist before Congress. . . .  Although filing properly with the Commission may require some additional training, and certainly requires recordkeeping and other administrative tasks, thousands and thousands of PACs and other political committees have successfully registered and reported to the FEC over the course of the past 25 years."  (Hickmott Decl. ¶ 12, FEC Exh. 114.)

446.    Since 1990, the number of nonconnected committees has been increasing rather than decreasing.  This confirms that the reporting requirements have not inhibited the development and maintenance of committees.  (*See supra* Facts 376-383.)

447.    SpeechNow can handle registration and reporting as a political committee.  (*See infra* Facts 448-452.)

448.    Plaintiff David Keating is Treasurer of SpeechNow.  (*See supra* Fact 42.) If SpeechNow were to register and report with the Commission as a federal political committee,

David Keating, as treasurer, would be the one responsible for ensuring that the reports are filed. (Keating Dep. at 181, FEC Exh. 11.)

449.    As noted earlier, Mr. Keating developed a successful PAC at the National Taxpayers Union.  (*See supra* Fact 410.)  Mr. Keating assisted NTU PAC with its reporting obligations under the Act.  (Keating Dep. at 29-30, FEC Exh. 11.)

450.    Mr. Keating also has directed Club for Growth's highly successful PAC since 2000.  (*See supra* Fact 414.)  Mr. Keating has assisted Club for Growth PAC with its reporting obligations under the Act by "help[ing] the organization determine what its obligations were and help to see that it had the systems in place to make sure the reports are filed properly."  (Keating Dep. at 29-30, FEC Exh. 11.)

451.    David Keating admitted, in his remarks at a policy forum sponsored by The Cato Institute about this litigation, that he understands the legal requirements under the Act for reporting by political committees and can perform the duties of treasurer, stating "I can handle it."  He also said, with respect to fundraising under the Act, "I think I can handle it." (Partial Transcript of Policy Forum "Freeing SpeechNow: Free Speech and Association vs. Campaign Finance Regulation" (March 5, 2008) at 3, FEC Exh. 129.)

452.    At deposition, Mr. Keating acknowledged that he could perform the responsibilities of treasurer of SpeechNow, saying "I'm sure I could do it."  (Keating Dep. at 180-181, FEC Exh. 11.)   David Keating "generally" understands the requirements for reporting by nonconnected political committees.  (Keating Dep. at 180, FEC Exh. 11.)

Respectfully submitted,

Thomasenia P. Duncan
(D.C. Bar No. 424222)
General Counsel

David Kolker
(D.C. Bar No. 394558)
Associate General Counsel

Kevin Deeley
Assistant General Counsel

Robert W. Bonham III
(D.C. Bar No. 397859)
Senior Attorney

Vivien Clair
Steve N. Hajjar
Greg J. Mueller
(D.C. Bar No. 462840)
Graham Wilson
Attorneys

October 28, 2008                    FOR THE DEFENDANT
                                    FEDERAL ELECTION COMMISSION
                                    999 E Street NW
                                    Washington, DC 20463
                                     (202) 694-1650